Transcript of the Testimony of

# ANGELA GRIFFIN

July 1, 2019

JESSIE CRITTINDON, ET AL v. MARLIN GUSMAN, ET AL



P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA


JESSIE CRITTINDON, et          CASE NO.
al.,                           3:17-cv-00512-SDD-EWD
     Plaintiffs,
v.
MARLIN GUSMAN, et al.,
     Defendants.


c/w


EDDIE COPELIN, et al.,         CASE NO.
     Plaintiffs,               3:17-cv-00602-SDD-EWD
v.
MARLIN GUSMAN, et al.,
     Defendants.


     DEPOSITION OF ANGELA GRIFFIN, taken at the
LOUISIANA DEPARTMENT OF CORRECTIONS, 504
MAYFLOWER STREET, BATON ROUGE, LOUISIANA 70802,
in the above-entitled cause on the 1st of
July, 2019, commencing at 12:27 p.m.


REPORTED BY:CHERIE' E. WHITE
            CCR (LA), CSR (TX), CSR (MS), RPR
            CERTIFIED COURT REPORTER



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   APPEARANCES:
 2   ATTORNEYS REPRESENTING THE PLAINTIFFS, JESSIE
 3   CRITTINDON AND EDDIE COPELIN, ET AL:
 4
 5   RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
 6   4400 South Carrollton Avenue
 7   New Orleans, Louisiana  70119
 8   Phone: (504) 620-2259
 9   (BY: Emily Washington, Esquire)
10   E-mail: emily.washington@macarthurjustice.org
11   (BY: Hannah Lommers-Johnson, Esquire)
12   E-mail:hannah.lommersjohnson@macarthurjustice.org
13   (BY: James Craig, Esquire)
14   E-mail: james.craig@macarthurjustice.org
15
16   ATTORNEYS REPRESENTING THE DEFENDANT, STATE OF
17   LOUISIANA, LOUISIANA DEPARTMENT OF JUSTICE:
18
19        LOUISIANA DEPARTMENT OF JUSTICE
20        1885 N. Third Street, Floor 4
21        Baton Rouge, Louisiana 70802
22        Phone: (225) 326-6085 |Fax: (225) 326-6099
23
24        (BY: James "Gary" Evans, Esquire)
25        E-mail: evansj@ag.louisiana.gov
```



1    APPEARANCES CONTINUED:

2

3    ATTORNEYS REPRESENTING THE DEFENDANTS, EAST

4    CARROLL PARISH SHERIFF'S OFFICE:

5

6    USRY & WEEKS, PLC

7    1615 Poydras Street, Suite 1250

8    New Orleans, Louisiana  70112

9    Phone: (504) 592-4600 |Fax: (504) 592-4641

10   (BY: Ronald Shane Bryant, Esquire)

11   E-mail: sbryant@usryweeks.com

12   (By Telephone)

13

14   ATTORNEYS REPRESENTING THE DEFENDANT, ORLEANS

15   PARISH SHERIFF'S OFFICE:

16

17        RODRIGUE & ARCURI LAW GROUP

18        201 St. Charles Avenue, Suite 114-412

19        New Orleans, Louisiana  70170

20        Phone: (504) 249-6990

21

22        (BY: Pete Matthews, Esquire)

23        E-mail: pm@rodriguearcuri.com

24        (By Telephone)

25



```
1        E X A M I N A T I O N   I N D E X

2

3   BY:                                        PAGE

4    Ms. Washington                             6

5

6              E X H I B I T S

7

8   NO.   DESCRIPTION                          PAGE

9   30    1/2017 E-mail Chain                   66

10  31    Pre-Class Packet Information          66

11  32    Lean Six Sigma Study                  92

12  33    Pre-Class Policy                     118

13  34    2017 Legislature Audit               135

14  35    Excerpt from Mr. Crittindon's File   145

15  36    12/16/16 E-mail                      158

16  37    Excerpt from Mr. Burse's File        165

17  38    Excerpt from Mr. Copelin's File      166

18  39    Excerpt from Mr. Dominick's File     167

19  40    Excerpt from Mr. Guidry's File       169

20  41    E-mails Regarding Mr. Burse          170

21  42    E-mails Regarding Mr. Guidry         191

22  43    2nd Step Response Form, Mr. Guidry   203

23  44    2nd Step Response Form,              203

24         Mr. Crittindon

25  45    1/5/17 E-mail                        208
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              S T I P U L A T I O N

 2

 3        IT IS HEREBY STIPULATED AND AGREED by and

 4   between counsel for the parties hereto that the

 5   deposition of the aforementioned witness is

 6   hereby being taken under the Louisiana Code of

 7   Civil Procedure, Article 1421, et seq., for all

 8   purposes, in accordance with law;

 9        That the formalities of reading and signing

10   are specifically NOT waived;

11        That the formalities of sealing,

12   certification and filing are specifically waived;

13        That all objections, save those as to form

14   of the question and the responsiveness of the

15   answer, are hereby reserved until such time as

16   this deposition, or any part thereof, may be used

17   or sought to be used in evidence.

18                  *   *   *   *

19        CHERIE E. WHITE, Certified Court Reporter,

20   in and for the Parish of Orleans, State of

21   Louisiana, officiated in administering the oath.

22

23

24

25
```



```
 1               ANGELA GRIFFIN,
 2   LOUISIANA DEPARTMENT OF CORRECTIONS, 504
 3   MAYFLOWER STREET, BATON ROUGE, LOUISIANA 70802,
 4   fter having first been duly sworn by the
 5   above-mentioned Court Reporter did testify as
 6   follows:
 7   EXAMINATION BY MS. WASHINGTON:
 8         Q.    Good afternoon, Ms. Griffin.
 9         A.    Good afternoon.
10         Q.    My name is Emily Washington.  My
11   colleagues, Hannah Loomers-Johnson and James
12   Craig, are going to be joining me for this
13   deposition.  We all represent the plaintiffs in
14   the matter that brings us all here today.
15               Could you please introduce yourself
16   just for the record?
17         A.    Okay.  I'm Angela Griffin.  I'm the
18   administrative program director over pre-class
19   for Department of Corrections.
20         Q.    And, Ms. Griffin, have you had your
21   deposition taken before?
22         A.    Yes.
23         Q.    Without going into too much detail,
24   can you tell me just a little bit about the other
25   cases or context in which you've had your
```

```
 1    deposition taken?

 2         A.    I mean, where or what they are about

 3    or --

 4         Q.    Sure.  Let me ask it this way.

 5         A.    Okay.

 6         Q.    How many other times have you had

 7    your deposition taken?

 8         A.    Twice.

 9         Q.    Okay.  And, in those two other

10    cases, were you being deposed in your

11    professional capacity as an employee of the

12    Department of Corrections?

13         A.    Yes.

14         Q.    Okay.  And were you being deposed as

15    yourself, Ms. Griffin, or as a 30(b)(6)

16    representative for the Department; do you know?

17         A.    I'm not sure.

18         Q.    Okay.

19         A.    Okay.

20         Q.    So when you were deposed before, I'm

21    guessing whoever was taking your deposition went

22    over some basic ground rules.  I am going to go

23    over with them with you as well just to make sure

24    that we are on the same page for the next couple

25    of hours here.
```

1    A.    Okay.

2    Q.    So we have a court reporter sitting

3  at the end of the table.  She's going to be

4  taking down everything that we say, so I just ask

5  that you make your answers audible; yeses and nos

6  rather than nodding or shaking of the head as we

7  do.

8    A.    Okay.

9    Q.    You just took an oath.  It's the

10  same oath you would take as if you were

11  testifying in court, so we are just looking for

12  truthful and complete answers today.  Fair

13  enough?

14    A.    Okay.  Fair.

15    Q.    If at any point during your

16  questioning today I ask you something that is

17  confusing or complicated or unclear, please let

18  me know.

19    A.    Okay.

20    Q.    I will be happy to try to rephrase

21  it or simplify it or see if we can get on the

22  same page.  Fair enough?

23    A.    Okay.

24    Q.    If you don't ask me to rephrase a

25  question or clarify, I'm going to assume that you

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/17/2017

```
 1    understand the question that I have asked and
 2    that you are answering that question, okay?
 3         A.    Okay.
 4         Q.    I am happy to take any breaks that
 5    you need to take today or if you need to speak
 6    with your attorney, that's okay as well.
 7         A.    Okay.
 8         Q.    I just ask that if I have a question
 9    out on the table, that you give me your answer
10    and then we'll take a break after that?
11         A.    Okay.
12         Q.    If at any point during our
13    questioning today if you think about something
14    that maybe came up earlier in our conversation,
15    please just let me know.  I'm happy to supplement
16    the record or make corrections on the record so
17    long as you just let me know.
18         A.    Okay.
19         Q.    And, lastly, is there anything,
20    medication that you're taking, sleep deprivation,
21    other hardships that would keep you from giving
22    complete and truthful testimony today?
23         A.    No.
24         Q.    Okay.  Great.  Let's get started.
25    Very briefly, can you walk me through your
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    educational history?

2          A.    I have a high school diploma.

3          Q.    And where did you receive that from?

4          A.    It was called Sunshine High School

5    at the time.

6          Q.    That sounds nice.  Where is that?

7          A.    It's in Iberville Parish.

8          Q.    Did you take any college courses?

9          A.    No.

10          Q.    What about any other kind of

11    vocational or specialized training, school of any

12    sort?

13          A.    I've taken courses when I worked for

14    a bank, not since.

15          Q.    And what were those courses --

16          A.    I'm trying to think of what they

17    were.

18          Q.    -- focused on?

19          A.    It was on accounting.

20          Q.    Okay.  And you are currently

21    employed by the Department of Public Safety and

22    Corrections, correct?

23          A.    Yes.

24          Q.    And I will warn you right now that

25    during questioning today I'm probably going to

```
 1    use DOC --
 2            A.     That's okay.
 3            Q.     -- and DPS&C interchangeably, maybe
 4    some other variations, but you will understand
 5    what I'm meaning, correct?
 6            A.     Correct.
 7            Q.     Okay.  Good.  And you mentioned that
 8    your job title is administrative program director
 9    over pre-class, correct?
10            A.     Correct.  The job title is basically
11    administrative program director.
12            Q.     Okay.  And then pre-class is the
13    department?
14            A.     Is the department, correct.
15            Q.     And am I correct in understanding
16    that the pre-class department falls inside of the
17    Office of Adult Services?
18            A.     Correct.
19            Q.     Okay.  And all of that is within the
20    Department of Corrections?
21            A.     Correct.
22            Q.     Okay.  And so as the administrative
23    program director, are you head of the pre-class
24    department?
25            A.     Yes.
```

1          Q.     And how long have you been in that
2    position?
3          A.     Since 2013.
4          Q.     Were you employed with the
5    Department of Corrections prior to 2013?
6          A.     Yes.
7          Q.     When did you first start with the
8    department?
9          A.     1995.
10         Q.     Between 1995 and 2013, what other
11   positions have you held with the Department?
12         A.     I started as clerical in the mental
13   health department at Hunt Correctional,
14   transferred to the classification clerical,
15   promoted up to a position -- I'm not sure what
16   the title is -- in the pharmacy at Hunt, then I
17   promoted to a classification officer and was
18   still a classification -- considered
19   classification officer but changed to the
20   pre-class department at Hunt Correctional Center
21   and became a supervisor in -- as a classification
22   officer supervisor in pre-class, then came to
23   headquarters in 2000 -- I can't remember if it
24   was 2008 or '09 and as an ESO supervisor and
25   promoted to an executive management position, and

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554 Hammond LA 70404     Fax 985.419.0799

```
1    then I became the administrative program director
2    in 2013.
3         Q.    Okay.  And just to make sure I
4    understand since that was a lot of information.
5    When you were working as a classification
6    officer, that was at Elayn Hunt?
7         A.    Correct.
8         Q.    And what were your job
9    responsibilities in that position?
10        A.    Working with the-- talking to the
11   offenders and classifying where they needed to be
12   housed depending on their release dates or --
13        Q.    Okay.  So am I correct in
14   understanding that that was largely focused on
15   the housing of prisoners within the Elayn Hunt
16   facility?
17        A.    And verifying the offender is the
18   right offender coming in.
19        Q.    Okay.  So you also had a role in
20   intake?
21        A.    Because there is an intake, correct.
22        Q.    Okay.  And it sounds like -- did you
23   also have a role with release of offenders when
24   you were in that capacity?
25        A.    We would get the offenders'
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

 1    addresses or things like that, but not the actual

 2    release.

 3           Q.    Okay.  And you stated that following

 4    that you moved into a role with pre-class at

 5    Elayn Hunt?

 6           A.    Correct.

 7           Q.    And what were your job

 8    responsibilities when you moved over to the

 9    pre-class department?

10           A.    Processing new convictions, working

11    their release dates, entering their information

12    in the computer and working their release dates

13    and handling releases.

14           Q.    And so in that job you were

15    responsible for performing time computations?

16           A.    Yes.

17           Q.    How long were you in that position

18    at Elayn Hunt?

19           A.    I'm -- I would have to guess.

20           Q.    Can you give me a rough estimate?

21           A.    I'm going to say roughly five to six

22    years.

23           Q.    Okay.  And that would be five to six

24    years while you were working as a pre-class

25    officer at Elayn Hunt?

1    A.    Right.  As a -- in the pre-class
2  department, yes.
3    Q.    Okay.  Does that include the years
4  when you became a supervisor in that department?
5    A.    Some of that may, because I was a
6  supervisor only a little while before I moved
7  here.
8    Q.    Okay.  Is a "little while" less than
9  a year?
10    A.    A little -- less than a year.
11    Q.    Okay.  And that supervisory role was
12  over the pre-class officers who were working at
13  Elayn Hunt; is that correct?
14    A.    Yes.
15    Q.    And at the time that you were in the
16  pre-class department at Elayn Hunt, were you-all
17  performing time computations for people sentenced
18  all over the State of Louisiana?
19    A.    For the -- I got to think a while.
20  For the southern parishes --
21    Q.    Okay.
22    A.    -- only.
23    Q.    And roughly what years was that
24  between the five to six years that we've been
25  talking about?

```
 1            A.    I'm thinking -- and this -- again,
 2    I'm not --
 3            Q.    It's not a quiz.
 4            A.    -- positive of the dates, yeah.  But
 5    roughly between '96, early '97 through I'm going
 6    to say right before -- '13, probably about '12 as
 7    the -- in the department and then the supervisor
 8    in 2008 or '09.
 9            Q.    Okay.  So that would be sort of a
10    span it looks like of actually like about
11    11 years that you were spending --
12            A.    Okay.
13            Q.    -- doing pre-class?
14            A.    Maybe so.
15            Q.    Okay.  Okay.  And you mentioned that
16    when you came over to headquarters in 2008 or
17    2009 you were working as an EOS supervisor?
18            A.    It's an executive -- I'm trying to
19    think of what the name of it was.  It's a --
20    supervisor levels.
21            Q.    Okay.  And was that within the
22    pre-class department?
23            A.    No.
24            Q.    Okay.  Where was that?
25            A.    That was in the Office of Adult
```

```
1   Services.
2        Q.     And what was your -- what were your
3   job responsibilities when you were working as the
4   supervisor in the Office of Adult Services?
5        A.     I handled some letters and things
6   for the chief of operations at the time and went
7   around the southern institutions training on
8   pre-class and time comp.
9        Q.     And when you say the "southern
10  institutions," which facilities would that
11  include?
12       A.     It's Rayburn Correctional.  I'm
13  trying to think of which other ones were here.
14  Some at Hunt, and I went to -- it was Phelps
15  Correctional at the time.
16       Q.     And all of these facilities that you
17  just mentioned, these are all facilities that are
18  run by the Department of Corrections?
19       A.     Correct.
20       Q.     Did you do any of the training on
21  pre-class and time computation at local
22  facilities or jails?
23       A.     Not -- they don't handle time
24  computation at the jail, so I never did that.  I
25  have been to some of the jails that have
```



1    requested some help showing what we needed when
2    they got newer employees and they would request
3    us to help.  Either they came here or we have
4    went there, if they were close by.  I think we
5    went to St. Mary, but very few.
6         Q.    Okay.  Do you happen to remember
7    other than St. Mary other parishes?
8         A.    Iberia and that -- I'm trying --
9    that may be the only ones.  That's the ones I
10   remember.
11        Q.    Okay.  So the ones that you remember
12   requesting pre-classification training would be
13   St. Mary and Iberia?
14        A.    Right.
15        Q.    Okay.  And how long were you in this
16   role as the EO -- EOS supervisor within adult
17   services?
18        A.    I'm going to say about right at two
19   years, maybe a little less.
20        Q.    So that would put us around 2010,
21   2011; is that correct?
22        A.    Correct.
23        Q.    And then you moved over to an
24   executive management position?
25        A.    Management, correct.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1          Q.     And what department or section was
 2     that located in?
 3          A.     The same department, just the
 4     supervision -- my supervision changed,
 5     supervisor.
 6          Q.     Okay.
 7     MR. BRYANT:
 8              Hey, guys.  Pete -- sorry to
 9          interrupt.  Pete is at the sheriff's
10          office, and I have that number if you guys
11          are ready.
12     MS. WASHINGTON:
13              Let's go off the record for a minute
14          and we will try to get Pete on the phone.
15          (A short recess was taken.)
16     BY MS. WASHINGTON:
17          Q.     Okay.  We can go back on the record.
18     So we were talking about your position, your
19     executive management position which was still
20     within the Office of Adult Services, correct?
21          A.     Correct.
22          Q.     And what were your job
23     responsibilities in that position?
24          A.     Still the same thing, the training.
25     I handled parts of the escapes and fugitive
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    processes.  I'm trying to think back.  And I
2    still helped with any questions that maybe the
3    outside field needed answered.  I would get the
4    questions to help with any time comp concerns or
5    anything.
6            Q.    And by "outside field," do you mean
7    other institutions?
8            A.    Anywhere, even if it's institutions
9    or parishes that have concerns and they would
10   call.
11           Q.    Okay.  So if people either in local
12   jail facilities or other DOC facilities had
13   questions about time computation and pre-class,
14   you would be fielding those questions?
15           A.    Correct.
16           Q.    And you were in that position from
17   roughly 2010, 2011 until you took on your
18   position as head of the pre-class department in
19   2013; is that correct?
20           A.    Correct.
21           Q.    When you were working as the EOS
22   supervisor and then in the executive management
23   position within the Office of Adult Services, who
24   were you reporting to?
25           A.    The -- when I was the ESO, the

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1  executive supervisor position, it was to Jeff

2  Travis, the chief of operations.  And when I

3  switched over to the executive management

4  position, it was Linda Ramsey.

5        Q.    And what was her job title?

6        A.    I'm -- I'm not sure.

7        Q.    Okay.  Was she also part of the

8  Office of Adult Services?

9        A.    Yes.

10       Q.    And am I correct that the -- the

11 position that we've been referring to with an

12 acronym, is it ESO?

13       A.    There's one that's ESO.  It's

14 Executive Supervisor Officer.  I think that's the

15 title it was.

16       Q.    Okay.  I think I wrote it down as

17 EOS before --

18       A.    Okay.

19       Q.    -- but it should be ESO.  I think I

20 understand now.  We are going to talk a little

21 bit more about your current position, but before

22 we move on to that, prior to your employment with

23 the Department of Corrections in '95, can you

24 give me a rough history of any other employment

25 experience that you had?

```
 1          A.     I worked for the Iberville Trust and
 2    Savings Bank for I guess it was about seven
 3    years, then I changed to a -- a credit union, a
 4    Louisiana credit union for a couple of -- about a
 5    year and a half, and then I changed to a company
 6    that was -- I'm trying to think of the name.  A
 7    construction company as clerical, keep their
 8    books, just little -- it was a little business.
 9    And then moved from that one to another company,
10    a valve company, which was the same thing I did,
11    accounting, pay bills, the bill paying and things
12    like that.
13          Q.     Okay.  Would it be fair to say that
14    prior to joining the Department of Corrections
15    your work experience was largely banking and
16    accounting and clerical work?
17          A.     Correct.
18          Q.     Okay.  Have you worked for any other
19    law enforcement or correction agency?
20          A.     No.
21          Q.     As the administrative program
22    director, you supervise the pre-class department,
23    correct?
24          A.     Correct.
25          Q.     Can you define pre-class for me?
```

```
1            A.      And first I wanted to clarify that.
2            Q.      Sure.
3            A.      Supervise the pre-class, I
4     supervisor the pre-class department that is here
5     at headquarters.
6            Q.      Okay.
7            A.      Okay.
8            Q.      And I think we'll get to that in a
9     minute --
10           A.      Okay.
11           Q.      -- but while we are on that topic,
12    let me just ask you this.  Are there other
13    pre-class departments within the Department of
14    Corrections?
15           A.      Yes.
16           Q.      And where are those located?
17           A.      It's at David Wade Correctional.
18           Q.      Is that the only other pre-class
19    department?
20           A.      Yes.  Well, I'm saying that.  Now
21    that I remember, there is one more that does it
22    now that started about a year ago, Raymond
23    Laborde Corrections.
24           Q.      And you indicated that Raymond
25    Laborde started having a pre-class department
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    about a year ago?

2         A.    It's about a year ago I guess, maybe

3    a little bit longer.  I'm not positive of the

4    date.

5         Q.    I will represent to you that the

6    facts that underlie this litigation largely took

7    place in 2016 and 2017.

8         A.    Uh-huh (affirmatively).

9         Q.    Am I correct that during that time

10   period the two pre-class departments that would

11   have been operating would have been here at

12   headquarters and at David Wade?

13        A.    Yes.

14        Q.    Okay.  Now, let's talk about

15   pre-class just so we are on the same page because

16   I think we are going to be using that term a lot.

17   Can you define pre-class for me, what your

18   understanding of it is?

19        A.    It's pre-classification of an

20   offender once he's convicted and sentenced to the

21   Department of Corrections to serve hard labor.

22   And it's the paperwork that lets Department of

23   Corrections know an offender received hard labor

24   and how much time he received and who the

25   offender is that we can process the pre-class --

```
 1    the paperwork to process him in our system and
 2    work his release dates.
 3            Q.     Am I correct in understanding then
 4    that the pre-class department is responsible for
 5    performing time computations and thereby
 6    establishing release dates for persons who are
 7    sentenced to the Department of Corrections?
 8            A.     Yes, on hard labor sentence, yes.
 9            Q.     And drilling down on that a little
10    bit, the pre-class department is responsible for
11    initial time computations?
12            A.     Initial time comp or any re-time
13    comps of re-sentences or any loss of time they
14    get or any educational credits.  We re-time, we
15    do the time comp.
16            Q.     Okay.  So the pre-class department
17    at headquarters that you supervise is responsible
18    for both initial time computations as well as
19    recalculations?
20            A.     As long as they are offenders housed
21    in the parish -- in a parish jail.
22            Q.     Okay.  If they are housed not in a
23    parish jail, who is responsible for the
24    recalculations?
25            A.     If they are housed in a state
```



```
 1   institution, each state institution has a records
 2   department that handles that.
 3          Q.     Am I correct that just for the piece
 4   that's the initial time computations, does the
 5   pre-class department handle all of those across
 6   the state?
 7          A.     Handle --
 8          Q.     The time, initial time computation?
 9          A.     Yes.  Each pre-class department
10   handles whatever the parish that belongs to the
11   pre-class department, yes --
12          Q.     Okay.
13          A.     -- initial.
14          Q.     I guess I just want to make sure
15   that I'm understanding all of this.
16          A.     Yeah.
17          Q.     But initial time computation is not
18   happening in the records department of the
19   individual DOC facilities, correct?
20          A.     With the exception of maybe Hunt
21   Correctional and right now Raymond Laborde
22   handles initial time comp now, which they are
23   part of pre-class.  Now, Hunt Correctional may do
24   initial time comp because they have offenders
25   that go straight there from transfer out of state
```

GRIFFIN, ANGELA - 7/11/2019

```
 1   and things like that and they have to do the
 2   initial because he's housed at their facility.
 3           Q.    Okay.  But by and large when persons
 4   across the State of Louisiana are initially
 5   sentenced to time at Department of Corrections
 6   and need to have their initial computation, that
 7   work is being performed by the pre-class
 8   department here at headquarters as well as at
 9   David Wade and now Raymond Laborde; is that
10   correct?
11           A.    Correct.  Once we get the paperwork,
12   we do the initial.
13           Q.    And the pre-class department at
14   headquarters is located in the building that we
15   are in today?
16           A.    No.  It's in building -- it's right
17   outside.  I think it's Building 5 I think.
18           Q.    Okay.  But it's at this Mayflower --
19           A.    Correct.
20           Q.    -- complex?
21           A.    Correct.
22           Q.    Okay.  How many people work within
23   the pre-class department that's located here at
24   headquarters?
25           A.    Fifty two.
```

GRIFFIN, ANGELA 07/12/2019

```
 1          Q.    And you supervise those 52
 2   employees?
 3          A.    I'm -- yes.  I'm over the
 4   department.  I have managers and -- yes.
 5          Q.    Can you tell me a little bit about
 6   the rough organizational structure under you
 7   within the pre-class department here at
 8   headquarters?
 9          A.    Sure.  I have two managers who are
10   under me and then under them there's five
11   supervisors, and each supervisor has roughly
12   eight.  There's a few employees under them, and
13   then we have one clerical.  I'm trying to think
14   if that's all.
15          Q.    Has that been the structure within
16   the pre-class department for a while?
17          A.    When pre-class moved here in 2013,
18   we had managers, supervisors, maybe not as many
19   people as we did then.  We have more.
20          Q.    But the basic structure that you
21   just --
22          A.    Structure --
23          Q.    -- described has been the same since
24   2013?
25          A.    Yes.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond  LA  70404     Fax 985.419.0799

