Transcript of the Testimony of

# SHERIFF WYDETTE WILLIAMS

July 8, 2019

JESSIE CRITTINDON, et al. c/w EDDIE COPELIN, et al. v.
MARLIN GUSMAN, et al.



P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


JESSIE CRITTINDON, et al.

VERSUS                                    CASE NO.

                                          3:17-cv-00512-SDD-EWD


MARLIN GUSMAN, et al.

c/w

_____

EDDIE COPELIN, et al.

VERSUS                                    CASE NO.

MARLIN GUSMAN, et al.                     3:17-cv-00602-SDD-EWD


_____



        DEPOSITION OF SHERIFF WYDETTE WILLIAMS, taken at
the River Bend Detention Center, 9450 Highway 65 South,
Lake Providence, Louisiana  71254, in the above-entitled
cause at 9:30 a.m on the 8th day of July, 2019.

```
 1    APPEARANCES:
 2     ATTORNEYS REPRESENTING THE PLAINTIFFS, JESSIE
 3     CRITTINDON AND EDDIE COPELIN, ET AL:
 4
 5     RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
 6     4400 South Carrollton Avenue
 7     New Orleans, Louisiana  70119
 8     Phone: (504) 620-2259
 9     (BY: James Craig, Esquire)
10      E-mail: james.craig@macarthurjustice.org
11      (BY: Emily Washington, Esquire)
12      E-mail: emily.washington@macarthurjustice.org
13
14     ATTORNEYS REPRESENTING THE DEFENDANT, STATE OF
15     LOUISIANA, LOUISIANA DEPARTMENT OF JUSTICE:
16
17      LOUISIANA DEPARTMENT OF JUSTICE
18      1885 N. Third Street, Floor 4
19      Baton Rouge, Louisiana 70802
20      Phone: (225) 326-6085 |Fax: (225) 326-6099
21      (BY: James "Gary" Evans, Esquire)
22      E-mail: evansj@ag.louisiana.gov
23              (By Telephone)
24
25     ATTORNEYS REPRESENTING THE DEFENDANTS, EAST
```



```
1    CARROLL PARISH SHERIFF'S OFFICE:
2    USRY & WEEKS, PLC
3    1615 Poydras Street, Suite 1250
4    New Orleans, Louisiana  70112
5     Phone: (504) 592-4600 |Fax: (504) 592-4641
6     (BY: Ronald Shane Bryant, Esquire)
7     E-mail: sbryant@usryweeks.com
8
9    ATTORNEYS REPRESENTING THE DEFENDANT, ORLEANS
10    PARISH SHERIFF'S OFFICE:
11
12     RODRIGUE & ARCURI LAW GROUP
13     201 St. Charles Avenue, Suite 114-412
14     New Orleans, Louisiana  70170
15     Phone: (504) 249-6990
16     (BY: Blake J. Arcuri, Esquire)
17     E-mail: bja@rodriguearcuri.com
18            (By Telephone)
19
20
21
22
23
24
25
```



```
 1           E X A M I N A T I O N   I N D E X

 2

 3    BY:                                    PAGE

 4    MR. CRAIG                                5

 5

 6

 7

 8

 9

10                    E X H I B I T S

11

12    EXHIBIT NO.                            PAGE

13

14    Exhibit 58                              15

15    Louisiana Board of Ethics 2014 through 2017

16

17    Exhibit 59                              25

18    East Carroll Sheriff's Department Employee Handbook

19

20    Exhibit 60                              44

21    Acknowledgment form of malfeasance in office

22

23    Exhibit 61                              55

24    The Pretrial Billing for Orleans Parish

25    for the month of December 2016,
```



SHERIFF WYDETTE WILLIAMS 7/8/2019

1    EXHIBITS CONTINUED:

2

3    Exhibit 62                                    67

4    Crittindon 4707, excerpt from Mr. Crittindon's

5    file at River Bend

6

7    PREVIOUSLY INTRODUCED EXHIBITS

8

9    Exhibit 7                                     19

10   Exhibit 50                                    37

11   Exhibit 48                                    46

12   Exhibit 9                                     46

13   Exhibit 16                                    52

14   Exhibit 14                                    53

15   Exhibit 2                                     57

16   Exhibit 1                                     65

17   Exhibit 3                                     66

18   Exhibit 4                                     71

19   Exhibit 5                                     74

20   Exhibit 43                                    91

21

22

23   REPORTED BY:    Theresa G. Tumulty
                     Certified Court Reporter
24                   State of Louisiana
                     License # 96016

25



S T I P U L A T I O N S

It is stipulated and agreed by and
between counsel for the parties that the deposition
of SHERIFF WYDETTE WILLIAMS, is hereby taken under Article
1421, Et Seq., of the Louisiana Code of Civil Procedure, in
accordance with law pursuant to notice;

That the formalities, such as reading,
signing, sealing, certification, and filing, are
specifically waived;

That all objections, save those as to
the form of the questions, are hereby reserved
until such time as this deposition, or any part
thereof, may be used or sought to be used in
evidence.

                    *      *      *
        THERESA G. TUMULTY, Certified Court Reporter in
and for the State of Louisiana, officiated in
administering the oath to the above-named witness.

                    *      *      *



```
 1          W Y D E T T E   W I L L I A M S , after having

 2    first been duly sworn by the above-mentioned Court

 3    Reporter, did testify as follows:

 4    EXAMINATION BY MR. CRAIG:

 5         Q    This is the deposition of Sheriff Williams taken

 6    pursuant to notice and the Federal Rules of Civil

 7    Procedure.  Plaintiffs specifically do not waive reading

 8    and signing.  Plaintiffs do waive sealing, certification,

 9    and filing of the deposition.  So let's get started.

10              Please introduce yourself, sir.

11         A    Yes.  My name is Wydette Williams.  I'm the

12    Sheriff here at East Carroll Parish Sheriff's Office.

13         Q    And have you been deposed before, Sheriff?

14         A    Deposed?

15         Q    Yes, sir.  In this kind of situation?

16         A    In one other situation.  It was when I was an

17    investigator with the Sheriff's Office.  That's been about

18    15, 20 years ago for an incident that took place at a

19    store, and the family sued the store.  So we had to be a

20    part of the deposition.

21         Q    I see.  So I'm going to go over what we kind of

22    call ground rules, or for lack of a better term,

23    expectations for the deposition just to make sure we're

24    kind of on the same page.

25         A    Sure.
```



1    Q    First of all like in court, we have a court

2    reporter here.  She'll be taking down everything anybody

3    says, including the folks on the phone.  So if you would

4    please speak up, which I can tell you've got an easy to

5    follow voice.  But also try to avoid head nods or -- or

6    the kind of affirmative noises we sometimes make like

7    uh-huh (affirmative response) or uh-uh (negative

8    response), which then become pretty difficult to interpret

9    in the course of a transcript.

10    A    Okay.

11    Q    And if I remind you of that, which sometimes

12    happens once or twice during a deposition, I'm not trying

13    to be rude or a smart aleck.  I'm just trying to keep the

14    record straight.

15    A    Okay.

16    Q    The oath that you just took is the same oath

17    that you would take in a court in this case or any other

18    case at trial.  Do you understand that?

19    A    Yes, I do.

20    Q    Thank you.  We are looking for full and complete

21    answers to the questions that I'll be asking you today.

22    And to that end if -- at some later point in the

23    deposition, if a question or just something pops into your

24    head that would be a more complete answer to a previous

25    question, please do.  Just let us know and give the



1    answer.  It's just as easy as saying I just remembered

2    something about a question you asked an hour ago.  There

3    is no special rule that -- that your answers are closed at

4    the end of -- of giving a particular answer.  Does that

5    make sense?

6         A    It does.

7         Q    If I ask any questions that don't make sense,

8    which definitely will happen at some point during the day,

9    please feel free to let me know.  Either ask me to restate

10   it, and even better if it's possible, if you know exactly

11   what part of the question was confusing, if you let me

12   know to clarify that piece, I'm happy to do that.  In the

13   absence of understand -- of getting a response from you

14   like that, I'm going to assume that you understood my

15   question, and that your answer is a response to the

16   question.

17              Does that sound fair?

18        A    Yes, it does.

19        Q    You're allowed to ask for a break at any point

20   during the deposition.  There's no particular rule about

21   it.  It can be any time you need one.  The only rule that

22   really applies to that is that if I've asked a question

23   that you haven't answered yet, um, we would appreciate you

24   answering the question and then taking a break.  It avoids

25   any kind of appearance of -- of impropriety, and that's



866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

1    what we ask of all witnesses.

2         A    (Nods head affirmatively.)

3         Q    And that includes that you're allowed at any

4    point to say I want to talk to my attorney, or I want to

5    talk to the office's attorney, and that's permitted as

6    long as you answer the question first or it's in between

7    questions.

8         A    Okay.

9         Q    Are there any medications, or hardships, or

10   sleep deprivation that would keep you from giving full and

11   accurate testimony this morning?

12        A    No.

13        Q    Great.  Have you had an occasion to speak to the

14   members of your staff who have already been deposed in

15   this case about their depositions?

16        A    No.

17        Q    What did you do to get ready for your deposition

18   today?

19        A    I showed up this morning.

20        Q    Okay.  And not to ask, and I will never ask the

21   content of any conversations you had with counsel.  But

22   did you meet with your counsel at any time prior to today

23   to prepare for the deposition?

24        A    No.

25        Q    And so you haven't looked at any documents to



```
 1    prepare for today's deposition?

 2         A    No.

 3         Q    And I can see sometimes, people bring documents

 4    with them.  But it looks like you didn't bring any

 5    documents with you today.

 6         A    No.

 7         Q    Okay.  You weren't required to.  Does the

 8    Sheriff's Office have a financial arrangement that

 9    provides for representation by your counsel today?  How

10    is -- how is that done?

11         A    I'm not sure exactly.

12         Q    Okay.  Okay.  And likewise, you're not sure how

13    -- assuming there was a judgment or settlement, how that

14    would be paid?

15         A    I'm not sure.

16         Q    What would you understand?

17         A    To my understanding, it would be paid through

18    the insurance.

19         Q    Okay.  And do you know the -- what your policy

20    limits are on the insurance?

21         A    No.

22         Q    Okay.  Let's start with some basic questions.

23    Oh, who is your carrier?  I'm sorry.

24         A    I don't recall.

25         Q    Fair.  Which is, by the way, something I could
```



```
 1    have also included in my preliminary points.  I don't
 2    recall is a fine, truthful answer to any question.  It's
 3    not a -- not a memory contest.
 4              MR. BRYANT:
 5                   And, you know, can we go off the record for
 6              a second?
 7                   (Whereupon, there was a discussion held off
 8              the record.)
 9              MR. CRAIG:
10                   Thank you, Counsel, and just for the
11              record, we -- we spoke a little bit about the
12              arrangements that I had asked the Sheriff about.
13    BY MR. CRAIG:
14         Q    So I understand you took office as Sheriff in
15    2012?
16         A    Yes.  I physically took office in 2012.
17         Q    And that was because you were elected in the
18    fall of 2011?
19         A    Correct.
20         Q    So let's start with your educational background,
21    please.
22         A    I completed high school and completed the North
23    Delta Law Enforcement Academy.
24         Q    And well, I'm sorry.  Which law enforcement
25    academy?
```



```
 1        A    North Delta --

 2        Q    Oh.

 3        A    -- Law Enforcement Academy.

 4        Q    Where is that?

 5        A    Out of Monroe.

 6        Q    I see.  And when did you do the North Delta Law

 7   Enforcement Academy?

 8        A    It was in 1999.  I completed July 2nd of 1999.

 9        Q    When did you graduate from high school?

10        A    1994.

11        Q    Where did you go?

12        A    Lake Providence Senior High.

13        Q    Where -- give me a little thumbnail sketch of

14   your work experience from '94 to '99.

15        A    I worked with AmeriCorps with rural economic

16   community development.  And from that point, I started in

17   the work force at the prison.  I worked every position

18   there.  Every position at the Sheriff's Office.  Chief

19   investigator for the Sixth JDC, elected Sheriff.

20        Q    Okay.  Let's get some -- let's try to put some

21   dates on those then.  You -- you graduated high school in

22   '94?

23        A    Correct.

24        Q    And did AmeriCorps after that?

25        A    Correct for a year, and I started from '95 to --
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

1    I think 2008 at the Sheriff's Office.  Then I worked with

2    the Sixth Judicial District Attorney's Office from 2008 to

3    2012.

4         Q    And then, I think you said you started with the

5    Sheriff's Office in the jail?

6         A    Yes.

7         Q    And then, what positions did you have between

8    that and going to the JDC?

9         A    At the jail, I worked Sergeant, Lieutenant,

10   Captain, Major.  Went to the street.  I've graduated in

11   the academy.  I worked shift supervisor as a deputy, shift

12   supervisor as an investigator, lead investigator.  Then I

13   went to the Sixth Judicial District Attorney's Office and

14   was the lead investigator there.

15        Q    Okay.  And when you worked at the jail, the jail

16   was operated by the East Carroll Parish Sheriff's Office?

17        A    Correct.

18        Q    Were you ever the warden or deputy warden of the

19   jail?

20        A    No.

21        Q    In your position as major, that was within the

22   jail, or was that in a different capacity?

23        A    It was with the detention center.

24        Q    What were your duties as major in the detention

25   center?


AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A    I oversaw the captains and the under ranking,
 2   the offenders.  I was also over transportation.  It was
 3   just a variety.
 4        Q    Okay.  Were you involved in any clerical or
 5   administrative duties at the jail when you were either
 6   captain or major?
 7        A    In -- in capacity, yes.  What -- what are you?
 8   Can you elaborate on that for me?
 9        Q    Yes, excellent.  Just as a for instance,
10   reporting about the -- who was present in the jail on a
11   given day, billing, or financing?
12        A    No.
13        Q    Nothing like that?
14        A    (Shakes head negatively.)
15        Q    You talked about being at the North Delta Law
16   Enforcement Academy that way, and that you finished there
17   in, I think you said July 2?
18        A    July 2nd, 1999.
19        Q    '99?
20        A    (Nods head affirmatively.)
21        Q    And that was in connection with your employment
22   with the East Carroll Parish Sheriff's Office?
23        A    Correct.
24        Q    And what training have you undertaken since
25   then?  Have you undertaken any in-service trainings or
```

1    additional trainings?

