Transcript of the Testimony of

# Secretary James LeBlanc

July 9, 2019

Jessie Crittindon, Et Al v. Marlin Gusman, Et Al



P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

```
*  *  *  *  *  *  *  *  *  *  *  *  *

JESSIE CRITTINDON, ET AL. *

VERSUS                    * CASE NO.
                             3:17-cv-00512-SDD-EWD

MARLIN GUSMAN, ET AL.     *

*  *  *  *  *  *  *  *  *  *  *  *  *

C/W

*  *  *  *  *  *  *  *  *  *  *  *  *

EDDIE COPELIN, ET AL.     *

VERSUS                    * CASE NO.
                             3:17-cv-00602-SDD-EWD

MARLIN GUSMAN, ET AL.     *

*  *  *  *  *  *  *  *  *  *  *  *  *
```

DEPOSITION OF SECRETARY JAMES LEBLANC

TAKEN AT DEPARTMENT OF CORRECTIONS

504 MAYFLOWER STREET

BATON ROUGE, LA

ON TUESDAY, JULY 9, 2019 AT 9:11 A.M.



866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    APPEARANCES:
 2
 3    REPRESENTING PLAINTIFFS:
 4      RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
        BY:  JAMES CRAIG, ESQUIRE
 5      BY:  EMILY WASHINGTON, ESQUIRE
        4400 S. CARROLLTON AVENUE
 6      NEW ORLEANS, LA 70119
 7
 8
 9    REPRESENTING DEFENDANTS, SECRETARY JAMES LEBLANC,
      PERRY STAGG AND ANGELA GRIFFIN:
10
        LOUISIANA DEPARTMENT OF JUSTICE
11      LITIGATION DIVISION, CIVIL RIGHTS SECTION
        BY:  JAMES "GARY" EVANS, ESQUIRE
12      BY:  JONATHAN R. VINING, ESQUIRE
        1885 NORTH THIRD STREET
13      4TH FLOOR
        BATON ROUGE, LA 70802
14      jvining@doc.la.gov
        evansj@ag.louisiana.gov
15
16
17
18    REPRESENTING DEFENDANT, ORLEANS PARISH SHERIFF'S
      OFFICE:
19
        RODRIGUE & ARCURI LAW GROUP
20      BY TELEPHONE:  PETE MATTHEWS, ESQUIRE
        201 ST. CHARLES AVENUE
21      SUITE 114-412
        NEW ORLEANS, LA 70170
22      pm@rodriguearcuri.com
23
24
25
```



```
 1    APPEARANCES (CONTINUED):

 2

 3    REPRESENTING DEFENDANT, EAST CARROLL PARISH
      SHERIFF'S OFFICE:

 4

         USRY & WEEKS, PLC
 5       BY TELEPHONE:  SHANE BRYANT, ESQUIRE
         1615 POYDRAS STREET
 6       SUITE 1250
         NEW ORLEANS, LA 70112
 7       trichardson@usryweeks.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    REPORTED BY:  ANNA COATES, CCR, RPR
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

```
 1              E X H I B I T   I N D E X

 2   EXAMINATION BY:                              PAGE

 3      MR. CRAIG.................................. 6

 4

 5   REPORTER'S CERTIFICATE.......................146

 6

 7

 8

 9

10

11

12              E X H I B I T   I N D E X

13   NO.         DESCRIPTION                      PAGE

14   EXHIBIT 67  BASIC JAIL GUIDELINES............ 97

15   EXHIBIT 68  12/28/16 LETTER..................121

16   EXHIBIT 69  10/25/17 MEMO TO W. WILLIAMS.....128

17   EXHIBIT 70  9/21/16 MEMO.....................133

18

19

20

21

22

23

24

25
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              S T I P U L A T I O N

 2

 3         IT IS STIPULATED AND AGREED by and among

 4    counsel for the parties hereto that the deposition

 5    of the aforementioned witness may be taken for all

 6    purposes permitted within the Louisiana Code of

 7    Civil Procedure, in accordance with law, pursuant

 8    to notice;

 9

10         That the formalities of reading, signing,

11    sealing, certification and filing are specifically

12    NOT waived;

13

14         That all objections, save objections as to

15    the form of the question and responsiveness of the

16    answer, are reserved until such time as this

17    deposition, or any part hereof, is used or sought

18    to be used in evidence.

19

20              *  *  *  *  *  *  *  *  *

21

22         ANNA COKER COATES, RPR, CCR, Certified Court

23    Reporter in and for the State of Louisiana,

24    officiated in administering the oath to the

25    witness.
```



```
 1                   SECRETARY JAMES LEBLANC,
 2   AFTER HAVING BEEN FIRST DULY SWORN BY THE
 3   ABOVE-MENTIONED COURT REPORTER, DID TESTIFY AS
 4   FOLLOWS:
 5              MR. CRAIG:  This is deposition of
 6              Secretary James LeBlanc, taken pursuant
 7              to notice and Federal Rules of Civil
 8              Procedure.  Reading and signing of the
 9              deposition is expressly not waived by
10              the Plaintiffs.  We do waive sealing,
11              certification and filing.
12   EXAMINATION BY MR. CRAIG:
13        Q.   Please introduce yourself for the
14   record.
15        A.   James M. LeBlanc.
16        Q.   How many times have you been deposed,
17   Mr. Secretary?
18        A.   Anywhere from 10 to 50.
19        Q.   Fair.
20        A.   I have no clue.
21        Q.   I can appreciate that.  I'm going to go
22   over just some basic, we call them, ground rules.
23   It won't take a second, but I think it's helpful
24   to get started.
25        A.   All right.
```

1      Q.   As you're familiar, we have a court
2  reporter here.  She takes down verbal answers, so
3  nods of the head and --
4           MR. CRAIG:  Stop for a second.
5           (OFF-THE-RECORD DISCUSSION)
6  EXAMINATION BY MR. CRAIG:
7      Q.   I'm just going over some of the basic,
8  kind of mutual expectations, for lack of a better
9  word.  One is, with the court reporter here, it's
10  important to use verbal answers, rather than
11  shaking heads or the kind of uh-huh, huh-uh that I
12  think a lot of us do in ordinary conversation.
13  And if I prompt you to give a verbal answer, I'm
14  not trying to be smart or rude, I'm just trying to
15  clean up the record.
16      You understand that the oath that you just
17  took is the same oath that you would take in a
18  court of law if we were to go to trial in this
19  case?
20      A.   I do.
21      Q.   We are interested in your complete
22  answers based on your own memory, which means
23  couple of things:  One, if you don't have a memory
24  of a particular question, which could happen, "I
25  don't remember" or "I don't know" is an acceptable

1   truthful answer.  We don't ask witnesses to guess,

2   and your lawyer is probably going to object if I

3   did.

4        The second piece of that is that, if in

5   answering a question sometime later in the

6   morning, it prompts you about a previous question,

7   please feel free to let me know and supplement

8   your previous answer.  There's nothing magical

9   about having to get all the answer in, in answer

10  to the specific question.  There's no jury or

11  judge here, so we're just taking the record down.

12  It will be fine.

13       If you don't understand a particular question

14  I phrase, which happens, please let me know.  If

15  you are able to identify the part of the question

16  that doesn't make sense and can direct me to that,

17  I won't take it personally, and I will be happy to

18  rephrase.  Does that make sense?

19       A.   It does.

20       Q.   And similarly, if you don't ask me to

21  clarify, I'm going to assume that you understood

22  the question.  But again, if later on it turns out

23  that you didn't, and you want to reanswer the

24  question, you're allowed to do that.

25       You are also allowed to take breaks, to the

```
 1    extent that you need to.  There's no rule about
 2    how long or short you need to go.  The only
 3    particular rule is that once I've asked a
 4    question, it's better to answer the question and
 5    then take a break rather than take a break with a
 6    question pending.  And that would include, at any
 7    point, if you need to talk to counsel, you're
 8    allowed to stop and do that, as well.  And you
 9    don't even need to tell us that that's what you
10    want to do.  You just need to say, "I want to take
11    a break," and we'll stop.  And as long as the
12    question has been answered, that's perfectly
13    appropriate.  Does that make sense?
14         A.   It does.
15         Q.   Are you taking any kind of medication or
16    have hardship, sleep deprivation or whatever that
17    would interfere with giving accurate testimony
18    today?
19         A.   No.
20         Q.   Did you do anything to prepare for
21    today's deposition, Mr. Secretary?
22         A.   Other than talking to counsel, not
23    really.
24         Q.   Okay.  I should have brought that up to
25    you.  It's permissible for me to ask "did you talk
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    to your counsel?"  I will -- no question I pose

2    should be interpreted as me asking about the

3    substance of any conversations between you and

4    your counsel.  Did you look at any documents to

5    get ready for today?

6         A.    No.

7         Q.    A number of persons that work for DPS&C

8    or DOC have already been deposed in this case.

9    Have you spoken with anybody about their

10   depositions?

11        A.    No.

12        Q.    And I can see that you didn't bring any

13   documents or materials with you to help you in

14   this deposition; am I correct?

15        A.    You're correct.

16        Q.    Okay.  Sometimes people come with boxes

17   of stuff, and we got to do the box thing.  Okay,

18   then, let's start with your educational

19   background, please, sir.

20        A.    Okay.  I have a Bachelor of Arts degree

21   from Southeastern.  That's really it.  I mean,

22   other than going through the high school, and I

23   graduated from Southeastern in 1972, and been

24   working with the department since that time.

25        Q.    What was your degree in?

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1       A.    In business administration.

2       Q.    So you started in 1972, with the

3   department.  And I may use DOC and DPS&C

4   interchangeably.

5       A.    I'm sorry.  It was '73 when I started,

6   not '72.

7       Q.    Fair enough.  So give me a thumbnail

8   sketch of your jobs with your positions within the

9   department up to, like, senior management.  We may

10  slow down a little bit for those.

11      A.    Okay, I'll try to be as brief as I can.

12  I started at the women's facility in St. Gabriel,

13  that's where I was from.  That's my hometown.  So

14  when I graduated, I had an opportunity to go to

15  work there in the business office.  Then from

16  there, I promoted into headquarters into the

17  budget section of headquarters working basically

18  over the budgets for the department, probably in

19  the neighborhood of '78, in that range.

20      And then promoted to Prison Enterprises

21  Division as planning and management officer from

22  there.  And then went to director of Prison

23  Enterprises from that.  That all happened in the

24  80s.

25      And then in the 90s, I went in as

```
 1   undersecretary appointed by Edwin Edwards in his
 2   last term.  I was undersecretary.  And then late
 3   90s, I went to Dixon as warden, spent several
 4   years there.  And then from there, I had some
 5   interim appointments as warden of Hunt, as
 6   director of probation and parole.  And that was
 7   interim as kind of temporary assignments with the
 8   current secretary Richard Stalder, put me in those
 9   positions.
10        Went back to DCI after that, and then had an
11   opportunity to be in this job in 2008.  Appointed
12   by, at that time, by Bobby Jindal.  Then
13   reappointed in 2016 by current governor John Bel
14   Edwards.  So that's kind of a quick overview.
15        Q.   That's very helpful.  So I suppose your
16   job duties and responsibilities are to supervise
17   everything, but I assume that there's some more
18   business appropriate definition of your job duties
19   and responsibilities.  What would that be?
20        A.   Well, I mean, you know, obviously, we
21   have a mission statement, and I kind of look at
22   our mission statement as part of my job duties.
23   And, obviously, public safety is the number one
24   issue in our department in providing public safety
25   to this state.  But at the same time, reentry and
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   moving people out of our system back into our
 2   communities is a real important initiative of what
 3   we're trying to do today.  95 percent of the
 4   people that we get are going home.  And we have a
 5   major concentration on getting those people in
 6   good shape before they return to our communities,
 7   both in the prison system, be it local jails or
 8   state prisons, and in our community corrections in
 9   probation and parole.  That's been a major focus
10   of mine in the last 3 to 4 years.
11        Being appointed as chairman of the task
12   force, the criminal justice reinvestment task
13   force, and bringing that forward, we consider ten
14   historic pieces of legislation that were passed in
15   2017.  That has moved us in the right direction.
16   So, you know, I have a responsibility for the
17   state prisons.  I have a responsibility for
18   probation and parole, and I have a responsibility
19   for our prison enterprises division.  Those are
20   the three major compartments.
21        Under the state prison systems, obviously,
22   local jails play a role in what we do.  And basic
23   jail guidelines were established that we oversee,
24   that was passed -- that were done when federal
25   court supervision -- we were released from federal
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1    court supervision both in the state prisons and
 2    the local jails.  And the basic jail guidelines
 3    were the guidance that got us out from under
 4    federal court supervision.  So that has developed
 5    and improved over time.  So that's kind of a
 6    rendition of where I am at this point.
 7         Q.   Yes, that's extremely helpful.  And a
 8    couple of those points we'll come back to,
 9    obviously.
10         A.   Okay.
11         Q.   Who reports to you as secretary, who
12    reports directly to you?
13         A.    I have Seth Smith, our chief of
14    operations, who's over the state prisons and local
15    jails; I have Natalie Laborde is our executive
16    counsel, who is also responsible for medical and
17    mental health; I have actually Thomas Bickham, who
18    is our undersecretary, who is over management and
19    finance.  That's another big compartment that I
20    failed to mention that we have responsibility for
21    that, I guess, falls under my supervision, too;
22    and then Malcolm Myer, who's our deputy secretary,
23    who's basically over the reentry part, the part
24    that I talked about in getting people prepared.
25    He's over that, along with Rhett Covington, our
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    assistant secretary.  Those two kind of
 2    quasi-report directly to me.  I work with Rhett as
 3    much as I do with Malcolm on those issues.  Like I
 4    said, that's been a major focus of mine.  So I
 5    stay pretty much in tune with our reentry efforts
 6    and getting people back to our communities.
 7         Q.    Under Seth Smith, the chief of
 8    operations, is one of the positions that reports
 9    to him the deputy assistant secretary?
10         A.    Correct.
11         Q.    And the deputy assistant secretary, if I
12    understand it, is responsible for the Office of
13    Adult Services?
14         A.    Yes, along with the chief of operations.
15         Q.    Okay.
16         A.    So the chief of operations is over Adult
17    Services, and the deputy assistant secretary
18    reports directly to him, that has that
19    responsibility, also, so...
20         Q.    Thank you.  Within the office of --
21               (INTERRUPTION)
22    EXAMINATION BY MR. CRAIG:
23         Q.    So we'll be talking a lot in the next
24    however long this morning about preclassification.
25    Preclassification is under Office of Adult
```

1    Services?

2        A.    Yes.

3        Q.    Do you have a particular definition of

4    preclassification so that we're on the same page?

5        A.    Well, you know, yes.  Preclass. is

6    responsible for the records of our offenders at

7    the local level, is how I simply look at it.  So,

8    you know, that involves the calculation of time

9    and all the things that go along with bringing

10   people into the system and working their way

11   through the system in addition to discharging

12   them.

13       Q.    So that preclassification would not

14   include the calculation of time for offenders who

15   are going directly to DOC institutions?

16       A.    No.  They have their own -- they have a

17   classification group at each state prison that

18   does the time for the people that are assigned

19   there.

20       Q.    Okay.

21       A.    There may be some exceptions.  I'm not

22   aware of it, but there may be a few exceptions to

23   that.

24       Q.    Okay.  The deputy assistant secretary,

25   does that person also have responsibility for the

```
 1    use of the CAJUN system for tracking information
 2    about DOC-sentences prisoners?
 3         A.    Could you repeat that?
 4         Q.    Sure.  We're talking about the duties of
 5    the deputy assistant secretary right now.  And I
 6    was asking if the use or the operation of CAJUN,
 7    which I think is the data management system for
 8    your prisoners.
 9         A.    Right.
10         Q.    Does that fall under the deputy
11    assistant secretary or under somebody else?
12         A.    Well, it's probably partly, you know, if
13    I'm understanding right, partly responsible for
14    that.  But, I mean, we have other people that are
15    involved in that.  So I guess, overall, he's
16    responsible for the management of the system to
17    some extent, but that's an awesome responsibility.
18    CAJUN involves a lot of different segments of our
19    department, not just preclass.  So it goes around
20    a little bit.  But in terms of preclass. and time,
21    I would say that he has some responsibility in
22    that regard.
23         Q.    Okay.  Let me just drill down a little
24    bit on that.  What other -- because we, of course,
25    have been focusing on preclass. and trying to
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond  LA  70404   Fax 985.419.0799

```
 1    understand how your department works.  And so what
 2    other aspects of the department's business is
 3    facilitated by CAJUN?
 4         A.   Oh, people participating in education,
 5    people -- you know, the programmatic side of this
 6    is all involved in CAJUN and keeping up with that.
 7    That's the main thing.  Medical, you got some of
 8    that, mental health.  We do things in CAJUN,
 9    discharge summary to our probation and parole
10    division of what a person has been through while
11    they're with us.  That's probably more related to
12    state prisons than it is to local jails.  It's a
13    much different aspect of how people are handled in
14    our state prisons versus how they're handled in
15    local jails.  We'll probably get to some of that
16    later on.
17         Q.   Right.
18         A.   We're trying to change that.  That's
19    part of what this initiative is on reentry, is
20    being better organized with programs and things
21    for our offenders that are housed at the local
22    levels.  So it involves a lot of different things
23    that people have input into CAJUN.  It's not just
24    about time comp.  It's a comprehensive wrap-around
25    type.
```

```
 1          It's not -- it's still -- it's an old system.
 2    Can't do everything we want to do on it.  We're in
 3    the process of developing a new management system
 4    as we speak, which will allow us to do a lot more
 5    things than we can do now, as far as extracting
 6    data, doing the things that we need to do.  That's
 7    another thing that we do with CAJUN.  Melanie is
 8    involved in CAJUN extracting data on a daily basis
 9    on helping us with our briefing reports that we
10    do.
11          Q.   Who is Melanie?
12          A.   Melanie is -- actually, Melanie and
13    Angela works here in my office.  Melanie is our --
14    I don't know what her title is, but she's over our
15    data research section.
16          Q.   What is her last name?
17          A.   Gail.
18          Q.   And then Angela?
19          A.   Angela Whitaker.
20          Q.   Okay, right.  Y'all have a lot of
21    Angelas, or at least we run into a lot of Angelas
22    in this particular case.
23          A.   We do have a lot of Angelas, yes, I
24    agree with that.
25          Q.   So we will be talking a lot about the
```

```
 1    years 2016 and 2017, because that's the time
 2    period encompassed by the five men that we
 3    represent.  During that period of time, Seth Smith
 4    was the chief of operations?
 5         A.   Yes.
 6         Q.   And Perry Stagg was the deputy assistant
 7    secretary?
 8         A.   Correct.
 9         Q.   And Mr. Smith is still the chief of
10    operations, correct?
11         A.   Correct.
12         Q.   And Mr. Stagg, we deposed him a couple
13    of days ago, he's deputy warden at Hunt?
14         A.   Correct.
15         Q.   To your knowledge, was that a voluntary
16    move on his part?
17         A.   Yes.
18         Q.   Okay.  It was not any kind of demotion
19    or --
20         A.   No.  It was strictly voluntary.  I'm not
21    sure if it was a promotion.  I'm assuming it was.
22         Q.   Okay.  In the time that you've -- your
23    career in this department, sir, tell us a little
24    bit about what training that you've had with
25    respect to the constitutional requirements on
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1   jailers or people who hold men and women in
2   custody.
3        A.   You know, I've been through a lot of
4   training in my time.  I don't know anything in
5   particular about the constitutional requirements.
6   I mean, I don't know that I can answer that,
7   really.
8        Q.   Okay.
9        A.   I mean, I did the basic training that
10  you go through in any department.
11       Q.   Sure.
12       A.   It doesn't deal directly with the
13  constitutional requirements.  A lot of that is
14  just strictly through experience of working in
15  this environment.
16       Q.   You would agree that no individual could
17  be held in jail in the absence of legal authority
18  to keep them there?
19            MR. EVANS:  Object to form.
20                 You can answer.
21            THE WITNESS:  Yes, I'll agree with that.
22  EXAMINATION BY MR. CRAIG:
23       Q.   And would you agree that an incarcerated
24  person has a civil right not to be imprisoned
25  beyond the term of their sentence?

