Transcript of the Testimony of

# LAURA SEVIER

June 24, 2019

JESSIE CRITTINDON, ET AL v. MARLIN GUSMAN, ET AL





P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404

**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**

office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA


JESSIE CRITTINDON, et        CASE NO.
al.,                         3:17-cv-00512-SDD-EWD
    Plaintiffs,
v.
MARLIN GUSMAN, et al.,
    Defendants.


c/w


EDDIE COPELIN, et al.,       CASE NO.
    Plaintiffs,              3:17-cv-00602-SDD-EWD
v.
MARLIN GUSMAN, et al.,
    Defendants.




        DEPOSITION OF LAURA SEVIER, taken at the
RIVERBEND DETENTION CENTER, 9450 US 65 SOUTH,
LAKE PROVIDENCE, LOUISIANA 71254, in the
above-entitled cause on the 24th of June, 2019,
commencing at 9:41 a.m.


REPORTED BY:CHERIE' E. WHITE
            CCR (LA), CSR (TX), CSR (MS), RPR
            CERTIFIED COURT REPORTER



866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Case 3:17-cv-00512-SDD-EWD    Document 111-29   08/16/19   Page 3 of 164

```
 1   APPEARANCES:

 2

 3   ATTORNEYS REPRESENTING THE PLAINTIFFS, JESSIE

 4   CRITTINDON AND EDDIE COPELIN, ET AL::

 5

 6   RODERICK & SOLANGE MACARTHUR JUSTICE CENTER

 7   4400 South Carrollton Avenue

 8   New Orleans, Louisiana  70119

 9   Phone: (504) 620-2259

10

11   (BY: Emily Washington, Esquire)

12   E-mail: emily.washington@macarthurjustice.org

13

14

15   ATTORNEYS REPRESENTING THE DEFENDANTS, EAST

16   CARROLL PARISH SHERIFF'S OFFICE:

17

18   USRY & WEEKS, PLC

19   1615 Poydras Street, Suite 1250

20   New Orleans, Louisiana  70112

21   Phone: (504) 592-4600 |Fax: (504) 592-4641

22

23   (BY: Ronald Shane Bryant, Esquire)

24   E-mail: sbryant@usryweeks.com

25
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   APPEARANCES CONTINUED:

 2

 3   ATTORNEYS REPRESENTING THE DEFENDANT, ORLEANS

 4   PARISH SHERIFF'S OFFICE:

 5

 6        RODRIGUE & ARCURI LAW GROUP

 7        201 St. Charles Avenue, Suite 114-412

 8        New Orleans, Louisiana  70170

 9        Phone: (504) 249-6990

10

11        (BY: Pete Matthews, Esquire)

12        E-mail: pm@rodriguearcuri.com

13

14

15   ATTORNEYS REPRESENTING THE DEFENDANT, STATE OF

16   LOUISIANA, LOUISIANA DEPARTMENT OF JUSTICE:

17

18        LOUISIANA DEPARTMENT OF JUSTICE

19        1885 N. Third Street, Floor 4

20        Baton Rouge, Louisiana 70802

21        Phone: (225) 326-6085 |Fax: (225) 326-6099

22

23        (BY: James "Gary" Evans, Esquire)

24        E-mail: evansj@ag.louisiana.gov

25
```

1          E X A M I N A T I O N   I N D E X

2

3    BY:                                          PAGE

4

5     Ms. Washington                               7

6

7               E X H I B I T S

8

9    NO.   DESCRIPTION                            PAGE

10

11    1     East Carroll Parish Sheriff's          21
12          Office Defendant Answers to
13          Interrogatories

14    2     Records Regarding 5 Plaintiffs         28

15    3     11/1/16 CEAs or MOUs                    35

16    4     3/1/17 CEAs or MOUs                     35

17    5     10/11/16 E-mail                         44

18    6     Jessie Crittindon Inmate File          55

19    7     Policy & Procedure for Booking         65
20          and Classification and Release
21          of Offenders

22    8     OPSO In Globo Documents for Mr.        111
23          Crittindon and Mr. Copelin

24    9     Billing between ECP & DOC, July        128
25          2016



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              E X H I B I T S

 2

 3    NO.    DESCRIPTION                          PAGE

 4

 5    10     Billing between ECP & DOC,           128

 6           August 2016

 7    11     Billing between ECP & DOC,           128

 8           September 2016

 9    12     Billing between ECP & DOC,           128

10           October 2016

11    13     Billing between ECP & DOC,           128

12           November 2016

13    14     Billing between ECP & DOC,           128

14           December 2016

15    15     Billing between ECP & DOC,           128

16           January 2017

17    16     Supplemental Billing                133

18    17     Records printed 4/2019 for          140

19           Litigation

20    18     Compilation of E-mails              143

21

22

23

24

25
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Case 3:17-cv-00512-SDD-EWD    Document 111-29   06/16/19   Page 7 of 164

```
 1              S T I P U L A T I O N

 2

 3          IT IS HEREBY STIPULATED AND AGREED by and

 4     between counsel for the parties hereto that the

 5     deposition of the aforementioned witness is

 6     hereby being taken under the Louisiana Code of

 7     Civil Procedure, Article 1421, et seq., for all

 8     purposes, in accordance with law;

 9          That the formalities of reading and signing

10     are specifically NOT waived;

11          That the formalities of sealing,

12     certification and filing are specifically waived;

13          That all objections, save those as to form

14     of the question and the responsiveness of the

15     answer, are hereby reserved until such time as

16     this deposition, or any part thereof, may be used

17     or sought to be used in evidence.

18                *   *   *   *

19          CHERIE E. WHITE, Certified Court Reporter,

20     in and for the Parish of Orleans, State of

21     Louisiana, officiated in administering the oath.

22

23

24

25
```



SEVIER, LAURA 6/21/2019

1                    LAURA SEVIER,
2     after first having been duly sworn by the
3     above-mentioned court reporter did testify as
4     follows:
5     EXAMINATION BY MS. WASHINGTON:
6              Q.    Good morning.
7              A.    Good morning.
8              Q.    Would you mind introducing yourself
9     for the record?
10             A.    My name is Laura Sevier.
11             Q.    My name is Emily Washington.  I am
12    counsel for the five named plaintiffs in this
13    lawsuit, which is Crittindon versus Gusman.  We
14    have counsel for the East Carroll defendants here
15    present in the room and then counsel for the
16    Department of Corrections defendants on the phone
17    as well as counsel for Sheriff Gusman in Orleans
18    and Corey Amacker in Orleans as well on the
19    phone.  Have you been deposed previously?
20             A.    No.
21             Q.    Okay.  So I like to start by just
22    going over some sort of basic ground rules so we
23    are all on the same page about what's going to go
24    on for the next couple of hours.
25                   There's a court reporter sitting at

SOVIERE LAURA 6/24/2019

```
 1    the end of the table here.  She is taking down
 2    everything that we say during the deposition, so
 3    I just ask that you speak up, make audible
 4    answers, yeses and nos rather than nodding of the
 5    head just to make for a clean record.  Does that
 6    sound fair?
 7              A.    Yes.
 8              Q.    The oath that you just took is the
 9    same oath as if you were in court so we are just
10    looking for your full and truthful answers today.
11              Basically, I am interested in
12    finding out everything that you might know about
13    the facts and claims that underlie this lawsuit,
14    so if at any time during the course of
15    questioning today you remember something that we
16    talked about earlier and you want to supplement
17    the record, we can always do that, just let me
18    know.
19              If at some point I ask a question
20    that is unclear or complicated or confusing and
21    you don't understand what I'm asking you, please
22    let me know.  I'm happy to try to rephrase the
23    question or to break it up into multiple parts,
24    but I can't do that unless I know that it's
25    confusing to you.  Does that make sense?
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.640.0799

1       A.      Yes.

2       Q.      Okay.  So if you don't ask for

3   clarification, I will assume that you understand

4   my question and that that's the question that you

5   were answering.  Fair enough?

6       A.      Yes.

7       Q.      If at any point today you want to

8   take a break, I am happy to do so.  Just let me

9   know.  All I ask is that if I have a question

10  kind of out on the table, that you give me your

11  answer and we sort of finish up that question

12  before we go and take a break.

13      A.      Okay.

14      Q.      Lastly, is there anything,

15  medication, sleep deprivation, any other kind of

16  hardship that would prevent you from giving

17  accurate and truthful information today?

18      A.      No.

19      Q.      Okay.  Let's get started then.  Very

20  briefly, I'm hoping we can go through a little

21  bit of your education and work history just so I

22  have some background about who you are.  Did you

23  attend high school?

24      A.      Yes.

25      Q.      Where was that?

```
 1          A.     Briarfield Academy in Lake
 2   Providence.
 3          Q.     And what year did you graduate in?
 4          A.     1980.
 5          Q.     Okay.  Did you attend college?
 6          A.     One year.
 7          Q.     Which school was that at?
 8          A.     Louisiana Tech.
 9          Q.     Have you attended any other kind of,
10   you know, vocational or professional training at
11   all?
12          A.     No.
13          Q.     Okay.  And you are currently
14   employed by the East Carroll Parish Sheriff's
15   Office?
16          A.     Yes.
17          Q.     What is your current job title?
18          A.     I am HR and administrative
19   assistant.
20          Q.     How long have you been in that
21   position?
22          A.     Basically 24 years.
23          Q.     Is that how long you've been
24   employed by the sheriff's office?
25          A.     Yes.
```

```
 1          Q.    Okay.  Can you do the math for me?
 2    What year were you first hired in?
 3          A.    April 17th, 1995.
 4          Q.    Okay.  Thank you.  Have you held any
 5    other positions while you have been with the
 6    sheriff's office?
 7          A.    No.
 8          Q.    Okay.  Have you been employed with
 9    any other law enforcement agency?
10          A.    No.
11          Q.    Very generally speaking, prior to
12    joining the sheriff's office in '95, what other
13    forms of employment, if any, did you have?
14          A.    I worked as a legal secretary for a
15    local law firm, and I also worked as a
16    receptionist/billing clerk for a local -- two
17    local physicians.
18          Q.    Okay.  The law firm that you worked
19    with, what kind of law did they practice?
20          A.    Mostly corporate.
21          Q.    Okay.  Okay.  So you mentioned that
22    your current and past job with the sheriff's
23    office is HR and as an administrative assistant,
24    correct?
25          A.    Yes.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1            Q.     Who did you report to in that
 2     position?
 3            A.     The warden.
 4            Q.     Okay.  And who is that?
 5            A.     Warden Johnny Hedgemon.
 6            Q.     Okay.  Is there anyone else other
 7     than Warden Hedgemon who supervises you?
 8            A.     Indirectly, Sandra Campbell at the
 9     sheriff's office.
10            Q.     And what is her job?
11            A.     She is the sheriff's administrative
12     assistant.
13            Q.     Okay.  So she works directly for
14     Sheriff Williams?
15            A.     Yes.
16            Q.     Okay.  Is there anyone else other
17     than Warden Hedgemon and indirectly to
18     Ms. Campbell that you report to?
19            A.     Warden -- Assistant Warden Knight.
20            Q.     Okay.  Can you explain to me a
21     little bit the structure of Warden Hedgemon and
22     Warden Knight?  You just mentioned that Warden
23     Knight is the assistant warden; is that correct?
24            A.     Yes.
25            Q.     Okay.  Can you just kind of outline
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1       the organizational structure for me?  Does Warden

2       Knight report to Warden Hedgemon?

3              A.     They work together.

4              Q.     Okay.

5              A.     Warden Hedgemon is more employee and

6       Warden Knight is more corrections, but they work

7       together.

8              Q.     Okay.  And both Warden Hedgemon and

9       Warden Knight ultimately report to Sheriff

10      Williams --

11             A.     Yes.

12             Q.     -- is that correct?  Okay.  So you

13      mentioned that Warden Hedgemon deals more with

14      the employee perhaps administrative side?

15             A.     Uh-huh (affirmatively).

16             Q.     And Warden Knight deals more with

17      the correctional side; is that correct?

18             A.     Yes.

19             Q.     Okay.  Is it your understanding that

20      they are both responsible for the housing of

21      prisoners here at Riverbend?

22             A.     Yes.

23             Q.     Okay.  And both Warden Hedgemon and

24      Warden Knight would be responsible for releasing

25      prisoners from the facility?

SOPHIE LAURA   6/24/2019

1      A.    Yes.

2      Q.    Okay.  Are Warden Hedgemon and

3  Warden Knight also responsible for administering

4  the policies and practices of the detention

5  center?

6      A.    Yes.

7      Q.    And are Warden Hedgemon and Warden

8  Knight responsible for supervising all of the

9  employees of the detention center?

10     A.    Yes.

11     Q.    Am I correct in understanding that

12  the detention center is part of the East Carroll

13  Parish Sheriff's Office?

14     A.    Yes.

15     Q.    And so ultimately everyone who is

16  employed here at the detention center reports up

17  to Sheriff Williams, correct?

18     A.    Yes.

19     Q.    Are there East Carroll Parish

20  Sheriff Office employees that you supervise?

21     A.    No.

22     Q.    Are there any other employees who

23  work in HR with you?

24     A.    Not in HR.

25     Q.    Okay.  How about in your role as the

1    administrative assistant?

2         A.    There are three other ladies that

3    work in my office.

4         Q.    Uh-huh (affirmatively).

5         A.    But we all have separate duties.

6         Q.    Okay.  Who are the three who work in

7    your office?

8         A.    Brandy Teague, Linda Freeman, and

9    Renee Curly.

10        Q.    Very briefly, you mentioned that

11   they have different responsibilities from your

12   responsibilities.  What are they responsible for?

13        A.    Ms. Curly and Ms. Freeman are the

14   receptionists and mail clerks.

15        Q.    Okay.

16        A.    Ms. Teague is the booking secretary

17   and the banking secretary.

18        Q.    And by "booking," do you mean

19   keeping the books like finances or do you mean

20   like booking as in booking people into the

21   prison?

22        A.    Booking people into the prison.

23        Q.    Okay.  Who do they all report to in

24   the sort of hierarchy of the detention center?

25        A.    The wardens.



866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1              Q.     Okay.   The wardens as well?
 2              A.     Uh-huh (affirmatively).
 3              Q.     Okay.   So Warden Hedgemon and Warden
 4     Knight also supervise Ms. Teague and Ms. Freeman
 5     and Ms. Curly?
 6              A.     Yes.
 7              Q.     Okay.  Can you walk me through what
 8     your job responsibilities are?
 9              A.     I take care of the payroll; and when
10     I say payroll, I do the time.  And we are
11     actually -- the checks and all are issued by a
12     payroll company out of Tampa, Florida; and I
13     basically submit everything online for payroll
14     checks to be processed, and then that's one of my
15     main duties.  And then I am responsible for the
16     invoicing of the different agencies, including
17     the Department of Corrections.
18              Q.     Uh-huh (affirmatively).
19              A.     I not only do our internal
20     invoicing, but I process the CAJUN invoice by
21     which DOC pays us and work with DOC as far as if
22     we have an issue with an offender that's not on
23     our invoice trying to get that resolved.
24              Q.     Okay.  Any other job
25     responsibilities that we haven't gone over?
```

```
 1          A.    Just general duties on, you know,
 2    the -- during the day-to-day operation of the
 3    facility.
 4          Q.    Okay.  But it seems like your two
 5    maybe main things that you are working on is
 6    payroll for the employees --
 7          A.    Yes.
 8          Q.    -- of the detention center and then
 9    the invoicing of the agencies for the housing of
10    prisoners here at the detention center?
11          A.    Yes.
12          Q.    Okay.  Can you tell me a little bit
13    more about the last piece that you mentioned,
14    about working with the Department of Corrections
15    if prisoners aren't on an invoice?
16          A.    Well, we hold pretrial offenders for
17    other agencies.
18          Q.    Uh-huh (affirmatively).
19          A.    We also receive offenders that are
20    revoked; and if their -- their paperwork has not
21    been submitted by the parish of conviction, then
22    I work with DOC trying to get that paperwork from
23    that parish of conviction to headquarters so they
24    can process them.  And that's basically -- you
25    know, and those issues vary.  I mean, it could be
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1   anything from the -- the sentencing information
2   not being sent to DOC to it being lost somewhere
3   in the mail because most of it is mailed.  And,
4   you know, occasionally we have inmates that we
5   may have for six months that we never -- we
6   haven't got paid for, and I have to go back and
7   try to do supplemental invoices for those inmates
8   so we can be paid for those inmates.
9           Q.   Okay.  And I think we are going to
10  get into that a little bit more later, so let's
11  leave it there for now; and I might have some
12  more questions for you with some documents that
13  might make it easier for me to understand.
14               I wanted to show you -- oh.  One
15  question before we go on to that, is there any
16  system within the sheriff's office or at the
17  detention center for doing employee like
18  performance evaluations?
19          A.   Yes.
20          Q.   How does that process work?
21          A.   I'm not familiar with that process
22  because that doesn't fall under my job title.
23          Q.   Uh-huh (affirmatively).
24          A.   That may be something that the
25  warden could expand on.