```
 1          Q.     How do you supervise the work of
 2    everyone within the pre-class department?
 3          A.     Pretty much if -- if I get any --
 4    ask any question, I'll get the question, try and
 5    figure it and hand it to my managers to make sure
 6    the work gets -- they check with their
 7    supervisor, see if the work is here or if we need
 8    to do something with it or --
 9          Q.     And who -- who are the two managers
10    currently that work under you?
11          A.     Elizabeth Tigner (phonetically
12    spelled) and Tessie Cooley.
13          Q.     And how long have they been in those
14    positions?
15          A.     Tessie, she's here at headquarters
16    -- she's been here since 2013.  She moved here
17    when pre-class moved here.  And then I don't know
18    how much time she's had in the same position
19    where -- in -- at Angola.  And Elizabeth Tigner,
20    this go round she's been here since I think
21    October of last year.  She was a manager prior to
22    that here and retired and has come back.
23          Q.     Does the Department of Corrections
24    conduct any sort of regular performance
25    evaluations for stuff?
```

1      A.    Yes.

2      Q.    How does that process work?

3      A.    We have a performance that has to be

4  done every year.  It's yearly, so they -- each

5  supervisor handles their employee's performance

6  and has to fill out the performance evaluation.

7      Q.    Is there a form that's used for

8  these annual performance evaluations?

9      A.    Yes.

10     Q.    Are you responsible as the

11 supervisor for completing these evaluations for

12 the pre-class department?

13     A.    I am responsible for completing the

14 ones on my managers.

15     Q.    Okay.

16     A.    It's each supervisor over whoever

17 has to do theirs.

18     Q.    Okay.  Am I correct then that you

19 would complete the performance evaluations for

20 the two managers under you?

21     A.    Yes.

22     Q.    And then those two managers would

23 complete the performs evaluations for the five

24 supervisors under them?

25     A.    Yes.



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

 1          Q.     And then those five supervisors
 2    would complete the performance evaluation for all
 3    of the employees under them?
 4          A.     Yes.
 5          Q.     Okay.  I think I got it.  Who are
 6    those review forms sent to?
 7          A.     HR.
 8          Q.     Do you know what the reviews are
 9    used for, what happens to them after you send the
10    review to HR?
11          A.     I'm not -- not really sure.  I mean,
12    I know that our pay scale, pay goes on it now,
13    but in the past, I'm not sure.
14          Q.     Are the performance evaluations the
15    main way by which pay raises are considered and
16    then provided as necessary?
17          A.     They can keep someone from getting
18    their yearly -- if we -- if we receive a yearly
19    pay increase, it can stop someone from getting
20    that.
21          Q.     Okay.  So a negative performance
22    review could stop someone from getting their
23    yearly pay increase?
24          A.     Correct.
25          Q.     Who does your performance

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond  LA  70404     Fax 985.419.0799

```
 1   evaluation?
 2          A.    Derrick Ellis.
 3          Q.    Okay.  And what is his position
 4   title?
 5          A.    Deputy assistant secretary.
 6          Q.    Okay.  Is it also sometimes referred
 7   to as an assistant deputy secretary?
 8          A.    I get the two confused sometimes, so
 9   I got to stop and think about it, but it's deputy
10   assistant secretary.
11          Q.    Okay.  I guarantee you that I will
12   get those terms confused within the next few
13   minutes.  We spoke earlier today with Monisa
14   Lentz.  You're familiar with Ms. Lentz?
15          A.    Yes.
16          Q.    And what is your understanding of
17   what her title or -- or job responsibilities are?
18          A.    I do not know.  You know, she's not
19   in pre-class, so I don't know what she does.
20          Q.    What office does she work in?
21          A.    I'm not sure who she's assigned to.
22          Q.    Okay.  Do you know if she works
23   within the Office of Adult Services?
24          A.    I'm not sure.  That section's
25   assigned to adult services.  I'm not sure.
```

```
 1          Q.    And I want to ask you just about a
 2   couple of other individuals because they are
 3   names that are going to come up on various
 4   documents that we might look at today.  Are you
 5   familiar with Raven Groom?
 6          A.    Yes.
 7          Q.    And what is your understanding of
 8   where Ms. Groom works or worked?
 9          A.    I know she works with Monisa.
10          Q.    But you are not sure where either of
11   them are employed?
12          A.    No.
13          Q.    Do you know if Ms. Groom is still
14   with the department?
15          A.    I'm not sure.
16          Q.    Do you know Barbara McMullen?
17          A.    Yes.
18          Q.    And what is her role within the
19   department, to your knowledge?
20          A.    I'm not sure.
21          Q.    Do you know which division she works
22   within?
23          A.    No.
24          Q.    With respect to Ms. Lentz, how have
25   you come into contact with her within the
```

GRIFFIN, ANGELA 7/19/2019

```
1   department?  Are there particular topics or
2   issues you've dealt with her on?
3           A.      We may get an e-mail if she receives
4   a phone call, but --
5           Q.      What sorts of phone calls does she
6   e-mail you about?
7           A.      Just if a family member's checking
8   on an offender's case or any phone calls that
9   they would get from family and an offender is
10  still in a parish jail.
11          Q.      And by the same token, how in your
12  work at the department have you come into contact
13  with Ms. Groom?
14          A.      She would send us some e-mails every
15  once in a while.
16          Q.      The same types of e-mails?
17          A.      Yes.
18          Q.      And what about Ms. McMullen?
19          A.      She would transfer phone calls to
20  us.
21          Q.      What kind of phone calls would she
22  transfer?
23          A.      It could be anywhere from the parish
24  jail calling or a family member of the offender.
25          Q.      What number does Ms. McMullen use to
```

```
 1    transfer phone calls to you?
 2           A.    I'm not sure of the number.
 3           Q.    Okay.  Is it a number that's
 4    specific to the pre-class department?
 5           A.    I don't understand what --
 6           Q.    Well, I'm just trying to understand.
 7    You indicated that if Ms. McMullen would get
 8    phone calls, she would transfer the phone calls
 9    to you?
10           A.    Uh-huh (affirmatively).
11           Q.    I'm wondering what number
12    Ms. McMullen is dialling or connecting to in
13    order to reach you?
14           A.    Oh, to reach me?
15           Q.    Correct.
16           A.    She would -- my number.
17           Q.    Your personal number?
18           A.    My work office number, uh-huh
19    (affirmatively).
20           Q.    Okay.  And I guess my question is is
21    that a personal desk number for you?
22           A.    Yes.  The number's assigned to me.
23           Q.    Okay.  Are there other numbers that
24    are assigned to people within the pre-class
25    department?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          A.    Yes.
 2          Q.    Is there a general number that's
 3    available to the public --
 4          A.    Yes.
 5          Q.    -- for the pre-class department?
 6          A.    Yes.
 7          Q.    Okay.  And that's separate from your
 8    work number?
 9          A.    Yes.
10          Q.    When Ms. McMullen would transfer
11    phone calls, she would transfer it to your direct
12    office line?
13          A.    Some.
14          Q.    Okay.  Are there other numbers that
15    she would transfer phone calls to?
16          A.    Yes.  They're -- like maybe my
17    supervisors or the managers.
18          Q.    Okay.  The people that work under
19    you?
20          A.    Correct.
21          Q.    And they all have individual phone
22    lines as well?
23          A.    Correct.
24          Q.    Who is Angela Smith?
25          A.    She was one of the managers that
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   worked in pre-class.

 2           Q.    So she would have been one of the

 3   two managers working under you?

 4           A.    Yes.

 5           Q.    And she's no longer with the

 6   department?

 7           A.    No.

 8           Q.    When did she leave?

 9           A.    December -- I'm trying to think was

10   it last year.  Yeah.  December of '18.

11           Q.    Do you recall how long she had been

12   a manager in pre-class?

13           A.    I'm -- I'm not sure.

14           Q.    Do you have a rough timeframe?

15           A.    I'm going to say about from maybe

16   2016.  I'm not sure.

17           Q.    Okay.  Did Ms. Smith work inside of

18   the pre-class department prior to becoming a

19   manager?

20           A.    She had in the past worked in

21   pre-class, not directly prior to coming to here.

22           Q.    Okay.  Had she worked in the

23   pre-class department during the time that you

24   were the director of the department?

25           A.    No.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              Q.    Okay.  So her work in pre-class
 2    prior to around 2016 had been prior to your
 3    existence --
 4              A.    Correct.
 5              Q.    -- in that department?
 6              A.    Correct.
 7              Q.    But when Ms. Smith was manager in
 8    pre-class, she reported to you as her supervisor,
 9    correct?
10              A.    Yes.
11              Q.    Who is Joseph Bordelon?
12              A.    He is -- he was a pre-class worker,
13    an employee that worked for pre-class.
14              Q.    And he's no longer in that position?
15              A.    Not in pre-class here at
16    headquarters.
17              Q.    Where is he located now?
18              A.    At Raymond Laborde.
19              Q.    So he would have moved over there
20    sometime after that office opened?
21              A.    Correct.
22              Q.    Do you know why Ms. Smith left the
23    department in 2018?
24              A.    She retired.
25              Q.    Okay.  And you indicated before that
```

```
 1    Mr. Ellis as the deputy assistant secretary would
 2    be the person who performs your work evaluations,
 3    correct?
 4         A.    Yes.
 5         Q.    And so the deputy assistant
 6    secretary is your direct supervisor?
 7         A.    Yes.
 8         Q.    How long has Mr. Ellis been in that
 9    position?
10         A.    I'm not sure.
11         Q.    Did you report to somebody prior to
12    Mr. Ellis being in that position?
13         A.    Yes.
14         Q.    Who was that?
15         A.    Perry Stagg.
16         Q.    I'm just trying to create a sort of
17    general timeline in my head.
18               Do you know if Mr. Stagg was in the
19    position of deputy assistant secretary in 2016?
20         A.    I believe he was.
21         Q.    And what about in 2017?
22         A.    I'm -- I'm not sure.
23         Q.    Mr. Stagg is still employed by the
24    Department of Corrections?
25         A.    Yes.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Do you know how he's employed
 2   currently?
 3          A.    No.  I'm not sure of his title.
 4          Q.    Okay.  Does he still work within the
 5   Office of Adult Services?
 6          A.    No.
 7          Q.    So, to the best of your knowledge,
 8   at some point after 2016 Mr. Stagg left his role
 9   as deputy assistant secretary?
10          A.    Yes.
11          Q.    It's my understanding that Mr. Stagg
12   may have been in an acting position when he was
13   deputy assistant secretary; are you aware?
14          A.    I'm not sure how that -- yeah, their
15   positions go.  I'm not sure.
16          Q.    Okay.  Do you know when Mr. Stagg
17   started in his position as the deputy assistant
18   secretary?
19          A.    I'm not sure.
20          Q.    Would it have been before 2016?
21          A.    It could have been then, that year
22   or the year -- I'm not really sure when he
23   started.
24          Q.    Okay.  Was there somebody else who
25   was in the position of deputy assistant secretary
```

```
 1    that you reported to prior to Mr. Stagg.
 2           A.    Yes.
 3           Q.    And who was that?
 4           A.    James Bush.
 5           Q.    Since you've been in the role of
 6    administrative program director, is there anyone
 7    else who has occupied the position of deputy
 8    assistant secretary that you reported to?
 9           A.    I'm not sure if I got that role
10    while James Bush was in the position or prior to
11    him.
12           Q.    Okay.  But those three that we just
13    talked about are the people that you remember
14    reporting to as the deputy assistant secretary?
15           A.    Correct.
16           Q.    Do you -- do you know why Mr. Bush
17    left the position and Mr. Stagg started in that
18    position?
19           A.    I'm really not sure.
20           Q.    And by the same token, are you aware
21    of why Mr. Stagg left the position and Mr. Ellis
22    was put into that position?
23           A.    I'm not sure.
24           Q.    Do you know who makes decisions
25    about who serves as the deputy assistant
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    secretary?
 2            A.     I don't know.  Yeah.
 3            Q.     Does that position report directly
 4    to Secretary LeBlanc?
 5            A.     The position, which --
 6            Q.     The deputy assistant secretary
 7    position.
 8            A.     I'm really not sure what -- who they
 9    report to.  I'm trying -- I'm not sure.
10            Q.     Okay.  To your knowledge, what are
11    the general responsibilities that fall under the
12    deputy assistant secretary?
13            A.     Other than them being my supervisor,
14    I'm not sure what their responsibilities are --
15            Q.     Okay.
16            A.     -- and job description.
17            Q.     Are there sections other than the
18    pre-class department that fall under the deputy
19    assistant secretary?
20            A.     Again, I'm not sure.  I haven't
21    seen -- I'm not privileged to that information, I
22    guess.
23            Q.     Okay.  Are there other departments
24    that fall within the Office of Adult Services?
25            A.     There's different departments in the
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1    Office of Adult Services, yes.
2           Q.    Okay.  What are some of the things
3    that fall under adult services?
4           A.    Transition work program, the
5    fugitive department, which I was part of.  That's
6    all that's coming to mind that I know --
7           Q.    Okay.
8           A.    -- you know, that I've dealt with.
9           Q.    And I'm correct in understanding
10   that the deputy assistant secretary position that
11   we have been talking about is within the Office
12   of Adult Services, correct?
13          A.    Yes, that position.
14          Q.    Okay.  Is that --
15          A.    That I know of.
16          Q.    Is that like the top of the Office
17   of Adult Services hierarchy?
18          A.    I've never seen an organizational
19   chart, so I'm not really sure who's the top --
20          Q.    Okay.
21          A.    -- of it.  I'm not sure how they --
22   who they go to.  I'm not sure where they go.
23          Q.    Okay.  So you know that the deputy
24   assistant secretary supervises you directly, but
25   you're not sure who would be there director?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1            A.     Their direct -- right.
 2            Q.     Okay.  Fair enough.  Is there also a
 3     position within the Department of Corrections
 4     that is the chief of operations?
 5            A.     Yes.
 6            Q.     And, to your knowledge, the chief of
 7     operations reports to the secretary, Secretary
 8     LeBlanc?
 9            A.     To my knowledge, he does, yeah.
10            Q.     Okay.  Do you know whether or not
11     the deputy assistant secretary position that we
12     have been talking about, is it possible that that
13     position reports to the chief of operations?
14            A.     Again, I'm not sure how the chain
15     works.  I've never seen the organizational chart
16     to see how they go.
17            Q.     Okay.  Do you have regular meetings
18     with the deputy assistant secretary?
19            A.     We meet pretty regular, uh-huh
20     (affirmatively).
21            Q.     How often is that?
22            A.     We have a staff meeting we try -- he
23     tries for every month, but sometimes we don't get
24     it in, but it's -- we meet at least once a week
25     on different issues going on.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          Q.     Is there a set agenda for your
 2     weekly meeting?
 3          A.     Not the weekly.
 4          Q.     Who decides what you talk about
 5     during your weekly meetings?
 6          A.     Usually it's a meeting that we may
 7     have called to go meet with him on things we may
 8     have that we just need answers on or --
 9          Q.     Okay.
10          A.     -- opinions.
11          Q.     So a meeting that the pre-class
12     department has called --
13          A.     Correct.
14          Q.     -- to ask him about various things?
15          A.     Correct.
16          Q.     How does the deputy assistant
17     secretary supervise your work?
18          A.     Wait.  I don't -- I mean, what do
19     you mean -- such as?  I don't --
20          Q.     I don't know.  I'm just wondering
21     what structures are in place for the secretary to
22     supervise the work that you do on a daily basis?
23          A.     I mean, he -- pretty much he may
24     assign things to us and make sure it's done and
25     meets with us to see if there's any issues with
```

```
 1    what we are working on or backlog or anything
 2    that's going on in the pre-class department.
 3            Q.     And this is the structure currently
 4    under Mr. Ellis?
 5            A.     Yes.
 6            Q.     Was it the same structure under
 7    Mr. Stagg?
 8            A.     Yes, pretty much.
 9            Q.     Did you have the same weekly
10    meetings with Mr. Stagg?
11            A.     I was going to say.  It wasn't like
12    a weekly meeting.  It's just when we had things
13    we need to -- we would call him and see when we
14    could meet with him and we did the same with
15    Mr. Stagg.
16            Q.     Did you have the monthly -- ideally
17    monthly staff meeting with Mr. Stagg as well?
18            A.     Yes, pretty -- maybe not every
19    month, like I say, but we tried to meet.
20            Q.     Do you know if there's any minutes
21    that are taken during those meetings?
22            A.     I'm not sure.
23            Q.     Is there any record that's
24    maintained of what's discussed in the meetings
25    you had with the deputy assistant secretary?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          A.     On our meetings that we would call,
 2    we wouldn't keep minutes.
 3          Q.     You wouldn't keep minutes?
 4          A.     No.
 5          Q.     Are you aware if any minutes or
 6    notes were kept of the staff meetings?
 7          A.     I'm not sure.
 8          Q.     Did you ever take notes personally
 9    when you would meet with the deputy assistant
10    secretary?
11          A.     Yes.
12          Q.     We talked generally about what the
13    pre-class department is responsible for and some
14    of your supervisory responsibilities within that,
15    but can you describe for me what your other
16    day-to-day job responsibilities are?
17          A.     Okay.  Basically working with any
18    issues that may come up, employees -- the
19    managers usually bring me the issues to get an
20    answer, then they go back and get it to the
21    employees.  But working with probation and parole
22    on cases, the fugitive department on cases.
23    Pretty much anything that comes into our office,
24    we -- we try to handle.
25          Q.     Okay.  Any other job
```

 1  responsibilities that we haven't talked about?

 2       A.    I think that's pretty much it.

 3       Q.    Okay.  And earlier you gave me a

 4  definition of pre-class that I'm going to try to

 5  work within.

 6       A.    Okay.

 7       Q.    But just to make sure we are on the

 8  same page, I want to walk through a few things

 9  that I understand to be components of the

10  pre-class and time computation process.

11       A.    Okay.

12       Q.    So you indicated before that DPS&C

13  receives notification that a person has been

14  sentenced to time in the Department of

15  Corrections; is that correct?

16       A.    Well, notification meaning the

17  packet.  It's a packet we receive.

18       Q.    Okay.  And when you say "a packet,"

19  are you referring to something in hard copy?

20       A.    Yes, or e-mail.  We get sometimes

21  e-mailed or faxes.  I know they'll be faxed

22  sometimes.

23       Q.    And who are you receiving these

24  packets from?

25       A.    From the parish of conviction

```
 1    wherever the offender was convicted.
 2            Q.     Is that from the sheriff's office?
 3            A.     Yes.
 4            Q.     Do you receive anything directly
 5    from, let's say, the clerk of court in the parish
 6    of conviction?
 7            A.     We do receive clerk paperwork
 8    sometimes too --
 9            Q.     Okay.
10            A.     -- from the clerks.
11            Q.     And that would come directly from
12    the clerks?
13            A.     Sometimes they will send us
14    supplemental paperwork or -- or original copies
15    of something we have already received.
16            Q.     But the packets you referred to,
17    those come from the sheriff in the parish of
18    conviction; is that correct?
19            A.     Correct.
20            Q.     Is there any other mechanism by
21    which the Department of Corrections is notified
22    that a person has been sentenced to hard labor?
23            A.     Meaning officially or just notified?
24    I don't --
25            Q.     Officially or unofficially.
```

```
 1           A.    Okay.  I mean, we -- we get phone
 2    calls or things like that of somebody that's
 3    waiting for their time comp to be done.
 4           Q.    And that would be an unofficial?
 5           A.    Right.  And then we will -- right.
 6           Q.    Is there any other official
 7    mechanism by which the Department of Corrections
 8    is notified that someone has been sentenced to
 9    DOC?
10           A.    Not officially.
11           Q.    Is there a requirement that the
12    Department of Corrections receive notification
13    that someone has been sentenced to the Department
14    of Corrections?
15           A.    Yes, so we'll know they were
16    sentenced to hard labor to be able to --
17           Q.    Where does that requirement come
18    from?
19           A.    It's an article in the state
20    legislature.  I don't remember the article.
21           Q.    How does the Department of
22    Corrections enforce the requirement that you-all
23    be notified when someone is sentenced to the
24    Department of Corrections?
25           A.    I'm really -- I'm not sure how it's
```

 1   enforced.  I'm not sure.

 2          Q.    Do you-all enforce the requirement?

 3          A.    Yes.  In fact, I mean, we do if we

 4   need -- we need the paperwork to be able to

 5   calculate someone in our system to know that he's

 6   hard labor.

 7          Q.    I guess I'm wondering how the

 8   Department of Corrections ensures that it

 9   receives the paperwork that you are discussing so

10   that the time computation can occur?

11          A.    We -- it's just that the parishes,

12   once they are convicted and sentenced, they get

13   the packets together and they mail them, send

14   them to us mail or -- yeah.  I'm not sure of --

15   like you are saying to note that we got it or

16   not.  There's no mechanism.

17          Q.    Can a person who has been sentenced

18   to time in the Department of Corrections in one

19   parish be transferred to another parish facility?

20          A.    Yes.

21          Q.    Somehow does the Department of

22   Corrections receive notification of that movement

23   of a person sentenced to DOC?

24          A.    Usually what we have, if they are --

25   if they have not sent us the pre-class packet yet

```
 1    but they have moved the offender because that's
 2    between the sheriff and the sheriff moving the
 3    offenders, they put that on their jail credit
 4    letter.  It's a letter that tells us when he was
 5    arrested and when they send that to us, if
 6    transferred to another parish they will put that
 7    transfer over to and state the parish he moved
 8    to.
 9          Q.    Am I correct in understanding that
10    that would be paperwork that you still receive
11    from the sheriff at the parish of convictions?
12          A.    Of conviction, correct.
13          Q.    Okay.  So that would be the sheriff
14    who is transferring that individual to another
15    facility?
16          A.    Correct.
17          Q.    Do you receive any notification from
18    the receiving parish in that scenario?
19          A.    Pre-class does not receive anything
20    from them.
21          Q.    Does someone else receive something?
22          A.    There is a form that if an offender
23    transfers to another parish, that they turn that
24    in, the parish sending the offenders to fill out
25    a form and send that in or the parish receiving
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    them, if it's still not in, they'll send it
 2    sometimes.  I don't know who required.
 3            Q.    Okay.  Who does that go to?
 4            A.    To the transfer department.
 5            Q.    Okay.  And that's a separate section
 6    of the Department of Corrections?
 7            A.    It's under the adult services.
 8            Q.    Okay.
 9            A.    In that department.
10            Q.    And am I correct in understanding
11    that the packet that you've been referring to is
12    supposed to contain the information that the
13    pre-class department needs to perform the initial
14    time computation?
15            A.    Correct.
16            Q.    And what specifically is needed to
17    perform that initial time computation?
18            A.    We receive the basic interview form,
19    which is his personal information; his
20    fingerprints showing that he's verified to that
21    person, that he was the one that was arrested for
22    the -- convicted; jail credit letter when he was
23    arrested; his sentencing minutes, Uniform
24    Commitment Order now; and bill of information.
25    Now, we have worked people's time without the
```

```
 1    bill of information.  If they just can't get it
 2    to us, we will work it because it needs to be
 3    worked.
 4          Q.    Okay.  And this is the information
 5    that is supposed to be provided by the sheriff of
 6    the parish of conviction, correct?
 7          A.    Correct.
 8          Q.    Now, you mentioned that you might
 9    get this packet in hard copy or by e-mail or by
10    fax; is that correct?
11          A.    Correct.
12          Q.    Is there any directive to the
13    sheriff's of the various parishes in Louisiana
14    about how this packet of information is to be
15    provided to the Department of Corrections?
16          A.    It -- I don't know if there's a
17    directive out there.  I'm not sure.
18          Q.    Do you know if the Department of
19    Corrections has provided any instruction to the
20    various sheriffs in the state about their
21    obligation to send this packet to the Department
22    of Corrections?
23          A.    We have in the past had training at
24    the sheriff's association meetings, conferences;
25    and then if the jail asks for any information, we
```

```
 1    give them the information on how -- what needs to
 2    be done.
 3           Q.    How often have you had these
 4    trainings at the sheriff's offices?
 5           A.    Several years, we have done the
 6    training.
 7           Q.    Have you done them in recent years?
 8           A.    Since pre-class has been here, we
 9    have.
10           Q.    So since 2013?
11           A.    I just don't know which year it is.
12    Correct.
13           Q.    Have you done the training every
14    year since 2013?
15           A.    Not at the -- not with the -- that
16    kind of training at the Louisiana Sheriff's
17    Association.  We may have had it again twice
18    since 2013.
19           Q.    Okay.  So maybe twice since 2013 the
20    Department of Corrections has provided training
21    at that sheriff's conference --
22           A.    Uh-huh (affirmatively).
23           Q.    -- that you mentioned?
24           A.    Right.
25           Q.    And what topics are covered during
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

1   that training?

2          A.    From the beginning of the pre-class,

3   what paperwork we would need that needs to be

4   sent in and why, and all the way through what we

5   need them to do when we release an offender,

6   clearing an offender for release.

7          Q.    Do you happen to remember the last

8   year that that training was provided?

9          A.    We did a training last year, the

10  last conference, but I don't know how many -- I

11  know right after 2013 we did one.  I just don't

12  know how many in between we have done.

13         Q.    Are you the one who provided the

14  training at the conference?

15         A.    I have, and then I've also included

16  my managers and supervisors to help out and be

17  familiar with them.

18         Q.    Okay.  You mentioned the transfer

19  paperwork that might be sent to the transfer

20  department --

21         A.    Uh-huh (affirmatively).

22         Q.    -- just a minute ago.  If the

23  transfer department were to receive paperwork of

24  a parish jail to parish jail transfer and that

25  person isn't already entered in the Department of

1    Corrections system, what would happen?

2          A.    I'm not sure.  I've never worked in

3    that capacity doing those.

4          Q.    Has the pre-class department, to

5    your knowledge, ever received notification of

6    that occurring?

7          A.    Meaning the transfer of offenders?

8          Q.    Meaning that an offender has been

9    transferred and when the transfer department got

10   that form that you mentioned, they went to put

11   that into the Department of Corrections system

12   and that person wasn't listed or updated.

13         A.    I'm not sure.

14         Q.    If you receive a packet of

15   information from a sheriff's office and that

16   packet is missing some of the information you

17   just said you need to do the time computation,

18   what steps does the pre-class department take?

19         A.    I usually call them first and try

20   and ask them to send it as soon as possible and

21   then we may go on to e-mail them and try and get

22   it.