2         A    Yes, sir.  I couldn't begin to tell you where

3    that starts or ends.  I've had all type of schoolings,

4    trainings, and variations of other things.

5         Q    Okay.  Would that include what I think they call

6    legal aspects in post training?

7         A    Yes.

8         Q    All right.  And would that include the

9    constitutional rights of prisoners, either pretrial

10   detainees, or convicted prisoners?

11        A    To some extent.

12        Q    Do you remember when the last time you would

13   have had a training on that particular subject would have

14   been?

15        A    I don't recall.

16        Q    Okay.

17        MR. CRAIG:

18             Did you say we were at 58?

19        MS. WASHINGTON:

20             Yes.

21             (Exhibit 58, Louisiana Board of Ethics 2014

22        through 2017, was marked for identification.)

23   BY MR. CRAIG:

24        Q    Sheriff, I've handed you a document that's been

25   marked as Exhibit 58.  And for the record, it's Bates



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    Numbers Crittindon 4884, 48 -- 4896, 4879, and 4878.  And

2    these documents came from the personnel file that your

3    counsel provided to us in discovery.

4         A    Okay.

5         Q    Do you recognize these four pages?

6         A    Louisiana Board of Ethics 2014 through 2017.

7         Q    And what -- what's the substance of this

8    particular training?

9         A    This is a certificate stating that I've

10   completed the Louisiana Board of Ethics course that's

11   mandated by law every year by the State of Louisiana.

12        Q    Does it have the same substance in terms of the

13   material every year?

14        A    There's -- there could be some different

15   variations year to year.

16        Q    What are some of the topics that you recall

17   studying in these four years, or any other years you've

18   had the ethics training for public service?

19        A    Basically holding you to be true and to

20   summarize, holding you to be true to whatever craft that

21   you are participating as a professional that works for the

22   State or as Sheriff as an elected official.

23        Q    Okay.  And do I understand is this through a DVD

24   or -- or an Internet presentation, or is this live?

25        A    I've attended some that were live, some that



1    were over the computer, and some that was presented live

2    and some DVD's were shown or some small clips were shown,

3    yes.

4         Q    In connection with -- with your position as

5    Sheriff, you took an oath of office?

6         A    Yes, I did.

7         Q    And that oath requires you to defend the

8    Constitution of the United States and of the State of

9    Louisiana?

10        A    Correct.

11        Q    And you actually took a similar oath during your

12   previous positions, both with the East Carroll Parish

13   Sheriff's Office and with the District Attorney for the

14   Sixth JDC?

15        A    Correct.

16        Q    What are your responsibilities as Sheriff of

17   East Carroll Parish?

18        A    I'm the chief law enforcement official, tax

19   collector, and I'm the CEO of the Law Enforcement District

20   of East Carroll Parish.

21        Q    Okay.  Does the East Carroll Parish Sheriff's

22   Office have a policy or procedural manual?

23        A    Yes, we do.

24        Q    Did it exist before you were elected?

25        A    Unsure.



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

SHERIFF WYDETTE WILLIAMS 7/8/2019

 1          Q      Okay.  I'm going to hand you what has previously

 2     been marked as Exhibit 7.  Yeah, I've got that.  Also,

 3     produced by -- by your counsel in this case.

 4              Sheriff, do you recognize this document?

 5          A      It looks familiar.

 6          Q      Is that one of the policies and procedures in

 7     the panoply of policies and procedures issued by you as

 8     Sheriff of East Carroll Parish?

 9          A      Yes, it looks familiar.

10          Q      Okay.  It has a date on this document,

11     September 15, 2012.  Do you see that?

12          A      I do.

13          Q      And so this particular policy would have been --

14     at least this version of it that's in Exhibit 7 would have

15     been issued after the time that you took office as

16     Sheriff, correct?

17          A      That is correct.

18          Q      What -- what is the procedure for the creation

19     of policies like Exhibit 7 in your office?  How -- how do

20     -- how do policies like this come to be?

21          A      Can you elaborate a little bit more?

22          Q      Yes, sir.  Is there somebody on your staff that

23     researches and writes the potential policies and presents

24     them to you, or are they generated a different way?

25          A      They are generated by way of Department of



1    Corrections, and what is implemented through the State

2    legislation as well as what's implemented through the

3    Louisiana Sheriff's Association.

4        Q    I see.  Does the Louisiana Sheriff's Association

5    provide some kind of template of potential policies --

6        A    No.

7        Q    -- for the Sheriff's Offices?

8        A    When -- when new information is being brought

9    forth, sometimes that information is disseminated to other

10   sheriffs.

11       Q    Okay.  And is there somebody who works in your

12   office, the East Carroll Parish Sheriff's Office, who is

13   responsible for taking all of that information and putting

14   it in the form of a written policy especially for East

15   Carroll Parish Sheriff's Office?

16       A    Yes.

17       Q    Who is that person?

18       A    That would be Sandra Campbell and also that

19   would be Laura Sevier.

20       Q    What is -- what is Ms. Campbell's position?

21       A    She's my administrative assistant.

22       Q    Okay.  Does she report directly to you?

23       A    Yes, she does.

24       Q    And Ms. Sevier, what is her position?

25       A    She is our HR person here at River Bend

1    Detention Center.

2         Q    And does Ms. Sevier report directly to you?

3         A    No, she reports directly to the warden.

4         Q    And -- and who is the warden that she reports

5    to?

6         A    Warden Hedgemen.

7         Q    Okay.  And then, Warden Hedgemen reports to you?

8         A    Correct.

9         Q    Are there circumstances in which -- or

10   particular issues on which Ms. Sevier would meet

11   particularly with you without Mr. Hedgemen present?

12        A    If needed.

13        Q    With respect to policies and procedures such as

14   is reflected here in Exhibit 7, would Ms. Campbell or

15   Ms. Sevier present the draft directly to you, or would it

16   go through some other member of your staff?

17        A    She would report -- I mean position to warden

18   with it, and the warden would send it to me, or if Sandra

19   needs to get any information to me, she would make contact

20   with it to me.  Am I speaking loud enough?

21        Q    Yeah, you're very clear actually.  Thank you.

22        A    Okay.

23        Q    And for policies that have to do with patrol as

24   distinct from corrections or detention, is there a member

25   of your staff that reports directly to you that is over



```
 1   patrol?
 2         A      Yes.
 3         Q      Who is that person?
 4         A      That would be Bill Hopkins, and I have another
 5   deputy, Columbus Willis.
 6         Q      Okay.  And Mr. Hopkins, what is his rank?
 7         A      He's a major.
 8         Q      Okay.  So -- so Warden Hedgemen reports directly
 9   to you and the major over patrol, and the Deputy Hopkins,
10   is the deputy?  I'm sorry.
11         A      He is the major.
12         Q      Oh, Hopkins is the major?
13         A      Hopkins is a major along with Columbus Willis.
14         Q      Willis is the-- is the deputy that you
15   referenced.  Thank you.  So Major Hollis, Deputy Willis,
16   and Warden Hedgemon report directly to you.  Do you have
17   any other staff who report directly to you?
18         A      Major Willis, Major Hopkins.
19         Q      I'm sorry.
20         A      No problem.
21         Q      I thought you said deputy before.
22         A      No problem.
23         Q      That's totally my bad.  I said Major Willis,
24   Major Hopkins, Warden Hedgemen.
25         A      Correct.
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

SHERIFF WYDETTE WILLIAMS 7/8/2019

```
 1          Q    And anybody else?
 2          A    That reports directly to me?
 3          Q    Yes, sir.
 4          A    At any given time, I'm going to have contact
 5     with my employees.
 6          Q    Certainly, of course.
 7          A    Yes.
 8          Q    But in terms of being the -- and in terms of
 9     employees who are directly supervised by you, are there
10     others besides the warden and the two majors?
11          A    Yes.
12          Q    And who would that be?
13          A    I have my 911 coordinator.  I have other
14     employees that are there in my office.  But there is a
15     hub.  There is someone else that supervises them if that's
16     what you're asking.
17          Q    It is what I'm asking.  Who -- and who is the
18     person that supervises the people in your office in the
19     hub?
20          A    That would be Sandra Campbell, Lisa Cody.  That
21     would be Columbus Willis.  That would be Bill Hopkins.
22     Then the ranking just breaks down thereforth.
23          Q    And are you personally responsible for hiring
24     new employees or staff at the East Carroll Parish
25     Sheriff's Office?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A    Am I personal?

 2        Q    Yeah.

 3        A    No.

 4        Q    Who -- who handles that?

 5        A    The wardens handle the hiring of some employees

 6   as well as Sandra Campbell and when it comes to the

 7   deputies, I most definitely do have a direct hand into the

 8   street deputies, yes.

 9        Q    I see.  How many -- how many patrol staff,

10   either street deputies or rank do you have?

11        A    I do believe I have about 21.  20 to 21

12   full-time deputies, somewhere around there.  Auxiliary

13   deputies, I only count at four.  There's maybe about 20 of

14   those.