```
 1              MR. EVANS:  Object to form.
 2                   You can answer.
 3              THE WITNESS:  Yes.
 4    EXAMINATION BY MR. CRAIG:
 5         Q.   As secretary of the department, you're
 6    ultimately responsible for ensuring that you only
 7    detain those persons that the Department of
 8    Corrections has authority to hold?
 9         A.   Yes.
10         Q.   And as secretary of the department,
11    you're also responsible for ensuring that people
12    are released from the Department of Corrections
13    when there is no longer any legal authority to
14    detain them, correct?
15         A.   Correct.
16         Q.   And you would agree that it would be a
17    violation of a person's rights to be held against
18    their will when there's no legal authority for the
19    person to be detained?
20              MR. EVANS:  Object to form.
21                   You can answer.
22              THE WITNESS:  Yes.
23    EXAMINATION BY MR. CRAIG:
24         Q.   How many DOC institutions are there in
25    the Department of Corrections?
```



866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1        You understand what I mean by DOC
 2   institutions, that's as contrasted with local and
 3   parish jails that hold DOC-sentenced prisoners?
 4        A.    Seven.
 5        Q.    And do you have an idea how many local
 6   and parish jails hold DOC-sentenced prisoners?
 7        A.    It was 104, but with the ICE situation,
 8   it's probably a little less than that now, because
 9   they're housing ICE.
10        Q.    I see.
11        A.    Federal inmates versus housing state
12   inmates.  So that number has probably declined
13   four or five.  So it may be 100 instead of 104.
14        Q.    I understand.  Does ICE pay them better?
15        A.    Oh, yes.  Oh, yes.
16        Q.    So is it my understanding that there are
17   three regional centers that do preclassification
18   of prisoners?
19        A.    I'm not sure about that, when you say
20   three regional facilities.
21        Q.    I'm thinking of -- and I may -- my
22   terminology may be off, so I appreciate that.  I'm
23   thinking of a unit at David Wade, a unit at
24   Raymond Laborde and then a unit at Hunt.
25        A.    Correct.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

```
 1          Q.    So if we're --
 2          A.    Yes.
 3          Q.    -- thinking of the same phenomenon, give
 4     me the terminology.
 5          A.    Actually, the way it works is, two --
 6     Raymond Laborde is now a reception center.  We
 7     only have -- there's a lot of history there,
 8     but --
 9          Q.    No, it's simple.
10          A.    Well, we had two reception centers a
11     long time ago.  But with budget cuts, we had to
12     shut one down in north Louisiana, which was at
13     Forcht-Wade.  We closed the reception center
14     because we couldn't afford to keep it open.  So we
15     only had one, which was at Hunt.  So we opened
16     another one at Raymond Laborde, which now, for
17     five parishes that we're concentrating our efforts
18     on, returning people to those communities, that
19     they all are being required to go through a
20     reception process.  And, therefore, they are now
21     currently one of those facilities that is
22     processing paperwork.  So that's why there's
23     three.
24          Wade was established when we centralized
25     preclass. to headquarters.  We left Wade as the
```

1    north Louisiana preclass. component.  So you have
2    Wade doing north Louisiana.  You have Raymond
3    Laborde doing those five parishes.  I'm not sure
4    if all five of them are onboard yet.  Probably
5    three or four of them are where everybody has to
6    come to Raymond Laborde before they go anywhere.
7    Therefore, they are now doing preclass.  Of
8    course, we have headquarters preclass., which is
9    doing south Louisiana.  So you have three
10   components now, if that helps you.
11        Q.   It does.  For a newly convicted
12   individual who is sentenced to DOC time, how does
13   DOC decide whether that person should begin their
14   time at a DOC institution versus a local or parish
15   jail?
16        A.   You know, it's two ways -- I mean, two
17   things to answer that, I guess:  One is, is that
18   usually 20 years is a cutoff period.  If you have
19   more than 20 years, that's a flag for us that we
20   ought to be looking at him, and he may need to be
21   at a state institution.  Doesn't necessarily mean
22   he will be, but that's kind of a flag for us, Seth
23   and his group to look at to see if they need to be
24   moved into a state prison with more security,
25   obviously, and maybe more programming if needed.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

 1          But ultimately, you know, when you get
 2     convicted in Baton Rouge -- and I use this a lot
 3     in trying to help people understand the challenges
 4     that we have -- you could go straight to Catahoula
 5     and not go through any process for us, you know.
 6     So we have no idea whether that guy or a girl or
 7     lady has mental health problems, medical problems.
 8     That's a challenge.  And that's what we're
 9     changing, and it needs to be changed.  It's a real
10     cultural resource demanding-type change, but it's
11     one that we're going through and one that we're
12     going to get to where we need to be ultimately.
13     We're seeing that in the numbers that things are
14     really improving in that regard as far as people
15     coming back to us, prison population, our
16     probation population, all that headed in the right
17     direction.  Kind of getting off on a tangent here.
18          Q.  A little bit, but not so much, actually,
19     because my follow-up to that was going to be to
20     understand, then, prior to this point in time.
21     With respect to the changes you've just been
22     talking about, has there been a practice where an
23     individual newly sentenced to DOC time could be
24     transferred directly from the parish of their
25     conviction to a parish or local jail in another

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1    location?
 2          A.    Yes.
 3          Q.    And let's focus on 2016, 2017, and then
 4    we'll maybe talk about changes if we need to.  But
 5    during that period of time, would DOC have any
 6    input in whether that newly sentenced prisoner was
 7    going to go, in your example, to Catahoula as
 8    opposed to one of the DOC facilities?
 9          A.    No.
10          Q.    And would that be true even if that
11    individual was serving a sentence over that 20
12    year line you were talking about?
13          A.    Like I said, that was a red flag --
14          Q.    Yes.
15          A.    -- that we tried to -- and really, Seth
16    or Derrick could answer this better than I do, but
17    I'm assuming when they see that, when they get
18    that information, that they would inquire as to
19    whether this person needs to come in to us or not.
20    And, look, there are times when a sheriff will
21    call and say, I have a guy here that needs to be
22    in state prison.  That happens occasionally.  It
23    doesn't happen that often.  We even actually take
24    pretrials on occasions, where a guy is a serial
25    killer that they don't want to keep in the parish
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    jail, that has all sorts of enemies to begin with,

2    that they can't keep.  We'll find a place for him

3    in our system.  So there's some of that, that goes

4    on, that when a sheriff or DA or whoever, you

5    know, thinks that this is a security issue, that

6    y'all probably need to take this guy in, that

7    we'll take them in, but that's an exception.

8         Q.   How long has it been the case that a

9    parish of conviction would -- could send a newly

10   convicted prisoner with DOC time to another parish

11   or local jail, rather than going through DOC?

12        A.   Forever.

13        Q.   Since the time you've been in this

14   department?

15        A.   Yes.  I mean, I don't know of a time

16   that wasn't happening.  But, yes, I mean, it's

17   probably a time when we had 8 or 9,000 inmates

18   where all we needed was state facilities.  But

19   that was before my time involved in the overall

20   management of this department, as far as being

21   undersecretary.  It goes back that far.  It goes

22   back probably in the 70s.  I'm, again, guessing a

23   little bit, but I would think it does.

24        Q.   Yes.  Or estimating, we could say.

25        A.   Yes.



```
 1        Q.    You can estimate.

 2        A.    Okay.

 3        Q.    And you talked about cultural problems,

 4   I think, in your previous statement about some of

 5   the struggles to change this particular facet of

 6   the beginning of a prisoner's time as a

 7   DOC-sentenced person.  What kind of cultural -- I

 8   know you're talking about institutional cultural,

 9   I think, and --

10        A.    Yes.  It's not just institutional.  I

11   mean, it's a cultural shift in every aspect of the

12   criminal justice system in the way Louisiana

13   operates and how we're doing things these days

14   compared to the way we were doing them before.

15        In fact, I had a meeting yesterday at Angola

16   saying that I need to be meeting with majors and

17   colonels and helping those people understand at

18   our mid-levels of why we're doing the things that

19   we're doing to help people get back into our

20   communities, versus them just seeing that, hey,

21   why are we doing all -- they get more than my kids

22   are getting, you know.  So helping them understand

23   that, helping our probation and parole agents

24   understand why we would rather find a way to make

25   them successful than putting them back in prison,
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   and why we're doing that, is going to make a
 2   better Louisiana.
 3        So it's not -- I wouldn't call it a problem.
 4   It's really a cultural challenge and a shifting of
 5   the way we do business in this state.  And you
 6   have to have everybody onboard with this, you
 7   know, at 5,000 employees.  So it's a big
 8   responsibility, and helping them understand why
 9   we're doing things is important and incumbent upon
10   me to make sure that they understand it and helps
11   them do their jobs a little better, in my opinion.
12        I think, overall, I've seen the shift.  In
13   probation and parole is an exciting time for them
14   now to see that, hey, you know, they were right,
15   we need to be doing things differently.  And same
16   with the sheriffs.  I think they're realizing and
17   seeing the light that, hey, this is a good way to
18   do things.
19        And as I've said in the past, I believe
20   housing people at the local level at $24 a day is
21   driving our highest incarceration rate in the
22   world.  We aren't doing -- 80 percent of the
23   people that discharge out of this department,
24   discharge out of parish jails with little of
25   nothing.  If we don't change that, we're going to
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   keep getting what we're getting, which is ranked
 2   in the top 10 in every crime category and the
 3   highest incarceration rate in the world.
 4         So, I mean, that's pretty simple for me to
 5   say that what we're doing is not working, and we
 6   need to change.  I think it's a culture shift for
 7   everyone, including our judges, including our DAs,
 8   which, as I'm sure you guys know, is a tough nut
 9   to crack, but I think we're making progress.  I've
10   said that to them directly.
11         Q.   Good.  So have we.  When did Raymond
12   Laborde open its reception center approximately?
13         A.   Oh, I'm going to say it's been probably
14   a year, year and a half maybe.
15         Q.   And do Orleans Parish, is that one of
16   the five parishes you're talking about?
17         A.   Orleans, Jefferson, St. Tammany, East
18   Baton Rouge and Caddo.  East Baton Rouge and Caddo
19   are the only two now, I think, that haven't really
20   started it yet.
21         Q.   Right.  That makes sense.
22         A.   So three have, yes.
23         Q.   Yes.  Those are large population.
24         A.   They are.  That's 48 percent of our
25   prison population, those five.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        Q.   Wow.
 2        A.   Unfortunately.
 3        Q.   Yes.  And we have spoken to some of the
 4   folks that work under you in more detail about
 5   this, but I would appreciate hearing from your
 6   50,000 foot perspective, the process by which your
 7   department becomes aware that a person has been
 8   sentenced to imprisonment at hard labor at DOC
 9   through the time that that individual is given a
10   DOC number and there's a time calculation.  And
11   obviously, as I said, this would just be based on
12   your thumbnail sketch.  We've deposed a lot of
13   people and gotten a more detailed perspective, but
14   I think it will help set up where we're going with
15   this.
16        A.   Well, you know, as far as the way I
17   understand it is that, you know, when the judge
18   sentences someone, then we get notified when we
19   get the paperwork, that we get the information
20   that says that this person has been sentenced.
21   Very simply, that's how I look at it.  Now, there
22   may be some exceptions to that, but I'm not aware
23   of it.  I think that's part of the issue here, in
24   that the time limits of the paperwork and getting
25   the information to us in order to figure time.
```

```
 1        I could get off on a couple of things here,
 2   but the uniform commitment order, we made some
 3   changes in statutes to allow us to use uniform
 4   commitment order to figure time.  That seems to
 5   have run into problems.  We're still working on
 6   that.  We made an effort at trying to improve that
 7   through the uniform commitment order.  Judges are
 8   very difficult, as sheriffs are, as clerk of
 9   courts are.  Everybody is kind of in their own
10   little areas of responsibility, and it's very
11   difficult to bring everybody on the same page.
12   But basically when a judge sentences someone, it's
13   getting the paperwork and getting the uniform
14   commitment order.  When we get that, then we're
15   notified that somebody has been sentenced to us.
16        Q.   And we'll talk about this in more detail
17   later, also.  But is there a requirement that the
18   local parish jail that's moving -- that's the
19   parish of conviction, that they're moving a newly
20   convicted prisoner to another local or parish
21   jail, is there a requirement that they notify DOC?
22        A.   I think in the basic jail guidelines,
23   there's some notification requirement within a
24   certain amount of time that they have to notify
25   us --
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1     Q.    Yes.  Okay.

2     A.    -- before they move them.

3     Q.    And then so that's the -- I want to call

4  it the sending facility.  To your knowledge, is

5  there a requirement that the receiving facility,

6  the one that's, in your example of East Baton

7  Rouge and Catahoula, would be Catahoula, is there

8  a requirement that they give notice to DOC that

9  they've received this person?

10    A.    Not that I'm aware of.  I could be

11  wrong, but I don't think there is.

12    Q.    I'm going to hand you -- most of the

13  exhibits we're going to talk about today have

14  already been marked and other people have been

15  questioned about them.  This one is marked as

16  Exhibit 32.  And we've shown it to other DOC

17  witnesses.  So your lawyer already has a copy

18  there in front of him.

19        You were secretary in 2012, when there was

20  something called a Lean Six Sigma study of the

21  efficiency of the department's preclassification

22  and time calculation processes were conducted?