1        Q.    Okay.  Is your performance evaluated
2    on any kind of regular basis?
3        A.    Not that I'm aware of.
4        Q.    Okay.  So there's no form, let's
5    say, that you fill out and then, you know, that's
6    like a performance evaluation of any sort?
7        A.    Not for me, no.
8        Q.    Okay.  Or any, let's say, regular
9    maybe annual meetings, let's say, with one of
10   your supervisors to review your performance?
11       A.    We have annual meetings.  Well, we
12   have monthly meetings --
13       Q.    Uh-huh (affirmatively).
14       A.    -- and we have periodic meetings
15   with the warden, but as far as a performance
16   evaluation, I'm not aware --
17       Q.    Okay.
18       A.    -- of anything.
19       Q.    They are not structured --
20       A.    No.
21       Q.    -- as a performance evaluation?
22       A.    No.
23       Q.    Okay.  What -- what is covered in
24   the monthly meeting that you just mentioned?
25       A.    Any issues that may arise, problems

```
 1    that we are having with anything from, you know,
 2    employees not reporting to work or basically
 3    anything, you know, that needs to be assessed.
 4          (An interruption took place.)
 5    BY MS. WASHINGTON:
 6          Q.    Okay.  And so the monthly meeting is
 7    between you and the wardens; is that correct?
 8          A.    Yes.  And sometimes the supervisors
 9    of the shifts.
10          Q.    Okay.
11          A.    We call them lieutenants.
12          Q.    Okay.  And those meetings would be
13    an opportunity for anyone to raise problems that
14    have cropped up with the administration; is that
15    correct?
16          A.    Yes.
17          Q.    Problems that you're perhaps seeing
18    or that the lieutenants are seeing could be
19    raised with the wardens during those meetings?
20          A.    Yes.
21          Q.    Okay.  Are there any minutes or
22    notes taken during those monthly meetings?
23          A.    Not that I'm aware of.
24          Q.    Okay.  Do you take any minutes or
25    notes during those meetings?
```

```
 1           A.    No.
 2           MR. WASHINGTON:
 3               Okay.  I am going to hand you an
 4           exhibit that I am marking as Exhibit 1.
 5        (Exhibit 1 marked and tendered.)
 6           MS. WASHINGTON:
 7               Just for counsel, I'm going to be
 8           doing continuing numbering for all of
 9           these depositions so we may reuse them.
10           This is the East Carroll Parish Sheriff's
11           Office Defendant Answers to
12           Interrogatories in this litigation.
13    BY MS. WASHINGTON:
14           Q.    Have you seen this before?
15           A.    No.
16           Q.    Okay.  I didn't think you would, but
17    I want to just turn to page 4?
18           A.    (Witness complied.)
19           Q.    Actually, I'm sorry.  It's page 6.
20    And in -- in the response to Interrogatory No. 4,
21    it indicates that you are an administrative
22    assistant and that you "coordinate the transfer
23    of offenders from an OPP billing code to a DPS &
24    C billing code in the in-house Jail Management
25    System."  Do you see where I'm reading there?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    A.    Yes.

2    Q.    Okay.  And is that correct regarding

3    your job responsibilities?

4    A.    Yes.

5    Q.    Okay.  What is the in-house Jail

6    Management System that this answer is referring

7    to?

8    A.    It's what we call our ITF, which is

9    our Inmate Trust Fund.  It's our Jail Management

10   System where we maintain their booking and, you

11   know, any housing changes, their Inmate Trust

12   Fund account transactions.  All of that's

13   maintained in that system.

14   Q.    Okay.  So you mentioned that the

15   system has booking information, housing, and

16   transactions.  Is there any other information

17   that's maintained in the system?

18   A.    Race, sex, date of birth, general.

19   Q.    Demographic data?

20   A.    Demographic information of the

21   offender.

22   Q.    Okay.  Anything else?

23   A.    No.

24   Q.    Okay.  And who is responsible for

25   maintaining this Jail Management System?

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          A.    When you say "maintaining," are you
 2   talking like the IT or are you talking about
 3   keying in the information?
 4          Q.    I guess I'm talking about the data
 5   input.  Who's responsible for inputting
 6   information into the system?
 7          A.    Brandy Teague as the booking
 8   secretary.
 9          Q.    Okay.  Is she the only person who
10   inputs information into the Jail Management
11   System?
12          A.    No.
13          Q.    Okay.  Who else inputs information
14   into the Jail Management System?
15          A.    Hope Mills.  She's responsible for
16   making bed changes or location changes.
17          Q.    Uh-huh (affirmatively).
18          A.    Me, because I make billing code
19   changes; and that's probably it.
20          Q.    Okay.  So your role with the Jail
21   Management System is related to the billing code
22   changes; is that correct?
23          A.    Yes.
24          Q.    Do you have any other role in
25   inputting information or otherwise maintaining
```

1    the Jail Management System?

2          A.    Well, I fall into Brandy Teague's

3    position when she is not there.

4          Q.    Okay.

5          A.    So I do the finance, you know, any

6    transactions, anything like that that has to be

7    done.

8          Q.    And if Ms. Teague is not present,

9    you may be the person inputting the booking

10   information?

11         A.    Yes.

12         Q.    Okay.  Who all has access to the

13   Jail Management System?

14         A.    In this office here, you have Hope

15   Mills, Mary Brown, Tony Washington, and Someeka

16   Martin; and at Phase 3, you have Ms. Freeman, Ms.

17   Curly, myself, and Ms. Teague.

18         Q.    Okay.  And do -- does Warden

19   Hedgemon have access to the Jail Management

20   System?

21         A.    No.

22         Q.    Okay.  Does Warden Knight have

23   access to the Jail Management System?

24         A.    No.

25         Q.    Do they have any ability to pull up

```
 1    and look at what's in the Jail Management System?
 2         A.    No.
 3         Q.    Why is that, if you know?
 4         A.    Just never has come up.  They are
 5    given a roster each day of the offenders, like a
 6    daily head count, an alphabetical roster, but
 7    it's always been the females that, you know, have
 8    access to the -- what we call the ITF.
 9              Warden Hedgemon does have access to
10    CAJUN, which is DOC's data processing -- data
11    management system --
12         Q.    Uh-huh (affirmatively).
13         A.    -- and -- but he does not have
14    access to our internal system.
15         Q.    Does Warden Knight also have CAJUN
16    access?
17         A.    No.
18         Q.    Okay.  You mentioned that there is
19    some sort of daily roster that is generated for
20    the wardens; is that correct?
21         A.    Yes.
22         Q.    And what information is contained on
23    that roster?
24         A.    Their booking number; their inmate
25    ID number; DOC number, if they have one; their
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    SID number, if they have one.  Names are listed
 2    alphabetically, their race, sex, date of birth,
 3    billing code, and location.  I'm not sure if
 4    their booking date is on there or not, but --
 5          Q.    It might be?
 6          A.    It might be.
 7          Q.    Okay.  Who prints out and provides
 8    the daily roster to the wardens?
 9          A.    Hope Mills at Phase 2 and Brandy
10    Teague at Phase 3.
11          Q.    Okay.  Do any of the lieutenants or
12    any of the correctional officers have access to
13    the JMS?
14          A.    No.
15          Q.    Okay.  Did you receive any kind of
16    training in how to operate the Inmate Trust Fund
17    system when you first started or when it came on
18    line?
19          A.    Yes.
20          Q.    Okay.  When -- when was that,
21    roughly?
22          A.    In the early 2000's.
23          Q.    Okay.  And what did that training
24    consist of?
25          A.    It's pretty user friendly.  It's
```

```
1    just a database system.
2              Q.    Uh-huh (affirmatively).
3              A.    We had our commissary personnel,
4    they had an IT guy that came and spent a couple
5    of days with us training and, you know, it's
6    pretty simple.
7              Q.    Okay.
8              A.    I mean, it's very user friendly.
9              Q.    During that training, was there any
10   instruction provided by the supervisors or
11   wardens of the detention center on what
12   information needed to go into the system
13   regarding the prisoners that were being housed
14   here?
15             A.    No.
16             Q.    Okay.  Is there any process by which
17   the JMS is reviewed or audited to see if it has
18   all of the information that you wanted to have on
19   all of the prisoners that you are housing?
20             A.    No.
21             MS. WASHINGTON:
22                   Shane, I apologize.  I had printed
23        you a copy.
24             MR. BRYANT:
25                   Oh.
```

```
 1          MS. WASHINGTON:
 2               I'm going to show you what we are
 3          marking as Exhibit 2.  And I will
 4          represent to you that these are records
 5          that we received regarding the five
 6          plaintiffs in this litigation.  I believe
 7          these were actually printed in July of
 8          2017, which would have been after all of
 9          the plaintiffs had actually been
10          ultimately released from custody.
11          (Exhibit 2 marked and tendered.)
12     BY MS. WASHINGTON:
13          Q.    I'm wondering if these records or
14     this type of form is the Inmate Trust Fund system
15     that we have been talking about?
16          A.    It is.
17          Q.    Okay.  And at the top, we can just
18     look at the first one, which is for Donald
19     Guidry, and at the top there, the inmate number
20     or ID number.  What -- what is that number?
21          A.    That is a number that is generated
22     by the Jail Management System.
23          Q.    And so is that number created when a
24     person is first booked into Riverbend?
25          A.    Yes.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

```
 1              Q.     If a person was released from
 2       Riverbend and then at some point in time came
 3       back into custody here, would this number still
 4       attach to them or would a new one be generated?
 5              A.     That number would be attached to
 6       them.  I was trying to see.  Yes, it would be.
 7              Q.     Okay.  So that's kind of theirs for
 8       life?
 9              A.     Yes.
10              Q.     Okay.  And then under that, there is
11       a DOC number, correct?
12              A.     Yes.
13              Q.     Who generates the DOC number for an
14       individual?
15              A.     The Department of Corrections.
16              Q.     Okay.  And similar to the question
17       that I asked about the inmate number, is a DOC
18       number attached to one person forever or are new
19       DOC numbers created if people are coming in and
20       out of custody?
21              A.     The same number is attached to them
22       unless they use an alias, but normally it's --
23       they go back and correct and -- and tie them in
24       together.
25              Q.     Okay.  So generally speaking, if
```

```
 1    someone is assigned a DOC number the first time,
 2    that DOC number will stick with them throughout
 3    their life even on multiple incarcerations?
 4         A.    Yes.
 5         Q.    Okay.  There's also a space here for
 6    a SID number that appears to be blank; is that
 7    correct?
 8         A.    Yes.
 9         Q.    And what is a SID number?
10         A.    That is a state ID number.
11         Q.    Okay.  And how is that generated?
12         A.    I'm not sure.  It's issued by the
13    state, but I'm not sure how it's generated.
14         Q.    Okay.  It is not a number that the
15    Riverbend Detention Center generates for a person
16    in their custody?
17         A.    No.
18         Q.    Okay.  I'm looking down here
19    (indicated) at the lower section of the form
20    under book-ins and billing history?
21         A.    Yes.
22         Q.    And there is also then something
23    that is called a book-in number; is that correct?
24         A.    Yes.
25         Q.    What is a book-in number?
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1          A.     The book-in number -- the booked in
2    number is the number that is generated each time
3    that offender comes into our facility.  That
4    number will change.  It is a chronological number
5    that is issued and it will change each time they
6    come in.
7          Q.     Okay.  I get it.  It is "book in"
8    not "booking."  Thank you.  Okay.  So if someone
9    was to be booked into Riverbend, they would be
10   issued a book-in number?
11         A.     Yes.
12         Q.     If they were to leave the facility
13   and then later come back to Riverbend, they would
14   get a new book-in number?
15         A.     Yes.
16         Q.     The interrogatory answer that we
17   were discussing before in Exhibit 1 mentioned
18   changes in billing codes, and it specifically
19   references an OPP billing code.  What is an OPP
20   billing code?
21         A.     Orleans Parish Prison.
22         Q.     Okay.  I guess I'm wondering what is
23   meant by "billing code"?
24         A.     Okay.  If you look at the bottom of
25   that page that we were just looking at.
```

```
 1          Q.    In Exhibit 2?

 2          A.    Yes.

 3          Q.    Uh-huh (affirmatively).

 4          A.    Where it says New Orleans Parish and

 5   it says NOPO 5/4/2016 through 7/11/2016.

 6          Q.    Right.

 7          A.    We were billing Orleans Parish for

 8   those dates.

 9          Q.    Okay.

10          A.    And then under that, it says DOC.

11   You'll see that it picks up on 7/11 until 1/24.

12          Q.    Uh-huh (affirmatively).

13          A.    And he actually was in our custody

14   from 5/4 to 1/24, but his billing code changed

15   7/12.

16          Q.    Okay.  And, if I understand

17   correctly, you would have been the person

18   responsible for changing the billing code from

19   this Orleans Parish to Department of Corrections?

20          A.    Either me or Ms. Teague.

21          Q.    Okay.  Ms. Teague also shares the

22   duties of changing billing codes?

23          A.    Yes.  If I'm not available, she will

24   change the billing code.

25          Q.    Okay.  Is it primarily your
```

SOMETHING LAURA 6/24/2013

1    responsibility?

2          A.    Yes.

3          Q.    And Ms. Teague is your backup on

4    that function?

5          A.    Yes.

6          Q.    Okay.  So the East Carroll Parish

7    Sheriff's Office had an agreement with the

8    Orleans Parish Sheriff's Office to house

9    prisoners; is that correct?

10         A.    I'm not sure what the agreement was.

11   I don't know --

12         Q.    Okay.

13         A.    -- if it was oral or written, but we

14   were housing the offenders.

15         Q.    Okay.  Do you know if -- if East

16   Carroll Parish Sheriff's Office was housing

17   pretrial detainees for Orleans Parish?

18         A.    Yes.

19         Q.    Okay.  Do you know if the Riverbend

20   Detention Center was housing DOC sentenced

21   prisoners for Orleans?

22         A.    Not for Orleans.

23         Q.    Uh-huh (affirmatively).

24         A.    But once an offender is sentenced,

25   they become the responsibility of Department of

1  Corrections.  We do have offenders from Orleans

2  Parish that are DOC offenders.  We have DOC

3  offenders from any parish in the state, but once

4  they become a DOC offender, they are no longer

5  the responsibility of that parish.  They are the

6  responsibility of DOC.

7           Q.    Okay.  Do you know whether or not

8  the Orleans Parish Sheriff's Office was

9  transferring DOC sentenced prisoners to Riverbend

10  for housing?

11          A.    No.

12          Q.    Okay.  Just to clarify, no, you

13  don't know or no, they were not?

14          A.    No, I don't know.

15          Q.    Thank you.

16  MS. WASHINGTON:

17              I'm going to show you two documents.

18          I will represent to you that both of these

19          are entitled either Cooperative Endeavor

20          Agreements or Memorandum of Understanding,

21          which means you, the East Carroll Parish

22          Sheriff's Office, and Orleans Parish

23          Sheriff's Office.

24              The one that's been marked as

25          Exhibit 3 appears to have an effective

```
 1              date of November 1, 2016, if you look at
 2              the first paragraph; and the one marked
 3              Exhibit 4 appears to have an effective
 4              date of March 1st, 2017, again in the
 5              first paragraph.
 6         (Exhibit 3 and Exhibit 4 marked and
 7    tendered.)
 8    BY MS. WASHINGTON:
 9         Q.    Have you seen either of these
10    documents before?
11         A.    No.
12         Q.    I think you mentioned earlier, but I
13    just want to make sure.  I understand -- before
14    we move on, do you know if the East Carroll
15    Parish Sheriff's department had a contract or
16    agreement with Orleans Parish to receive DOC
17    sentenced prisoners transferred from Orleans?
18         A.    I was not aware of any agreement or
19    contract.
20         Q.    Okay.  And you have not seen these
21    two contracts or -- I'm sorry, they are CEAs --
22    or Memorandums of Understanding before?
23         A.    No.
24         Q.    Okay.  Are you aware of any of the
25    content of those documents?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

SOPHIE LAURA 6/24/2019

1          A.     No.

2          Q.     Okay.  Do you know whether or not

3   those documents -- never mind -- scratch that.

4   You don't know about those documents.

5               You mentioned earlier when we were

6   talking about Exhibit 2, the Inmate Trust Fund

7   documents, that the bottom of it shows a transfer

8   from an Orleans Parish billing code to a

9   Department of Corrections billing code; is that

10  correct?

11         A.     Yes.

12         Q.     Okay.  And are those billing codes

13  what is used by East Carroll Parish Sheriff's

14  office to provide invoices to Orleans Parish

15  Sheriff's Office, for example?

16         A.     Yes.

17         Q.     Okay.  And also to the Department of

18  Corrections for the housing of DOC prisoners?

19         A.     DOC actually issues a -- what we

20  call a CAJUN invoice --

21         Q.     Uh-huh (affirmatively).

22         A.     -- and I have to pull that from the

23  system.  And I can remove offenders from that

24  invoice, but I cannot add offenders to that

25  invoice.  I use our internal invoice to reconcile

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

SOPHIE LAURA 6/24/2019

1    the DOC invoice.

2         Q.    Okay.  And so by the internal

3    invoice, you mean an invoice that you would

4    generate from your JMS about which DOC prisoners

5    you are housing here in Riverbend?

6         A.    Yes.

7         Q.    And you would compare that to the

8    CAJUN invoice which the Department of Corrections

9    issues?

10        A.    Yes.

11        Q.    Okay.  How often do you receive the

12   CAJUN invoice?

13        A.    I pull it at the end of the month

14   from the CAJUN system, actually the first day of

15   the month following the --

16        Q.    The end of the month?

17        A.    Yes.

18        Q.    Okay.

19        A.    The first day of the month is the

20   day I pull the invoice.

21        Q.    Do you know if that invoice is kept

22   in Realtime?

23        A.    It updates at DOC, I believe they

24   have access to it at Realtime, but if I ask that

25   they make changes, like because it's -- obviously

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

SOPHIE MAURA 6/24/2019

```
 1    if the offender is not showing to be in my
 2    prison, I don't get paid for him, so he doesn't
 3    show on my invoice.  But if I request that it be
 4    updated, it's the next day before it shows up on
 5    my invoice.
 6            Q.    Okay.  Are you able to access the
 7    CAJUN invoice anytime you wanted to?
 8            A.    Yes.
 9            Q.    It's your practice to access it at
10    the end of the month, but you would have access
11    to it at anytime?
12            A.    Yes.  They actually recommend that
13    we reconcile mid-month --
14            Q.    Uh-huh (affirmatively).
15            A.    -- to make sure any changes or
16    adjustments be made prior to the end of the
17    month.
18            Q.    And do you do that?
19            A.    Yes.
20            Q.    Okay.  Am I correct in understanding
21    that the East Carroll Parish Sheriff's Office was
22    billing the Orleans Parish Sheriff's Office for
23    every pretrial detainee that they were holding
24    for Orleans?
25            A.    If they had been booked into the
```

```
 1    system --
 2           Q.     Uh-huh (affirmatively).
 3           A.     -- yes, we were billing Orleans if
 4    their billing code was Orleans Parish Prison.
 5           Q.     Okay.  And, by the same token, the
 6    East Carroll Parish Sheriff's Office bills the
 7    Department of Corrections for all of the
 8    prisoners who have a DOC billing code in your
 9    Inmate Trust Fund system?
10           A.     Only after their CAJUN transfer
11    history is updated by the Department of
12    Corrections.  Because if their transfer history
13    is not correct, they do not appear on my billing.
14           Q.     From CAJUN?
15           A.     From CAJUN.
16           Q.     So you mentioned that you are not
17    able to add anything to the CAJUN invoice, right?
18           A.     That's correct.
19           Q.     But you do reconcile the CAJUN
20    invoice with your Riverbend Inmate Trust Fund
21    information?
22           A.     Yes.
23           Q.     What do you do if there is a
24    prisoner being housed at Riverbend as a DOC
25    sentenced prisoner who does not appear on the
```

1   CAJUN invoice?

2        A.    I have an option in the billing

3   system to "do not include this offender" on the

4   invoice, and I have six months from that date or

5   like the -- the invoice date is the first day

6   after the month, and I have six months to get his

7   transfer history correct and submit a

8   supplemental invoice to the Department of

9   Corrections.

10        Q.    Okay.  And I guess walk me through

11   like what steps you actually take if you are

12   sitting down and you are comparing the CAJUN

13   invoice with your Inmate Trust Fund system and

14   you notice that there is a DOC sentenced prisoner

15   in Riverbend Detention Center that is not on that

16   CAJUN invoice, like what steps do you take at

17   that time?