23         Q.    Is there any way that the pre-class

24   department tracks when you-all receive a packet

25   of information?

```
 1          A.      Yes.
 2          Q.      Okay.  How is that tracked?
 3          A.      We stamp the paperwork received.
 4          Q.      Do you stamp each page of the
 5  paperwork?
 6          A.      Not each page.  If it's a packet, we
 7  stamp the -- one page of it received and then the
 8  rest -- if we get any supplemental, it's supposed
 9  to be stamped received when we receive that.
10          Q.      Now, if you receive a packet in hard
11  copy and you stamp it when you receive it, what
12  happens to the packet after that as far as record
13  storage is concerned?
14          A.      It's scanned into a scanning system.
15          Q.      To create an electronic record?
16          A.      To create an electronic, correct.
17          Q.      And does that electronic record then
18  also capture the date that that paperwork was
19  scanned in?
20          A.      Yes.
21          Q.      What do you-all do if you receive
22  the paperwork by e-mail or fax as far as tracking
23  the day that it's received?
24          A.      The same thing.  We stamp it
25  received and then in our system, when we are
```

```
 1    entering the information in our system, it's got
 2    a pre-class screen and it's has date received and
 3    we put it in there.
 4            Q.    So am I correct in understanding
 5    that you print out a hard copy of that e-mail or
 6    fax --
 7            A.    Yes.
 8            Q.    -- so that it can be stamped?
 9            A.    Yes.
10            Q.    And then that is scanned back in?
11            A.    Then that's scanned in our scanner
12    system, yes.
13            Q.    Do you-all have any mechanism by
14    which you track if there is a parish that you
15    frequently get incomplete packets from that you
16    have to follow up with?
17            A.    We don't have a -- like we don't
18    keep up with as far as a list, but the employees
19    know if they don't get anything to call and try
20    and get it.
21            Q.    And when you say "if they don't get
22    anything, they know to call" --
23            A.    Then they -- well, if they try and
24    get it and they don't, they'll try and e-mail
25    them and then they'll go up to the next chain,
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1    their supervisor, and let them start trying to
 2    get it.
 3          Q.    But there's no way that you guys
 4    track if there's a particular parish where
 5    information is frequently missing?
 6          A.    We don't.  We didn't.  We are
 7    starting to try now.  It's just that we have
 8    groups that are doing it and trying to keep up --
 9    everybody keeping up with it, so we are trying to
10    track it now, but --
11          Q.    When did that start?
12          A.    Probably the last few months.
13          Q.    And so what about the situation
14    where the pre-class department doesn't receive
15    information from a parish about someone who has
16    been sentenced to time in the Department of
17    Corrections?
18          A.    If we don't receive the paperwork,
19    we don't know he got sentenced, so we -- we
20    wouldn't know to call.  We wouldn't know he was
21    sentenced.
22          Q.    So the only mechanism by which the
23    Department of Corrections is keeping track of
24    people who are sentenced to DOC is through
25    receipt of the packets from the parishes of
```

```
1    convictions?
2            A.    That I know of, yes.
3            Q.    Okay.  You mentioned that the
4    paperwork is stamped when you-all receive it in
5    the office.  Is there a particular piece of the
6    packet that we discussed that usually receives
7    the stamp?
8            A.    Well, in the -- and I don't know
9    what year when we decided that you have to keep
10   stamping.  It's the basic interview sheet and
11   they are supposed to now -- and this has been
12   about a year now -- at the right top corner of it
13   in the same spot.
14                In the past, we realized that people
15   were stamping different pages, so we have came up
16   with -- so we -- because looking through the
17   paperwork trying to find it, we were having to
18   look at every piece of paper to see where the
19   stamp was.
20           Q.    Okay.  Has it always been the
21   process to at least stamp one of the pages?
22           A.    Yes.  It was supposed to be part of
23   the process to stamp at least one that was in the
24   packet.
25           Q.    And that's during your time as
```

1    director over the pre-class?

2          A.    Yes.

3          Q.    You mentioned the fingerprints as

4    part of the packet; is that correct?

5          A.    Yes.

6          Q.    And is that information that's

7    received from the AFIS system?

8          A.    Yes.

9          Q.    Okay.  Can you tell me a little bit

10   about what AFIS is?

11         A.    Okay.  It's an Automatic

12   Fingerprinting System that the offender is

13   fingerprinted and it automatically tells them his

14   SID so they know who he is, who he prints to.

15   And it will kick out a -- it's called a suspect

16   rap sheet and it's got his photo on it.  That

17   will give that SID number and ATN number, which

18   is a tracking number, and it prints to his

19   criminal history.  So that tracking number is our

20   piece to find that tracking number against his

21   criminal history to say that they fingerprinted

22   this offender in their jail and this is him who

23   -- who was convicted.

24         Q.    Okay.  Does the pre-class department

25   have direct access to AFIS?

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1           A.     We do not have AFIS.
 2           Q.     Okay.
 3           A.     We have the criminal -- we can pull
 4      a criminal history --
 5           Q.     Okay.
 6           A.     -- on NCIC.
 7           Q.     Okay.  And, if I understand correct,
 8      you would then be comparing the number from the
 9      AFIS printout --
10           A.     Uh-huh (affirmatively), correct.
11           Q.     -- to the NCIC history that you
12      could pull up?
13           A.     Correct.
14           Q.     So how do you receive the AFIS
15      information?
16           A.     It comes with the packet.  It's a
17      page that's in the packet.
18           Q.     So it's like a hard copy printout?
19           A.     Yes.
20           Q.     And so that's a printout that you
21      receive from the parish of conviction?
22           A.     Yes.
23           Q.     Other than the numbers that you are
24      using to identify the person, is there any other
25      information that's contained on the AFIS printout
```

```
 1   that the pre-class department isn't using?

 2        A.    We'll use any -- we look at it for

 3   any address, marks and tattoos or things like

 4   that that's on it.

 5        Q.    And as far as some of the other

 6   pieces of paper that you mentioned that should be

 7   in the packet, what documents does the pre-class

 8   department use to actually enter the -- the

 9   sentence information to actually do the time

10   computation?

11        A.    The Uniform Commitment Order or

12   sentencing minutes and which is the sentence, how

13   long he's to serve, and then the bill of

14   information, so -- is what we enter.  Like the

15   crime, it tells us when he committed it.

16        Q.    And what about the letter of credit

17   that you mentioned?

18        A.    That's to do the time.  We need that

19   to time comp him to go through, so we know when

20   he was arrested to start his time in custody.

21        Q.    And I assume also thereby the amount

22   of time that he's getting credit for?

23        A.    Correct.  Any ins and outs, if he

24   bonded.  Arrested and bonds, he'll get jail

25   credit, correct.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    Q.    The AFIS that you mentioned, does
2  the pre-class department rely on those at all for
3  information about sentence or credit for time
4  served?
5    A.    No.  Because usually if we get just
6  the suspect rap sheet, it doesn't give any
7  sentencing information.  It just gives who he
8  printed to, the date he was printed, and none of
9  that sentencing information is on there.
10         Now, it is on the criminal history.
11  If they typed it in, it would be on the criminal
12  history once we pull that criminal history.
13    Q.    That -- you are referring to what's
14  pulled from NCIC?
15    A.    Right.  It's whatever they've
16  entered in the AFIS machines.  Whoever printed
17  the offender, whatever they type comes out on
18  that criminal history.
19    Q.    Okay.  But I'm correct that a
20  printout of the criminal history isn't something
21  that needs to be provided with the pre-class?
22    A.    They do not provide it, no.
23    Q.    Okay.  Is there information that
24  needs to have been entered into the criminal
25  history at the time that the AFIS entry happens

1    for you-all to do your work?

2         A.    We need them to at least print him

3    and they -- they supposed to put the disposition

4    of the crime, but they will put DCID, just that

5    they ID'd him that that is him, and we still use

6    that.

7         Q.    That's enough for --

8         A.    Just as long as he's fingerprinted,

9    yeah, and his arrests are on there and -- and we

10   get minutes that coincide with that.

11        MS. WASHINGTON:

12             Okay.  I want to show you an e-mail

13        which I am marking as Exhibit 30.  And

14        along with it, I am going to mark what was

15        provided to us in discovery as the

16        attachment to the e-mail that you are

17        looking at, which was also provided to us

18        in discovery, and the attachment will be

19        No. 31; and I'm handing you that exhibit

20        as well.

21      (Exhibits 30 and 31 marked and tendered.)

22        THE WITNESS:

23             Okay.

24   BY MS. WASHINGTON:

25        Q.    Do you recognize this e-mail and

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1    attachment?

2         A.    Yes.

3         Q.    And the e-mail that I'm referencing

4    is an e-mail that you sent in January of 2017,

5    correct?

6         A.    Yes.

7         Q.    And it indicates that with the

8    e-mail you are forwarding the, quote, pre-class

9    packet information that you provide when you

10   train on pre-class; is that correct?

11        A.    Correct.

12        Q.    And so then Exhibit 31 is the

13   pre-class packet information, correct?

14        A.    Correct.

15        Q.    And am I correct in understanding

16   that these are -- these are documents like the

17   ones that we have just been talking about that

18   you expect to receive in the pre-class packet?

19        A.    Yes.  This is the acknowledgement

20   and signature form when I mentioned the forms.

21        Q.    And so you indicate in your e-mail

22   that -- that you provide this packet when you

23   train on pre-class, correct?

24        A.    Correct.

25        Q.    And so who -- who has received the



1    pre-class and thereby received this pre-class

2    packet?

3             A.    I'd say any parishes that has gone

4    -- was at the LSA conference that attended the

5    class.

6             Q.    In the years that it was held?

7             A.    Right.  Correct.

8             Q.    Okay.

9             A.    And anyone that has asked for it.

10   We have -- some parishes will call and ask us

11   because we have it in electronic form to send to

12   them, things like that.

13            Q.    Okay.  And this is an e-mail that

14   you exchanged with the Corey Amacker with OPSO;

15   is that correct?

16            A.    Correct.

17            Q.    Do you know if this was the first

18   time that this packet of information had been

19   provided to OPSO?

20            A.    I'm not sure.

21            Q.    Was Orleans Parish one of the

22   parishes that had asked you for training

23   previously?

24            A.    I'm not sure if they are.

25            Q.    Do you know if they had attended the

1    LSA conference and the particular class on

2    pre-class?

3            A.    I'm not sure.

4            Q.    Okay.  The training that occurred at

5    the sheriff's association conference, would there

6    be a roster or sign-in sheet to know who actually

7    attended that training?

8            A.    We would probably have one for the

9    last one, but prior, I'm not sure if we still

10   have them.

11           Q.    And you mentioned that the last one

12   would have been just last year?

13           A.    Right.  Correct.

14           Q.    Why don't you know if there are ones

15   from prior trainings?

16           A.    I'm just not sure if we kept them,

17   have them available or --

18           Q.    Okay.  And I'm correct in

19   understanding then that this pre-class packet is

20   what the pre-class department needs completed in

21   order to do an initial time computation?

22           A.    Majority of this paperwork, we would

23   need.  Now, we -- if it's someone they send us

24   paperwork to time comp and we are needing the

25   paper -- we know he needs to be time comped --

1    there's parts that we wouldn't make them send us
2    to time comp them, like signature form,
3    acknowledgment/signature form, because that's if
4    someone escapes or there's, you know, the
5    property.  And knowing he's not coming into a
6    stated facility, we would calculate his release
7    dates without it.
8         Q.    Okay.  Is there any other piece of
9    this packet that isn't needed to do a time
10   computation?
11        A.    In the past, we've had facilities
12   that did not send us the basic interview sheet.
13   They may send us a copy of their -- their
14   computer system with the information on it and we
15   would take it.
16        Q.    Maybe this is an inartful question,
17   but what are the essential pieces of the
18   pre-class packet that you-all need in order to do
19   the time computation?
20        A.    The jail credit letter, the UCO in
21   minutes or minutes, and the fingerprints.  Now,
22   the bill of information is very important because
23   that tells us when he committed the crime.  We
24   have worked them without that depending on the
25   crime.  Because a lot of crimes, it depends on

```
 1    how they release by what the crime was and who
 2    they committed on and the date it was committed.
 3    He would release differently, so we would
 4    absolutely need it then.
 5         Q.    Because of changes in the statute?
 6         A.    Correct.
 7         Q.    Okay.  That makes sense.  Now, when
 8    the pre-class department gets these packets of
 9    information, is there some kind of screening that
10    the department does to prioritize the packets and
11    the time computation?
12         A.    Sort of.  They -- first of all, they
13    have to verify that it's hard labor sentences,
14    then they do try and screen it for -- not
15    necessarily how long the offender received, it's
16    how long he's been in custody against his
17    sentence length, so just trying to see who would
18    -- and what act they would fall under depending
19    on how much time they would have to serve.
20         Q.    And within the pre-class department,
21    who is tasked with performing that screening role
22    that you just described?
23         A.    We have an intake group.  It's a
24    group of employees that we consider the intake
25    group, and they are -- they receive the packets
```

```
 1   and start going through them.
 2        Q.    Has the intake group been
 3   structurally in existence since you started as
 4   director in 2013?
 5        A.    We've changed a little bit since
 6   then, but it's always been the employees receive
 7   intake; and it used to be some parishes assigned
 8   to different groups and they -- their people
 9   would -- and now it's one intake group and it all
10   goes to the same intake group.  So we've changed
11   it, but it's pretty much the same as far as how
12   they process it when they receive it.
13        Q.    And when was this sort of
14   specialized intake group created?
15        A.    I'm -- I'm not sure when it was.
16        Q.    Okay.  Like I mentioned before, the
17   facts in this case occurred in 2016 and 2017.  I
18   guess what I'm trying to understand was was this
19   specialized intake group created after that point
20   in time?
21        A.    I'm not sure.  It was somewhere in
22   there, but I'm not sure when -- yeah.  I can't --
23        Q.    Okay.  And am I correct in
24   understanding that prior to that various groups
25   were responsible for various parishes?
```

AmersonWhite®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

1    A.    Correct.

2    Q.    Okay.  The intake group that exists

3  currently, do they have responsibilities outside

4  of just this screening process?

5    A.    Just their responsibilities are to

6  receive the paperwork, verify it, screen it, and

7  enter the pre-class screen that we have received

8  it, this paperwork; and they pull the criminal

9  history too.

10    Q.    Okay.  And then from that point do

11  the various cases or packets get somehow

12  distributed for time computations?

13    A.    They are distributed to different

14  supervisors that handle the time computation to

15  enter the information in our system, the crime,

16  the sentence, and time comping.

17    Q.    Okay.  So you mentioned that the

18  packets are distributed to the supervisors; is

19  that correct?

20    A.    Yes.

21    Q.    Okay.  And is it the supervisors who

22  are responsible for the time computation?

23    A.    No.  They assign it to their

24  employees --

25    Q.    Okay.

```
 1          A.      -- to time comp.
 2          Q.      Are the employees who are
 3    responsible for actually doing the time
 4    computation provided with instruction on how long
 5    they have to complete the time computation once
 6    they receive a packet?
 7          A.      Yes.  I mean, not basically a number
 8    of days, no, but they know it's to be worked as
 9    soon as they can and once they have the available
10    paperwork; and then as the supervisor keeps up
11    with how long it's -- when it was given to them
12    and if it's done in a certain period of time and
13    find out why it hasn't been done.
14          Q.      How are the supervisors keeping up
15    with that timeline that you just discussed?
16          A.      They assign it to their employees.
17          Q.      Okay.
18          A.      And we also have a scanning program
19    which if it's not time comped, it isn't scanned.
20    I mean, it is indexed, it's scanned, so it's
21    sitting out there in a holding; and once they
22    time comp, they -- it's called indexing and it
23    goes away.  It goes out of that hold.
24          Q.      Do you know if the supervisors
25    maintain any kind of log or spreadsheet by which
```

```
 1    they track when they give out a particular case
 2    to an employee?
 3          A.    I'm not sure if they keep up a log.
 4          Q.    After the time computation has been
 5    completed by the employee, is -- is the person,
 6    the prisoner provided information about their
 7    time computation?
 8          A.    He gets a copy of his -- we call it
 9    master prison record.
10          Q.    How is that provided?
11          A.    We mail it to the jail that he's
12    housed in.
13          Q.    Does the jail that he is housed in
14    also receive a copy?
15          A.    They receive the packet of whoever's
16    housed there and they can make a copy of that
17    copy to give to the -- keep a copy and give to
18    the offenders.
19          Q.    Is there any requirement that the
20    jail make a copy of these master prison records
21    when they receive them?
22          A.    I'm not sure.
23          Q.    But it sounds from your description
24    like that would be optional?
25          A.    Be optional, correct.
```

```
 1          Q.    As director over the pre-class
 2   department, is it your responsibility to ensure
 3   that the department is receiving the required
 4   information from the parishes of conviction?
 5          A.    Again, we try -- I try my best to --
 6   if we know we are not receiving the paperwork, I
 7   try my best to work with them and try and see
 8   what the hold up or work out some kind of -- with
 9   the parish.  Other than that, not knowing we are
10   not getting it, we just don't know if he's
11   sentenced -- if someone's sentenced or not if we
12   do not get it.
13          Q.    Is it part of your responsibility to
14   make sure that you-all are receiving the
15   requisite paperwork soon after person are
16   sentenced?
17          A.    Again, I don't know -- I mean, we --
18   we try our best to tell the parishes to send it
19   as soon -- but I don't know -- if we do not
20   receive anything from the jail, we do not know
21   they are sentenced.
22          Q.    Okay.  The pre-class department is
23   responsible for making sure that time
24   computations are done timely so that persons can
25   be released on the date that they are due to be
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    released, correct?
 2         A.    Correct.
 3         Q.    And it is possible that if time
 4    computations are not performed promptly that
 5    people may end up being released at some point
 6    past the date they were due to be released; is
 7    that correct?
 8         A.    Correct.  If they don't do it in --
 9    right.  If we have the paperwork and just don't
10    do the time comp, yeah, that could happen.
11         Q.    Are there any timelines in place for
12    that screening process that you told me about?
13         A.    We -- we train the employees to have
14    it done within a day of receiving the paperwork.
15    Again, that depends on how much paperwork came in
16    the mail that day, but we try and get it done and
17    it goes to the next group within a day.  And each
18    thing we do, it's as soon as possible when you
19    can get it done and just work it --
20         Q.    Okay.
21         A.    -- as you have it.
22         Q.    And by the same token, once the
23    intake screening process has happened and those
24    have been distributed to the supervisors, is
25    there a timeline by which the supervisor is
```

```
 1    supposed to assign a given case to one of the
 2    employees to work?
 3           A.     They should be assigning it right
 4    away --
 5           Q.     Okay.
 6           A.     -- as soon as they receive it.
 7           Q.     Okay.  And earlier you mentioned the
 8    -- the UCO, the Uniform Commitment Order.  Is
 9    that coming as part of the packet from the
10    sheriff's office to the department?
11           A.     The Uniform Commitment Order is a
12    new form that legislation passed and the Supreme
13    Court passed that they are to use to send to us
14    on convictions, sentences.  We still have a few
15    parishes that do not use it, so we still use
16    sentencing minutes --
17           Q.     Okay.
18           A.     -- to calculate.
19           Q.     When did that order or the form come
20    into existence?
21           A.     I think it was 2000 -- I'm not
22    positive.  I know 2016, '17 that they made it
23    mandatory.
24           Q.     Is it one of the forms that was in
25    Exhibit 31 that we looked at?
```

```
 1              A.      No.

 2              Q.      Okay.

 3              A.      Because it's a Supreme Court form.

 4              Q.      Okay.

 5              A.      Yeah.

 6              Q.      But just so I understand, is that a

 7      form that you are receiving directly from the

 8      clerk of court?

 9              A.      The parish jails of conviction sends

10      it to us.

11              Q.      Okay.  So the sheriff is still

12      sending that?

13              A.      They -- right.

14              Q.      But it would be part of the court

15      record for a case; is that correct?

16              A.      It's his court minutes.  It's really

17      the court minutes --

18              Q.      Okay.

19              A.      -- but they use UCO.

20              Q.      Okay.  But it is a document that is

21      initially generated by the court itself where the

22      sentence occurred?

23              A.      I'm not sure who generates it.  We

24      have different places they say do it.  I mean,

25      I'm not sure who does it, if it's the court,
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    clerk of court.  I'm not sure.

2        Q.    On your end, you receive it as part

3    of the packet you receive from the sheriffs'

4    offices?

5        A.    Correct.

6        Q.    Okay.  When you started your work in

7    pre-class at Elayn Hunt --

8        A.    Uh-huh (affirmatively).

9        Q.    -- what training did you receive for

10   performance of your job duties?

11       A.    It was a booklet more on the laws

12   and things, the different acts that someone can

13   fall under and a lot of on-the-job training.

14       Q.    And when you moved into your current

15   position as director over the pre-class

16   department here at headquarters, what training

17   did you receive specific to that role?

18       A.    Training wise, again, it was

19   basically on-the-job training and the training --

20   going out and train.  It was basically what I was

21   doing prior, so it's about the same, on-the-job

22   training.

23       Q.    Okay.  For the employees who work

24   under you within the pre-class department here at

25   headquarters, what training do they receive when



1    they start working the department?

2         A.    We have a training, we call them

3    modules.  Each step of the pre-class process, we

4    broke it down to train what each thing is and

5    what we need and how it's handled, how to enter

6    in our system, explain time comp.  And then we

7    also give out -- again, it's kind of like a cheat

8    sheet per se.  It's the different acts and the

9    dates the offender committed, what he would fall

10   under, and all the list of crime of violences,

11   the list of offenders that -- the crimes that are

12   not eligible for parole, so it's a lot of forms

13   that -- basically it's a lookup process to be

14   able to process the time comp.

15        Q.    Okay.  And the training modules that

16   you mentioned, are those PowerPoint

17   presentations?

18        A.    They are, yeah.  I was trying to

19   think.  Yeah, PowerPoint.

20        Q.    Okay.  Are they provided as an

21   in-person training with the PowerPoint

22   presentations?

23        A.    Yes.

24        Q.    Okay.  I think that we were provided

25   with several of those modules in discovery in

1    this litigation.

2           A.    Uh-huh (affirmatively).

3           Q.    They were on topics like verifying

4    paperwork, updating CAJUN.  Does that sound

5    right?

6           A.    Yes.

7           Q.    How long have those training modules

8    been in existence?

9           A.    The so-called modules we made within

10   about a year or so, but it was -- the same

11   process, the same training material has been

12   around since I began in pre-class.  We just keep

13   updating it with the change in legislation and we

14   just update it.  And then about two years ago, we

15   made it into -- we called them modules.  It just

16   -- but it's the same material, just updated with

17   the new legislation.

18          Q.    Okay.  And when you say that the

19   modules were created about a year or two ago, by

20   modules, do you mean specifically this PowerPoint

21   presentation form?

22          A.    Yeah.  It's as a PowerPoint.

23          Q.    And prior to the creation of the

24   PowerPoint, where was this information contained?

25          A.    I think it was in something like

1    Microsoft Word and they printed it for us.  We
2    had it in books.
3          Q.    Okay.  So that would be the booklet
4    that you referred to from your time at Elayn
5    Hunt?
6          A.    That's part of it, correct.
7          Q.    Okay.  And when it was in booklet
8    form, was that something that was printed out and
9    provided to employees in the department?
10          A.    We've had training, and I don't know
11    when.  Being at Hunt where we sat down and went
12    over the pre-class and -- but they would also --
13    once we had it in our book, we sat down with an
14    employee and -- as they were working it, we went
15    through our book and to see where they were at
16    that point.  But we were provided with the copies
17    of the -- like I said, Microsoft Word.  It wasn't
18    in PowerPoint.
19          Q.    Okay.  Am I correct, though, that
20    this sort of more formal training modules and
21    in-person PowerPoint presentation started about a
22    year or two ago?
23          A.    Pretty much about, right.
24          Q.    Okay.  And in looking at the modules
25    that we received, am I correct in understanding

```
 1    that the modules sort of start at the time from
 2    which the packet has arrived in the
 3    pre-classification department?
 4         A.    Correct.
 5         Q.    Okay.  And so the modules don't
 6    appear to deal with what has happened with the
 7    packet prior to it arriving in the pre-class
 8    department?
 9         A.    Correct.  Because that's -- it
10    starts with our job, you know, what -- what would
11    happen -- once we get the paperwork, what's the
12    responsibility of the employees here.
13         Q.    Okay.  Does it have -- does the
14    module cover anything about what steps a DPS&C
15    pre-class employee needs to take to make sure
16    that you are receiving the sentencing information
17    from the parishes of conviction?
18         A.    Again, no, it doesn't; because we
19    wouldn't know if they were sentenced or not to
20    know to take steps for that.
21         Q.    Okay.  So that's not covered in the
22    training modules?
23         A.    Right.
24         Q.    Is the pre-classification department
25    staff provided with any legal training, any
```

```
 1    training on the legal aspects of pre-class and
 2    time computation?
 3           A.    No.
 4           Q.    Okay.
 5           A.    No training.
 6           Q.    Okay.  Is the pre-class department
 7    staff provided with any information about the
 8    duty of a jailer to only be holding persons that
 9    they have the legal authority to hold?
10           MR. EVANS:
11                Object to form.  You can answer.
12           THE WITNESS:
13                No.  The jailer holding the offender
14           that -- they can't.  I mean, we wouldn't
15           as far as pre-class other than once he
16           time comped and due for release.
17           MS. WASHINGTON:
18                Okay.
19           THE WITNESS:
20                Yeah.
21    BY MS. WASHINGTON:
22           Q.    And how about then are employees of
23    the pre-class department provided with any
24    training or instruction regarding the duty of a
25    jailer to release someone once there is no longer
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    a legal authority to hold that person?
 2           MR. EVANS:
 3                Object to form.
 4           THE WITNESS:
 5                In our training -- oh, I'm sorry.
 6           MR. EVANS:
 7                Object to form.  You can answer.
 8           THE WITNESS:
 9                In our training, we do go over that,
10           that once we have a release date for an
11           offender and he's due for release that we
12           are to handle the release as long as we
13           have everything that we need to do the
14           release.  So they do know that an offender
15           is not to be held over once we get
16           everything necessary.  They need to be
17           released.
18    BY MS. WASHINGTON:
19           Q.    Okay.  Are employees of the
20    pre-class department provided with any training
21    or instruction that delays in conducting time
22    calculation could result in persons being held
23    past their release date?
24           A.    Yes.
25           Q.    Okay.  What does that consist of?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
1           A.    It's in the training.  Whenever we
2     do our pre-class training, that is mentioned in
3     every step of it, the pre-class receiving it, not
4     to hold onto it, and it's to keep going through
5     the steps.  Once they -- and to time comp and --
6     because if they are due for release, we need to
7     handle those releases.
8           Q.    Okay.  But like we just discussed,
9     the steps that are being covered in the training,
10    that only has to do with once a pre-class packet
11    has arrived in the pre-class department; is that
12    correct?
13          A.    Correct.
14          Q.    What training are persons within the
15    pre-class department provided regarding concerns,
16    communications that might come into the
17    department about someone's time not being
18    computed or someone being overdue for release?
19          A.    Basically if someone -- if a call or
20    e-mail, anything, if we get one, our supervisors
21    and managers are -- you know, we meet and talk
22    about this, that they are to get -- every
23    possible way try and get the paperwork.
24                Employees, not so much, because the
25    majority of the employees, they don't receive the
```

1  e-mails or phone calls.  If they do, they know to
2  bring it to their supervisor.
3        Q.    Okay.  Are there any specific steps
4  that the supervisors and managers have been
5  instructed to take when they receive a concern
6  about time computation?
7        A.    We always tell them the fastest
8  possibly way, and which is phone calls for us, so
9  they usually start off with phone calls.  Once we
10 get nowhere with a phone call, we start sending
11 e-mails; or we may e-mail saying tried to call
12 and trying to get paperwork.
13       Q.    Is there a mechanism by which the
14 department tracks or logs or records the outreach
15 that a supervisor or manager or you personally
16 take when you've received a complaint about time
17 computation delays?
18       A.    We have just started where we fill
19 out a narrative now on anything that we are
20 trying to get.  If we call, we put who we call;
21 and we pretty much started that within the last
22 year or less, a little bit less.
23       Q.    And why was this new narrative
24 system put into place?
25       A.    So we can track.  I wanted them to

1    keep from having to come tell me about every one,

2    to track if -- if it's a specific parish that we

3    are having problems with.

4            Q.    And prior to this narrative system

5    being put into place, there wasn't any way by

6    which you-all were tracking particularly

7    problematic parishes?

8            A.    We didn't track the parishes per se.

9            Q.    Did you track the outreach or the

10    e-mails or calls in any kind of way?

11            A.    We did until, once the case was

12    processed, it went with the case.  Like we didn't

13    keep a going record of them.

14            Q.    What do you mean "it went with the

15    case"?

16            A.    By if we processed a case and we had

17    to call, they would write little notes on it and

18    it stayed with that paperwork until they finished

19    -- completed it; and I don't think they kept the

20    paperwork with it.  Just once they finished it,

21    it was done.

22            Q.    Okay.

23            A.    And that was the -- after the

24    scanning, it was held a couple of months and then

25    shredded.