15        Q    And then, how many staff approximately work for

16   the East Carroll Parish Sheriff's Office at the River Bend

17   Detention Center?  Do you know?

18        A    You talking about a totality of everyone?

19        Q    Let's -- let's start with sworn officers.  Are

20   there sworn officers that work at River Bend Detention

21   Center?

22        A    Yes, there is.  I do believe it's about, give or

23   take, maybe about 15, 20 sworn --

24        Q    And then you have --

25        A    -- through the Sheriff's Office.
```

1      Q    -- do you have an idea of how many nonsworn
2  officers or other staff?
3      A    I think a total would be around 200 and -- it
4  ranges from 238 to 262 employees total.
5      Q    And that's the total employees for?
6      A    River Bend as well as East Carroll Sheriff's
7  Office.
8      Q    Got it.  And am I assuming correctly that this
9  Exhibit 7 is part of a larger set of policies that
10 Ms. Campbell and Ms. Sevier have put together into a
11 policies book?
12     A    Yes, sir, I can -- I believe so.
13     Q    Who -- who was responsible for drafting this
14 particular policy?
15     A    I do believe Sandra Campbell.
16              (Exhibit 59, East Carroll Sheriff's Department
17              Employee Handbook, was marked for
18              identification.)
19 BY MR. CRAIG:
20     Q    Okay.  We'll talk about this in just a little
21 bit more later.  Handing you next, Sheriff, a document
22 that's titled East Carroll Sheriff's Department Employee
23 Handbook for River Bend Detention Center, East Carroll
24 Detention Center.  And it has a date on the front page of
25 April 1, 2014.  And we're marking this as Exhibit 59, and

1    with any kind of document that's the number of pages.

2    It's completely permissible to just stop and look through

3    however much of it you need to.

4           Again, this is not a -- there are no tricks to

5    this.  So I just really want to know what you think about

6    different things.  Having said that, do you recognize this

7    particular document?

8        A    Yes, sir.

9        Q    What is it?

10       A    It's the handbook for the employees.

11       Q    And is this handbook specifically for employees

12   of River Bend Detention Center and East Carroll Detention

13   Center?

14       A    River Bend Detention Center.  There is no longer

15   East Carroll Detention Center.

16       Q    That was going to be my next question.  What --

17   what's the history of East Carroll Detention Center?  And

18   by which I really mean how long was it in operation?

19       A    I do believe it came operable in the early '90s.

20   It was under direction of Sheriff Dale Reneger until, I do

21   believe in 2014.  Somewhere around that time.

22       Q    And it was closed in 2014?

23       A    Somewhere around I think 2014, 2015.

24       Q    And what about -- we're sitting, I think in

25   what's River Bend Detention Center, or we are close to

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    River Bend Detention Center?

2         A    Yes.

3         Q    Which is it?  We're close to it, I guess.  Is it

4    on this same compound?

5         A    We're in the River Bend Detention Center.

6         Q    Okay.  And when was River Bend Detention Center

7    built?

8         A    You had different phases that were built.  I do

9    believe this phase here was built in 2000, somewhere

10   around here.  There is another phase that was phase 3 that

11   was built in 2018.  And this facility to my immediate

12   right, which is phase 1, I'm not for sure when it was

13   constructed.  But I do believe it became operable -- had

14   to be somewhere around in '97.  1997, I do believe.

15        Q    At any time, was River Bend Detention Center

16   privately owned as opposed to owned by the Sheriff's

17   Office?

18        A    Yes.

19        Q    When was that?

20        A    When you say privately owned, I do believe in --

21   there was a corporate endeavor agreement with Law

22   Enforcement District with the private entity at one point

23   that had partial ownership.  And from that point after

24   2011, I do believe January to September of -- that would

25   be 2012, it was completely under the management of a



1    private company.

2         Q     What company was that?

3         A     Emerald Corporation.

4         Q     Emerald?

5         A     Yes.

6         Q     And what happened after Emerald owned it?  You

7    said that was through -- did you say September 2012?

8         A     I do believe January to September 2012.  January

9    of 2012 to September.

10        Q     And then, what happened in September of 2012?

11        A     The law enforcement District gained access.  We

12   secured the bonds on the facility, and it is under the

13   direction of the East Carroll Parish Sheriff's Department,

14   which is the Law Enforcement District.

15        Q     I see.  In your previous testimony, you talked

16   about serving in various capacities at that -- that would

17   have been at the East Carroll Detention Center or would

18   that have been at River Bend?

19        A     It would have been at East Carroll Detention

20   Center.

21        Q     Now, this particular document, Exhibit 59, on --

22   these pages aren't numbered.  But on the third page, you

23   see how it says "All hiring shall be done by, or subject

24   to approval of the Sheriff."  I think you're a page ahead

25   of me.  If you turn back one page where it says hiring

SHERIFF WYDETTE WILLIAMS 7/8/2019

 1  policies?

 2       A    (Witness complies.)

 3       Q    There you go.  Thank you.  Hiring procedures A

 4  says "All hiring will be done by, or subject to the

 5  approval of the Sheriff?"

 6       A    Correct.

 7       Q    So earlier, we're talking about hiring

 8  procedures.  Is there a procedure with respect to River

 9  Bend Detention Center where new hires are communicated to

10  you for your approval or disapproval?

11       A    No.  Not necessarily, no.

12       Q    And then, would it be fair to say that you

13  delegate that approval process to the warden of River Bend

14  Detention Center?

15       A    Yes.

16       Q    And you are the final authority in deciding the

17  policies of the East Carroll Parish Sheriff's Office,

18  correct?

19       A    Correct.

20       Q    And that includes the operation of River Bend?

21       A    Correct.

22       Q    Looking back to Exhibit 7, which I think you

23  still have in front of you, and I'm looking at the -- the

24  third page of this document, too.  And there will be from

25  time to time, these little numbers.  We call them Bates



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    Numbers for some reason.  I guess maybe the person who

2    invented them was named Bates or something.  I -- I don't

3    really know.  But this one has 45 -- 4858 on the bottom if

4    that ever comes up.  But I'm looking at the paragraph on

5    admissions documentation, and do you see there where it

6    says "an order to detain or release bearing the

7    appropriate official signature shall accompany the newly

8    arriving offender?"

9         A    Yes.

10        Q    What is your understanding of -- of what that

11   means?  What does it mean by an "order to detain or

12   release bearing the appropriate official signature?"

13        A    Once an offender is sentence by our court system

14   or any other court system, we're going to adhere to

15   whatever that documentation is.

16        Q    Okay.  So that would be a sentencing order in

17   that case?

18        A    Correct.

19        Q    So would this also apply to pretrial detainees?

20        A    Yes.

21        Q    And then, what is the -- what would be the order

22   to detain or release bearing an appropriate official

23   signature in that circumstance?

24        A    Can you be more specific?

25        Q    What -- is there -- is there another kind of



```
 1    order, or detainer, or document that -- that this policy
 2    instructs your staff to have in the case of a pretrial
 3    detainee?
 4         A    Yes.  We would -- time would be calculated
 5    through our court system and once upon their time to be
 6    released, they will be released.
 7         Q    Yeah.  Yes, sir.  I appreciate that.  We'll talk
 8    about release in just a minute.  But I'm thinking more in
 9    terms of -- and we'll be talking about Orleans pretrial
10    detainees in a little bit.
11              But -- but I'm really just thinking of any
12    pretrial detainee?
13         A    Uh-huh (affirmative response).
14         Q    What -- when somebody is -- is not yet going to
15    trial, but they are being held for whatever reason
16    pretrial?
17         A    Okay.
18         Q    What would be the appropriate order to detain in
19    that circumstance that this policy is talking about?
20         A    What we're going to do, we're going to secure
21    custody of them until their court proceedings.  Until they
22    are either pled guilty or they are released by the courts.
23    We're going to contain them until that time.
24         Q    And are you -- does this policy refer -- is this
25    policy talking about any particular kind of paperwork that
```

1    has to be held by your -- by River Bend in order to

2    maintain custody of somebody before trial?

3          A     Yes.  With our pretrial detainees, yes.

4          Q     And what?  What kind of paperwork would that be?

5          A     This would be paperwork that we will receive

6    from the courts.

7          Q     Such as an order committing a pretrial detainee

8    to your custody pending bail?

9          A     Yes.

10         Q     Okay.  And then, what about -- and again,

11   obviously, we're here because of a situation that started

12   with pretrial detainees from Orleans Parish being held

13   here.

14               Are there people held at River Bend who are

15   awaiting trial in jurisdictions other than Orleans?

16         A     Yes.

17         Q     What other jurisdictions are they from?

18         A     I do believe Tangipahoa Parish, East Baton Rouge

19   Parish, and Lafayette Parish.

20         Q     And for those three jurisdictions, your office

21   has cooperative in deferral agreements with Tangipahoa,

22   East Baton Rouge, and Lafayette Parish?

23         A     Correct.

24         Q     And in those circumstances, do the Sheriffs or

25   the court systems of those three jurisdictions send you

1  paperwork that includes the order to detain that

2  individual until trial or until they post bail?

3       A    Yes.

4       Q    Who is responsible for -- who is responsible for

5  ensuring that this order to detain or release bearing the

6  appropriate official signature actually is in your

7  possession at East Carroll Parish?

8       A    That would be the facility -- I mean the --

9  whichever Parish or department that sends that information

10 up to my office, and that would be the warden and

11 administrative staff here at the River Bend Detention

12 Center.

13      Q    Okay.  So in terms of the folks here in East

14 Carroll Parish, it would be the warden of River Bend?

15      A    Correct.

16      Q    AND that would be Warden Hedgemen?

17      A    Correct.

18      Q    And then, by administrative staff, who are you

19 referring to?

20      A    His administrative staff that works under him

21 that handles that paperwork.

22      Q    And who are those people?

23      A    I'm sorry?

24      Q    What are their names is what I'm really trying

25 to ask.  Sorry.  It's okay if you don't know.  But that's



1    was what my question was.

2         A    There are several ladies that work in that

3    aspect.  That could be Laura Sevier.  That could be Mary

4    Brown.  That could the Hope Mills.  That could be a

5    variation of employees that work here.

6         Q    Okay.  In the second paragraph of this policy --

7    of this section of the policy, admissions documentation,

8    it says "Appropriate files must accompany the arriving

9    offender unless facility officials have authorized other

10   arrangements.  Facility personnel will request information

11   from the transferring facility in the event the offender

12   is transferred without proper documentation."  Do you see

13   where I'm reading from?

14        A    I do.

15        Q    Who at East Carroll Parish Sheriff's Office is

16   responsible for seeing that this provision of the policy

17   is complied with?

18        A    That would be Warden Hedgemen and his

19   administrative staff here at River Bend Detention Center.

20        Q    And those would be the same people that we've

21   just discussed few minutes ago?

22        A    Correct.

23        Q    What's the importance of why are these

24   paragraphs in this policy?  Why is -- why is it important

25   to have this documentation including the order to detain



1    or the order to release?

2        A     Wanted to make sure that we have the correct

3    offender and then make sure that -- that we're housing

4    what's needed so that the transfer of the inmate can go

5    back, and the courts there can deal with whatever they

6    need to do.

7        Q     Would you agree that no individual can be held

8    in jail in the absence of legal authority to keep them

9    there?

10       A     Can you elaborate?

11       Q     Do you -- would -- do you agree with the

12   proposition that as Sheriff of East Carroll Parish, you

13   are not allowed to hold an individual against their will

14   in the absence of legal authority to do that?

15       A     You need elaborate a little bit more on that,

16   please.

17       Q     Okay.  Can you help me understand what part is

18   confusing?

19       A     You say as Sheriff, to hold them against their

20   will?

21       Q     Yes, sir.  Like, a prisoner for example who --

22   you know, it's not a hotel, right?  Like -- like none of

23   -- none of the men or women at River Bend can come to the

24   front desk and check out?

25       A     Correct.



1    Q    And say they are going home today?

2    A    Correct.

3    Q    That's what I mean by against their will.

4    A    Okay.  Okay.  Then I -- I follow you now.

5    Q    Okay.  So -- So let me ask the question again so

6    we -- so we get -- I appreciate that.

7            So do you agree that no individual can be held

8    in jail against their will in the absence of legal

9    authority to keep them there?

10   A    Correct, correct.

11   Q    And do you agree that an incarcerated person has

12   a right not to be imprisoned beyond the term of their

13   sentence?

14   A    Yes.

15   Q    As Sheriff, it's your responsibility to ensure

16   that your office only detains those persons that you have

17   legal authority to hold?

18           MR. BRYANT:

19               Object to the form of the question.  But

20           you can answer.

21           THE WITNESS:

22               Yes.

23   BY MR. CRAIG:

24   Q    And you would agree that it would be a violation

25   of a person's rights to be held in custody when there is



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    no legal authority for that person to be detained?

 2         A     Correct.

 3               MR. BRYANT:

 4                     Object to the form of the question.  You

 5               can answer.

 6               MR. CRAIG:

 7                     And you did.  Thank you.

 8    BY MR. CRAIG:

 9         Q     Sheriff, I've handed you a document that's been

10    marked already as Exhibit 50.  Do you recognize this

11    document?

12         A     Yes, I do.

13         Q     What is it?

14         A     It's a corporate endeavor agreement between the

15    Louisiana Department of Public Safety and Corrections and

16    East Carroll Parish Law Enforcement District.

17         Q     And if you'd turn to the seventh page, and

18    there's little numbers at the bottom of this one.  It

19    looks like a footnote, but...

20         A     (Witness complies.)

21         Q     There you go.  Is -- is that your signature over

22    your name?

23         A     Yes, it is.

24         Q     Signed on December 10th, 2013?

25         A     Correct.
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    Q    What is the purpose of this agreement to your

2    knowledge?

3    A    That we can hold pretrial.  We have an

4    endeavor -- a corporate endeavor agreement with the

5    Department of Corrections where we can house their

6    offenders.

7    Q    And those would be people sentenced to DOC time?

8    A    Correct.

9    Q    Was there a corporate endeavor agreement between

10   the East Carroll Parish Sheriff's Office and I'm going to

11   sometimes call them the DOC because that's a little bit

12   easier than the mouthful DPS&C.

13        Was there a cooperative endeavor agreement

14   between East Carroll Parish Sheriff's Office and the DOC

15   before this?

16   A    Yes.

17   Q    So how -- how long -- when did East Carroll

18   Parish Sheriff's Office begin holding DOC sentenced

19   prisoners?  I take it from your previous answer it was

20   before this contract?

21   A    Yes, sir.  You're speaking of under the

22   direction of another sheriff?

23   Q    Yes, sir.

24   A    Give or take the early '90s.

25   Q    Okay.  So during the time that you were working

1    at various levels from Sergeant up through Captain and

2    Major in your previous employment at East Carroll Parish

3    Sheriff's Office, the Sheriff's Office held DOC sentenced

4    inmates during that time?

5         A    Correct.

6         Q    To your knowledge, was there a cooperative

7    endeavor agreement between the Sheriff's Office and the

8    DOC?

9         A    Yes.

10        Q    How did this particular agreement that you've

11   signed come to be?

12        A    (No response.)

13        Q    What was -- how did it -- what was the process

14   for getting up to the point where you had a completed

15   agreement that you agreed to with the secretary?

16        A    We had gained control of River Bend Detention

17   Center through the law enforcement district, and there was

18   a need of cooperative endeavor agreement to see secure the

19   bonds on the facility of River Bend Detention Center.

20        Q    I see.  And so the bonds were -- were presented

21   to the public for approval?  Is that how that works?

22        A    Right, correct.

23        Q    And so at some point prior to the election for

24   the bonds, the -- your office had been in discussions with

25   the DOC about housing DOC sentenced prisoners once the



1    Sheriff's Office was able to secure possession of the

2    facility?

3        A    Correct.

4        Q    Did -- in terms of the language or the

5    provisions of this particular agreement, who worked with

6    you as East Carroll Parish Sheriff to review and agree to

7    those provisions?

8        A    My attorney, Andy Brewster.

9        Q    Okay.  Anybody else?

10       A    Other than the Department of Corrections, no.

11       Q    Okay.  Page 1 here, the first one that we're on,

12   it's these clauses that start with the word "Whereas."

13       A    Okay.

14       Q    And the fourth one of those says that "The

15   parties recognize and acknowledge that the District will

16   purchase, and the Sheriff will operate and maintain the

17   River Bend Detention Center phase 2, located in East

18   Carroll Parish with the capacity of 414 beds.  And the

19   District agrees to provide bed space to the department for

20   housing offenders pursuant to this agreement."

21            Do you see where I'm reading from?

22       A    Yes, I do.

23       Q    And we talked about that -- the three phases, I

24   think of River Bend in your very beginning testimony.

25   When was phase two constructed?