23    A.    I was.

24    Q.    How did this study come to be; was there

25  an identified problem DOC was trying to solve?

```
 1        A.    Yes.  You know, I think this all got
 2   started -- and we have Angela Whitaker, who I
 3   mentioned earlier, was part of this team.  And she
 4   had been working in other areas outside of the
 5   department with this group on the state police
 6   side, a few things, and they asked us if there was
 7   any areas in corrections, if I remember this
 8   right, that we would want to look at.  Of course,
 9   time calculation at the time, as we all know and
10   still is, very complicated.  So I think this
11   initiated from that request, that how can we
12   improve and simplify our time comp. process.  And
13   so it got started, I think, in that realm.  And
14   from that came the issue of -- some of the
15   over-detention issues, I believe, came out of this
16   report, that we began realizing that, you know, we
17   had a problem there, and we needed to begin to
18   address that problem.
19        Q.    And Lean Six Sigma, I'm sorry to show my
20   ignorance, is that a company, or is it a method?
21   If you don't know, it's okay.
22        A.    No.
23        Q.    I'd feel better, actually.
24        A.    No, I think I'm a champion here.
25        Q.    You are.  That's my next question.
```

```
 1        A.   That I think we laugh about that.  I
 2   think they did that because we allowed them to do
 3   the study more than anything else.  I really
 4   wasn't involved in the study.  And so I think
 5   because we allowed them.  I'm not sure exactly how
 6   this was funded, but I think we helped with the
 7   funding and did the things that we had to do to
 8   make this happen.  So that yellow belt, I probably
 9   should have given it back to them when they
10   presented it to me.  But, yes, I think it's a
11   process.  Lean Six Sigma is a process of the way
12   you go about evaluating issues or challenges or
13   whatever.
14        Q.   Particular business process?
15        A.   Right.  Right.
16        Q.   So these slide pages are numbered.  And
17   this version that we're using has the notes that,
18   I guess, the presenters of this, whoever created
19   this power point, used.  So page -- I'm going to
20   be looking at page 8, or slide 8.  We'll be going
21   back and forth for a couple of minutes on this,
22   make sure I understand it.
23        A.   You might be asking the wrong person if
24   you want me to explain it to you.
25        Q.   Here's what we kind of learned:  It's
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1   like assembling a puzzle.  Some people have some
 2   pieces; some people have other pieces.  So at the
 3   end of the day, we hope to understand a little
 4   bit.  So it's okay.  You can just do your pieces.
 5        A.    Okay.
 6        Q.    So looking at slide 8, this would appear
 7   to be a chart kind of showing the process of
 8   calculating time from an individual's conviction
 9   to the point where DOC has actually calculated the
10   individual's release date.  Is that what it looks
11   like to you?
12        A.    Yes, it does.  Please excuse me, I've
13   been to the eye doctor, and my eyes are not
14   exactly right.  So some of the stuff inside this
15   is a little bit difficult for me to read.  My
16   glasses don't do me any good.
17        Q.    I'm sorry about that.
18        A.    That's all right.
19        Q.    I'd lend you mine, but that probably
20   wouldn't --
21        A.    Actually, I have cataracts.
22        Q.    Oh, I'm sorry.
23        A.    That's all right.
24        Q.    So I'm looking at those yellow boxes --
25   or actually, the little diamonds or squares,
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   whatever those things are.  And so it starts with
 2   the clerk of court, where the individual is
 3   convicted, to the jail.  It says, "jail
 4   processes," that yellow box, then the preclass.
 5   facility, where they talk about the preclass.
 6   mailroom.
 7        Yes, your counsel actually has a larger piece
 8   that may be easier to read.
 9             MRS. WASHINGTON:  Which number was that
10             marked, the exhibit?
11             MR. EVANS:  Oh, Exhibit 46.
12             MR. CRAIG:  Okay.  So for the record,
13             Exhibit 32 and Exhibit 46, in terms of
14             the slides, are the exact same document.
15             The only difference is Exhibit 32 has
16             the presentation notes.
17   EXAMINATION BY MR. CRAIG:
18        Q.   So you're there on slide 8.  We were
19   talking about there's a diamond there for
20   preclass. facility.  Preclass. mailroom sorts for
21   delivery, looks like.  And then there's a time
22   period for case being processed, and then ready to
23   transfer.  So looks like the way that Lean Six
24   Sigma framed the analysis was, in terms of the
25   different places that the individual's information
```

```
 1   proceeded from, from the clerk of court, where the
 2   judge issued the conviction, to the jail, which
 3   collects information, to your preclass. facility,
 4   and then the time it takes to actually do the time
 5   calculation.  Does that look right to you?
 6        A.    It does.
 7        Q.    And one goal of this study was to reduce
 8   the number of immediate releases.  Is immediate
 9   release a term that you use or that you're
10   familiar with?
11        A.    Oh, yes, it is.
12        Q.    What does it mean to you?
13        A.    It's usually when somebody is sentenced,
14   they are pretty much ready -- they're eligible to
15   be released.  I mean, when we get the paperwork,
16   in other words, he's either ready to be released
17   or overdue.  So I mean, you know, that's kind of
18   how I look at it.  I know we have issues with
19   paperwork challenges, as we've talked about
20   already a little bit.
21        And, of course, we have a lot of good time
22   being issued now at the local level that we've
23   never had before with the programming that we have
24   now that we didn't have before.  People actually
25   may earn a GED and get 180 days of credit for good
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   time and makes them immediately eligible to be
 2   released.  In some cases, may be even over; in
 3   other words, they pass their release date because
 4   they're getting 180 days, and they only had 90
 5   days left in their sentence.  So that makes them
 6   immediately eligible for release.  So that's kind
 7   of how I look at it.
 8        Q.   Okay.  This may be self-evident, but a
 9   major focus of this study is to reduce the number
10   of immediate releases in the course of a year; is
11   that your recollection of part of the point of
12   this?
13        A.   Yes, I think that was part of it.
14   Again, as it started, it blossomed into this
15   issue, from the issue of how do we improve the
16   calculation and make it simplify the calculation
17   into this.  So yes, I mean, I think that was the
18   basic recommendations of this group, to how we can
19   improve on improving the time that it takes to get
20   people out.
21        Q.   And maybe again asking the obvious, but
22   why are immediate releases a problem, from your
23   perspective?
24        A.   Well, you know, there's one is, what I
25   just mentioned, is the good time issue of people
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1   getting good time at the local level that they
 2   weren't getting before.  And by the time we get
 3   the notification, they're overdue, because of the
 4   good time that they're receiving.
 5       The other is the paperwork, the judges and
 6   the clerk of courts getting us the right paperwork
 7   in order for us to process someone out.  As y'all
 8   know, we get criticized for people getting out too
 9   early, you know.  So we have to be very careful in
10   making sure they don't have detainers.  There's a
11   lot of that goes into this process.  And we have
12   to be very careful for releasing people too early
13   and, obviously, too late.  And we're trying to
14   balance that and making sure that we do it right
15   and not make mistakes.  We know we are going to
16   have some mistakes.
17       I mean, that's just -- I mean, like I said
18   earlier, we do 15, 18,000 discharges every year.
19   There's 100 points of contact on each file when
20   somebody discharges.  So that's an awful lot of
21   work that goes involved in this, you know.  We
22   have people that don't get paid enough to do the
23   jobs to begin with, that would help with that.
24   It's a tough environment, it really is.
25       Q.   Yes.  If you would turn to slides 17 and
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1   18.   Yes, he'll find them for you.
 2          A.    I could see this okay.
 3          Q.    Yes.   17 is actually, I think, the one
 4   that sets it out, or to start with.  So it looks
 5   like here that in 2012, in May of 2012, that there
 6   were 2,252 immediate releases per year, at least
 7   according to the folks who compiled this data?
 8          A.    Yes.
 9          Q.    And the goal, I think, if you look at
10   the next page -- no, I'm sorry.  Oh, the goal was
11   to, I think, to reduce that by 1,802, to get to
12   450 immediate releases a year; does that make
13   sense to you?  Do you have any recollection of
14   these metrics --
15          A.    Not really.
16          Q.    -- Mr. Secretary?
17          A.    I mean, it's been a while.
18          Q.    Sure.
19          A.    No, I don't really.  I don't remember.
20   I mean, obviously, you know, 450 to zero would be
21   even better.  I think we'd like to get it down to
22   zero, would be my goal.
23          Q.    Yes.
24          A.    And I think this is just giving you
25   something to strive for over time to get to a
```

```
 1    point where you can get it to zero.
 2         Q.    Yes.
 3         A.    Certainly we want to do that.
 4         Q.    I appreciate that.  Then it has a
 5    statistic here, overdue days, number of overdue
 6    days per case, which says 71.7.  You see where I'm
 7    looking at?
 8         A.    I got you.
 9         Q.    So would that be for each immediate
10    release the number of days that a person had been
11    held over the term of their sentence, or does it
12    mean something else?
13         A.    I don't know.  I really don't.  I can't
14    answer that.
15         Q.    Okay.  And it has a goal of reducing
16    that by 31, I think.  Do you see that?
17         A.    I do.
18         Q.    And then if we can look back to slides 4
19    and 5, you'll see if the print on that is -- other
20    than their annoying bright blue, I think that
21    might be readable.
22         A.    Okay, I got it.
23         Q.    There was another statistic I was going
24    to ask you about, to see if you understood and
25    could help me out:  Where it's the very last
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    bullet point, 83.44 percent occurrence of an
 2    immediate release upon processing due to an
 3    earlier release date excluding those with CTRP
 4    credit.  Do you have any understanding of how to
 5    interpret that?
 6         A.   No, I don't.  Excluding those with --
 7    that's going to be the program, as I mentioned
 8    earlier, GEDs or finishing living inbound,
 9    whatever the program might be --
10         Q.   Yes, sir.
11         A.   -- they get credit.
12         Q.   Yes.
13         A.   So if you exclude those, then I guess it
14    would be those taken out of the process, I guess.
15         Q.   Yes.
16         A.   I mean --
17         Q.   That's helpful.  It's the 83.44 percent,
18    which I'm trying -- I was struggling with
19    understanding.
20         A.   Yes.  Occurrence of an immediate --
21    83 percent of immediate releases upon processing?
22    I don't know.  I really -- it's hard to understand
23    to me.
24         Q.   Okay.  Well, I feel better anyway.
25         A.   Yes.  I don't know.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Except for it would be nice to know.
 2          A.    Yes.
 3          Q.    If we look at the next page, maybe this
 4     will help us.  It's got project goals.  And it
 5     says -- it certainly says, reduce the percentage
 6     of immediate releases by 80 percent, and that's
 7     from 2,252 to 450 a year.  And that's similar to
 8     the slides we looked at on page, I think, 17 and
 9     18, correct?
10          A.    Yes, correct.
11          Q.    Again, this excludes immediate releases
12     due to -- I'm just going to call that programming,
13     if that's all right?
14          A.    That's what it is, the program good
15     time.
16          Q.    Those were the project goals?
17          A.    So the CTRP means certified treatment
18     rehabilitation programs.  That's what that stands
19     for.
20          Q.    So that would mean to reduce the
21     percentage of immediate releases so that they were
22     20 percent of what they were in 2012 --
23          A.    Right.
24          Q.    -- if you were going to reduce them
25     by --
```



```
 1        A.    That's right.  20 percent of the 2,252.
 2        Q.    If you look back on page 8, slide 8, I'm
 3   going to ask you about the notes.  So this Exhibit
 4   32 will be the important one, but it will be this
 5   part that's printed.
 6        A.    Okay.
 7        Q.    The very last paragraph here says,
 8   "while there does seem to be delays between the
 9   clerks and the jails to us, our approach was to
10   focus on minimizing our cycle time before
11   addressing it with the outside agencies."  Do you
12   see where I'm reading from?
13        A.    I do.
14        Q.    So it looked like there was a
15   recognition that there were delays between the
16   clerks of court and the sheriffs and the sheriffs
17   to the DOC; is that the way you read this?
18        A.    Yes, it is.
19        Q.    But that this particular study and the
20   recommendations that came out of it were not
21   addressing that part of this overall process; is
22   that your recollection?
23        A.    You know, maybe it is, but that's not
24   how I recollect it.
25        Q.    How do you recollect it?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A.   Well, because I think a big part of the
 2   problem is the clerk of courts and the jails, and
 3   that they have to be included in the solutions
 4   here.
 5        Q.   Yes.
 6        A.   I mean, that's how I look at it.  I may
 7   be a little bit more educated about it now than I
 8   was at the time of this, because this was kind of
 9   new to all of us when this came out.  So I think
10   the issue here is just trying to improve, let's
11   get on the right road here for improvement and get
12   things right, you know.  And so I think today when
13   I look at this, it has to include -- I mean, if it
14   doesn't, then we're not going to fix the problem
15   to zero for sure.  I mean, that's how I look at
16   it.  So I don't know if that makes any sense or
17   not.
18        Q.   Yes.  Is Darryl, Darryl Campbell?
19        A.   I assume it is.  Yes, because he was
20   working with that group.
21        Q.   And he was, at the time, the executive
22   management officer?
23        A.   I assume that was his title, MO, yes.
24   He is at headquarters now at Hunt.
25        Q.   Got it.  So I think the -- what page are
```

```
 1   you looking at?
 2        A.   I was looking at the "if you were king
 3   or queen for the day, what would you change?"
 4        Q.   Yes.  Right.  Exactly.  What would you
 5   change?
 6        A.   That's a good question.  I think we are
 7   changing.  I think that's where we're headed.  I
 8   think we're going to -- I think a new management
 9   system is going to help us an awful lot in helping
10   improve this completely.  Another thing I would do
11   is have a felony class system, which we
12   recommended to the legislature, which they didn't
13   act on.
14        Q.   Address that just a little bit for me,
15   please.
16        A.   Well, I mean, it's just simplifying our
17   system, you know, reducing our book from this to
18   this, when you look at criminal statutes and
19   classifying them into A, B, C, D, E and F, rather
20   than all the different classes of felonies that we
21   have and group them into classes.  And that
22   simplifies everything, helps the judges, helps the
23   clerks, helps us.  DAs were opposed.  God knows
24   why, but they were opposed.  It didn't even get
25   off the ground.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        That was the recommendation out of our
 2   original task force to have a felony class system
 3   task force, which was established.  They met.  I
 4   testified, talking about how complicated
 5   calculating times are, went to -- I mean, some
 6   people have made -- kind of made fun of my
 7   testimony in that regard, but it's true.  I mean,
 8   I don't know how to calculate time, you know.  I'm
 9   not going to pretend to.  And let's simplify it so
10   everybody understands it; when a judge sentences
11   somebody, he knows what he's going to do.  And for
12   the life of me, I don't understand why we didn't
13   do it, but we didn't do it.  And there's -- if you
14   haven't seen it, there's a report that was
15   submitted to the legislature.  So that was part of
16   the fixing this problem that nobody wants to go
17   along with.
18        Q.   Yes.  Let's look at page 26 in terms of
19   the recommendations of this report.  And the first
20   one here is to create a central office for
21   preclassification functions.  Do you see that?
22        A.   I do.
23        Q.   And was that implemented?
24        A.   Yes.
25        Q.   And was there a position created as
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Secretary James LeBlanc 7/9/2018

```
 1    classification manager, which is discussed in a
 2    later slide, slide 30?  But has there been a
 3    position that's classification manager that's over
 4    this central unit?
 5         A.   You know, I'm assuming that's Angela
 6    Griffin.
 7         Q.   Yes, sir.
 8         A.   I think if that's her title, then, yes,
 9    it has been.  I mean, I knew we had a position.
10    I'm not sure what the title is, so yes.
11         Q.   Okay.  And then on the next page, it
12    talks about eliminating the requirement for the
13    clerk of court offices to submit court minutes.
14    Do you see where I'm reading from?
15         A.   Yes.
16         Q.   And that was the issue with respect to
17    the uniform -- or the potential of using the
18    uniform commitment order rather than sentencing
19    minutes.  Do you see that?
20         A.   Yes.
21         Q.   So that's consistent with your previous
22    testimony, I think?
23         A.   Correct.  It is.
24         Q.   And then it talks about creating a
25    system for knowledge sharing and develop an
```

1   electronic case file.  Do you see those?

2        A.    I do.

3        Q.    And do you know anything about what was

4   done for those two provisions -- recommendations,

5   I'm sorry?

6        A.    You know, I think we have some

7   guidelines that have been written and to help with

8   the new employees.  I'm not exactly sure to what

9   extent that is and the training part of it.  I

10  don't have a clue on the standardized PC and time

11  comp. procedures, but I'm assuming that's been

12  accomplished.  It should be standard.  I can't

13  imagine that it's not.  So I think we've pretty

14  much completed that part of it.

15       Q.    Okay.  Going back to the uniform

16  commitment order, you had mentioned some problems

17  in terms of -- I don't know -- the implementation

18  or possibly the use by local judges of the uniform

19  commitment order; did I understand you correctly

20  on that?

21       A.    Yes.

22       Q.    Can you elaborate on that just a little

23  bit, please?

24       A.    Well, I think people below me can --

25  like, Angela and them can explain that a little

```
1    better.  My understanding is, that the judges
2    don't complete it.  They don't finish completing
3    all the questions on the document or either they
4    change the type of information that we ask for and
5    have their own form.  They develop their own
6    uniform commitment order after the Supreme Court
7    has approved the new uniform commitment order.
8         So that's the challenge that we're dealing
9    with, with the judges, is that they have their own
10   way of doing things.  We have no jurisdiction over
11   them.  We have no -- just like we don't over the
12   sheriffs or the clerk of courts.  And, you know,
13   ultimately, if they don't do what we ask them to
14   do, there's not a whole lot we can do about it at
15   this time.
16        Maybe we're going to talk about the
17   resolution that's been passed by Representative
18   Jackson, Katrina, who I asked to do it.  And I
19   asked her to do it at the sheriff's -- at a
20   legislative party, and I saw her there.  She and I
21   sat down and had dinner together there.  I asked
22   her to do that resolution to help me get everybody
23   to the table.  And that's what we're going to do.
24   And I'm glad it's going to happen so everybody can
25   hear from each source on what the issues are.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Secretary James LeBlanc  7/9/2019

```
 1        Q.   And tell me a little bit more about what
 2   the resolution is.  I think I know what you're
 3   talking about, but for the record, I think it
 4   would be helpful.
 5        A.   Well, it's a resolution that has
 6   criminal justice, I believe -- I'm not sure which
 7   two committees and judiciary.  It's a co-committee
 8   that's going to have hearings.  And the hearings
 9   are going to bring to the table everybody involved
10   in processing our inmate population.
11        Q.   So this would be a joint legislative
12   study committee?
13        A.   Yes, I guess that's how you would call
14   it.  I don't know if they're calling it a study
15   committee, but it's a resolution staffed by them,
16   which that wasn't exactly what I was proposing
17   when I talked to Katrina about it, because I
18   thought maybe we could get together and bring
19   everybody to the table, through a resolution.  And
20   let's kind of get behind closed doors and figure
21   this out and report back to them, to the
22   legislature, but she -- and I'm okay with that and
23   the sheriffs are, too.  So I think we're all in
24   agreement this needs to happen.
25        Q.   I want to ask you about -- we've talked
```

1    about two -- I want to call them metrics in

2    particular:  One, the number of immediate releases

3    per year, which was at 2,252 at the time of this

4    study, according to this group, anyway; and the

5    other being the number of days over release date,

6    which was at 72 days, according to the Lean Six

7    Sigma study.  To your knowledge, has the

8    department continued to collect data to be able to

9    track any progress in meeting these goals from

10    2,250 immediate releases a year to 450 and

11    hopefully, as you testified, to zero?

12        A.   I'm not sure.  I don't think we have,

13    but I'm not sure.  I don't know that I can answer

14    that.

15        Q.   Okay.  Mr. Stagg didn't think so when we

16    questioned him.  He's a little closer to it.

17        A.   Yes.  No, I don't think we have -- not

18    that I'm aware of.  So I haven't seen anything on

19    it.  I know we're continually working on it, but

20    I'm not sure if we have any data to back it up

21    yet.

22        Q.   Okay.  So that would also be true --

23    that would be true of both those metrics; is that

24    correct, the 2,250 immediate releases a year to

25    450, and then also the 72 days over release date

1    to, I think, the goal was 30 or 31, somewhere in

2    that neighborhood?

3        A.   Yes.

4        Q.   Okay.  So the answer is, to your

5    knowledge, there's no data collection going on?

6        A.   I haven't seen any.

7        Q.   Were either the chief of operations or

8    the deputy assistant secretary directly charged to

9    oversee a process of meeting the goals, those two

10   goals in particular, in this Lean Six Sigma

11   report?