18        A.    Okay.  I print the CAJUN invoice

19   from the CAJUN system and I print our internal

20   invoice; and I basically reconcile it by name, by

21   number of days.  If the CAJUN invoice paid me for

22   25, but I -- days and I show that he was here

23   30 days, I disallow those 30 days, I -- I mark

24   through it and put the dates that DOC is paying

25   me for, and then when I go into my -- in my

```
 1    internal invoice, I disallow those five days.
 2    Then once I send the DOC invoice, I finish
 3    reconciling it, my CAJUN invoice and my internal
 4    invoice match, almost like reconciling a bank
 5    statement.
 6              Q.    Uh-huh (affirmatively).
 7              A.    I submit the DOC invoice to the
 8    Department of Corrections.
 9              Q.    Uh-huh (affirmatively).
10              A.    Some -- at some point in the next
11    six months -- I try to do it on a monthly basis,
12    but at some point during the next six months, I
13    go into CAJUN to see if -- why they didn't pay me
14    those five days, whether either it shows that he
15    was a -- he was transferred to another facility,
16    but -- and -- and it's an error that I have to go
17    back and notify DOC that no, he was not
18    transferred to another facility; and we get it
19    corrected and then I can bill for those five
20    days.
21              Occasionally, we have DOC offenders
22    that are on a detainer, they have open charges or
23    whatever, we will release them from DOC, but --
24    and it's East Baton Rouge will transfer them the
25    next day back to East Baton Rouge because they
```

```
 1    have open charges.  And -- but -- and -- but I
 2    always try to find out why they did not pay me
 3    for those five days.  And sometimes it's an error
 4    on my part where he may have been released today,
 5    but because of the time and the date that it was
 6    written down on the movement sheet, we release
 7    him tomorrow or well, he was released yesterday
 8    and we released him today, and then I have to go
 9    back and correct that in our internal system.  We
10    are human, we -- you know.
11         Q.    Okay.  And when you -- when you
12    printed the CAJUN invoice and printed your
13    internal invoice and were making these
14    reconciliations, you said you -- you send that
15    back to the Department of Corrections?
16         A.    Yes.  The CAJUN invoice goes to the
17    Department of Corrections.
18         Q.    Okay.  And do you send that by
19    electronic mail?
20         A.    No.  We hand deliver.
21         Q.    Okay.  You hand deliver to
22    headquarters?
23         A.    Yes, to accounts payable.
24         Q.    Do you guys get any kind of like
25    receipt?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1            A.     No.
2            Q.     So you don't have a record of the
3    CAJUN invoices that have been hand delivered back
4    to Baton Rouge?
5            A.     I have a copy of it.
6            Q.     Okay.
7            A.     But usually in five to seven days,
8    we receive a check through the OSRAP system, so
9    we know they received the -- the invoice at that
10   point.
11           Q.     Okay.  So you receive the check
12   through some kind of online payment system?
13           A.     Yes.
14           Q.     Okay.  It sounds like you're
15   primarily responsible for generating or
16   reconciling the invoicing; is that correct?
17           A.     Yes.
18           Q.     Is there anyone who reviews the
19   invoicing before you provide it, let's say, to
20   the Department of Corrections?
21           A.     No.
22           Q.     Okay.  What about before you were
23   providing it to Orleans for payment?
24           A.     No.
25           Q.     Am I correct that the invoices are
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    actually signed off on by Sheriff Williams?

2          A.    The DOC invoices, yes.

3          Q.    Okay.  And how does that sign off

4    occur; is that in person?

5          A.    Yes.

6          Q.    Okay.  Do you meet with Sheriff

7    Williams?

8          A.    Yes.

9          Q.    Okay.  When you meet with Sheriff

10   Williams on the Department of Corrections

11   invoices, do you have the CAJUN invoice as well

12   as your internal invoice to review with him?

13         A.    Only the CAJUN invoice.

14         Q.    Only the CAJUN invoice.  Okay.

15         MS. WASHINGTON:

16               I am showing you what has been

17         marked now as Exhibit 5.

18         (Exhibit 5 marked and tendered.)

19   BY MS. WASHINGTON:

20         Q.    And I want to look at the first page

21   of Exhibit 5 right now.

22         A.    Uh-huh (affirmatively).

23         Q.    These are some communications that

24   were provided to us in the course of this

25   litigation.  And the first page of Exhibit 5

```
 1   appears to be, well, an e-mail from you to Corey
 2   Amacker from October 11th, of 2016?
 3        A.    Yes.
 4        Q.    Do you remember this e-mail?
 5        A.    Yes.
 6        Q.    Okay.  And I want to look at the --
 7   the last line of it before your signature.  It
 8   says, "I am unable to invoice DOC for this
 9   offender until he is updated."  Do you see where
10   I'm reading?
11        A.    Yes.
12        Q.    Okay.  What -- what does that
13   statement mean?
14        A.    That means he will not appear on our
15   DOC invoice until DOC updates him in CAJUN.
16        Q.    Okay.  So when you say "until he is
17   updated," you're referring to the CAJUN invoice;
18   is that correct?
19        A.    Yes.
20        Q.    And sort of going back to what we
21   were just talking about, you do not invoice or
22   you don't receive payment from the Department of
23   Corrections or ask for payment from the
24   Department of Corrections until the CAJUN invoice
25   matches your Riverbend Inmate Trust Fund system;
```

```
 1    is that correct?
 2         A.    DOC will not pay me until he appears
 3    on the CAJUN invoice.
 4         Q.    And I know we talked about the steps
 5    you would take, say, if your invoice was
 6    reflecting 30 days for a DOC sentenced prisoner
 7    but the CAJUN invoice was only showing 25 days
 8    for that prisoner.
 9               I want to ask about a situation
10    where there is a prisoner being housed here at
11    Riverbend who shows up on your Inmate Trust Fund
12    system as a DOC sentenced prisoner.  Let's say we
13    are talking about the month of September.  He's
14    been in custody or housed here at Riverbend for
15    all of September as a DOC sentenced prisoner.
16               When you look at the CAJUN invoice,
17    let's say on October 1st, you notice that that
18    prisoner's name is not on that CAJUN invoice at
19    all.  What do you do in that situation?
20         A.    Normally, I disallow him on my
21    internal invoice, because I -- you know, he's
22    still showing to be a DOC offender in the system,
23    in the internal system, but I -- I disallow him
24    which gives him zero days in the internal
25    invoice.  And, at that point, I finish
```

```
 1    reconciling the DOC invoice and submit it for
 2    payment; and sometime during the next six months,
 3    I go in to try to determine why he was not on the
 4    CAJUN invoice.  It may be that he was a new
 5    conviction on August 28th.  The clerk of court
 6    has not submitted the minutes to the pre-class
 7    officer at the parish of conviction.  Therefore,
 8    the pre-class packet that the parish of
 9    conviction is responsible for submitting to DOC
10    has not been received, therefore DOC personnel
11    have not updated CAJUN.  And they may -- he may
12    not have an out date yet, but he -- they can at
13    least update him as DOC billable and in my
14    location.
15         Q.    Okay.  Is there any steps that you
16    take when you -- I'm talking about the same
17    scenario -- when you noticed, you know, this DOC
18    sentenced prisoner who's at Riverbend who isn't
19    on the CAJUN invoice.  Are there any steps that
20    you take to reach out, say, to the parish of
21    conviction and ask whether or not the paperwork
22    has been submitted to DOC?
23         A.    Yes, I do.
24         Q.    Okay.  And what steps do you take to
25    do that?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

         A.    I normally e-mail or, if I don't
have an e-mail address, I will call the parish of
conviction and confirm and if he is -- if they
confirm then he is a DOC offender, I ask them
have they submitted the paperwork.  And if at
that point they say well, I submitted it to my
pre-class officer at DOC, I contact -- I usually
contact that pre-class officer or I will contact
someone in -- at headquarters, if I am not
familiar with their pre-class officer, because I
don't deal with their parish on a regular basis.
         I may just reach out to Colette
Chapman, who does the transfer updates or, in
this instance, I contacted Glynn Stassi, who was
doing the updates, and asked him to check to see
if possibly the paperwork is there, because they
do receive tons of paperwork I'm sure, and, you
know, it just hasn't been processed yet.
         Q.    And typically if you would send an
e-mail, there would be a record of that e-mail
communication.  If you were making phone calls to
try to follow up on paperwork with the parish of
conviction or the DOC, do you keep any kind of
log of those phone calls?
         A.    No.



```
 1          Q.    Okay.  When you disallow a prisoner
 2    on your internal invoice, do you keep any, I
 3    guess, kind of tracking of that?
 4          A.    I can --
 5          Q.    Within your system?
 6          A.    I can actually go back and print a
 7    report of unbilled days.
 8          Q.    Okay.
 9          A.    And they would be -- those five days
10    would be listed on that unbilled supplemental
11    invoice.
12          Q.    Okay.  Is there any mechanism you
13    use where, let's say, a -- a prisoner was
14    disallowed on your internal invoice down to zero
15    days for a month because they didn't show up on
16    the CAJUN invoice at all like we just talked
17    about, so when the next invoice come around and
18    you are doing your invoice reconciliation or,
19    let's say, maybe even in the middle of the month
20    when you're checking the system like DOC
21    recommends, is there any system or process you
22    use to see whether or not prisoners who have been
23    disallowed on the invoice for a past month are
24    now showing up in CAJUN?
25          A.    When I reconcile the CAJUN invoice
```

1    with my -- my internal invoice, if he's been
2    updated in CAJUN, he's going to appear on the
3    CAJUN invoice.
4            Q.    Uh-huh (affirmatively).
5            A.    And it may go back, be retroactive
6    to the previous month.
7            Q.    Uh-huh (affirmatively).
8            A.    But yes, he -- he may show up in the
9    following month.
10           Q.    Uh-huh (affirmatively).
11           A.    And at that point, once he shows up
12   in the following month, I have to go back to do
13   what I call a supplemental invoice.
14           Q.    Okay.  What if he doesn't show up in
15   the following month?
16           A.    I usually give it 90 days because
17   larger parishes have a lag in court minutes,
18   processing paperwork.
19           Q.    So you give it three months for a
20   particular prisoner to show up on the CAJUN
21   invoice; is that correct?
22           A.    Yes.
23           Q.    Okay.  Where does the 90 days come
24   from?
25           A.    That's just my -- my window.

1   Usually, we have the biggest issue with the

2   probation and parole office --

3          Q.    Uh-huh (affirmatively).

4          A.    -- especially if someone is revoked.

5   It may take them up to four to six weeks, and

6   it's just -- it's a time mechanism for me going

7   -- I mean, I could go in every day to check to

8   see, but I just -- I go back -- like for right

9   now, I may go back into March or April and see if

10  there is anybody that I haven't been able to bill

11  for.

12         Q.    Okay.

13         A.    And, at that point, you know, and

14  usually after about 90 days, I get on it where

15  I'm trying to figure out what's going on with

16  them.

17         Q.    So if it were more than 90 days, you

18  would then take some action to find out why the

19  person was not showing up in CAJUN?

20         A.    Yes.

21         Q.    Okay.  And what type of action would

22  you take at that time?

23         A.    I would start making phone calls

24  again to the parish of conviction or the

25  Department of Corrections, just reaching out to

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

SOPHIE LAURA  6/24/2019

1    them trying to figure out why we are not being

2    paid.

3            Q.    Okay.  We talked about the change in

4    the billing code in your internal JMS.

5            A.    Uh-huh (affirmatively).

6            Q.    What information or documentation do

7    you receive to know to change someone to a DOC

8    billing code?

9            A.    Usually it is a court slip,

10   something from the court.

11           Q.    Okay.  Are there other billing codes

12   in the JMS other than Orleans and Department of

13   Corrections?

14           A.    Yes.

15           Q.    Okay.  And would these be for other

16   parishes that the --

17           A.    Yes.

18           Q.    Okay.  Is there anything other than

19   other parishes that has a billing code?

20           A.    No.

21           Q.    Okay.  Is the JMS searchable by a

22   prisoner's name?

23           A.    Yes.

24           Q.    Okay.  Are there other data inputs

25   that you can search by in the JMS?

```
 1              A.     DOC number.
 2              Q.     Okay.
 3              A.     Or ID number.
 4              Q.     Okay.  If the person has a DOC
 5     billing code, does the JMS provide that person's
 6     release date?
 7              A.     No.
 8              Q.     Okay.  Is release date information
 9     stored in the JMS at all?
10              A.     Only after they are released.
11              Q.     Only after they are released.  Okay.
12              A.     Their actual date of release is
13     keyed into the system.
14              Q.     Okay.  But it does not show
15     projected or in the future release dates?
16              A.     No, ma'am.
17              Q.     Okay.  Does the JMS have information
18     about whether or not a DOC -- DOC sentenced
19     prisoner has had their time calculated?
20              A.     No.
21              Q.     Okay.  So the JMS cannot be used to
22     track the release dates for prisoners who are
23     being held at Riverbend?
24              A.     No.
25              Q.     Okay.  Where is that information
```

1    contained?

2            A.      CAJUN.

3            Q.      Only in CAJUN?

4            A.      (Nodded head affirmatively.)  Yes,

5    ma'am.

6            Q.      So the East Carroll Parish Sheriff's

7    Office doesn't have its own system to know the

8    release dates of people who are housed at

9    Riverbend?

10           A.      Only by accessing CAJUN.

11           Q.      Okay.  Can you take a look at

12   Exhibit 2 again, the trust fund account exhibit?

13           A.      (Witness complied.)

14           Q.      And I want to turn to page 4 of this

15   exhibit, which is for Leon Burse?

16           A.      Uh-huh (affirmatively).

17           Q.      Just to make sure I understand what

18   you had mentioned earlier.  If you look at the

19   bottom about book ins and billing history, there

20   are two book-in numbers for Mr. Burse; is that

21   correct?

22           A.      That is correct.

23           Q.      Okay.  And am I correct in

24   understanding that this is because between 6/16

25   of 2016 and 8/18 of 2016, he was not housed at

1    Riverbend?

2         A.    That's correct.

3         Q.    Okay.  And so when he came back in

4    -- in August of 2016, he received a new book-in

5    number?

6         A.    Yes.

7         Q.    Okay.  Does the new book-in number

8    correspond to an entirely new booking process

9    into the facility?

10        A.    Yes.

11        Q.    Okay.  If there is not -- if there's

12   only one book-in number -- say we can turn back

13   to the first page, Donald Guidry that we have

14   been looking at before.  You know, if he has one

15   book-in number, even though he changed from being

16   Orleans Parish to DOC sentences, would Mr. Guidry

17   have gone through a new booking or intake process

18   at the time that he changed to be a DOC sentenced

19   prisoner?

20        A.    No.

21        Q.    Okay.

22        MS. WASHINGTON:

23             I'm going to show you what I just

24        marked as Exhibit 6.

25        (Exhibit 6 marked and tendered.)

BY MS. WASHINGTON:

    Q.    So what I have marked as Exhibit 6
is the inmate file that we received for Jessie
Crittindon, and I just want to look at a couple
of pages inside of this.

    A.    Okay.

    Q.    If you look at the bottom right-hand
corner, there are Bates stamp numbers; and I am
going to direct you to 4672 to begin with.  It's
about halfway through, and this is titled support
rap sheet.  Do you see where I'm looking at?

    A.    Yes.

    Q.    Okay.  And then kind of holding on
to that page, if you flip over one page further
at Bates number 4674 there is another support rap
sheet; is that correct?

    A.    Yes.

    Q.    Okay.  Who generates these rap
sheets?

    A.    The AFIS system.

    Q.    Okay.  And is that generated and
operated here at Riverbend?

    A.    I'm not sure about this one because
I don't know what the ATN number is.  I don't
know if that's -- I couldn't tell you.  I'm not



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

 1    familiar with the AFIS system.  I don't operate
 2    it.
 3             Q.     Okay.
 4             A.     I know that it came from the AFIS
 5    system, but I don't know any of the workings of
 6    the AFIS system.
 7             Q.     That's okay.  I think I have other
 8    people to ask about the AFIS system so I
 9    appreciate that.  At the -- the top of the -- the
10    first rap sheet at the top and the SID number
11    that you mentioned before, and that would be some
12    sort of state ID number; is that correct?
13             A.     Yes.
14             Q.     Okay.  And that's also contained on
15    that second rap sheet that we are looking at?
16             A.     Yes.
17             Q.     Okay.  Taking the one that's the
18    second rap sheet in this packet on 4674, the
19    book-in date appears to be August 11th of 2016;
20    is that correct?
21             A.     Yes.
22             Q.     Do you know what that book-in date
23    corresponds to?
24             A.     No.
25             Q.     Okay.  And on the -- the first rap

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1    sheet that's at 4672, the -- there is a different
 2    book-in date of January 4th, 2017; is that
 3    correct?
 4         A.    Yes.
 5         Q.    Okay.  Do you -- do you know why
 6    there are two different book-in dates for this
 7    individual?
 8         A.    No.
 9         Q.    Okay.  Do you know who might know?
10         A.    I would say Robert Russell.
11         Q.    Anyone else who might have
12    information?
13         A.    No.
14         Q.    Okay.  You can keep browsing, if you
15    would like.
16         A.    I'm just looking.  I mean, it's --
17    it almost looks like the same picture.
18         Q.    I agree.  Referring back to the very
19    first exhibit I gave you, the interrogatories,
20    the rest of that answer to Interrogatory No. 4
21    indicated that part of your job responsibilities
22    have also been to communicate with Orleans Parish
23    personnel regarding transfer issues with pretrial
24    offenders.  Do you see where I'm reading?
25         A.    Uh-huh (affirmatively).
```

```
 1          Q.     What kind of transfer issues have
 2    you communicated with Orleans Parish about?
 3          A.     It would be something similar to
 4    this e-mail.
 5          Q.     Okay.  And you are referencing the
 6    first page of Exhibit 5?
 7          A.     Yes.
 8          Q.     Okay.
 9          A.     Basically transferring him from OPP
10    to DOC.
11          Q.     Okay.  So transfer issue means kind
12    of the movement between being Orleans pretrial
13    and being a DOC sentenced prisoner transferred
14    from Orleans?
15          A.     Yes.
16          Q.     Okay.  Other than that e-mail that
17    we were looking at, do you remember other
18    specific times that you communicated with Orleans
19    Parish about transfer issues?
20          A.     Not specific dates or times.
21          Q.     Okay.  Were there other times other
22    than that one time that's in that e-mail?
23          A.     I would say, yes.
24          Q.     Okay.  That e-mail was directed to
25    Corey Amacker, correct?
```

SEWELL, LAURA - 6/24/2019

```
 1          A.     Yes.
 2          Q.     Other than Mr. Amacker, is there
 3   anyone else at Orleans Parish that you would
 4   communicate with?
 5          A.     No.
 6          Q.     Okay.  He was your sole point of
 7   contact?
 8          A.     Yes.
 9          Q.     Okay.  And obviously you used e-mail
10   with Mr. Amacker?
11          A.     Yes.
12          Q.     Did you also communicate by phone
13   with Mr. Amacker?
14          A.     No.
15          Q.     Okay.  No phone.  All e-mail?
16          A.     (Shook head negatively.)
17          Q.     So if you had communicated with
18   Mr. Amacker, other than that time regarding
19   Mr. Dominick in Exhibit 5, there would be an
20   e-mail trail of that?
21          A.     Yes.
22          Q.     Okay.  Did you have a phone number
23   for Mr. Amacker?
24          A.     I don't recall having one.
25          Q.     Okay.  Did you ever send anything by
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    U.S. mail to Mr. Amacker?
 2          A.    I did not.
 3          Q.    Okay.  But people at East Carroll
 4    Parish Sheriff's Office might have?
 5          A.    Possibly --
 6          Q.    Okay.
 7          A.    -- but I'm unsure.
 8          Q.    Okay.  So you communicated with
 9    Mr. Amacker by e-mail?
10          A.    Yes.
11          Q.    Okay.  And I believe there's a
12    hotmail e-mail address that's for you on
13    Exhibit 5?
14          A.    Yes.
15          Q.    And is that the only e-mail address
16    that you used for work?
17          A.    Yes.
18          Q.    Okay.  This lawsuit was filed in
19    August of 2017, and I think you probably know it
20    concerns five men who allege that they were over
21    detained and released far past their legal
22    release date.
23                Has anyone, you or anyone, searched
24    your e-mail account for communications relative
25    to this litigation since August of 2017?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1          A.     No.