```
 1            Q.    And if you-all were receiving calls,
 2    let's say, from family members of people who
 3    maybe hadn't had their time calculated or family
 4    members were concerned that someone was due for
 5    release, is there a way that those calls were
 6    being logged within the pre-class department?
 7            A.    Not logged.
 8            Q.    Okay.   Other than the training that
 9    we discussed, the booklet and the on-the-job
10    training that you received when you were at
11    pre-class at Hunt and the other on-the-job
12    training that you got when you started in your
13    director position, is there any other training
14    that you've received specifically with reference
15    to your current job responsibilities?
16            A.    As far as training, we will go -- I
17    don't want to call -- I guess it would be
18    training.   We'd go through the legislature --
19    once the laws change and we sit down with legal
20    and go through to make sure the understanding and
21    the process of it.
22            Q.    And that would be as to legislative
23    statutory changes?
24            A.    Correct.
25            Q.    Is that done annually?
```

```
 1          A.    Yes, if we have any changes dealing
 2    with pre-class or time comp.
 3          Q.    Okay.  Anything else, any other
 4    training that we haven't gone over?
 5          A.    I mean, then I guess we have
 6    mandatory training, but that's not specifically
 7    job, you know, related.
 8          Q.    What is the mandatory training on?
 9          A.    It's just ethics and just we have a
10    lot of mandatories that we have to take in a year
11    --
12          Q.    Okay.
13          A.    -- during the year.
14          Q.    And are those in-person trainings?
15          A.    Some are in-person and some are to
16    be done on the computer that are eligible to be
17    done on the computer.
18          Q.    Okay.  But those are specific to the
19    pre-class department?
20          A.    To the -- no.  No.
21          Q.    You mentioned the development of the
22    modules in the last year or two.  Have there been
23    any other changes to the training that's being
24    provided to the pre-class staff in recent years?
25          A.    Not -- I'm trying to think if any
```

```
 1   different -- I mean, we train and we try -- we do
 2   -- we have changed it where -- and this has been
 3   a few years where the employee -- the supervisors
 4   meet with their employees -- and we tried once a
 5   week -- just to talk over the cases that they
 6   had.
 7          Q.    When did that start?
 8          A.    That's been going on for a couple of
 9   years.
10          Q.    And that's to go over the cases that
11   the employee has been assigned for the time
12   computation?
13          A.    Right.  If they have any problems or
14   issues with them.
15          MS. WASHINGTON:
16                Okay.  I'm going to show you what we
17          can mark as Exhibit 32.
18       (Exhibit 32 marked and tendered.)
19   BY MS. WASHINGTON:
20          Q.    Are you aware of the Lean Six Sigma
21   study that the Department of Corrections engaged
22   in in 2012?
23          A.    Yes.
24          Q.    What was your involvement in the
25   study?
```

 1          A.    I was at the meetings to give
 2    information how the paper -- how it's handled,
 3    the work is handled and number of cases, things
 4    like that.
 5          Q.    And the exhibit that I have marked
 6    as 32 and handed to you, am I correct that this
 7    is a PowerPoint presentation that sums up the
 8    findings of the study?
 9          A.    Correct.
10          Q.    Were you present when this
11    presentation was given?
12          A.    Yes.
13          Q.    Who all was present for the
14    presentation?
15          A.    I really can't -- I can't name --
16    now that I've seen some of these names, I can say
17    -- but I -- I know they worked on it, but I can't
18    say for sure they were present in the
19    presentation.
20          Q.    Okay.  Sure.  Let's look at the
21    third slide in this exhibit.  It mentions what
22    the LSS, which I assume stands for Lean Six
23    Sigma, correct?
24          A.    Correct.
25          Q.    And this slide discusses the project

 1   team and that it consisted of seven DOC staff,
 2   other DPS LSS trained staff, and then three
 3   project champions; is that correct?
 4           A.    Yes.
 5           Q.    Were you one of the DOC staff that
 6   was part of the LSS team?
 7           A.    Yes.
 8           Q.    Okay.  And I'm correct that
 9   Secretary LeBlanc is listed there as one of the
10   project champions?
11           A.    Yes.
12           Q.    And this exhibit is the PowerPoint
13   presentation that includes the notes section of
14   the slide, and under this slide it explains that
15   "Champions guide the work and approve the work
16   during toll gates at the end of each phase of
17   work."  Did I read that correctly?
18           A.    Yes.
19           Q.    And so Secretary LeBlanc was one of
20   the champions who guided the work and approved of
21   the work at various phases of the study; is that
22   correct?
23           A.    I'm not sure if he did or not, no.
24           Q.    Okay.  But you would agree that he
25   is listed as one of the champions, correct?

```
 1          A.     Yes.
 2          Q.     And also that this slide provides a
 3   definition for champions?
 4          A.     Yes.
 5          Q.     We can turn to the next page in the
 6   slide, the fourth slide, which is titled Business
 7   Case.  Do you see where I am?
 8          A.     Yes.
 9          Q.     And am I correct in understanding
10   that this slide gives the state of affairs in
11   January of 2012 relative to pre-class?
12          A.     Yes.
13          Q.     Okay.  And on this slide it
14   indicates that at that time there was 1,446 cases
15   that were backlogged to have time computed; is
16   that correct?
17          A.     Yes.
18          Q.     And also provides an average
19   processing delay of 110 days?
20          A.     Yes.
21          Q.     And then looking down at the bottom
22   of the slide, it indicates that there was an
23   83.44 percent occurrence of an immediate release
24   upon processing; is that correct?
25          A.     Yes.
```

 1          Q.    What is referred to as an "immediate
 2    release"?
 3          A.    Immediate release to pre-class, and
 4    I'm not sure what it was referring to here.  It
 5    is anyone releasing from the date he's time
 6    comped within ten days in the future.
 7          Q.    Okay.  So am I correct in
 8    understanding that once time was calculated
 9    83 percent of the cases were due for immediate
10    release either because the release date had
11    passed or it was within ten days; is that
12    correct?
13          A.    Yes.
14          Q.    Okay.  And so to summarize this
15    business case slide, would it be fair to say that
16    the Six Sigma study found that there were a lot
17    of people waiting or a lot of cases that were
18    waiting months to be calculated?
19          A.    I'm not sure if it's saying that or
20    that we -- how long it was waiting.  It shows the
21    backlog, there was a backlog.
22          Q.    Okay.
23          A.    But I'm not sure how long they were
24    waiting to be worked.
25          Q.    Okay.  But this slide is talking

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1   about the number of cases that were in backlog to

2   have their time computed, correct?

3          A.     Correct.

4          Q.     And also contains the finding that

5   there was an average processing delay of 110 days

6   for cases; is that correct?

7          A.     Correct.

8          Q.     Okay.  If you look at the seventh

9   slide, there's a little number seven in the

10  bottom right-hand corner.  And am I correct that

11  this slide is looking at kind of the different

12  stages of the process between when a person is

13  sentenced and the time is ultimately computed?

14         A.     I'm not sure if it's between the

15  time sentenced and computed or just that DOC

16  received it.

17         Q.     Okay.

18         A.     I'm not sure.

19         Q.     That makes sense.  And this slide is

20  looking at different agencies or actors who play

21  a role in getting the information from when a

22  person is sentenced to the Department of

23  Corrections; is that correct?

24         A.     Correct.

25         Q.     Okay.  And it is discussing the



```
 1    various clerks of court and then the jails that
 2    would be run by a local sheriff; is that correct?
 3            A.    Correct.
 4            Q.    Okay.  I'm looking at the next page,
 5    which is the eighth slide.  And I'm looking at
 6    the note section to that slide where it says
 7    "While there does seem to be delays between the
 8    clerks and the jails to us, our approach was to
 9    focus on minimizing our CT before addressing it
10    with out agencies."  Did I read that correctly?
11            A.    Yes.
12            Q.    Okay.  Is it your understanding that
13    the study chose to focus on minimizing time to
14    time calculations for actions taken within the
15    Department of Corrections?
16            A.    I think it was looking at the
17    process, the time it took from the time of
18    sentencing all the way through time comp and
19    looking at the length it took at each step --
20            Q.    Okay.
21            A.    -- and trying to minimize it.
22            Q.    Okay.  I guess my question is about
23    that note section.  Have you seen this note to
24    this slide before?
25            A.    Maybe in the past, but I don't
```


Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    remember it.

2         Q.    Okay.  Well, I guess my question is

3    this.  The study showed that there were delays

4    between conviction or sentencing and the

5    documentation actually being received by the

6    Department; is that correct?

7         A.    Correct.

8         Q.    Okay.  Do you know whether or not

9    the study made any recommendations as to this

10   part of the delay in time computation?

11        A.    I'm not sure.

12        Q.    Okay.  Do you know if the Department

13   of Corrections has gone back since this study to

14   address the delays that might be happening at the

15   level of the clerk of court or the sheriffs'

16   offices since this study?

17        A.    I know that because I was involved,

18   went to a meeting with them with the clerk of

19   courts trying to see if there was a delay in the

20   time of sentencing until they got the paperwork

21   ready.

22        Q.    Okay.  When did that occur?

23        A.    It's been probably maybe 2016,

24   somewhere in there.

25        Q.    Okay.  And was that with all of the



1    clerks of courts across the state?

2         A.    It was with Ms. Hudnell.  I can't

3    think of her name.  She's over the clerk of

4    courts.

5         Q.    For the State of Louisiana?

6         A.    State of Louisiana, yes.

7         Q.    Okay.  What were the outcomes of

8    that meeting?

9         A.    Not really, that I remember, much

10   other than she was going to get with the clerks

11   of courts and see if they could -- you know, if

12   there was a delay or if -- you know, we just met

13   with her to see if she could work with us on

14   that.

15        Q.    Okay.  Do you know of any follow-up

16   communication with Ms. Hudnell?

17        A.    I'm not really sure directly with

18   her.

19        Q.    Uh-huh (affirmatively).

20        A.    But I haven't had any communications

21   with them --

22        Q.    Okay.

23        A.    -- about it.

24        Q.    Do you know if any changes were made

25   to the actions that the clerks of court were

1    taking following this meeting that you-all had?

2         A.    I know that was part of the UCO,

3    becoming part of law and going -- the Supreme

4    Court ordering that.

5         Q.    And that's the uniform commitment

6    order?

7         A.    Correct.

8         Q.    And you're not sure when that

9    started?

10        A.    No.  I'm not sure.

11        Q.    I want to look at slide 17 of this

12   exhibit.

13        A.    (Witness complied.)

14        Q.    And looking at that first column

15   which talks about a baseline and says May.  Do

16   you see that?

17        A.    Yes.

18        Q.    And I assume that would refer to May

19   of 2012 when this study was occurring; do you

20   know?

21        A.    I wouldn't -- I don't know.

22        Q.    Okay.  In that baseline column under

23   the -- the first row, it indicates that there was

24   2,252 immediate releases per year as the

25   baseline; is that correct?

1          A.     Correct.

2          Q.     And this would be immediate releases

3    as we discussed just a minute ago?

4          A.     Yes.

5          Q.     Which would be cases where either

6    the release date had already come due and passed

7    or release dates that were within ten days; is

8    that correct?

9          A.     Yes.

10         Q.     And this slide also then shows

11   immediately below that that there was a baseline

12   of 71.7 days overdue per case; is that correct?

13         A.     Correct.

14         Q.     And this slide then also shows a

15   column for goals; am I correct?

16         A.     Yes.

17         Q.     And am I correct in understanding

18   that that was the -- the goal that the Department

19   of Corrections was -- was hoping to achieve

20   through some of the programs that were being

21   piloted as part of this study?

22         A.     I'm not sure.  I don't remember what

23   -- how the goal came up, but --

24         Q.     Okay.  Do you understand this to be

25   a goal of the Department of Corrections?

1        A.      Yes.

2        Q.      Okay.  And my question is that under

3    immediate releases, the goal is listed as 1,802

4    immediate releases per year, correct?

5        A.      Yes.

6        Q.      Do you know -- do you know why that

7    was the goal?

8        A.      I'm not sure, because immediate

9    releases could happen whether from sentencing and

10   already being immediate to earning credits in

11   custody, so I don't know if that was taking

12   effect that we would bring it down to that

13   because of the amount of credit.  I'm not sure

14   what the offender's receiving.

15       Q.      And then below that, the stated goal

16   for number of overdue days per case is listed as

17   31; is that correct?

18       A.      Correct.

19       Q.      That would be about a month?

20       A.      Correct.

21       Q.      Do you know why this was the goal?

22       A.      I'm not sure.

23       Q.      Okay.  Do you know why the goal

24   wouldn't have been 0?

25       A.      I'm not sure.

1        Q.    There's a column on that same slide

2    for control.  Do you see where I'm looking at?

3        A.    Yes.

4        Q.    Do you know what that column

5    represents?

6        A.    I don't remember.

7        Q.    Am I correct in understanding that

8    during this study there were various pilot

9    programs or different test processes that were

10    still well over a thousand releases per year?

11        A.    Yes.

12        Q.    Okay.  And that assessments were

13    made about whether or not any of those pilot

14    programs had any success in achieving the stated

15    goals of the department; is that correct?

16        A.    Yes.

17        Q.    And am I correct in understanding

18    that even with some of these pilot programs and

19    changed processes in place that there were still

20    well over a thousand immediate releases per year?

21        A.    Yes.

22        Q.    And that the overdue days per case

23    remained at about 60; is that correct?

24        A.    Yes.

25        Q.    Okay.  I want to look at slides 26

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    and 27 which are titled Recommendations and

2    Additional Recommendations.  And my question is

3    just for the record, to your knowledge, were

4    these recommendations on these two slides carried

5    out by the department as followed on this study?

6         A.    I believe some of them were -- were

7    carried out, some were carried out and changed

8    since it -- you know, after the --

9         Q.    And some of them were not, though?

10        A.    Well, I think --

11        Q.    Which ones do you know were carried

12   out?

13        A.    They locate a specialized pre-class

14   central office where we -- where we still have

15   two places.

16        Q.    But am I correct in understanding

17   that was the movement of the pre-class department

18   to headquarters in David Wade?

19        A.    David Wade already had a pre-class

20   department and they just left it there --

21        Q.    Okay.

22        A.    -- so I don't --

23        Q.    So what steps were taken to carry

24   out this recommendation?

25        A.    We moved -- we moved pre-class from

1   the institutions.  Each institution had pre-class

2   and we moved those pre-class sections to

3   headquarters.

4           Q.    Okay.  Are there other of the

5   recommendations on these two slides that were

6   carried out?

7           A.    The management routines we carry out

8   as far as having meetings with the groups.  We

9   have supervision in levels now.  I'm not sure

10  about the number of positions.  I wasn't involved

11  in that one.  We did move the files here.  All

12  the pre-class that came here, we moved them here

13  and now we have since started scanning them.

14          Some of the legislative statutes

15  were revised and made it a little bit simpler to

16  know time comp, but since this, you know,

17  legislation, it changes every year and they'll

18  add some different laws, so the Uniform

19  Commitment Order was created and that was to be

20  filled out in the court by the judge and signed

21  by the judge in court so it was available

22  immediately.

23          Q.    Available to who, who immediately?

24          A.    So it was available to give to the

25  jails to start the process to send to us.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1          Q.    But it sounds like that wasn't put
2    in place until more recently; is that correct?
3          A.    Well, it was in place.  It's just
4    it's been changed and they have made it a law.
5    The supreme court pushed it, and I don't remember
6    exactly what year, but they did start it fairly
7    -- not -- it was after '12 because they had to
8    make the foreman things, but --
9          Q.    Was it -- was it mandatory to be
10   used at that point in time?
11         A.    Not at this point, no.
12         Q.    Okay.
13         A.    I'm not sure about the communication
14   of the requirements with all stakeholders.  I'm
15   not sure what that means.
16         Q.    You're looking at the recommendation
17   to provide communication of the requirements with
18   all stakeholders?
19         A.    I'm not sure.
20         Q.    You're not sure of that
21   recommendation?
22         A.    I'm not sure what it means.
23         Q.    Okay.
24         A.    Standardized pre-class and time
25   computation procedures, it was pretty much we --
```

1    there was one way to do it and we were doing it.

2              The resource for the new employees

3    to reference, we do have -- again, we don't call

4    it a resource and we -- it's just the different

5    laws out there that -- the acts that they could

6    fall under and the commitment dates, so we have

7    done that.

8              The electronic filing, and we did

9    reduce the transfer of paper files because we

10   have started scanning all newer files.  Anybody

11   sentenced after 2013 are a scanned file.

12        Q.    Okay.  So you started scanning in

13   2013?

14        A.    I think it was June of '13.

15        Q.    But I'm correct in understanding

16   that the pre-class department still receives hard

17   copy paper packets?

18        A.    Correct.

19        Q.    Okay.  Am I correct that none of

20   these recommendations have to do with any of the

21   delays that might be occurring at the level of

22   the clerk of court or the local sheriffs prior to

23   information being received by the Department of

24   Corrections?

25        A.    Not prior to us receiving it, no.

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

 1          Q.     Looking at the 37th slide of this
 2    exhibit, in the note section it says "Angela G."
 3    Is that referring to you?
 4          A.     Yes.
 5          Q.     Did you design this slide?
 6          A.     No.
 7          Q.     Okay.  Why does it have you in the
 8    notes section?
 9          A.     I think what they did is have --
10    they picked different slides and we read them to
11    the -- in the meeting.
12          Q.     Okay.  So you gave this slide during
13    the presentation?
14          A.     Correct.
15          Q.     Okay.  And am I correct that this
16    slide deals with benefits that might befall
17    various people, including wardens, staff, and the
18    prisoners themselves, if there are reductions in
19    the amount of time that it takes for pre-class
20    time computations?
21          A.     Correct.
22          Q.     Okay.  And so this slide in
23    describing the benefits to prisoners includes
24    less wait time for time computation, correct?
25          A.     Yes.

 1          Q.     And the second one listed there is
 2     less releases beyond due date; is that correct?
 3          A.     Correct.
 4          Q.     And also it appears fewer complaints
 5     or questions about time computation?
 6          A.     Correct.
 7          Q.     Okay.  So at the time of this study
 8     in 2012 and when you were giving the presentation
 9     on this slide, it was known to be a consequence
10     to DOC sentenced persons if there is delays in
11     time computation that they might be released
12     beyond their due date; is that correct?
13          A.     I don't understand the question.
14          Q.     I'm looking at the second bullet
15     point under the title Offender here.
16          A.     Uh-huh (affirmatively).
17          Q.     And it says, "less releases beyond
18     due date," correct?
19          A.     Correct.
20          Q.     And so am I correct in understanding
21     that the Department of Corrections knew at the
22     time of this study that one of the consequences
23     of the delays in time computation was that
24     prisoners were at risk for release beyond their
25     due dates?

```
 1          A.     Correct.
 2          Q.     And am I correct based on the slides
 3    that we reviewed in this presentation that even
 4    with the various pilot programs and changes in
 5    processes that were part of this study, immediate
 6    releases continued?
 7          A.     Yes.  We still have immediate
 8    releases.
 9          Q.     Okay.  And that even at the time of
10    this study after the various pilot programs had
11    been tried, there was still an average overdue
12    days per case of about two months; is that
13    correct?
14          A.     As far as the program -- this --
15          Q.     As far as the study?
16          A.     The Lean Six Sigma study, yes.
17          Q.     Uh-huh (affirmatively).  Okay.
18    MR. EVANS:
19              Take a little bit of a break.
20    MS. WASHINGTON:
21              Sure.  Let's go off the record.
22       (A short recess was taken.)
23    BY MS. WASHINGTON:
24          Q.     We can go back on the record.  We
25    were just wrapping up talking about the Six Sigma
```

```
 1    study, correct?
 2          A.    Correct.
 3          Q.    Is there a mechanism by which the
 4    Department of Corrections tracks the number of
 5    immediate releases per year that was included in
 6    that study?
 7          A.    I'm really not sure how they got the
 8    numbers off -- I'm really not sure how they get
 9    it.
10          Q.    Okay.  Do you know who would have
11    provided the study with those numbers?
12          A.    I'm not sure.
13          Q.    Is it information that's maintained
14    by your pre-class department?
15          A.    We keep manual -- some different
16    numbers, but it's just them writing little ones,
17    but I don't think they took that.  I'm not sure
18    how they -- where they got it from.
19          Q.    Okay.  So the pre-class department
20    doesn't maintain its own record of the number of
21    immediate releases per year?
22          A.    No.
23          Q.    Okay.  And what about the data that
24    was contained about the average number of overdue
25    days per case, do you know where that information
```

```
 1    came from?
 2         A.    I'm not sure.
 3         Q.    Okay.  Does the pre-class department
 4    maintain any way to track the average number of
 5    overdue days per year?
 6         A.    No.
 7         Q.    Okay.  Does the Department of
 8    Corrections at large have a policy and procedure
 9    manual?
10         A.    Yes.
11         Q.    Okay.  Is there a mechanism by which
12    employees of the department receive that manual?
13         A.    It's on the Lotus notes.  We can
14    pull them up.
15         Q.    Okay.  Is there a particular section
16    of the manual that deals with the pre-class
17    department?
18         A.    Yes.  There's a pre-class manual.
19         Q.    Okay.  Is it just one policy or are
20    there multiple policies?
21         A.    There's one -- it -- it's different
22    steps.  The pre-class part, the time comp,
23    there's a time comp part.
24         Q.    Okay.  When people start their
25    employment with the Department of Corrections, do
```



```
 1    they receive a hard copy of the policy manual?
 2         A.    No.  They go through training, but I
 3    don't -- a mandatory training, but no copies of
 4    the policy would be -- of all the policies -- are
 5    you talking about pre-class?
 6         Q.    No.  I was just --
 7         A.    General.
 8         Q.    -- talking in general at this point.
 9         A.    No.  Oh, yeah.  No.
10         Q.    Okay.  Are new employees provided
11    with instructions about where to access policies
12    that would be relevant to their job
13    responsibilities?
14         A.    I'm not sure in the training they
15    receive, which is our training department does
16    that.  But we try -- in pre-class we do, but I'm
17    not sure about in their initial training.
18         Q.    Okay.
19         A.    I'm not sure.
20         Q.    Do you know what is covered in the
21    initial training by the training department?
22         A.    I don't remember.
23         Q.    Did you go --
24         A.    It's been years ago.
25         Q.    -- through it yourself --
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          A.     Yeah.
 2          Q.     -- when you first started?
 3          A.     Yeah, right, uh-huh (affirmatively).
 4          Q.     Okay.  Do you remember if it covers
 5   topics that have to do with the pre-class
 6   department?
 7          A.     I'm really not sure, but I don't --
 8   it -- it's basic.  Everybody goes to it, so I
 9   really don't think a specific job, you know,
10   department is covered.
11          Q.     And -- and so you mentioned that
12   there are a couple of policies that are related
13   to the work that the pre-class department does,
14   correct?
15          A.     Correct.
16          Q.     And how are new employees that you
17   have in the pre-class department provided with
18   access to those policies?
19          A.     And -- and it really -- we -- I keep
20   saying policies.  It's regulations.  We call them
21   reg --
22          Q.     Uh-huh (affirmatively).
23          A.     And we do give them copies of the
24   pre-class, in the training material of the
25   pre-class, the time comp, the release
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   regulations.

2          Q.    Okay.  And you provide that in hard

3   copy to all new employees within the pre-class

4   department?

5          A.    Correct.

6          Q.    Okay.  And is there any training

7   course or curriculum that's actually performed

8   based on those policies?

9          A.    The module trainings are kind of

10  based on those because it is our job; and -- and

11  even though we give it to them, they still have

12  to do on-the-job training to understand what it

13  is, but the modules are based on -- pretty much

14  on those regulations.

15         Q.    Okay.  Do you all do any kind of pre

16  or post testing of new employees in the pre-class

17  department to see if they understand the

18  information that they received?

19         A.    We audit cases.

20         Q.    Okay.

21         A.    We do internal audits.

22         Q.    Okay.  And how -- how do you perform

23  those audits?

24         A.    It's cases that they have worked and

25  we check them.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

```
 1            Q.     Is there a certain percentage of
 2    cases that you check?
 3            A.     Yes.  They do a percentage; and I
 4    can't remember the percent, but it's roughly --
 5    each supervisor has roughly 35 cases a month that
 6    they audit.
 7            Q.     And when you say "each supervisor,"
 8    you are talking about the five supervisors who
 9    work under the two managers under you?
10            A.     Correct.  Correct.
11            Q.     Okay.  Do you review the audits that
12    the supervisors do?
13            A.     The managers -- the managers do and
14    then they will come and talk to me about the --
15    what they found and if it's a specific employee
16    or -- or a specific kind of case that's the
17    issue.
18            Q.     Okay.  Other than the regulations
19    that the department puts out and the training
20    modules and the booklet that you referenced
21    before and the sort of cheat sheet, are there any
22    other sort of written directives that are used by
23    pre-class department employees in doing their
24    jobs?
25            A.     Yeah.  We -- we may send out e-mails
```

1   with changes or just a reminder of things, how to

2   do something or reminder of anything that changes

3   in legislation once it changes, things like that.

4          MS. WASHINGTON:

5                Okay.  I'm going to show you what we

6          can mark as Exhibit 33, which I'm hoping

7          is one of the policies that you just

8          mentioned.

9       (Exhibit 33 marked and tendered.)

10  BY MS. WASHINGTON:

11         Q.    Take a look at that and let me know

12  if you recognize it.

13         A.    Yes.  It's the pre-class reg.

14         Q.    Okay.

15         A.    Uh-huh (affirmatively).

16         Q.    And this is the copy of the policy

17  that we received in discovery in this case.  And

18  am I correct that at the top of it it has a

19  printed, like type printed date of the 15th of

20  February, 2011?

21         A.    Yes.

22         Q.    And then there seems to be a

23  handwritten note that says revised 4/5/13; is

24  that correct?

25         A.    Yes.