```
 1        A    This would be phase two that we're seating in
 2   now.  I do believe that would have been early 2000.
 3        Q    Okay.  And when the bonds were issued and the
 4   Sheriff's Office secured the rights to River Bend
 5   Detention Center, was -- was that over both phase one
 6   phase two?
 7        A    No.
 8        Q    Or was it just of phase two?
 9        A    The recent,you know starting -- dating after
10   2013 (indicating)?
11        Q    Yes, sir, because I think -- I think from what
12   your previous testimony, phase three didn't come into
13   place until sometime last year.
14        A    No, that wasn't my previous testimony.
15        Q    Okay.  That was my misunderstanding of your
16   previous testimony.  Okay.  Give me the dates for phase
17   two and phase three, when they were?
18        A    Phase two was early 2000.  Phase three is going
19   to be around 2008.
20        Q    Oh, okay.  And so when the bonds were issued,
21   and the Sheriff's Office gained control of the facility,
22   it was all three of the phases --
23        A    Correct.
24        Q    -- at the same time?
25        A    Correct.
```



```
 1        Q    Okay.  But phase two was -- is what was referred
 2   to in this particular agreement?
 3        A    (Viewing.)  In this particular agreement
 4   (indicating)?
 5        Q    Yes, sir.  This -- this -- this language that I
 6   just read.
 7        A    No.  This particular agreement covers all three
 8   phases.
 9        Q    I see.  So under this agreement, the East
10   Carroll Parish Sheriff's Office contracts with the
11   Department of Corrections to house DOC sentenced prisoners
12   at River Bend Detention Center regardless of which part of
13   it is concerned?
14        A    Correct.
15        Q    And the paragraph under the one that we looked
16   at states that "The Department of Corrections contracts to
17   house offenders a minimum of 40 percent of the 414 beds
18   that it discussed in the previous paragraph."  Is that
19   your understanding?
20        A    Correct.
21        Q    And is 414 the total for all of River Bend or
22   just for one of the phases?
23        A    414, this is just a number that's for a
24   percentage as far as a cooperative endeavor agreement that
25   secures over the bonds.  It's not the makeup of the
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

1    facility.  The facility has a total bed capacity of 1,326.

2        Q    Okay.  On page 3 of the agreement, it says that

3    the department will pay the sum of $24.39 per offender per

4    day?

5        A    Correct.

6        Q    And this agreement, as we saw, was signed at the

7    end of 2013.  Has the per day rate changed since then?

8        A    $24.39 no, sir.  Yes, sir.  Actually, of July

9    this present year per diem was increased by $2.  So it

10   should be $26.39.

11       Q    Okay.  But during the -- we'll be talking about

12   that the 2016 and 2017.  So for those years, it was the

13   $24.39?

14       A    Correct.

15       Q    Okay.  In looking back at the second page --

16       A    (Witness complies.)

17       Q    -- where it says "During the term of this

18   agreement" -- it's the second paragraph there.  Pardon me.

19   "The 40 percent number is broken down or -- or calculated

20   specifically to a minimum of 166 offenders."

21            Do you see that?

22       A    Yes, I do.

23       Q    So the department is agreeing to pay for 100 --

24   a minimum of 166 beds at $24.39 a day.  Is that your

25   understanding?

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1        A     Correct.

 2        Q     And so that if we whipped out a calculator, that

 3   would be a little bit under $1,500,000 a year?

 4        A     If you say so.

 5        Q     Yeah.  I actually calculated it as $1,477,790.

 6   But it is what it is.  We can all do the math from -- from

 7   the basic numbers at some point.

 8              (Exhibit 60, Acknowledgment form of malfeasance

 9              in office, was marked for identification.)

10   BY MR. CRAIG:

11        Q     I'm handing you what's Exhibit 60, which is a

12   one page document which talks about acknowledgment form

13   malfeasance in office.  Do you recognize this document?

14        A     Yes, sir.

15        Q     What is it?

16        A     It's an acknowledgment form of malfeasance in

17   office.

18        Q     And is that form -- is this form that is Exhibit

19   60 required under the CEA that we've already looked at

20   that's Exhibit 50?

21        A     Yes.

22        Q     And this -- this particular form is dated

23   July 6th, 2012, which is before the actual contract.  Is

24   this malfeasance in office acknowledgment just required

25   for you to be able to serve as sheriff, or what's your
```



1    understanding of what all are the purposes of the

2    acknowledge form?

3          A    Not to just be served as on the Sheriffs is to

4    make you aware of the laws and protocols and things as far

5    -- as far as my office is concerned.

6          Q    Okay.

7          A    As well as this information is something that

8    each employee has to undergo as well.

9          Q    I see.  So every employee in your office signs

10   this acknowledgment form?

11         A    Correct.

12         Q    And would you agree with me that this is

13   consistent with the training that you talked about in

14   terms of ethics for public servants?

15         A    Correct.

16         Q    Looking back to the first page of Exhibit 50,

17   and I'm now looking at the fifth of the paragraphs that

18   start with the word "Whereas," is it your understanding

19   that one of the conditions of this CEA is that River Bend

20   Detention Center will be operated and maintained in

21   accordance with the 2011 basic jail guidelines?

22         A    Correct.

23         Q    What are the basic jail guidelines?

24         A    I can't tell you right off the top of my head.

25         Q    I didn't mean like what all they all are.  But



1    let me show you something perhaps that will?

2        A    Secure custody and control.

3        Q    And what do you mean by that?

4        A    Any offender secure.  Them secure and hold them

5    in custody and we're going to have control and care.

6        Q    Okay.  I'm going to hand you what's been marked

7    as Exhibit 48.  Do you recognize Exhibit 48?

8        A    Yes, sir.  I do.

9        Q    What is it?

10       A    It is the basic jail guidelines, state of

11   Louisiana -- I mean state offenders housed in local jails

12   and facilities.

13       Q    And these are the -- Exhibit 48 are the basic

14   jail guidelines that are referred to as a condition of the

15   CEA between your Sheriff's Office and the Department of

16   Corrections?

17       A    Correct.

18       Q    Hang onto that.  We're going to come back to it

19   in just a little bit.  I'm handing you Exhibit 9 and I'm

20   not saying that you would recognize this particular --

21   this particular document.

22            Do you recognize what the -- the form of this

23   document -- what it basically is?

24       A    Yes, a DOC billing --

25       Q    Okay.

SHERIFF WYDETTE WILLIAMS 7/8/2019

```
 1        A      -- or invoice.
 2        Q      And on the last page, the very, very back page
 3   of Exhibit 9, that bears your signature?
 4        A      (Viewing.)  Yes, it does.
 5        Q      And is Exhibit 9 an example of billing to the
 6   Department of Corrections from the East Carroll Parish
 7   Sheriff's Office pursuant to the cooperative endeavor
 8   agreement that you have with the DOC?
 9        A      Yes.
10        Q      Tell me how -- what form you receive an invoice
11   like this?  How do you -- what does the invoice look like
12   when you receive it for review?
13        A      Pretty much -- pretty much looks like this as
14   well (indicating).  Offender's name, number, sex, date of
15   birth.  Pretty much like this.
16        Q      And then, looking at any one of these columns
17   starting at the second page, it has a DOC number at the
18   far left?
19        A      Correct.
20        Q      And what -- what do you understand to be the DOC
21   number?  What is that?
22        A      What do I understand to be the DOC?
23        Q      Yeah.
24        A      That's the number that's elected to any offender
25   that's incarcerated or sentenced to the Department of
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

 1    Corrections, and that is their number throughout their

 2    sentencing period.

 3         Q    And is that a number that's assigned by you or

 4    by the warden of River Bend Detention Center?

 5         A    That number is assigned by the Department of

 6    Corrections.

 7         Q    Okay.  And then, it also says on this same page,

 8    start date and end date.  Do you see those columns?

 9         A    I see start date and end date.

10         Q    And what do those columns represent?

11         A    I do believe that's the billing cycle for that

12    month.

13         Q    Okay.  And looking down just as a for example,

14    too, it looks like there's an offender by the name of Joe

15    Allen.  Do you see him there --

16         A    (Viewing.)

17         Q    -- about halfway down that first page?

18         A    Joe Allen?  Which number are you on?

19         Q    Oh, I'm sorry.  I'm on -- I'm on this -- yeah.

20    That the columns we're looking at are on all the pages.

21    But I'm actually looking at --

22              MR. BRYANT:

23                   That's the right one.

24              THE WITNESS:

25                   Yes, I see a Joe Allen.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

BY MR. CRAIG:

1

2      Q    -- 3550.  So Mr. Allen, it has a start date of
3  July 1, 2016 and an end date of July 5, 2016?

4      A    Uh-huh (affirmative response).

5      Q    Oh, that's the first time you did that.  Can you
6  say yes or no for me, please?

7      A    Yes.  I was -- yeah, I was letting you complete
8  your question.

9      Q    Oh, okay.  Good for you.

10      A    That's just -- that was informal for me.

11      Q    Okay.  Good there.  That's good.  I'll tell you
12  a story about that, but that at a break or we're not.
13  You'll probably be bored.

14          But so for a -- am I correct in thinking that
15  this means that Mr. Allen was only held at River Bend from
16  the 1st to the 5th of July?

17      A    Correct.

18      Q    He might have been held all of June.  We don't
19  know from this document.  But -- but this document is
20  billing for the month of July 2016, correct?

21      A    Correct.

22      Q    And so Mr. Joe Allen was only held for those
23  days, July 1, 2016 to July 5, 2016?

24      A    According to this document, yes.

25      Q    Okay.  Do you know who -- who puts this



1    information into this document?  By which I mean what is

2    the process for knowing that Mr. Allen was only at your

3    facility until the 5th, as compared with some of the other

4    people on this list who were here all month or for other

5    periods of time?

6        A    Now, you have two form question.  Which one do

7    you want me to answer?  Can you repeat the first one?

8        Q    Yes, I can.  Thank you for pointing that out.

9    How do you know that Mr. Allen was only in the facility

10   for July 1 to July 5?

11       A    Because it was documented the days that he was

12   present.

13       Q    How was it documented?

14       A    It was documented through the proper people that

15   are here and in our system.

16       Q    And in what -- yes, I'm sorry.  Go ahead.

17       A    In our system, it was documented to that point.

18       Q    And would the system be the JMS System?

19       A    Correct.

20       Q    And so would somebody on your staff use the JMS

21   System to determine how long each DOC sentenced prisoner

22   was in the facility for the month of July?