12       A.   I don't know that there's anything in

13   writing directly charging them, but I would assume

14   that, from our meetings and all, that they have

15   that responsibility, and that they would assume

16   the responsibility of making sure.  I mean, when

17   you look at the recommendations, I think we've --

18   I think they've pretty much followed the

19   recommendations.  And building the new computer

20   system is one that we tried but failed, in that

21   last recommendation, and that we spent --

22   unfortunately, probably one of the most

23   embarrassing things for me is that I think we

24   spent in the neighborhood of 2 to $3 million on a

25   new management system, and when we turned it on,

 1    it couldn't handle the number of users on the
 2    system.  So ultimately, I had to shut it down,
 3    because it was becoming a public safety issue on
 4    being able to keep up, especially guys on
 5    probation and parole.  So we shut it down and went
 6    back to CAJUN.
 7          Now we're ramping back up.  Finally got the
 8    division to come onboard with us.  And they have
 9    six, seven, eight people assigned to us now
10    full-time here at headquarters, ramping up a new
11    system.  So that was one thing that they tried
12    to -- we tried to accomplish that.  We didn't in
13    the timeframe we wanted to.
14          And reducing the transferring of paper files
15    between institutions, I'm not sure what that
16    means.  But I would think that they did take this
17    serious, and they implemented the things that they
18    were asked to implement, which was a sign that
19    says they took it serious and moved forward with
20    it.
21          Q.   Yes, sir.  Would it be fair to say that
22    the recommendations were implemented -- the
23    recommendations of the Lean Six Sigma study were
24    implemented, but as we sit here today, DOC doesn't
25    know if the goals, the goals in terms of those two

```
 1   measurements, have been met?
 2        A.   Yes, I would say that's probably right,
 3   unless there's something I'm not aware of.
 4        Q.   Okay.  I believe if we -- if you look
 5   back on that slide 17.  And, again, it's going to
 6   be that blue ink, so you may need to look at the
 7   gray scale.  It looks like the -- if we look at
 8   this where it talks about the improved group and
 9   the controlled group, and the improvement pre and
10   post Lean Six Sigma, that even in the initial
11   pilots of the recommendations of this study, the
12   recommendations alone didn't get those pilot
13   projects to the numerical goals that you were
14   hoping to reach?
15        Is that question -- that's one of my long
16   questions that probably is confusing, or do you
17   understand where I'm going?
18        A.   I'm not sure that I understand it.  I'm
19   not sure when this improved numbers were -- I
20   mean --
21        Q.   Improve is, I believe, the name of -- so
22   there were results in this -- there were several
23   different --
24        A.   It says, "improve July 9th through the
25   27th."
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    Q.   Through the 27th.  That's a particular

2    cell of the pilot project.  And then there was a

3    control, a control group, that it's talking about.

4    Neither of them got anywhere close to an average

5    that would get you to 450 immediate releases a

6    year, I guess, is my point.  But I'm asking if you

7    understood that.

8    A.   I don't understand.  So what is the

9    30.7 percent improvement, and what period of time

10   is this?

11   Q.   Well, you were looking for an 80 percent

12   improvement.  So that's exactly my point.

13   A.   So we were looking for 80 percent.  But

14   I'm saying, what period of time did they allow --

15   I mean, I don't know.  If it's July, when did --

16   Q.   So the black and white may show up

17   better.

18   A.   It says July 9th.

19   Q.   July 9th through 27th.

20   A.   So they did over 18 days?

21   Q.   Yes, that's right.  They ran one set of

22   proposals for that period of time, and then there

23   was a control group which ran from the 30th

24   through the 17th, the 30th of July to the 17th of

25   August.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A.    So they went from 26 to 1,560?
 2        Q.    That's the control group, that's right.
 3        A.    The control group is the group that went
 4   through the new process?
 5        Q.    No.  I think the control group was the
 6   group that was doing the same thing as before.
 7   Basically, as they say in the movies, what we have
 8   here is a failure to -- it's not really a failure
 9   to communicate.  The truth of the matter is, this
10   is not something you remember; is that correct?
11        A.    No, I don't.  I don't remember this at
12   all.
13        Q.    Okay.  Then we'll leave that to the
14   side.
15        A.    They probably didn't even -- you know,
16   they may have went through a power point with me
17   at one point in time.  Look, when they go through
18   a power point and everybody else is in the room,
19   I'm expecting the people that are responsible for
20   this to do it.  So I don't remember this being
21   presented this way, though.  I don't.
22        Q.    Okay.  Okay.
23        A.    A lot of water under the bridge since
24   '16 for me.
25        Q.    Well, '12, actually.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1      A.    Yes, '12, excuse me.  Oh.

2      Q.    Okay, you can put that aside.  We're

3 done with that.

4      A.    Great.

5      Q.    We may come back to it.

6      A.    Oh, no.

7      Q.    Hold on to it, but we're not going to

8 talk about it for a little bit.

9      A.    All right.

10      Q.    So I want to turn now to a little more

11 in-depth exploration of some of the other

12 stakeholders in this process of preclassification

13 and, in particular, the sheriffs of the parishes

14 of conviction in Louisiana.  And as we've seen in

15 the slide 8, where Mr. Campbell presented, the

16 focus of this particular study was on the process

17 once the paperwork started to be worked on by the

18 preclassification personnel of the Department of

19 Corrections; does that make sense to you?

20      A.    Uh-huh (AFFIRMATIVE RESPONSE).

21      Q.    Great.  And then as you were saying, one

22 issue in particular is the question of getting the

23 appropriate information from the source, the

24 parishes of conviction, to the DOC.  And that's

25 what I want to focus on now.  And you've covered,

```
 1   I think, this in part in answering some of my
 2   previous questions, but I want to focus on it a
 3   little more directly.
 4        What efforts has the DOC made, let's start
 5   with clerks of court and sentencing judges, to
 6   address issues of getting timely information about
 7   men and women who are sentenced to DOC time so
 8   that DOC can calculate release dates and classify
 9   those people?  So I'm starting with the clerks of
10   court and the judges.
11        A.   Uniform commitment order was, you
12   know -- I mean, of course, we met -- I had them
13   both at the table, the executive director of the
14   sheriff's association and representative from
15   supreme court and the executive director of clerk
16   of courts.  I can't remember her name.  I have a
17   mind block.
18        Q.   That's fine.  You don't have to remember
19   that person's name.
20        A.   Yes.  Anyway, we met with them, trying
21   to help them understand what the issues are,
22   trying to solicit help from them, you know.  In
23   that sense, that's kind of what we've done, you
24   know.  And as I said, we opened up the reception
25   center, which is going to help with the -- those
```

1   five parishes, with the sheriffs.  I'm not sure
2   we've done anything to basic jail guidelines.  I
3   know we just sent out a new edition of those in
4   May and probably addressed some of those issues in
5   that, too, I would assume.
6        Q.   We're going to come to that in just a
7   second.  So in terms of the clerks of court and
8   the sentencing judges, that focus has been on the
9   uniform commitment order?
10       A.   Yes, basically.  I mean, we passed some
11  legislation to get rid of the minutes and to
12  require the uniform commitment order in order to
13  calculate time.  But I don't think that's worked
14  quite as well as we thought it would.  When we do
15  get it, they still have to get -- they have to
16  another part of that they have to get from the
17  court that they have to have in order to process.
18  I'm not sure what that is, but it's another part
19  of it.  I know Jonathan is sitting over there
20  knowing the answer, but he can't help me.
21       Q.   He can't help you right now, and I don't
22  think he wants to come on down.
23            MR. VINING:  No, I'm going to pass on
24            that.
25            MR. CRAIG:  Okay, I appreciate that.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

EXAMINATION BY MR. CRAIG:

 1

 2       Q.   I want to hand you Exhibit 48, the basic

 3  jail guidelines.  Before we get to that, do you

 4  know -- Do you have an idea of the timeframe of

 5  when you met with the Supreme Court and the

 6  whatever the executive director of the --

 7       A.   Actually, I wrote a long letter to them.

 8       Q.   Did you?

 9       A.   Yes, I did.  You know, it's within the

10  last year, maybe.

11       Q.   Okay.

12       A.   Somewhere in that neighborhood.

13       Q.   In the letter, did you advocate for

14  additional changes to how the courts provided

15  information to DOC?

16       A.   I think my letter was just soliciting,

17  requesting a meeting and talking about how

18  important it was that we get together in order to

19  improve the way we are doing our preclass.

20  operations in the state.  So I think that's

21  basically what it surrounded.  I'm not sure.  It

22  was a fairly lengthy letter, if I remember, but

23  I'm not sure what all was included in that.  I

24  mean, I don't mind, you can get a copy of it.

25       Q.   Yes, we'll pursue that at a later point.

```
 1        A.    Yes.
 2        Q.    Would that have been -- as you know,
 3   what we are focused on in this particular case --
 4        A.    Yes, y'all on an earlier time.
 5        Q.    Well, no, but it is important.  What
 6   we're focusing on is, our five clients were among
 7   the group that were -- whose parish of conviction
 8   was Orleans Parish, who were transferred to East
 9   Carroll Parish after their convictions as
10   DOC-sentenced prisoners, and who I believe all the
11   parties agree were held for months after their
12   release date.  And that was in -- and we'll be
13   looking at some documents about this, but that
14   came to light during -- from about the summer of
15   2016 to January, February of 2017.  And that's
16   just to give you kind of an orientation of the
17   timeframe.  Do you think your letter --
18        A.    No.
19        Q.    -- to the clerks of court --
20        A.    It was after.
21        Q.    It was after that?
22        A.    Yes, it was after.  I'm sure it was.
23        Q.    Okay.
24        A.    So, yes.
25        Q.    Has that meeting taken place, then?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        A.    Yes.
 2        Q.    And what has come of the meeting; has
 3   there been any particular initiative?
 4        A.    Not really.  The resolution is going to
 5   resolve that.  That brings everybody together.
 6   And that's kind of what -- you know, I'm just
 7   totally dependent on the resolution to bring
 8   everybody together.  So we haven't done anything
 9   since then, actually, that I'm aware of.
10        Q.    And the resolution was the legislative
11   joint committee that we were talking about?
12        A.    Right, which has all those parties
13   involved.
14        Q.    Yes.  Okay.  So you've given us some --
15   you've talked a little bit at the beginning of
16   your testimony, in fact, at the very beginning,
17   when you were talking about your overall duties
18   and responsibilities, about the basic jail
19   guidelines.  And I believe you started out talking
20   about how they developed as part of the process of
21   exiting the federal litigation that involved the
22   Department of Corrections and local jails and
23   prisons --
24        A.    Yes.
25        Q.    -- in about '96, I believe, ish?
```

Secretary James LeBlanc 7/92/2016

```
 1        A.    Somewhere in there, yes.  Early -- I
 2   think it may have been a little earlier than that.
 3        Q.    Okay.
 4        A.    '93, '94, somewhere in there.
 5        Q.    Yes.  And in terms of the process of
 6   actually developing the basic jail guidelines and
 7   revising them, how does that work?  I guess my
 8   question, to be more specific, is:  Is that within
 9   DOC process, or is it in consultation with the
10   sheriff's association, or how -- if you wanted to
11   change something in these basic jail guidelines
12   today, what would be the process that DOC would
13   have to go through to enact that?
14        A.    We submit it to the sheriffs.  They have
15   a jail committee, I believe, is how they term it.
16   And that committee reviews the changes, as I
17   appreciate it, and approves the recommended
18   changes.  I don't think we've ever had any
19   problems.  And to bring it a little further, is
20   that ACA has jail standards.  And that's what
21   we're working towards, is being able to get
22   accredited by the American Correctional
23   Association in our jails, and they have jail
24   standards.  And you'll see that, if you look at
25   both, that this sort of mirrors jail standards.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

```
 1   We're not quite there, but we're real close to
 2   being to the point of being able to get them ACA
 3   certified at the local level.
 4        Q.   And ACA is the American Correctional
 5   Association?
 6        A.   Yes.  They have, again, jail standards.
 7   There's two different standards.  There's -- we're
 8   already accredited.
 9        Q.   For the state institutions?
10        A.   Right.  Right.  But they -- I would like
11   to get them certified, you know, through ACA with
12   the jail standards.  That's what my goal is here.
13   We may start in those five parishes with those
14   regions, is kind of what I'm thinking about down
15   the road.  That's what we base a lot of this on,
16   is those jail standards.
17        Q.   Okay.  Let's look at page 17 in this
18   document.  And 17 and going over into 18 is
19   guideline II-A-8, which is titled "offender
20   population management system."  Do you see that?
21        A.   I do.
22        Q.   And it looks like the parenthesis under
23   the title references ACA standards?
24        A.   Yes.  That's the correction jail
25   standards.  That's right.  Sure is.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    Q.   That correction jail standards is the
2  CJS statement there?
3    A.   It is.
4    Q.   And there's two separate paragraphs
5  here.  And the first one, I want to read from it,
6  it talks about, "there is an offender population
7  management process that includes records on the
8  admission processing and release of offenders.
9  Written policy, procedure and practice provide for
10  offender case record management that includes, at
11  a minimum, maintenance of the following documents
12  and information.  This offender record shall be
13  transferred with the offender at such time the
14  offender is transferred to another local or DPS&C
15  facility."  And then it lists the master prison
16  form, the bill of information and court minutes or
17  uniform commitment, photograph, disciplinary
18  reports is Number 4.  Program participation and
19  other matters like that is Number 5.  A government
20  issued ID card is Number 6.  And the offender
21  health record is Number 7.  Do you see where I'm
22  reading from?
23    A.   I do.
24    Q.   And then the next paragraph says, "in
25  addition to the maintenance of the above

```
 1    information, the following shall be collected and
 2    forwarded to the DPS&C preclass. coordinator for
 3    the area in which the facility is located."  And
 4    under that is an additional six, some of them
 5    overlap, items:  Master prison form, fingerprints,
 6    one FBI print card from AFIS, one photograph.  4
 7    is the bill of information and court minutes or
 8    uniform commitment for each conviction.  5 is the
 9    jail credit letter.  And 6 is an inventory
10    acknowledgment form.  Do you see where I was
11    reading from just then?
12         A.    I do.
13         Q.    Thank you.  Now, there's nothing in this
14    guideline that requires sheriffs to provide this
15    documentation to DOC within any particular
16    timeframe; is that right?
17         A.    That's correct.
18         Q.    Has it ever been considered to include a
19    timeframe for the submission of these materials to
20    DOC?
21         A.    Not that I'm aware of, but there's no
22    reason why we couldn't.  I mean, I'm not sure why
23    we don't, to be honest with you.
24         Q.    Okay.
25         A.    I'm not sure that we could enforce it to
```