2          Q.     Okay.  Has anyone directed you to

3    look at your e-mail?

4          A.     No.

5          Q.     Okay.  And have you given access or

6    does anyone have access who could have searched

7    your e-mail outside of you?

8          A.     No.

9          Q.     Okay.  When you started work with

10   the sheriff's office 24 years ago, did you

11   receive any training relative to your new

12   employment and new position at the sheriff's

13   office?

14         A.     No.

15         Q.     Okay.  How did you learn how to do

16   your job?

17         A.     Self taught, common sense, trial and

18   error.

19         Q.     Okay.  Is there any policy manual or

20   Standard Operating Procedures or memos or

21   guidelines that direct how you are supposed to do

22   some of the job functions that we have talked

23   about?

24         A.     No.

25         Q.     Okay.  And it seems like a lot of

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA  70404     Fax 985.419.0799

SOPHIE LAURA 02/24/2015

1  your job responsibilities that we have been
2  talking about have some interactions with the
3  Department of Corrections, correct?
4          A.    Yes.
5          Q.    Did you ever receive any training
6  from the Department of Corrections on how to do
7  these tasks that are involved in your job?
8          A.    When we first started, we were only
9  submitting -- when I started in 1995, we were
10  only submitting an in-house invoice --
11          Q.    Uh-huh (affirmatively).
12          A.    -- but at some point we started
13  using the CAJUN invoice --
14          Q.    Uh-huh (affirmatively).
15          A.    -- as a billing process for D -- for
16  DOC to pay us.  I cannot remember exactly when
17  that happened, but it was probably in the early
18  2000s that we started using -- we had to submit
19  the CAJUN invoice and they only paid from the
20  CAJUN invoice.
21          Q.    Okay.  And did the Department of
22  Corrections provide you with any training or
23  instruction on the CAJUN invoice process?
24          A.    Usually by telephone or by e-mail.
25          Q.    Uh-huh (affirmatively).



1          A.     There again, I discussed it with
2     Glynn Stassi, who was -- he was like the IT guy
3     or the -- I mean, he kind of walked me through
4     some procedures.  He basically told me it was
5     harmless, that I couldn't hurt it, just go in and
6     play around with it; but as far as formal
7     training, no.
8          Q.     Okay.  And I know you said that you
9     weren't provided with any training when you
10    started with the sheriff's office.  Have you
11    received any training since you started to direct
12    your job responsibilities?
13         A.     No.
14         Q.     Okay.  You mentioned before that if
15    there is some kind of discrepancy between your
16    internal invoice and the CAJUN invoice that you
17    have six months to, I guess, seek supplemental
18    payment; is that correct?
19         A.     Yes.
20         Q.     Where does that six-month timeframe
21    come from?
22         A.     Department of Corrections.
23         Q.     Okay.  Is that a particular
24    regulation of theirs?
25         A.     We were just advised that they would

SOPHIE LAURA 6/24/2019

```
 1    only go back and pay us six months past.
 2         Q.    Okay.
 3         A.    I don't know why, but --
 4         Q.    Do you know when you received that
 5    advice?
 6         A.    No.
 7         Q.    Okay.  Do you know who informed you
 8    that you could seek --
 9         A.    Someone in the accounts payable
10    office.
11         Q.    At the Department of Corrections?
12         A.    Yes, at the Department of
13    Corrections.
14         Q.    Okay.  And was that information
15    provided directly to you?
16         A.    Yes, by telephone.
17         Q.    Okay.
18         MS. WASHINGTON:
19              I am going to show you what we are
20         marking as Exhibit 7.
21         (Exhibit 7 marked and tendered.)
22    BY MS. WASHINGTON:
23         Q.    Have you seen this document before?
24         A.    Yes.
25         Q.    What is it?
```

1      A.    It is our policy and procedure for

2  booking and classification and release of

3  offenders.

4      Q.    And from what we discussed earlier

5  about your job responsibilities, it seems like

6  you have some pieces of responsibility in the

7  booking and release process of prisoners at

8  Riverbend; is that correct?

9      A.    Yes.

10      Q.    Okay.  And can you sort of recap for

11  me what your role in the booking process is or

12  can be?

13      A.    When we are notified of a billing

14  change, billing code change, I would go into the

15  system and make that change.

16      Q.    Who notifies you of the billing code

17  change?

18      A.    Different parishes.  Sometimes it

19  comes from the pre-class office here, especially

20  if it is a local jail, like if it's an East

21  Carroll Parish offender.  Sometimes I'm not

22  notified until it appears on my CAJUN invoice and

23  then I have to go back and look at CAJUN and see

24  his actual DOC date.

25      Q.    Okay.  Specifically with reference

1    to Orleans --

2         A.    Uh-huh (affirmatively).

3         Q.    -- and the Inmate Trust Fund

4    document we looked at earlier in the five

5    plaintiffs in this case, how -- how were you

6    notified for Orleans prisoners of changes in

7    their billing code from pretrial to DOC

8    sentenced?

9         A.    Corey Amacker would send me an

10   e-mail with the offender's name, date of birth,

11   and sentence date only for most of them.  He

12   would just send me a list of six or seven names,

13   these guys went DOC as of this date; and

14   occasionally he did send me -- as in Exhibit 5, I

15   would receive the paperwork.

16        Q.    You said occasionally you would

17   receive the paperwork?

18        A.    Yes.  If -- well, for instance, like

19   this guy, there was an issue with him, so he sent

20   me the paperwork that he had received.

21        Q.    Okay.

22        A.    Just so I would have the paperwork

23   to send to the Department of Corrections and say,

24   you know, can you check to see if you have this

25   paperwork.



```
 1              Q.    Okay.
 2              A.    They would not accept a copy from me
 3    to book -- you know, to change it.  They have to
 4    have the original documentation.
 5              Q.    So when Corey Amacker would send you
 6    an e-mail with the name, date of birth, and
 7    sentence date for, let's say, ten -- ten
 8    prisoners, was there any -- were there any
 9    documents attached to those e-mails?
10              A.    Not every time, no.
11              Q.    Okay.  So on -- there wasn't any
12    structure to when there were documents attached
13    and when there weren't?
14              A.    No.
15              Q.    Okay.  And you said that it
16    indicated the sentence date.  Did it provide any
17    other information by e-mail about the conviction?
18              A.    No.
19              Q.    Okay.  Did it provide the length of
20    the sentence?
21              A.    No.
22              Q.    Did it provide credit for time
23    served?
24              A.    No.
25              Q.    Okay.  So all that you would receive
```

1    in the e-mail was a name, a date of birth, and
2    the sentence date?
3           A.    Yes.
4           Q.    And maybe if you were lucky, an
5    attachment occasionally?
6           A.    Yes.
7           Q.    Okay.
8           MR. MATTHEWS:
9                 Object to the form of the question.
10   BY MS. WASHINGTON:
11          Q.    We were looking at that policy,
12   which also deals with release; is that correct?
13          A.    Yes.
14          Q.    Do you have a role in the release of
15   prisoners from Riverbend in any sense?
16          A.    Other than updating it in our
17   internal general management system, no.
18          Q.    Okay.  How does that updating in the
19   JMS work?  You indicated that the release date
20   only happens after the person has been released,
21   correct?
22          A.    That's correct.
23          Q.    Okay.  Tell me about that process.
24          A.    The offender -- we receive the
25   release information or the documentation from the

```
 1    Department of Corrections --
 2            Q.    Uh-huh (affirmatively).
 3            A.    -- and our pre-class officer,
 4    Ms. Bell, will sign them out; and when -- upon
 5    their release date, they are released, either
 6    transported to the bus station or back to the
 7    parish of conviction, if we have a court trip
 8    that day.
 9                  The release date and time is
10    documented in the control center, which would
11    change the head count; and that information, that
12    paperwork is sent to us the very next day and we
13    make the bed changes and movements and release
14    information in the system.
15            Q.    Okay.  What's the control center?
16            A.    That is the main control center of
17    the -- I mean, they document everything that goes
18    on in the facility.
19            Q.    Okay.  So that's here at Riverbend?
20            A.    Yes.
21            Q.    Okay.  Other than this policy,
22    Exhibit 7, is there any other manual, Standard
23    Operating Procedure, memo which directs how
24    bookings and releases occur at Riverbend?
25            A.    I'm not aware of one, no.
```

```
 1              Q.     And this policy appears to be issue
 2    dated September 15th, of 2012; is that correct?
 3              A.     That's correct.
 4              Q.     Do you know of any revisions to this
 5    policy since this issue date?
 6              A.     No.
 7              Q.     So this is the policy that would
 8    have been in place in 2016 and 2017?
 9              A.     Yes.
10              Q.     And is in place today?
11              A.     Yes.
12              Q.     Okay.  And this policy predates
13    those CEAs and Memorandums of Understanding
14    between Orleans Parish Sheriff's Office and the
15    East Carroll Parish Sheriff's Office that we
16    looked at briefly in the exhibits earlier.  To
17    your knowledge, were there any modifications made
18    to this policy after East Carroll began housing
19    prisoners from Orleans?
20              A.     No.
21              Q.     Okay.
22              A.     Not to my knowledge.
23              Q.     Okay.  And so, to your knowledge,
24    this policy would also direct the booking and the
25    release of prisoners from Orleans Parish?
```

```
 1            A.      Yes, to my knowledge.
 2            Q.      I want to look at the first page of
 3    Exhibit 7; and in that first paragraph in very
 4    small print under Policy, that concludes with
 5    "The booking intake shall follow" -- oh, "shall
 6    include the following information unless
 7    prohibited by law."
 8                 Do you see where I'm reading?  And
 9    then it appears to then go on to list 18 numbered
10    requirements for the intake process; is that
11    correct?
12            A.      That's correct.
13            Q.      Who collects the information that's
14    listed in these 18 numbered bullet points?
15            A.      The majority of this information is
16    provided from the transferring agency, and it
17    is -- when offenders are processed in, it's sent
18    to the front office for the records department.
19            Q.      You mentioned the records
20    department.  The records department would be
21    responsible for collecting the information that's
22    listed here from 1 to 18?
23            A.      They would be responsible for
24    maintaining that information.  Most of the
25    information here is provided by the offender on
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    -- on forms that we have which are part of the

2    offender's record.

3            Q.    So the offender completes forms once

4    he or she arrives at Riverbend?

5            A.    That's correct.

6            Q.    And so that's self reporting by --

7            A.    Yes.

8            Q.    -- the prisoner?

9            A.    Yes.

10           Q.    I want to look specifically at No. 5

11   there, which says, date of arrest and admission,

12   duration of confinement, and a copy of the court

13   order or other legal basis for commitment.  Do

14   you see where I'm reading?

15           A.    Yes.

16           Q.    Where does that information come

17   from?

18           A.    The transferring parish.

19           Q.    And is that provided in hard copy

20   when the prisoner shows up at Riverbend?

21           A.    Sometimes.

22           Q.    Okay.  How else could it be provided

23   to Riverbend?

24           A.    Possibly by mail, possibly by

25   e-mail.  I'm unsure because I don't maintain the

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

 1    records.

 2         Q.    Okay.  The information that's listed

 3    in Nos. 1 through 18, where is that information

 4    ultimately maintained at Riverbend?

 5         A.    In the records department.

 6         Q.    Okay.

 7         A.    Medical information is maintained in

 8    the medical department, of course.

 9         Q.    Does Riverbend have an individual

10    file on each person in its custody?

11         A.    Yes.

12         Q.    Okay.  And is that in the records

13    department?

14         A.    Yes.

15         Q.    Okay.  To your knowledge, what

16    information would be contained in that individual

17    prisoner file?

18         A.    The information listed on this

19    exhibit.

20         Q.    Okay.  Exhibit 7?

21         A.    Any write-ups, release

22    documentation, if there is any release

23    documentation available.  Basically anything that

24    pertains to that offender.

25         Q.    Okay.  So if the person is a DOC

```
 1    sentenced offender, would their individual file
 2    contain information about their conviction and
 3    sentence?
 4          A.    If it's been provided by the parish
 5    of conviction to us.
 6          Q.    Okay.  And would the individual file
 7    for a DOC sentenced prisoner contain information
 8    about their time calculation and release date?
 9          A.    No.  Only if DOC had provided a
10    clearance certificate or if we had -- if they
11    have been computed, their time has been computed
12    and they have a release date and we printed a rap
13    sheet, like a master prison record.
14          Q.    Okay.
15          A.    Not the suspect rap sheet as here
16    (indicated).  They have an actual DOC master
17    prison record.
18          Q.    Is it the practice at Riverbend to
19    print the master prison record and put it in an
20    individual file?
21          A.    Only at the request of the offender.
22          Q.    Okay.
23          A.    Or excuse me.
24          Q.    No, that's okay.
25          A.    Or unless it's provided by the
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
1    Department of Corrections.  Occasionally, we will
2    get a thick envelope of rap sheets, but that
3    doesn't happen often any more.  Since we have
4    CAJUN access, we normally print them at the
5    offender's request.
6         Q.   Okay.  Do you have access to the
7    individual files for prisoners who are housed at
8    Riverbend?
9         A.   They are housed in a separate
10   building, but I do have access to them.
11        Q.   Other than you, and it sounds like
12   members of the records department, who all has
13   access to those individual files?
14        A.   Anyone in administration.
15        Q.   Okay.  Would that -- what about
16   actual correctional officers?
17        A.   No.
18        Q.   What about the wardens, Warden
19   Hedgemon and Warden Knight?
20        A.   Yes.
21        Q.   Okay.
22        A.   If they request a copy or request to
23   --
24        Q.   Access --
25        A.   -- review the file, the files are
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    pulled occasionally and brought to them.
 2          Q.    Okay.  And I'm correct in assuming
 3    that these are hard copy files?
 4          A.    Yes.
 5          Q.    Is there any electronic version of
 6    the files?
 7          A.    No.
 8          Q.    Okay.  And you mentioned that they
 9    are stored in a different location from where you
10    are; is that correct?
11          A.    Yes.
12          Q.    Who actually stores or maintains the
13    individual files?
14          A.    Mary Brown.
15          Q.    Okay.
16          A.    They are in her office.
17          Q.    Okay.  And is she in records?
18          A.    Yes.
19          Q.    Okay.  Looking back at Exhibit 7, in
20    this list of booking intake information, are
21    there circumstances under which someone is booked
22    into Riverbend but the information in
23    1 through 18 is not provided?
24          A.    If the offender refuses to provide
25    the information, yes.
```

1          Q.    Okay.  What about, for instance,
2   No. 5 that we were just looking at regarding the
3   arrest, confinement, and court order, other legal
4   basis for a commitment?
5          A.    Yes.  It -- it may or may not be in
6   the file because it has to be -- it has to come
7   from the parish of conviction.
8          Q.    Okay.  So if you don't receive it
9   from the parish of conviction, it -- it won't be
10  part of the booking intake; is that correct?
11         A.    That's correct.
12         Q.    Okay.  But you would still take
13  custody of that prisoner?
14         A.    Yes.
15         Q.    Looking at the same list, No. 6
16  talks about the name, title, agency, and
17  signature of the delivering officer.  Do you see
18  where I'm reading?
19         A.    Yes.
20         Q.    What -- what is that referring to?
21         A.    That's referring to the person who
22  actually brings the offender to our prison.
23         Q.    Okay.
24         A.    It would have -- the agency is from
25  where they are being transferred from and the --

1    their name.

2         Q.    Okay.  And is there a specific form

3    that's used to capture that information?

4         A.    The pre-class form would have the

5    agency; and actually it would have the signature

6    of the receiving officer, and I'm not sure about

7    the signature of the delivering officer.

8         Q.    You referenced a pre-class form.

9    Can we take a look at Exhibit 6, which was the

10   file that I was provided on Mr. Crittindon?

11        A.    Uh-huh (affirmatively).

12        Q.    Can you just look through this and

13   -- and see if that pre-class form that you just

14   mentioned is in here just so I know what that

15   document looks like?

16        A.    Right there (indicated), the Initial

17   Classification Form.

18        Q.    The Initial Classification Board?

19        A.    Form.

20        Q.    I'm sorry.  It just says board at

21   the top?

22        A.    I'm sorry.  I thought you said Ford.

23        Q.    Okay.  No.  And so this is completed

24   when the person goes through a booking?

25        A.    Yes.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          Q.     Okay.  And so it says "Received from
 2    Orleans Parish, slash, Franklin."
 3          A.     Yes.
 4          Q.     Okay.  And then the officers'
 5    signatures at the bottom here (indicated), are
 6    those the officers at Riverbend receiving the
 7    person?
 8          A.     Yes.
 9          Q.     Okay.  Okay.  Who conducts the
10    booking process at Riverbend?
11          A.     The booking process would be the
12    receiving officers.
13          Q.     Okay.  And are they assigned to like
14    a particular division?
15          A.     No.  They have shifts and each
16    lieutenant would either do the intake paperwork
17    or his designee would do that.
18          Q.     Okay.  And has -- would this have
19    been the same process that was in place in 2016?
20          A.     Yes.
21          Q.     Okay.  And as far as the
22    documentation that may or may not accompany a --
23    a prisoner when he arrives here at Riverbend, is
24    it the receiving officer who would be responsible
25    for initially collecting that information if it
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    accompanied the prisoner?

2          A.    Normally a paperwork packet is

3    transferred with offenders from the agency.   If

4    the paperwork, the booking -- I mean, the

5    conviction and sentencing information is

6    available at that time, yes, he would collect it

7    and it would be sent to the records department.

8          Q.    Okay.  I guess my question is, is it

9    the receiving officer's responsibility to make

10   sure that the booking intake has all of the

11   information that's listed in No. 1 through 18 in

12   this policy?

13         A.    No.  It would be the records

14   department.

15         Q.    Okay.  Who supervises the records

16   department?

17         A.    The warden.

18         Q.    Warden Hedgemon?

19         A.    Warden Hedgemon.

20         Q.    Okay.  Does Warden Knight supervise

21   the records department?

22         A.    No.

23         Q.    Okay.  And who supervises the

24   receiving officers who are conducting the booking

25   intake?