```
 1              Q.    And then at the bottom of the copy
 2    we received, it indicates that this is a true
 3    copy as of April of 2018.
 4              A.    Yes.
 5              Q.    Do you know if this is the correct
 6    version of this policy?
 7              A.    I'm really not sure --
 8              Q.    Okay.
 9              A.    -- without pulling it.
10              Q.    Do you know if there would have been
11    any revisions since the one that's noted in 2013?
12              A.    I'm not sure.  Usually pre-class is
13    the same process --
14              Q.    Uh-huh (affirmatively).
15              A.    -- as far as the pre-class, the
16    beginning part.
17              Q.    As director of the pre-class
18    department, do you know of any changes that have
19    been made to this policy since 2013?
20              A.    I'm not sure, yeah.
21              Q.    As director of the pre-class
22    department, would you be involved in any
23    revisions to the pre-class policy?
24              A.    Yes, uh-huh (affirmatively).
25              Q.    Okay.  And do you recall any changes
```

1    or input that you had into the policy since 2013?

2         A.    I'm trying to think.  I just can't

3    remember the -- if we changed it and when.

4         Q.    Okay.  So you don't have a specific

5    memory of any revisions since this one that's

6    noted in 2013?

7         A.    Not -- right.  I'd have to look it

8    up in my -- yeah.

9         Q.    Okay.  I want to look just at the

10   first page of this Exhibit 33 where it says

11   purpose.  Do you see where I'm reading?

12        A.    Yes.

13        Q.    And it says "To establish standard

14   operating procedures for regional facilities to

15   prepare newly convicted offenders housed at local

16   jail facilities for initial reception and

17   diagnostic processing."  Did I read that

18   correctly?

19        A.    Yes.

20        Q.    And this is the purpose of this

21   pre-classification policy; is that correct?

22        A.    Yes.

23        Q.    What regional facilities are being

24   referred to in this section?

25        A.    This -- prior to pre-class becoming

1    -- coming to headquarters, they were at each of
2    the institutions and there were regional
3    facilities.  Certain facilities was considered
4    together a region.
5         Q.    Okay.  And so that reference
6    predates the movement of the pre-class department
7    to headquarters?
8         A.    Correct.
9         Q.    And am I correct that that occurred
10   following the Six Sigma study?
11        A.    Yes.
12        Q.    I want to look at the second page at
13   the top where it says policy, colon.  Do you see
14   where I'm referring to?
15        A.    Yes, uh-huh (affirmatively).
16        Q.    And in that paragraph, it says that
17   it is the secretary's policy to ensure that
18   information necessary for reception and
19   diagnostic processing is captured and documented
20   soon after sentencing.  Do you see where I'm
21   reading?
22        A.    Yes.
23        Q.    And is that sentence the policy of
24   the Department of Corrections?
25        A.    It is to -- that is our procedure.

 1    We get it as soon as it's -- they sentence and

 2    they get the paperwork to send it to us to

 3    process.

 4         Q.    Okay.  What is your understanding of

 5    the phrase, "soon after sentencing?"

 6         A.    As soon as whenever -- because the

 7    jail gets their paperwork sentencing minutes,

 8    UCO, what they get from somewhere.  I'm not sure

 9    if they get it from the court, the clerk of

10    court, I'm not sure; but once they receive it,

11    that's notification to them that the offender has

12    a hard labor sentence.  So as soon as they get it

13    to process him is as soon as they can to get it

14    to us.

15         Q.    Okay.  And so it's the policy of the

16    secretary to ensure that the information that is

17    needed for a time computation is, quote.

18    Captured and documented soon after sentencing; is

19    that correct?

20         A.    Yes.

21         Q.    I want to look down at the very

22    bottom of that page where it says Procedures.  Do

23    you see that?

24         A.    Yes.

25         Q.    And it says there "Upon notification

1    that an offender has been sentenced to the

2    custody of the DPS&C, ARDC specialists at the

3    appropriate regional facility shall compile all

4    required information, including but not limited

5    to the following," and then it continues --

6           A.    Uh-huh (affirmatively).

7           Q.    -- is that correct?

8           A.    Yes.

9           Q.    And in this section of the policy

10   where it is talking about notification that's

11   received by DPS&C, is this the same notification

12   that we discussed earlier?

13          A.    Yes.  That the jails notify us with

14   the paperwork.

15          Q.    And I'm correct in remembering your

16   testimony that there's no other mechanism other

17   than the arrival of the packets by which DPS&C is

18   notified?

19          A.    No, correct.

20          Q.    Okay.  And the following page which

21   has the Bates number in the bottom right-hand

22   corner of 2118, about a third of the way down, it

23   talks about how "If any of the required

24   information is missing, an ARDC specialist shall

25   contact the appropriate agency, slash, office and

```
1    request the information."  Do you see where I'm
2    reading?
3          A.    Yes.
4          Q.    And I think you indicated before
5    that this would be the responsibility of persons
6    within the pre-class department?
7          A.    Yes.  As long as they are still in
8    the parish jail, the offender.
9          Q.    Tell me a little bit more about
10   that.
11         A.    Meaning, if -- if he has a sentence,
12   and we have received the paperwork on one
13   sentence and we process him, do his time comp,
14   and he moves into a state facility and he has
15   another sentence out there, the institution would
16   be responsible --
17         Q.    Okay.
18         A.    -- for getting the --
19         Q.    But if the initial packet of
20   information that was received in pre-class was
21   missing some of the required information, it
22   would be the responsibility of pre-class
23   employees under your department --
24         A.    Yes.
25         Q.    -- to follow up; is that correct?
```

```
 1          A.    Yes.  Yes.
 2          Q.    And in the section immediately below
 3   that where it talks about pre-class screening; do
 4   you see that?
 5          A.    Yes.
 6          Q.    And we talked a little bit about
 7   screening before, and I just wanted to ask.  The
 8   policy indicates that each offender shall be
 9   screened for intake priority and then lists some
10   various factors or program eligibility, correct?
11          A.    Correct.
12          Q.    And the first one says "immediate
13   release eligibility;" is that correct?
14          A.    Yes.
15          Q.    And I guess my question is, when
16   information comes into the pre-class department
17   and the employees under your supervision are
18   screening for the intake priority, is immediate
19   release eligibility one of the factors that they
20   are supposed to be considering?
21          A.    Yes.
22          Q.    Okay.  And how are they instructed
23   in how to determine whether or not that
24   particular case is immediate release eligible?
25          A.    They have to look at the crime and
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    then his sentence length and his jail credit, and
2    depending on what act he would fall under depends
3    on how much time he would have to serve, what
4    percentage of the time he has to serve; and just
5    kind of calculate it out by hand first and if
6    he's an immediate -- looks like he's going to be
7    close to being released within a month even, we
8    process -- those are done first.
9         Q.    Okay.  And when we talked earlier,
10   you mentioned that after the time computation is
11   completed a copy of the master prison record is
12   sent to the facility for the prisoner himself; is
13   that correct?
14        A.    Yes.
15        Q.    Is there any mechanism by which the
16   pre-class department logs or records when those
17   master prison records are sent out?
18        A.    No.
19        Q.    Okay.  How does the pre-class
20   department track which packets or cases have been
21   received and are still awaiting time computation?
22        A.    We have -- say it's hard copies, so
23   even though we scan it, that hard copy still gets
24   passed on to another group to do the time comp
25   once they process it.  So the employee that's

 1    assigned the case to time comp, they -- if they
 2    have a hard copy of it, it needs to be time
 3    comped.  Once they time comp it, it's all
 4    scanned, the rest of it is scanned in and indexed
 5    and then in the meantime the supervisor has
 6    access to what's out there in the scan program
 7    and what hadn't been indexed.  They will check
 8    and see if it's time comped and needed to be time
 9    comped or it's time comped and they just need to
10    index the paperwork.
11            Q.    Okay.  And just so I understand,
12    when the packets come in and are with the intake
13    group --
14            A.    Uh-huh (affirmatively).
15            Q.    -- are they responsible for scanning
16    all of those documents?
17            A.    The documents, correct.
18            Q.    Okay.  And that's the stage at which
19    they are stamped as received?
20            A.    Correct.
21            Q.    Okay.  And so after they have been
22    scanned by the intake group, there's some kind of
23    electronic folder?
24            A.    There's a -- once they scan it, they
25    enter a pre-class screen that's in our system and

1    it's -- it's marked as incomplete.  It's an I.

2    And so once that happens, it goes to the time

3    comp people; and once they time comp it, it flips

4    to an R, meaning he's ready for intake or we can

5    handle a release, if that's necessary.  So any of

6    the Is, we keep up with that also.  Any

7    incompletes, what -- what -- are we missing

8    paperwork or do we just need to calculate it.

9         Q.    Okay.  And this is inside of CAJUN

10   --

11        A.    CAJUN.

12        Q.    -- is that correct?

13        A.    Correct.

14        Q.    Okay.  And so do you have the

15   ability as a director to go into CAJUN and see

16   how many cases are marked as I for incomplete?

17        A.    Yes, I can.

18        Q.    Okay.  And do you also then have the

19   ability to conduct a search for R marked

20   pre-class screens?

21        A.    It -- we can pull up Rs and it's by

22   parish.  We have to put in each individual

23   parishes.

24        Q.    Okay.  In the screening and intake

25   priority process, is there any system by which

GRIFFIN, ANGELA 7/17/2019

1    the supervisors conduct a review of whether or

2    not those cases that have been marked as priority

3    actually are being treated by the employees with

4    priority?

5         A.    Other than just making sure all of

6    them are calculated, they just hand them -- I

7    mean, the supervisors may keep up with a sheet or

8    something.  I'm not sure if they keep a list and

9    to see when they completed it, the employee

10   completed it.  I'm not sure.

11        Q.    Okay.  And as far as the completion

12   of this pre-class screen that has the I and the R

13   notations in it, did that general format for the

14   pre-class screen exist in 2016?

15        A.    Yes.

16        Q.    Okay.

17        A.    That whole process that we just

18   described would have existed in 2016.

19        Q.    We just looked at the

20   pre-classification policy.  To your knowledge, is

21   there any policy that informs how the department

22   is supposed to respond when you-all receive

23   concerns about delays in time computation?

24        A.    I'm not that -- I'm not sure.  Not

25   that I know of.

```
 1          Q.    Okay.  And -- and I guess sort of by
 2    the same token, is there any policy that informs
 3    how the department is supposed to respond if
 4    you-all receive complaints or concerns that a
 5    person is overdue for a release?
 6          A.    There's a -- I think there's a
 7    regulation on Administrative Remedy Procedures.
 8          Q.    Uh-huh (affirmatively).
 9          A.    And that department -- there's a
10    department that handles that.
11          Q.    Okay.  Anything other than the ARP
12    policy?
13          A.    No.  There's nothing written other
14    than us, you know, in the training telling the
15    employees, if you get something, check on it.
16          Q.    And that's just sort of an oral
17    guideline that you get during training?
18          A.    Yes.
19          Q.    Other than the oral instruction that
20    if calls or concerns are received that they
21    should pass that along, is there any kind of
22    written directive that staff in the pre-class
23    department have received about responding to
24    concerns about people past due or time
25    computation delays?
```

 1          A.    I'm not sure.  Like I say, we do
 2    send out e-mails when we have situations come up,
 3    and so I'm really not sure if we send out
 4    something.
 5          Q.    Do you remember sending anything out
 6    on that topic?
 7          A.    No.
 8          Q.    Have the staff of the pre-class
 9    department been provided with any directives
10    about how to record or keep track of calls or
11    other communications that are received with
12    concerns about delays in time computation or
13    persons being overdue for a release?
14          A.    Not keep track of them, no.
15          Q.    Okay.  Is there any way that the
16    employees in the pre-class department have been
17    instructed to record how such calls or
18    communications are followed up on?
19          A.    Like I say, other than a narrative,
20    once they start a process that's a problem or
21    calls they are checking on and they keep up with
22    who they talk to, but it's not a list or
23    something they just keep up forever.  You know,
24    it's not there to just go pull it.
25          Q.    And that narrative process I think

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

 1    you indicated started fairly recently?

 2          A.    Right.

 3          Q.    Like within the past year?

 4          A.    Correct.  Correct.

 5          Q.    Okay.  What is your role as director

 6    of the pre-class department related to responding

 7    to any kind of calls or communications that are

 8    received with concerns about delays in time

 9    computation or persons overdue for release?

10          A.    That we -- you know, and I --

11    basically, I deal with my managers.  They are to

12    be told if there are any overdue, if they -- if

13    they notified of any too, we have to start trying

14    to get the paperwork from wherever, if we know

15    where he was sentenced.  We need to just call

16    that parish jail, try and find out where -- you

17    know, where he was sentenced or --

18          Q.    Okay.  Is it your responsibility as

19    the director to investigate when you receive

20    these reports or concerns?

21          A.    As a director -- I mean, I don't

22    know about investigate, but I am -- you know,

23    once we get them, to have it investigated.

24          Q.    Okay.  And is it your responsibility

25    to make sure that the concerns or reports are

```
 1    resolved or closed out in some kind of way?
 2          A.    To the best that they can, yeah.
 3    They -- we -- I instruct them to get it taken
 4    care of if we can and know the information to get
 5    the -- you know, or getting paperwork.  We have
 6    to know where to get it from, that we need to get
 7    it and try and get it because it's up to the
 8    parish to send it to us.
 9          Q.    We talked about this a little bit
10    earlier, but I just want to make sure I remember
11    your testimony.  After a person has been
12    sentenced to time in the Department of
13    Corrections and they are still housed at that
14    local jail facility, I think you indicated that
15    it's permissible for that local sheriff to
16    transfer that DOC sentenced person to another
17    local facility, correct?
18          A.    Correct.
19          Q.    Is the facility that wants to
20    transfer the person, the parish of conviction
21    facility, are they required to notify the
22    Department of Corrections about transferring that
23    DOC sentenced prisoner to another local facility?
24          A.    They are required to let us know
25    that they transferred, yes.  Like I say, if -- if
```

1    they -- we have not received the pre-class
2    packet, most jails put it on the jail credit
3    letter transferred over to and they'll put what
4    parish and the date they transferred them and we
5    enter it.  Now, if they do not put that and the
6    other parish doesn't have -- you know, they --
7    it's not showing he's in their parish and they
8    see that, there's a form that they fill out and
9    they send in to the transfer department.
10        Q.    Who fills out that form, the
11   receiving parish?
12        A.    There's one that they are -- the
13   receiving parish can fill one out and send it in
14   and also the transferring parish; because once
15   their pre-class is done, they still can transfer
16   them and there's a form they fill out to send in
17   they are transferring this offender to this
18   parish.
19        Q.    Where would I get a copy of that
20   form?
21        A.    From probably my supervisor, Derrick
22   Ellis --
23        Q.    Okay.
24        A.    -- should have a copy.
25        Q.    Does he supervise the transfer

```
 1    department as well?
 2            A.    I think so, but I'm not positive
 3    direct or not.
 4            Q.    Okay.  But I think you indicated
 5    before that those transfer forms would not come
 6    to pre-class?
 7            A.    No.
 8            Q.    They go to a separate department?
 9            A.    Correct.
10    MS. WASHINGTON:
11            Okay.  I'm going to show you another
12            exhibit that we can mark as 34.
13        (Exhibit 34 marked and tendered.)
14    BY MS. WASHINGTON:
15            Q.    Are you familiar with this document?
16            A.    Yes.
17            Q.    And what is this document?
18            A.    The legislature auditor -- audit
19    from 2017.
20            Q.    Generally speaking, what is your
21    understanding of what this report is?
22            A.    That they audited some cases or
23    different aspects of Department of Corrections,
24    but involving my department, they audited some
25    time comps in some cases.
```

1    Q.    Okay.  And I want to look
2    specifically at page 5 of this report.  And by
3    page 5, I mean the page that actually has the
4    number five at the bottom of it.
5          A.    Five.  Okay.
6          Q.    In the top of this page indicates
7    that DOC's policy for transferring offenders in
8    state facilities requires DOC to approve
9    transfers before they occur; and it says,
10   "However, the department's transfer policy for
11   local facilities does not include a timeframe for
12   when facilities must notify DOC of a transfer to
13   another local facility."  Do you see where I was
14   reading from?
15         A.    Yes.
16         Q.    Can you tell me about the DOC policy
17   that requires the department to approve transfers
18   before they occur?
19         A.    I'm not sure about transfers.
20         Q.    Okay.  Are you aware of the
21   department's policy regarding transfer approvals?
22         A.    I never -- yeah.  I'm not sure.  I
23   never worked in transfer, so I'm not sure.
24         Q.    Okay.  So approval for transfer is
25   not something that would fall within the

1    pre-class department?

2         A.    No.

3         Q.    Okay.  If you look at the paragraph

4    that's just below that, it indicates at the very

5    bottom of that second paragraph a recommendation.

6    It looks like that DOC should revise its transfer

7    policy to include a timeframe requirement and

8    method for keeping track of offenders housed in

9    local facilities.  Do you see that?

10        A.    Yes.

11        Q.    Do you have any knowledge about

12   whether or not this recommendation was put into

13   effect following the 2017 audit?

14        A.    No.  I don't know anything about --

15   yeah.

16        Q.    Okay.  Do you know if following this

17   report there was any new development of a method

18   to track DOC sentenced persons that were being

19   housed in local facilities?

20        A.    I'm not sure.  As far as the-- I

21   think that would deal with transfers, so I'm not

22   sure how they handled that.

23        Q.    Okay.  Are you aware that the

24   litigation that brings us all here today has to

25   do with five men who alleged that they were held

```
 1    in custody for months beyond their release dates?
 2         A.    Yes.
 3         Q.    Okay.  And are you aware that
 4    specifically this litigation involves five men
 5    who were convicted and sentenced in Orleans
 6    Parish, but who were transferred and housed at
 7    the Riverbend Detention Center?
 8         A.    Yes.
 9         Q.    Okay.  We have probably covered in
10    general terms some of what I am about to ask you
11    about, but I want to know what -- in your
12    understanding, what specific steps are to occur
13    once a person is sentenced to the Department of
14    Corrections in Orleans Parish as far as getting
15    them -- getting their time computation and their
16    release date determined?
17         A.    We receive and -- and always have
18    from Orleans a -- a pre-class packet.  And they
19    are one of the ones that the basic interview
20    sheet may not be the basic interview sheet.  They
21    printout a copy.  We get a jail credit letter.
22    Sometimes we do not get the bill of information
23    from them, but we get sentencing minutes and
24    fingerprints; usually the acknowledgment form,
25    signature form.  And they hand deliver them here
```

```
 1    usually on certain days -- a certain day of the
 2    week, and I'm not really sure what day; and we
 3    process them and we calculate their dates.
 4         Q.    Am I correct in understanding that
 5    they hand deliver these packets to you-all here
 6    at headquarters once a week?
 7         A.    Yes.
 8         Q.    Okay.
 9         A.    And they no longer do now.
10         Q.    Say that again?
11         A.    We don't -- they no longer hand
12    deliver them here now.
13         Q.    How do they provide them now?
14         A.    Now, they go to Raymond -- Raymond
15    Laborde Correctional Center is their pre-class
16    place.  And the offenders -- they will send it by
17    e-mail and they work them and those offenders
18    convicted go directly to Raymond Laborde.
19         Q.    When did that change?
20         A.    I'm not sure.  Maybe sometime last
21    year, but I'm not positive.
22         Q.    After 2017?
23         A.    Yes, I think it was.
24         Q.    Am I correct in understanding that
25    in 2016 and 2017 Orleans would have been hand
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   delivering pre-class packets to headquarters here
 2   in Baton Rouge --
 3           A.    Yes.
 4           Q.    -- once a week?
 5           A.    Yes.
 6           Q.    Okay.  And are you aware that
 7   sometime in or around 2016 Orleans Parish began
 8   transferring or, quote, releasing DOC sentenced
 9   prisoners to East Carroll Parish?
10           A.    Aware after the fact, yeah.
11           Q.    Were you aware --
12           A.    Yeah.
13           Q.    -- at the time that that process
14   started?
15           A.    No.
16           Q.    When did you first become aware?
17           A.    It was one of the cases where they
18   weren't time comped.  We had nothing on them and
19   trying to get -- that's when we were made aware
20   of it.
21           Q.    Okay.  But prior to that, you
22   weren't aware that Orleans had begun this
23   practice of transferring DOC sentenced prisoners
24   directly to Riverbend?
25           A.    Not a process -- right.  We didn't
```

```
 1    know there was a process out there for them to do
 2    that.
 3          Q.    Okay.  Am I correct in understanding
 4    that previously the Orleans practice was to be
 5    sending the pre-class paperwork here to
 6    headquarters?
 7          A.    Correct.
 8          Q.    And then the actual DOC sentenced
 9    prisoners, were those people being transported to
10    the Elayn Hunt facility?
11          A.    Some of them were sent to Elayn
12    Hunt, some I think transferred other places.
13          Q.    Okay.  When Orleans began
14    transferring DOC sentenced prisoners directly to
15    East Carroll Parish, what is your understanding
16    of who was responsible for providing the
17    department with the pre-classification paperwork?
18          A.    We always -- the pre-class packet
19    always comes from the parish of conviction, and
20    that's where we would order it from or get it.
21    That's where it comes from.
22          Q.    So you would have expected to
23    receive a pre-class packet directly from the
24    Orleans sheriff?
25          A.    Yes.
```

GRIFFIN, ANGELA 7/10/2019

 1          Q.    Am I correct that inside of CAJUN
 2     there is some sort of initial entry that's made
 3     for a person when that pre-class screen that you
 4     described is created?
 5          A.    Yes.
 6          Q.    Okay.  What information is contained
 7     just in that initial pre-class screen?
 8          A.    In that, the very first thing we do,
 9     we would put is the parish of conviction, the --
10     you know, the thing showing where he was
11     convicted at.  And then on the pre-class screen,
12     it's going to show that the date we received the
13     paperwork, and it shows a date of file -- of file
14     it was received.
15               That date -- if it's a new
16     pre-class, we are making the file, so we would
17     put that date.  It shows the sentence date, the
18     crime, the sentence length, I think the judicial
19     district, and the parish of conviction.
20          Q.    After the actual time computation
21     has occurred, can you still pull up that
22     pre-class screen for a given case?
23          A.    Yes.
24          Q.    Okay.  So the pre-class screen lives
25     forever?

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1          A.    Until he gets convicted again on --
2    if he gets out and comes back in, a new one is
3    created.
4          Q.    Okay.  Is there any storage
5    mechanism for the old pre-class screen?
6          A.    No.  I don't think there's a storage
7    for it.
8          Q.    Okay.  Can you tell in CAJUN when an
9    entry is created on a given individual?
10          A.    On the -- any screen or just are we
11    talking the pre-class screen or --
12          Q.    I guess I'm wondering about the
13    first entry that is made for somebody in CAJUN.
14    Like can you tell when that first existence of a
15    person in CAJUN occurred?
16          A.    Yeah.  You can inquire on -- like
17    the pre-class screen, it will give you a user
18    name and a date.  At that time, it will give
19    you --
20          Q.    Okay.
21          A.    As time goes on, as things change,
22    that changes.
23          Q.    Okay.  So further down the road,
24    let's say after a time computation has been
25    completed, can you still look for a given



 1    individual or a given case when they were first
 2    entered into the system?
 3           A.     You can see when the -- it still
 4    shows the pre-class received --
 5           Q.     Okay.
 6           A.     -- date stays there.
 7           Q.     Okay.  When we were talking a minute
 8    ago about receiving the pre-class packet from the
 9    parish of conviction, did I hear you say that the
10    Department of Corrections orders the pre-class
11    packet?
12           A.     No.
13           Q.     Okay.
14           A.     We will order if -- we will try to
15    order if we start getting calls on offenders that
16    they tell us where they were sentenced at or we
17    will try and order it from the parish.
18           Q.     Okay.
19           A.     If we don't have it, we will call
20    them and try to get it, but that -- you know,
21    it's up to them to send it to us, but that's the
22    only time we would order it, but they -- when
23    he's convicted, they send it.
24           Q.     Okay.  And -- and how would you know
25    to, quote, order?

1         A.     Like I say, if we get calls from a
2    family member or the ARP process, if they get a
3    letter from an offender and it goes through that
4    process, they would let us know.
5         Q.     Okay.  So you would only order
6    information if you had received word through an
7    ARP itself or someone calling on behalf of the
8    prisoner?
9         A.     Right.
10   MS. WASHINGTON:
11            I am going to mark a new exhibit for
12            you, which is Exhibit 35.
13       (Exhibit 35 marked and tendered.)
14   BY MS. WASHINGTON:
15        Q.     And I will represent to you that as
16   part of this litigation we received files on each
17   of the five named plaintiffs from the Department
18   of Corrections.
19        A.     Okay.
20        Q.     And I have saved us the trouble of
21   having the complete files and have excerpted them
22   so I have the specific pages I want to talk
23   about.
24        A.     Okay.
25        Q.     And so Exhibit 35 that I have just



```
 1    handed you I will represent was provided to us by
 2    the Department of Corrections as part of the file
 3    that was maintained on Jessie Crittindon.
 4              A.    Uh-huh (affirmatively).
 5              Q.    And I actually want to start not
 6    with the e-mail communication that is at the
 7    beginning of this exhibit, but towards the end.
 8    If you look at the second to last page --
 9              A.    Okay.
10              Q.    -- it has the Bates number 2360 in
11    the right-hand corner.  Do you see that?
12              A.    Yes.
13              Q.    And the top of this says "Time
14    computation and jail credits;" is that correct?
15              A.    Yes.
16              Q.    And am I correct in understanding
17    that this is an initial time computation form?
18              A.    Correct.
19              Q.    Okay.  And at the bottom it -- it
20    says "computed by," and then has a date of
21    January 13th, 2017; is that correct?
22              A.    Yes.
23              Q.    And so this date would indicate the
24    date that the initial time computation was
25    performed?
```

```
 1          A.    Correct.
 2          Q.    And about halfway down the page next
 3    to what I imagine stands for sentenced date and
 4    sentence start, it indicates August 2nd of 2016;
 5    is that correct?
 6          A.    Correct.
 7          Q.    And so that would be the information
 8    that was put into CAJUN as to Mr. Crittindon's
 9    sentencing date?
10          A.    Correct.
11          Q.    Okay.  And so I'm correct that there
12    was over five months that passed between the date
13    of sentence and the initial time computation that
14    was performed, correct?
15          A.    Correct.
16          Q.    Am I also correct that
17    Mr. Crittindon was an immediate release at the
18    time that this computation was performed?
19          A.    Yes.
20          Q.    Okay.  And that he was, in fact,
21    eligible for release in August of 2016 when he
22    had been sentenced?
23          A.    Yes.
24          Q.    Looking at the very last page of
25    this exhibit, it has Bates stamp number 2367 at
```

1    the bottom right-hand side.  Do you see that?