23       A    Correct.

24       Q    Who would that person be?

25       A    That would be Laura Sevier.



```
 1        Q    Okay.  And when Ms. Sevier is bringing you an
 2   invoice like this one, Exhibit 9, does she bring any of
 3   that supporting documentation to show you?
 4        A    Can you elaborate on that a little bit more,
 5   please?
 6        Q    Sure.  On a month-by-month basis, are you
 7   presented any additional documentation besides the final
 8   version of the invoice showing how your staff knows
 9   different prisoners were at the location on particular
10   times?
11        A    No.
12        Q    Okay.  Can you remember any instances such --
13   after reviewing an invoice such as Exhibit 9, that there
14   would be a need for corrections or revisions of the
15   invoice?
16        A    No, not to my knowledge.  I have never been, or
17   brought to my attention that there was ever a problem.
18        Q    Okay.  And then looking at the rest of the line
19   specifically for Mr. Allen since we're on him, the next
20   column says how many days DOC is being billed for.  It
21   says 004?
22        A    Yes, sir.
23        Q    And then, there is the billing rate is after
24   that; is that correct?
25        A    Correct.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1    Q    And then, the -- basically the calculation or

2    the number of days times the billing rate which in this

3    case is $97, and I can't really read that.  Some -- some

4    number of cents.  Do you see that?

5    A    I do.

6    Q    And then, it has physical location 549U.  What

7    -- what is that referring to, do you know?

8    A    I do believe that's going to address the

9    location at River Bend Detention Center in system of the

10   Department of Corrections.

11   Q    I see.  And is 549U any one of the phases of

12   River Bend or do you know?

13   A    Uncertain.  I do believe that's overall.

14   Q    Yeah.  I'm next handing you Exhibit 16.  If you

15   wouldn't mind looking through that and let me know if you

16   recognize what this is?

17   A    (Viewing.)

18   Q    Do you recognize this document, Sheriff?

19   A    I do.

20   Q    What is it?

21   A    It looks like supplemental billing.

22   Q    Supplemental billing to the Department of

23   Corrections?

24   A    Correct.

25   Q    And that would be under the cooperative endeavor



1    agreement?

2         A     Correct.

3         Q     And it looks like there is a place for your

4    signature on -- on each of these.  Let's -- just looking

5    at the document that's number 3884, that's a few pages

6    into it.  It looks like it says month December 2016?

7         A     Okay.

8         Q     And for this document where it says signature,

9    is that your signature?

10        A     Correct.

11        Q     So looking at the top, this is the supplemental

12   reimbursement invoice for the month of December 2016?

13        A     Yes.

14        Q     And it's submitted on the 5th of June, 2017; is

15   that correct?

16        A     Yes.

17        Q     And what is your understanding of the purpose of

18   this document?  Like, why -- why is there such a thing as

19   supplemental billing?

20        A     Because apparently, there was some misbilling

21   that DOC did not pay us for.  So this is a supplemental

22   report that was sent to the Department of Corrections for

23   correct billing.

24        Q     Hang onto that.  But I'm also going to hand

25   you -- while we're looking at this Exhibit 14, and if you



1   would -- if you would stay on that page 3884 on -- on 16

2   for me?

3        A    (Witness complies.)

4        Q    Great.  So yeah.  Well, keep -- keep turned to

5   that page.  But on Exhibit 14 if you would look at it and

6   tell me whether you agree this is East Carroll Parish

7   Sheriff's Office billing to the DOC?  The regular billing

8   for the month of December 2016.  This Exhibit 14 that's

9   there on your right hand?

10       A    (Viewing.)  And who am I looking for?

11       Q    On your left hand.  I'm asking you is this the

12  December 2016 bill?

13       A    It was signed the 2nd of January.  So yes, it

14  looks like the December billing.

15       Q    Okay.  So hang onto that.  We are -- here is

16  what I'm wanting to ask you.  On Exhibit 16, the page that

17  we left open, 3884?

18       A    Uh-huh (affirmative response).

19       Q    There, the very first name on that supplemental

20  billing is Leon Burse, B-U-R-S-E.  And I want to ask you

21  if Mr. Burse is listed on the December billing?  The

22  regular billing that went out in early January, January 2,

23  2017?

24       A    (Viewing.)  No, I don't see it.

25       Q    How it -- how would it happen that a prisoner at



1    River Bend Detention Center would not be listed on the

2    regular billing and would -- would have to be listed later

3    in the supplemental billing?  Like, how -- how does that

4    happen?

5         A    Um, I don't do the billing.  So I can't

6    appropriately answer that question.

7         Q    Okay.  Have you ever spoken to Ms. Sevier about

8    how it comes to be that prisoners have to be added to a

9    supplemental billing rather than the regular billing?

10        A    It could be clerical error.  It could be a

11   series of things.  But I think it's better that she answer

12   that question for you.

13        Q    Okay.  Do you know does the JMS System produce a

14   master list on a daily basis of the men and women who are

15   housed at River Bend Detention Center?

16        A    Yes.  It has those capabilities, yes.

17        Q    And is the master list what is used to generate

18   the bills to the Department of Corrections?

19        A    I do believe so.  I do believe she used that

20   formula or some formula to produce the invoice to send to

21   the Department of Corrections.

22                  (Exhibit 61, The Pretrial Billing for Orleans

23                  Parish for the month of December 2016, was

24                  marked for identification.)

25   BY MR. CRAIG:



 1          Q      I've handed you what I've marked as Exhibit 61.
 2    Do you recognize this document?
 3          A      (Viewing.)  Yes, it looks familiar.
 4          Q      What is it?
 5          A      It looks like the pretrial billing for Orleans
 6    Parish.
 7          Q      And in this particular case it's the pretrial
 8    billing for Orleans Parish for the month of December 2016?
 9          A      What I have is it shows the date on here as
10    being February the 15th of 2017.
11          Q      Right.  That would be the date of the check, I
12    think, right?  From Sheriff Gusman to -- to your office?
13          A      (Viewing.)  Yes.  Yes.
14          Q      So looking at the very first -- the second page
15    which is page number 4474, do you see there where it says
16    period end 12/1?  Period begin -- I'm sorry.  Period ends
17    12/31/2016 on the upper right-hand corner?
18          A      Yes, I do (indicating).
19          Q      And check -- check for me to be sure.  But
20    Mr. Burse is -- is not located in this document either.
21    Could you please look at it and confirm that for me?
22          A      (Viewing.)  I don't see him.
23          MR. CRAIG:
24                 Okay.  Thank you.  Let's take just a brief
25                 break.

```
 1              THE WITNESS:

 2                   Sure.

 3                   (A short break was taken.)

 4     BY MR. CRAIG:

 5          Q    Sheriff, let's keep all the stuff you still

 6     have.  I'm going to hand you this.  I only have one copy

 7     of Exhibit 2.

 8              MR. BRYANT:

 9                   I may have one if it's here.

10              MR. CRAIG:

11                   Oh, I'm sure.  I'm sure they are there

12              somewhere.

13     BY MR. CRAIG:

14          Q    And I turned it to a particular page.  But we

15     could look -- we could look at any of these.  But let's

16     look at this one that we're on which is marked as page

17     number 448.  And on the upper left side, it says River

18     Bend Detention Center Inmate Trust Fund Account.

19              Do you see where I'm reading from?

20          A    Yes.

21          Q    And is this printout from the JMS System that we

22     were talking about earlier?

23          A    I'm not for sure.

24          Q    Okay.  Have you seen this kind of form before?

25          A    I hadn't saw this in particular.
```



SHERIFF WYDETTE WILLIAMS 7/8/2019

Page 58

```
 1        Q    Well, what about the -- you -- I understand if
 2    you hadn't seen the one that has Mr. Burse's name on it.
 3    But have you -- have you seen this particular type of form
 4    before?
 5        A    Yes, I have.
 6        Q    Okay.  Yeah.  So when you were answering a
 7    minute ago, you meant like of all the 1,400 -- however
 8    many folks you said you all house here, you don't remember
 9    seeing this particular screen before?
10        A    Correct.
11        Q    Okay.  Sure.  Looking down at the bottom of --
12    of this page for Mr. Burse where it says bookings billing
13    history?
14        A    Yes.
15        Q    It looks here like it says opened 4-21-2016.
16    Transferred from Orleans.  Do you see where -- where I'm
17    reading from?
18        A    Are we still looking at Leon?
19        Q    Yes, we are.
20        A    Down at the bottom, you see there?
21        Q    Bookings billing history?
22        A    I see that.
23        Q    And then, it says opened 4-21-2016?
24        A    Okay.  I see.  I was looking for a sentence on
25    that.  I see it.  I see it.
```



```
 1        Q    Yeah, yes.  Well, I'm sorry.  I'm sorry.  It's

 2   just the entries.

 3        A    Okay.  I got you.

 4        Q    This is indicating and if you can either look at

 5   that line or you can look at the -- the line underneath it

 6   where it says New Orleans Parish males.  But this -- this

 7   document indicates that Leon Burse was received by your

 8   office on April 21, 2016 from Orleans and was released

 9   back to Orleans on June 16, 2016?

10        A    Yes, I -- I see that on the paper.

11        Q    Okay.  Right, exactly.  That's my -- that was my

12   question.  And then, looking at the next line where it

13   says 8-18-2016, do you see where I'm looking at?

14        A    Yes, I see.

15        Q    And then, it says transfer from Orleans again,

16   right?

17        A    (No response.)

18        Q    So -- so you received him back from Orleans on

19   August 18, 2016?

20        A    Yes, I see that.

21        Q    And then, he was released to home on January 11,

22   2017?

23        A    I see.

24        Q    And then, the last -- the last line on that

25   page, does that mean that Mr. Burse was a DOC sentenced
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    prisoner at your facility from August 18, 2016 through

2    January 11, 2017?

3         A    I see it has DOC/male, and it has those dates.

4    So I'm not for sure.

5         Q    You're not for sure exactly how to interpret

6    that?

7         A    Correct.

8         Q    Okay.  As Sheriff, do you receive a total roster

9    of the individuals who are held at River Bend on any

10   regular basis, be it daily, or weekly, or monthly?

11        A    No.  I receive a total count of the facility.

12        Q    Is the count divided by where they came from or

13   what their status is?  Where the count came from?

14        A    Yes.

15        Q    One question at a time?

16        A    Yes.

17        Q    So it will say so many Orleans.  So many DOC, so

18   many Baton Rouge, and -- and the like?

19        A    Correct.

20        Q    Yeah.  Can you pull out your copy of Exhibit 48,

21   the basic jail guidelines, please?

22        A    (Witness complies.)

23        Q    And I'm going to be looking at pages 17 and 18

24   of this document.  Within your office, Sheriff, who is

25   responsible for -- who is responsible to you for ensuring



1   that River Bend Detention Center complies with these basic

2   jail guidelines?

3        A    Warden Hedgemen.

4        Q    And then ultimately, you're the final -- you're

5   the person finally responsible as Sheriff to the

6   Department of Corrections --

7        A    Correct.

8        Q    -- for ensuring that?

9        A    Correct.

10       Q    So I'm looking at policy 288 which is called

11  Offender Population Management System, and it says there's

12  an offender population management process that includes

13  records on the admission, processing, and release of

14  offenders.  "Written policy procedure and practice

15  provides for offender case record management that includes

16  at a minimum, maintenance of the following documents and

17  information.  This offender record shall be transferred

18  with the offender at such time the offender is transferred

19  to another local or DPS&C facility."

20            Do you see where I'm reading from?

21       A    Yes.

22       Q    And then, it gives a number of documents

23  including the master prison form, the bill of information

24  and court minutes, or a uniform commitment, a photograph,

25  reports of various disciplinary actions, records of



1    various program participation and work assignments, any

2    collected identification card, and the health record.

3           Do you see that?

4    A    Yes.

5    Q    And in particular, the first two of those

6    documents are similar to the requirement of your policy

7    that the River Bend Detention Center maintain

8    documentation of the legal authority by which it holds

9    each individual prisoner?

10   A    Correct.

11   Q    Would you agree with that?  And then, the next

12   section of this -- of this particular guideline, guideline

13   8, I'm on page 18 now.  Says that "The following shall be

14   collected and forwarded to the DPS&C preclass coordinator

15   for the area in which the facility is located, and that

16   includes the master prison form, fingerprints including

17   one FBI print card from AFIS, one photograph, Bill of

18   Information and court minutes or uniform commitment, a

19   jail credit letter, and one inventory acknowledgment form.

20          Do you see where I'm reading from?

21   A    Yes.

22   Q    And so this part of guideline 2A8 is talking

23   about documents that -- that the facility sends to the

24   Department of Corrections to their preclass coordinator

25   for purposes of the Department of Corrections



 1    recordkeeping; is that correct?

 2          A     Correct.

 3          Q     So with respect to -- not just to the five

 4    people in this lawsuit.  But for anybody who is listed in,

 5    for example, Exhibit 15, the December 2016 invoice to the

 6    DOC for each one of those individuals, River Bend

 7    Detention Center should have the documents required by the

 8    Department of Corrections in guideline 2A8?

 9                MR. BRYANT:

10                    Object to the form of the question.  You

11                can answer.

12                THE WITNESS:

13                    I was looking for them.  I'm sorry.

14    BY MR. CRAIG:

15          Q     Yeah, let me -- let me restate it.  Yeah.

16          A     Yeah, because I was looking for Exhibit 15.

17          Q     It's the one that looks like this.  I've just

18    seen it right there.  No, that's 14.

19          A     That's 14.

20          Q     Well, I apologize.

21          A     That's 16.

22          Q     Yeah, you know, it could be any of those.  Let's

23    pick another one if we need to.

24          A     That's 7.  That's 58.

25          Q     Let's use 14.  That's fine.  We're fine.



1      A      Okay.

2      Q      That was 14?

3      A      So that's what lost me in your question.  I was

4    hearing the part.

5      Q      I appreciate that.  I'm glad to know I'm not the

6    only person with this issue.

7              Okay.  So what my question is for Exhibit 14?

8      A      Uh-huh (affirmative response).

9      Q      Which is the invoice to DOC --

10     A      Correct.

11     Q      -- for November 2016 -- oh, for December 2016,

12   correct?

13     A      Correct.

14     Q      So for everybody who the Sheriff's Office bills

15   DOC for as a DOC sentenced inmate on Exhibit 14, the East

16   Carroll Parish Sheriff's Office should have the documents

17   listed in the first part of basic jail guidelines 2A8?