```
 1    begin with, but we could certainly, at least, make
 2    an attempt.  But, yes, I get where you're coming
 3    from.
 4         Q.   Do you find, in general, that once a
 5    provision is added to the basic jail guidelines,
 6    there's a certain level of commitment among the
 7    sheriffs to bring their facilities into compliance
 8    with them?
 9         A.   Well, we monitor them.  And, you know,
10    some do; some don't.
11         Q.   Okay.
12         A.   I mean, that's the bottom line.
13         Q.   Yes, sir.
14         A.   I have one on my desk right now that has
15    probably anywhere from 12 to 20 issues with not
16    complying with the basic jail guidelines.
17         Q.   I see.
18         A.   So our chief of operations is on his way
19    over there today.
20         Q.   Okay.
21         A.   To sit down with the sheriff and his
22    warden to talk about how we're going to fix them.
23    So it's one of those deals where we try to help
24    them get to where they need to be.  We don't shut
25    them down and close them down, because, obviously,
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554 Hammond LA 70404     Fax 985.419.0799

```
 1    they've committed, and it's a partnership.  So we
 2    work as partners with them to improve it.
 3         So some of them do; some of them don't.  But
 4    usually we work with them, and we get them in
 5    compliance.  And that happens on a fairly regular
 6    basis.  I mean, we do it, I think it's once every
 7    6 months, once a year, depending on what the
 8    issues are.  This group right now, we're going
 9    back in 30 days with a group in there to see, make
10    sure they comply.
11         Q.   Are you at liberty to tell us which jail
12    we're talking about?
13         A.   Not at this point.  I'd rather --
14         Q.   Okay.
15         A.   What does that mean?
16         Q.   It doesn't mean anything, actually.  I'm
17    just giving you a hard time.
18         A.   No, I think it probably meant something.
19    That's okay.
20         Q.   It's okay.  So --
21         A.   I mean, that's what it's about --
22         Q.   Yes.  That's right.
23         A.   -- to hold them to the standards --
24         Q.   Right.
25         A.   -- and that's what we do.
```



```
 1           Q.    Right.  And my overall question, which I
 2     think you've answered, is that that second section
 3     of guideline II-A-8 could --
 4           A.    Yes, it could have.
 5           Q.    -- include a timeframe that would then
 6     be a benchmark that when you do audits, like you
 7     were just talking about with this unnamed jail,
 8     would be something that your --
 9           A.    Yes.  By the way, it has nothing to do
10     with that section.
11           Q.    I understand that.
12           A.    So you're right.  I mean, you could.
13     When we monitor them, we could.  We could check
14     files and see if they're living up to the
15     standards.  There's no reason why we couldn't do
16     that.
17           Q.    Okay.
18           A.    I say there's no reason.  Seth and
19     Derrick can answer that better than I can.  I
20     don't know what kind of -- I mean, to get in the
21     files and all, that may take another person or
22     whatever when you go, because that's a little bit
23     more intensive when you start going through
24     records and checking on that kind of stuff --
25           Q.    Yes.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A.    -- but certainly something we need to
 2   consider.
 3        Q.    I'm assuming, though, that looking at
 4   the first part of this same guideline, that in
 5   order to -- which has to do with what has to be in
 6   the offender's record at the local jail, that, at
 7   times, an audit team would, in fact, have to look
 8   to make sure that those seven items --
 9        A.    Yes.
10        Q.    -- are complied with, right?
11        A.    Yes.  I think they have -- and again, I
12   mean, Derrick and those can answer this better
13   than I can.  The things that -- you know, we worry
14   about public safety.  We worry about contraband.
15   We worry about drugs.  We worry about those
16   real -- those things we concentrate on when we go
17   in.  We can't -- I forget how many standards this
18   is, but we can't go through every standard.
19        Q.    Yes, sir.
20        A.    It's just impossible to do.  It's 104
21   jails out there that we have to monitor.  We're
22   doing it with staff that has other jobs.  It's not
23   their only job doing this.  So it does require
24   some time.  So we -- this is something that
25   probably needs to be on the list.  If it's not, at
```

```
1    least, you know, maybe not every time, but at
2    least, you know, every other time maybe check the
3    files to see if they have, at least, that in
4    there.  And they may be doing it, and I'm not
5    aware of it.
6         Q.   Okay.
7         A.   It could be.  So they don't check every
8    standard every time.  They just don't have the
9    time to do it.
10        Q.   It's like a spot check?
11        A.   Yes.  Same with ACA, they don't go
12   through every file.
13        Q.   Right.
14        A.   They randomly select files that they go
15   through to make sure that you're living up to it.
16        Q.   Right.  And with respect to this second
17   part of the guideline, the materials submitted to
18   the DOC preclass., your preclassification
19   personnel would be in a position to know which
20   facilities are and are not compliant with this
21   provision; is that correct?
22        A.   Yes.  I think we're working on that part
23   of it as we speak.  It's not that easy.
24        Q.   Could you please explain?
25        A.   I don't know that I can.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        Q.   Okay.
 2        A.   I just know that that's information at
 3   this point that I'm not sure that we have, to know
 4   which ones are problems and which ones aren't
 5   problems.
 6        Q.   I see.  So what you're saying is that
 7   there isn't --
 8        A.   That somebody else needs to be answering
 9   these questions and not me.
10        Q.   No, that's all right.
11        A.   I mean, y'all trying to -- if I was a
12   preclass. person, I could sit here and answer all
13   your questions.  I mean, you're getting into the
14   weeds here that --
15        Q.   Oh, no, we're not quite to the weeds.  I
16   promise you, we're not --
17        A.   You're in the weeds with me, I'm just
18   saying.
19        Q.   Yes.
20        A.   I just need to -- okay, go ahead.
21        Q.   Yes, that's fine.  My question was,
22   though, just to make sure I understood your
23   testimony, is one of the things that's being
24   worked on is for the preclassification department
25   to keep track of which parishes of conviction pose
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    particular problems with respect to submission of
 2    complete information for preclass.?
 3          A.    As I understand it, yes.
 4          Q.    And that's a relatively recent project?
 5          A.    Again, as I understand it, yes.
 6          Q.    Okay.  Keep the guidelines in front of
 7    you.  We're going to refer to them a couple of
 8    different times here before we're done.  You're
 9    familiar with Exhibit 34, the legislative auditor
10    report on management of offender data?
11          A.    Yes.  I'm familiar.  I don't know how
12    you define familiar, but --
13          Q.    Well, you recognize the document?
14          A.    I'm aware of it, yes.
15          Q.    If we turn to page 6, where the first
16    recommendation is.  And it's there at the top of
17    the page, is that "DOC should revise its policy
18    for local facilities to include a timeframe for
19    local facilities to notify DOC of transfers."  Do
20    you see where I'm reading from?
21          A.    Yes.
22          Q.    And then the summary of management's
23    response says, "DOC agrees with this
24    recommendation and stated it will revise the basic
25    jail guidelines to ensure a required timeframe for
```

```
 1   transfer notifications and ensure this process is
 2   part of the BJG monitoring visits."  Do you see
 3   that?
 4        A.   Yes.
 5        Q.   So hang on to that, because I'm going to
 6   hand you another document, which is Exhibit 49,
 7   which was produced to us by your counsel, which we
 8   have been told is the revisions, recent revisions
 9   to the basic jail guidelines.  Is this a document
10   you've seen before?
11        A.   I probably have seen it before, but I'm
12   not sure this is going to be the latest rendition.
13        Q.   Oh.  How often are the guidelines
14   revised?
15        A.   Well, this is -- I'm not sure where this
16   came from, actually.
17        Q.   It came from somebody -- it was produced
18   to us as part of the litigation by your
19   department.
20        A.   I see the date at the top.  I mean --
21        Q.   Yes, sir.
22        A.   So is that in this?
23        Q.   No, sir.  The Exhibit 48 is the
24   guidelines, I think.
25        A.   So where did it come from?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        Q.    Your department produced it to us in
 2   this litigation.   Do you think there's a more
 3   recent version?
 4        A.    I thought that we sent out new basic
 5   jail guidelines -- and I may be wrong -- in May of
 6   this year.
 7        Q.    May of 2019?
 8        A.    Yes.   So I'm not --
 9        Q.    Okay.
10        A.    I'm confused, I guess.   I don't know
11   where -- I don't know who would issue a page with
12   these guidelines.
13        Q.    And these are saying May of 2017.
14        A.    Yes.   And I don't know how that would
15   have been issued.   How would you issue that
16   without issuing a total -- you know, the whole
17   guideline out.   How does this get out?   I don't
18   know --
19        Q.    I don't know the answer to those
20   questions.
21        A.    I don't either.   I mean, this is how
22   it's issued.
23        Q.    It's issued in the form of --
24        A.    Occasionally, we may have to, if it's
25   urgent, do a letter saying "until we get basic
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    jail guidelines out there."  Maybe that's what we
 2    did, and this was an attachment to a letter saying
 3    we're revising these until we get the new basic
 4    jail guideline, you know, the rewrites out.  But I
 5    don't know why we would have done that.  What's
 6    the point of this, anyway?  Where are we going
 7    with this?
 8         Q.   So one of the rules is, I ask the
 9    questions, but I appreciate what your point is.
10    My question -- let me just ask you my next
11    question.
12         A.   Good.  Thank you.
13         Q.   There we go.  My question was:  In terms
14    of what we were provided, which is the document
15    you have in front of you, Exhibit 49, the part of
16    guideline II-A-8, which is the guideline we looked
17    at before that was revised, revises the way in
18    which preclass. paperwork can be transmitted to
19    the preclass. department.
20         A.   I got it.
21         Q.   Do you see that?
22         A.   Yes.
23         Q.   But it doesn't -- but this provision
24    doesn't make any requirement -- I'm sorry.
25            This provision doesn't impose or suggest a
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    timeframe within which that paperwork should be
2    sent to DOC, correct?
3         A.    Yes.  No, it doesn't.
4         Q.    And I understand that the provision --
5    the audit recommendation that we just looked at is
6    referring to transfer --
7         A.    Yes.  It's not --
8         Q.    -- not preclassification.  I get that.
9    But it does not appear to me that Exhibit 49,
10   anyway, has any provision with respect to
11   timeframes for transfer notifications.
12        A.    Yes, they wouldn't be in II-A-08, any of
13   these.  It's in another part of the standards.  So
14   it wouldn't be in this part of the standards.  And
15   you would have to look at the most recent standard
16   to see if we'd done it, which was, again, issued
17   in May.
18        Q.    I appreciate that.  Just so we know we'd
19   looking at the right thing, if you would look at
20   guideline II-A-9, which is right there on page 18.
21        A.    Okay.
22        Q.    The second and third bullet points,
23   which go over to page 19, do refer to transfer
24   notifications; is that correct?
25        A.    Yes.



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

 1          Q.   Well, actually, all three of them do.
 2     Because the first bullet point says -- which is
 3     the one that starts at page 18 and goes to page
 4     19 -- starts "all transfers of DPS&C offenders to
 5     other than DPS&C facilities shall be reported to
 6     the Office of Adult Services."  And it gives how
 7     to send those.  And then says, "the notification
 8     shall be the responsibility of the sending
 9     facility."  You see where I'm reading from?
10          A.   No, I don't.
11          Q.   Oh.  I'm going to stand up and just kind
12     of point it to you, because I think that's easier.
13     It's this first bullet point, that then goes on.
14          A.   Okay.  Yes, I got it.
15          Q.   So this guideline, II-A-9, could be a
16     place where the legislative audit's recommendation
17     could be implemented?
18          A.   Yes.
19          Q.   By inserting a timeframe for that
20     transfer information?
21          A.   Yes.
22          Q.   And Exhibit 49 doesn't make any changes
23     to II-A-9, correct?
24          A.   No.
25          Q.   Okay.  Do you want to take a break, or

Secretary James LeBlanc 7/9/2016

```
 1    do you want to just keep rolling on?
 2         A.    Keep going.
 3              (OFF-THE-RECORD DISCUSSION)
 4    EXAMINATION BY MR. CRAIG:
 5         Q.    Mr. Secretary, the DOC has cooperative
 6    endeavor agreements with the sheriffs of parishes
 7    where DOC-sentenced prisoners are located?
 8         A.    We have some cooperative endeavor
 9    agreements with a guarantee of 40 percent
10    occupancy.  We don't have any agreements outside
11    of that.  I'm not sure how many of those are left.
12         Q.    Can you say that again, please?  I
13    didn't quite hear you.
14         A.    So we have a cooperative endeavor
15    agreements, CEAs, with I don't know how many
16    jails, that they built the facilities based --
17    they got funding on this cooperative endeavor
18    agreement that we would occupy 40 percent of their
19    jail with state inmates.  That's the only place
20    that we have cooperative endeavor agreements.
21         Q.    Okay.
22         A.    Not --
23         Q.    Not every --
24         A.    No.
25         Q.    -- local jail?
```

```
 1        A.    That might be what's left, because I
 2   think most of those have expired.
 3        Q.    Yes, sir.
 4        A.    So we might have two or three or four
 5   left.  I'm not sure exactly how many.  So
 6   that's -- now, we have some agreements for reentry
 7   centers.  We have some agreements for -- no,
 8   reentry centers, basically, with the sheriffs,
 9   where we operate -- we give them additional
10   funding to operate regional reentry centers that
11   we've opened up.  So we have some of those
12   agreements.  It's not about occupancy.  It's only
13   about providing programming for them before they
14   go home in their region.
15        Q.    Okay.  I will hand you Exhibit 50.
16        A.    Okay.
17        Q.    Which is the CEA between your department
18   and East Carroll.  And consistent with your
19   testimony, I believe we've heard that East
20   Carroll -- the East Carroll Parish Sheriff's
21   Office issued bonds -- or some entity connected
22   with them issued bonds for purchase and
23   construction of jail facilities.  And this
24   agreement, Exhibit 50, is a commitment by the
25   Department of Corrections to occupy one of those
```

```
 1    buildings -- 40 percent of one of those buildings,
 2    which I think it even says right on the first
 3    page, in the last two "whereas" clauses; does that
 4    make sense to you?
 5         A.   Yes.
 6         Q.   And as part of this CEA, the sheriff,
 7    who is Sheriff Williams in this particular case,
 8    agrees to operate and maintain the jail facility
 9    in accordance with the basic jail guidelines?
10         A.   Correct.
11         Q.   So with respect to the local and parish
12    jails that are holding DOC-sentenced prisoners,
13    but who no longer have or don't have a CEA, is
14    there a different kind of agreement or document
15    that indicates what the rate of -- how the
16    department will compensate the local sheriff?
17         A.   It's by statute.
18         Q.   Okay.  Does the department have
19    discretion to determine which sheriffs or which
20    facilities in which it will approve the placement
21    of DOC-sentenced prisoners?
22         A.   I mean, there's no written approval, but
23    we can -- yes, we have that -- we can decide
24    whether we house them on that local jail or not.
25    And most of that is on the basic jail guidelines.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    If they meet the basic jail guidelines, then we

2    allow them to house them.  Now, there are some

3    exceptions with city jails, where they might have

4    three or four.  They -- I forget the term, but

5    they have to go through a process, but it's not a

6    complete process with the basic jail guidelines.

7         Q.   With respect to Exhibit 50 and those

8    jurisdictions that still have a CEA, there's a

9    pretty clear link between the funding of the

10   40 percent of the beds or more and the basic jail

11   guidelines?

12        A.   Yes.

13        Q.   Is there another source of authority or

14   agreement that imposes a similar kind of quid pro

15   quo with the sheriffs to operate their jail in

16   accordance with the basic jail guidelines in order

17   to receive DOC-sentenced prisoners?

18        A.   Basically, I mean, I think the basic

19   jail guidelines is the document that requires them

20   to meet the basic jail guidelines if they want to

21   house state inmates.  I mean, that's it.

22        Q.   I see.

23        A.   There's no other agreement, other than

24   the ones we've already talked about.

25        Q.   Okay.



AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond  LA  70404     Fax 985.419.0799

```
 1              THE WITNESS:  Is that the new rendition?
 2              MR. EVANS:  Yes.
 3              MR. CRAIG:  Yes.  And just for the
 4              record, Counsel has brought in a
 5              document that's dated April 25, 2019,
 6              and is -- the cover page says, "basic
 7              jail guidelines, state offenders housed
 8              in local jail facilities," as Secretary
 9              previously testified.  We'll come back
10              to that in a minute, so as we don't --
11              so we're keeping on track.
12              Mrs. Washington will look at that, and
13              we'll come back to it at a later point.
14    EXAMINATION BY MR. CRAIG:
15         Q.   Do you know, is Orleans Parish one of
16    the other parishes that continues to have a CEA
17    with the Department of Corrections, or do you
18    know?
19         A.   I don't think so, no.  I don't think
20    they ever had a CEA.
21         Q.   Okay.  I'm going to hand you Exhibit 33.
22    And this document appears to be a department
23    regulation B-02-018 on classification, sentencing
24    and service functions, classification,
25    preclassification of offenders.  Is that correct?
```

```
 1         A.    Yes.

 2         Q.    On the last page, it bears your

 3    signature; is that correct?

 4         A.    Correct.

 5         Q.    If you'll look at page 5 -- I'm sorry,

 6    page 2, section 5.  I got myself confused.

 7         A.    Okay.

 8         Q.    Right.  It states as the policy, "it is

 9    the Secretary's policy to provide a consistent and

10    standardized system for evaluating and classifying

11    offenders newly sentenced to the custody of the

12    DPS&C and who are housed at a local jail facility.

13    It is further the Secretary's policy to ensure

14    that information necessary for reception and

15    diagnostic processing is captured and documented

16    soon after sentencing.  This information shall

17    form the foundation for developing the offender's

18    transitional and reentry plan."  Do you see where

19    I'm reading from?

20         A.    Yes, I do.

21         Q.    Does this department regulation bind the

22    sheriffs of the local jails in any way?

23         A.    No.  This is for -- when you refer to

24    reception and diagnostic, that's Hunt Correctional

25    Center or Raymond Laborde today.
```

```
 1        Q.    I got it.
 2        A.    They don't have reception at the local
 3   level.  This is for our state prisons.
 4        Q.    But it says -- what -- I understand
 5   that.  It's confusing to me because it says, "and
 6   who are housed at a local jail facility."
 7        A.    Well, because they're coming in from a
 8   local jail facility to the state prison, to our
 9   reception center.
10        Q.    I see.
11        A.    The ones that have to come in, medical,
12   mental health problems that are obvious, as we
13   talked about earlier, that are extreme cases --
14        Q.    Yes.
15        A.    -- this applies to them coming into our
16   state prisons.
17        Q.    I see.
18        A.    I'm not sure how many that is a month
19   now, but we still get them straight from the jails
20   every month to Hunt and Raymond Laborde, now
21   everybody from Orleans, as we talked about
22   earlier, Jefferson and St. Tammany.
23        Q.    Okay.  So we've talked about the basic
24   jail guidelines, and we've looked at cooperative
25   endeavor agreements, and you've explained Exhibit
```

1   33, this regulation B-02-018.  Are there any other

2   regulations, guidelines or contracts, that you can

3   think of as we sit here today, that impose

4   obligations on sheriffs to provide

5   preclassification information to the DOC in a

6   timely manner?

7        A.   Not that I'm aware of.  I mean, again,

8   there's a lot of information in our department

9   regulations and a lot of information in those

10  basic jail guidelines.

11       Q.   Yes.

12       A.   But that's the two areas that would be

13  the focus on them requiring them to provide

14  documentation to us.

15       Q.   Okay.  When Orleans, in the current --

16  under the current situation, as we sit here today,

17  Orleans parish of conviction prisoners, who are

18  sentenced to DOC time, to your knowledge, would

19  all of those individuals be sent to Raymond

20  Laborde, or are there still some who are being

21  sent to other local or parish jails?

22       A.   I would hope not.  They should all be

23  coming to us.  I mean, there's no guarantees

24  there, but I would hope that they all coming to

25  us, unless there's some extenuating circumstances

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1    that I'm not aware of.  They may hold some back,

2    that may be assigned to Orleans Parish Jail to do

3    some -- you know, to help with the kitchens.

4         Q.   Yes.

5         A.   So they may keep a few of those there

6    that may never come in to us, maybe.  I'm not sure

7    about that, but they ought to come to us and go

8    back if they want to keep them there for whatever

9    purposes.  There probably was a group there that

10   they kept there after we required them to send

11   them to us, that are pretty much permanently

12   assigned to Orleans Parish Prison.

13        Q.   Yes, okay.  And with respect to these

14   five parishes of conviction in this newer program

15   that you were talking about earlier, is there a

16   memorandum or some document somewhere that lays

17   out that requirement for the five parishes?