```
 1          A.     Captain Russell.
 2          Q.     Okay.  And who does Captain Russell
 3   report to?
 4          A.     Warden Hedgemon or Warden Knight.
 5          Q.     Okay.  So Captain Russell oversees
 6   the receiving officers in booking and Captain
 7   Russell reports to both Warden Hedgemon and
 8   Warden Knight?
 9          A.     Yes.
10          Q.     Okay.  Does Riverbend use a
11   checklist or any kind of log to see if all of
12   these components that are listed on the first
13   page of Exhibit 7 are obtained for each booking?
14          A.     The offender is given this packet of
15   paperwork and --
16          Q.     Are you in exhibit?
17          A.     Yes, Exhibit 6.
18          Q.     Uh-huh (affirmatively).
19          A.     He is given an intake packet and all
20   of this information is collected from the
21   offender.  Signatures, contact information, all
22   of this is done upon intake.
23          Q.     Can you tell me based on the Bates
24   numbers at the bottom which pages you are
25   referring to?
```

```
 1          A.     The 4680.
 2          Q.     Uh-huh (affirmatively).
 3          A.     4681.
 4          Q.     Uh-huh (affirmatively).
 5          A.     4682, 4863, 4864, 4685.  Let's see.
 6   Yes.  That's it.
 7          Q.     Okay.  The page before the first
 8   page that you just listed, which is 4679?
 9          A.     Yes.
10          Q.     Says Riverbend Detention Center
11   checklist at the top, do you see where I'm
12   referring to?
13          A.     Yes.
14          Q.     What is this form?
15          A.     That form is a form that is in the
16   record that the records department puts in there
17   just to verify that the information is there.
18   There is no follow up from this form.
19          Q.     And this is completed by the records
20   department --
21          A.     Yes, ma'am.
22          Q.     -- when the individual prisoner file
23   is created?
24          A.     Yes.
25          Q.     Okay.  So the form in
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   Mr. Crittindon's inmate file that we are looking
2   at does not appear to have all of those elements
3   checked off, correct?
4          A.    That's correct.
5          Q.    In fact, it looks like only three
6   are checked off for fingerprint card, photograph
7   and acknowledgment and signature form; is that
8   correct?
9          A.    That's correct.
10         Q.    Okay.  So it isn't checked for
11  master prison form, for the bill of information,
12  for court minutes or uniform commitments, for the
13  jail credit letter or detainer, for the health
14  record or for the basic information interview
15  from -- or for local jail is; is that correct?
16         A.    Yes.
17         Q.    Okay.  Are these checklist forms
18  used by the records department for both pretrial
19  prisoners as well as DOC sentenced prisoners?
20         A.    Yes.
21         Q.    Okay.  And we -- we spoke earlier
22  about the book-in numbers and whether a new
23  booking process happens when people change from a
24  pretrial billing code to a sentenced billing
25  code.

          A.     Yes.
          Q.     And it's my understanding, based on
your previous testimony, that there isn't a new
book-in process that happens with that billing
code change; is that correct?
          A.     That's correct.
          Q.     Okay.  So this checklist and the
whole booking process would only happen at the
first time that someone came in through booking;
is that correct?
          A.     That's correct.
          Q.     Okay.  And so Mr. Crittindon, who
changed from being Orleans pretrial to being DOC
sentenced, he would have only gone through the
booking process when he came in originally as the
pretrial prisoner?
          A.     That's correct.
          Q.     Okay.  Briefly on the second page of
Exhibit 7, the policy that we were looking at,
No. 4 at the top indicates "Personnel will open
an offender file as part of the admissions
process.  This file will contain all paperwork
generated by the offender's stay at the facility
including the following."  Do you see where I'm
reading from?

SOMMER, LAURA - 6/24/2019

```
 1          A.    Yes.
 2          Q.    Okay.  And is this the -- that hard
 3   copy file that exists for each prisoner?
 4          A.    Yes.
 5          Q.    Okay.  And it references there in A
 6   and B intake and booking info as well as court
 7   documentation; is that correct?
 8          A.    Yes.
 9          Q.    Okay.  The bottom of that section or
10   kind of right after A through H says "The
11   contents of the offender file are compiled
12   according to a format approved by the facility
13   administrator."  Do you see that?
14          A.    Yes.
15          Q.    Who is the facility administrator
16   that is being referred to in this policy?
17          A.    That would be the warden,
18   Warden Hedgemon.
19          Q.    Okay.  Do you know for B under
20   Section 4 there where it says "court
21   documentation" what is meant or included in
22   "court documentation"?
23          A.    It would include any sentencing
24   information or bill of information, anything that
25   would be originated in the courts that we would
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1    be provided.
 2          Q.    Okay.
 3          MS. WASHINGTON:
 4                Do you guys mind if we take a break
 5          real fast?
 6       (A short recess was taken.)
 7    BY MS. WASHINGTON:
 8          Q.    We can go back on the record.  Just
 9    a couple more questions about Exhibit 7, the
10    policy.  I'm looking at the third page in the
11    section in the middle under what says Admissions
12    Documentation?
13          A.    Uh-huh (affirmatively).
14          Q.    The first paragraph there reads "An
15    order to detain or release bearing the
16    appropriate official signature shall accompany
17    the newly arriving offender."  Do you see where
18    I'm reading?
19          A.    Uh-huh (affirmatively).
20          Q.    And it goes on to say that the -- in
21    the next paragraph, that "If an offender is
22    transferred without proper documentation,
23    Riverbend facility personnel will request
24    information from the transferring facility."  Did
25    I read that correctly?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1       A.    Yes.

2       Q.    Who is responsible for making sure

3 that new admissions -- new intakes to Riverbend

4 have this proper documentation that's referred to

5 in this section?

6       A.    The records department or possibly

7 myself, if there is a billing issue.

8       Q.    What documentation do you need such

9 that there isn't a billing issue?

10      A.    Basically something from the court

11 or from the Department of Corrections stating

12 that they are a billable offender.

13      Q.    Okay.  So I guess my question on

14 that, just to go back really briefly to

15 Exhibit 6, we looked at that checklist for

16 Mr. Crittindon and, like we went over before, the

17 only thing checked is photograph, fingerprint

18 card, and acknowledgment and signature form.  The

19 sections for, you know, the jail credit letter,

20 the detainer, the court minutes, the bill of

21 information, all -- all of that doesn't appear to

22 be present when this checklist was filled out,

23 correct?

24      A.    That's correct.

25      Q.    So how would -- how would you have

1    had for Mr. Crittindon the documentation that you

2    just talked about?

3         A.    We would have had to have contacted

4    Orleans Parish --

5         Q.    Okay.

6         A.    -- to obtain that information.

7         Q.    Okay.  So Mr. Crittindon would have

8    been booked into Riverbend; and then subsequent

9    to him being booked in, you-all would have had to

10   get in touch with Orleans to get the missing

11   information?

12        A.    Yes.

13        Q.    Okay.  And I know we talked a little

14   bit about it before, but is that -- would you

15   personally have been the one reaching out to

16   Orleans for this information?

17        A.    Only if there was a billing issue.

18        Q.    Would there have been a billing

19   issue if you didn't have any of this court

20   information?

21        A.    I personally or our department --

22   our agency does not have to have it as well as

23   the Department of Corrections has it, because the

24   Department of Corrections would be responsible

25   for updating his CAJUN file, which would

```
 1    subsequently allow me to bill.
 2            Q.    Okay.  So your department at
 3    Riverbend would not need to have the court
 4    information or sentencing document or anything
 5    like that?
 6            A.    Technically, no.
 7            Q.    Okay.  You-all rely on the
 8    Department of Corrections obtaining that
 9    information and that becoming part of the CAJUN
10    invoice; is that correct?
11            A.    That's correct.
12            Q.    Okay.  So is it possible that none
13    of this other information like the court minutes
14    or commitment order or jail credit letter was
15    ever received for Mr. Crittindon?
16            A.    I'm not sure, because I'm not in
17    records and I'm not -- I'm not sure whether we
18    pre-classed him or whether Orleans pre-classed
19    him.
20            Q.    Okay.  And you may not know because
21    you are not in records, but, to your knowledge,
22    if subsequent information came in after the
23    checklist has been completed, would the checklist
24    be updated to reflect that this information was
25    now in the prisoner's file?
```

```
1           A.    Not -- not -- not usually.

2           Q.    Okay.

3           A.    No.

4           Q.    Would there be any other document or

5     log showing when additional information would

6     have been received after a person was booked into

7     Riverbend?

8           A.    No.

9           Q.    Okay.  Looking back at that

10    section H admissions documentation in the policy

11    that we were looking at, it indicates that

12    facility personnel will request information from

13    the transferring facility in the event the

14    offender is transferred without proper

15    documentation.  Who is the facility personnel

16    responsible for requesting that information?

17          A.    It would be the records department.

18          Q.    Okay.  And do you know who

19    specifically in the records department would be

20    responsible for that?

21          A.    Mary Brown.

22          Q.    Okay.  Is there anybody else in the

23    records department?

24          A.    No.

25          Q.    Okay.  Just Mary Brown?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

```
 1          A.    Yes.
 2          Q.    Was she employed by the sheriff's
 3   office in 2016?
 4          A.    Yes.
 5          Q.    And she's still here?
 6          A.    Yes.
 7          Q.    Okay.  You told me earlier who
 8   supervises Ms. Brown, but I don't remember.
 9          A.    Warden Hedgemon.
10          Q.    Okay.  Thank you.  Lastly, on
11   Exhibit 7, the last page deals with releases --
12          A.    Uh-huh (affirmatively).
13          Q.    -- and it refers to the booking,
14   slash, release officer in some of these
15   subsections on the last page.  Do you see that?
16          A.    Yes.
17          Q.    Is this referring to the same
18   booking officers, the lieutenants or their
19   designees that we discussed earlier?
20          A.    No.
21          Q.    Okay.  Who is this referring to?
22          A.    Ms. Brown would check for any
23   warrants or detainers that would be present in
24   the file.
25          Q.    Okay.  You're looking at No. 1 --
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1              A.      Yes.
2              Q.      -- on page 4, correct?  Who else is
3      involved in the release process for a person from
4      Riverbend?
5              A.      In the normal release process,
6      Ms. -- DOC would send a clearance sheet to our
7      department, either to Ms. Brown or Ms. Bell, and
8      they would check for any outstanding warrants or
9      detainers or possible open charges.
10             Q.      Uh-huh (affirmatively).
11             A.      And, once that is determined, once
12     the offender is determined to be clear, they
13     would send that information back to the
14     Department of Corrections and then either a
15     certificate of release or diminution of sentence
16     would be issued by the Department of Corrections
17     back to our department either by fax or we
18     usually get a packet once a month of releases
19     coming in for -- like we probably are getting the
20     releases for July already --
21             Q.      Okay.
22             A.      -- like right now.
23             Q.      Got it.
24             A.      And we would -- once they are clear,
25     they would -- the diminution would be sent from
```

 1    the Department of Corrections.
 2          Q.    So when are Ms. Brown and Ms. Bell,
 3    if she's involved in that, are checking for the
 4    warrants or the detainers, are they doing that
 5    immediately upon intake?
 6          A.    No.  They do that when DOC sends us
 7    a clearance sheet.
 8          Q.    What does that look like?
 9          A.    If you refer to Exhibit 6 --
10          Q.    Yes.
11          A.    -- it is 4662.
12          Q.    Okay.  So this (indicated) sheet
13    that we are looking at indicates that it's to
14    Bell or Brown, correct, and that is -- it appears
15    to be from Kelly, someone with the Department of
16    Corrections; is that correct?
17          A.    That's correct.
18          Q.    Okay.  And so this is what you are
19    referring to as the clearance sheet?
20          A.    Yes.
21          Q.    Okay.  And you-all at Riverbend
22    don't take any action to check for warrants or
23    detainers or send the information back to DOC
24    until you get this clearance form?
25          A.    Yes.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond  LA  70404     Fax 985.419.0799

```
 1           Q.    Okay.  And when, kind of generally
 2    speaking in the process of time calculation and
 3    release for people who are DOC sentenced, do
 4    you-all receive these clearance forms?
 5           A.    Sometimes, the very same day.  His
 6    release date was January 13th; and if you look at
 7    the date of this clearance sheet, it's dated
 8    January 13th as well.
 9           Q.    Okay.
10           A.    So we may get this clearance sheet
11    in the morning, clear them as indicated here --
12           Q.    Uh-huh (affirmatively).
13           A.    -- on the form, and send it back to
14    the Department of Corrections immediately along
15    with a residency plan, which is docket number --
16    I mean, document number 4664 --
17           Q.    Uh-huh (affirmatively).
18           A.    -- and then a diminution or
19    certificate of release is issued by the
20    Department of Corrections.
21           Q.    And is that the first page of --
22           A.    Yes.
23           Q.    -- Exhibit 6?  Okay.
24           A.    That was the release document.  Page
25    -- 4658 is our authorization to release him.
```

```
 1        Q.    And so you receive a clearance form,
 2   you send back those two pages we just talked
 3   about, maybe additional things, and then you
 4   receive a certificate of release from the
 5   Department of Corrections; is that correct?
 6        A.    That's correct.
 7        Q.    Okay.  And this may be a little bit
 8   duplicative of what we discussed before, but I
 9   just want to make sure I understand.  Is the East
10   Carroll Parish Sheriff's Office tracking in any
11   kind of way upcoming or approaching release dates
12   for persons housed at Riverbend?
13        A.    Only when we receive the
14   documentation from the Department of Corrections.
15        Q.    And that's the clearance form you
16   just mentioned?
17        A.    Actually, it would be the clearance
18   form or it would be the diminution of sentence
19   for July or the upcoming month, and we go ahead
20   and sign those documents, you know, get -- the
21   offender has -- this certificate of release does
22   not have to be signed by the offender.
23        Q.    Correct.
24        A.    But a diminution of sentence has to
25   be signed by the offender because there are
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   certain stipulations of his release.  And once we
 2   get those, we go ahead and process the ones that
 3   are released first.  You know, time plays a part
 4   because we may get 30 or 40 releases for the
 5   month of July, so obviously she's going to do the
 6   -- process the ones that are released the first
 7   week or two of July.
 8        Q.    Uh-huh (affirmatively).
 9        A.    And then she has them in order of --
10   date order.  Ms. Bell --
11        Q.    Ms. Bell.
12        A.    -- keeps up with those
13   diminutions --
14        Q.    Okay.
15        A.    -- or the certificates of release
16   and they are processed accordingly by the dates
17   of their release.
18        Q.    Okay.  But am I correct in
19   understanding that other than receipt of the
20   clearance forms from the Department of
21   Corrections or receipt of the packets from the
22   Department of Corrections for upcoming releases
23   there's no other mechanism --
24        A.    No.
25        Q.    -- by which Riverbend tracks release
```



1    dates for persons housed here at Riverbend?

2         A.    No.

3         Q.    Okay.  Specifically with reference

4    to the housing of DOC sentenced prisoners who

5    were transferred from Orleans, to the extent that

6    you know, what -- what documentation was East

7    Carroll being provided that was the -- the legal

8    authority for holding these DOC sentenced

9    prisoners transferred from Orleans?

10        A.    They were transferred as a pretrial

11   offender; and if they had been sentenced, we were

12   receiving the date they were sentenced with their

13   name or date of birth.  And, you know, initially

14   that's all I was receiving.  I don't know what

15   anybody else was receiving as far as

16   documentation.  Now, if I had a billing issue, I

17   would contact Corey and get him to send me the

18   information.

19        Q.    Okay.

20        A.    Because if they had not been updated

21   and kept -- my main concern was getting them on

22   the invoice so we could be paid for them.

23        Q.    Okay.  And so this goes back to what

24   you said before.  The only information you were

25   receiving was the e-mails from Mr. Amacker that

1    provided a name, date of birth, and sentence

2    date?

3          A.    Yes, initially.

4          Q.    Okay.  What do you mean "initially"?

5          A.    If I had an issue, they would -- he

6    would send me additional information.

7          Q.    Okay.

8          A.    But initially, to change them from a

9    pretrial offender to a DOC, I was only getting

10   the -- the name and date of birth and sentence

11   date.

12         Q.    Okay.  I believe earlier you

13   mentioned the term pre-class; is that correct?

14         A.    Yes.

15         Q.    What does that -- what is your

16   understanding of pre-class?

17         A.    Our pre-class department -- and we

18   really don't have a department.  It is strictly

19   where we gather the information from the

20   offender, where we have to determine housing as

21   far as whether they need to be in segregation or

22   whether they need to be in general housing,

23   whether they are a pretrial offender or whether

24   they're a DOC offender, and that's basically --

25   we just -- the initial classification board

SEVIER, LAURA 02/24/2019

1    determines that information.

2         Q.    Okay.  And those were the documents

3    that you previously referenced examples of from

4    Exhibit 6; is that correct?

5         A.    Yes.

6         Q.    Okay.  Does the -- well, you just

7    said you don't really have a department; is that

8    correct?

9         A.    Yes.

10        Q.    Okay.  Who at Riverbend participates

11   in the pre-class process such as this?

12        A.    For the initial intake, it would be

13   your supervisors.

14        Q.    Okay.

15        A.    And they would -- or their designee.

16   Occasionally if he's got something going on in

17   the back, he would designate his assistant to

18   pre-class the offenders; and then Ms. Bell is

19   responsible as part of that pre-class department

20   obtaining release information from DOC or release

21   documentation -- not release information, release

22   documentation from DOC.

23        Q.    And is that the process that we just

24   talked about or is that something that happens

25   during booking?

SEVIER, LAURA 06/24/2019

 1          A.     No.  That's the process that we just

 2     discussed.

 3          Q.     Okay.  Do you know if there's any

 4     separate policy other than Exhibit 7 that we just

 5     looked at that deals with pre-class at Riverbend?

 6          A.     No.

 7          Q.     Okay.  And do you know if the

 8     lieutenants and their designees have been

 9     provided with training by the sheriff's office on

10     this pre-class process?

11          A.     No.  I'm not aware of any training.

12          Q.     Okay.  What -- what about Ms. Bell,

13     did she receive any training, to your knowledge,

14     on her responsibilities relative to release and

15     pre-classification?

16          A.     No.

17          Q.     Okay.  No, she didn't receive any or

18     no, you don't know?

19          A.     No, she did not receive.

20          Q.     Thank you.  It's my fault for the

21     question.