2         A.    Yes.

3         Q.    The top of this form says "Transfer

4    record inquiry."

5         A.    Yes.

6         Q.    What is this form?  I assume it

7    comes from CAJUN.

8         A.    Yes.

9         Q.    But what is it?

10        A.    It's his -- it's the location of the

11   offender.  The very first one, the A-101 means a

12   new conviction.

13        Q.    That's my next question.

14        A.    And he was convicted in Orleans

15   Parish.

16        Q.    Okay.

17        A.    The next one shows he was -- the

18   A-402 is a transfer, and he was transferred to

19   Riverbend on the same day.  And we -- he may have

20   been transferred before -- before that date or

21   whatever, but we only keep up with after they are

22   sentenced.

23        Q.    How would you-all receive the

24   information about the date that he had been

25   transferred to Riverbend Detention?

```
 1         A.    I'm not sure about him, but usually,
 2   like I say, they put it on the jail credit letter
 3   "transferred over to" and they will say where or
 4   the forms that are sent in saying that they
 5   received him or they transferred him.
 6         Q.    Okay.
 7         A.    So it's entered in different ways.
 8   Or we could call -- that's another way.  We --
 9   since he was an immediate release, we could call
10   the jail trying to clear his release and they
11   tell us he's not here.
12         Q.    Orleans would tell you he's not
13   here?
14         A.    Right.  And we would ask where did
15   you send him and when and we would update it.
16         Q.    Okay.  So it seems like there's a
17   lot of ways you could get information for that?
18         A.    Correct.  Correct.
19         Q.    But A-101 means new conviction and
20   A-402 means transfer?
21         A.    Correct.
22         Q.    Okay.  Looking back at the e-mails
23   that were at the beginning of this exhibit, I
24   want to start with the page that's Bates numbered
25   2333, so it's a couple of pages in.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1          A.     Okay.

2          Q.     And actually starting on the

3    following page, which is 2334.  It's part of an

4    e-mail that spans both pages, correct?

5          A.     Correct.

6          Q.     The first e-mail in this chain

7    appears to be from Raven Groom, who we talked

8    about briefly earlier, correct?

9          A.     Correct.

10          Q.     And in this e-mail it appears that

11    she received a call on November 21st of 2016 from

12    Tammy Crittindon and that Ms. Crittindon

13    indicated that her son was sentenced in August of

14    2016, is located at Riverbend, and was concerned

15    that his time had not been calculated; is that

16    correct?

17          A.     Correct.

18          Q.     And looking at the page that's Bates

19    numbered 2333, it appears that Ms. Groom sent

20    this information to Monisa Lentz and some other

21    personnel within the department; is that correct?

22          A.     Correct.

23          Q.     Do you know why Ms. Groom sent the

24    information to these individuals?

25          A.     No, I'm not sure.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1              Q.    Okay.  Do any of the individuals
 2     listed there work with you in the pre-class
 3     department?
 4              A.    No.
 5              Q.    Okay.  Do you know if any of them
 6     work in the office of adult services?
 7              A.    No.
 8              Q.    They don't work there?
 9              A.    Well, I'm not sure if they were --
10     if they were assigned to adult services or if
11     they are a different department.
12              Q.    Okay.  It looks like then Ms. Lentz
13     forwards this e-mail to Perry Stagg; is that
14     correct?
15              A.    Correct.
16              Q.    With a note saying "Please see below
17     and handle as appropriate," correct?
18              A.    Correct.
19              Q.    And then Mr. Stagg in turn it
20     appears forwards that to you and Angela Smith; is
21     that correct?
22              A.    Correct.
23              Q.    So am I correct that Mr. Stagg
24     thought that you and Ms. Smith were the
25     appropriate persons to look into the concerns
```

```
 1    contained in this e-mail thread?
 2         A.    Correct.
 3         Q.    And I'm looking now at Bates number
 4    2332, and -- and you respond to Mr. Stagg; is
 5    that correct?
 6         A.    Correct.
 7         Q.    And this is all happening on the
 8    same day, November 21st of 2016, correct?
 9         A.    Correct.
10         Q.    And you indicate that Mr. Crittindon
11    is not in CAJUN and also that the only way you
12    know when an offender is DOC is when you receive
13    the complete pre-class packet; is that correct?
14         A.    Correct.
15         Q.    What happened after your e-mail to
16    Mr. Stagg?
17         A.    I'm not sure, but we -- I -- Angela
18    Smith would have been handling it because she was
19    over the pre-class department that would get the
20    paper -- you know, that would handle it once the
21    paperwork gets in.
22         Q.    Ms. Smith works under you, correct?
23         A.    She did, yes.
24         Q.    Okay.  Do you know if you called
25    Ms. Crittindon?  Her -- her number is listed in
```

1    the initial e-mail.

2         A.    I did not.

3         Q.    Okay.  Do you know if Ms. Smith

4    contacted --

5         A.    I don't know if she did.

6         Q.    Okay.  Did you contact Riverbend

7    regarding --

8         A.    I did not.

9         Q.    Do you know if Ms. Smith did?

10         A.    I'm not sure.

11         Q.    Were you concerned that there wasn't

12    a CAJUN entry for somebody who had been sentenced

13    three months earlier?

14         A.    Yes.  We usually try to find out

15    where they were convicted at.  Like I say, I'm

16    not sure what Angela Smith did.

17         Q.    Is there a way to know from these

18    e-mails that Ms. Smith had been told to do

19    anything?

20         A.    No.  There's no e-mail telling her

21    to.

22         Q.    Okay.  We can look at the first page

23    of this exhibit which kind of overlaps some of

24    the e-mails --

25         A.    Uh-huh (affirmatively).



GRIFFIN, ANGELA 7/10/2019

1      Q.    -- the same ones, and there does
2  appear to be an e-mail from you to Ms. Smith
3  saying "See me on this" with an ellipsis.  Do you
4  see that?
5      A.    Uh-huh (affirmatively), yes.
6      Q.    Do you remember sending that
7  communication to Ms. Smith?
8      A.    I don't remember, but it's --
9      Q.    Okay.  Do you know if Ms. Smith came
10 to see you about this concern related to
11 Mr. Crittindon?
12     A.    I'm not -- I'm not sure.
13     Q.    Okay.  Do you know what actions, if
14 any, Ms. Smith took following this e-mail on
15 November 21st of 2016?
16     A.    I can't say what she did.  I'm not
17 sure.
18     Q.    Did you follow up with Ms. Smith
19 about Ms. Crittindon?
20     A.    I -- I can't remember following up
21 with her; but usually if I send something out, I
22 do follow up that they are trying to get
23 paperwork.
24     Q.    How would any actions that Ms. Smith
25 took in response to this e-mail thread and the

```
 1   call from Mr. Crittindon's mother, how -- how
 2   would those steps have been documented?
 3        A.    Like I say, in '16, I'm not sure how
 4   she would -- just wrote notes and usually they
 5   would write notes, but I'm not sure back then how
 6   they kept up with them.
 7        Q.    Okay.  If we look a little bit
 8   further back in this exhibit, we can turn to
 9   Bates numbers 2335 and 2336?
10        A.    Okay.
11        Q.    It appears that Ms. Smith e-mailed
12   someone at the e-mail address of Laura,
13   underscore, Johnson 62 at hotmail dot com on
14   December 8th, of 2016 and asked for a, quote,
15   updated list of offenders that are housed with
16   you from Orleans Parish that are DOC without
17   paperwork.  Do you see that?
18        A.    Yes.
19        Q.    Are you aware of this e-mail that
20   Ms. Smith sent?
21        A.    I may have been then, but --
22        Q.    Okay.
23        A.    Yeah.
24        Q.    And based on the -- the e-mails that
25   then follow in this chain it appears that that
```

1    person who this was directed to was Laura Sevier;

2    is that correct?

3           A.    Correct.

4           Q.    And is she an employee of the East

5    Carroll Parish Sheriff's office?

6           A.    She works or worked at Riverbend

7    Detention Center.

8           Q.    Okay.  Okay.  And so at the time

9    that Ms. Smith was sending this e-mail, the

10   pre-class department was aware that Riverbend was

11   housing DOC sentenced prisoners from Orleans that

12   the department didn't have paperwork on, correct?

13          A.    It looks like at this point she

14   found out, yes.

15          Q.    Okay.  And looking further in the

16   e-mail chain on Bates number 2335, it appears

17   that Ms. Smith forwarded the response that she

18   received from Ms. Sevier to you; is that correct?

19          A.    Correct.

20          Q.    And in looking at the response from

21   Ms. Sevier, am I correct that it describes DOC

22   sentenced prisoners who, quote, went to DOC in

23   prior months, but who at that time were not

24   updated in CAJUN?

25          A.    Yes.

```
 1              Q.    And there's a list that's attached
 2     that if you look to the next couple of pages in
 3     the exhibit at Bates number 2337 through 2339.
 4     Do you see that list?
 5              A.    Yes.
 6              Q.    Okay.  And am I correct in
 7     understanding that this is the list that
 8     Ms. Smith had requested of persons from Orleans
 9     Parish that are DOC without paperwork?
10              A.    Yes.  That's what it appears.
11              Q.    Okay.  And do you see that in this
12     list Mr. Crittindon, Mr. Jessie Crittindon, who
13     we have been discussing, is included in the list?
14              A.    Yes.
15              Q.    Okay.  And so this would be two
16     weeks approximately after Ms. Groom's e-mail
17     regarding the call from Tammy Crittindon,
18     correct.
19              A.    Correct.
20              Q.    Do you know if any action has been
21     taken in those two weeks?
22              A.    Like I say, I can't say positively,
23     but our first response is to try and call because
24     that's the fastest way we can get in touch with
25     them.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1              Q.    Okay.  But two weeks later
2    Mr. Crittindon is still included in this list as
3    someone that department is without paperwork on,
4    correct?
5              A.    Correct.
6              MS. WASHINGTON:
7                    Okay.  I want you to hold onto that
8              exhibit because we are going to talk about
9              a couple more things, but I'm going to
10             mark this next exhibit as Exhibit 36.
11        (Exhibit 36 marked and tendered.)
12   BY MS. WASHINGTON:
13             Q.    And if you look to the last page, or
14   I guess really the second page of this exhibit,
15   this appears to be e-mail correspondence between
16   Corey Amacker and Joseph Bordelon; is that
17   correct?
18             A.    Correct.
19             Q.    Okay.  And Corey Amacker is a person
20   with the Orleans Parish Sheriff's office?
21             A.    Correct.
22             Q.    And then we talked about
23   Mr. Bordelon briefly before, but he was a
24   pre-class employee in your department?
25             A.    Correct.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1              Q.    Okay.  And so in looking at the
 2    e-mail that's dated December 16th of 2016, and in
 3    it, am I correct that Mr. Amacker states that
 4    "Riverbend has been failing to send the sentence,
 5    slash, LOC to you guys"?  I'm looking at the
 6    first paragraph.
 7              A.    Oh.  Yes.
 8              Q.    And by "you guys," I assume he means
 9    the Department of Corrections?
10              A.    Corrections, correct.
11              Q.    Okay.  And also that Mr. Amacker
12    reports that he is, quote, running into way too
13    many inmates whom are over their full term date
14    that we released to Riverbend?
15              A.    Yes.
16              Q.    Okay.  And it appears from this
17    exhibit that Mr. Bordelon provided this e-mail to
18    Ms. Smith who then provided it to you; is that
19    correct?
20              A.    Correct.
21              Q.    Okay.  And you responded a couple
22    days later on the 19th of December to
23    Mr. Bordelon saying well, this e-mail tells us he
24    was sending the packet to Riverbend and not DOC;
25    is that correct?
```

```
 1          A.    Correct.

 2          Q.    Do you remember this exchange?

 3          A.    I don't remember it, but --

 4          Q.    Okay.  Am I correct in understanding

 5    that at least as of this point in mid December of

 6    2016, you were aware that there were issues with

 7    the time calculation for DOC sentenced persons

 8    who had been transferred from Orleans to

 9    Riverbend?

10          A.    Yes.

11          Q.    Okay.  Do you know what you did

12    after you received this e-mail from Mr. Bordelon

13    and Ms. Smith?

14          A.    I'm not -- I mean, I really don't

15    remember back then, but I know I've spoken to him

16    lots of times during this process.

17          Q.    Who is "him"?

18          A.    To Corey Amacker.

19          Q.    Okay.

20          A.    But I can't say what -- I don't

21    remember what was going on.

22          Q.    So in this e-mail, Mr. Amacker's

23    title is listed as the Department of Corrections

24    classification manager.  Do you see that?

25          A.    Yes.
```

```
 1            Q.    It's on the last page?
 2            A.    Yes.
 3            Q.    Okay.  Is there any kind of
 4      certification process for a person at a local
 5      facility to become a DOC classification manager?
 6            A.    No.
 7            Q.    Okay.
 8            A.    He's not a Department of
 9      Corrections --
10            Q.    Employee?
11            A.    -- employee.
12            Q.    Okay.  Am I correct in understanding
13      that this title doesn't designate him as having
14      received some special kind of certification or
15      training from the Department of Corrections?
16            A.    Not that I know of.
17            Q.    Okay.  And I want to look back at
18      the exhibit that we were just looking at
19      previously, and if you could go to Bates number
20      2340 in that exhibit.
21            A.    Okay.
22            Q.    And here it appears that there is an
23      e-mail from Mr. Amacker now dated December 27th
24      of 2016.  Do you see that?
25            A.    Correct.
```

```
 1            Q.    And this e-mail is sent to various
 2   DPS&C employees, including Ms. Smith, correct?
 3            A.    Yes.  Yes.
 4            Q.    Okay.  And in this e-mail
 5   Mr. Amacker indicates that there are about a
 6   hundred inmates so far whom were supposedly
 7   pre-classed by Riverbend; is that correct?
 8            A.    Yes.
 9            Q.    But that had not been worked or
10   calculated in CAJUN, correct?
11            A.    Correct.
12            Q.    And I believe he describes this as,
13   quote, a Riverbend fiasco; is that correct?
14            A.    Yes.
15            Q.    Okay.  And in the second paragraph
16   of his e-mail, he indicates that some of these
17   individuals that he's identified are, quote, most
18   likely full-term once calculated; is that
19   correct?
20            A.    Correct.
21            Q.    Would you agree that this e-mail
22   from Mr. Amacker describes a pretty significant
23   problem?
24            A.    Yes.
25            Q.    Okay.  And this e-mail also attaches
```

CRITINDON, ANGELA 7/1/2019

```
 1    a separate list, correct?
 2          A.    Correct.
 3          Q.    And that is at Bates numbers 2342 to
 4    2344.  Do you see that?
 5          A.    Yes.
 6          Q.    And would you agree that
 7    Mr. Crittindon's -- Mr. Jessie Crittindon's name
 8    is also included in this audit list?
 9          A.    Yes.
10          Q.    And so this is as of December 27th
11    of 2016, correct?
12          A.    Correct.
13          Q.    So it's now been over a month since
14    Ms. Groom's e-mail regarding the call from Tammy
15    Crittindon?
16          A.    Yes.
17          Q.    Okay.  Do you know why further
18    action as to Mr. Crittindon hadn't been taken
19    over that month?
20          A.    Well, we have yet to get the
21    paperwork on him, his sentencing paperwork, his
22    jail credit letter for us to calculate him.
23          Q.    Okay.  Are -- do you have memory of
24    not having received the paperwork or are you
25    inferring that from the e-mails?
```

 1          A.    I mean, I remember some of the
 2    cases, not necessarily him, but looking through
 3    the paperwork and these e-mails.
 4          Q.    Okay.  Turning to the second to last
 5    e-mail page of this exhibit, it's Bates number
 6    2345.
 7          A.    Okay.
 8          Q.    This is an e-mail from Angela Smith
 9    that includes you as one of the recipients on
10    January 13, 2017; is that correct?
11          A.    Correct.
12          Q.    And this indicates that, as of
13    January 13th, Mr. Crittindon is an immediate
14    release; is that correct?
15          A.    Correct.
16          Q.    And the bottom of the e-mail
17    indicates, quote, per Chief Smith, it is
18    imperative that these offenders are released
19    today, if possible.  Do you see that?
20          A.    Yes.
21          Q.    Why, to your knowledge, was it
22    imperative that these offenders be released?
23          A.    From what I can recall is if -- or
24    reading it, it's because we knew that we were
25    trying to get this paper, that there was a

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    possibility that they were overdue.
 2         MS. WASHINGTON:
 3              Okay.  I'm going to mark this next
 4         exhibit as Exhibit 37, and I'll represent
 5         to you that this is an excerpt from one of
 6         the other individual files on one of the
 7         plaintiffs that we received from the
 8         Department of Corrections in discovery.
 9         This one is as to Mr. Leon Burse.
10       (Exhibit 37 marked and tendered.)
11  BY MS. WASHINGTON:
12       Q.    And like the form that we reviewed
13  with Mr. Crittindon, is this also the initial
14  time computation for Mr. Burse?
15       A.    Yes.
16       Q.    And am I correct in looking at the
17  bottom that the date of the computation was
18  January 10th of 2017?
19       A.    Yes.
20       Q.    And Mr. Burse had been sentenced on
21  August 8th of 2016; is that correct?
22       A.    Correct.
23       Q.    And so similar to Mr. Crittindon,
24  this appears to be roughly five months that
25  lapsed between his sentencing and his initial
```



```
 1    time computation, correct?
 2          A.    Correct.
 3          Q.    And Mr. Burse was also an immediate
 4    release?
 5          A.    Yes.
 6          Q.    And he was also due for release in
 7    August of 2016 when he had been sentenced; is
 8    that correct?
 9          A.    Correct.
10    MS. WASHINGTON:
11                I'm handing you Exhibit 38, which,
12          again, is an excerpt from the individual
13          files that we received on the named
14          plaintiffs in this litigation from the
15          Department of Corrections.  And this one
16          is as to Mr. Eddie Copelin.
17        (Exhibit 38 marked and tendered.)
18    BY MS. WASHINGTON:
19          Q.    And, similar to the questions that I
20    asked about Mr. Burse and Mr. Crittindon, this is
21    the documentation of Mr. Copelin's initial time
22    computation, correct?
23          A.    Yes.
24          Q.    And this one was performed or
25    computed on January 13th of 2017?
```

```
 1         A.    Correct.
 2         Q.    And Mr. Copelin had been sentenced
 3    October 14th, of 2016; is that correct?
 4         A.    Yes.
 5         Q.    Am I correct that Mr. Copelin was
 6    also an immediate release?
 7         A.    Yes.
 8         Q.    And that Mr. Copelin was due for
 9    release in October of 2016 when he had been
10    sentenced; is that correct?
11         A.    Yes.
12         MS. WASHINGTON:
13               I'm handing you Exhibit 39, which is
14          the excerpt from the file that we received
15          from the Department of Corrections on
16          plaintiff Philip Dominick.
17         (Exhibit 39 marked and tendered.)
18    BY MS. WASHINGTON:
19         Q.    And I've included a couple more
20    pages in this excerpt as it appears that some
21    time computation steps were being taken over the
22    course of a couple of days; is that correct?
23         A.    Correct.
24         Q.    Okay.  Am I correct that the -- it
25    looks like the initial time computation was
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    started at the very end of November of 2016?

2         A.    Correct.

3         Q.    November 30th it looks like?

4         A.    Yes.

5         Q.    Okay.  And that ultimately that

6    computation was completed on December 6th of

7    2016; is that correct?

8         A.    Yes.

9         Q.    Mr. Dominick had been sentenced on

10   the charges or cases for which his time

11   computation was happening on September 1st of

12   2016; is that correct?

13        A.    Correct.

14        Q.    And so it was approximately three

15   months between the date of his sentencing and

16   when his time computation and release date was

17   computed; is that correct?

18        A.    Yes.

19        Q.    And Mr. Dominick was also an

20   immediate release?

21        A.    Yes.

22        Q.    And he was due for release on

23   September 1st of 2016 when he was sentenced; is

24   that correct?

25        A.    Yes.



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1              MS. WASHINGTON:

 2                   I'm going to hand you Exhibit 40,

 3              which I will represent to you is the final

 4              excerpt from an individual file as to the

 5              plaintiffs that we were provided by the

 6              Department of Corrections.  This one is as

 7              to Mr. Donald Guidry.

 8         (Exhibit 40 marked and tendered.)

 9    BY MS. WASHINGTON:

10         Q.    Am I correct that this form is his

11    initial time computation?

12         A.    Yes.

13         Q.    And it appears that this time

14    computation was conducted on January 24th of

15    2017; is that correct?

16         A.    Yes.

17         Q.    And that Mr. Guidry had been

18    sentenced July 12th of 2016, correct?

19         A.    Correct.

20         Q.    So this was over six months from the

21    time of his sentence until his initial time

22    computation was completed, correct?

23         A.    Correct.

24         Q.    Was Mr. Guidry also an immediate

25    release?
```

```
 1              A.     Yes.
 2              Q.     And am I correct that it appears
 3      that he was due for release at the beginning of
 4      September of 2016?
 5              A.     Correct.
 6              Q.     We talked about some of the
 7      communications that the department had received
 8      from Ms. Crittindon on behalf of her son, and I
 9      wanted to look at a couple of other contacts that
10      the department received with concerns about time
11      calculation and overdetention specifically
12      related to the plaintiffs in this litigation.
13      And like the former e-mails, I will represent to
14      you that these are exhibits that we received from
15      -- I'm making them exhibits, but they are e-mails
16      that we received from the department in discovery
17      in this litigation.
18              MS. WASHINGTON:
19                     I'm marking this set of e-mails
20              Exhibit 41.
21          (Exhibit 41 marked and tendered.)
22      BY MS. WASHINGTON:
23              Q.     I want to start at the last page of
24      this exhibit, which actually is on the very back
25      of the exhibit.  Am I correct that there appears
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1  to be an e-mail dated November 22nd of 2016 from
2  Barbara McMullen to Monisa Lentz?
3          A.    Yes.
4          Q.    And that the title of that e-mail is
5  Leon Burse, no DOC number, and then a date of
6  birth; is that correct?
7          A.    Correct.
8          Q.    And in the e-mail that Ms. McMullen
9  sends, she indicates that Linda Hargrove Jones
10 called again about her son.  She goes on to say
11 that she states that he was sentenced August 8th,
12 2016 and has no DOC number or time calculated as
13 of yet; is that correct?
14         A.    Correct.
15         Q.    And it appears that there is contact
16 information.  In fact, there are two numbers that
17 Ms. Hargrove Jones can be reached at?
18         A.    Correct.
19         Q.    Am I correct in understanding from
20 the text of this e-mail that this doesn't appear
21 to be the first time that Ms. Hargrove Jones had
22 called the Department of Corrections about her
23 son?
24         A.    I mean, it says -- again, so it
25 looks like she may have.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/12/2019

Page 172

```
1            Q.    Do you know where previous calls by
2    Ms. Hargrove Jones would be cataloged or noted?
3            A.    I don't know.
4            Q.    Okay.  And it appears that Ms. Lentz
5    then passed this e-mail along to Mr. Stagg; is
6    that correct?
7            A.    Correct.
8            Q.    And also that by this point there
9    was some information that she provided regarding
10   Mr. Burse's sentence and the date of his sentence
11   and the location of it; is that correct?
12           A.    Correct.
13           Q.    Do you know what Mr. Stagg did with
14   this information?
15           A.    I -- I don't know.
16           Q.    Okay.  Do you know if Mr. Stagg
17   brought this call to your attention?
18           A.    I don't know.
19           Q.    Okay.  So if you flip ahead in the
20   exhibit, it appears that Ms. Hargrove Jones
21   called again on November 28th of 2016.  Do you
22   see that?  I'm looking at an e-mail from Barbara
23   McMullen to Malcolm Myer.
24           A.    Okay.  Yes.
25           Q.    In the body of that e-mail, as far
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1   as the message appears to indicate, that
2   Ms. Hargrove Jones, quote, has spoken to Monisa
3   about getting her son's time calculated several
4   times.  He still doesn't have a DOC number.  Do
5   you see that?
6        A.   Yes.
7        Q.   Okay.  And so it appears that on
8   November 7th -- I'm sorry -- December 7th of
9   2016, Ms. Lentz e-mailed Mr. Stagg again.  I'm
10  kind of working my way up the chain.  Do you see
11  that?
12       A.   Yes.
13       Q.   Okay.  And Ms. Lentz tells Mr. Stagg
14  "FYI, offender's family is calling again about
15  him not having a DOC number.  Per the caller, the
16  offender has filed an ARP.  Please handle as
17  appropriate."  Did I read that appropriately?
18       A.   Yes.
19       Q.   And, at that point, it looks like we
20  are now at December 7th of 2016.  Mr. Stagg
21  reaches out to you; is that correct?
22       A.   Yes.
23       Q.   Do you know why Mr. Stagg didn't
24  reach out to you between November 22nd and
25  December 7th of this issue?