18              MR. BRYANT:

19                  The same objection.  You can answer.

20              THE WITNESS:

21                  Yes.

22   BY MR. CRAIG:

23     Q      Are you aware, Sheriff, that when in the

24   discovery process, we asked for production of the River

25   Bend inmate file for the five men that we represent, that



1    your office was not able to locate an inmate file for Leon

2    Burse?

3         A    That was not brought to my attention.

4         Q    Let me just -- I think we can handle this very

5    quickly.  I'm going to show you Exhibit 1 just so you

6    understand.  Exhibit 1 being your discovery responses.

7         A    (Viewing.)

8         Q    And if you look at page 9 of that document?

9         A    (Witness complies.)

10        Q    You see it's the very first one on page 9.

11   Request for production of documents number 1 where we

12   requested produce the complete PCPSO file concerning each

13   of the plaintiffs?  And the response says "All such files

14   are attached hereto other than the file for Leon Burse.

15   No such file could be located for Leon Burse."

16             Do you see where I'm reading from?

17        A    Yes.

18        Q    Are -- are all of the inmate files at River Bend

19   physically printed and put in a -- in a room somewhere?

20        A    Yes.

21        Q    And is it just one room, or is it there are --

22   there are a number of rooms?

23        A    There should be two different locations.

24        Q    Please explain.

25        A    River Bend phase 2 where files are held, as well



1    as River Bend phase 3 where files are held as well.

2        Q    And is there a difference between the types of

3    files that are held in phase 2 versus phase 3?

4        A    What do you mean?

5        Q    Like -- like, are some DOC and others pretrial?

6        A    Correct.

7        Q    I see.  So to your knowledge to answer my

8    previous question, you -- you are not aware that your

9    staff was able to locate four files for four of the five

10   men in this case.  But not for Mr. Burse?

11       A    No, sir.

12       Q    Is there somebody who is in charge of records,

13   per se, at River Bend?

14       A    Yes, it is.  Once you speak with the warden, he

15   should be able to answer that.

16       Q    Okay.  So the warden would know who's in -- some

17   places have like a records department that has somebody

18   who -- and a lot of times, one person is the records

19   department.  But that's a question we should ask Warden

20   Hedgemon?

21       A    Correct.

22       Q    Okay.  I handed you a document that's marked

23   Exhibit 3.  Do you recognize this document?

24       A    I do.

25       Q    What is it?


Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A     It's a corporate endeavor agreement between the
 2   law enforcement district and Orleans Parish.
 3        Q     Okay.  And the effective date is November 1,
 4   2016?
 5        A     Where are you seeing your date at?
 6        Q     It's the first paragraph.
 7        A     Oh, I see.
 8        Q     There's probably a signature line here at the
 9   bottom, too.  But I was looking at the first page, the
10   first paragraph?
11        A     Yes, November '16.
12        Q     Was November 2016 the first cooperative --
13   written cooperative endeavor agreement that East Carroll
14   Parish had with Orleans Parish for housing pretrial
15   prisoners -- pretrial detainees, sorry?
16        A     Initially, we didn't have any signed agreements.
17   Signed agreements came latter in the keeping of the
18   offenders.
19        Q     I understand.  And so this document, Exhibit 3,
20   would be the first of the -- the written agreements?
21        A     Yes.
22              (Exhibit 62, Crittindon 4707, excerpt from
23              Mr. Crittindon's file at River Bend, was marked
24              for identification.)
25   BY MR. CRAIG:
```



SHERIFF WYDETTE WILLIAMS 7/8/2019

Page 68

```
 1        Q    And I'm going to hand you 62.  It's a new
 2   exhibit.  That's Crittindon 4707.  It's an excerpt from
 3   Mr. Crittindon's file at River Bend.  But I just need --
 4   we just need to look at this one page.
 5             Do you recognize this form?  I'm sorry.  It's
 6   from Philip Dominic's file. I misspoke.  Not just
 7   Crittindon.  That would be rather odd.  Do you recognize
 8   this form, Sheriff?
 9        A    This looked like a form that would be at our
10   facilities.
11        Q    Okay.  And it's -- you see there where it's
12   dated September 14, 2015?
13        A    Yes.
14        Q    For Mr. Philip Dominic?
15        A    Yes.
16        Q    And that he -- the transferring agency was --
17   it's about halfway down the page.  Orleans Parish,
18   correct?
19        A    Yes.
20        Q    So -- and I think you said before, there was
21   prior to the written agreement of November 2016, there was
22   some kind of arrangement between East Carroll Parish
23   Sheriff's Office and Orleans Parish for the housing of
24   pretrial detainees from Orleans here at River Bend?
25        A    Correct.
```



```
 1        Q    How did that agreement come to be?

 2        A    I received a call from Sheriff Gusman in regards

 3   to holding their offenders.  We agreed that I would assist

 4   another sheriff in holding their pretrial offenders, and

 5   it went from there.  And we were to hold the offenders

 6   just as a housing unit, and there would be preparations

 7   made where they would collaborate with us where all of the

 8   offenders would be able to go to court on a mutual day,

 9   opposed to every day.  It would be like maybe once a week.

10        Q    And prior to the written agreement that we

11   looked at, Exhibit 3, was there any part of this in

12   writing by e-mail, or letter, or anything like that?

13        A    I think formally, we had a verbal agreement to

14   do so.

15        Q    Okay.  Was -- did any part of the verbal

16   agreement discuss the keeping of records for the pretrial

17   detainees from Orleans?

18        A    No.

19        Q    I assume you must have agreed on a rate of some

20   sort for?

21        A    I do believe the rate was $35 a day.

22        Q    Okay.  Prior to receiving the call from -- from

23   Sheriff Gusman, had you -- had River Bend already been

24   holding pretrial detainees for -- for other Parishes?

25        A    Yes, we had.
```

1      Q    Okay.  Because I think you testified previously

2  about three Parishes, Lafayette, East Baton Rouge, and

3  Tangipahoa?

4      A    I do believe we were holding for East Baton

5  Rouge during the time.

6      Q    So the form for Mr. Dominic, Exhibit 62, was

7  September of 2015.  Do you have a recollection of when you

8  spoke to -- to the Sheriff of Orleans Parish about this?

9      A    I can't recall the exact time.

10     Q    Okay.  Would it have to have been prior to at

11 least this -- this form we have from Mr. Dominic of

12 September 14?

13     A    Yes, it would have been prior.

14     Q    Who worked with you on the language to be used

15 in Exhibit 3, the -- the November 2016 agreement?

16     A    I do believe this came from Orleans Parish.

17     Q    And if you would look on Exhibit 3, it's the one

18 you've got there.  On the third page which is Bates Number

19 13, where it said -- talks about services to be performed

20 by OPSO.  Do you see where I'm -- that -- that section?

21     A    Yes.

22     Q    And I'm looking at paragraph F --

23     A    Okay.

24     Q    -- where it says "Maintain all inmate records

25 and orders received by the Orleans Parish Criminal

1    District Court relative to OPSO inmates, including bail

2    release, transport and detainer orders, and to provide

3    notification and a copy of such to the ECPSO as necessary

4    to comply with all laws."

5            Do you see that?

6    A    Yes.

7    Q    Is there -- well, I should say who.  Who is the

8    person responsible to you for ensuring that Orleans Parish

9    Sheriff's Office meets its obligations to your office

10   under agreements like Exhibit 3?

11   A    The warden.

12   Q    And that would be Warden Hedgemon?

13   A    Correct.

14   Q    Now, I believe later, there was a second

15   agreement between your office and the Orleans Parish

16   Sheriff's Office.  Is that your recollection?

17   A    Yes.

18   Q    And Exhibit 4, which I handed you, is another

19   memorandum of understanding between the East Carroll

20   Parish Sheriff's Office and Orleans Parish Sheriff's

21   Office, effective date March 1, 2017?

22   A    I see the --

23   Q    I'm looking at --

24   A    -- I see the date, yes.

25   Q    -- do you know what the reason was for doing



1   this second agreement four months after the first one?

2       A    I don't recall.

3       Q    Okay.  Are you aware of any changes in the

4   agreement?

5       A    I haven't had a chance to read it.

6       Q    Oh, okay.  Fair.  At least not today anyway,

7   right?  Okay.  But both of these agreements are

8   referencing the holding of Orleans Parish pretrial

9   detainees at East Carroll Parish.  Am I right about that?

10      A    Correct.

11      Q    At some point which is -- which is relevant to

12  this case, at some point, Orleans Parish began

13  transferring DOC sentenced prisoners directly to East

14  Carroll Parish after their sentencing date.  Is that your

15  understanding?

16      A    To my understanding, yes.

17      Q    When did you first know about that?

18      A    I'm not for sure.

19      Q    Was it -- do you know whether you knew about the

20  transfer of Orleans Parish?  I'm sorry.  Do you know

21  whether you learned about the transfer of DOC sentenced

22  prisoners to River Bend directly from Orleans before it

23  was known that there were Orleans prisoners being held

24  beyond their release dates?

25           MR. BRYANT:



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1                    I'm going to object because I'm confused.
 2           I'm sorry.
 3           THE WITNESS:
 4                    Yeah.
 5           MR. CRAIG:
 6                    Did I not promise there would be at least
 7           one confusing question?  I think we're on six
 8           right now.  Let me restate it.  We'll come back
 9           to that.  I think it will make more sense in
10           order.  I was trying to kinda get ahead of
11           myself.
12           THE WITNESS:
13                    Okay.
14           MR. CRAIG:
15                    So I'm just going to withdraw that question
16           for now.
17   BY MR. CRAIG:
18       Q    Let me start with this.  You've testified
19   previously about three other parishes besides Orleans,
20   Tangipahoa, East Baton Rouge, and Lafayette that for whom
21   East Carroll Parish holds pretrial detainees, correct?
22       A    Currently now?
23       Q    Yes.  With respect to those three parishes, do
24   any of them send those pretrial detainees directly back to
25   River Bend after they've been sentenced to DOC time?
```



```
 1        A     I'm not for sure.
 2        Q     Okay.  I'm going to hand you what's been marked
 3  as Exhibit Number 5.  The first page of Exhibit 5 is an
 4  e-mail from Laura Sevier to Corey Amacker.
 5              (Telephone interruption.)
 6        A     No, I'm listening.
 7        Q     Okay.  Okay.  Cool.  I appreciate that.
 8  Remember, any time you need to -- if a call comes in that
 9  you need to take, we can do that.
10        A     Okay.  Thank you.
11        Q     Just let me know.
12        A     Thank you.
13        Q     Sure.  So the first page of Exhibit 5 is an
14  e-mail from Laura Sevier, who you've already talked to us
15  about, to Corey Amacker at Orleans Parish.  Do you know
16  who Corey Amacker is?
17        A     I've heard of that name.
18        Q     Did you -- had you heard of his name before this
19  lawsuit was filed?
20        A     No.
21        Q     This is an e-mail from October of 2016, and
22  Laura Sevier in the e-mail says, "Good morning, Corey.
23  I'm working on some supplemental billings for DOC.  We
24  have a fellow, Dominic, in our facility.  According to our
25  records, OPP transferred him to us on 9-13-2015 as a DOC
```

 1    offender.  CAJUN does not show that he has been updated

 2    since 2014."

 3              Do you see where I'm reading from?

 4        A    Yes.

 5        Q    I'm going to skip a paragraph which has to do

 6    with identification of Mr. Dominic.  And then, the third

 7    paragraph says, "Can you tell me if this offender is a DOC

 8    offender?  If he is, please have his paperwork resubmitted

 9    to DOC so they might get him updated in the computer.  I

10    am unable to invoice DOC for this offender until he is

11    updated."

12              Are you seeing where I'm reading that?

13        A    Yes.

14        Q    Do you remember anything about issues with

15    supplemental billing to DOC for DOC sentenced prisoners

16    that came from Orleans?

17        A    I don't recall.  I don't recall.

18        Q    Okay.  I was just wondering if perhaps -- where

19    is Ms. Sevier?  Where is she physically located compared

20    to your office?  Is she in the same building?

21        A    No.  She's here at River Bend in phase 3.

22        Q    I see.  But you don't recall?  Do you recall at

23    all?  Not necessarily this e-mail.  But at any point,

24    Ms. Sevier telling you that there seemed to be a problem

25    with the billing for -- for DOC inmates or -- or with



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    these inmates from Orleans?

2        A    I do recall a conversation that she and I have

3    had.  But we have had a course of conversations on top of

4    conversations.  So I can't pinpoint.

5        Q    Okay.

6        A    So I'm saying I don't recall.

7        Q    So in your -- in your memory, the conversations

8    that you have had with Ms. Sevier about issues related to

9    DOC sentenced prisoners from Orleans are kind of like

10   all -- you can't really separate one conversation from the

11   other?

12       A    Correct because sometimes, our conversation or

13   the conversations in which we have had have not been

14   specifically toward Orleans Parish.  We've held

15   conversations about other issues dealing with DOC.