18        A.   It is.  There's an agreement -- well,

19   not all five yet.  There's an agreement with

20   Orleans and Jefferson.  Actually, it's with

21   Plaquemines Parish, because that's where they go.

22   They go to Plaquemines Parish for that agreement.

23   And then St. Tammany, I think, is in the works of

24   being -- I think they have a final draft ready to

25   go, but they will be in agreement.  I don't know

```
 1   if it's CEA or -- I'm not sure what the title of
 2   the agreement is.  But, yes, it's a contractual
 3   obligation for them to provide the services that
 4   we require, and then we -- they invoice us, and we
 5   pay them.  We monitor them just like we do basic
 6   jail guidelines.  There's a monitoring team that
 7   goes in.
 8        Q.   Right.  And so part of that is a
 9   commitment by -- I'm just going to use Orleans
10   Parish, because that's what we're talking about in
11   this case -- currently by Orleans Parish to send
12   all of their newly -- I mean, with the exception
13   of kitchen people and stuff --
14        A.   You're talking about to the reception
15   center?
16        Q.   Yes, sir.
17        A.   No, there's no agreement on that.  We
18   just require them.  They have to send them.
19   That's just something we require them to do.
20        Q.   Okay.  Is that memorialized anywhere,
21   like a directive or a memorandum or anything?
22        A.   I don't think there is, no.
23        Q.   Who would have -- somebody picked up the
24   phone and called Sheriff Gusman, told him to do
25   that?
```

1          A.    Uh-huh (AFFIRMATIVE RESPONSE).
2     (INDICATING).
3          Q.    You did?
4          A.    I did.
5          Q.    Okay.  Well, then, when did that happen?
6          A.    When we started this.  I mean, we went
7     in, we met with all the parishes.  We went in and
8     did a presentation to all the parishes.  This is
9     on the reinvestment part, on the $8 million
10    savings that we were able to reinvest.  So we did
11    presentations to each sheriff in those five areas
12    and helped them understand why we were doing what
13    we had to do.  And this is part of the process,
14    that they come in to us first.  I mean, there's no
15    reason why -- they didn't have a problem with it.
16    As far as I'm concerned, it's working okay, unless
17    there's something I'm not aware of.
18         Q.    So part of the purpose of that is so at
19    the earliest possible stage, your department can
20    determine the needs of the particular offenders so
21    that the programming and reinvestment can be
22    targeted to the specific needs of the offenders,
23    ultimately, of those five parishes?
24         A.    That's correct.
25         Q.    So that was not specifically directed at

1    the problem of receiving timely preclassification
2    paperwork from those parishes?
3         A.    No, but it addresses that.
4         Q.    I understand what you're saying.
5         A.    Yes.  I mean, that's just -- part of the
6    resolution or solution to this process is to do
7    reception centers for everyone at the local level.
8    That way, you know, we're chasing the paper and
9    not depending on someone else.
10         Q.    Yes.  Is the ultimate plan -- ultimate
11    is not the right word.  At some point in the
12    future, is it a goal for the DOC to have every
13    DOC-sentenced offender go first to a regional
14    classification facility --
15         A.    That is --
16         Q.    -- reception, I'm sorry?
17         A.    Yes, that's part of it.  Actually, we
18    got two coming on next year's savings or the
19    current year savings for next year, which is going
20    to bring on, I think, seven more parishes, which
21    is going to get us in the 70 percentile.  The
22    reception part of it I'm still -- because we only
23    have the capability right now at Raymond Laborde
24    and Hunt to do so many.  Like, East Baton Rouge,
25    we may put the staff at East Baton Rouge to do the

```
 1    reception right there, you know, in the facility
 2    where they were sentenced.
 3         Q.   Yes.
 4         A.   And that way, we determine from there
 5    where they go.  And that's probably how we're
 6    going to have to work it out, because we just
 7    don't have the capacity to do it at Hunt or
 8    Raymond Laborde at this point.
 9         Q.   Right.
10         A.   After we do St. Tammany at Raymond
11    Laborde, they're going to be maxed out in
12    processing.
13         Q.   Right.
14         A.   So we're looking at East Baton Rouge,
15    would be the first where we do it right there on
16    site.  We think we can do it on site.  So, yes,
17    ultimately, that is the goal, is to get everybody
18    through a reception process before they get sent
19    anywhere.
20         Q.   Okay.  I want to ask you briefly about
21    the most recent -- at least the most recent
22    strategic plan of your department that we have,
23    which is Exhibit 51.
24         A.   That's --
25         Q.   You're smiling.  Is there a reason?
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1          A.    I have a reason I'm smiling, because I
 2    just had a one-on-one with my undersecretary about
 3    this strategic plan that I'm not real happy with.
 4          Q.    Okay.  It doesn't have to do with this
 5    particular subject?
 6          A.    No.  It's, like, this is -- this
 7    document is about worth the amount of paper that
 8    it's on, in my opinion.
 9          Q.    Oh, then I'm sorry I copied it twice.
10          A.    I mean, it needs to be worked on.  Every
11    person in our leadership group is getting ready to
12    get a letter from me on looking at this strategic
13    plan and making sure that it is what it's supposed
14    to be.
15          Q.    And what is it supposed to be?
16          A.    Well, I think it's supposed to be just
17    what it says; a plan.  It needs to be more
18    particular.  When I read through here, there are
19    things that are not in here that should be in
20    here.  This is a document that they use in the
21    budget process.  It's sent over to the division
22    and to the legislature, who I bet nobody looks at,
23    honestly.  That's why nobody really pays attention
24    to it, because they know nobody is looking at it.
25    So I'm saying, they may not be looking at it, but
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   I'm looking at it, and we ought to be looking at
 2   it, and we ought to use it as a process to plan
 3   out what we're doing in this department.
 4        Right now, this document doesn't reflect
 5   that, in my opinion.  I still have work to do on
 6   this.  I kind of went through it real quick, but I
 7   realize that, looking at some things in here, that
 8   it needs some work.
 9        Q.   Okay.
10        A.   So anyway.
11        Q.   So it wouldn't surprise you to be told
12   that there's nothing in -- that I found nothing in
13   the strategic plan addressing for the problem
14   of --
15        A.   Amen.
16        Q.   -- timely preclassification paperwork?
17        A.   Amen.
18        Q.   If you were king or queen for a day,
19   would the strategic plan have that information?
20        A.   It would, and it will.  So we're working
21   on -- in fact, I asked for a delay in submitting
22   the current year one.  I asked for a delay to fix
23   this, so yes.
24             MR. CRAIG:  All right.  Let's do take a
25             brief break.  I think we're moving along
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1          pretty well, but I would like to look at
2          this document that we just got.  It
3          won't take me more than 3 to 5 minutes.
4          (RECESS 11:11-11:18 A.M.)
5          (EXHIBIT 67 MARKED FOR IDENTIFICATION)
6    EXAMINATION BY MR. CRAIG:
7          Q.   I'm going to hand you what we have now
8    marked as Exhibit 67.  This is the document that
9    your Counsel -- you might want to move the clip to
10   where you can turn pages better.  Sorry about
11   that.
12         A.   That's all right.
13         Q.   That has just been produced.  So this
14   document -- and feel free to look at it to the
15   extent you need to for this question, but this
16   document is the most recent as of April 25, 2019,
17   revision to the basic jail guidelines, correct?
18         A.   Correct.
19         Q.   In comparison to Exhibit 48, which is
20   the complete -- you don't have to look at it.  I'm
21   just going to show it to you --
22         A.   Okay.
23         Q.   -- which has the same title page, but
24   December 2011.  Have there been different
25   iterations or versions of this entire document

```
 1    over the years, or is this the first full revision
 2    since 2011, or do you know?
 3         A.   I'm not -- I'm thinking there was one in
 4    between here, but I'm not real sure.  I think
 5    there was, though.
 6         Q.   Okay.  So we're going to look at the
 7    couple of policies we've been focused on.  And I'm
 8    actually going to start with the transfer area.
 9    So if you look at page 17 of this document.
10         A.   Okay.
11         Q.   And I'm looking at what is guideline
12    II-A-9.  And if you'll recall, in the 2011
13    version, this was previously the section that
14    talked about the requirements of sending transfer
15    information from one local jail to another to the
16    department.  And it's been truncated to a slightly
17    different concept.  Do you see where I'm pointing
18    to?
19         A.   I do.
20         Q.   Okay.  So turn -- it appears that
21    there's a new section on page 21, which is now
22    designated II-A-19, which I won't bother to take
23    you through this step by step, but the table of
24    contents indicates which policies have been
25    revised for this edition.
```

```
 1          A.    Okay.

 2          Q.    And this section, offender transfers, is

 3    a brand new section.  And looking at the first

 4    paragraph here, it does now specifically say that

 5    "all transfers of DPS&C offenders to other than

 6    DPS&C facilities shall be reported to the Office

 7    of Adult Services at least one day prior to all

 8    scheduled transfers and within one business day

 9    for all nonscheduled transfers."  Do you see where

10    I'm reading from?

11          A.    I do, yes.

12          Q.    So this new provision, II-A-19, would

13    seem to respond to the legislative auditor's

14    recommendation and your management response from

15    the 2017 audit, correct?

16          A.    Correct.

17          Q.    Okay.  And then down below there, where

18    it says "documentation" and says "facility logs,

19    documentation of transfers of DPS&C offenders to

20    other than DPS&C facilities."  Do you see that?

21          A.    I do.

22          Q.    So is that talking about documentation

23    that the facility, the local jail facility should

24    have to be compliant with this?

25          A.    In this file, yes.  So when you go to
```

```
 1   this II-A-19 file that they have to keep, they
 2   should be able to go to that file and see the
 3   facility logs, so they can audit the logs and
 4   confirm that they're doing what they're supposed
 5   to be doing, yes.
 6        Q.   Yes.  Okay.  So if we can then turn back
 7   to page 16 and look at the provision -- the other
 8   provision that we've been looking at on these
 9   offender population management system.  I'm not
10   going to read this whole document again, but if
11   you'll just take a second and look at it and
12   confirm for me that the second part, which talks
13   about "the following shall be collected and
14   forwarded to the DPS&C preclass. coordinator,"
15   does not have a timeframe suggested the way that
16   the transfer section does?
17        A.   That's correct.
18        Q.   Okay.  And then also looking at the
19   documentation for the new -- for II-A-8 in the
20   2019 guidelines, it doesn't -- which is on the
21   next page, it does not look like there's a log
22   required of the local facility for that, for
23   the -- to show transmission to preclassification
24   of the proper paperwork?
25        A.   No.  It just says -- you're talking
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    about on the top of the next page?
 2         Q.   I am.
 3         A.   Where it says "completed forms, reports
 4    and offender record?"
 5         Q.   Yes, sir.
 6         A.   Yes.  So, I mean, that -- so it would be
 7    in the offender record, is where they would --
 8         Q.   They would look?
 9         A.   Yes.
10         Q.   Right.  Would it be helpful to have a
11    log for this process similar to the transfer?
12         A.   I think a log is not -- I mean, I think
13    you have to look at the actual documentation in
14    the file to confirm that it's being kept.
15         Q.   Sure.
16         A.   So I would think you have to go to the
17    file.
18         Q.   Ultimately, you would.
19         A.   Yes.
20         Q.   But having a log would be helpful, don't
21    you think, for your auditors to be able to
22    determine --
23         A.   You see, the logs are the actual
24    documents that they use to monitor the previous
25    guideline that we were looking at.  This is a
```

```
 1    little bit more -- I mean, you're not going to --
 2    if you start trying to -- I don't know what you
 3    would log.  What would you log?
 4         Q.   Well, how about the date on which the
 5    preclass. paperwork was --
 6         A.   Oh, yes.  If you're talking about dates,
 7    that's a different thing.
 8         Q.   Yes.
 9         A.   Yes, I got you on that.  I'm just
10    talking about the general, making sure that they
11    have what's in this -- that they have the master
12    prison form, the fingerprints, the one copy.  You
13    have to go to the file to make sure they have that
14    in the file.
15         Q.   Yes, I understand what you're saying.
16         A.   You had me thinking on that issue.  I
17    don't mind looking at doing something like that,
18    but I just have to -- I'll work with staff on --
19    we can do an amendment to this and require some
20    dates, timeline.
21         Q.   Yes.
22         A.   I don't mind trying to do that.
23         Q.   Okay.
24         A.   I'm going to have to listen to staff and
25    understand why if we can't, but, I mean, I can't
```

```
 1   imagine --
 2       Q.   Trust me, I don't have 5,000 employees,
 3   but I have ten, and I understand what you're
 4   saying.
 5       Okay.  I'm ready to move to my next section
 6   of questioning, which is specifically about the
 7   situation with respect to department of -- excuse
 8   me just one second.  So let me start over.
 9       I want to turn now to the specific issue of
10   DOC-sentenced prisoners from Orleans Parish who
11   were located at Riverbend in East Carroll Parish
12   in the 2016, 2017 timeframe.  And I understand,
13   Secretary, that people who reported to you and, in
14   some cases, people who reported to people who
15   reported to you were closer to this.  But I think
16   it is important for us to try to understand what
17   you knew and how it came to your attention.  So
18   that's the focus of my questions.
19       I want to start with what's been marked as
20   Exhibit 28.  And there's going to be a couple of
21   e-mails we'll go through here in the next couple
22   of minutes.  And as you may be familiar, when one
23   prints an e-mail, that generally prints the most
24   recent e-mail and goes in descending order from
25   there.  So you kind of have to read it back to
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   front to understand the chronology.  So that's
2   what I'm going to do.  So what I'm going to be
3   looking at -- and there are these very small
4   numbers that we call Bates numbers on these pages,
5   that kind of help us keep up with stuff.  And I'm
6   at the page number that says Crittindon 2042.
7        A.   Okay.
8        Q.   We'll be going over to the next page
9   from there.  But this is an e-mail from Monisa
10  Lentz -- I'm sorry, yes, it's an e-mail from Raven
11  Groom, actually, right, that was ultimately
12  forwarded to Monisa Lentz, copied to Barbara
13  McMullan, Malcolm Myer and Elizabeth Traylor.  And
14  the subject says, Jessie Crittindon.  So if we
15  could just take a couple of seconds and identify
16  these people, because some of them will come up
17  again, not all of them.  I'm going to ask about
18  specific folks.
19       So Monisa Lentz works in the office of the
20  deputy secretary?
21       A.   Correct.
22       Q.   And Barbara McMullan, do you know where
23  she works?
24       A.   Barbara McMullan, I don't think she's
25  still in the department.  She was probably at the

1    front desk, I think, at some point in time.

2         Q.    So the front desk would mean over in the

3    main building?

4         A.    Yes, in the building 1.

5         Q.    In building 1.  And when you say front

6    desk, that would be one of the people who answers

7    the telephones, or what does that mean exactly?

8         A.    Partially, yes.

9         Q.    And reception?

10        A.    Uh-huh -- correct.

11        Q.    Excellent.

12        A.    Sorry.

13        Q.    No, you did good.  And then Raven Groom

14   was an administrative coordinator in the office of

15   the secretary?

16        A.    Raven was -- I remember Raven as a

17   student worker, actually.  So I'm not sure -- I

18   think she moved to the front desk at some point in

19   time.  I think when she worked out of our office

20   with Angela Whitaker, she was a student worker,

21   and she ultimately end up coming onboard.  And I

22   think she went to the front desk, as I remember

23   it.

24        Q.    Yes, sir.  And so looking at the last

25   page, printed page here, which is Raven Groom's

1   original e-mail, it talks about "Tammie
2   Crittindon, the mother of the above-referenced
3   offender, called in regards to her son's time not
4   being calculated.  He's been in Riverbend since
5   July of 2014.  He was sentenced in August of 2016,
6   and she can't find him in CAJUN."  And then she --
7   which is that computer system we talked about, or
8   the data management system.  And then it gives the
9   mother's contact number.  Hold on to that just for
10  a second, because I want to also show you at the
11  same time Exhibit 27, which is from the very next
12  day.  We're looking at November 21 of 2016.
13       Now we're looking at November 22 of 2016.
14  And the very last page again, which is the
15  beginning of this e-mail, is from Barbara McMullan
16  to Ms. Lentz about Leon Burse, another one of our
17  clients.  And says, "Ms. Hargrove-Jones called
18  again about her son, the above-referenced
19  offender.  She states he was sentenced August 8,
20  2016, and has no DOC number or time calculated as
21  of yet.  She can be reached at," and then gives
22  the phone numbers.
23       Were you aware, or was it brought to your
24  attention that family members of at least two and
25  more -- or more offenders were calling about this

```
 1   same problem of their loved ones being sentenced
 2   in Orleans and being held up in Lake Providence,
 3   and months later still didn't have a DOC number or
 4   a time calculation?
 5        A.   No.  I mean, ultimately, I was informed,
 6   but I don't think I knew that -- I mean, I'm not
 7   aware of this.
 8        Q.   Yes, I understand.
 9        A.   But ultimately, I was informed -- I
10   don't remember exactly how -- that there was some
11   issues at East Carroll with Orleans Parish.
12        Q.   Okay.
13        A.   May have been Jonathan or someone like
14   that had told me about it.
15        Q.   Okay.  Would it raise concerns that 3 or
16   4 months later, 3 or 4 months after DOC-sentenced
17   prisoner had been sentenced, that something --
18   that for whatever reason, there was no DOC number
19   or time calculation for that person?
20        A.   Yes.  I mean, obviously, if they don't
21   have a DOC number, it's been 3 or 4 months.  But I
22   mean, again, these are e-mails.  I'm not sure
23   exactly -- you know, I'm not sure exactly what
24   transpired here.
25        Q.   That's right.  Right.
```

Secretary James LeBlanc   7/9/2019

1      A.   Yes.  If it's been 3 or 4 months, and

2   it's true, then there would be concern, that we

3   need to find out why we don't have a DOC number at

4   this point, yes.

5      Q.   Okay.  I'm going to hand you Exhibit 5.

6   And this is an e-mail from Laura Sevier, who I

7   will tell you is an employee of the East Carroll

8   Parish Sheriff's Office, who works -- actually, I

9   think she's the HR person at East Carroll, but

10  also does their preclassification -- not their --

11  their billing, sorry; not preclassification, does

12  their billing.  And she is writing in this e-mail

13  to Corey Amacker, who is with Orleans Parish, and

14  copying Glynn Stassi at the Department of

15  Corrections.  And here in October of 2016, do you

16  see where she's talking about them having a

17  Phillip Dominick in their facility who was,

18  "according to our records, OPP transferred him to

19  us on 9/13/2015, as a DOC offender.  CAJUN does

20  not show that he's been updated since 2014."  Do

21  you see where I'm reading?