22                 And I think we already talked about

23     this, but does the sheriff's office have any

24     other manuals or guidelines, even things provided

25     by, let's say, the Department of Corrections

```
 1   about the pre-classification and release process
 2   that happens here at Riverbend?
 3          A.    The only documentation or
 4   information would have been in the basic jail
 5   guidelines.
 6          Q.    Uh-huh (affirmatively).
 7          A.    And it's basically the same
 8   documentation that's required according to our
 9   booking and classification policy.
10          Q.    That Exhibit 7 that we have been
11   looking at?
12          A.    Yes.  Our policy is actually a
13   little more detailed than Department of
14   Corrections only because it lists everything
15   separately.
16          Q.    Okay.  And you are saying that the
17   policy was developed based on the basic jail
18   guidelines; is that correct?
19          A.    That's correct.
20          Q.    Do you know who created Exhibit 7,
21   that policy?
22          A.    No.  I'm not sure.
23          Q.    Okay.  It would have been created or
24   issued at least while you've been employed by the
25   --
```

```
1          A.     Yes.

2          Q.     -- sheriff's office?  Okay.

3          A.     I believe this --

4    MR. EVANS:

5               Hey, Emily?

6    MS. WASHINGTON:

7               Yes.

8    MR. EVANS:

9               I have to hop off for a couple of

10   minutes to make that call.

11   MS. WASHINGTON:

12              Okay.

13   MR. EVANS:

14              You can just keep going.  I don't

15   know how much you have left, but I

16   guess -- or would it be easier if we just

17   went off record real quick and I call back

18   in or, Shane, would it cause any

19   destruction if I call back in?

20   MS. WASHINGTON:

21              We can go off the record for a

22   minute, Gary.  I -- I think our next one

23   with Ms. Bell is noticed for 12:30, and I

24   -- I really think I'll probably be done by

25   then even with taking a short break.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          MR. EVANS:
 2               Great.  Excellent.  I'll call back
 3          very soon.
 4          MS. WASHINGTON:
 5               Okay.  We can go off the record.
 6          MR. EVANS:
 7               I'll call back in just a second.
 8          Sorry.
 9      (A short recess was taken.)
10  BY MS. WASHINGTON:
11      Q.    We can go back on the record.  You
12  mentioned earlier the rap sheets being generated
13  by AFIS; is that correct?
14      A.    There is a rap sheet, a suspect rap
15  sheet that is generated by AFIS.
16      Q.    Okay.  And is there capability to
17  use AFIS at Riverbend?
18      A.    Yes.
19      Q.    Okay.  And who -- who works AFIS at
20  Riverbend?
21      A.    We have several employees, but
22  Captain Russell is pretty much the one that
23  oversees that.
24      Q.    Okay.
25      A.    I'm not sure which ones have been
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1  trained on it.

2      Q.    Okay.  People in addition to Captain

3  Russell have been trained on it?

4      A.    Yes.

5      Q.    Okay.  Do you know generally what

6  it's used for?

7      A.    No.

8      Q.    Okay.

9      A.    I have no idea how it works.  I

10 don't want to know how it works because it means

11 I would have to work on it if something happens.

12     Q.    Okay.  I understand.  The Riverbend

13 Detention Center houses pretrial prisoners for

14 East Carroll Parish; is that correct?

15     A.    Yes.

16     Q.    Do you know what the process is

17 after an East Carroll pretrial detainee is

18 sentenced to the Department of Corrections?

19     A.    Not particularly.  Ms. Bell may be

20 able to give you more detail on that.

21     Q.    Okay.

22     A.    There again, I'm brought a slip

23 telling me they are DOC and I change it in the

24 billing.

25     Q.    Okay.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1            A.    That's it.
 2            Q.    So Ms. Bell may have more
 3    information about --
 4            A.    The process.
 5            Q.    -- the process once someone is -- is
 6    sentenced to the Department of Corrections for
 7    East Carroll?
 8            A.    For East Carroll, yes.
 9            Q.    Okay.
10            A.    For East Carroll only.
11            Q.    Okay.  And earlier I showed you
12    those two documents that were the CEA and the MOU
13    between East Carroll Parish Sheriff's Office --
14            A.    Uh-huh (affirmatively).
15            Q.    -- and the Orleans Parish Sheriff's
16    Office, and I believe you indicated you hadn't
17    seen those records before, correct?
18            A.    Yes, that's correct.  I have not
19    seen those.
20            Q.    Are you aware that at some point in
21    time Orleans Parish Sheriff's Office began
22    transferring DOC sentenced prisoners to
23    Riverbend?
24            A.    I am aware of the fact that pretrial
25    offenders were sentenced and they remained here,
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1    but I am not familiar with any DOC inmates being
 2    transferred here as a DOC offender.
 3         Q.    At some point in time Orleans Parish
 4    stopped housing pretrial detainees here, correct?
 5         A.    Yes.
 6         Q.    Okay.  After that point in time, are
 7    you aware that Orleans Parish Sheriff's Office
 8    continued to provide transfer DOC sentenced
 9    prisoners to Riverbend?
10         A.    I am not aware of any that came
11    specifically from Orleans.  They may have come
12    from another parish and have been sentenced in
13    Orleans, but because we do transfer offenders,
14    DOC offenders between facilities, local jail
15    facilities.
16         Q.    Okay.  So all of the transfers from
17    Orleans Parish that you are aware of are
18    prisoners who would have been held here pretrial
19    who were then sentenced and remained here as DOC
20    sentenced prisoners?
21         A.    Yes.
22         Q.    Okay.  When Orleans started housing
23    pretrial detainees here at Riverbend, was it the
24    practice from the very beginning that Orleans
25    based prisoners who took DOC time would remain at
```



SEVIER, LAURA 2/24/2019

1    Riverbend?

2         A.    I can't be sure.

3         Q.    Uh-huh (affirmatively).

4         A.    But generally, that was a practice

5    that took place, but I can't say that every

6    offender.  I mean, I -- I really didn't pay that

7    close of attention to it.

8         Q.    Okay.  What I'm trying to figure out

9    is whether or not there was a specific point

10   where, to your knowledge, Orleans Parish

11   Sheriff's Office started transferring or keeping

12   DOC sentenced prisoners at Riverbend?

13        A.    I am not familiar with it or I don't

14   recall a specific point in time.

15        Q.    Okay.  Do you remember when

16   Riverbend began housing prisoners for the Orleans

17   Parish Sheriff's Office?

18        A.    Not the specific date.

19        Q.    Generally, do you remember when that

20   was?

21        A.    No, because it's been such a long --

22   I mean, I don't remember exactly.

23        Q.    Okay.

24        A.    Billing invoices would be my only

25   indication and I would have to review that.



```
 1           Q.    Okay.  That makes sense.  Am I
 2    correct in understanding that after a prisoner is
 3    sentenced to the Department of Corrections there
 4    is certain paperwork and documentation and other
 5    records that are to be provided to the Department
 6    of Correction for time calculation and releases
 7    to issue and that kind of thing?
 8           A.    Yes.
 9           Q.    Okay.  Are those tasks, the
10    paperwork and documentation that has to happen
11    after someone is sentenced to the Department of
12    Corrections, is that performed here at the
13    Riverbend Detention Center?
14           A.    No.
15           Q.    Okay.
16           A.    That paperwork would have to
17    originate from the court system --
18           Q.    Okay.
19           A.    -- the clerk of court, the judge's
20    office, the DA.  All of that would come from
21    their office.
22           Q.    Okay.  And do you know whether or
23    not that paperwork that you are talking about
24    coming from the clerk of court or the district
25    attorney's office is sent directly from the court
```

SEVIER, LAURA 2024/2019

1    or the DA to the Department of Corrections?

2         A.    No.

3         Q.    Okay.  Who sends it?

4         A.    It is sent to the parish of

5    conviction, usually the sheriff's office.

6         Q.    Okay.

7         A.    Our practice is to send it to -- the

8    clerk sends it to the sheriff's department.  I'm

9    not familiar with other parish procedures, but it

10   normally comes from the clerk of court and the

11   parish of conviction to the sheriff, and then the

12   sheriff processes the -- the offender.  You know,

13   you have to have a jail credit letter and other

14   things that go with it --

15        Q.    Okay.

16        A.    -- that are generated from that

17   sheriff's department.

18        Q.    Okay.  And you're talking about that

19   practice for East Carroll Parish?

20        A.    Yes.

21        Q.    Okay.  Specifically with the

22   prisoners from Orleans Parish that were being

23   housed at Riverbend, when those prisoners were

24   sentenced to time in the Department of

25   Corrections, who was responsible for providing

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    the various forms of paperwork, letters of
 2    credit, all of the stuff that you just talked
 3    about to the Department of Corrections?
 4          A.    It would have to come from the
 5    parish of conviction.
 6          Q.    Okay.  So it is your understanding
 7    that for Orleans Parish prisoners housed at
 8    Riverbend, it was Orleans Parish who was
 9    responsible for sending that documentation to the
10    Department of Corrections after sentencing?
11          A.    I would say, yes, because we have no
12    access to the Orleans Parish clerk or DA other
13    than, you know, they would have more direct
14    access than we would.
15          Q.    Okay.  Do you know if there was
16    discussions, conversations between the East
17    Carroll Parish Sheriff's Office and the Orleans
18    Parish -- Parish Sheriff's Office about how all
19    of that paperwork would be provided to the
20    Department of Corrections after an Orleans Parish
21    prisoner was sentenced to DOC time?
22          A.    I am not familiar with that process.
23    MS. WASHINGTON:
24          Okay.  Okay.  Let me show you a
25          document that we will mark as Exhibit 8,
```

1            and I will represent to you that these are
2            documents in globo that we were provided
3            by the Orleans Parish Sheriff's Office --
4         (Exhibit 8 marked and tendered.)
5         THE WITNESS:
6              Uh-huh (affirmatively).
7         MS. WASHINGTON:
8              -- that pertain to, I believe, two
9         of the plaintiffs, Jessie Crittindon and
10        Eddie Copelin.  I wanted to show you this
11        document so that we could look at the
12        first few pages which are Bates stamp
13        number 785 and onward.  I think this
14        document goes through to 795.
15   BY MS. WASHINGTON:
16        Q.    Looking at what is Bates number 790,
17   it appears to be some sort of a log with a date
18   of 8/4/16 and ECP with the name Jessie Crittindon
19   under that.  Do you see that?
20        A.    Yes.
21        Q.    Okay.  And then if you look then
22   also at what is Bates number 792, which is a
23   couple pages forward, there's another log of some
24   sort which at the top appears to read ECP packets
25   only, received 1/9, I believe that's '17 and then

1    a note down below of delivered 1/12/17, and

2    Mr. Crittindon's name appears in this list on

3    that page.  Do you see where I'm looking at?

4            A.    Yes.

5            Q.    I guess my question is, do you know

6    what ECP packets this exhibit would be referring

7    to that it appears the Orleans Parish Sheriff's

8    Office was receiving?

9            A.    No.

10           Q.    Okay.  Okay.  East Carroll Parish

11   Sheriff's Office holds pretrial detainees for

12   other parishes other than Orleans, correct?

13           A.    Yes.

14           Q.    Okay.  What are some of the other

15   parishes that you hold pretrial detainees for?

16           A.    West Carroll Parish, East Baton

17   Rouge Parish.

18           Q.    Okay.

19           A.    Acadia Parish, Terrebonne,

20   Tangipahoa, Lafayette, Madison, St. John the

21   Baptist, and I believe that's all.

22           Q.    Okay.  Great.  I was really just

23   looking for an example, but perfect.  Well, let's

24   take East Baton Rouge.

25           A.    Uh-huh (affirmatively).

```
1            Q.     So when an East Baton Rouge pretrial
2    detainees who is housed here at Riverbend is
3    sentenced to time in the Department of
4    Corrections, is East Carroll Parish or East
5    Baton Rouge responsible for sending the court
6    documentation, the letter of credit, all of that
7    paperwork that we were discussing, to the
8    Department of Corrections?
9            A.     East Baton Rouge does.
10           Q.     Okay.  Is there any parish for which
11   Riverbend houses pretrial detainees, the list
12   that you just gave me, is there any of those
13   parishes for which East Carroll and Riverbend is
14   responsible for sending all of this post sentence
15   paperwork, the letters of credit, any other
16   documentation that's necessary to the Department
17   of Corrections?
18           A.     Occasionally, the Department of
19   Corrections will contact us --
20           Q.     Uh-huh (affirmatively).
21           A.     -- and ask us to pre-class an
22   offender --
23           Q.     Okay.
24           A.     -- that they have part of the
25   paperwork and they need additional.  They may
```

SEVIER, LAURA 06/24/2019

1    need fingerprints or they may need a photo or

2    they may need evidence of DNA testing, and we do

3    provide that to the Department of Corrections

4    directly.

5         Q.    Okay.

6         A.    But normally our procedure is the

7    parish of conviction is responsible for

8    submitting that paperwork.

9         Q.    Okay.  And it would seem like those

10   things that the Department of Corrections is

11   reaching out to you for is because you physically

12   have custody of the person at that time, correct?

13        A.    That's correct.

14        Q.    Okay.  And has that always been the

15   process or practice at Riverbend?

16        A.    Yes.

17        Q.    Okay.  Is that practice written down

18   in any kind of policy or guideline or anything

19   anywhere?

20        A.    No.

21        Q.    Okay.  I want to go back to one of

22   the exhibits that we already looked at, the --

23   Exhibit 5.  We had looked at that first page,

24   which was the e-mail between you and Mr. Amacker?

25        A.    Uh-huh (affirmatively).

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1           Q.    How long have you known in any sort
 2     of sense, although I assume it is professional,
 3     Mr. Amacker?
 4           A.    Only since we started holding
 5     Orleans Parish offenders.
 6           Q.    Okay.  And you indicated that he's
 7     your sole contact person at OPSO; is that
 8     correct?
 9           A.    Yes.
10           Q.    Okay.  And what is your
11     understanding of what Mr. Amacker's job with the
12     Orleans Parish Sheriff's Office is?
13           A.    I'm not sure, but he was the person
14     that was -- that we contacted.  You know, he --
15     he basically provided the transfer list, you
16     know, information as far as sentencing
17     information and that stuff.
18           Q.    Okay.  And by transfer list, are you
19     referring to the e-mails that you received?
20           A.    Yes.
21           Q.    Okay.  Was there any other sort of
22     transfer list?
23           A.    No.
24           Q.    Okay.  Looking at Exhibit 5, and
25     turning to -- sorry about the back of the
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1    exhibit.  It's actually Bates number 4733.  I
2    apologize that the Bates numbering kind of jumps
3    in this one.  Do you see which page I'm on?
4            A.    Uh-huh (affirmatively).
5            Q.    It's an e-mail that at the top says
6    DOC inmates to release to ECP?
7            A.    Yes.
8            Q.    Okay.  And it appears to be an
9    e-mail from Mr. Amacker that's dated July 15th,
10   of 2016, correct?
11           A.    Yes.
12           Q.    And you are included as a recipient
13   on this e-mail, correct?
14           A.    Yes.
15           Q.    The -- the e-mail reads "The
16   following inmates can be transferred to your
17   custody as DOC sentenced offenders" and says,
18   "Laura, I will get these packets to Captain
19   Russell as soon as possible for pre-class,"
20   correct?
21           A.    Yes.
22           Q.    And it appears to have some sort of
23   attachment with the attachment name ECP DOC
24   transfer, 7/15/16, correct?
25           A.    Yes.
```

1          Q.    Okay.  Do you remember this e-mail?

2          A.    Not specifically.  Looking at it, I

3    did receive e-mails like this occasionally.

4          Q.    Okay.

5          A.    But this specific one, no.

6          Q.    Is this the type of e-mail that we

7    were discussing before that you would receive

8    from Mr. Amacker indicating persons from Orleans

9    Parish that were being transferred to East

10   Carroll after DOC sentencing?

11         A.    Yes, but not always.  Occasionally,

12   it would be in the body of the e-mail.

13         Q.    Okay.  So sometimes the information

14   that appears to be contained in the attachment,

15   which is Bates number 4734 of this exhibit, that

16   information would just be in the body of the

17   e-mail?

18         A.    Yes.

19         Q.    Okay.  And like you indicated when

20   we were talking about it before, this appears to

21   provide the first and last name for the -- the

22   prisoner, the sentence date, and then it also

23   seems to include a folder number and sentence; is

24   that correct?

25         A.    That's correct.

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Okay.  Would you always receive all
 2    of this information from Mr. Amacker?
 3          A.    No.
 4          Q.    Okay.  I believe you indicated
 5    before that you would just receive the name, the
 6    date of birth, and the sentence date?
 7          A.    That's correct.
 8          Q.    Okay.  And the Captain Russell
 9    that's being referred to in this e-mail that we
10    just looked over, that's the same Captain Russell
11    that you have referenced before?
12          A.    Yes.
13          Q.    Okay.  To your knowledge, what is
14    Captain Russell's position or -- or role with the
15    sheriff's office?
16          A.    He's a captain.
17          Q.    Okay.  Does he have any -- I got
18    that part.  Does --
19          MR. BRYANT:
20                That is the best answer you've given
21          today.
22    BY MS. WASHINGTON:
23          Q.    Does he have any particular section
24    or division or job responsibilities that fall
25    under him?
```

```
 1          A.     Normally, he works at Phase 3.
 2          Q.     Okay.
 3          A.     Which is where at the time DOC
 4    offenders were being held.
 5          Q.     At which time?
 6          A.     During this period of time.
 7          Q.     2016 --
 8          A.     Yes.
 9          Q.     -- '17?
10          A.     Yes.
11          Q.     Okay.
12          A.     And -- and he was pretty much
13    responsible for the day-to-day operations
14    there --
15          Q.     Uh-huh (affirmatively).
16          A.     -- and would -- you know, anything
17    that happened, he was responsible for
18    investigating or trying to resolve and would make
19    sure that the warden was aware, Warden Hedgemon
20    and Warden Knight were aware of what was going
21    on.
22          Q.     Okay.  Great.  And the packets that
23    are referred to in Mr. Amacker's e-mail --
24          A.     Uh-huh (affirmatively).  Yes.
25          Q.     -- do you know -- do you know what
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    packets Mr. Amacker is referring to?

2         A.    I can only assume that it was the

3    court packets.  I don't know for sure.

4         Q.    Okay.  And you may or may not know

5    this, but, to your knowledge, when the packets

6    referenced in this e-mail came to Riverbend, how

7    would they get to Captain Russell?

8         A.    Usually by our transportation

9    officer.

10         Q.    Okay.

11         A.    Hand delivering, picking up at

12    Orleans Parish and hand delivering back here.

13         Q.    Okay.  Would the packets referenced

14    in this e-mail be something that you saw?

15         A.    No.

16         Q.    Okay.  Do you know what Captain

17    Russell did with the packets once he received

18    them?

19         A.    I'm assuming processing them, but I

20    don't know for sure.

21         Q.    Okay.  When you say "processing

22    them," what would that involve?

23         A.    They would be put on AFIS.

24         Q.    Okay.  Do you know what happens

25    after the information from the packets is put on

```
 1    AFIS?
 2           A.     No.
 3           Q.     Okay.  That's a question for Captain
 4    Russell?
 5           A.     Yes.
 6           Q.     Okay.  Do you know if the East
 7    Carroll Parish Sheriff's Office was responsible
 8    for sending any documentation relative to these
 9    Orleans DOC sentenced prisoners to the Department
10    of Corrections?
11           A.     Only documents that might have been
12    requested by DOC, like if they were missing
13    something.
14           Q.     Okay.
15           A.     But I'm assuming the original packet
16    would be -- would have been sent from Orleans,
17    being the parish of conviction.
18           Q.     Okay.  And the e-mail that we were
19    just looking at appears to reference for
20    pre-class.  Do you see that at the end of the
21    e-mail we just looked at?
22           A.     Yes.
23           Q.     Okay.  And so do you -- do you know
24    what pre-class was to be performed by East
25    Carroll Parish?
```

        1          A.    Pre-class is a term that we use for

        2     assembling everything that DOC needs to process

        3     and calculate an out date.