```
 1          A.     I don't know.
 2          Q.     Do you know if he did during that
 3    period of time?
 4          A.     I don't know.
 5          Q.     Okay.  And so similar to the e-mails
 6    that we looked at related to Mr. Crittindon, it
 7    appears that at some point Mr. Stagg thought it
 8    was appropriate to reach out to you for you to
 9    look into the concerns that were raised by
10    Ms. Hargrove Jones; is that correct?
11          A.     Yes.
12          Q.     And, based on those e-mails, it
13    appears that at this point Ms. Hargrove Jones had
14    already made several calls about her son; is that
15    correct?
16          A.     Yes.
17          Q.     Okay.  In response to Mr. Stagg, you
18    indicate that the department had not received
19    pre-class paperwork on Mr. Burse; is that
20    correct?
21          A.     Yes.
22          Q.     Okay.  And how did you determine
23    that the department hadn't received paperwork on
24    Mr. Burse?
25          A.     I can't say for sure what I did, but
```

1    how we can tell is look in CAJUN and go and look
2    through paperwork that we may have --
3           Q.    Okay.
4           A.    -- that is entered.
5           Q.    And that's the search that you could
6    have performed; is that correct?
7           A.    That's what we usually perform when
8    we looking, yeah, for things.
9           Q.    Okay.  You also tell Mr. Stagg that
10   you are trying to get information on Mr. Burse,
11   "but cannot do anything until we receive it"?
12          A.    Correct.
13          Q.    And just based on these e-mails
14   alone, it appears that it's now a couple of weeks
15   after Mr. McMullen's e-mail about the
16   November 22nd call from Ms. Hargrove Jones; is
17   that correct?
18          A.    Correct.
19          Q.    Is there a reason why multiple calls
20   from this woman were not addressed more promptly?
21          MR. EVANS:
22                Object to form.  You can answer.
23          THE WITNESS:
24                Our addressing is going to be with
25                the actual parish of conviction trying to

```
 1            get the paperwork.
 2    BY MS. WASHINGTON:
 3            Q.    Do you have any record of the steps
 4    that would have been taken over these two weeks
 5    to try to address the concerns?
 6            A.    No.  I don't -- I don't recall any.
 7    I mean, I don't -- I'm not sure.
 8            Q.    Were you concerned that you didn't
 9    have paperwork on someone who had been sentenced
10    in August which would have been four months
11    earlier at this point?
12            A.    Yes.  When we -- we -- and it's not
13    in these e-mails, it's -- we start calling
14    because we do not get e-mails back, start calling
15    to get paperwork.
16            Q.    Okay.  Were you concerned that
17    Mr. Burse might be past due for release at this
18    point?
19            A.    Yes.
20            Q.    Why is that?
21            A.    Anytime they have parents calling
22    saying they are overdue, we look at it as if they
23    are really overdue and try and start getting
24    paperwork to see if they really were sentenced to
25    the amount of time they are saying they were.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1     Q.    And you-all had been provided with
2  some information --
3          A.    Correct.
4          Q.    About Mr. Burse, correct?  Okay.  So
5  it looks like you e-mail Ms. Smith in relation to
6  Mr. Burse and say "See me on this, please,"
7  correct?
8          A.    Correct.
9          Q.    Do you know if you met with
10  Ms. Smith about Mr. Burse?
11          A.    Again, I don't remember this
12  specific case, but usually when I tell them to
13  see me, they come and meet with me.
14          Q.    Do you know what steps you took
15  after this December 7th e-mail related to
16  Mr. Burse?
17          A.    Again, I don't remember.  It would
18  be preferably telling her she needs to contact
19  whatever parish it is to try and get paperwork so
20  we can work him.
21          Q.    So it appears that this situation
22  with Mr. Burse relates to both Orleans Parish and
23  East Carroll Parish that was included in some of
24  the original e-mails; is that correct?
25          A.    Correct.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1          Q.    Do you know if you or Ms. Smith
 2   contacted electronically by e-mail anyone at
 3   either of those sheriffs' offices?
 4          A.    I'm not sure.  We would have
 5   contacted Orleans.  That's where he was convicted
 6   at.
 7          Q.    Okay.  And other than phone calls,
 8   that could have been by e-mail; is that correct?
 9          A.    Correct.
10          Q.    And would that have been to
11   Mr. Amacker --
12          A.    Yes.
13          Q.    -- that we discussed earlier?
14          A.    Yes.
15          Q.    Okay.  I want to look at the first
16   page of this exhibit.  There are some pages in
17   there that duplicate part of the thread.  But it
18   appears that as of December 27th of 2016, Raven
19   Groom is sending an e-mail to Mr. Stagg and to
20   others within the department.  Do you see that
21   e-mail?
22          A.    Yes.
23          Q.    Okay.  I'm sorry.  Apparently, for
24   the record, I said the wrong year.  We are
25   dealing with a lot of dates.  This is an e-mail
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    dating December 27th of 2016; is that correct?

2           A.    Yes.

3           Q.    Okay.  And this e-mail from

4    Ms. Groom indicates the family has called back

5    again.  "I looked in CAJUN and cannot find the

6    offender.  Please handle as appropriate."  Did I

7    read that appropriately?

8           A.    Yes.

9           Q.    And this appears, based on the

10   subject of the e-mail, to be part of the same

11   thread regarding Mr. Burse; is that correct?

12          A.    Yes.

13          Q.    Okay.  And Mr. Stagg then provides

14   you and Seth Smith with this e-mail; is that

15   correct?

16          A.    Yes.

17          Q.    Okay.  Why is Mr. Seth Smith on this

18   e-mail?

19          A.    I can't say positively, but at some

20   point in time he was involved.  When we found out

21   all these offenders were transferred and we had

22   no paperwork --

23          Q.    And what was --

24          A.    -- we notified him.

25          Q.    What was Mr. Smith's position?



```
 1          A.    At this point, I'm thinking he was
 2     the chief of operations.
 3          Q.    Within the Department of
 4     Corrections?
 5          A.    Yes.
 6          Q.    Okay.  Do you know what you did
 7     after receiving this e-mail from Mr. Stagg?
 8          A.    I don't recall.
 9          Q.    I want to look back to about the
10     middle of this exhibit.  I apologize that there
11     --
12          A.    Okay.
13          Q.    -- are no page numbers on this, but
14     I'm trying to move chronologically.  I'm looking
15     at an e-mail that's from you, and it's dated
16     January 9th, of 2017 to Corey Amacker.
17          A.    Okay.
18          Q.    Do you see that?
19          A.    Yes.
20          Q.    Okay.  In the subject line of this
21     is -- is Leon Burse, correct?
22          A.    Correct.
23          Q.    And this is the same individual that
24     these other e-mails have been related to; is that
25     correct?
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1           A.      Correct.

2           Q.      Okay.  And you e-mail Mr. Amacker

3    and you indicate that family members continue to

4    call DOC on this offender; is that correct?

5           A.      Correct.

6           Q.      And you request that Mr. Amacker

7    send the pre-class packet ASAP; is that correct?

8           A.      Correct.

9           Q.      Do you know if anyone with the

10   department had reached out to Mr. Amacker about

11   Mr. Burse in any of the weeks prior to

12   January 9th of 2017?

13          A.      Again, I can only say usually when

14   we get e-mails like that we start calling

15   immediately to try to get paperwork.

16          Q.      Would you'll have been calling for

17   almost a month and a half?

18          A.      We could.

19          Q.      If you look above that, it appears

20   to be Mr. Amacker's response to your e-mail in

21   which Mr. Amacker indicates that Mr. Burse was,

22   quote, pre-classed by my staff; is that correct?

23          A.      Correct.

24          Q.      And Mr. Amacker goes on to say that

25   his packet was delivered to HQ on 8/18/2016.  Do

 1   you see that?

 2        A.   Yes.

 3        Q.   And am I correct in understanding

 4   that Mr. Amacker was indicating that Orleans had

 5   provided the pre-class packet on Mr. Burse on

 6   August 18th of 2016?

 7        A.   Correct.

 8        Q.   And you responded to Mr. Amacker and

 9   stated, quote, not sure what happened with the

10   PW, sent 8/18/2016; is that correct?

11        A.   Correct.

12        Q.   Did you take any steps to see why

13   whether or not the pre-class packet that

14   Mr. Amacker referenced sending to headquarters in

15   August of 2016 --

16        A.   We did.

17        Q.   -- had arrived?

18        A.   We looked for a packet and also

19   verified the paperwork and I -- I maybe off of

20   Leon Burse, but all of them -- when the copies we

21   -- he finally did send to us weren't dated August

22   of 2016.

23        Q.   Okay.  I guess my question is, did

24   you specifically look for whether or not

25   headquarters received this packet on Mr. Leon

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1   Burse in August of 2016?
 2         A.    We did.
 3         Q.    And what was the outcome of that
 4   search?
 5         A.    From what I remember, we were not
 6   here during August of 2016.  That was during the
 7   flood, so we tried to get him to give us who he
 8   gave it to -- who they gave it to, who they
 9   dropped it off with, and then he never could give
10   us that information.
11         Q.    Where were you-all in August of
12   2016?
13         A.    Our office was closed.
14         Q.    What dates was it closed between?
15         A.    I'm not positive the complete dates,
16   but it was a little while because it was during
17   the flood, when it was flooding here.
18         Q.    Right.  I remember the flood.  Do
19   you know approximately how long that lasted for?
20         A.    I can't say for sure because I
21   wasn't here at the time.
22         Q.    Where were you?
23         A.    I was off on FMLA.
24         Q.    Okay.
25         A.    I had surgery.
```

```
 1          Q.    Okay.  Who was filling in in your
 2   position during the time?
 3          A.    The two managers.
 4          Q.    Which would have been Ms. Smith and
 5   somebody else?
 6          A.    And, at that time, I think it was --
 7   I'm not positive, but Mary Strickland maybe in
 8   '16.
 9          Q.    Had headquarters informed the
10   sheriff's offices that the office was closed?
11          A.    I'm not sure.
12          Q.    Would the sheriff's office have
13   known that the office was closed?
14          A.    Again, I'm not -- I don't know.
15          Q.    As director of the pre-class
16   department, what did you think would happen to
17   pre-class packets that were arriving at
18   headquarters during this time period?
19          A.    I mean, I -- I think because they
20   hand delivered their packets, they would have --
21   you know, if they came, they would have seen that
22   we weren't open to give it to someone, so I'm not
23   sure.  Like I say, I wasn't here at the time when
24   all that was going on.
25          Q.    But you were still director of the
```

1    department, correct?

2         A.     Yes.  Yes.

3         Q.     When did you return from your

4    medical leave?

5         A.     I think maybe -- maybe the end of

6    August or beginning of September.  I'm not really

7    positive the exact date.

8         Q.     Okay.  But sometime in the beginning

9    of September timeframe?

10        A.     Sometime, right.

11        Q.     Was the office back open at that

12   point?

13        A.     Yes.

14        Q.     When the office was reopened, did

15   the pre-class department reach out to local

16   sheriffs about pre-class packets that might have

17   arrived during the time the office was closed?

18        A.     Well, Orleans is one of the only

19   ones that hand delivers.  The others are mailed.

20   So I -- I mean, when it reopened, I'm not sure if

21   anyone reached out, but the mail -- if they

22   mailed it, the mail came -- you know, they

23   checked the mail after -- I'm sure the mailroom

24   whenever they got here.

25        Q.     Was all of headquarters closed



1    during this time period of the flood?

2          A.    At some -- I'm not sure how many

3    days they were closed, but during that -- the

4    August -- a few days in August, around that time,

5    they were closed.

6          Q.    Was mail still being delivered

7    during that time?

8          A.    I'm not sure how that works.

9          Q.    Did you'll reach out to Orleans

10   specifically knowing that they would have been

11   trying to hand deliver pre-class packets during

12   the time that the office was closed?

13         A.    Again, I wasn't here.  I'm not sure

14   if they reached out to them then, but they did --

15   they continued to deliver after.

16         Q.    I'm asking about when you returned

17   from leave --

18         A.    Okay.

19         Q.    -- whether or not you reached out to

20   Orleans or directed anyone to?

21         A.    No, because they were still

22   delivering each week.

23         Q.    And when Orleans hand delivers the

24   packets, where -- where do they show up with the

25   packets?

```
 1        A.    At the front gate; and I'm not sure
 2   back then how they did it, but they usually sent
 3   them to the pre-class department to give it to a
 4   pre-class person.
 5        Q.    And you are referring to the front
 6   gate that's on Mayflower?
 7        A.    Front gate, right.  Correct.
 8        Q.    And then someone from the front gate
 9   from the security office would deliver the
10   packets?
11        A.    Correct.  No.  They would -- well,
12   again, I'm not sure how they were doing it back
13   then, but they would let them in and let them go
14   to the pre-class department to hand deliver to
15   our pre-class department.
16        Q.    Okay.  So other than the time when
17   there was a closure due to the flooding, in
18   general when Orleans was hand delivering the
19   packets, they would physically walk into the
20   pre-class department?
21        A.    From the times I knew they came this
22   year, there was a deputy and he would deliver it.
23        Q.    Okay.  And -- and who within the
24   pre-class department does the deputy deliver the
25   packets to?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

GRIFFIN, ANGELA 7/12/2019

```
 1          A.     It was usually a supervisor.

 2          Q.     Do you know if the front gate was

 3   being staffed during the period that the flood

 4   closed operations?

 5          A.     It's 24 hours, yes.

 6          Q.     Okay.  And even during the flood, it

 7   was operational?

 8          A.     Yes.

 9          Q.     Is it a common occurrence for

10   parishes to report that they have delivered

11   paperwork that you-all in the pre-class

12   department then say wasn't delivered?

13          A.     Common, no.  Like I say, they are

14   one of the only ones that delivers, and I'm not

15   going to say in the past we haven't had someone

16   say they mailed it before, but no, it's not

17   common.

18          Q.     Okay.  Is there any log that the

19   front gate keeps of when Orleans comes to hand

20   deliver packets?

21          A.     I don't know.  I'm not sure.

22          Q.     Is there any log within the

23   pre-class department when pre-class packets come

24   in hand delivered from Orleans?

25          A.     No.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1            Q.    Do you know if the mail room has any
 2     log of receipt of pre-class packets that come by
 3     mail?
 4            A.    I'm not sure how they -- if they log
 5     or not.
 6            Q.    Do you-all sign any kind of receipt
 7     when the mailroom delivers mail to the pre-class
 8     department?
 9            A.    No, we don't.
10            Q.    With regard to Mr. Burse, you're
11     aware that he finally had his time computed in
12     January of 2017?
13            A.    Uh-huh (affirmatively), yes.
14            Q.    And I think we reviewed earlier that
15     he was an immediate release at the time; do you
16     remember that?
17            A.    Correct.
18            Q.    And he had been due to be released
19     on August 8th of 2016, which was the date that he
20     had been sentenced, correct?
21            A.    Yes.
22            Q.    Okay.  In your opinion, do you think
23     that the Department of Corrections handled the
24     numerous calls and concerns that it received from
25     Mr. Burse's family appropriately?
```

```
 1          MR. EVANS:
 2                Object to form.  You can answer.
 3          THE WITNESS:
 4                I mean, I -- as far as what I think
 5          that happened, yes, because again, we make
 6          phone calls rather than e-mails; and if we
 7          receive a call from someone, we start
 8          calling the parish of conviction to try
 9          and start the process.
10    BY MS. WASHINGTON:
11          Q.    You would agree that the department
12    failed to ensure that Mr. Burse was timely
13    released from custody, though, correct?
14          MR. EVANS:
15                Object to the form.  You can answer.
16          THE WITNESS:
17                Yes.  He released when we calculated
18          him.
19    BY MS. WASHINGTON:
20          Q.    Which was over five months after the
21    date he was due for release, correct?
22          A.    Yes.
23          Q.    Do you know if any changes have been
24    made in how the department handles calls from
25    family members like the ones you received from
```

```
 1    Ms. Hargrove Jones?
 2         A.    I don't know about changes.  I
 3    don't.
 4         Q.    So you're not aware of any changes?
 5         A.    I'm not aware.
 6    MS. WASHINGTON:
 7              Okay.  I'm going to mark another set
 8         of e-mails that we received in discovery
 9         from the Department of Corrections as
10         Exhibit 42.  And I will represent to you
11         that these are e-mails that we received
12         from the Department of Corrections related
13         to Donald Guidry, who is another one of
14         the named plaintiffs in this litigation.
15         (Exhibit 42 marked and tendered.)
16    BY MS. WASHINGTON:
17         Q.    I'm looking at the second page of
18    this exhibit which appears to contain an e-mail
19    from Raven Groom on January 9th of 2017, correct?
20         A.    Yes.
21         Q.    And the subject line has to do with
22    Donald Guidry; is that also correct?
23         A.    Yes.
24         Q.    And the subject line appears to
25    include a number.  Am I correct that that could
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    be his DOC number?

 2         A.    Yes.

 3         Q.    Okay.  And Ms. Groom's e-mail

 4    indicates that "Ms. Jamica White" -- and provides

 5    a phone number -- that "Ms. White called in

 6    regards to Offender Guidry's time calculation.

 7    She mentioned Offender Guidry was sentenced

 8    July 15th of 2016.  She is concerned that the

 9    offender might be due for release if his time is

10    calculated."  Did I read that correctly?

11         A.    Yes.

12         Q.    And there appears to be an

13    attachment or maybe it was included in the body

14    of the e-mail since Ms. Groom's signature is

15    under it, but that's on the next page of this

16    exhibit.  Do you see that?

17         A.    Yes.

18         Q.    And is -- this is a screen from

19    CAJUN, correct?

20         A.    Correct.

21         Q.    Okay.  And so it appears that as of

22    this date, there is, in fact, a CAJUN entry for

23    Mr. Guidry, correct?

24         A.    Correct.

25         Q.    Okay.  And it -- it provides the
```



866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1   number that was in the subject line is his DOC

2   number?

3          A.     Correct.

4          Q.     And it provides information about

5   his physical location as Riverbend Detention and

6   includes a transfer date of 7/15/2016; is that

7   correct?

8          A.     Correct.

9          Q.     But am I correct that a lot of the

10  other information on this screen is blank?

11         A.     Correct.

12         Q.     And so this doesn't include any

13  information about a time computation or a release

14  date?

15         A.     Correct.  No.

16         Q.     Okay.  How would Mr. Guidry have a

17  DOC number but not the time calculation?

18         A.     I'm really not sure by looking at

19  this.

20         Q.     We talked before about pre-class

21  screens versus some other screens in CAJUN,

22  correct?

23         A.     Correct.

24         Q.     This is not a pre-class screen,

25  correct?

```
 1          A.    No.
 2          Q.    Okay.  This says Master Record
 3     Inquiry at the top, correct?
 4          A.    Correct.
 5          Q.    Am I correct in understanding that
 6     the master record is something that is usually
 7     generated after a time computation has been
 8     completed?
 9          A.    Well, his release dates will be
10     filled out after time comp.  He will have a
11     master -- we have to give him a DOC number and
12     enter his information.  So once we do a pre-class
13     screen, the pre-class status which showed an I,
14     incomplete, waiting to be time comped -- it's all
15     the way at the bottom on the left.
16          Q.    Oh, I see that.  Okay.
17          A.    And then -- and then once he's time
18     comped, he would have release dates and the full
19     term and that pre-class status would change to an
20     R.
21          Q.    Is there anything in this pre-class
22     --
23          A.    There's no --
24          Q.    -- pre-class status?
25          A.    No.  He doesn't have a pre-class
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    status at this point.
 2           Q.    So it's just blank?
 3           A.    Correct.
 4           Q.    So how would -- how would this entry
 5    have been completed for Mr. Guidry?
 6           A.    I'm not sure.
 7           Q.    Okay.  There is a transfer date on
 8    this screen.  Do you see that?
 9           A.    Yes.
10           Q.    What does -- what information is
11    being provided by the transfer date?
12           A.    The date he moved to Riverbend.
13           Q.    Okay.  Do you know where he moved
14    from?
15           A.    No.
16           Q.    How would that information have
17    gotten into CAJUN?
18           A.    Someone entered it, but I'm not
19    sure.
20           Q.    Okay.  Do you know why Mr. Guidry
21    has some CAJUN entries having to do with a
22    transfer in July of 2016 without having his time
23    calculated by the time this screen was pulled up
24    in January of 2017?
25           A.    I'm not sure.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554 Hammond LA 70404     Fax 985.419.0799

```
 1              Q.     Looking back at the e-mails, it
 2      appears that Ms. Lentz forwarded that e-mail to
 3      Mr. Stagg; is that correct?
 4              A.     Correct.
 5              Q.     And then Mr. Stagg forwards this
 6      e-mail to you and Ms. Smith; is that correct?
 7              A.     Correct.
 8              Q.     You then e-mail Ms. Smith stating,
 9      please have someone send Corey an e-mail in
10      reference to this offender; is that correct?
11              A.     Yes.
12              Q.     Do you know what happened after you
13      directed this e-mail to Ms. Smith?
14              A.     I'm not sure.
15              Q.     Did you follow up with Ms. Smith to
16      see if she or someone else sent an e-mail to
17      Corey like you referenced?
18              A.     I can't say if I did or not.  I
19      don't remember.
20              Q.     When an e-mail was being sent to
21      Corey Amacker, would you be cced on that e-mail?
22              A.     Sometimes; sometimes no.
23              Q.     Was there any protocol in place for
24      whether or not you were cced?
25              A.     No, there was no protocol.
```

```
 1              Q.    Looking back at that CAJUN screen,
 2       is there a way to tell who entered the data?
 3              A.    Not using this screen.
 4              Q.    Is there another screen?
 5              A.    It's -- It's screen 1 of 3.  It
 6       would have a -- a user name, but that name
 7       changes when different things happen on it.
 8              Q.    Okay.  I want to look at the last
 9       page of this exhibit.
10              A.    (Witness complied.)
11              Q.    So this is approximately two weeks
12       after the e-mail from Ms. Groom regarding the
13       call from Ms. White, correct?
14              A.    Correct.
15              Q.    And, on this date, you e-mail
16       Mr. Amacker and state that "Below are a few
17       offenders that we are getting questions on and we
18       have no paperwork on them;" is that correct?
19              A.    Correct.
20              Q.    And it appears that Mr. Donald
21       Guidry is listed below --
22              A.    Correct.
23              Q.    -- is that correct, along with
24       apparently some other individuals whose names we
25       were not provided by the Department of
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    Corrections?

2         A.    Right.

3         Q.    Do you know if anything had happened

4    in the two weeks between your e-mail to Ms. Smith

5    asking that somebody e-mail Corey and you

6    e-mailing Corey on January 23rd?

7         A.    Like I say, if it gets to a point

8    where we still can't get the paperwork, it

9    usually comes back to me and I start trying to

10   get in touch with them, calling them or trying to

11   get in touch with them.  And e-mail for me is my

12   last resort because I try and get in touch with

13   them and talk to him.

14        Q.    Do you know if any steps, in fact,

15   had been taken in those two weeks?

16        A.    I'm not sure.  I can't -- I don't

17   remember.

18        Q.    I want to look back briefly at one

19   of the other exhibits that we looked at, which

20   was the excerpts from the file that we received

21   as to Mr. Crittindon.  That has some of those

22   e-mails at the beginning of it.  It's No. 35.

23        A.    Okay.

24        Q.    And, specifically, I want to look

25   back at Bates No. 3 -- sorry, 2342, which is that



1    -- that -- that audit list that Ms. --
2    Mr. Amacker provided on December 27th of 2016.
3          A.     Uh-huh (affirmatively).
4          Q.     Do you see that?
5          A.     Yes.
6          Q.     And Mr. -- Mr. Guidry's name is on
7    that list, correct?
8          A.     Correct.
9          Q.     Do you know if any steps had been
10   taken to look into Mr. Guidry and his time
11   computation in December of 2016 when this audit
12   was received?
13         A.     Well, we still didn't have paperwork
14   on these offenders, so we still couldn't
15   calculate their times.
16         Q.     But you knew of their existence,
17   correct?
18         A.     At this point, yes.
19         Q.     And you knew that you didn't have
20   paperwork --
21         A.     Correct.
22         Q.     -- at that time, correct?  Do you
23   know what steps were taken specifically as to
24   Mr. Guidry at the end of December to locate his
25   paperwork?

```
 1          A.     Again, you know, other than calling
 2   Corey -- and some of this is a result of us
 3   talking to Corey trying to get paperwork from him
 4   and which inmates out there that we need
 5   paperwork on.
 6          Q.     And I think we reviewed earlier,
 7   you're aware that Mr. Guidry ultimately had his
 8   time calculated near the end of January '17,
 9   January 24th of 2017?
10          A.     Yes.
11          Q.     And, like the other individuals that
12   we reviewed relative to this litigation, he was
13   an immediate release, correct?
14          A.     Correct.
15          Q.     And by the time Mr. Guidry was
16   released at the end of January 2017, he had been
17   held, I believe, about four months past his due
18   date; is that correct, over four months, correct?
19          A.     Correct.
20          Q.     In your role as director of the
21   pre-class department, were you made aware of
22   other situations like the ones we have been
23   reviewing where a DOC sentenced prisoner had no
24   DOC number or time calculation or release date
25   several months after they were sentenced?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          A.    The list that Corey Amacker sent was
 2    a list of offenders and when they were sentenced,
 3    not necessarily how much time they received, so
 4    we wouldn't know if they were past their time
 5    just getting this report, but these are some that
 6    we knew that we didn't have the paperwork to
 7    calculate.
 8          Q.    Did you ask Mr. Amacker for
 9    additional information when you received that
10    audit so that you might be able to prioritize the
11    time computations?
12          A.    Yes.  We tried to get the paperwork
13    from him, and that's what made him start the --
14    the audit.  To get the offenders, he was having
15    to get the paperwork done to send to us, put it
16    together to send to us.
17          Q.    Did you ever send anyone, staff to
18    Orleans physically to meet with Mr. Amacker and
19    get the paperwork that you-all needed?
20          A.    I didn't.  Yeah.  That's something I
21    couldn't do --
22          Q.    Not as director --
23          A.    -- in my director --
24          Q.    -- of pre-class department?
25          A.    No.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1          Q.     Why not?

2          A.     I would -- it would have to come

3     from higher up to send people out, state

4     employees.

5          Q.     Did you -- Did you ask your

6     supervisor for permission to send personnel to

7     Orleans to get the paperwork that you needed?

8          A.     Not that I know of because they have

9     always sent us the paperwork.  They knew what

10    paperwork we needed, because before this, we --

11    we had received paper -- all the paperwork from

12    them.

13         Q.     But you knew that there was a pretty

14    significant problem going on, correct?

15         A.     After he sent this list saying they

16    were in another parish at that point.

17         Q.     Well, I think actually even before

18    that; is that correct, we looked at some stuff

19    from at least the middle of December?

20         A.     Well, that's what I'm saying.  When

21    we knew, they started transferring them.  When we

22    found that out, yes, and didn't have paperwork.