16       Q    Okay.  Let's -- let's -- if you could think

17   specifically about Orleans with me for a minute?  Without

18   having to break it up into particular conversations, what

19   is your recollection about the substance of your

20   conversations with Ms. Sevier about problems with Orleans

21   Parish?  DOC sentenced inmates who came from Orleans

22   Parish?

23       A    I don't recall.

24       Q    Oh, okay.  Yes.

25       A    I just said I don't recall.



1      Q    No, I know.  I knew you were -- they were

2    probably for ten -- I thought you were telling me you

3    didn't recall any particular conversation.

4      A    Well --

5      Q    But that you -- but then I thought maybe there

6    would be like a general substance that you recall?

7      A    I don't recall.

8      Q    Okay.  Okay.  I'm going to ask you to look to

9    the second to the last in the last page of this document,

10   Exhibit 5?

11     A    Exhibit 5?

12     Q    Yes, sir.

13     A    Yes.  Where it says DOC inmates to release to

14   East Carroll Parish?

15     Q    That's it.

16     A    Yes.

17     Q    This is an e-mail from Mr. Amacker to Ms. Sevier

18   from July 2016, and -- and it says "The following inmates

19   can be transferred to your custody as DOC sentenced

20   offenders.  Laura, I will get these packets to Captain

21   Russell as soon as possible for preclass."

22          Do you see where I'm reading from?

23     A    Yes.

24     Q    Does that -- do you have any understanding of

25   what the term "packets -- "get these packets to Captain

1    Russell as soon as possible for preclass?"

2          Did -- does that have any meaning for you?

3    A    No, sir.

4    Q    Okay.  Regardless of when -- when you found out

5    that Orleans was sending prisoners -- DOC sentenced

6    prisoners directly to East Carroll Parish to be housed, do

7    you have any recollection of talking with anybody at

8    Orleans about that?  Sheriff Gusman or anybody else?

9    A    No.

10   Q    So to your mind, was there ever any kind of

11   specific arrangement between -- I'm not saying whether

12   there was or wasn't.  But do you recall any specific

13   arrangement between East Carroll Parish and Orleans Parish

14   about how transfers directly from Orleans to River Bend

15   would be handled?

16   A    There was no agreement.

17   Q    Okay.  And so to your understanding, was there

18   any specific division of responsibility between Orleans

19   Parish and East Carroll Parish about which parish would

20   send DOC pre-classification paperwork to DOC for these DOC

21   sentenced prisoners from Orleans Parish?

22   A    Orleans Parish, I do believe we were used as a

23   housing unit.  That was the agreement as a housing unit.

24   Q    Okay.

25   A    Yes, sir.

SHERIFF WYDETTE WILLIAMS 7/8/2019

```
 1        Q    And that when you say that was the agreement,
 2   you're talking about the pretrial folks or the DOC
 3   sentenced folks?
 4        A    I was talking about pretrial.
 5        Q    Okay.
 6        A    Now, as far as the -- what goes from DOC or them
 7   directly sending, I have no -- no knowledge of that.
 8        Q    Okay.  Are -- you're aware as we're sitting here
 9   today, that -- that there were a number of people
10   sentenced to DOC time out of Orleans Parish housed at
11   River Bend, who did not have DOC identification numbers or
12   release dates determined by DOC?
13        A    Since you're telling me, yes.
14        Q    Yeah.  Did you know?  But you didn't know that
15   from in terms of when you were served with this lawsuit
16   and when you started studying the lawsuit?
17        A    I learned afterwards, yes.
18        Q    Okay.  And do you have any recollection of then
19   how it came to be that a prisoner -- let's take Mr. Burse.
20   That we looked at his JMS form for how Mr. Burse came to
21   be returned to East Carroll as a DOC prisoner after he had
22   been sentenced to Orleans?
23        A    Orleans Parish sent him back.
24        Q    Yeah.  And was the first that you knew that that
25   was happening when the lawsuit was filed or sometime
```



1    before then?

2         A    Okay.  What part of your question you then that

3    you're -- (witness shrugs.)

4         Q    Yeah, okay.  No, that's fine.  I'm just trying

5    to figure out -- so clearly from Ms. Sevier -- from the

6    e-mail that we looked at a minute ago, Exhibit 5, Laura

7    Sevier in your office and Corey Amacker in the Orleans

8    Parish Sheriff's office, they were -- they were aware that

9    Orleans Parish was sending DOC sentenced prisoners back to

10   East Carroll, to River Bend?

11        A    Okay.

12        Q    I guess I'm trying to figure out if you knew

13   that was happening?  And if you did, do you have any idea

14   about when you learned that was happening?

15        A    No, sir.

16        Q    You didn't know it was happening?

17        A    No, sir.

18        Q    Okay.  Were you aware that in December of 2016,

19   Mr. Amacker and perhaps others from Orleans Parish came

20   here to River Bend to meet with people in your office

21   about paperwork for DOC sentenced prisoners who are being

22   housed at River Bend?

23             MR. BRYANT:

24                  Object to the form of the question.  You

25             can answer.



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

SHERIFF WYDETTE WILLIAMS 7/8/2019

```
 1            MR. CRAIG:

 2                  I can restate it if it helps.

 3            THE WITNESS:

 4                  I recall of a name of Mr. Amacker --

 5      BY MR. CRAIG:

 6       Q    Uh-huh (affirmative response).

 7       A    -- came to -- to my knowledge, Orleans came up

 8      to show my guys something on the AFIS.

 9       Q    On the AFIS?

10       A    Yes.

11       Q    And did you meet -- did you meet or say hello to

12      Mr. Amacker during that -- that visit?

13       A    I don't recall.

14       Q    Uh-huh (affirmative response).  And did you talk

15      to anybody at your office about exactly why Mr. Amacker

16      was coming?

17       A    If I recall, he was trying to show us -- to my

18      understanding, we were placing him on the AFIS machine.

19      But we were not advising of a step on the AFIS.  That's my

20      knowledge of it.

21       Q    I see.  Now, your staff -- I mean there's --

22      there are pretrial detainees charged with crimes in East

23      Carroll Parish at River Bend, are there not?

24       A    Correct.

25       Q    And if those -- some of these of individuals are
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    convicted and sentenced to DOC time, then your staff would

2    do the pre-classification paperwork to -- to have them

3    sent to the Department of Corrections for their sentence,

4    correct?

5         A    Correct.

6         Q    And AFIS would be part of that process, wouldn't

7    it be?

8         A    Correct.

9         Q    So do you have any understanding of why your

10   staff -- well, let me ask you this first.  And -- and

11   prior to the visit of Mr. Amacker, do you know if your

12   staff had ever been told by DOC that they were not

13   submitting the AFIS documentation correctly?

14        A    Never.

15        Q    So in that context, did you understand why

16   Mr. Amacker had to come up from New Orleans to tell your

17   staff how to do AFIS?

18        A    No.  But apparently, they felt it.  So we was --

19   wasn't doing a step correctly to my understanding and...

20        Q    Okay.  So at the point of Mr. Amacker's visit

21   here, then you understood that -- that River Bend was

22   holding DOC sentenced prisoners who had been sentenced in

23   Orleans?

24        A    My -- my understanding of -- of this came later.

25    Not during the time apparently of the visit.



```
1       Q    I see.  Did you understand the purpose of
2  Mr. Amacker's visit at the time of his visit, or were you
3  told about that later?
4       A    That came a little later.
5       Q    Okay.  But you knew -- but you knew about
6  Mr. Amacker's -- you knew Mr. Amacker was coming.  You
7  just didn't know what the reason was?
8       A    The warden stated that someone would come up
9  from Orleans to show the guys something on AFIS, or
10 another step or steps -- or steps that needed to be taken
11 on the AFIS.  This is what was told to me.
12      Q    I see.  And that was told to you at the time?
13      A    If I --
14      Q    That's all --
15      A    -- if I recall correctly, yes.  During that
16 time, yes.
17      Q    But at that point, it didn't occur to you that
18 it related to DOC sentenced prisoners that had come back
19 to River Bend from Orleans?
20      A    No, sir.
21      Q    Okay.  That's what I'm trying to understand.
22      MR. CRAIG:
23           Let's take about a five minute break so I
24      can kind of figure out where I am.
25           (A short break was taken.)
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA  70404     Fax 985.419.0799

1    BY MR. CRAIG:

2         Q    At some point -- at some point, Sheriff, and I'm

3    not -- in terms of exactly when is not the focus of this

4    question.  At some point, you become aware that there were

5    DOC sentenced prisoners from Orleans being housed at River

6    Bend, correct?

7         A    At some point, yes.

8         Q    And did you come to know that at least some of

9    those individuals -- I'm sorry.

10              Did you come to know that there were family

11   members of some of that group of individuals calling East

12   Carroll Parish saying that there that the prisoner they

13   were related to had served their time and needed to be

14   released?

15        A    When I received a call from the media outlet

16   from down south.

17        Q    Okay.  Do you remember who that was?  The who in

18   the media that was?

19        A    It was several.

20        Q    Oh, okay.  Do you recall when about that was?

21        A    Could have been sometime in July, August.

22   Somewhere around that time.

23        Q    Of which year?

24        A    I think it was '16.  No, this is '17.  '17.

25        Q    Okay.  And what is your understanding of what



```
 1    the problem was with respect to individuals sentenced to

 2    DOC time from Orleans?  Who are at River Bend, but didn't

 3    have time calculations or release dates from DOC?

 4         A    I see that your very miss DOC in hits it's

 5    Orleans coming from Orleans being housed as DOC offenders.

 6         Q    Yes, sir?

 7         A    My knowledge when I received a call from the

 8    news media outlet stating that there were some guys being

 9    held in my facility, my thoughts being held at my facility

10    past their time when I received that call from them, I

11    stated that we were a housing unit, and we were housing

12    offenders from River Bend Detention Center for Orleans

13    Parish, and that was my comment.

14         Q    Did you -- after getting that information, did

15    you discuss with anybody on your staff what the problem

16    might be?

17         A    I did speak with my staff in regards to that.

18         Q    Who did you talk to?

19         A    I do believe I spoke with the warden.

20         Q    That would be Warden Hedgemon?

21         A    Yes.

22         Q    What was the substance of that conversation?

23         A    I can't recall that.

24         Q    Okay?

25         A    I just wanted to make sure we weren't holding
```

1    people past their time.

2          Q    Right?

3          A    Right.  That was my concern.

4          Q    Right.  And do you recall what the warden said

5    to you about what the problem might be?

6          A    Honestly, truthfully verbatim, I don't.

7          Q    Yeah, I understand.  I'm wondering about the

8    gist you were given to understand that there was a problem

9    and where the problem might be?

10         A    The gist of it, I can't recall.  I think he can

11    better answer that question.

12         Q    Okay.  Okay.  Do you agree as we sit here today,

13    that there were individuals sentenced to DOC time out of

14    Orleans who were held at River Bend beyond the time of

15    their sentence?

16              MR. BRYANT:

17                   Object to the form of the question.  I mean

18              if you want to show him the documents, he can go

19              through them.

20              MR. CRAIG:

21                   I'm just wondering.

22    BY MR. CRAIG:

23         Q    As we sit here today, like do you have any

24    knowledge of that one way or the other?

25         A    There's most definitely been accusations stated,



1    or I wouldn't be sitting in front of you guys today taking

2    this deposition.

3        Q    Of course, there are accusations.  But my

4    question is, you know, regardless of whether and for

5    purposes of this question, only obviously for purposes of

6    this question.  I'm not asking who was responsible or

7    which agency was responsible.  What I'm asking is do you

8    agree that there were individuals held at River Bend as

9    DOC prisoners out of Orleans that stayed beyond their

10   release date?

11       A    They are most definitely.  That is been

12   accusations made that there were five offenders that were

13   held past their time.

14       Q    But as we sit here today, you wouldn't be able

15   to say whether that is true or not true?  The accusations

16   obviously are a matter of record.  But whether they were,

17   in fact, held beyond their time or not, do you have an

18   opinion about that?

19       A    My opinion, we're here in a deposition and it's

20   stated that these guys were held past their time.  And

21   from the knowledge and the conversations in which I've

22   had, and we're having now, I have to take you that these

23   guys were held past their time.  That's what you're

24   stating they are.  I don't have anything before me to say

25   that yeah, these guys were held after their time.

1      Q     Have you done anything yourself to determine
2    whether they are or were not held beyond their time?
3      A     Yes, we have looked into -- into something.
4      Q     When you say "we," who do you mean?
5      A     I have spoken with my warden.
6      Q     Warden Hedgemon?
7      A     Yes, I've spoken to my warden with this
8    situation and the totality of this entire situation.
9      Q     Okay.  And what is that?
10     A     I don't know how to answer your question.  You
11   want me to give a statement on something that has not
12   really been concluded to whatever the fact or presented to
13   me.  I think that's why we are doing all this to make
14   sure.
15     Q     I'm trying to figure out if, separate and apart
16   from briefing something in a lawsuit, whether you've
17   looked into this yourself and said no.  There is nothing
18   to it.  Nobody served beyond their time or yeah, you know,
19   they were?
20     A     If they have served beyond their time, that's
21   why we have counsel, and they have counsel, and you guys
22   on here to depict and determine if this is so.
23     Q     Okay.
24     A     So that's my answer to that question.
25     Q     Okay.  Okay.  Have you done any kind of -- have

1    you or Warden Hedgemon to your knowledge?  We'll ask him.