22     A.   Yes.

23     Q.   Okay.  And there appears to be -- well,

24  this one page of the exhibit being sent to Orleans

25  Parish and also to the Department of Corrections,

```
 1   would I be correct in assuming that here in
 2   October of 2016, which was before the phonecalls
 3   we just looked at, at this point you personally
 4   didn't have knowledge of this problem?
 5        A.   No.
 6        Q.   Do you know who Glynn Stassi is?
 7        A.   Yes.
 8        Q.   Who is that person?
 9        A.   Glynn works for Malcolm Myer, the deputy
10   secretary.  I'm not sure exactly what all his
11   areas of responsibilities are.
12        Q.   Okay.  Possibly billing would be -- is
13   that under the deputy secretary?
14        A.   No.  That's under Thomas, our
15   undersecretary.  So I don't know why -- maybe
16   Glynn, somebody they knew -- Glynn does a lot on
17   CAJUN, does a lot of different things.  I'm not
18   sure exactly what all his areas of his
19   responsibility are.  It's pretty far down the
20   list, but I do know he works for Malcolm.  He
21   does -- I'm trying to think what Glynn does, but I
22   can't -- I don't know exactly what he does, but
23   he's involved in some of this.  But I don't know
24   why they would send Glynn a copy of this,
25   honestly.
```

```
 1          Q.   Okay.  I'm going to next hand you
 2    Exhibit 47.  And looking at the middle of the
 3    page, this is from Laura Sevier again in East
 4    Carroll to Angela Smith, who reports to Angela
 5    Griffin in the preclassification unit.  I don't
 6    know if you know Angela Smith.
 7          A.   No.
 8          Q.   Right.  But Angela Griffin we've talked
 9    about before?
10          A.   Yes.
11          Q.   And copying Mr. Stassi.  And in this
12    e-mail, Ms. Sevier is talking about, "on this
13    sheet is the original transfer date to Riverbend
14    and the DOC date that Corey Amacker provided to me
15    via e-mail."  I will skip that one sentence about
16    AFIS.  "Unfortunately, some slipped through the
17    cracks, either because OPP did not send us the
18    sentencing paperwork or they were overlooked by
19    us.  We have tried to go back and make sure we
20    have everyone from November forward.  You will see
21    that some of these offenders went DOC in prior
22    months, but are not updated in CAJUN yet."  Do you
23    see where I'm reading from?
24          A.   I do.
25          Q.   And then if you look at the attachment,
```

```
 1    the names have actually been redacted on the
 2    attachment, but there are a good number of names
 3    on this list.  Do you see that if we just look at
 4    the first page of this list, which has a
 5    handwritten 3 of 5 on the top of it, it has an
 6    offender above Eddie Copelin -- we'll talk about
 7    Mr. Copelin in a minute, but the person above
 8    Eddie Copelin has a DOC date of 6/28/2016.  Do you
 9    see where I'm looking at?  Point it to you --
10         A.    Above?
11         Q.    Yes.  Above Mr. Copelin, there's a
12    redacted piece.  The person above him is a white
13    male born in October of '74.
14         A.    Okay, I got it.
15         Q.    His transfer date is 6/10/2016, DOC date
16    6/28/2016.  Do you see that?
17         A.    I do.
18         Q.    Thank you.  And then the three names
19    that are showing are three of our clients in this
20    lawsuit, Mr. Copelin, Mr. Crittindon and
21    Mr. Dominick.  And you see that they all have what
22    I refer to as DOC dates:  In Mr. Copelin's case,
23    in October of 2016; in Mr. Crittindon's, August of
24    2016; and Mr. Dominick's in September of 2016.  Do
25    you see that?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A.    Yes.
 2        Q.    And looks to be about somewhere between
 3   50 or 60 names in that spreadsheet of people who,
 4   to use Ms. Sevier's terms, "fell through the
 5   cracks."  And then if you look at the very last
 6   page of this e-mail --
 7        A.    Okay.
 8        Q.    Got it?
 9        A.    Yes.
10        Q.    Where Ms. Smith, who again works --
11   she's retired now, but reported to Ms. Griffin,
12   wrote to Laura Sevier, of East Carroll, "good
13   morning.  Can you send me an updated list of
14   offenders who are housed with you from Orleans
15   Parish that are DOC without paperwork?"  Do you
16   see that?
17        A.    No, I don't.  Is this on the back page?
18        Q.    No.  It's on this -- yes, it's this
19   right here, I'm sorry.  It's on page 2336.
20        A.    All right.
21        Q.    So this Exhibit 47 would be an e-mail
22   Ms. Smith sent to Laura Sevier on December 8th, in
23   the morning, to which Ms. Sevier responded with
24   this list of 50 or so prisoners a little bit later
25   in the day.  Do you see that?
```

```
 1        A.    Yes.
 2        Q.    I guess would a number of 50 prisoners
 3   without DOC numbers in a particular parish, be
 4   East Carroll coming from a single other parish,
 5   Orleans, would that be the kind of information
 6   that would make its way to you?
 7        A.    This didn't make its way to me.
 8        Q.    That was going to be my next question.
 9        A.    No, it didn't.  This is the first time I
10   seen this.
11        Q.    But in terms of knowing -- because the
12   number is going to expand as we go briefly through
13   this month of December.
14        A.    Well, I think as soon as we knew we had
15   an issue here, that we started chasing the
16   paperwork.  I think we did what we had to do to
17   try to get the paperwork, because nobody had
18   notified us, as I understand it -- because I'm not
19   there.  I wasn't -- nobody had notified us that
20   they had been transferred to East Carroll.  And so
21   we had no idea they were up there until this sort
22   of information, I guess, started being exchanged.
23   And then we realized it.  And then that's when we,
24   looks like, it indicates to me that we're trying
25   to get the paperwork to process.
```

1      Q.    Right.

2      A.    So, I mean -- but, I mean, I think once

3   we knew we had a problem, we started dealing with

4   it.

5      Q.    Is this -- is this size of problem, just

6   at this point in early December 2016, with 50

7   prisoners, with what seems to be the same --

8   falling through the same crack, for lack of a

9   better word, is this a size of a problem that you

10  commonly get from parishes?

11     A.    No.  I think Orleans was being pressured

12  into reducing their prison population.  I mean,

13  that was -- they were being pressured by the city

14  to reduce their prison population.  And so -- I

15  mean, that's my opinion.  And I think it's what

16  was happening is, they needed to reduce their

17  prison population.

18     Q.    Okay.

19     A.    And that's what they -- they moved them.

20  They just moved them out.  And that way, the city

21  had to pay for them -- as I appreciate it, the

22  city then has to pay for them when they're housed

23  outside of Orleans Parish prison.  So they moved a

24  whole bunch.  This is not typical of what our

25  issues are.  This is an exception to the case,

```
 1    which this is a one-time thing that happened when
 2    they were being pressured by the jail monitors,
 3    the federal judge and everybody else to reduce
 4    their prison population in Orleans.  They didn't
 5    want to build any more beds.  They didn't want to
 6    spend any more money on capital investments in
 7    Orleans.  So they were being pressured.  And in my
 8    opinion, that's what they were doing.
 9         Q.   So was it your understanding that these
10    prisoners who were pretrial, housed in East
11    Carroll Parish after they were sentenced, those of
12    whom were convicted and sentenced, were then moved
13    over to the DOC part of that same East Carroll
14    Parish facility, or did you know that?
15         A.   No, I didn't know it when it happened.
16    I had no clue.  I mean, this was -- I don't know
17    what the timeframe was here, but, I mean, I don't
18    think any of us knew, that I'm aware of, that we
19    didn't know when it happened.  And then we started
20    getting these requests, I'm assuming, and started
21    inquiring.  And then this kind of stuff starts
22    coming about, that we have a group of -- from
23    Orleans that are at East Carroll that we weren't
24    aware of.
25                   (OFF-THE-RECORD DISCUSSION)
```



```
 1    EXAMINATION BY MR. CRAIG:
 2         Q.   I'm going to hand you Exhibit 35 -- I'm
 3    sorry, hold on to that.  We'll get back to it.
 4    But let me hand you Exhibit 36.  I think we'll
 5    move faster that way.  Exhibit 36 is a series of
 6    e-mails that starts with one from Corey Amacker of
 7    Orleans to Joseph Bordelon.  And then that's on
 8    12/16/2016.  And then from Joseph Bordelon to
 9    Kenedra Burton and Angela Smith at the Department
10    of Corrections.
11         In looking at Mr. Amacker's e-mail, the first
12    paragraph of it, he is telling Mr. Bordelon, who
13    works in the preclass. department, "I will send a
14    copy of the letter of credit and sentence to you
15    each week so we can try to manage the inmates we
16    are releasing to them.  It looks like they have
17    been interviewing and fingerprinting properly.
18    They are just failing to send the sentence, letter
19    of credit to you guys."  And then he says, "I'll
20    send them with the Orleans packets on Thursday
21    each week, and we'll just have them denoted as
22    Riverbend inmates."  And then I'll skip that one
23    sentence.  The last sentence says, "I am just
24    running into way too many inmates who are over
25    their full term date that we released to
```

1    Riverbend."  This is in the middle of December of

2    2016.

3         And I guess one question I have is:  If you

4    know, as between Orleans, which was the parish of

5    conviction, and East Carroll, who, as you stated,

6    was the facility that was receiving these

7    prisoners before trial and then having them,

8    quote, released to DOC to serve their DOC

9    sentence, which of those parishes is DOC looking

10   to, to receive the sentence and letter of credit?

11        Do I need to rephrase that?

12        A.   No.  I would think Orleans, where the

13   original sentence was.  That would be my -- again,

14   that's where I would think it would have to come

15   from.

16        Q.   Okay.

17        A.   The other question I would have in this

18   paragraph, if I may, is full term date.  Are they

19   over their full term date, or they're over their

20   discharge date?

21        Q.   Well, we haven't spoken with Mr. Amacker

22   yet.  What's the significance of that for you?

23        A.   Because most of these people are going

24   out on parole, and they're not full-terming.

25        Q.   I see.  So by full term --

```
 1        A.    Means that they're through with their
 2   sentence, and they're not going to be on parole.
 3        Q.    Okay.  And what if that meant release
 4   date?
 5        A.    Well, it's a little bit different.  I
 6   mean, when a person is, you know -- in other
 7   words, a person is still under his sentence.
 8        Q.    Yes.
 9        A.    That's the difference.  I mean, he's
10   still doing his time, whether he's on the street
11   or in the prison.
12        Q.    Right.
13        A.    He's sentenced to certain amount of
14   time, and part of it is parole.
15        Q.    Right.
16        A.    So I don't know if she handed you a note
17   there, and maybe she knows --
18        Q.    Yes, she does that.
19        So our five clients --
20        A.    All full termed?
21        Q.    No.  Our five clients had release dates.
22        A.    Okay.
23        Q.    And some of them had pled with time
24   served.
25        A.    Credit for time served.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

```
 1          Q.   And with the credit for time served
 2    would have been full term, yes.
 3          A.   Well, then, they were full term.
 4          Q.   So they were full term, if that was the
 5    situation?
 6          A.   Okay.  What was the question?
 7          Q.   Is that a greater concern that there
 8    were people who were being held beyond their full
 9    term date as opposed to their parole date?
10          A.   To me, it does, because I think somebody
11    is still -- I mean, it has some bearing on it,
12    but --
13          Q.   Explain.  I think I --
14          A.   Well, I'm just saying, they're still
15    under a sentence.
16          Q.   If they're not full term?
17          A.   Right.
18          Q.   But if they are full term, they're
19    completed with their sentence?
20          A.   Yes, that's right.
21          Q.   So that would be a larger concern?
22          A.   Yes.
23          Q.   Okay.  Now we can look at 35, which I
24    think is that one.  So these are excerpts from
25    Mr. Crittindon's file, which includes some of the
```

AmersonWhite®

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1   e-mails that we've looked at previously.

2          A.    Yes, I noticed that.  Okay.

3          Q.    Okay.  And I want you to look at the

4   page that is 2340, which looks like this, just so

5   you can kind of find it.  There you go.

6          A.    Okay.

7          Q.    And this is an e-mail from Mr. Amacker

8   to Joseph Bordelon, copied to other people at the

9   Department of Corrections, including Mr. Bordelon.

10  And he says, "just to give you-all a heads up of

11  what I'm looking at with this whole Riverbend

12  fiasco, I have found a total of about 100 inmates

13  so far who were supposedly pre-classed by them for

14  us.  None of them were update/calculated/worked in

15  CAJUN."  And then the middle of that next

16  paragraph, "I'm going to attach this list of what

17  I have so far to this e-mail, just to give you an

18  idea of what we are looking at.  Some of these

19  inmates have sentences of up to 100 years hard

20  labor, and others are most likely full term once

21  calculated."  Do you see where I'm reading from?

22         A.    Uh-huh (AFFIRMATIVE RESPONSE).

23         Q.    And then the next couple of pages after

24  that is a much longer list than the one that we

25  had looked at --

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1        A.    Yes.
 2        Q.    -- before, including three of our
 3   clients in this case, Mr. Guidry, Mr. Copelin and
 4   Mr. Crittindon.
 5             MR. CRAIG:  68?
 6             (EXHIBIT 68 MARKED FOR IDENTIFICATION)
 7   EXAMINATION BY MR. CRAIG:
 8        Q.    Handed you Exhibit 68, Mr. Secretary,
 9   which is a letter dated December 28th, 2016.  And
10   you are one of the people to whom it was
11   addressed, signed by Mrs. Washington, who is my
12   co-counsel seated to my right here.  Do you recall
13   receiving this letter?
14        A.    I mean, I'm sure I did.  I don't know
15   that I -- you know, I know I got it.  I assume,
16   yes.  Recall, meaning --
17        Q.    Like, do you remember -- as we sit here
18   today, do you remember getting --
19        A.    Yes.  I think this is probably one of
20   the things that got our attention that we had an
21   issue going on.
22        Q.    Okay.
23        A.    So, yes.
24        Q.    And when you say "that got our
25   attention," you're talking about your office and
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1    the people directly under you --
 2         A.   Yes.
 3         Q.   -- would that be correct?
 4         Because as we've seen, people in the
 5    preclass. department of the DOC and in -- and
 6    under Mr. Myer had been receiving information in
 7    October, November and earlier in December on this
 8    same problem, correct?
 9         A.   Correct.
10         Q.   And as of December 28, 2016, it was
11    clear that the problem had not been solved, and
12    there were still prisoners at Riverbend who were
13    entitled to their freedom; is that correct?
14         A.   Say that again.
15         Q.   That after staff in the preclass.
16    department in the Office of Adult Services had
17    been receiving information in October and November
18    and earlier in December, as of the end of the year
19    here December 28, 2016, there were still prisoners
20    being held who were entitled to be at liberty; is
21    that correct?
22         A.   I would assume that's correct.
23         Q.   Okay.  Would you agree with me that your
24    department and the sheriff's office involved
25    didn't move quickly enough to get these men the
```

```
 1   freedom that they were entitled to?
 2           MR. EVANS:  Object to form.
 3               You can answer.
 4           MR. BRYANT:  Object to the form here,
 5           too.
 6           THE WITNESS:  No, I wouldn't agree.
 7   EXAMINATION BY MR. CRAIG:
 8       Q.   Okay.  Why not?
 9       A.   Because I think we reacted when we got
10   notified to get the appropriate work to process
11   them out.  I mean, we couldn't do anything until
12   we had the appropriate paperwork to process them.
13   So I think we did everything we could within the
14   timeframe that we had to work with.  That's why.
15       Q.   Okay.  I think we agreed earlier that
16   this was kind of outlier situation that was rather
17   extreme.
18       A.   Uh-huh (AFFIRMATIVE RESPONSE).
19       Q.   I don't mean to mischaracterize your
20   testimony.
21       A.   No.  That's right.  I agree.  I didn't
22   say it wasn't extreme.
23       Q.   I agree.  Okay.
24       A.   But I don't think it's our fault.  I
25   don't think we neglected doing what we needed to
```

```
 1    do to get this worked out.
 2         Q.   Okay.  If there had been changes to the
 3    basic jail guidelines prior to this, requiring
 4    these sheriffs and local jails to provide you with
 5    timely notice and timely preclassification
 6    information, wouldn't that have prevented a
 7    problem of this size from happening?
 8              MR. EVANS:  Object to form.
 9                  You can answer.
10              THE WITNESS:  I'm not sure that it
11              would.  As I said before, they were
12              being pressured to reduce their
13              population.  And that probably overcame
14              any requirements of the basic jail
15              guidelines.  That's my opinion.
16    EXAMINATION BY MR. CRAIG:
17         Q.   Well, what about East Carroll, who were
18    holding these prisons and receiving payments?
19         A.   So the requirement would be on the
20    transferring institution, not on the receiving
21    institution.  That's the way I'm looking at it.
22    You know, if we did it on the receiving side,
23    maybe that would have made a difference.
24         Q.   Okay.  I'm handing you Exhibit 52, which
25    is an e-mail from Angela Griffin to Deputy
```

```
 1   Assistant Secretary Stagg, and Chief of Operations
 2   Smith, on January 5, 2017, with a series of
 3   attachments.  And some of the attachments are some
 4   of the same documents that we've seen before, and
 5   we've questioned Ms. Griffin about this already.
 6        My question for you is, really:  At the point
 7   at which this e-mail is being sent in early
 8   January to the chief of operations, would you have
 9   been involved -- would you personally -- do you
10   remember personally being involved in this problem
11   at this point?
12        A.   No.
13        Q.   Okay.  Did you have any occasions to
14   meet with Seth Smith in December or January about
15   the problem that was happening in East Carroll?
16        A.   I meet with Seth on many occasions, and
17   I would say that I probably did at some point, but
18   I don't remember any particular meeting in this
19   regard, but I'm sure we had some.
20        Q.   Okay.  Do you communicate with Mr. Smith
21   at all by e-mail or other communication that would
22   be documented?
23        A.   Do I communicate with Seth by e-mail?
24        Q.   Yes.  Sorry, that was an artless
25   question.  I'm going to ask it a different way.
```

```
 1          Do you have occasion to send e-mails and
 2   receive e-mails from Mr. Smith about problems that
 3   are occurring in the parts of the department that
 4   are under his supervision?
 5          A.   Sure.  Sure, we do.
 6          Q.   Have you or somebody under you conducted
 7   a search of your e-mails to see if there are
 8   e-mails either from or to you or on which you're
 9   copied about this situation at Riverbend?
10          A.   I think they -- I'm sure they did.  I
11   mean, if y'all requested it, I'm sure they did.
12          Q.   Okay.
13          A.   Can I comment on one of these
14   attachments here?
15          Q.   If you want to testify, you're welcome
16   to.  I may ask you a question about it.
17          A.   Well, you can.
18          Q.   Thank you.
19          A.   And that's okay.  When I read this, it
20   says not sure how many pretrial offenders are
21   housed at Riverbend.  So that, to me, that creates
22   more problems.  How many are pretrial and how many
23   are DOC, you know?  Then you start having to wade
24   through this to figure out who's the pretrial and
25   who's DOC.
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        Q.    Correct.
 2        A.    Especially if you don't have assigned
 3   numbers and no paperwork is being submitted.  You
 4   got people up there that are pretrial.  You got
 5   people that are DOC.  To me, my comment is, that
 6   complicates things when you send pretrials and
 7   DOCs all at the same time, if they're not all
 8   DOCs.  And that indicates they aren't.
 9        Q.    Yes.
10        A.    So, to me, that makes things more
11   complicated.  If they house pretrials, we have
12   no -- that has nothing to do with DOC at all,
13   period.
14        Q.    Right.
15        A.    So that just --
16        Q.    Because they haven't been convicted?
17        A.    No, but they're mixed in.  The list
18   probably includes pretrials in some cases.
19        Q.    I don't think --
20        A.    I'm not talking about this attachment,
21   but I'm talking about lists that we were getting,
22   possibly, you know, that they had pretrials up
23   there along with DOCs.  So, I mean, my point is
24   that just, to me, it makes things more complicated
25   in trying to figure out who's who, that's all.
```

```
 1              MR. CRAIG:  69.
 2              (EXHIBIT 69 MARKED FOR IDENTIFICATION)
 3    EXAMINATION BY MR. CRAIG:
 4         Q.   Exhibit 69, the first page of it has
 5    your signature.
 6         A.   Uh-huh (AFFIRMATIVE RESPONSE).
 7         Q.   I'm not really asking do you recall this
 8    specific document, but do you recognize the form
 9    of this document?
10         A.   Yes.
11         Q.   What is it?
12         A.   This is a monitoring report, monitors
13    when they go out and visit facilities.
14         Q.   You're talking about the monitors --
15         A.   Basic jail guideline monitors.
16         Q.   Right.  And those basic jail guideline
17    monitors are working on behalf of the Department
18    of Corrections, correct?
19         A.   Correct.
20         Q.   And this particular one is dated
21    October 25, 2017, or at least the memorandum from
22    you to the sheriff is, and it's to Sheriff
23    Williams at East Carroll, correct?
24         A.   Correct.
25         Q.   Is this the form that you would expect
```



1  to see from a full audit of a facility like

2  Riverbend?

3      A.   Yes.

4      Q.   I want to direct your attention to page

5  3 of the actual report, monitoring report.  And on

6  page 3, there's a report on guideline II-A-8.  Do

7  you see that?