        4          Q.    Right.

        5          A.    Usually it's just assembling all the

        6     jail credit letter, the court minutes, everything

        7     that's necessary.  I don't know the specifics,

        8     but it's -- it's a term that we usually loosely

        9     use to mean that packet that DOC needs --

       10          Q.    Okay.

       11          A.    -- to -- I mean, we use that term,

       12     DOC uses that term to -- it's just a term that we

       13     use to mean the assembling of that packet that

       14     they need.

       15          Q.    Okay.  And based on the e-mail that

       16     we have been looking at, is it your understanding

       17     that Captain Russell and East Carroll Parish

       18     Sheriff's Office would be responsible for

       19     these -- this pre-class assembling to send

       20     documents to the Department of Corrections?

       21          A.    Not to the Department of

       22     Corrections.

       23          Q.    Okay.

       24          A.    It would have been sent back to

       25     Orleans.

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1           Q.    Okay.  How did that process work?  I
 2     guess that's my question.  What was sent back to
 3     Orleans?
 4           A.    The AFIS paperwork, I am assuming.
 5           Q.    Okay.
 6           A.    I don't know because, I mean, I
 7     can -- I don't know.
 8           Q.    You weren't -- you weren't there
 9     physically doing it?
10           A.    No.  No, ma'am.
11           Q.    Okay.
12           A.    I was not.
13           Q.    Okay.  But Captain Russell would
14     know about what happened with the packets and
15     what, if anything, was sent either to Orleans or
16     to the Department of Corrections; is that
17     correct?
18           A.    Yes.
19           Q.    Okay.  To your knowledge, did
20     Orleans Parish Sheriff's Office ever send DOC
21     sentenced prisoners to East Carroll without
22     providing these packets that are referenced in
23     this e-mail?
24           A.    I'm not aware of it, if they have.
25           Q.    Okay.  Because you don't see the
```

```
 1   packets?
 2          A.    No, I do not.
 3          Q.    Okay.  I want to turn to the page
 4   right in front of the ones we have been looking
 5   at in the same exhibit, which is Bates number
 6   4732.  This appears to be a -- an e-mail based on
 7   the title regarding Jessie Crittindon, who is one
 8   of the named plaintiffs in this litigation, and
 9   it appears to be an e-mail from Corey Amacker
10   again to you --
11          A.    Uh-huh (affirmatively).
12          Q.    -- that's dated November 7th of
13   2016; is that correct?
14          A.    Yes.
15          Q.    Okay.  And the body of the e-mail
16   says "Could you please check to make sure that
17   his packet was sent to DOC.  We sent his
18   paperwork to you guys in August and the family
19   and DOC are indicating they received nothing from
20   pre-class.  Thank you."  Is that correct?
21          A.    Yes.
22          Q.    Do you remember receiving this
23   e-mail?
24          A.    Not this specific e-mail.
25          Q.    Okay.  Do you remember receiving
```

SEVIER, LAURA 2/24/2019

```
 1   e-mails like this e-mail?
 2         A.    Yes.  And it would have been passed
 3   on to Captain Russell because I again --
 4         Q.    Okay.
 5         A.    -- had nothing to do with the
 6   packets.
 7         Q.    How would you have passed this
 8   e-mail on to Captain Russell?
 9         A.    More than likely, orally.
10         Q.    Okay.
11         A.    I would have gone in there and said
12   can you check on this or I may have printed this
13   off and taken it to him if he was not in his
14   office.  I do that occasionally --
15         Q.    Okay.
16         A.    -- with a note, please check into
17   this.
18         Q.    Do you ever e-mail Captain Russell?
19         A.    No, because we are in the same
20   building.
21         Q.    Okay.
22         A.    I may forward an e-mail to him of
23   something that he needs, but specifically if I
24   need to speak to him or something, I just go in
25   his office.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Okay.  And when an e-mail like this
 2    -- or let's say a time that you went to Captain
 3    Russell to say, hey, there's something you need
 4    to follow up on, you know, related to these
 5    packets.  Is there any mechanism by which you
 6    logged or tracked these types of --
 7          A.    No.
 8          Q.    -- issues that popped up?
 9          A.    No.
10          Q.    Okay.  Do you know what -- what
11    happened after this -- this e-mail was sent
12    relative to the -- the packet related to Jessie
13    Crittindon?
14          A.    No.
15          Q.    Okay.  But Captain Russell is the
16    person who would know?
17          A.    I would say if anybody did, he
18    would.
19          Q.    Okay.  We talked a lot earlier about
20    billing and invoicing, and I want to just walk
21    through some of the specific records that we were
22    provided by East Carroll.  Don't worry.  We are
23    not going to walk through every page of them.
24          MR. BRYANT:
25                You said 12:30.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1          MS. WASHINGTON:

2                 I believe Gary's call ran over.

3          Okay.  I have a series of exhibits that I

4          want to mark.  They are billing documents

5          that we received from East Carroll billing

6          to the Department of Corrections.  I have

7          broken them down for the months that I am

8          concerned with by month, which is why they

9          are separate exhibits; and I'm hoping that

10         we can mark them in order.

11                So the first exhibit, Exhibit 9, is

12         going to be billing from July of 2016;

13         Exhibit 10 is going to be billing between

14         East Carroll and the Department of

15         Corrections for August of 2016; Exhibit 11

16         will be billing between East Carroll and

17         Department of Corrections for September of

18         2016; Exhibit 12 is going to be billing

19         for October of 2016; Exhibit 13 is going

20         to be billing for November of 2016;

21         Exhibit 14 is going to be billing for

22         December of 2016; and 15 is going to be

23         for January of 2017.  And, as promised, we

24         are not walking through all pages of these

25         exhibits.  I just want to look at them
```

1           with you to ask a few questions about

2           billing relative to the -- the named

3           plaintiffs in this litigation.

4       (Exhibits 9 through 15 marked and tendered.)

5   BY MS. WASHINGTON:

6       Q.    And if you wouldn't mind also

7   pulling out Exhibit 2, which was the Inmate Trust

8   Fund account information that we looked up

9   before.  And if you flip to -- in Exhibit 2, if

10  you flip to the third page for Jessie Crittindon,

11  I'm hoping we can just walk through it for him.

12           And based on Exhibit 2 and the

13  information in the Inmate Trust Fund account, am

14  I correct that Mr. Crittindon was entered into

15  the Riverbend system as an Orleans prisoner from

16  it looks like May 25th of 2016 until August 1st

17  of 2016?

18      A.    That's correct.

19      Q.    And then he switched over to DOC

20  sentenced in the Riverbend system, correct?

21      A.    That's correct.

22      Q.    And so he was then entered as a DOC

23  sentenced prisoner from August 2nd of 2016

24  through January 13th of 2017; is that correct?

25      A.    That's correct.

1    Q.    Okay.  I want to look first at the

2    August 2016 billing between the East Carroll

3    Parish Sheriff's Office and the Department of

4    Corrections.  And this is Exhibit 10, and I guess

5    my question is whether or not East Carroll Parish

6    Sheriff's Office billed the Department of

7    Corrections or invoiced the Department of

8    Corrections for housing Mr. Crittindon as a

9    Department of Corrections prisoner in August of

10   2016?

11   A.    No.

12   Q.    We can turn next to Exhibit 11,

13   which should be the billing for September of

14   2016.  And my question for Exhibit 11 is the

15   same, whether or not East Carroll Parish

16   Sheriff's Office billed or invoiced the

17   Department of Corrections for housing Jessie

18   Crittindon as a DOC sentenced prisoner in

19   September of 2016?

20   A.    No.

21   Q.    Exhibit 12 would be the October of

22   2016 billing records.  And I'm wondering whether

23   or not the East Carroll Parish Sheriff's Office

24   billed or invoiced the Department of Corrections

25   for housing Jessie Crittindon as a DOC sentenced

SEVIER, LAURA - 2/24/2019

1    prisoner for October of 2016?

2         A.    No.

3         Q.    Exhibit 13 would be November of

4    2016.

5         A.    No.

6         Q.    No.  The department -- East Carroll

7    Parish Sheriff's Office did not bill the

8    Department of Corrections for housing Jessie

9    Crittindon in November of 2016; is that correct?

10        A.    That's correct.

11        Q.    And you are looking at Exhibit 13?

12        A.    Yes.

13        Q.    Okay.  And Exhibit 14 is the

14   December of 2016 billing or invoicing between the

15   East Carroll Parish Sheriff's Office and the

16   Department of Corrections.

17             Did the East Carroll Parish

18   Sheriff's Office bill or invoice the Department

19   of Corrections for housing Jessie Crittindon in

20   December of 2016?

21        A.    No.

22        Q.    And the last exhibit that we just

23   marked is January of 2017, and my question is

24   whether or not East Carroll Parish Sheriff's

25   Office billed the Department of Corrections for

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

```
 1   housing Jessie Crittindon in January of 2017?
 2        A.    We billed the Department of
 3   Corrections a total of 12 days.
 4        Q.    Okay.  And if we look at Exhibit 2
 5   that we talked about before, it appears that
 6   Mr. Crittindon was released on January 13th of
 7   2017, correct?
 8        A.    That's correct.
 9        Q.    And so it would appear that those --
10   those 12 days correlate with the days that he
11   would have been in custody in January of 2017?
12        A.    Yes.
13        Q.    Okay.  Do you know why East Carroll
14   did not bill the Department of Corrections for
15   housing Mr. Crittindon between August 2nd of 2016
16   and January of 2017?
17        A.    Because he did not appear on our
18   CAJUN invoice.
19        Q.    Okay.  You had mentioned previously
20   that you allow 90 days for a DOC sentenced
21   prisoner to show up on the CAJUN invoice; is that
22   correct?
23        A.    That's correct.
24        Q.    For Mr. Crittindon, that would
25   appear to have occurred at the end of October
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    roughly, the beginning of November; is that
 2    correct?
 3           A.    That's correct.
 4           Q.    Do you know if you took any steps in
 5    November of 2016 to inquire or investigate as to
 6    why Mr. Crittindon was not showing up in the
 7    CAJUN invoice?
 8           A.    No.  Other than the holidays could
 9    have delayed that.
10           MS. WASHINGTON:
11                 Okay.  One more billing exhibit.
12           This can be marked as Exhibit 16.
13        (Exhibit 16 marked and tendered.)
14    BY MS. WASHINGTON:
15           Q.    And before we move on to Exhibit 16,
16    can I just ask Exhibits 9 through 15 that we have
17    looked at, those are the -- the billings or the
18    invoicing that East Carroll Parish Sheriff's
19    Office was providing to the Department of
20    Corrections immediately at the end of those
21    months; is that correct?
22           A.    That's correct.
23           Q.    Okay.  And those exhibits, that
24    invoicing, those were all signed by Sheriff
25    Williams; is that correct?
```

1    A.    That's correct.

2    Q.    And this would have been the

3  invoicing that you reviewed with Sheriff Williams

4  before submitting to the Department of

5  Corrections?

6    A.    That's correct.

7    Q.    Okay.  Now, turning to Exhibit 16,

8  this is another billing record that we were

9  provided by the East Carroll Parish Sheriff's

10  Office in this litigation.

11    Am I correct that these documents

12  represent some of the supplemental billing that

13  you had talked about doing earlier?

14    A.    Yes --

15    Q.    Okay.

16    A.    -- they do.

17    Q.    And looking sort of in reverse order

18  starting at the back of the document, and

19  specifically looking at what's Bates numbered

20  3888, this appears to be a supplemental invoice

21  from the sheriff's office; is that correct?

22    A.    That's correct.

23    Q.    And it is dated the 18th of May of

24  2017?

25    A.    That's correct.

```
1          Q.    And on -- on this document, it
2    appears that the East Carroll Parish Sheriff's
3    Office billed or invoiced the Department of
4    Corrections for the housing of Mr. Crittindon in
5    November of 2016?
6          A.    That's correct.
7          Q.    Do you know how this supplemental
8    invoice came about for Mr. Crittindon?
9          A.    It came about because I did the
10   disallowed DOC offenders on the internal
11   invoicing; and when his name was one of all of
12   these names listed on this exhibit for the month
13   of November, I went into CAJUN.  I have to
14   printout a transfer history from CAJUN and he --
15   it indicated that he was in our facility on these
16   dates and we -- at that time, he was a billable
17   invoice, I mean, a billable offender.
18         Q.    Okay.  And looking at the exact same
19   page of that exhibit --
20         A.    Uh-huh (affirmatively).
21         Q.    -- am I also correct that this
22   supplemental billing sought payment for November
23   of 2016 for housing Eddie Copelin?
24         A.    Yes.
25         Q.    And also for Phillip Dominick; is
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

1    that correct?

2          A.    Yes.

3          Q.    And looking at the page immediately

4    in front of that which is Bates number 3887, it

5    appears that there was a supplemental invoice

6    also from May of 2017 for housing in

7    November 2016 of Leon Burse; is that correct?

8          A.    That's correct.

9          Q.    Okay.  And flipping a few pages

10   forward in the same exhibit, I am looking at

11   Bates number 3884.  Am I correct that this is

12   also another supplemental invoice from East

13   Carroll Parish Sheriff's Office to the Department

14   of Corrections?

15         A.    Yes.

16         Q.    And this one is dated June 6th of

17   2017, correct?

18         A.    Yes.

19         Q.    And, on this document, the East

20   Carroll Parish Sheriff's Office billed the

21   Department of Corrections for housing in December

22   of 2016; is that correct?

23         A.    That's correct.

24         Q.    And listed on this document are Leon

25   Burse, Eddie Copelin, and Jessie Crittindon; is



```
 1    that correct?
 2           A.     That's correct.
 3           Q.     And so that would have been
 4    supplemental billing that the East Carroll Parish
 5    Sheriff's Office sought in June of 2017 for the
 6    housing of those three prisoners and others from
 7    December of 2016, correct?
 8           A.     That's correct.
 9           Q.     When you would meet with Sheriff
10    Williams to review these supplemental billings,
11    what information would you review with the
12    sheriff?
13           A.     The -- just the invoice itself.
14           Q.     Okay.
15           A.     There was no other documentation to
16    review.
17           Q.     Okay.  Did you review the -- I'm
18    forgetting what you called them where you sort of
19    cancel somebody out for the month in your
20    internal invoice at the time.  Like would you
21    have shown the sheriff from December of 2016 your
22    internal invoice that had not billed for these
23    prisoners at that time?
24           A.     No.
25           Q.     Okay.  It would have just been the
```



1    -- the documents like shown in this Exhibit 16

2    that you-all would have reviewed?

3         A.    That's correct.

4         Q.    Okay.  Did you -- you prepared the

5    supplemental billing as well, correct?

6         A.    Yes.

7         Q.    Okay.  We talked a little bit before

8    or mentioned CAJUN.  Am I correct in

9    understanding that that is a recordkeeping system

10   of some sort that is run by the Department of

11   Corrections?

12        A.    It is their Jail Management System

13   of all of the offenders that are -- or have been

14   or currently been sentenced to DOC time.

15        Q.    Okay.  Who at -- who within the East

16   Carroll Parish Sheriff's Office has access to

17   CAJUN?

18        A.    The ladies in the front office,

19   Warden Hedgemon, Sheila Bell, me, Brandy Teague,

20   Mary Brown, Hope Mills, Someeka Martin.

21        Q.    Okay.  Does Warden Knight have

22   access to CAJUN?

23        A.    Not that I'm aware of.

24        Q.    How do you get access to CAJUN; do

25   you have to be given a user name or something?

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1          A.     You have a user name and password.
 2          Q.     Okay.
 3          A.     And you have to send a request in to
 4    the Department of Corrections and state why you
 5    need access and they give you a user name and
 6    password.
 7          Q.     Okay.  Does the sheriff have access
 8    to CAJUN?
 9          A.     Not that I'm aware of.
10          Q.     Who has the capability, generally
11    speaking, to add or change information in CAJUN?
12          A.     Only DOC personnel.
13          Q.     Only DOC personnel?
14          A.     (Nodded head affirmatively.)
15          Q.     So for everybody employed by the
16    East Carroll Parish Sheriff's Office, it's just
17    the ability to view what's in the system; is that
18    correct?
19          A.     Inquire and print --
20          Q.     Okay.
21          A.     -- basically.
22          Q.     Inquire meaning search?
23          A.     Yes.
24          Q.     Okay.
25          MS. WASHINGTON:
```

AmersonWhite

COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554  Hammond LA  70404   Fax 985.419.0799

```
 1                    I'm going to mark this as
 2          Exhibit 17.
 3          (Exhibit 17 marked and tendered.)
 4     BY MS. WASHINGTON:
 5          Q.    Were you provided with any training
 6     on using CAJUN --
 7          A.    No.
 8          Q.    -- at any point in time?  And I'm
 9     hoping to look at this exhibit on -- we can just
10     look at the second page of this exhibit, which is
11     Bates number 4593, and I just have some questions
12     for you to the extent that you know about some of
13     the entries in CAJUN.
14                    So this appears to be a record --
15     these are all records that are printed in April
16     of 2019 as part of this litigation.  And the
17     first couple of pages deal with one of the named
18     plaintiffs, Phillip Dominick.
19                    And looking at that Bates number
20     4593, it -- It appears to be a listing of
21     assigned location and -- and physical locations
22     and -- and dates.  For September 1st of 2016, in
23     the "from" date column, it is appears that
24     Mr. Dominick is listed both as Orleans PP and
25     Riverbend Detention; is that correct?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

SEVIER, LAURA 2024/2019

```
 1           A.     Yes.
 2           Q.     Do you know why there would be two
 3    physical locations for the same from date?
 4           A.     When paperwork was submitted to the
 5    Department of Corrections from Orleans Parish --
 6           Q.     Uh-huh (affirmatively).
 7           A.     -- the -- and I'm not sure who would
 8    have updated CAJUN.  I'm assuming it's someone in
 9    pre-class.
10           Q.     Uh-huh (affirmatively).
11           A.     They would assume that because he
12    was sentenced in Orleans that he was in physical
13    custody of Orleans.  And I would notify them that
14    while he was sentenced on September 1st, we
15    transported him to court, he was sentenced and
16    our officers transported him back to East Carroll
17    Parish or to Riverbend on that same day that we
18    actually did not transfer custody, physical
19    custody, only we took him to court, he was
20    sentenced, we brought him back.  And that's why
21    both dates would show up from what I --
22           Q.     Okay.
23           A.     I mean, I don't know.  I can't key
24    in to CAJUN.  It may be that they can't delete
25    that transfer.
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1            Q.    That makes sense.  I can ask some
 2   Department of Corrections people for some more
 3   information.  And under the reason code, looking
 4   at those same two entries, next to Orleans PP for
 5   September 1st of 2016, it says A-101?
 6            A.    Yes.
 7            Q.    Do you know what that means?
 8            A.    No.  I do have access to the tables
 9   in CAJUN.
10            Q.    Okay.
11            A.    But without looking it up, no, I do
12   not.
13            Q.    Okay.
14            A.    I do know the A stands for adult
15   services, but I do not know what the 101 stands
16   for.
17            Q.    Okay.  By the -- by the same token,
18   do you know next to Riverbend Detention what
19   A-402 stands for?
20            A.    He is an office of adult services
21   and I'm assuming that is in custody, like a
22   sentenced offender because that's the common code
23   -- reason code for most of our offenders is
24   A-402.
25            Q.    Okay.  And you said there's some
```

```
 1    sort of table that's in the CAJUN system that
 2    gives you kind of like a key?
 3            A.    Each -- yes.  Each code means
 4    something, but I'm not familiar with that.
 5            Q.    Okay.
 6            A.    Each letter means something, each
 7    number means something.
 8            Q.    I want to look back at -- actually,
 9    I don't think I have marked this yet.
10            MS. WASHINGTON:
11                Okay.  I am handing you a document
12            marked as Exhibit 18, which is a
13            compilation of various e-mails.  Not all
14            of this we are going to look at right now.
15        (Exhibit 18 marked and tendered.)
16    BY MS. WASHINGTON:
17            Q.    But I do want to look at what is
18    Bates numbered 2074 in this exhibit.  And this
19    appears to be part of an e-mail sent by
20    Mr. Amacker on December 27th, of 2016; is that
21    correct?
22            A.    That's correct.
23            Q.    And you're not a recipient on this
24    e-mail, correct?
25            A.    That's correct.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1            Q.     This is to the staff with the
 2    Department of Corrections?
 3            A.     It appears, yes.
 4            Q.     Okay.  I am only referencing this
 5    for the last paragraph or large paragraph of
 6    Mr. Amacker's e-mail that indicates "Myself and
 7    one of staff are traveling to Riverbend tomorrow
 8    to train them on the process of inputting
 9    sentences into AFIS sentencing."  Do you see that
10    on the top of Bates number 2074?
11            A.     Yes.
12            Q.     Do you remember Mr. Amacker and/or
13    other staff from OPSO coming to Riverbend on what
14    I guess would have been December 8th of 2016?
15            A.     Unfortunately, I do not.  I was in
16    San Angelo, Texas with my daughter.
17            Q.     Okay.  Did you -- did you know about
18    this trip by OPSO staff?
19            A.     No.
20            Q.     Okay.  Did you know about it prior
21    to me just asking you about it?
22            A.     I -- I have heard, but I did not --
23    I mean, I have know -- I don't know who came; I
24    don't know what training they did; I don't know
25    who they trained.
```

1         Q.    Okay.  Do you know anyone who would

2  have participated in that training?