23         Q.     Okay.  And at any point after that

24    did you ask for permission to send personnel to

25    Orleans to obtain the paperwork that you needed?

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

```
 1          A.    Not that I recall.  We offered our
 2    help to them, but not that I recall checking with
 3    our people to send somebody.
 4          Q.    What do you mean you offered to
 5    help?
 6          A.    Just let him know that on several
 7    occasions on the phone for sure that, if he
 8    needed anything, to let us know; any help with
 9    DOC or something, we could help him with.
10          Q.    Did Mr. Amacker take you up on those
11    offers?
12          A.    No.  He actually had formed up some
13    type of task force or something that they were
14    going to go handle up in Riverbend.
15          MS. WASHINGTON:
16               I am going to hand you two exhibits
17               that I am marking as 43 and 44.  I want to
18               represent to you that these are documents
19               that, again, we received from the
20               Department of Corrections in discovery in
21               this litigation.
22          (Exhibits 43 and 44 marked and tendered.)
23    BY MS. WASHINGTON:
24          Q.    What I have marked as Exhibit 43
25    appears to be related to Donald Guidry; is that
```

```
 1    correct?
 2          A.    Yes.
 3          Q.    And Exhibit 44 is related to Jessie
 4    Crittindon, correct?
 5          A.    Correct.
 6          Q.    And both of these documents appear
 7    to be titled as Second Step Response Forms; is
 8    that correct?
 9          A.    Correct.
10          Q.    And -- and these forms are part of
11    the ARP process that you've referenced?
12          A.    Yes.
13          Q.    These forms are second step
14    responses, correct?
15          A.    That's what it -- yeah.  It states
16    on there "second step."
17          Q.    And do you know where the original
18    ARP that Mr. Guidry and Mr. Crittindon wrote
19    would be?
20          A.    I'm not sure or with the
21    administrative procedure department.  There's a
22    department.
23          Q.    And you indicated before that that's
24    something else that would have fallen under the
25    deputy assistant secretary?
```

```
 1          A.     Yes.
 2          Q.     Okay.  So the -- the role that
 3   Mr. Stagg had previously?
 4          A.     Correct.
 5          Q.     Okay.  And what about the First Step
 6   Response Form, am I correct that there would be a
 7   first step response before the second step
 8   response?
 9          A.     I'm not sure how the steps -- I'm
10   not sure.  I mean, I'm --
11          Q.     Are you familiar with the ARP?
12          A.     I'm not familiar with the ARP
13   process, no.
14          Q.     Okay.  But you indicated that ARPs
15   are one of the ways that persons in custody might
16   be able to relate concerns about time
17   computation, correct?
18          A.     Right.  I know they can -- yes, yes.
19          Q.     Okay.  But you're not aware of what
20   the process is?
21          A.     No.
22          Q.     Okay.  So am I correct in
23   understanding that you don't know where the first
24   step response forms that go with either of these
25   case numbers are; is that correct?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

 1          A.     No, I do not know, correct.

 2          Q.     Both of these forms that I'm looking

 3   at appear to have dates in January of 2017 next

 4   to "received in this office."  Do you see that?

 5          A.     Yes.

 6          Q.     And the signature date on these two

 7   forms appears to be in September of 2017; is that

 8   correct?

 9          A.     Yes.

10          Q.     Do you know why these Second Step

11   Response Forms would be dated eight months after

12   they were reportedly received?

13          A.     I don't know how they handle that.

14          Q.     Okay.  Have you seen these response

15   forms as to Mr. Guidry and Mr. Crittindon before?

16          A.     I can't say that I did or -- yeah,

17   I'm not sure.

18          Q.     Okay.  There appears to be, just

19   from reading these two forms, information

20   contained in here about their sentences, the acts

21   that would relate to them, time they were given

22   for credit, that sort of information; is that

23   correct?

24          A.     Correct.

25          Q.     And were you contacted to provide

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    this information related to Mr. Guidry and

2    Mr. Crittindon for these response forms?

3          A.    I don't -- I didn't understand the

4    question.

5          Q.    Sure.

6          A.    I'm sorry.

7          Q.    The information that's contained in

8    these two paragraphs in the response forms

9    appears to be largely related to -- to time

10   calculation, correct?

11         A.    Correct.

12         Q.    And I'm wondering whether or not you

13   were contacted to provide the information that

14   wound up being provided in this Second Step

15   Response Form?

16         A.    The ARP department, I know they have

17   people that have work in time comp and that have

18   access to the files.

19         Q.    So you don't remember being

20   contacted specifically related to the ARPs by

21   Mr. Guidry or Mr. Crittindon?

22         A.    No.

23         Q.    Do you see at the bottom of both of

24   them that they state that "No further

25   investigation is warranted"?

```
 1          A.    Yes.
 2          Q.    Okay.  Do you know why that is?
 3          A.    No.  I'm not familiar with the
 4   process.
 5          MS. WASHINGTON:
 6                I'm going to show you what I will
 7          mark as Exhibit 45, more e-mails.
 8          (Exhibit 45 marked and tendered.)
 9          THE WITNESS:
10                Okay.
11          MS. WASHINGTON:
12                And I will represent to you that
13          this is another e-mail with an attachment
14          that we received from the Department of
15          Corrections in discovery in this
16          litigation.
17   BY MS. WASHINGTON:
18          Q.    And am I correct that this exhibit
19   contains an e-mail that you sent to Mr. Seth
20   Smith and Mr. Perry Stagg on January 5th of 2017?
21          A.    Correct.
22          Q.    And -- and that that e-mail was
23   related to information on the Orleans Parish
24   offenders waiting to be processed and time
25   comped?
```

```
 1            A.     Correct.
 2            Q.     And that there was an attachment to
 3     it which you ultimately converted to a Word
 4     document and that's the second page of this
 5     exhibit, correct?
 6            A.     Correct.  Correct.
 7            Q.     Did you author the memo attachment
 8     that's contained in this exhibit?
 9            A.     Did I send it, yes.  What do you
10     mean?
11            Q.     Did you author it?  Did you write
12     this?
13            A.     Oh, yes.
14            Q.     You did.
15            A.     Yes.
16            Q.     Okay.  And you are looking at the
17     second page of Exhibit 45?
18            A.     Yes.
19            Q.     And that's dated January 5th of
20     2017?
21            A.     Yes.
22            Q.     Tell me about how this memo came to
23     exist.
24            A.     From what I recall, trying to relate
25     to Perry and the chief what would have been --
```

```
 1   what's been going on with Orleans and the
 2   problems; because before this, we were just
 3   telling them and -- you know, so I just tried to
 4   put something into play what was going on and so
 5   they will know, be able to have something in
 6   writing to go by to look at on what was going on
 7   with the Orleans cases.
 8           Q.    Were you asked to generate this
 9   memo?
10           A.    Not that I recall.
11           Q.    What did you use to put together
12   this memo?
13           A.    Just information that we had, the
14   e-mails, the calls, the different -- my manager
15   telling me and the employees that were involved
16   with it what was going on.
17           Q.    Okay.  After you sent this memo to
18   Mr. Smith and Mr. Stagg, what -- what happened as
19   a result of sending this memo?
20           A.    I'm not sure.  I really don't know.
21           Q.    Did you follow up with Mr. Stagg or
22   Mr. Smith after they would have received this
23   memo?
24           A.    I can't say for sure if we had
25   meetings after it or talked, you know, if we
```

1    talked about it.  I don't remember.

2          Q.    Do you know if the department made

3    any changes after what Mr. Amacker referred to as

4    "the Riverbend fiasco"?

5          A.    The department made changes?

6          Q.    Yeah.  Did DPS&C and the pre-class

7    department or anyone else in the Department of

8    Corrections make any changes as a result of what

9    had happened with these DOC sentenced prisoners

10   from Orleans?

11         A.    I mean, no changes.  I mean, that we

12   still have to get the paperwork to work them, so

13   I mean, I don't think any changes happened.

14         Q.    Do you know if there were any other

15   reports or documents or analysis that was

16   produced as a result of looking into this -- this

17   situation that occurred with these Orleans

18   sentenced prisoners?

19         A.    Not -- Not that I'm aware of.  I

20   don't think so.

21         Q.    Were there any kind of, you know,

22   lessons learned, presentations or e-mails

23   communicated in the department that you remember?

24         A.    Not that I remember.

25         Q.    Do you know if Orleans Parish is



```
 1   still transferring DOC sentenced prisoners to
 2   East Carroll Parish?
 3          A.    I -- I don't know that.  I do know
 4   they are part of one of the parishes that
 5   transfer their offenders as they are sentenced to
 6   Raymond Laborde Correctional.
 7          Q.    And that's within the past year that
 8   that has been occurring --
 9          A.    Right.
10          Q.    -- since Raymond Laborde became a
11   pre-class?
12          A.    An intake facility.
13          Q.    An intake facility?
14          A.    Right.
15          Q.    Okay.  I want to play for you an
16   audio recording.  I'll play the recording for
17   you, and then just let me know if you are
18   familiar or if you recognize the recording.
19          A.    Okay.
20       (Recording playing on the record).
21   BY MS. WASHINGTON:
22          Q.    Are you familiar with that
23   recording?
24          A.    I'm not familiar with the exact
25   recording.  It could have been our recording at
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

GRIFFIN, ANGELA 7/10/19

 1    the beginning, but I'm not familiar with the

 2    exact recording.

 3          MS. WASHINGTON:

 4                Okay.  And, for the record, this is

 5          the recording that was previously marked

 6          as Exhibit 26A.

 7    BY MS. WASHINGTON:

 8          Q.    Do you -- so you don't know what --

 9    what number you would call to reach that

10    recording?

11          A.    No.

12          Q.    Okay.  I'm going to play for you a

13    second recording, which was previously marked as

14    Exhibit 26B.  Again, take a listen.  This one is

15    a little bit quieter, but hopefully you can hear

16    it.

17          (Recording playing on the record.)

18    BY MS. WASHINGTON:

19          Q.    Are you familiar with that

20    recording?

21          A.    Yes.

22          Q.    And what is that recording?

23          A.    That's the recording in the

24    pre-class department.

25          Q.    What number do you call to reach

```
 1    that recording?
 2           A.    I believe it's 342-0799.
 3           Q.    Okay.  And is that one of the
 4    numbers that was in that first recording you
 5    listened to or do you remember?
 6           A.    I don't remember.
 7           Q.    And is that the -- like a main line
 8    for the pre-class department?
 9           A.    It's a contact line.  We have main
10    line -- we have a line -- other lines, but it's a
11    contact line to call on.
12           Q.    Do you know when that recording, the
13    second one that we just listened to, when that
14    was created?
15           A.    It was after pre-class came here --
16           Q.    Uh-huh (affirmatively).
17           A.    -- and after 2013.
18           Q.    Okay.  And -- and the number that
19    you just indicated you would call to get to that
20    recording, do you know if that number is
21    available to the public, that pre-class contact
22    line?
23           A.    I'm not sure.  I mean, I think it's
24    on our website, but I'm not positive.
25           Q.    Okay.  Do you know if there's a --
```

1    an entry for the pre-class department on the

2    DPS&C website?

3             A.    Which entry?

4             Q.    If I'm a member of the public and I

5    go to the Department of Corrections website, is

6    there a page that I can get to that provides

7    contact information for the pre-class department?

8             A.    I'm not sure.

9             Q.    Okay.  So the recording that we just

10   listened to gave you some options; is that

11   correct?

12            A.    Correct.

13            Q.    And, to your knowledge, if you were

14   to call the number and get that recording and

15   select an option, where are you sent to; are you

16   sent to a voicemail?

17            A.    It depends on what option you

18   selected.

19            Q.    Uh-huh (affirmatively).

20            A.    That some go to voicemail and some

21   it goes to -- you have to put in a parish.  Like

22   if it's the sheriff's office, then it sends you

23   to the supervisor over that parish.

24            Q.    Okay.  Let's listen to it one more

25   time just so I can understand where the various



```
 1    options take you.
 2          (Recording playing on the record.)
 3    BY MS. WASHINGTON:
 4          Q.    Okay.  So option one of the
 5    recording says "for family and friends of an
 6    offender," correct?
 7          A.    Right.
 8          Q.    If you call this number and receive
 9    this recording and press 1, what happens to your
10    call?
11          A.    It goes to another message that
12    tells them about the sentencing, the calculating
13    of time, and what -- I can't remember exactly
14    what it says.  And then it eventually leads them
15    to a message, I think to leave a message.
16          Q.    So it may eventually, after you
17    receive another recording, provide you with an
18    option to leave a message?
19          A.    Right.
20          Q.    And who picks up the messages that
21    are left?
22          A.    It goes to our clerical, to an
23    e-mail, then sends it out to the supervisors to
24    check on.
25          Q.    The messages are attached to an
```



 1    e-mail as a recording?

 2           A.    Yes.

 3           Q.    And the e-mail address that they are

 4    sent to is a clerical person within the pre-class

 5    department?

 6           A.    I'm not sure if it's a telephone,

 7    e-mail address, or her e-mail.  I think it's a

 8    different address in the pre-class department,

 9    yes.

10           Q.    And -- and who -- who manages that

11    e-mail or who's e-mail does it get sent to?

12           A.    Our clerical, Melissa Allen.

13           Q.    How long has Melissa Allen been in

14    that role?

15           A.    Since the beginning of -- since the

16    automated line was developed.

17           Q.    And when was it developed?

18           A.    Oh, you mean in her -- well, she

19    came with pre-class when pre-class came here.

20           Q.    Okay.  So she came over --

21           A.    And this was developed right after.

22           Q.    Okay.  So she has been within the

23    pre-class department here at headquarters since

24    2013?

25           A.    Thirteen, correct.

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1      Q.    Okay.  Would she have been receiving
2  all of the messages from this phone number to her
3  e-mail since 2013?
4      A.    I'm not sure how it -- in 2013, if
5  it went to an e-mail, but I do now know it goes
6  to an e-mail.  I don't remember what happened in
7  -- when they first set it up how it worked.
8      Q.    Do you know if in 2016, 2017
9  messages left on this line would be provided by
10 e-mail?
11     A.    I'm not sure exactly when it
12 changed.
13     Q.    After Ms. Allen receives the
14 recordings by e-mail, what does she do with the
15 recordings?
16     A.    She forwards them to -- she listens
17 to them to see what parish -- if she can tell
18 what parish or she'll look them up; if they leave
19 a DOC inquiry by name, look and see if we have
20 them in pre-class.  If there's something on them
21 and if it needed further investigating, she will
22 send it to the supervisors to check, so --
23     Q.    And these other five supervisors
24 within the pre-class department?
25     A.    Correct.

1    Q.    And what is your expectation of what
2    the supervisors do when they receive an e-mail
3    from Ms. Allen regarding a call that she received
4    on this line?
5    A.    To check into if they are looking
6    for someone that's sentenced, and we do not have
7    paperwork to check into it; see where their
8    paperwork is, if we can figure out where they are
9    sentenced at to call.
10    Q.    Are those supervisors instructed to
11    inform the managers or inform you when they
12    receive e-mails about these calls?
13    A.    No.
14    Q.    No.
15    A.    Unless there's issues that continues
16    after the fact.
17    Q.    Do you know if the two managers who
18    work under you follow up in any way on calls that
19    the supervisors may have received by way of this
20    line?
21    A.    I'm not sure.
22    Q.    Do you follow up with the managers
23    or with the supervisors about calls that are
24    received on this line?
25    A.    I do not follow up on each call,

```
1    just that I do randomly ask are you-all keeping
2    up with the calls that come in or if you sent an
3    e-mail to check on them.
4           Q.    So that's just a random question you
5    might ask every so often?
6           A.    Bring it up just to keep them --
7    right.
8           Q.    Okay.  Are the calls logged in any
9    kind of way by Ms. Allen or anyone else?
10          A.    Not that I know of, but I'm not
11   positive.
12          Q.    Do you know if the calls that are
13   received by Ms. Allen by e-mail are saved
14   somewhere?
15          A.    I'm not sure.
16          Q.    How did you first learn about this
17   particular lawsuit being filed?
18          A.    I'm not really sure, but I know I
19   had received some paperwork on the lawsuits.
20          Q.    Okay.  Do you know approximately
21   when that would have been?
22          A.    I don't.  It seems like it's been a
23   while, but I'm not positive.
24          Q.    And, prior to the lawsuit being
25   filed and you receiving the paperwork, whenever
```

1   that was, did you remember anything about these

2   particular plaintiffs and their overdue release

3   dates?

4           A.    Not the individual names.  I mean, I

5   just -- I do remember the problems with Orleans,

6   but not individual offenders, no.

7           Q.    And I'm not asking for any

8   privileged communications with your counsel, but

9   have you spoken with anyone or has anyone spoken

10  to you about this lawsuit since it's been filed?

11          A.    Just Gary and legal, one of the

12  legal, our legal here.

13          Q.    Okay.  Outside of the AG's office or

14  the legal department --

15          A.    Uh-uh (negatively).

16          Q.    -- have you spoken with anyone else?

17          A.    No.

18          Q.    Okay.  What steps did you take to

19  prepare for your deposition today?

20          A.    I did read over the paperwork that

21  was looked over, the cases, kind of looked over

22  them to see if they were overdue and things like

23  that.

24          Q.    And that would be the case files --

25          A.    Correct.

```
 1          Q.    -- that we were provided by the
 2     Department of Corrections?
 3          A.    Correct.
 4          Q.    And you were about to say something
 5     else.
 6          A.    Just -- and then just some of the
 7     e-mails.
 8          Q.    Okay.  And is it your understanding
 9     that the documents that you reviewed were things
10     that the department has provided as discovery in
11     this litigation?
12          A.    Yes.
13          Q.    Okay.
14          MS. WASHINGTON:
15               I don't have any further questions
16          for you.  Your counsel might, or if we
17          still have anybody sitting on the phone
18          for the other defendants.
19          MR. EVANS:
20               Shane, have anything?  Twice.  Pete,
21          have anything?
22     EXAMINATION BY MR. EVANS:
23          Q.    All right.  I actually do have just
24     a few follow-up questions, not too many.
25               Ms. Griffin, you talked earlier
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    about kind of the -- the process when you -- when

2    you would learn generally that whether it be by

3    family member or an ARP or whatever the case may

4    be, that someone may or may not be overdue, there

5    might be a question of it.  You indicated that

6    the first thing your department does is reach out

7    via telephone --

8                A.    Correct.

9                Q.    -- to the -- to the parish, correct?

10               A.    Correct.

11               Q.    Now, tell me what mechanisms the DOC

12   has to -- to make a sheriff provide paperwork.

13               A.    We can't make them provide it.  We

14   just continually call them and try to get it from

15   them, but making them, we can't make them.

16               Q.    Now, do -- do you supervise anybody

17   with any sheriff's office in the State of

18   Louisiana?

19               A.    No.

20               Q.    Do you have the authority to

21   discipline anybody -- any employee of a sheriff

22   of the State of Louisiana?

23               A.    No.

24               Q.    Do you -- do you perform performance

25   reviews of any kind of employees of sheriffs in



1    the State of Louisiana?

2           A.    No.

3           Q.    Similar question regarding parish

4    jails, to the extent that they may be separate

5    and apart from the sheriff's office.  Do you

6    supervise any employee of a parish detention

7    center -- detention center or jail?

8           A.    No.

9           Q.    Do you -- do you have the authority

10   to discipline any employee of a parish detention

11   center or jail?

12          A.    No.

13          Q.    Okay.  And then, finally, same --

14   same set of questions for the clerk of court's

15   office.

16                Do you supervise anybody with any

17   clerk of court in the State of Louisiana?

18          A.    No.

19          Q.    Do you have the authority to

20   discipline any -- any employee of a clerk of

21   court in the State of Louisiana?

22          A.    No.

23          Q.    Tell me a little bit about -- to the

24   extent that we can -- just generally what is the

25   formula that exists for computing an offender's

```
 1   time?
 2            A.    First, once -- once we find out he
 3   has a hard labor sentence, we have to find out
 4   what -- what kind of sentence -- what his
 5   sentence -- his crime is, depending on if he's a
 6   crime of violence, a sex offense or if he's -- if
 7   he is a crime of violence, does he have a prior.
 8   All of these effect how much time he will serve
 9   in custody and whether he's pro-eligible or not.
10   We have to know -- look up and see what -- if
11   he's pro-eligible, and a lot of times it depends
12   on his -- the date of commit or probation
13   revoked, which one of the crimes -- acts he falls
14   under for good time.
15            Q.    So -- so when somebody is sentenced
16   just for this -- we will just say for a year,
17   right, so that's -- that's kind of a starting
18   point, right, this is their sentence --
19            A.    Right.
20            Q.    -- is that right?
21            A.    Correct.
22            Q.    Now, so -- so what other factors,
23   though, play into whether any particular person
24   or offender will actually serve a year?
25            A.    His -- whether we get the paperwork,
```

```
 1    but if -- his crime will depend on if he's going
 2    to serve the year or less.  It's basically what
 3    act he falls under.
 4            Q.    What do you mean by "act"?
 5            A.    The good time act that he would --
 6    if he receives good time, if he doesn't; and that
 7    depends on when he committed the crime, which is
 8    on the bill of information, and we would look up
 9    how much good time he would earn.
10            Q.    Is an offender eligible to earn good
11    time on pretrial custody?
12            A.    Just for clarification, jail credit,
13    anytime he spent in jail prior to sentencing.
14            Q.    Well -- well, we will start with
15    that.
16            A.    Okay.
17            Q.    So -- so generally, is an offender
18    entitled to -- to a reduction of his -- of his
19    normal sentence based off of time previously
20    served?
21            A.    Yes.
22            Q.    Okay.  But that's a different
23    question than good time, correct?
24            A.    Correct.
25            Q.    Okay.  So is an offender -- might an
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    offender be entitled to earn good time based on

2    his -- his time served prior to sentence?

3         A.    He would earn more credits off his

4    time once we receive a jail credit letter letting

5    us know how long he served prior to his sentence

6    date.  He would get time off of his -- his

7    sentence.

8         Q.    Okay.  So all -- all the information

9    that we have just talked about, when your

10   department computes an offender's time, where

11   does that information come from?

12        A.    From the parish of conviction, the

13   parish jail.

14        Q.    Now, earlier you were asked a few

15   questions about or you -- you looked at some of

16   the e-mails following up on a call from family

17   members, correct?

18        A.    Correct.

19        Q.    And, in those calls, it appeared

20   that the family member indicated some facts that

21   may have indicated that particular offender was

22   overdue.  Do you -- do you recall that?

23        A.    Yes.

24        Q.    Now, can you -- can you compute an

25   offender's time based off of information provided



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

     1    by a family member?

     2           A.     No.

     3           Q.     Why not?

     4           A.     Because we need his official

     5    sentence, what he was truly sentenced to, and the

     6    paperwork from the jail telling us how much time

     7    he served and what his sentence was to be able to

     8    calculate his release dates.

     9           Q.     So -- so at the end of the day, your

    10    department cannot compute an offender's time

    11    until they receive the proper paperwork?

    12           A.     Correct.

    13    MR. EVANS:

    14           I think that's all I have.

    15    MS. WASHINGTON:

    16           I have no further questions for you

    17    either.  Thank you very much.

    18    (The deposition was concluded at 5:27 p.m.)

    19

    20

    21

    22

    23

    24

    25



```
 1                     CORRECTION SHEET

 2

 3    PAGE        LINE DESCRIPTION

 4    _____       _____ _____

 5    _____       _____ _____

 6    _____       _____ _____

 7    _____       _____ _____

 8    _____       _____ _____

 9    _____       _____ _____

10    _____       _____ _____

11    _____       _____ _____

12    _____       _____ _____

13    _____       _____ _____

14    _____       _____ _____

15    _____       _____ _____

16    _____       _____ _____

17    _____       _____ _____

18    _____       _____ _____

19

20    WITNESS:  ANGELA GRIFFIN

21    TAKEN ON: JULY 1, 2019

22    BY:       CHERIE' E. WHITE, CCR (LA NO. 96002)

23              CSR (TX NO 10720)

24              CSR (MS NO. 1514)

25              RPR (NATIONAL NO. 839452)
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1              WITNESS CERTIFICATE

2

3

4        I, ANGELA GRIFFIN, do hereby certify that

5    the foregoing testimony was given by me, and the

6    transcription of said testimony, with corrections

7    and/or changes, if any, is true and correct as

8    given by me on the aforementioned date.

9

10

11

12    _____   _____

13    DATE SIGNED          (Witness' Signature)

14

15

16

17        Signed with corrections as noted.

18

19        Signed with no corrections as noted.

20

21

22

23

24    DATE TAKEN: July 1, 2019

25



```
 1                    REPORTER'S PAGE
 2          I, CHERIE' E. WHITE, Certified Court
 3     Reporter, in and for the State of Louisiana, the
 4     officer, as defined in Rule 28 of the Federal
 5     Rules of Civil Procedure and/or Article 1434(B)
 6     of the Louisiana Code of Civil Procedure, before
 7     whom this sworn testimony was taken, do hereby
 8     state on the record;
 9             That due to the interaction in the
10     spontaneous discourse of this proceeding, dashes
11     (--) have been used to indicate pauses, changes
12     in thought, and/or talkovers; that same is the
13     proper method for the court reporter's
14     transcription of a proceeding, and that dashes
15     (--) do not indicate that words or phrases have
16     been left out of this transcript; also, that any
17     words and/or names which could not be verified
18     through reference material have been denoted with
19     the phrase "(spelled phonetically)."
20
21
22             CHERIE' E. WHITE, CCR(LA NO. 96002)
23             CSR (TX NO 10720)
24             CSR (MS NO. 1514)
25             RPR (NATIONAL NO. 839452)
```

```
 1              REPORTER'S CERTIFICATE

 2

 3         This certification is valid only for a

 4    transcript accompanied by my original signature

 5    and original seal on this page.

 6         I, CHERIE' E. WHITE, Certified Court

 7    Reporter, in and for the State of Louisiana, do

 8    hereby certify that Angela Griffin, to whom the

 9    oath was administered, after having been duly

10    sworn by me upon authority of R.S. 37:2554, did

11    testify as hereinbefore set forth in the

12    foregoing 232 pages; that this testimony was

13    reported by me in the stenotype reporting method,

14    was prepared and transcribed by me or under my

15    personal direction and supervision, and is a true

16    and correct transcript to the best of my ability

17    and understanding; that I am not related to

18    counsel or the parties herein, nor am I otherwise

19    interested in the outcome of this matter.

20

21

22         CHERIE' E. WHITE, CCR (LA NO. 96002)

23         CSR (TX NO. 10720)

24         CSR (MS NO. 1514)

25         RPR (NATIONAL NO. 839452)
```