2    But in terms of your knowledge, do you know if you or

3    somebody else working for you has made any kind of change

4    in -- in your operations with Orleans or other parishes,

5    too, since this has come to light to prevent people being

6    held beyond their DOC sentence?

7         A    Most definitely there have been safeguards put

8    in place.

9         Q    I would like to know about that.  What

10   safeguards?

11        A    You can talk to the warden about that.  We are

12   definitely more particular about that about.

13        Q    That would be for Warden Hedgemon to speak to?

14        A    Correct.

15        Q    Who at River Bend or who -- strike that.

16             What is the process of DOC sentenced prisoners

17   at River Bend in any DOC sentenced prisoner?  Not talking

18   about this particular situation.  But what is the system

19   for a DOC sentenced prisoner at River Bend to file an ARP

20   or any other kind of grievance about anything?  I assume

21   there is a grievance?

22        A    There is a grievance process.

23        Q    How does that operate?  Do you know?

24        A    The offender files his grievance.  Goes through

25   the proper channels.



SHERIFF WYDETTE WILLIAMS 7/8/2019

```
 1        Q    Yes, sir?

 2        A    And that's how it goes to the warden.  I'm the

 3   last person from that point to DOC.

 4        Q    So do you actually -- you, as Sheriff, sign off

 5   on the response to an ARP from a DOC sentenced prisoner?

 6        A    If it makes it that far, I will.

 7        Q    Yes, sir, because perhaps the warden will

 8   resolve it?

 9        A    Yes.

10        Q    Fair?

11        A    Fair.

12        Q    Or perhaps the warden will disagree with the

13   prisoner.  But the prisoner decides not to take it any

14   further, would that be correct?  I mean that must happen

15   some?

16        A    It could happen.

17        Q    Let's say that it gets to you.  But it's a DOC

18   sentenced prisoner?

19        A    Yes, sir.

20        Q    So then after you -- that prisoner can file an

21   appeal to the DOC itself in Baton Rouge, correct?

22        A    Correct.

23        Q    Does River Bend keep the file?  The ARP or

24   grievance after it's appealed to Baton Rouge?

25        A    That's something I'm quite sure they probably
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    should and would.  But the warden can speak firmly on

2    that.

3         Q    We have a couple of these.  But I'm going to

4    hand you one.  It's Exhibit 43.

5         A    Okay.

6         Q    Just to give you an idea why I'm asking, this

7    exhibit had three.  We received from the Department of

8    Corrections.  It's the second response form from our

9    client, Donald Guidry, about his time calculation, and

10   this particular second step response form is signed by --

11   it's kind of hard to see.  But Perry Stagg, who is the

12   deputy assistant for adult services at the department.

13   And I would -- you know, and we could go through this.

14   But Mr. Guidry is one of the men housed here at River

15   Bend?

16        A    Okay.

17        Q    And so it's a safe assumption, isn't it for

18   Mr. Guidry to be able to file a second step response to

19   the DOC, he must have first filed an ARP or grievance here

20   at River Bend?

21        A    Apparently.

22        Q    Okay.  Right.  That's what I think, too.

23             MR. CRAIG:

24                  Give me just one second.

25   BY MR. CRAIG:



```
1        Q    Where to your knowledge are grievances
2   physically -- where would a grievance -- record of my
3   grievance be here at River Bend?  Would it be in your
4   office, or in somebody else's office, or in some other
5   room?  I haven't figured out yet.
6        A    I know it would be probably be at the facility
7   here.  Where, I don't know.
8        Q    Okay.  So the exact location of those files is
9   not within your knowledge?
10       A    No, I don't know the exact location.
11       Q    Okay.  That's what I was trying to figure out.
12  Were you aware that that -- not the lawsuit that we're
13  here for today.  But the habeas corpus petitions were
14  filed by attorneys to secure release of DOC prisoners at
15  River Bend who have been incarcerated beyond their release
16  date?
17       A    Irregardless of these guys?
18       Q    Yes, sir.
19       A    I don't recall if anything we could -- we send
20  it to counsel and refer to them.  So I don't recall.
21       Q    Okay.  How did you learn that you were a
22  defendant in this lawsuit?
23       A    I received your paperwork on it.
24       Q    Okay.  Have you searched your e-mail account or
25  any files in your own office with respect to possible
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    documents that would be relevant to this case?

2         A    I don't e-mail.

3         Q    You don't use e-mail?

4         A    I use e-mail.  But I have not e-mailed anyone in

5    regard to Orleans Parish.  My initial was a phone

6    conversation I had with the sheriff.

7         Q    I guess what I was asking was have you looked

8    through your e-mails to see if you were coached on

9    anything that would be relevant to the case, or that there

10   might be some document there that would be relevant?

11        A    No, sir.

12        Q    Okay.  And other than what we've already talked

13   about, have you spoken to any of the other people at East

14   Carroll Parish Sheriff's Office who are in this case who

15   are Warden Hedgemon, Warden Knight about the allegations

16   in this case?

17        A    Rephrase that for me one more time?

18        Q    Yes.  I'm going to exclude any conversations

19   where your lawyers were present.  But have you -- you've

20   told us about a couple of conversations, best you can

21   recall with Warden Hedgemon.  So put those aside.  We

22   talked about them.

23             Can you think of any other conversations, or

24   e-mails, or other discussions that you've had with anybody

25   on your staff about this lawsuit since you've been --

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   since you got the legal paperwork originally?

2        A    No, sir.

3        Q    And have you spoken with Sheriff Gusman since --

4   let's just go from the time you got the phone call from

5   the media, the phones from the media in New Orleans, did

6   you have any occasion to talk to Sheriff Gusman about the

7   situation with DOC sentenced prisoners from Orleans?

8        A    No, sir.  Have I saw him?  Yes.  But no, sir.

9   We didn't talk about the offenders.  We let counsel do

10  that.

11       Q    Okay.  And have you spoken to anybody at the

12  Department of Corrections about this lawsuit or the issue

13  of DOC sentenced prisoners at River Bend any time since

14  you got that call from the media in New Orleans?

15       A    I do recall having a conversation.  But I don't

16  recall who I conversated with, and what was the content of

17  the conversation.

18       Q    Okay.  Was it a phone call or was it in person?

19       A    It was a phone call.  I do recall speaking to

20  someone in regards to that.

21       Q    Okay.  We looked at the basic jail guidelines.

22  Before the Department of Corrections from time to time

23  sends a team to audit institutions that receive money for

24  DOC sentenced prisoners, correct?

25       A    Yes.



866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        Q    Do you play any role in meeting with the people
 2   from the audit team?
 3        A    I know of them from various different meetings.
 4   But I do not interact with them when they are doing their
 5   job.
 6        Q    Can you remember whether you were in any
 7   meetings with the auditors for the DOC since this set of
 8   allegations?  Go ahead.
 9        A    Meetings, conferences.  Not meetings in regards
10   to --
11        Q    This?
12        A    -- this.
13        Q    I see.
14        A    Meetings in regard to specific.  But in general,
15   when you have law enforcement, you have prison conference
16   type of settings receiving knowledge.
17        Q    So you're saying that you participated in
18   general meetings?
19        A    Correct.
20        Q    With DOC folks including about the basic jail
21   guidelines?
22        A    Correct.
23        Q    But not specifically about the allegations of
24   DOC sentenced prisoners at River Bend who might have been
25   incarcerated beyond their release date?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1  A  For the third time.

2  Q  No, I understand.

3  A  No, sir, no, sir.  I have not.  That's not being

4 facetious.

5  Q  I understand.  Understand the reason we ask

6 questions like that is you try to be very specific.

7  A  Right.

8  Q  But then, you are looking back and saying oh,

9 wait.  Maybe he is thinking -- well, he asked it that kind

10 of way.  So I'll answer it that way?

11  A  You not doing anything wrong.  Trust me.

12  Q  I'm just trying to cover my bases.

13  A  I'm not trying to be facetious and just being

14 honest and straightforward.

15  Q  Based on -- on what you st's very sires for

16 somebody to be held in prison when they've done their

17 time?

18  A  Yes, it is.

19  Q  That person deserves to be released and go home?

20  A  I totally agree.

21  MR. CRAIG:

22    That's the end of my questions.  However,

23    your attorney is allowed.  We have two other

24    attorneys, one from Orleans Parish and one from

25    the Department of Corrections on the telephone.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond, LA 70404   Fax 985.419.0799

```
 1            They are also allowed to ask questions, and then
 2       I can follow up if I need to.  So I'm going to
 3       tender that to your attorney at this time.
 4       MR. EVANS:
 5            No questions.
 6       MR. ARCURI:
 7            No questions.
 8       MR. BRYANT:
 9            I have no questions, and we'll read and
10       sign.
11       MR. CRAIG:
12            We're done.
13            (Deposition concluded at 12:12 P.M.)
14
15
16
17
18
19
20
21
22
23
24
25
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
1                    WITNESS CERTIFICATE

2

3         I, WYDETTE WILLIAMS, do hereby certify that the

4  foregoing testimony was given by me, and the transcription

5  of said testimony, with corrections and/or changes, if

6  any, is true and correct as given by me on the

7  aforementioned date.

8

9

10 _____  _____

11 (DATE SIGNED)          WYDETTE WILLIAMS

12

13

14

15

16

17

18

19

20

21

22

23

24

25 DATE TAKEN: JULY 8, 2019
```



SHERIFF WYDETTE WILLIAMS 7/8/2019

1          C O R R E C T I O N   S H E E T

2

3     PAGE        LINE            DESCRIPTION

4     _____       _____     _____

5     _____       _____     _____

6     _____       _____     _____

7     _____       _____     _____

8     _____       _____     _____

9     _____       _____     _____

10    _____       _____     _____

11    _____       _____     _____

12    _____       _____     _____

13    _____       _____     _____

14    _____       _____     _____

15    _____       _____     _____

16    _____       _____     _____

17    _____       _____     _____

18    _____       _____     _____

19    _____       _____     _____

20

21                          IN RE:
                    Jessie Crittindon, et al.
22                          VERSUS
                    Marlin Gusman, et al.

23

24              Taken on July 8, 2019
            Reported By: Theresa G. Tumulty

25

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1              REPORTER'S CERTIFICATE
 2        This certification is valid only for a transcript
    accompanied by my original signature and original required
 3  seal on this page.
 4        I, THERESA G. TUMULTY, Certified Court Reporter in
    and for the State of Louisiana, as the officer before whom
 5  this testimony was administered, do hereby certify that
    Wydette Williams,  after having been duly sworn by me upon
 6  authority of R.S. 37:2554, did testify as hereinbefore set
    forth in the foregoing 101 pages;
 7
          That this testimony was reported by me in the
 8  stenotype reporting method; was prepared and transcribed
    by me or under my personal direction and supervision, and
 9  is a true and correct transcript to the best of my ability
    and understanding;
10
          That the foregoing transcript has been prepared in
11  compliance with transcript format guidelines required by
    statute or by the Rules of the Louisiana Certified
12  Shorthand Reporter Board; and that I am informed about the
    complete arrangement, financial or otherwise, with the
13  person or entity making arrangement for deposition
    services;
14
          That I have acted in compliance with the prohibition
15  on contractual relationships, as defined by the Louisiana
    Code of Civil Procedure Article 1434 and in rules and
16  advisory opinions of the board;
17        That I have no actual knowledge of any prohibited
    employment or contractual relationship, direct or
18  indirect, between a court reporting firm and any party
    litigant in this matter, nor is there any such
19  relationship between myself and a party litigant in this
    matter;
20
          That I am not of counsel, not related to counsel or
21  the parties herein, nor am I otherwise interested in the
    outcome of this matter.
22
                   _____
23                 Theresa G. Tumulty
                   Certified Court Reporter
24                 State of Louisiana
                   License # 96016
25
```



Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1                      REPORTER'S PAGE

 2

 3         I, THERESA G. TUMULTY, Certified Court Reporter

 4    in and for the State of Louisiana, the officer, as

 5    defined in Rule 28 of the Federal Rules of Civil

 6    Procedure and/or Article 1434(B) of the Louisiana

 7    Code of Civil Procedure, before whom this

 8    proceeding was taken, do hereby state on the

 9    Record:

10         That due to the interaction in the

11    spontaneous discourse of this proceeding, dashes

12    (--) have been used to indicate pauses, changes in

13    thought, and/or talkovers; that same is the proper

14    method for a Court Reporter's transcription of

15    proceeding, and that the dashes (--) do not

16    indicate that words or phrases have been left out

17    of this transcript;

18         That any words and/or names which could

19    not be verified through reference material have

20    been denoted with the phrase "(spelled

21    phonetically)."

22         _____

                   Theresa G. Tumulty

23                 Certified Court Reporter

                   State of Louisiana

24                 License # 96016

25
```