8      A.   Yes.

9      Q.   And it says, "offender population

10  management system compliant.  If an offender is

11  transferred to another facility, all records are

12  transferred with the offender."  Do you see that?

13      A.   Yes.

14      Q.   So, Mr. Secretary, this particular audit

15  was in October of 2017, after all of the events

16  that had transpired in late 2016 and early 2017,

17  related to problems with preclassification and

18  transfer of paperwork.  And I'm trying to

19  understand how it's possible that East Carroll is

20  being told that they're complaint with this

21  section of the basic jail guidelines.  Can you

22  help me with that?

23      A.   I think you would have to ask the

24  monitoring team that question, but I would say

25  these are ones transferred out, not in.



```
 1        Q.    Okay.
 2        A.    When they transferred to another
 3  facility, not transferred in to their facility.
 4  If an offender is transferred to another facility,
 5  which means they're going out, not coming in.
 6        Q.    I see.
 7        A.    I assume that's what that is.
 8        Q.    But when this team is looking at East
 9  Carroll for compliance with the other provisions
10  II-A-8 and II-A-9 of the basic jail guidelines,
11  wouldn't there be some notation here that there
12  was a major problem at this facility in the
13  previous year?
14            MR. BRYANT:  Object to the form of the
15            question.
16            MR. CRAIG:  Thank you.
17            THE WITNESS:  I'm not sure what -- does
18            the guideline refer to transfer in?
19  EXAMINATION BY MR. CRAIG:
20        Q.    These are the two guidelines that we
21  were just looking at.
22        A.    Yes.
23        Q.    The one had to do with -- that II-A-8
24  had to do with the documents that the facilities
25  are required to have.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    A.   Didn't have anything to do with

2   transfers.  It had documentation they need to

3   maintain in their filing when they transfer

4   someone -- what they need to include when they

5   transfer them out.

6    Q.   Okay.

7    A.   That's what that says.

8    Q.   When you say "that," you're talking

9   about the basic --

10    A.   Yes.  II-A-08, that's what it says.  It

11   shall be collected and forwarded to DPS preclass.

12   coordinator.  The other is what they need to

13   maintain in their file.  So, I mean, I don't know

14   why they would -- I mean, if they knew it was

15   going on, I would think they would put it in

16   there.  These guys may not have even known that

17   all this was going on when they went to that

18   facility.  I'm assuming they didn't.

19    Q.   Is there any part of -- is there a file

20   on basic jail guidelines compliance for each of

21   the 100 or so parish jails?

22    A.   Yes.

23    Q.   In the file for Riverbend Detention

24   Center, would you expect to find documentation of

25   the problems that we saw in these previous e-mails



1    that the last half an hour or so we've been
2    talking about?  Would there be a notation in that
3    file that there was a major problem here?
4         A.   It may be in headquarter's file, but not
5    in -- I mean, most of this was being done at
6    headquarters.  I don't know that it would be in
7    their file at the prison.  I don't think.
8         Q.   No.  I'm asking about the basic jail --
9    is there a file at headquarters documenting
10   compliance or issues with the basic jail
11   guidelines?
12        A.   These are in their file, these reports.
13        Q.   Yes, sir.  Then would there be other
14   things in the report like these e-mails?
15        A.   Could be, but somebody would have to
16   send it to the file.
17        Q.   I see.
18        A.   It does not -- if there's a not a CC to
19   the file in any of those documents, it's probably
20   not in the file.  I'll send something to a file if
21   I get a letter or something that I think needs to
22   be in the basic jail guideline file.  I'll send it
23   to Angela Tauzin and say, file it in.  Sometimes I
24   do news presses, you know, I'll send it to the
25   file.  But outside of that, I'm not sure if

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1    anybody else is sending all these e-mails and
2    stuff that you're talking about, whether they're
3    going to the file or not.  You have to ask them.
4         Q.   Okay.  Is Tauzin, T-A-U-Z-I-N?
5         A.   Right.
6         Q.   And would Orleans Parish also be audited
7    on some semi-regular basis for compliance with the
8    basic jail guidelines?
9         A.   Yes, they would.
10        Q.   And so how -- well, hold that thought.
11             MR. CRAIG:  I want to first give you
12             Exhibit 70.
13             (EXHIBIT 70 MARKED FOR IDENTIFICATION)
14   EXAMINATION BY MR. CRAIG:
15        Q.   Exhibit 70 is -- the first part is a
16   memorandum with your signature from September 21,
17   2016, also to Sheriff Williams of East Carroll
18   Parish.  And this is called basic jail guidelines
19   monitoring report.  Is this the kind of document
20   you're familiar with, generally?
21        A.   Uh-huh (AFFIRMATIVE RESPONSE).
22        It's a year earlier, right?
23        Q.   It is a year earlier.  Is this a
24   different kind of monitoring report or audit, or
25   is it the same kind?
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1      A.    It's basically the same, yes.

2      Q.    I see.  So are these facilities audited

3  on a yearly basis?

4      A.    Yes.

5      Q.    So if the basic jail guidelines required

6  a timeframe for notification of transfers, if they

7  had in 2016, as they do now in 2019, would the

8  auditors in 2016 have looked for that, looked for

9  the logs of transfer information when they went to

10  East Carroll?

11      A.    I would assume they would.  You know,

12  the other problem with that is, they're dependent

13  on the clerk of court for the minutes, too.  So

14  when they start putting timeframes on them, and

15  they don't have the appropriate paperwork to send

16  to us, what do they do then, if the clerk of court

17  or the judge hadn't sent them the information they

18  need to process?  So you have another problem.  If

19  I require them 10 days, do I need to require the

20  judges to send their paperwork in by a certain

21  amount of time?

22      Q.    You could ask the Supreme Court to

23  include that in the requirements for the uniform

24  commitment order; could you not?

25      A.    Now, you know better than I do that

ain't going to never happen.

Q.   Well, you were able to get the Supreme
Court to create the uniform commitment order,
correct?

A.   I was, that the judges won't use.

Q.   But if the auditors had been looking --
if because the guidelines required them to, the
auditors had been looking for compliance with
timely notification of sentencing through the
preclassification paperwork and transfer through
the transfer requests in 2016, they could have
found this problem before 100 prisoners' names
ended up on a list in Mr. Smith's office, correct?

MR. EVANS:  Object to form.

You can answer.

THE WITNESS:  I'm not sure that's
correct, no.

EXAMINATION BY MR. CRAIG:

Q.   How come?

A.   I just don't think it is.  I mean --

Q.   I appreciate that, but what's the
reason?

A.   -- if we anticipate all the answers to
all of our problems, there wouldn't be any
problems.


AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        Q.    Right.
 2        A.    So, I mean, I'm not sure they would have
 3   looked at that standard.  They may not have.
 4        Q.    What do you mean?
 5        A.    They don't look at every -- as I
 6   mentioned earlier, they don't look at every
 7   standard.  They don't look at every standard, all
 8   100 something of them every time they go.  We're
 9   limited resource-wise when we go into these
10   facilities.  So I'm not sure they would have
11   looked at it at that point in time.  Just to say
12   that if we would have had this, it would have
13   fixed all our problems, I think that's unfair.
14        Q.    At the same time, you knew as early as
15   2012, that there were a couple of thousand
16   prisoners who were immediate releases?
17        A.    I did.  And you know that everything in
18   those recommendations we've done.
19        Q.    That's right.
20        A.    So we've taken action.  And I'm doing
21   everything I can within the power of this
22   department to fix the problem.  I haven't quit.
23        Q.    I appreciate that.
24        A.    I'm just telling you.
25        Q.    Okay.  But you, on behalf of the
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    department, you don't take responsibility for, in

 2    our case, these five men who were deprived of

 3    their freedom without reason?

 4              MR. EVANS:  Object to form.

 5                    You can answer.

 6              THE WITNESS:  I take part of the

 7              responsibility, but I don't know that

 8              all that is on us.  You know, I'm

 9              sitting here deposing.  Why aren't the

10              sheriffs sitting here deposing?  Why

11              aren't the judges sitting here deposing?

12              Why don't you have the Supreme Court

13              involved?  Why aren't they part of this?

14              Why am I the only person that's

15              responsible?  I know you ask the

16              questions, but, you know, I wonder that.

17              Why has this department been singled

18              out, sued over something that there are

19              other parties involved?  Maybe we're

20              easy prey.

21    EXAMINATION BY MR. CRAIG:

22         Q.   What do you mean?

23         A.   Well, you know, suing the DAs or the

24    judges or the clerk of courts is not an easy task.

25         Q.   All right.  But you did say that you
```

```
 1    thought the department bore partial
 2    responsibility?
 3         A.   I think if -- I don't know the
 4    particulars of these cases and what happened.  I
 5    know that if they were immediate releases because
 6    the day the judge sentenced them, they were
 7    immediately eligible for release, that's not our
 8    problem; or if they earned good time, and they
 9    were eligible for early release, that's not my
10    problem.  We didn't have the paperwork.  That's
11    not my problem.  But if we miscalculated or if we
12    had the paperwork, and we didn't do it in a timely
13    fashion, then I'm responsible.
14         Q.   And if your staff knew that there was a
15    problem and didn't move quickly enough to resolve
16    it, that would also be your problem, wouldn't it?
17         A.    If they didn't move quickly enough.  But
18    nothing I've seen anywhere in all of this
19    indicated that we weren't trying to move as fast
20    as we could to resolve the problem.
21         Q.   When did you first hear about this
22    particular lawsuit?
23         A.   Oh, I don't know the date.
24         Q.   Okay.
25         A.   I mean, I guess since I've been
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    scheduled for these depositions.
 2         Q.    Okay.  During the time that after which
 3    the department was sued in this matter, have you
 4    had occasion to have conversations with Mr. Smith
 5    or Mr. Stagg about the case?
 6         A.    Not that I remember, no.
 7         Q.    Okay.  And other than counsel, as I
 8    indicated before, do you recall talking to anybody
 9    else within the DOC about this particular case?
10         A.    No.
11         Q.    Okay.  And similarly, have you had any
12    occasion to talk to either of the sheriffs
13    involved about the over-detention problem that's
14    indicated in the e-mails and the testimony that
15    we've talked about today?
16         A.    Not in regards to what we talked about
17    today, no.  I mean, I talked to them, as you know,
18    and I've talked about -- we had meetings in
19    regards to the problems.  But other than that, no.
20         Q.    Okay.  Have Sheriff Williams and Sheriff
21    Gusman participated in those meetings, or do you
22    know?
23         A.    No.
24         Q.    Do you know if anybody from either East
25    Carroll Parish Sheriff's Office or Orleans Parish
```

```
 1    has participated so far?
 2         A.   No.  I had the executive director of the
 3    sheriff's association.
 4         Q.   I see.  And remind me who that is.
 5         A.   Mike Ranatza.
 6         Q.   Oh, yes, Mr. Ranatza.  Okay.
 7              MR. CRAIG:  Let's take a brief break.
 8              We're close to wrapping up here.
 9              (RECESS 12:21-12:26 P.M.)
10    EXAMINATION BY MR. CRAIG:
11         Q.   Mr. Secretary, can you think of anything
12    that any -- I'm thinking here specifically of
13    either the Department of Corrections, the sheriff
14    of Orleans and the sheriff of East Carroll Parish.
15    Those are the three groups that have been sued in
16    this case.  Can you think of anything that any of
17    those parties could have done that would have
18    prevented the situation with over 100 prisoners
19    not having their time calculated, if we credit the
20    e-mails that we've been looking at today?
21         A.   I mean, very simply, I think if we would
22    have -- before shipping anybody out, if we would
23    have had the paperwork done and had, you know,
24    what we needed, the documentation, that maybe that
25    could have avoided the situation.  I don't know
```

```
 1    that that's the answer.  But as any of this is
 2    involved, it's the paperwork normally that we're
 3    chasing, to try to -- I mean, I get criticized for
 4    letting people out too early.  We didn't check a
 5    detainer that he had.  So now I'm on both ends of
 6    the spectrum here.  I'm trying to get people out
 7    of prison.  I'm not trying to hold them longer
 8    than they should be.  I mean, that's what I'm
 9    about.  So I think this was maybe moving that many
10    inmates at one time is probably something that we
11    don't need to get in the business of without
12    knowing, you know, that the paperwork is available
13    and ready to process.  That, to me, is the
14    foundation of it all.
15         Q.   And that would be primarily then the
16    sending facility, Orleans Parish; is that correct?
17         A.   That's the way I look at it, yes.
18         Q.   Is there anything you can think of that
19    East Carroll could have done differently?
20         A.   Not taking them without the paperwork.
21    I mean, they could have done that.  If they didn't
22    have the paperwork, I don't know that I would want
23    a lot of people spending time in my prison if I
24    didn't have the appropriate paperwork to know who
25    they are and why they're there, you know.
```

1      Q.   As we sit here today, does DOC know the
2    names and locations of all inmates serving a
3    sentence of imprisonment with the DOC?
4      A.   Do we know all the names and locations?
5      Q.   Yes.
6      A.   I think 99.9 percent of it we probably
7    do.  There may have been somebody that got
8    emergency transferred last night because of
9    medical reasons or court order reasons or
10   disciplinary or fight, or anything like that,
11   breaks out where they got to separate somebody.
12   They have the authority to move them without
13   notification until the next day.  So there's
14   probably some of that, that we may not have been
15   notified by now.  But I would hope that this has
16   got them in the position that they need to let us
17   know in advance of transferring anybody.
18     Q.   This, you're referring to Exhibit 67,
19   the new version of the jail guidelines?
20     A.   Right.  I'm sorry.
21     Q.   That's okay.
22     Does DOC know, on any given day, the names
23   and locations of all prisoners who were sentenced
24   to imprisonment within that day or even that week?
25     A.   No, I would think not.  I mean, that

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    just takes time for us to know when they're
 2    sentenced, if that's what you're asking.
 3          Q.   It is what I'm asking.
 4          A.   Yes.  I mean, God knows how many people
 5    today that were sentenced in court that we're not
 6    aware of yet.  So there's going to be that
 7    transition of time notifications that takes place.
 8          Q.   Yes.  Whether you know about -- whether
 9    DOC knows that a particular person was sentenced
10    to DOC time today or yesterday, at the point at
11    which that person is sentenced, they are committed
12    to the Department of Corrections; is that correct?
13          A.   That's correct.
14          Q.   And in your view, has DOC done
15    everything that it can to ensure it's aware of the
16    identity and location of newly sentenced prisoners
17    as soon as possible?
18          A.   I think we have, with the resources that
19    we have, yes.
20               MR. CRAIG:  So that's all the questions
21               I have for you.  The way this works, you
22               may know, is that counsel for the
23               department is permitted to follow up.
24               Also, we have the lawyers for the two
25               sheriffs of Orleans and East Carroll
```

Secretary James LeBlanc  7/9/2019

```
1              Parish also on the phone, because
2              they're also Defendants in this case.
3              They may or may not have questions.  So
4              my job at this point is to tender you to
5              Counsel for the department.
6              MR. EVANS:  Shane, you have any
7              questions?
8              MR. BRYANT:  I don't have any questions.
9              Thank you, Secretary LeBlanc.
10             THE WITNESS:  You're welcome.
11             MR. EVANS:  Pete, you there, you have
12             any questions?
13             MR. MATTHEWS:  No questions.
14             MR. EVANS:  I actually have no
15             questions.
16             MR. CRAIG:  That means that you're done.
17             Thank you so much for your time.
18             (DEPOSITION CONCLUDED AT 12:32 P.M.)
19
20
21
22
23
24
25
```

1                       WITNESS' CERTIFICATE

2

3

4        I, SECRETARY JAMES LEBLANC, read or have had

5    the foregoing testimony read to me and hereby

6    certify that it is a true and correct transcription

7    of my testimony, with the exception of any attached

8    corrections or changes.

9

10

11

12

13

14        _____            _____

15    DATE SIGNED                SECRETARY JAMES LEBLANC

16

17

18

19    INITIAL ONE:

20

21        _____ Read with no corrections.

22

23        _____ Read and correction sheet attached.

24

25    DATE TAKEN:  JULY 9, 2019



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              REPORTER'S CERTIFICATE
 2         This certification is valid only for a
 3    transcript accompanied by my original signature
 4    and original seal on this page.
 5         I, ANNA C. COATES, CCR, RPR, do hereby
 6    certify that SECRETARY JAMES LEBLANC, to whom the
 7    oath was administered, after having been duly
 8    sworn by me upon authority of R.S. 37:2554, did
 9    testify as herein above set forth in the foregoing
10    146 pages; that this testimony was reported by me
11    in the stenotype reporting method, was prepared
12    and transcribed by me and is a true and correct
13    transcript to the best of my ability; that the
14    transcript has been prepared in compliance with
15    transcript format guidelines required by rules of
16    the board; that I have acted in compliance with
17    the prohibition on contractual relationships, as
18    defined by Louisiana Code of Civil Procedure
19    Article 1434 and in rules and advisory opinions of
20    the board; that I am not related to counsel or the
21    parties hereto, nor am I otherwise interested in
22    the outcome of this matter.
23    _____          _____
24    DATE                ANNA COATES, CCR, RPR
25                        LOUISIANA CCR NO. 97018
```