3         A.    No, because I wasn't here.

4         Q.    Okay.

5         A.    I don't know who was in there.

6         Q.    Okay.  Do you know of any other

7  training that East Carroll Parish Sheriff's

8  Office staff received in 2016 and 2017 related to

9  pre-classification of DOC sentenced prisoners?

10        A.    No.

11        Q.    Okay.  Do you know if the Department

12  of Corrections provided any training to the East

13  Carroll Parish Sheriff's Office in 2016 or 2017

14  about the pre-class and release process?

15        A.    No.  I'm not aware of any training.

16        Q.    What is the procedure, to your

17  knowledge, at Riverbend Detention Center for the

18  filing of grievances by persons who are housed

19  here?

20        A.    We have a grievance drop box --

21        Q.    Uh-huh (affirmatively).

22        A.    -- for offenders for any grievances

23  they may have at that time they were being

24  processed by Ms. Bell.

25        Q.    When you say "at that time," when

```
 1    would that be?
 2            A.      During that period of time.
 3            Q.      Okay.
 4            A.      And I don't know what day -- I don't
 5    recall what date that the process changed.
 6            Q.      Okay.
 7            A.      But she would -- someone would
 8    remove them from the box and bring them to her --
 9            Q.      Uh-huh (affirmatively).
10            A.      -- and she would scan them in and
11    send them to the first responder, which would
12    normally be Deshawn Frost, I believe is his name.
13            Q.      He's a lieutenant; is that correct?
14            A.      Yes.
15            Q.      How would they be sent to Lieutenant
16    Frost?
17            A.      Through the interoffice mail.
18    Usually in an envelope.
19            Q.      Through a hardcopy?
20            A.      Yes.
21            Q.      Okay.
22            A.      Through the interoffice mail or
23    envelope.
24            Q.      And was this the process for both
25    pretrial prisoners as well as DOC sentenced
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1   prisoners?
 2          A.    I'm assuming, yes.
 3          Q.    Okay.  But Ms. Bell may have more
 4   information on that?
 5          A.    Yes.
 6          Q.    Okay.  And was there a specific form
 7   that people were provided?
 8          A.    We do have grievance forms, but any
 9   piece of paper that they write, this is an
10   administrative remedy relief --
11          Q.    Uh-huh(affirmatively).
12          A.    -- for -- you know, anything that
13   they can write it on, the back of a brown paper
14   bag.
15          Q.    Okay.
16          A.    As long as it has ARP written at the
17   top of it.
18          Q.    Okay.  And where are the actual
19   forms themselves?  How do your people get access
20   to those forms?
21          A.    They are in the control centers that
22   offenders have access to 24/7.
23          Q.    Okay.  Does someone have to
24   physically hand the form --
25          A.    Yes.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

 1          Q.     -- to the prisoner?

 2          A.     Yes.

 3          Q.     Okay.  And by "control center," do

 4   you mean some sort of pod that overlooks the --

 5   the dorm or the tier?

 6          A.     Yes.

 7          Q.     Okay.  And so a prisoner who wanted

 8   access to a form would have to inquire of a -- a

 9   East Carroll Parish Sheriff's officer located in

10   the pod?

11          A.     Yes.

12          Q.     Okay.  And the drop box that you

13   referenced, where is that located?

14          A.     I'm not sure.

15          Q.     Okay.  Do you know if there's only

16   one of them or --

17          A.     No.  I believe we have one at each

18   facility.  We have Phase 1 --

19          Q.     Okay.

20          A.     -- Phase 2 and Phase 3.

21          Q.     Okay.  You mentioned that they are

22   scanned in and then provided to Lieutenant Frost.

23   Do you know if a copy of the grievance is placed

24   in the prisoner's individual file that we

25   discussed earlier?

```
 1          A.    Normally, it's returned back to him;
 2    and unless he requests a second step review,
 3    he -- the grievance is returned back to him.  We
 4    keep a copy, but the original is returned.
 5          Q.    And where does the copy live; is it
 6    saved?
 7          A.    It's a scanned copy.
 8          Q.    Okay.
 9          A.    It's a scanned copy.
10          Q.    And so that's electronic?
11          A.    Yes.
12          Q.    Okay.  And where -- how are those
13    archived?
14          A.    Ms. Bell has them on her computer.
15          Q.    Okay.  And you said at some point in
16    time she stopped being the person processing
17    grievances?
18          A.    Yes.
19          Q.    Okay.  But that would have been
20    after 2016?
21          A.    Yes.
22          Q.    Or 2017?
23          A.    Yes.
24          Q.    And what is the process for
25    prisoners who want to mail something out of the
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1    facility?
 2           A.     It's dropped in the mailbox.  We
 3    have a drop box and the mail clerks seal them,
 4    make sure postage is on there.  If they don't
 5    have postage, there -- we allow offenders two
 6    free stamps per week and we provide that to them,
 7    that if they are indigent, they are provided two
 8    stamps.
 9           Q.     And the drop box for mail, is that
10    different than the grievance drop box?
11           A.     Yes.
12           Q.     Okay.  And are there also mail drop
13    boxes at the various facilities?
14           A.     Yes.
15           Q.     And -- and you mentioned that the
16    mail clerk seals the mail.  Is it a requirement
17    that the mail be left unsealed when it goes into
18    the drop box?
19           A.     It is a requirement, but if there is
20    something that they don't want the mail clerks --
21    they can get the lieutenant to check it for
22    contraband.  We don't read what's in it.  We just
23    make sure there's nothing that's being sent out
24    that's illegal, and then the lieutenant will seal
25    it and initial it and it can be sent out that
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

way.

    Q.    Okay.  If a family member or a
friend or an attorney, let's say, called the
Riverbend Detention Center with a concern about a
person housed at the facility, who would that
person speak with from the facility?

    A.    It depends on the complaint.

    Q.    Uh-huh (affirmatively).

    A.    If it's dealing with mail, the mail
clerk, it would be directed to them.

    Q.    Uh-huh (affirmatively).

    A.    If it is a security issue or they
are having an issue with other offenders, it
would be directed to the warden.

    Q.    Okay.

    A.    If it's dealing with money, it's
directed to Ms. Teague because she does any
banking.

    Q.    Okay.  What if it is a concern that
someone's Department of Corrections time has not
been calculated?

    A.    Normally, we advise them to contact
their parish of conviction.  We -- we -- and
Ms. Bell can -- she can -- I've done this before,
but if we have an offender that writes a request,

1    not necessarily a grievance, but a request that

2    his time is close or he's overdue, we contact the

3    Department of Corrections and advise them and

4    then they advise us whether they have the

5    paperwork or not and we go from there.  If they

6    don't have the paperwork, then we advise them to

7    contact their parish of conviction, and we are

8    dealing with the family at this point.

9              Q.    Uh-huh (affirmatively).

10             A.    They need to contact the parish of

11   conviction and get the paperwork in with respect

12   to the Department of Corrections.

13             Q.    You instruct the family to contact

14   the parish of conviction?

15             A.    Yes.

16             Q.    Okay.  And if calls like this come

17   in from family members who are concerned about

18   time calculation and you or Ms. Bell speak with

19   them, are those phone calls or conversations

20   recorded or noted or archived in any kind of way?

21             A.    Normally not, and -- well, they are

22   not.  But we do -- if -- and I have done this

23   before.  If we have a rap sheet, I mean, if we --

24   if I have the court minutes and I can look -- and

25   I -- I have called DOC before and said, listen,

```
 1   you know, this guy was revoked.  It looks like he
 2   may be getting close --
 3              Q.    Uh-huh (affirmatively).
 4              A.    -- and they will research it; but as
 5   far as, you know, on a regular basis, I haven't
 6   done that in a long time.  I mean, it's been
 7   years.
 8              Q.    Okay.
 9              A.    But we do pursue it.  You know, and
10   basically we have to rely on DOC because we just
11   call and tell them there is a concern and then
12   they go from there.
13              Q.    Okay.  You mentioned reviewing court
14   minutes.  Is that something that you or Ms. Bell
15   would do?
16              A.    I -- I've looked at them before.
17              Q.    Uh-huh (affirmatively).
18              A.    But, there again, I don't have
19   access to them.  I will call --
20              Q.    Okay.
21              A.    -- and say I need to see the court
22   minutes, you know, especially if the inmate has
23   -- he alleges that he's overdue.  You know, we
24   try to help if we can.  If we don't have the
25   court minutes, then there's nothing we can do at
```

1   this point.

2        Q.   Okay.  Is there any other personnel

3   with the sheriff's office who would be reviewing

4   court minutes or other documents if there is

5   allocation of time not being calculated or

6   overtime on you or Ms. Bell?

7        A.   It would be -- it would be Captain

8   Russell or possibility Warden Hedgemon.

9        Q.   Okay.  And how would you or Captain

10  Russell or Warden Hedgemon know or be prompted to

11  -- to review documents that you-all might have to

12  see if someone was being --

13       A.   The offender would put in a request.

14       Q.   Okay.  So it would only be if you

15  received notice some sort of way from the

16  offender himself?

17       A.   Yes.

18       Q.   Okay.  Last questions I think.  When

19  did you first hear about this lawsuit?

20       A.   The lawsuits?

21       Q.   Uh-huh (affirmatively).

22       A.   I hate to say it, but when I got the

23  discovery questions from our lawyer.

24       Q.   Okay.

25       A.   I mean, I didn't have any -- I mean,

```
 1    other than the publicity that was in the paper,
 2    but at that point, there was no lawsuit.  It was
 3    just allegations that we had held offenders over
 4    their time.
 5         Q.    Okay.
 6         A.    But I was not aware of the lawsuit
 7    until, you know -- well, I don't get served with
 8    the lawsuit.  I have to --
 9         Q.    You are also not a named defendant,
10    so --
11         A.    I have to do a lot of the legwork,
12    paperwork, gathering the paperwork.
13         Q.    Okay.
14         A.    But, you know, as far as, you know,
15    I -- I may have been informed informally, but as
16    far as being given a copy of the lawsuit or
17    knowing what the lawsuit pertained to, I -- you
18    know, I really didn't -- it's just been within
19    the last probably six or eight months that I was
20    fully aware of what was going on.
21         Q.    Okay.  And you mentioned some
22    publicity or allegations previously prior to the
23    filing of -- of the lawsuit.  What was the
24    publicity that you remember?
25         A.    It was in the paper, the Monroe
```

SEVIER, LAURA 06/24/2019

```
 1   paper.
 2        Q.    Okay.  And what do you remember from
 3   the paper?
 4        A.    That it was -- the main thing is
 5   that Riverbend was -- you know, there were
 6   offenders that potentially had been held over
 7   their time.  And, I mean, of course being a small
 8   town, you know, you just -- everybody is asking
 9   questions; and, of course, I told them I didn't
10   have a clue what was going on --
11        Q.    Uh-huh (affirmatively).
12        A.    -- you know, because I didn't at the
13   time.
14        Q.    Uh-huh (affirmatively).  Was there
15   discussions at Riverbend amongst the staff about
16   that publicity?
17        A.    Of course.  Anytime your name is in
18   the paper in a negative light, you -- you know,
19   you're a small town, you are going to discuss it.
20        Q.    Uh-huh (affirmatively).
21        A.    You know, as far as, you know -- and
22   not specifics, but just the fact that, you know,
23   we were named in the paper, we made the paper, we
24   made the news, you know.
25        Q.    Uh-huh (affirmatively).
```

```
 1           A.    And as far as specifics of what the
 2     allegations were, general consensus was we didn't
 3     have a clue what was going on.
 4           Q.    Okay.  And when you say "general
 5     consensus," that, you know, would include, say,
 6     Warden Hedgemon and Warden Knight?
 7           A.    We -- I don't recall having
 8     discussions with him.
 9           Q.    Okay.
10           A.    I mean, this was like the -- the
11     lower people --
12           Q.    Okay.
13           A.    -- the subordinates.
14           Q.    Okay.
15           A.    The peons.
16           Q.    Okay.  Do you know if any steps were
17     taken at the time of this publicity that you're
18     talking about by the sheriff's office to look
19     into these allegations?
20           A.    I'm not sure what steps were taken.
21           Q.    Okay.
22           A.    I -- I don't know of what was being
23     done because I really -- like I said, I wasn't
24     familiar with what was going on.
25           Q.    What steps did you take to prepare
```

```
 1   for this deposition today?  And I'm not asking
 2   about any privileged communication with counsel
 3   from the sheriff's office.
 4        A.    Copying documentation, scanning
 5   documentation.  That's pretty much -- you know,
 6   just gathering it all up, trying to get everybody
 7   to give me what they had as far as what the
 8   discovery was asking for.
 9        Q.    Okay.
10        MS. WASHINGTON:
11             I believe that concludes my
12        questions for you.  Counsel for the
13        sheriff's office may have some questions
14        and counsel for the other defendants on
15        the phone may as well.
16        MR. BRYANT:
17             Gary, Pete, either of you guys got
18        any questions?
19        MR. EVANS:
20             This is Gary.  I don't have any
21        questions.
22        MR. BRYANT:
23             Okay.  Pete, any questions?
24        MR. MATTHEWS:
25             No, I don't.
```

```
 1            MR. BRYANT:
 2                  Okay.  I also don't have any
 3        questions.  So we are going to read and
 4        sign, and that's it.
 5            MS. WASHINGTON:
 6                  Sounds great.
 7        (The deposition was concluded at 1:23 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1                    CORRECTION SHEET

2

3       PAGE        LINE DESCRIPTION

4       _____       _____ _____

5       _____       _____ _____

6       _____       _____ _____

7       _____       _____ _____

8       _____       _____ _____

9       _____       _____ _____

10      _____       _____ _____

11      _____       _____ _____

12      _____       _____ _____

13      _____       _____ _____

14      _____       _____ _____

15      _____       _____ _____

16      _____       _____ _____

17      _____       _____ _____

18      _____       _____ _____

19

20      WITNESS:  LAURA SEVIER

21      TAKEN ON: JUNE 24, 2019

22      BY:       CHERIE' E. WHITE, CCR (LA NO. 96002)

23                CSR (TX NO 10720)

24                CSR (MS NO. 1514)

25                RPR (NATIONAL NO. 839452)



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1                    WITNESS CERTIFICATE
 2
 3
 4        I, LAURA SEVIER, do hereby certify that the
 5   foregoing testimony was given by me, and the
 6   transcription of said testimony, with corrections
 7   and/or changes, if any, is true and correct as
 8   given by me on the aforementioned date.
 9
10
11
12   _____  _____
13   DATE SIGNED           (Witness' Signature)
14
15
16
17        Signed with corrections as noted.
18
19        Signed with no corrections as noted.
20
21
22
23
24   DATE TAKEN: June 24, 2019
25
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1              REPORTER'S PAGE
 2        I, CHERIE' E. WHITE, Certified Court
 3    Reporter, in and for the State of Louisiana, the
 4    officer, as defined in Rule 28 of the Federal
 5    Rules of Civil Procedure and/or Article 1434(B)
 6    of the Louisiana Code of Civil Procedure, before
 7    whom this sworn testimony was taken, do hereby
 8    state on the record;
 9          That due to the interaction in the
10    spontaneous discourse of this proceeding, dashes
11    (--) have been used to indicate pauses, changes
12    in thought, and/or talkovers; that same is the
13    proper method for the court reporter's
14    transcription of a proceeding, and that dashes
15    (--) do not indicate that words or phrases have
16    been left out of this transcript; also, that any
17    words and/or names which could not be verified
18    through reference material have been denoted with
19    the phrase "(spelled phonetically)."
20
21
22              CHERIE' E. WHITE, CCR(LA NO. 96002)
23              CSR (TX NO 10720)
24              CSR (MS NO. 1514)
25              RPR (NATIONAL NO. 839452)
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1                REPORTER'S CERTIFICATE

 2

 3         This certification is valid only for a

 4   transcript accompanied by my original signature

 5   and original seal on this page.

 6         I, CHERIE' E. WHITE, Certified Court

 7   Reporter, in and for the State of Louisiana, do

 8   hereby certify that Laura Sevier, to whom the

 9   oath was administered, after having been duly

10   sworn by me upon authority of R.S. 37:2554, did

11   testify as hereinbefore set forth in the

12   foregoing 163 pages; that this testimony was

13   reported by me in the stenotype reporting method,

14   was prepared and transcribed by me or under my

15   personal direction and supervision, and is a true

16   and correct transcript to the best of my ability

17   and understanding; that I am not related to

18   counsel or the parties herein, nor am I otherwise

19   interested in the outcome of this matter.

20

21

22         CHERIE' E. WHITE, CCR (LA NO. 96002)

23         CSR (TX NO. 10720)

24         CSR (MS NO. 1514)

25         RPR (NATIONAL NO. 839452)
```



866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799