Transcript of the Testimony of

# Angela Smith

July 2, 2019

Jessie Crittindon, Et Al v. Marlin Gusman, Et Al



P.O. Box 1554 ▪ Hammond ▪ Louisiana 70404
**(Toll Free) 866.870.7233 ▪ 985.542.8685 ▪ (Fax) 985.419.0799**
office@amersonwhite.com ▪ www.amersonwhite.com

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

* * * * * * * * * * * * * *

JESSIE CRITTINDON, ET AL. *

VERSUS                    *    CASE NO.

3:17-cv-00512-SDD-EWD

MARLIN GUSMAN, ET AL.    *

* * * * * * * * * * * * * *

c/w

* * * * * * * * * * * * * *

EDDIE COPELIN, ET AL.    *

VERSUS                    *    CASE NO.

3:17-cv-00602-SDD-EWD

MARLIN GUSMAN, ET AL.    *

* * * * * * * * * * * * * *

DEPOSITION OF ANGELA SMITH

TAKEN AT DEPARTMENT OF CORRECTIONS

504 MAYFLOWER STREET

BATON ROUGE, LA

ON TUESDAY, JULY 2, 2019 AT 9:11 A.M.

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

```
 1   APPEARANCES:
 2   REPRESENTING PLAINTIFFS:
 3     RODERICK & SOLANGE MACARTHUR JUSTICE CENTER
       BY:  JAMES CRAIG, ESQUIRE
 4     BY:  EMILY WASHINGTON, ESQUIRE
       BY:  HANNAH LOMMERS-JOHNSON, ESQUIRE
 5     4400 S. CARROLLTON AVENUE
       NEW ORLEANS, LA 70119
 6
 7
 8
 9   REPRESENTING DEFENDANTS, SECRETARY JAMES LEBLANC,
     PERRY STAGG AND ANGELA GRIFFIN:
10
       LOUISIANA DEPARTMENT OF JUSTICE
11     LITIGATION DIVISION, CIVIL RIGHTS SECTION
       BY:  JAMES "GARY" EVANS, ESQUIRE
12     1885 NORTH THIRD STREET
       4TH FLOOR
13     BATON ROUGE, LA 70802
       evansj@ag.louisiana.gov
14
15
16
17   REPRESENTING DEFENDANT, ORLEANS PARISH SHERIFF'S
     OFFICE:
18
       RODRIGUE & ARCURI LAW GROUP
19     BY TELEPHONE:  PETE MATTHEWS, ESQUIRE
       201 ST. CHARLES AVENUE
20     SUITE 114-412
       NEW ORLEANS, LA 70170
21     pm@rodriguearcuri.com
22
23
24
25
```

```
 1    APPEARANCES (CONTINUED):
 2
 3    REPRESENTING DEFENDANT, EAST CARROLL PARISH
      SHERIFF'S OFFICE:
 4
          USRY & WEEKS, PLC
 5        BY TELEPHONE:  TIM RICHARDSON, ESQUIRE
          1615 POYDRAS STREET
 6        SUITE 1250
          NEW ORLEANS, LA 70112
 7        trichardson@usryweeks.com
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    REPORTED BY:  ANNA COATES, CCR, RPR
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554  Hammond LA 70404   Fax 985.419.0799

1           E X H I B I T   I N D E X

2    EXAMINATION BY:                              PAGE

3       MRS. LOMMERS-JOHNSON...................6, 158

4       MR. EVANS...............................155

5

6    REPORTER'S CERTIFICATE.....................161

7

8

9

10

11

12

13           E X H I B I T   I N D E X

14    NO.          DESCRIPTION                    PAGE

15    EXHIBIT 46  LEAN SIX SIGMA 2012.............. 91

16    EXHIBIT 47  12/8/16 E-MAIL THREAD...........138

17

18

19

20

21

22

23

24

25



```
 1              S T I P U L A T I O N

 2

 3         IT IS STIPULATED AND AGREED by and among

 4    counsel for the parties hereto that the deposition

 5    of the aforementioned witness may be taken for all

 6    purposes permitted within the Louisiana Code of

 7    Civil Procedure, in accordance with law, pursuant

 8    to notice;

 9

10         That the formalities of reading, signing,

11    sealing, certification and filing are specifically

12    NOT waived;

13

14         That all objections, save objections as to

15    the form of the question and responsiveness of the

16    answer, are reserved until such time as this

17    deposition, or any part hereof, is used or sought

18    to be used in evidence.

19

20              *  *  *  *  *  *  *  *  *

21

22         ANNA COKER COATES, RPR, CCR, Certified Court

23    Reporter in and for the State of Louisiana,

24    officiated in administering the oath to the

25    witness.
```



866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1                     ANGELA SMITH,
 2    AFTER HAVING BEEN FIRST DULY SWORN BY THE
 3    ABOVE-MENTIONED COURT REPORTER, DID TESTIFY AS
 4    FOLLOWS:
 5    EXAMINATION BY MRS. LOMMERS-JOHNSON:
 6         Q.   Good morning.
 7         A.   Hi.
 8         Q.   My name is Hannah Lommers-Johnson.  And
 9    together with Emily Washington and Jim Craig, we
10    represent the Plaintiffs in this case.
11         A.   Okay.
12         Q.   Can you introduce yourself for the
13    record?
14         A.   Angela Smith.
15         Q.   What's your position?
16         A.   I'm retired corrections manager.
17         Q.   And have you had any deposition
18    experience previously?
19         A.   No.
20         Q.   Okay.  I just want to start by going
21    over some of the ground rules for today, just so
22    you and I both know what to expect over the next
23    couple of hours.
24         A.   Okay.
25         Q.   First of all, we obviously have a court
```



1   reporter sitting at the end of the table.  She's

2   taking down everything we say so that it can be

3   recorded.  So just make sure that you give verbal

4   answers.  And if you have a nonverbal answer, like

5   a nod or shake of the head, just turn that into

6   saying yes or no.

7       A.   Okay.

8       Q.   You also just took an oath to tell the

9   truth.  That's the same oath you would take in

10  court.  We really just ask that you give full,

11  factual and complete answers to the questions.  If

12  you think of something later and want to correct

13  an answer of yours or supplement it, definitely

14  feel free to do so.

15      A.   Okay.

16      Q.   If there's any questions that I ask that

17  are confusing or hard to understand, just ask me

18  to clarify or rephrase it.

19      A.   Okay.

20      Q.   If you don't tell me that a question of

21  mine is confusing or that you don't understand it,

22  I will assume that you understand it.  Is that

23  fair?

24      A.   Okay.

25      Q.   And then today you might need breaks

1    throughout, and that's fine.  If you do need a
2    break, just let us know, but I would just ask that
3    you wait until you finish answering whatever
4    question is out on the table.
5         A.    Okay.
6         Q.    And same for speaking with your
7    attorney; you're free to speak with the attorney
8    whenever you need to, just make sure you give the
9    answer to the question first, and then we can have
10   a break to do whatever you need to do.
11        A.    Okay.
12        Q.    Last of all, do you have any hardships,
13   or are you taking any medication today that might
14   interfere with your ability to understand or fully
15   answer the questions?
16        A.    No.
17        Q.    Okay.  Get started.  First, I want to
18   talk a little bit about your career path and
19   background.  Can you give me a brief glimpse of
20   your educational history.
21        A.    My educational, I have a high school
22   diploma.
23        Q.    Where did you go to high school?
24        A.    Denham Springs High School.
25        Q.    And what year did you graduate?



```
 1        A.    1985.
 2        Q.    After you graduated, did you do any type
 3   of vocational or other training?
 4        A.    No.
 5        Q.    When did you first start working at the
 6   Department of Corrections?
 7        A.    I don't remember the exact month, but I
 8   do know it was in '91.
 9        Q.    Just briefly, can you sketch out your
10   career path before you started at the Department
11   of Corrections in 1991?
12        A.    Okay.  In 1986 -- I'm sorry, 1985, I
13   went to work at Woman's Hospital on the night
14   shift as a ward clerk.  I stayed there for 2
15   years.  Went to work for a temp service.  I worked
16   a temp service until 1989.  And then in 1989, I
17   took state civil service test, and I went to work
18   for LASERS, the retirement system.  And I worked
19   there for like a year and a half.  And then I went
20   to work for the Department of Corrections.
21        Q.    When you started at the Department of
22   Corrections, what was your first position?
23        A.    I was a records clerk.
24        Q.    What were your responsibilities as
25   records clerk?
```

```
 1        A.   Pulling inmate files for court, filing
 2   inmate files.  That's about it, from what I can
 3   remember.  It's been a long time.
 4        Q.   How long did you stay in that position
 5   as records clerk?
 6        A.   Until 1993.
 7        Q.   And in 1993, what did you do next?
 8        A.   I moved to a secretarial position.
 9        Q.   Was that a promotion from records clerk?
10        A.   Yes.
11        Q.   In what office did you work?
12        A.   The business office.
13        Q.   Business office.  What were your
14   responsibilities there?
15        A.   I was the secretary to the assistant
16   warden of administration.  I worked -- I sat in
17   with him on staff meetings, kept minutes, worked
18   with the culinary staff regarding different things
19   that they needed, any functions that he
20   supervised, that the assistant warden supervised.
21   I dealt with the maintenance crew.  I dealt
22   with -- I took care of their time and attendance.
23        Q.   And how long did you stay in that
24   secretary position?
25        A.   Until 1998.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond, LA 70404     Fax 985.870.0799

```
 1        Q.    What did you do next?
 2        A.    I promoted to the classification
 3   department.
 4        Q.    And what was your position in the
 5   classification department?
 6        A.    Classification officer.
 7        Q.    Can you tell me what your
 8   responsibilities were as classification officer?
 9        A.    On the front end, I was a HRDC, which
10   was the Hunt Reception and Diagnostic Center at
11   Hunt.  I was part of the intake staff.
12        Q.    Were you working physically at the Hunt
13   location?
14        A.    Yes.
15        Q.    And as part of the intake staff, what
16   functions did you perform?
17        A.    We processed the inmates on intake day.
18   We processed them in, classified their housing,
19   where they were to be housed.  We interviewed them
20   for summaries.  They call it intake summaries,
21   where we gather their personal information, their
22   job skills, that sort of thing.
23        Q.    How long did you stay in that position
24   for?
25        A.    Until probably the end of 1999.  1999, I
```



1   moved into the preclassification department as a

2   preclass. officer.

3       Q.   When you were working at Hunt in the

4   classification department, did you participate in

5   performing any time calculation?

6       A.   Yes.

7       Q.   Okay.  I think we'll come back to that a

8   little bit later.

9       A.   Okay.

10       Q.   And I apologize.  I think you said in

11   1999, you moved to --

12       A.   Well, I was in -- the classification

13   department was broken down into -- at Hunt anyway,

14   it was broken down into three separate

15   departments:  You had the classification

16   department that was for HRDC, which was the

17   reception center; then you had classification that

18   was for the Hunt population; and then you had

19   classification that was for preclass.  All three

20   of those did different functions.  The first year

21   and a half, I was HRDC, the reception unit.  Then

22   when I went into the preclass. section, that was

23   different.  I had different job functions.

24       Q.   Okay.  So just to make sure that I

25   understand, you were in the classification

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1  department originally at HRDC?

2       A.    Uh-huh (AFFIRMATIVE RESPONSE).

3       Q.    And in that position, you participated

4  in processing inmates and doing the intake

5  interviews at Hunt?

6       A.    Correct.

7       Q.    And then there's another department

8  under classification that works just with the Hunt

9  population?

10      A.    Correct.

11      Q.    And then the third department is the

12 preclass. department, and that's where you went to

13 work next?

14      A.    Correct.

15      Q.    Can you tell me what that department

16 does and how it's different from the HRDC

17 classification?

18      A.    Preclassification, we processed DOC

19 offenders that are housed in the parish jails.

20      Q.    Was it the situation at HRDC

21 classification that you were working with inmates

22 when they came in face to face, and then when you

23 were working in preclass., it was remote?

24      A.    Correct.

25      Q.    Okay.  Can you tell me what your



```
 1   position was in the preclass. department when you
 2   started there?
 3         A.   They changed our positions in midstream.
 4   I started -- they changed them from classification
 5   officers to, when I went to preclass., we were
 6   corrections ARDC specialists.
 7         Q.   And can you break down for me what your
 8   job responsibilities were as the corrections ARDC
 9   specialist at preclass.?
10         A.   I received sentencing documents from the
11   parish jails when an offender was sentenced to the
12   Department of Corrections, set up a file, ensured
13   that we had all of the documents that we needed to
14   be able to process his case or her case, because
15   we had the females at that time, also.  We would
16   put them in a file, make their file, and then we
17   would time comp them.
18         Q.   And in that position, who did you report
19   to?
20         A.   Henry Goings.
21         Q.   What was Henry Goings' position?
22         A.   He was corrections manager.
23         Q.   At that point, were you working at
24   headquarters in the preclass. department?
25         A.   No.  We were still at Hunt at that time.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1          Q.    Still at Hunt.
 2          A.    The preclass. department stayed at Hunt
 3     for a while.
 4          Q.    How many other people were in the same
 5     position that you were in as corrections ARDC
 6     specialists?
 7          A.    I think when I came into that position,
 8     there was, like, 15 of us.
 9          Q.    Did they all report to Henry Goings?
10          A.    No.  We were broke down.  They had three
11     separate corrections managers, and we were broke
12     down into sections, because we were divided by
13     parishes.
14          Q.    What parishes did you focus on when you
15     were in that role, if you remember?
16          A.    The very beginning parishes Orleans and
17     Jefferson.
18          Q.    We'll talk some about this later, but
19     just in terms of receiving the sentencing
20     documents, at that time when they were sent in
21     from Orleans, do you remember who you would
22     receive them from?
23          A.    Not at that point.  That was -- that's
24     been a long time ago, and I really don't remember
25     who was actually in the records office at that
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    time.  I really don't.

2        Q.    Can you tell me what your next position

3    was?

4        A.    My next position was in 2011.  I was --

5    we had some layoffs, and I changed positions.  I

6    moved from the corrections ARDC specialist --

7    wait, I'm sorry, I need to back up.  In preclass.

8    department, I had, in 2007, I promoted to a

9    supervisor's position, to a corrections

10   supervisor.  Then in 2011, I took a voluntary

11   demotion, due to layoffs, back to a corrections

12   ARDC specialist.  And I moved -- at that point, I

13   moved into the Hunt general population records

14   office.

15       Q.    Why were there layoffs in 2011?

16       A.    Cutbacks, money.

17       Q.    And I apologize, you said you moved back

18   to corrections ARDC specialist at Hunt?

19       A.    At Hunt.

20       Q.    Okay.  Was that in the preclass.

21   department?

22       A.    No.  I still was working with the Hunt

23   general population.

24       Q.    The general population.  Where did you

25   go from there?

```
 1         A.    Within about 6 months, one of the
 2   corrections supervisors transferred to another
 3   facility.  Then I was able, due to rehire,
 4   reinstatement rights, I was eligible to move back
 5   into my supervisor's position.  I moved back into
 6   my supervisor's position in the Hunt records
 7   office.
 8         Q.    So at that point, were you supervising
 9   the intake of records for the Hunt population?
10         A.    Yes, because, at that point, preclass.
11   had moved here to headquarters.
12         Q.    Okay.  How long did you stay in that
13   role for?
14         A.    To 2014.
15         Q.    And where did you go in 2014?
16         A.    I transferred here to the preclass.
17   department at headquarters as a corrections
18   supervisor.
19         Q.    Why did you transfer?
20         A.    It was just time.  I was ready to try
21   something new -- I mean, not new, but ready to
22   branch out, go somewhere else.
23         Q.    When you started at the preclass.
24   department at headquarters in 2014, what was your
25   position?
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

Angela Smith 7/2/2019

```
 1        A.    I was a corrections supervisor.
 2        Q.    Were you still in that same position in
 3   2016, 2017?
 4        A.    No.  I had promoted to the corrections
 5   manager in 2015.
 6        Q.    In 2015.  Can you tell me, in your role
 7   as corrections manager, what were your specific
 8   responsibilities there?
 9        A.    As a corrections manager, my direct
10   responsibilities were to ensure that my -- the
11   supervisors that I supervised, supervised their
12   respective employees.
13        Q.    How many supervisors did you have
14   working underneath you?
15        A.    Three.
16        Q.    And how many staff did each of those
17   supervisors --
18        A.    They had, on average, six to seven.
19        Q.    -- manage?
20             MR. EVANS:  Let her finish her question
21             before you answer.  Makes it clear.
22             THE WITNESS:  I'm sorry.
23   EXAMINATION BY MRS. LOMMERS-JOHNSON:
24        Q.    Just how many people did each of those
25   supervisors manage?
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1          A.    On an average of six to seven.
 2          Q.    And what was your department in charge
 3   of doing at that point?
 4          A.    Intake and time comp.
 5          Q.    And that was just for DOC-sentenced
 6   inmates housed at local facilities?
 7          A.    Correct.
 8          Q.    And in your role as corrections manager
 9   in 2015, who did you report to at that point?
10          A.    Angela Griffin.
11          Q.    Was there just one other manager --
12          A.    Correct.
13          Q.    -- reporting to Angela Griffin?
14          A.    Correct.
15          Q.    And who, to your understanding, who did
16   Angela Griffin report to?
17          A.    At that point, Perry Stagg.
18          Q.    So I have a couple of questions about
19   the general organizational structure that you
20   worked in 2015, 2016, 2017.  Am I correct in
21   understanding that you were a manager at
22   headquarters in the preclass. department, and that
23   was under the umbrella of the office of adult
24   services?
25          A.    Correct.
```

Alleged Smith - 7/3/2019

 1        Q.    What does ARDC stand for?

 2        A.    Adult reception and diagnostic center.

 3        Q.    What does that refer to?

 4        A.    It's the reception of the adult

 5    offenders coming in from parish jails into DOC to

 6    be processed.

 7        Q.    But it doesn't refer physically to the

 8    physical location of Hunt?

 9        A.    Originally, it did.  Originally, it was

10    HRDC -- yes, HRDC, which was Hunt Reception and

11    Diagnostic Center.

12        Q.    And then after preclass. was moved here,

13    it was ARDC was used to refer to the entire

14    classification department; is that correct?

15        A.    Well, while it was still at Hunt, it was

16    divided several times.  It went up north to David

17    Wade and Forcht-Wade.  Then it wasn't just Hunt

18    Reception and Diagnostic Center anymore.  Then

19    that's when it changed into adult.

20        Q.    Okay.  And during 2015, 2016, who else

21    worked in the preclassification department besides

22    yourself?

23        A.    You want me to list every --

24        Q.    You don't --

25        A.    I can't tell you each one of them.  I

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Angela Smith 7/3/2019

```
 1    mean, I can tell you --
 2         Q.    Let me rephrase.
 3         A.    Okay, please.
 4         Q.    Am I correct that there was one other
 5    manager in the preclassification department?
 6         A.    Correct.
 7         Q.    And that each of you supervised -- did
 8    each of you supervise, at that point, three
 9    supervisors yourself?
10         A.    I supervised three.  We had five groups.
11    I supervised three supervisors.  And the other
12    manager, she supervised two.
13         Q.    And how were the groups broken up?
14         A.    My three groups were broken up into -- I
15    had two groups that were intake and time
16    computation.  Then I had a group that handled the
17    parole violators.  Offenders that come back and
18    violate their parole were handled in a group unto
19    themselves.
20         Q.    Okay.  So if I understand correctly, the
21    three groups were intake, time computation and
22    parole violators?
23         A.    No.  There was two groups that handled
24    intake and time computation simultaneously.
25    That's what each group did.  Then I had a group
```

```
 1    that handled the parole violators.  Because I only
 2    handled the intake and time computation and parole
 3    violators, the other manager handled -- her groups
 4    were broke down for releases.
 5         Q.   Both of her groups were releases?
 6         A.   Correct.
 7         Q.   What was the name of the other manager
 8    at that time?
 9         A.   Mary Strickland.
10         Q.   I think I forgot to ask earlier, when
11    did you leave the Department of Corrections?
12         A.   My official retirement date was
13    January 2nd of 2019.
14         Q.   Did you remain in the role of
15    corrections manager in the preclass. department
16    until you left?
17         A.   Correct.  Yes.
18         Q.   And can you tell me, between 2015 and
19    the time you left, what other managers -- what
20    other people worked in the role of manager, if
21    there were any others, besides Mary Strickland?
22         A.   When Mary Strickland retired, Tessie
23    Cooley promoted into the manager's position.
24         Q.   Was that the only change between 2015
25    and when you left?
```

```
 1        A.    Manager-wise, yes.
 2        Q.    Okay.  Did Tessie Cooley maintain the
 3   same groups that Mary Strickland did of people
 4   working on releases?
 5        A.    Yes, for a short period of time.
 6        Q.    What year was that, that Mary Strickland
 7   retired and Tessie Cooley promoted into her role?
 8        A.    I don't remember the specific year.  I
 9   don't remember if it was '16 or '17.
10        Q.    Would it be correct to say that, in your
11   recollection, Tessie Cooley promoted into Mary
12   Strickland's role prior to 2018?
13        A.    Yes.
14        Q.    I think you already described that both
15   you and the other manager reported to Angela
16   Griffin?
17        A.    Yes.
18        Q.    And that Angela Griffin, in 2016, 2017,
19   reported to Perry Stagg; is that correct?
20        A.    As far as I remember, yes.
21        Q.    Who was -- in your understanding, who
22   did Perry Stagg report to during those years?
23        A.    Seth Smith.
24        Q.    Was Seth Smith serving the role of chief
25   of operations?
```

```
 1        A.    Yes, chief of operations.
 2        Q.    Who did Seth Smith report to?
 3        A.    I assume Jimmy LeBlanc; Secretary
 4   LeBlanc.
 5        Q.    Do you -- I guess other than what we've
 6   discussed about your role as manager, did you have
 7   any other responsibilities as manager in 2016,
 8   2017, that we have not touched on?
 9        A.    You mean as far as job function or as
10   far as responsibilities just as the manager in the
11   position that I was in?  I guess --
12        Q.    Either.
13        A.    Well, I mean, as corrections manager, we
14   had other functions regarding -- we did audits --
15   that's what I'm not for sure.  You know, I mean,
16   that's what I'm not for sure what the question is,
17   because, I mean, we did audits.  We had phone
18   duty, that sort of thing.
19        Q.    Okay.  Yes, definitely.  Tell me about
20   that, I guess starting with audits.
21        A.    I mean, we are the department that
22   audited the records offices and the facilities,
23   the state prisons.
24        Q.    What did your audits of records offices
25   and state facilities involve?
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1        A.    Just going through the offender's record
 2   and making sure everything was done properly.
 3        Q.    Was that making sure everything was done
 4   properly in terms of time computation and
 5   releases?
 6        A.    Both, yes.
 7        Q.    Would you do that yourself, or would you
 8   supervise your staff in performing those audits?
 9        A.    No.  I would perform that myself.
10        Q.    And did that involve you physically
11   going to different state facilities?
12        A.    Yes.
13        Q.    How often would you do that?
14        A.    Maybe once or twice a year.
15        Q.    Did that ever involve you going to local
16   facilities or just state facilities?
17        A.    Just state facilities.
18        Q.    What type of documentation were you
19   looking for when you audited those offender files?
20        A.    We checked the time computation for
21   correctness, for accuracy and docket numbers,
22   offender class, and just to make sure the file was
23   consistent with policy.
24        Q.    When you say checking to make sure that
25   the file was consistent with policy, can you tell
```

1    me a little bit more about what you mean by that?

2         A.   We have -- there's a department reg.

3    that states how the file was supposed to be kept

4    regarding in what order things are kept in a file.

5         Q.   What is the name of that department

6    regulation that gives you the policy for what must

7    be contained in the file?

8         A.   I do not remember the exact name of it.

9         Q.   Okay.  Or where would -- where could we

10   find that?

11        A.   We had it as employees, I mean, we had

12   the department regulations.

13        Q.   Did those same regulations apply to the

14   materials that you would keep records of for

15   offenders held in local jails?

16        A.   Yes.

17        Q.   Did you perform any similar audits of

18   the files of offenders who were held in local

19   jails?

20        A.   Regarding my job as a manager, yes, I

21   would say I did with my employees.  But just as a

22   whole, no, that wasn't part of my job, you know.

23   As far as going behind my employees, yes, I did,

24   as far as checking the files.

25        Q.   And all of those files that we've been

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

1    talking about for offenders held in local jails,

2    those files would be on site with you-all at

3    headquarters?

4         A.   Correct, until they went to the computer

5    system, and then us.

6         Q.   Would anyone ever physically visit the

7    local jails to conduct any type of auditing of

8    files or roster of inmates themselves?

9         A.   There's a group that -- I mean, in our

10   department, that never happened.  I mean, I know

11   that there's something with corrections that they

12   go to the local facilities.  As far as their

13   records, I really don't know.

14        Q.   What group is that?

15        A.   I think they have basic jail guidelines.

16   It's a function of some people in the Department

17   of Corrections.  I'm not sure exactly who that is

18   any longer.

19        Q.   You said that besides doing audits, you

20   also had some responsibilities that involved

21   answering the phones?

22        A.   Yes.

23        Q.   Can you tell me what that was?

24        A.   Once or twice a year, we had what they

25   refer to as duty officer duty.  And that was a

Alleged Smith 7/3/2019

1  phone that we had for 24 hours a day for several

2  days, and so that anyone would have access to

3  contact the Department of Corrections regarding

4  anything that happened with offenders.

5       Q.   And so if I'm understanding correctly,

6  that was a public line that people could call?

7       A.   No.  Only corrections staff.

8       Q.   Was that corrections staff from

9  headquarters or state facilities?

10      A.   State facilities.

11      Q.   Besides your phone duties as duty

12  officer once or twice a year, did you also have

13  any duties that involved answering calls from the

14  public?

15      A.   Yes.

16      Q.   Can you tell me about that?

17      A.   We just -- the public had access to us.

18  There's a public number that they can dial, and it

19  gives them prompts, and they would contact.  Any

20  of us, at any time, could talk to offender's

21  family, the public.

22      Q.   What was the number for that public line

23  that you --

24      A.   I don't remember.

25      Q.   Do you know if the line that you were

Abigail Smith 7/2/2019

1    attached to, the phone line, was listed as a

2    preclassification line of some sort?

3         A.   My direct number wasn't.

4         Q.   But there was a preclassification line

5    for your department?

6         A.   Correct.

7         Q.   And that preclassification line for your

8    department was available to the public?

9         A.   Correct.

10        Q.   Who answered that line?

11        A.   Sometimes it would go into -- the phone

12   would go into the groups.  Other times, we have a

13   secretary that answers that call, that number, or

14   it's -- I should say it's an automated system, and

15   we had a clerical person that -- not a clerical

16   person -- a secretary that would check the

17   messages.

18        Q.   Do you know who was assigned in that

19   clerical position in 2016, 2017?

20        A.   The only clerical person we have is

21   Melissa Allen.

22        Q.   Was the preclassification line that was

23   available to the public, was that number posted

24   online or in a phone book or anywhere, that you

25   know of?



```
 1        A.   I would assume it's on the Department of
 2   Corrections website.  And I think the parish, the
 3   local jails had it.  I'm not for sure.
 4        Q.   When you say that you think the local
 5   jails had it, do you mean the personnel at local
 6   jails or offenders themselves at local jails had
 7   access?
 8        A.   I really don't know.
 9        Q.   Okay.  Going back to the organizational
10   structure, can you tell me, in Perry Stagg's
11   position in 2016, 2017, did anyone else report to
12   him, that you know of, besides Angela Griffin?
13        A.   I'm not for sure who exactly reported to
14   him.
15        Q.   What was Perry Stagg's position?
16        A.   I'm not for sure what the exact.  I know
17   it's like a deputy secretary or something like
18   that.  I'm not 100 percent sure what the wording
19   is.
20        Q.   What was your understanding of what
21   Perry Stagg was responsible for in that role?
22        A.   I know he communicated with the local
23   facilities on things.  If they needed something,
24   they contacted him.  That's all I knew.
25        Q.   And when you say Perry Stagg
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA  70404     Fax 985.419.0799

1    communicated with the local facilities, do you

2    mean that Perry Stagg had responsibilities to

3    manage local facilities that were housing

4    DOC-sentenced inmates?

5         A.   I don't know if he managed them or not.

6    I know he had contact with the parish jails.

7         Q.   How long did Perry Stagg stay in that

8    role for?

9         A.   I'm not for sure the exact timeframe.

10        Q.   Do you know about when he left that

11   role?

12        A.   No.  I don't remember.

13        Q.   Do you know why he left?

14        A.   I know he went to Hunt Correctional

15   Center, assistant warden or deputy warden.

16        Q.   Would the move to Hunt Correctional as a

17   deputy or assistant warden have been a demotion or

18   a promotion or a lateral move?

19        A.   I really don't know.

20        Q.   In what context would you interact with

21   Perry Stagg when he was serving in that role as

22   deputy assistant secretary?

23        A.   If he received a phonecall from the

24   local facility, and they needed an offender made

25   ready or time comped or needed some documentation

```
 1   or anything like that, he would come to me for me
 2   to see what I needed -- what I needed to do to
 3   have someone, you know, what we refer to as, made
 4   ready or time comped, that sort of thing.
 5        Q.   And he would come to you because you
 6   managed the two groups?
 7        A.   Correct, the intake department.
 8        Q.   Okay.  So in terms of DOC-sentenced
 9   inmates who were being held at local jails, you
10   were the manager who oversaw all of their time
11   computation; is that correct?
12        A.   Correct.
13        Q.   What was Monisa Lentz' position?
14        A.   As far as I know, she's just a secretary
15   in the secretary's office.
16        Q.   Was your professional interaction with
17   her similar to your interaction with Perry Stagg
18   in terms of receiving communications from her?
19        A.   Yes.  If she received a phonecall from a
20   parent, family member, she would send me an e-mail
21   or she would notify me.  Somehow, she would
22   contact me, send me a note stating that she
23   received a phonecall from family members, and they
24   were questioning their family member's time
25   computation or ready status.
```

```
 1        Q.   Can you tell me, besides supervising you
 2   and the other manager, what was your understanding
 3   of what Angela Griffin was responsible for in her
 4   role?
 5        A.   As far as I know, that was her main
 6   responsibilities, was the director of the
 7   preclassification department.
 8        Q.   Was it your understanding that it was
 9   Angela Griffin then who was ultimately responsible
10   for managing the time computation and timely
11   release of DOC-sentenced inmates held at local
12   facilities?
13        A.   I don't know.  I don't quite know how to
14   answer that.
15        Q.   Can you tell me about what Raven Groom's
16   role was in 2016, 2017?
17        A.   I think, as far as what I knew, she
18   answered the telephone.  She was telephone
19   operator.
20        Q.   What department did she work in?
21        A.   As far as I knew, the secretary's
22   office.
23        Q.   Can you tell me about what Joseph
24   Bordelon's role was?
25        A.   He was a corrections specialist.
```

```
 1        Q.   Does that mean that he would work
 2   under --
 3        A.   One of my --
 4        Q.   -- one of the supervisors that you
 5   supervised?
 6        A.   Yes.
 7        Q.   Okay.  And was he in the intake and time
 8   computation?
 9        A.   Yes.
10        Q.   Okay.  Who did Joseph Bordelon report to
11   in 2016, 2017?
12        A.   I'm not for sure the exact timeframes,
13   but I know there were two supervisors in that
14   group at that time that moved in and out; one was
15   Sharita Spears, and one was Kinedra Burton.
16        Q.   You told me about the two groups.  Two
17   of the groups that you supervised would focus on
18   intake and time computation.  How were -- what was
19   the division of those two groups?
20        A.   Like I say, on average of six or seven
21   in a group.  And so many of those, like, possibly
22   two employees, would receive the, what we refer
23   to, as intake, which is packets received from the
24   parish jails of the sentencing documents for each
25   offender.  And they would come in a packet.
```

1    That's why we refer to them as a packet.  They

2    would come in a packet either paper-clipped,

3    stapled together.  Our intake person in that group

4    would go through it, make sure that they have all

5    the proper documentation, fingerprint cards,

6    everything that needed to be in that packet to be

7    able to process that offender's case.  They would

8    do that.  They would update some information off

9    of his personal information or whatever.  They

10   would update our computer system, which was Cajun

11   computer system.  They would update that system.

12   Once they had their part updated to a certain

13   point, then that paperwork would go to another

14   person in that group to be time comped.  And then

15   that person would take that packet, go through it.

16   They would doublecheck to make sure they had the

17   proper documentation that they needed to calculate

18   that offender's release date, and then that's what

19   they did.  So it was broke down into employees

20   within that group.

21        Q.   And were the two groups divided based on

22   parishes that they handled?

23        A.   Yes.  Yes.

24        Q.   What were the divisions, or which

25   parishes were divided up, if you can remember?



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1        A.   I cannot -- I can't remember how each
 2   one of them was divided up.  It was, like, at that
 3   point, it was 40-something parishes that we had.
 4        Q.   Do you know, in 2016, 2017, what Corey
 5   Amacker's role was?
 6        A.   We dealt with Corey Amacker when we
 7   needed any paperwork from them or any information
 8   from the Orleans records office or records room.
 9   He was our contact person at Orleans Parish
10   prison.
11        Q.   And when you say the Orleans records
12   room, is that within the sheriff's office at
13   Orleans?
14        A.   It's -- as far as I know, I know it's
15   probably in the jail somewhere with the sheriff's
16   office.
17        Q.   Do you know how Corey Amacker came to be
18   in that role?
19        A.   No.
20        Q.   When there is a person that you
21   communicate with in a records room in a parish, is
22   that person chosen to be in that role by the
23   Department of Corrections or by the local parish?
24        A.   By the local facility.
25        Q.   Was it your understanding that Corey
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

1    Amacker's title involved Department of Corrections

2    classification manager, that terminology?

3         A.    I didn't know that.

4         Q.    What would that have meant?

5         A.    To me, it wouldn't have meant anything

6    in particular.

7         Q.    Would that have been a position that was

8    given to him by the Department of Corrections?

9         A.    Not that I know of.

10        Q.    Who was the main point of contact at

11   Department of Corrections for Corey Amacker?

12        A.    Joseph Bordelon, at that time.

13        Q.    So that's in 2016, 2017, it would have

14   been Joseph Bordelon?

15        A.    Because we change up those contacts.  We

16   have a high turnover rate in those positions.  And

17   so I'm not even for sure how long he was the

18   contact person.  And I'm not for sure who was the

19   contact person after that.

20        Q.    And I think you said earlier, when we

21   were talking about the division of the groups,

22   that intake and time computation groups were

23   responsible for 40 different parishes at that

24   time?

25        A.    Uh-huh (AFFIRMATIVE RESPONSE).

Alfred Smith - 7/3/2019

```
 1          Q.    Would the intake and computation groups
 2   that you managed handle all 40 parishes at that
 3   time?
 4          A.    Correct.  Now, I may have the number
 5   wrong.  All I know is, we didn't have the whole --
 6   I mean, there's 64 parishes.  We didn't have all
 7   64 parishes, but I can't tell you the exact number
 8   that we had.  I know it was a lot.
 9          Q.    When you say that you didn't have all 64
10   parishes, you mean that the Department of
11   Corrections didn't utilize all 64 parishes' local
12   facilities to house DOC?
13          A.    No.  Some of the local facilities, those
14   parishes were handled by David Wade Correctional
15   Center in Keithville.
16          Q.    And at that time, was East Carroll
17   Parish one that was handled by David Wade?
18          A.    Yes.
19          Q.    And Orleans was a parish that was
20   handled under your supervision?
21          A.    Yes.
22          Q.    Here at headquarters?
23          A.    Yes.
24          Q.    Okay.  So now I want to talk about
25   training that you were given at the Department of
```

1    Corrections to perform your role.  When you
2    initially started at the Department of
3    Corrections, do you remember going through any
4    training?
5         A.   Yes.
6         Q.   What did that involve?
7         A.   It was mainly back in 1999, we had
8    instructions that were given to us, and it was
9    mainly on-the-job training.
10        Q.   When you say that you had instructions
11   given to you, do you mean you were given written
12   rules or regulations?
13        A.   Written rules, regulations, department
14   regulations.
15        Q.   When you moved into your position, and I
16   guess your first position involving
17   classification, did you receive any training at
18   that point?
19        A.   You're referring to when I went to the
20   adult reception, when I did the intake of the
21   offenders?
22        Q.   Yes.
23        A.   Yes, but it was more hands-on training.
24        Q.   Did you receive any training that was
25   specific to preclassification or classification?

```
 1         A.    When; when I moved into the
 2    classification -- the preclassification position?
 3         Q.    Yes.
 4         A.    We've always had modules that were given
 5    to us that had the information on it that we
 6    needed to preclass. an offender and also to do
 7    time computation.  Computation was a lot different
 8    20 years ago than it is today.
 9         Q.    When you say that you received modules,
10    did you receive those modules as power point
11    presentations or in some other form?
12         A.    It was mainly handouts.
13         Q.    Handouts.  And besides receiving those
14    modules, did you receive any other information or
15    training on performing preclassification or time
16    computation?
17         A.    The manager at that time, Henry Goings,
18    he would probably -- once a month, he would get
19    all of us preclass. together, and he would go over
20    certain -- anything that he felt we needed -- that
21    he felt like we needed any extra, you know, I
22    guess any extra insight into or any extra training
23    or anything like that.  He would do that once a
24    month or so.  And we had staff meetings once a
25    month, and they would always address anything that
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1    was an issue.
 2         Q.   Besides the modules and once-a-month
 3    trainings from the manager at that time, did you
 4    receive any other training for performing time
 5    calculation?
 6         A.   Nothing more than what I've already
 7    said.
 8         Q.   Am I correct that one of your roles is
 9    to help -- or one of your roles was to help
10    monitor issues with regard to delay in time
11    computation?
12         A.   What do you mean by "delay?"
13         Q.   I guess let me rephrase.  Was it one of
14    your roles to ensure that time computation was
15    processed in a timely manner so that people were
16    not held past their proper release date?
17         A.   It was part of my responsibility to
18    ensure that we had all of the paperwork and the
19    documentation that we needed to be able to
20    calculate their release date in a timely manner.
21         Q.   And did you receive any training that
22    was specific to conducting your role so that there
23    was no delay in time computation?
24         A.   I'm not really understanding the
25    question.
```

Angela Smith - 7/3/2019

```
 1          Q.   I guess let me back up.  During the time
 2     you were at the Department of Corrections, did
 3     you, at any point, become aware of a 2012 study
 4     done on over-detention problems in the Department
 5     of Corrections?
 6          A.   I was not aware of that.
 7          Q.   There was -- my understanding is, there
 8     was an audit done.  It was called the Lean Six
 9     Sigma study.  And a report came out from that in
10     2012.  Is that something that you --
11          A.   I remember Lean Six Sigma.
12          Q.   Tell me what you remember about Lean Six
13     Sigma.
14          A.   I just remember that Lean Six Sigma
15     came, that's when preclass. was at Hunt
16     Correctional Center.  And as far as I know, they
17     were coming to see what they could do to help us
18     streamline the preclassification department.
19          Q.   To your understanding, what was the goal
20     of streamlining preclassification?
21          A.   To make the process more efficient.
22          Q.   What was the reason that the process
23     needed to be made more efficient?
24          A.   Because at that point in time, we
25     handled all 64 parishes, and we had a staff of
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Angela Smith - 7/3/2019

```
 1   about 10 or 15.
 2        Q.   When you joined the preclassification
 3   department, did you receive any additional
 4   training?
 5        A.   At which point that I joined
 6   preclassification?
 7        Q.   I guess when you were involved with
 8   preclassification physically at headquarters.
 9        A.   I can't say I had anything that was
10   structured.  Like, when I came to work here, did
11   they hand me anything to say, here, this is how
12   you do time computation, no, because I already
13   knew how to do time computation.  That's because I
14   came here as a supervisor.  So as far as giving me
15   training materials, at that point in my career,
16   no.
17        Q.   And the training materials that you had
18   received previously, as far as how to conduct time
19   computation and preclassification in general, were
20   those modules that you talked about?
21        A.   Correct.
22        Q.   Did you receive any training specific to
23   receiving and responding to complaints about
24   problems with time calculation?
25        A.   Any training?  No, not really.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

Angela Smith - 7/2/2019

```
1        Q.   Any training or any direction about how
2    to deal with those, with any complaints that might
3    come in?
4        A.   Well, I need you to be a little more
5    specific.  Are you talking about complaints on how
6    to deal with a phonecall, with the offender's
7    family or anyone making the call coming in, or
8    what I was supposed to do once I received the
9    phonecall in?
10       Q.   I guess maybe walk me through any
11   direction that you were given about how to respond
12   to a phonecall about an over-detention complaint.
13       A.   We never really received phonecalls on
14   over-detentions.  It was mainly they want to know
15   why their time comp is not computed, why they
16   don't have release dates.  And at that point, I
17   would look through our system, I would look to see
18   what the status was of that offender's paperwork.
19   If we didn't have paperwork, then at that point I
20   would start a search to find out, is this offender
21   actually a DOC -- has he actually been sentenced
22   to the Department of Corrections, what parish.
23   Then I would start looking in-house.  I would go
24   to my groups, I would say, do you have paperwork
25   on this offender, we've received a phonecall.  At
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1   that point, I would start gathering information to
2   see where that offender's paperwork was, if we had
3   it on site.  And if we didn't have it on site,
4   then that's when we would start contacting the
5   facility or the parish of that conviction to see
6   why -- we need this paperwork to calculate this
7   offender's time.
8        Q.   We've talked a little bit about
9   receiving phonecalls.  What were the different
10  ways, in 2016 or 2017, to your knowledge, that
11  inmates or their families or loved ones could call
12  with a question or a complaint about time
13  calculation?
14       A.   To my knowledge, they had the 1-800
15  number, the public number that they were -- that
16  they were supposed to be given when they were in
17  the parish facilities.  And I assume that number
18  was on our Department of Corrections website.  I
19  do know that they would contact the secretary's
20  office.  They would contact -- if they could,
21  sometimes they would get our numbers, and they
22  would contact us directly.
23       Q.   When you say "our," do you mean the
24  preclassification department?
25       A.   The preclass., yes, department.  Our
```

1    numbers were not made public, but sometimes they
2    would get them.
3            Q.    What was the 1-800 number that people
4    could call?
5            A.    I don't remember what it is.
6            Q.    And to your knowledge, was that a
7    dedicated line that inmates or their families
8    could call about time computation specifically?
9            A.    It was an automated line, and that it
10   would give them prompts as to what function they
11   needed.
12           Q.    Was that an automated line to receive
13   complaints about all different things or specific
14   with regard to time calculation release?
15           A.    It was specific to preclassification.
16           Q.    Preclassification.  Besides telephone
17   calls, were there any other ways, to your
18   knowledge, that people could make a complaint
19   about time calculation?
20           A.    The offenders could, their grievance
21   procedure.
22           Q.    Besides going through the grievance
23   procedure or calling the three areas that we just
24   talked about, were there any other ways, to your
25   knowledge, that people could make complaints about

```
 1   time calculation?
 2        A.   You mean complaints or just inquiries?
 3        Q.   When I say -- I do mean complaints or
 4   inquiries.
 5        A.   The offenders could also write letters.
 6   We receive mail on a daily basis that we would go
 7   through, and we would look at each individual
 8   letter to see what the offender's complaint was.
 9        Q.   When you say "we," do you mean the
10   preclassification --
11        A.   The preclassification.
12        Q.   -- department?
13        A.   Department.
14        Q.   Who was in charge of reading and
15   responding to those?
16        A.   Most of the time, the corrections
17   specialist would go through them.  They would have
18   certain days of the week each one would go through
19   those letters.  If it was something they needed to
20   address, they would give it to the supervisor.  If
21   it was something the supervisor couldn't address,
22   then it would come up the chain to me.
23        Q.   Were those letters that the corrections
24   specialist went through stored or logged or saved
25   in any way?
```

```
 1        A.    No.  No.
 2        Q.    And you said that if the corrections
 3   specialist determined, in reading the letter, that
 4   it needed addressing, they would give it to a
 5   supervisor?
 6        A.    Correct.
 7        Q.    How was that determination made about
 8   whether it needed addressing by a supervisor, to
 9   your knowledge?
10        A.    Most of the time, if it was something
11   that the specialist couldn't deal with at their
12   level, as far as not knowing what to do.  If
13   they -- if someone wrote a letter and said "my
14   time is not calculated," and they looked in our
15   system, and they didn't see anywhere where
16   anything had been received or something needed to
17   be addressed, then at that point, they would give
18   it to the supervisor.
19        Q.    And the letters that were passed up the
20   chain to the supervisor or from the supervisor to
21   you, were those letters stored --
22        A.    No.
23        Q.    -- or logged in any way?
24        A.    Once we address the issue, they were not
25   kept.
```

```
 1        Q.   What would happen to the physical
 2   letter; would it be returned to the inmate or
 3   thrown out?
 4        A.   We didn't keep those.  They would be
 5   thrown out.  But if we addressed it in a written
 6   form, that written form would be kept in that
 7   offender's file, like, if we responded in a
 8   letter.
 9        Q.   Your response would be kept in the file?
10        A.   Uh-huh (AFFIRMATIVE RESPONSE).
11        Q.   In a situation that I think you
12   mentioned where someone would write in about not
13   having their time calculated yet, and the
14   supervisor was not able to address the situation
15   because they looked and were not able to find any
16   paperwork on that specific offender, what would
17   happen -- where would your response to that
18   offender be found if there was no file on them or
19   paperwork on them yet?
20        A.   If there was no file or no paperwork
21   yet, we would keep that, and we would work on
22   getting that offender's paperwork.  A lot of
23   times, the supervisor would bring it to me.  I
24   would go through if it was something that needed
25   to be addressed.  If we had information regarding
```

```
 1    if the offender had been sentenced, then I would
 2    direct them to get in touch with the parish jail
 3    or the local facility to request that paperwork.
 4    It should have automatically been sent to us, but
 5    if it was not, then we had to request it.  And
 6    that's the way that was handled.
 7          Q.   And so you would keep --
 8          A.   It would stay together.  I'm sorry.
 9          Q.   That's okay.  So just if I'm
10    understanding correctly, you would keep their
11    letter at that point, if there was no file on that
12    offender yet.  You would work on getting a file
13    together on them, and you would put any response
14    that you had sent them in their file when a file
15    was created?
16          A.   Correct.
17          Q.   Was there any protocol that you or your
18    staff were given to follow about handling this
19    type of situation that we've just discussed?
20          A.   Nothing in writing.  I knew as a manager
21    that as soon as we were notified in any form or
22    fashion that there was an offender that had been
23    sentenced to the Department of Corrections, and we
24    were receiving inquiries, and if we didn't have
25    the paperwork, we started immediately doing what
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

 1   we needed to do to try to resolve that issue to
 2   get that offender's paperwork.
 3         Q.   Would it be correct to say that if you
 4   received a communication from an offender or their
 5   loved ones that a time calculation had not been
 6   completed, and you looked and found no paperwork
 7   on that offender as of yet, that would be
 8   something that would flag you that there might be
 9   a problem?
10         A.   Correct.
11         Q.   Were there any reports or complaints
12   that you received about delay in time calculation
13   or lack of time calculation that you had to report
14   up the chain to your supervisor?
15         A.   If I attempted -- if my supervisor had
16   attempted to get the paperwork from the parish and
17   could not for whatever reason, it would come to
18   me.  At that point, I would attempt to try to get
19   it.  If I could not get it, then, yes, it would go
20   up the chain to my supervisor, because I knew it
21   was something that would need to be addressed, and
22   that sometimes it just wasn't happening with the
23   parish, and it would have to be addressed at a
24   different level.
25         Q.   And we discussed sort of what your

1   supervisors would do when they received a letter

2   that they couldn't respond to.  Can you tell me

3   what direction were your supervisors given?

4        I'm going to rephrase that.  What direction

5   was your staff given about the steps that they

6   should take in receiving and responding to the

7   letters they received about time calculation?

8        A.   I can't remember specifically.  I know

9   that it would be something that we would verbally

10  discuss.

11       Q.   And that would be verbal direction that

12  you would give them?

13       A.   Correct.

14       Q.   When you ended up having to communicate

15  up the chain reports of delay and time

16  calculation, how would you communicate it to your

17  supervisor?

18       A.   It would either be verbally or by

19  e-mail.

20       Q.   And that would be by e-mail to Angela

21  Griffin?

22       A.   Correct.

23       Q.   Would, at that point, you keep any log

24  or notes on what actions had been taken to follow

25  up on a situation?



1       A.   I always had a tray on my desk that had
2   notes in it that were for pending cases that I was
3   working on.  I didn't remove off of my desk unless
4   it was completed.  So, I mean, I kept, you know --
5   I mean, I just kept a folder of issues that I was
6   dealing with at that time, you know.
7       Q.   I guess one question that I have is:  If
8   a person didn't have their time calculation done,
9   and they contacted your office by phone and then
10  maybe by letter, as well, and then maybe tried to
11  follow up on that again, would there be any log or
12  record of this person reaching out to you multiple
13  times?
14      A.   If I was working on getting the
15  documentation, I may have something on my desk
16  that would pertain to that offender.  If we had
17  received multiple phonecalls, multiple inquiries,
18  there may be something on my desk.  But as far as
19  an initial log, no.
20      Q.   And so the Department of Corrections, in
21  your understanding, didn't have any procedure or
22  guideline for memorializing reports that you
23  received from people about their time calculations
24  not being completed?
25      A.   Not to my knowledge.

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1          Q.   If your office received repeat inquiries
 2    about the lack of time calculation from inmates in
 3    a certain parish, would that be a flag to you that
 4    there was a problem?
 5          A.   You mean as far as ongoing issues with
 6    parishes?
 7          Q.   Yes.
 8          A.   Not really.  We handled -- every parish
 9    was a priority to us.  That's the way I saw it.
10          Q.   Was there ever a point that you or your
11    staff noticed a pattern of time calculation issues
12    or delays that was focused on inmates from a
13    certain parish?
14          A.   Well, the way -- I just have to -- the
15    way you said that, with time computation delays,
16    are you referring to paperwork that we should be
17    receiving from parishes, because we were the ones
18    to do the time comp?  That's what I'm not
19    understanding.  Are you asking about us not
20    receiving the paperwork from the parishes in a
21    timely manner?
22          Q.   Yes.  I see what you mean about how
23    they're two separate issues that might lead to
24    delay in the calculation.  And so my question
25    is -- we can take it from a delay in paperwork.
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1    At any point in time, did you or your staff notice
2    that there was a delay in receipt of paperwork
3    from any specific parishes?
4            A.    No, because every parish -- we received
5    paperwork every day from several different
6    parishes.  So we received paperwork every day.  It
7    would be large packets of information from each
8    parish every day.  So some days, you could go two
9    or three days and not receive paperwork from a
10   specific parish, but you would get it from the
11   other parishes.  We didn't receive paperwork every
12   day from every parish.  So that would be hard to
13   distinguish that, well, we didn't get any
14   paperwork from this parish for three days, because
15   that wouldn't be that unusual.  And some parishes,
16   we only got paperwork once a week.
17           Q.    And correct me if I am misstating
18   anything.  But what I'm understanding from what
19   you said is that you were receiving paperwork from
20   so many different parishes so often, that at no
21   point did you notice or have the opportunity to
22   notice that any specific parishes was late or
23   absent in giving you materials?
24           A.    No.  Because if we would have went weeks
25   without getting any paperwork from any specific

```
 1    parish, then we would start checking on that.  We
 2    would know something -- they would come to me and
 3    say, I've not received paperwork in a week from
 4    this parish.  But as long as paperwork was coming
 5    in from that parish, it wouldn't raise any red
 6    flags, because every week was different.  We
 7    didn't receive the same amount of paperwork from a
 8    specific parish every time they sent paperwork in.
 9    Some weeks, you might get 20 packets; one week,
10    you might get 50 packets.
11         Q.   In terms of the communications you
12    received from inmates or their loved ones about
13    concerns regarding time calculation, would it be a
14    red flag to you if a large portion of those
15    concerns and complaints were coming from inmates
16    in a particular parish?
17         A.   Yes, that would be a red flag to us.
18    That would flag that we have an issue that we need
19    to address.
20         Q.   And did that occur at any time, that you
21    were alerted to a red flag from a concentration of
22    communications about inmates from a particular
23    parish?
24         A.   Yes.
25         Q.   Can you tell me about that?
```

```
 1       A.   Around the end of -- well, in the fall,
 2  I guess, of one year, we received various
 3  inquiries from Orleans Parish offenders or their
 4  families.
 5       Q.   Did you receive a high or frequent rate
 6  of complaints that alerted you that there was a
 7  concentration of issues in Orleans?
 8       A.   It only occurred two or three times, we
 9  would receive a phonecall.  Because, you know, as
10  I stated before, once we received a phonecall, we
11  would start then immediately trying to determine
12  what the issue was.  So that definitely would
13  throw a red flag.  It didn't have to be a large
14  amount.  It could be two or three phonecalls.
15       Q.   My understanding is that at some point
16  recently, the Department of Corrections added a
17  new phone message directing people to call a
18  dedicated line with over-detention concerns.  Are
19  you aware of that?
20       A.   No.
21       Q.   And I want to play a recording for you.
22  This is -- I'm playing what's been marked as 26A.
23            (RECORDING PLAYING)
24  EXAMINATION BY MRS. LOMMERS-JOHNSON:
25       Q.   Do you recognize that message?
```

```
 1         A.    No.
 2         Q.    Is that a message that, to your
 3    knowledge, existed when you were working as
 4    manager?
 5         A.    Not that I know of.
 6         Q.    In your understanding, would this be a
 7    new message?
 8         A.    Yes.
 9         Q.    Are you aware of who at the Department
10    of Corrections would be managing this line?
11         A.    Now, no.
12         Q.    So now I want to go to the
13    classification process and talk a little bit about
14    that.  Is it correct, in your understanding, that
15    after sentencing, the Department of Corrections
16    has authority over where a DOC-sentenced inmate is
17    housed?
18         A.    Yes.
19         Q.    And at the point of sentencing to the
20    Department of Corrections, Department of
21    Corrections regulations govern what happens to
22    that inmate?
23         A.    Yes.
24         Q.    This is a little bit of a technicality.
25    In your understanding, does classification mean
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond  LA  70404    Fax 985.419.0799

1  the same thing as preclassification?

2      A.   To me, classification always refers to

3  an offender that had already been time computed

4  and that is in a state facility.  And

5  preclassification refers to an offender that has

6  just been sentenced and has not been processed

7  into a state facility.

8      Q.   For those offenders who have been

9  sentenced to Department of Corrections time and

10  are undergoing preclassification, is the local

11  parish allowed to decide where that Department of

12  Corrections-sentenced inmate is housed?

13      A.   To my knowledge, they can transfer them

14  from local facility.  It's not, I don't think,

15  readily done once the offender has sentenced to

16  the Department of Corrections, but they can move

17  them until they come into a state facility.

18      Q.   What is your understanding about what is

19  required, if anything, for a local parish to

20  transfer a Department of Corrections-sentenced

21  inmate?

22      A.   Regarding my understanding with my

23  position, we were always supposed to be notified

24  once an offender was sentenced to the Department

25  of Corrections prior to that offender being



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond, LA 70404    Fax 985.419.0799

Angela Smith - 7/3/2019

1    transferred anywhere else by local facility.

2         Q.   Just so I'm clear, a local facility was

3    required to notify the Department of Corrections

4    that an inmate had been sentenced to the

5    Department of Corrections before transferring

6    them?

7         A.   To my knowledge, yes.  That was my

8    understanding.

9         Q.   Do you know if this was written in any

10   policy or other form that was communicated to

11   local parishes?

12        A.   Not that I know of.  I mean, I'm not

13   aware.

14        Q.   When you say that a local parish was

15   required to notify the Department of Corrections

16   that an inmate had been sentenced to the

17   Department of Corrections, how would that

18   notification occur?

19        A.   To me, that's when we received our

20   preclassification packet.  That was our first

21   indication, our first notification from the parish

22   that someone had been sentenced to the Department

23   of Corrections.

24        Q.   You said that that receipt of the

25   preclassification packet was the first way that

1    the Department of Corrections would have learned

2    of that sentenced inmate?

3        A.    Yes.

4        Q.    Was that the only way that local

5    parishes would communicate to the Department of

6    Corrections that someone had been sentenced to the

7    Department of Corrections?

8        A.    That was the only way the preclass.

9    department was notified.  If they were supposed to

10   notify someone else in the Department of

11   Corrections, I don't have that knowledge.  I don't

12   know.

13       Q.    Okay.  So to your knowledge, the receipt

14   of the preclassification packet is the only way,

15   that you're aware of, that the Department of

16   Corrections would learn of an inmate sentenced to

17   Department of Corrections in a local facility?

18       A.    Yes.  That's when our -- that's when we

19   were notified, yes.

20       Q.    In terms of the requirements of the

21   local facility to notify the Department of

22   Corrections before transferring a DOC-sentenced

23   inmate, do you know whether this was enforced at

24   all by the Department of Corrections?

25       A.    I don't know.

1      Q.   Do you know whether there was any time

2   when anyone from the Department of Corrections

3   would contact a local parish to correct them for

4   making a transfer before notifying the Department

5   of Corrections of a newly sentenced individual?

6      A.   I don't know.  I don't have -- I never

7   had that knowledge.

8      Q.   So going back to the preclassification

9   packet, who was it that was responsible for

10  sending the Department of Corrections the

11  preclassification packet of a DOC-sentenced inmate

12  at a local facility?

13     A.   To my knowledge, each parish had -- we

14  had a DOC -- we had a contact with that parish

15  that would gather all the paperwork together, and

16  that's who we contacted if we needed anything from

17  them regarding paperwork.  And as far as I know,

18  that's the person that would send us the

19  documentation that we needed to start processing

20  their paperwork.

21     Q.   For Orleans Parish, was that person in

22  charge of sending the documentation Corey Amacker?

23     A.   Yes.

24     Q.   Is it your understanding that it's the

25  parish of conviction that would be responsible for

Angela Smith - 7/3/2019

```
 1    sending the preclassification packet for

 2    DOC-sentenced inmates?

 3         A.   Yes.

 4         Q.   The person who was the contact for the

 5    parish that you would communicate with to receive

 6    this information, is it your understanding that

 7    that individual worked at the parish sheriff's

 8    office?

 9         A.   Yes.

10         Q.   Would you ever receive information as

11    part of the preclassification packet from the

12    clerk of court directly?

13         A.   Only in the situation of Orleans Parish.

14         Q.   When would you receive information from

15    the clerk of court directly from Orleans Parish?

16         A.   We received what we refer to as the

17    clerk's papers.  It was sentencing documents, bill

18    of information that we would receive from the

19    clerk's office.

20         Q.   And that was the case in 2016 and 2017?

21         A.   Yes.

22         Q.   Is it correct that all other parishes

23    would send you a single packet from their

24    sheriff's office, but Orleans would send you some

25    documents from the sheriff's office and some
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
1    documents from the clerk of court?
2         A.    Yes.  That was the process.
3         Q.    Why was that?
4         A.    To my understanding, Orleans Parish
5    Sheriff's Office and the clerk of court couldn't
6    agree on when and who to send the paperwork to.  I
7    mean, we received some paperwork from the
8    sheriff's department and then some from the clerk
9    of court.
10        Q.    Can you tell me which documents you
11   would receive from the Orleans Clerk of Court?
12        A.    We would receive a basic interview
13   sheet, jail credit letter, a sentencing
14   commitment, any, like, they have acknowledgment
15   rules and regulations, a form that they sign
16   saying that they received our DOC rules and
17   regulations, fingerprint card and a suspect rap
18   sheet.
19        Q.    What documents, if any, would you
20   receive from the sheriff's office?
21        A.    That was the documents.
22        Q.    I apologize.
23        A.    I'm sorry.
24        Q.    That's the sheriff's office.  What
25   documents would you receive from the clerk of
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
1   court?
2        A.   We would receive a cover sheet, it would
3   be -- and then we would have the bill of
4   information, the sentencing minutes.  We would
5   also receive another copy of the DOC commitment.
6   I think that was it.
7        Q.   Is the DOC commitment that you just
8   mentioned, that's the uniform commitment order?
9        A.   Yes.
10       Q.   Since you were receiving documents from
11  Orleans pertaining to one inmate from two
12  different places, would you receive that
13  information at different times, that paperwork
14  from the clerk's office and the sheriff's office?
15       A.   Yes.  The paperwork from the clerk's
16  office would come several weeks after we would
17  receive the paperwork from the sheriff's office.
18       Q.   How was the information sent by the
19  sheriff's office delivered to you?
20       A.   It was hand carried to us by a deputy
21  once a week.
22       Q.   Were the packets that you received from
23  the Orleans Sheriff's Office once a week all
24  inmates who had been sentenced that prior week?
25       A.   As far as we knew.
```



866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1        Q.    How would you receive delivery of the
 2   paperwork sent by the Orleans clerk of court?
 3        A.    Through the mail.
 4        Q.    Standard mail?
 5        A.    Yes.
 6        Q.    Who is the contact at Orleans clerk of
 7   court?
 8        A.    I don't know.
 9        Q.    Was it your understanding that there was
10   no particular point of contact, or you're just not
11   aware who that would have been?
12        A.    Throughout the years, it had changed.
13   And then during this timeframe, I don't remember
14   us having to deal with the clerk of court's office
15   that much to have to have a contact person,
16   because they just -- it just automatically came to
17   us, the paperwork from the clerk of court's
18   office.  And if there was a contact person that my
19   staff had, I wasn't aware of their name.
20        Q.    And it's my understanding that when you
21   would receive a preclassification packet, that
22   your department would stamp the packet with a date
23   of receipt; is that correct?
24        A.    That's correct.
25        Q.    Were you-all doing that in 2016, 2017?
```

```
 1        A.    Yes.
 2        Q.    Is it also correct that after stamping
 3   that packet, your team would then scan the packet
 4   into your computer system?
 5        A.    Yes.
 6        Q.    For the materials received from the
 7   clerk of court, would that portion of an inmate's
 8   paperwork also be stamped upon receipt?
 9        A.    It should have been, yes.
10        Q.    And then that information received from
11   the Orleans clerk of court after being stamped,
12   would that also be scanned into your system?
13        A.    Yes.
14        Q.    How would those files be combined in
15   your system so that the clerk of court paperwork
16   for one inmate would join up with the sheriff's
17   office information for that same inmate?
18        A.    It would be scanned in under that
19   offender's DOC number and his state identification
20   number, his SID number.
21        Q.    So the packets would be saved by DOC
22   number and the SID number?
23        A.    Uh-huh (AFFIRMATIVE RESPONSE).
24        Q.    If I'm understanding correctly, the DOC
25   number was one that your department would assign
```

1    to an offender after their paperwork had been

2    received?

3         A.    Yes.

4         Q.    And the SID number is a number that

5    would come to you in the paperwork from the

6    sheriff's office?

7         A.    Yes.

8         Q.    Was there ever the situation that the

9    documents from the Orleans clerk of court would

10   arrive by mail before the information on that

11   inmate from the sheriff's office in Orleans?

12        A.    Very seldom.  I don't ever remember that

13   happening.

14        Q.    Was there a time requirement given to

15   parishes about -- excuse me.  Was there a time

16   requirement given to parishes for the date by

17   which they needed to get you the preclassification

18   paperwork for DOC-sentenced inmates from their

19   parishes?

20        A.    You mean as far as us giving them a

21   date?

22        Q.    Yes.

23        A.    I don't know quite how to answer that,

24   because we wouldn't know that an offender was

25   sentenced, as far as sentenced to the Department



Angela Smith - 7/2/2019

```
 1    of Corrections, to tell them what they had to send
 2    it to us by.
 3         Q.   I see what you're saying.  I guess my
 4    question is:  It's my understanding that the
 5    Department of Corrections would only know of the
 6    existence of a Department of Corrections-sentenced
 7    inmate by receiving that preclassification packet;
 8    is that correct?
 9         A.   Yes.
10         Q.   And so it seems important that you would
11    receive that notification here at the Department
12    of Corrections from the parish?
13         A.   Yes.
14         Q.   And so was there any guideline given to
15    local parishes about the need for them to get you
16    that preclassification paperwork in a timely
17    manner, so that you could be notified of the
18    existence of that inmate?
19         A.   As far as something written, not that
20    came from my department.  Now, if it came from
21    anywhere else in the department, I'm not for sure.
22    I don't have that information.  I don't know that.
23              MRS. LOMMERS-JOHNSON:  Now I think we'd
24              like to take a break, if that's okay
25              with you.
```

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1              THE WITNESS:  Okay.
 2              MRS. LOMMERS-JOHNSON:  Go off record.
 3              (RECESS 11:01-11:11 A.M.)
 4    EXAMINATION BY MRS. LOMMERS-JOHNSON:
 5         Q.   I think we left off talking about
 6    whether there was a time requirement in
 7    receiving -- sorry, a time requirement for
 8    parishes to send in the preclassification
 9    paperwork.  And I think that you had said --
10    correct me if I'm wrong -- but to your knowledge,
11    there was no time requirement by which a parish
12    had to get you that preclassification packet for
13    an inmate sentenced to DOC from their parish?
14         A.   Correct.  As far as my department, I
15    mean, we knew that the parish knew that the sooner
16    they gave us -- they sent in the paperwork, that
17    the offender's case could be worked or calculated,
18    but it wasn't anything that I told -- that as far
19    as I know, like, okay, three days after somebody
20    is sentenced, you have a timeframe from the time
21    he's sentenced, you know.  As far as an actual
22    time of days, I didn't know of anything like that.
23    I mean, I thought they knew that it was, you know,
24    imperative that we get the paperwork as soon as
25    possible.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1        Q.   So there was nothing communicated to
 2   parishes in terms of a policy or a guideline from
 3   the Department of Corrections for getting you that
 4   information in a timely manner?
 5        A.   Not that I had.
 6        Q.   So when you say not that you had, do you
 7   mean not that the preclassification department had
 8   at all?
 9        A.   Correct.
10        Q.   And preclassification, you-all were the
11   ones receiving and working the preclassification
12   packets from the parish?
13        A.   Yes.
14        Q.   Besides not having a time requirement
15   for parishes to send in that information, was it
16   also true that there was no action taken by your
17   department at the Department of Corrections if a
18   parish was routinely late in sending that
19   paperwork?
20        A.   Well, I don't understand what you mean
21   by "late," because if we -- I guess there was
22   nothing out there when -- I mean, for us, we
23   didn't even know that offender existed until he
24   got to -- until we received the paperwork.  There
25   was nothing telling us that he was sentenced on
```

1    this day, but we didn't get his paperwork for five

2    days.  We knew that once we got that paperwork and

3    we date stamped it and we could see when he was

4    sentenced.  But as far as us knowing, well, if

5    they sent it to us late, I mean -- I don't quite

6    know how to answer that.

7         Q.    Okay.  So the Department of Corrections

8    didn't have any time requirement for the deadline

9    by which a local parish notified you of a DOC

10   inmate?

11        A.    Not that I'm aware of.

12        Q.    And if I'm understanding you correctly,

13   no matter the time that passed between sentencing

14   and a local parish sending in the

15   preclassification packet for an inmate, that

16   packet essentially couldn't be late, because there

17   was no time requirement given to the parish for

18   when to send that in?

19        A.    As far as my department, yes, as far as

20   my department was concerned.

21        Q.    And to your knowledge, no other

22   department would have been communicating with the

23   parishes about --

24        A.    No.

25        Q.    -- a time deadline to send in that

1  information?

2      A.    Correct.

3      Q.    And I think you said that your

4  department could see the sentencing date once you

5  did receive the packet, the preclassification

6  packet from the parish --

7      A.    Yes.

8      Q.    -- for an inmate?

9      A.    Yes.

10     Q.    And when there was a long length of time

11 between the sentencing date and your department

12 receiving that preclassification packet for a

13 particular inmate, say, 2 months or over 2 months,

14 your department would not contact the local parish

15 to correct them for that length of time that had

16 passed before they sent you that packet of

17 information?

18     A.    Not that I was aware of.

19     Q.    And say in the instance that your

20 department started noticing that a particular

21 parish was sending in preclassification packets

22 for the inmates sentenced to the Department of

23 Corrections out of their parish, say, 6 months

24 after sentencing, at no point did you contact

25 those parishes to correct them for that lateness

1  or that delay?

2      A.   If it became a habit, I guess it would

3  be brought up, but if it was one case -- you know,

4  if we have 15 packets that were going through, and

5  there's one case in there that the offender has

6  been sentenced for 6 months, and we're just now

7  getting his paperwork, I don't think -- I would

8  not have notified anyone unless we received a

9  large, you know, so many packets.  If it became an

10  extreme situation, I would think at that point we

11  would bring it to somebody's attention.

12      Q.   Did you record, or did your staff record

13  the length of time between sentencing and receipt

14  of a packet?

15      A.   No -- well, can I back up for a second?

16  Nothing was logged regarding that.  But in our

17  computer system, when our intake staff would

18  update the computer system, there is a place on a

19  preclass. screen that states what the offender's

20  sentence date is and what the date we received the

21  paperwork.

22      Q.   So you would not log the length of time

23  between the sentencing date and the receipt of the

24  packet specifically, but you had access to that

25  information?



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

```
 1        A.    Yes.
 2        Q.    How would you or your staff track
 3   whether it appeared to have become a habit for a
 4   local parish to send in their packets a long time
 5   after sentencing?
 6        A.    Really, we didn't track that.
 7        Q.    Were there any steps taken by the
 8   Department of Corrections to determine on its own
 9   which inmates are sentenced to Department of
10   Corrections?
11        A.    No.
12        Q.    And it's my understanding, from what you
13   testified, that the clerk of court in Orleans was
14   an entity that you had contact with, the
15   preclassification department?
16        A.    We could if it was needed, but we didn't
17   have to deal with them on too much of a basis, not
18   like we did the sheriff's departments.
19        Q.    And so the Department of Corrections
20   would not reach out to the clerk of court at any
21   point to inquire which inmates had been recently
22   sentenced to the Department of Corrections?
23        A.    No, we never did that.
24        Q.    And to your knowledge, the Department of
25   Corrections didn't take any steps to reach out to
```

1  other entities, like the district attorney's

2  office in a parish, to determine which inmates had

3  been newly sentenced to the Department of

4  Corrections?

5       A.   No.

6       Q.   And to your knowledge, did the

7  Department of Corrections take any steps besides

8  waiting for the preclassification packet from the

9  local parish to be delivered in order to determine

10 whether there were newly sentenced inmates

11 sentenced to the Department of Corrections?

12      A.   That was our only process was waiting

13 for that preclass., because we had no way of

14 knowing, without receiving that paperwork, that an

15 offender had been sentenced to the Department of

16 Corrections.

17      Q.   And the Department of Corrections,

18 during your time there, put no other system in

19 place for learning whether inmates had received

20 Department of Corrections sentences besides

21 waiting for that preclassification packet?

22      A.   No, not that I know of.

23      Q.   If a parish of conviction did not send

24 paperwork on a group of newly sentenced inmates

25 that received sentences to the Department of

```
 1   Corrections, how would the Department of
 2   Corrections learn of those DOC inmates?
 3        A.   If they didn't -- if they didn't send us
 4   paperwork, we would have no way of knowing until
 5   we received some type of a phonecall from a family
 6   member; or if a facility that had the offenders
 7   needed something, then they might would contact us
 8   and say, you know, we have so and so here from,
 9   you know, whatever other parish, and we need to
10   know what the person's release date is or
11   whatever.  Then we would say, well, wait, we
12   didn't even know this person was there, we've
13   never received paperwork from the parish of
14   conviction.
15        Q.   Did you at any point, you or anyone else
16   at the Department of Corrections, conduct any
17   audits or checks of local parishes to make sure
18   that the situation didn't occur where there was a
19   DOC-sentenced inmate that you did not receive
20   preclassification paperwork on?
21        A.   Not if we didn't receive any
22   notification that the offender had been sentenced.
23   We had no way of knowing that.  And, no, we didn't
24   call a sheriff's department to find out or parish
25   to find out if somebody had been sentenced that
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.401.0799

1    day.

2        Q.    And in the instance where an inmate was

3    transferred to a new local facility, at that

4    point, did the Department of Corrections have any

5    system for learning that that inmate had been

6    transferred facilities?

7        A.    To my knowledge, they're supposed to

8    notify someone at DOC that that offender was

9    transferred from one facility to another, but that

10    information wasn't disseminated to us.

11        Q.    So for an inmate who had been sentenced

12    to DOC, whose paperwork the preclassification

13    department was working up to create a time

14    calculation for them, there was no system set up

15    within the Department of Corrections that you

16    would learn of the transfer of that inmate to

17    another facility?

18        A.    Correct.

19        Q.    And so in general, the requirement that

20    the Department of Corrections be notified by the

21    local parish of a newly sentenced, Department of

22    Corrections inmate, how was that requirement

23    enforced?

24        A.    Just the receipt of the paperwork.

25        Q.    And so is it correct that if there

1    were -- if there was a lack of compliance by the

2    local parishes with submitting that

3    preclassification paperwork, there was no action

4    taken by the Department of Corrections?

5         A.   Are you saying if we were aware that

6    somebody was sentenced to the Department of

7    Corrections, and we never received their

8    paperwork, or that we just didn't contact them

9    because we didn't -- I mean, I guess what I'm --

10   we, we as the preclass. department, had no way of

11   knowing when an offender was sentenced until we

12   received that sentencing packet.

13        Q.   And if, sort of like we talked about

14   earlier, it was made aware to people within your

15   department that there was a significant delay in

16   receiving that paperwork from a local parish after

17   sentencing, and that the requirement to notify the

18   Department of Corrections was not being completed

19   in a timely manner, there was no steps taken by

20   your department to enforce the requirement that

21   you would be notified in a timely manner?

22        A.   Correct, because I didn't know of any

23   requirement.

24        Q.   And I guess my question, then, is:  If a

25   local parish somehow lost or didn't send in the

1    preclassification paperwork for a newly sentenced

2    DOC inmate, this inmate could sit at that local

3    parish serving their Department of Corrections

4    sentence indefinitely, unless the inmate or their

5    family made a phonecall to the Department of

6    Corrections alerting you that there was a delay in

7    time calculation?

8         A.    Yes.

9         Q.    And so if preclassification paperwork is

10   not received by the Department of Corrections,

11   there's no check mechanism to make sure that no

12   inmate sentenced to the Department of Corrections

13   are in existence that you are not performing

14   preclassification and time calculation for?

15        A.    Right.  If we're not aware of the

16   offender being sentenced to the Department of

17   Corrections, we don't know he's out there until we

18   receive that paperwork.

19        Q.    And so besides -- I guess my question

20   is:  Besides receipt of that paperwork, say

21   something goes wrong with receipt of that

22   paperwork, the Department of Corrections has no

23   failsafe to make sure that you are completing the

24   time calculation and preclassification for that

25   DOC-sentenced inmate?

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

1      A.    Correct.

2      Q.    How does your department track which

3  Department of Corrections-sentenced inmates are

4  awaiting time calculation once you've received

5  preclassification paperwork?

6      A.    The procedure, when I was here, was, at

7  that time, the paperwork, once we received it,

8  once the intake person performed the duties that

9  they needed to do, and as far as updating our

10 computer system, then it went into a bin for a

11 time comp person to receive it and to time comp

12 the dates.  I think it's set up a little

13 differently now.  I don't know, since I've been

14 gone.

15     Q.    And did you have a system for triaging

16 so that you could give priority to time

17 calculation for some inmates who might be quickly

18 approaching their release date or past their

19 release date?

20     A.    Yes.

21     Q.    What was that system?

22     A.    When the preclass. was received, either

23 the time comp person or the intake person would

24 check the sentence length against the offender's

25 jail credit to see what the sentence length was

1    according to, and then how much jail credit the
2    offender had.  And we would always -- we would
3    look at the shorter sentences first and look at
4    the jail credit, and then we would go to each
5    different sentence that way.  I mean, we always
6    looked at that.
7        Q.   If an inmate receives a time
8    calculation, and they believe that the calculation
9    is incorrect, how do they go about disputing that
10   time calculation?
11       A.   We've always referred them to the
12   grievance procedure, the administrative remedy
13   procedure, through the ARP procedure.
14       Q.   Is the grievance procedure the only
15   means by which an inmate can dispute a time
16   calculation that they believe to be incorrect?
17       A.   As far as I know.
18       Q.   In your role as manager, how did you
19   ensure that your staff was correctly prioritizing
20   the calculation of those inmates who were quickly
21   approaching or had passed their proper release
22   date?
23       A.   I would keep up through the supervisor
24   to ensure that they were monitoring the short
25   sentences and that they were prioritizing those.

AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Alleged Smith-7/3/2019

```
 1   It was more of a process where, several times a
 2   day, I would go through their departments and just
 3   follow up on what they were doing in each group
 4   that day.  As far as following up, I would look
 5   through paperwork to make sure that they were
 6   processing the cases that needed to be processed
 7   first.
 8        Q.   And when you checked in on your
 9   supervisors or on specific case files to make sure
10   that prioritization was happening correctly for
11   time calculations, did you memorialize in any way
12   the follow-up that you did?
13        A.   As far as documenting it, no.
14        Q.   We talked earlier about the documents
15   that were sent in as part of the preclassification
16   packet.  What were the documents that were
17   necessary for your department to process time
18   calculation?
19        A.   For the time calculation, we had to have
20   the jail credit letter, the bill of information
21   and sentencing minutes.  In some instances of
22   Orleans cases, we did not have the bill of
23   information, because it didn't get sent to us by
24   the sheriff's department.  We received that later
25   through the clerk's papers.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Angela Smith - 7/3/2019

1    Q.   And in those instances, where you did
2  not receive the bill of information for Orleans
3  inmates from the sheriff's department, would you
4  wait to perform the time calculation?
5    A.   No.   Pre-Katrina, it was processed one
6  way.  And then after Katrina, there was such an
7  issue with getting paperwork to us, I don't know
8  where it came from, but we were told that we could
9  process the Orleans cases without the bill of
10  information, unless it was a sex offender.
11    Q.   That was something that was communicated
12  to you by Angela Griffin?
13    A.   No.   That was years ago.  That was in
14  2005, 2006, right after Katrina, because the
15  process prior to Katrina was different.
16    Q.   Different.  So from Orleans, you needed,
17  in order to process the time calculation, the jail
18  credit letter and the sentencing minutes?
19    A.   That's what we used, yes.
20    Q.   And who did you receive the sentencing
21  minutes from in Orleans?
22    A.   Well, we received the sentencing minutes
23  from clerk of court, but Orleans Parish would send
24  us a DOC commitment.
25    Q.   When you say Orleans Parish would send

1    you the DOC commitment, do you mean the sheriff's

2    office?

3         A.    Yes.

4         Q.    And so could you process the time

5    calculation on an Orleans inmate with just the

6    materials received from the sheriff's office?

7         A.    Yes.

8         Q.    Because you would use the commitment in

9    place of the sentencing minutes?

10        A.    Yes.

11        Q.    Is it correct that the Department of

12   Corrections does not need the AFIS printout in

13   order to calculate an inmate's time?

14        A.    We need that to be able to identify the

15   offender before we do anything.  I mean, I guess

16   if you want to say physically, yes, it can be

17   done.  But to us, it was never proper if we didn't

18   have his suspect rap sheet that gave us his

19   identifying SID information.  We didn't consider

20   that a complete packet until we had his

21   fingerprints and the suspect rap sheet to show

22   that we had the correct offender.

23        Q.    And that AFIS paperwork, that's

24   something that you received from the sheriff's

25   office?



```
 1        A.    Correct.

 2        Q.    In the instance that you would receive

 3   jail credit letter from Orleans Sheriff's Office

 4   and the commitment order from the Orleans

 5   Sheriff's Office, would you begin calculating that

 6   inmate's time at that point, even if you didn't

 7   have the AFIS printout yet?

 8        A.    No.

 9        Q.    Does the Department of Corrections have

10   access to the AFIS system?

11        A.    We have access to the criminal history

12   to pull criminal histories, like state police

13   criminal histories.  But to have access to the

14   AFIS system, no, we don't have access to that.

15        Q.    And so we've talked about the components

16   absolutely necessary for time calculation,

17   including the jail credit letter and sentencing

18   minutes or the commitment order and the AFIS

19   printout.  How does the Department of Corrections

20   communicate to parishes that these are the

21   documents that parishes need to send in?

22        A.    There is a packet that gets sent to the

23   sheriff's department that gives them the

24   information of everything that's needed for us to

25   correctly calculate an offender's time, or to
```



1    correctly process his paperwork.

2        Q.   When is that packet sent to sheriff's

3    offices describing everything that they need to

4    send in to the Department of Corrections?

5        A.   Generally, it can be anytime that they

6    change staff, if there's -- we usually made sure

7    that if there was a new person, a new contact

8    person, we would make sure that we would send that

9    packet of information, so that they would get it

10   from us and not someone else in the jail, you

11   know.  But also, we go to the -- we used to go to

12   the sheriff's conference once a year, and we would

13   always make sure that we would reiterate to them

14   the importance of the documentation that we

15   needed.  And they would get that packet at that

16   time, also.

17       Q.   Is that packet something that should

18   have been given to Corey Amacker at the time he

19   started in his role at Orleans?

20       A.   As far as I know, yes.

21       Q.   Who's in charge of sending that packet

22   to the sheriff's office?

23       A.   That was just someone in one of our

24   groups.  Whenever they would know that the -- that

25   if there was a new person, and if they need the

1    information, they would send it to them.  It was
2    no one's specific job.
3         Q.    In terms of the AFIS printout, does the
4    Department of Corrections rely on the AFIS
5    printout for sentencing information for time
6    calculation?
7         A.    On the suspect rap sheet, no.
8         Q.    Is it correct that the Department of
9    Corrections relies on the commitment order or the
10   sentencing minutes for the sentencing information?
11        A.    Yes.
12        Q.    So the AFIS printout, as far as time
13   calculation purposes goes, would be used solely to
14   confirm the identity --
15        A.    Correct.
16        Q.    -- of an inmate?
17        A.    Yes.
18        Q.    If a local parish is not sending in the
19   documents that are needed for time calculation,
20   what is done?
21        A.    You mean if they send in, like, a
22   partial packet; like, if they send us a packet,
23   and it has pieces of the paperwork, but not the
24   complete packet?
25        Q.    Yes.  What happens in that situation?

```
 1        A.   We would contact that person that sent
 2   it to us and tell them that we have to have the
 3   complete packet.  If there was anything missing
 4   out of that packet, it would have to be sent to us
 5   before we could process.
 6        Q.   And in the instance of Orleans, is Corey
 7   Amacker the person you would have contacted in
 8   2016, 2017?
 9        A.   Yes, we would have.
10        Q.   How would you have contacted Corey
11   Amacker?
12        A.   It could either be by phone or by
13   e-mail.
14        Q.   When you reached out to Corey Amacker,
15   would you have logged any phonecall that you made
16   to keep track?
17        A.   Yes.  In some situations, if we were
18   having difficulty getting documentation that we
19   needed, we would keep a narrative form as to, we
20   would date it, and we would write the time we
21   would have spoke with someone and what their
22   response was.
23        Q.   Is the narrative form that you would
24   have logged your communications on saved in an
25   inmate file?
```

Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1        A.    Yes, it should be.

2        Q.    When did you start using the narrative

3    form?

4        A.    The narrative form has been used for

5    several years, but more consistently in the last

6    few years.

7        Q.    Was it used in 2016?

8        A.    Let's see.  Some form of a narrative

9    form should have been used, yes.

10        Q.    Why has the narrative form been used

11    more consistently in the last few years?

12        A.    We have -- preclass. has a high rate of

13    turnover, and it's hard to track what staff member

14    has followed through or followed up on cases when

15    that person is not here anymore.  And that was our

16    best way of tracking things.  So it's been

17    implemented more the last few years.

18        Q.    Once preclassification paperwork is

19    received, is there a deadline for completing time

20    calculation for that inmate?

21        A.    We've always just went on the basis of,

22    they needed to be worked as soon as we received

23    them.  As far as the sentence length, go back to

24    that, you know, it was -- they were spot-checked

25    as far as, you know, what their sentence length

```
 1   compared to their jail credit letter.  And the
 2   staff knew that those were priority, and that as
 3   soon as those were processed, then you get -- you
 4   just keep processing them.  It wasn't like they
 5   went in a drawer, and they stayed there.  It was
 6   just a continuous process.
 7        Q.   And there was no guideline or policy
 8   about the amount of time by which your staff must
 9   complete the time calculation?
10        A.   No, not that I know of.
11        Q.   So I think I want to, at this point,
12   look at a document that I'm going to hand you.
13             MRS. LOMMERS-JOHNSON:  We'll mark this
14             as Exhibit 46.
15             (EXHIBIT 46 MARKED FOR IDENTIFICATION)
16   EXAMINATION BY MRS. LOMMERS-JOHNSON:
17        Q.   We talked earlier about the Lean Six
18   Sigma report.
19        A.   Uh-huh (AFFIRMATIVE RESPONSE).
20        Q.   You've seen this power point about the
21   Lean Six Sigma report?
22        A.   Uh-huh (AFFIRMATIVE RESPONSE).
23        Q.   And I want to turn to slide 17, which in
24   yours I've done a little pink flag on at the top,
25   since the slides aren't numbered.
```

1          You're aware that this study was completed in
2     2012?
3          A.   I knew that Lean Six Sigma was studying
4     us, and I knew that there was cases that they were
5     going through.  I knew that, but I was not a
6     participant of the actual reporting and the
7     findings of that.  I was not part of that.
8          Q.   So the Lean Six Sigma study was
9     something that you were aware of was being done at
10    the Department of Corrections?
11         A.   Correct.
12         Q.   And one of the things identified by the
13    Lean Six Sigma study was that there was a high
14    rate of immediate releases?
15         A.   Correct.
16         Q.   Can you describe to me what is meant by
17    the terminology "immediate release?"
18         A.   An immediate release is someone that,
19    once we receive their paperwork, we do the intake
20    process, we calculate their release date, and
21    their release date is due, they are due for
22    release.
23         Q.   And so looking at slide 17, we can see
24    that in the column baseline May, at this point,
25    there were 2,252 immediate releases per year; is

1    that correct?

2        A.    I would imagine, yes, that's close.

3        Q.    That's something that sounds right to

4    you, as far as what you recall from 2012?

5        A.    I don't know about 2012, but I know, on

6    an average, we've always had a lot of immediate

7    releases.

8        Q.    And so it has been the case, to your

9    knowledge, in the Department of Corrections that

10   in a high number of cases, in the multiple of

11   thousands, that time calculations were being

12   completed for inmates on or after the date that

13   those inmates were supposed to be released?

14       A.    Correct.

15       Q.    After this report came out in 2012, that

16   identified a large number of people receiving

17   immediate releases, were there any policies at the

18   Department of Corrections put into place to lower

19   the number of immediate releases?

20       A.    I don't know of any.  That's not to say

21   something wasn't done.  I'm not for sure.  But I

22   just know it's hard for us, as in preclass. or the

23   person doing the time comp, to control the amount

24   of immediate releases, because if we receive the

25   paperwork, then the offender is due to go home

```
 1    then, I don't see where we have that much -- we
 2    never had that much control over if someone was an
 3    immediate release or not.
 4         Q.    And so after learning that there was
 5    this high number of immediate releases, nothing
 6    was done to speed up the sending of
 7    preclassification paperwork to the
 8    preclassification department?
 9         A.    Not that I'm aware of.  It could have
10    been a process that was done above me, as far as
11    discussions with the parish jails or anything like
12    that, but not that I was involved in with Lean Six
13    Sigma, no.
14         Q.    And there was no implementation of any
15    requirements to the local parishes that they send
16    in preclassification paperwork with any timeline?
17         A.    Not that I know of.
18         Q.    And from this same slide, slide 17, when
19    we look at the second row, it says, "overdue days
20    per case," in the first column it says, "71.7,"
21    does this indicate that, in 2012, per case, there
22    was an average of 71 days that an inmate was
23    overdue for release?
24         A.    That's what it says.
25         Q.    Is that something that, in terms of your
```

```
 1    experience in processing these files, this is a
 2    rate that you were aware of?
 3         A.   It could be at any given time, but it
 4    wasn't -- I don't think it was anything that was
 5    on a regular basis.
 6         Q.   But this average is something that
 7    doesn't sound incorrect to you for the average
 8    number of overdue days?
 9         A.   No, because if someone has been sitting
10    in a parish jail for a year, and he's sentenced to
11    2 years, by the time we receive his paperwork,
12    those 70 days could have been before he was even
13    sentenced.
14         Q.   And so in your understanding, back in
15    2012, the Department of Corrections was aware that
16    DOC-sentenced inmates were sitting in local jails
17    for a long length of time before the Department of
18    Corrections was receiving that preclassification
19    paperwork?
20         A.   I would think so.  I really don't have
21    that knowledge.
22         Q.   In your work as manager in the
23    preclassification department, did you ever discuss
24    with the other manager or with your supervisor the
25    problems caused and the overdue days caused by the
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1   length of time that it took you to receive the
2   preclassification paperwork from local parishes?
3          A.   I don't recall.
4          Q.   And to your knowledge, the length of
5   time after sentencing that you would receive that
6   preclassification paperwork from the local
7   parishes, there was no action taken, during your
8   tenure, to shorten the length of time that it took
9   to receive that paperwork after sentencing?
10         A.   Not that I know of, because I don't know
11  how much control we would have had over the
12  parishes sending us that paperwork.  I don't know.
13  That would be something that would be beyond me.
14         Q.   And in terms of the direction that was
15  being sent to parish sheriff's offices, like the
16  packets that you talked about, there was no change
17  in the content of those packets to include any
18  guidelines about the time by which parishes must
19  send in the preclassification paperwork --
20         A.   Not that I know of.
21         Q.   -- to Department of Corrections?
22         And it's my understanding that local parishes
23  would bill the Department of Corrections for time
24  that DOC-sentenced inmates spent in those local
25  parishes; is that correct?

```
 1        A.    Correct.  Yes.
 2        Q.    But the amount of time for which the
 3   parish was able to bill the Department of
 4   Corrections never changed based on them sending in
 5   the preclassification paperwork late; is that
 6   correct?
 7        A.    I don't have that much knowledge of the
 8   billing.  That's done in a different department.
 9        Q.    And so if preclassification paperwork
10   was received late from a parish or a very long
11   time after sentencing, that is never something
12   that you, in your department as the entity that
13   receives the preclassification paperwork, would
14   communicate to the billing office?
15        A.    No.
16        Q.    Who was in charge of handling the
17   billing in 2016, 2017, at the Department of
18   Corrections?
19        A.    The business office.
20        Q.    And so going back to 2016, 2017
21   specifically, you're aware that at that time,
22   inmates from Orleans were being held at East
23   Carroll Parish?
24        A.    Yes.
25        Q.    So I'd like you to walk me through what
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.870.0799

1   the process was for inmates in those situations.

2   So an Orleans inmate sentenced to DOC time, held

3   at East Carroll Parish, how would you receive the

4   components necessary to complete time calculation

5   on that inmate?

6        A.   As far as I know, once that offender

7   would have been sentenced in Orleans Parish,

8   Orleans Parish should have, what we refer to as,

9   pre-classed him.  That would have been processing

10  the jail credit letter, receiving his DOC

11  commitment, getting him to sign his acknowledgment

12  papers, fingerprinting him on that file, AFIS

13  machine, to verify that that indeed is the correct

14  offender that's being sentenced.  And then that

15  would have been sent to the Department of

16  Corrections.  And that's our first notice that

17  that offender has been sentenced to the Department

18  of Corrections out of Orleans Parish.  On the jail

19  credit letter, if the offender had already been

20  sent to East Carroll, they were supposed to put on

21  the jail credit letter that the offender had been

22  transferred on this date to East Carroll Parish.

23       Q.   So in your understanding, there was no

24  component of this preclassification paperwork that

25  East Carroll Parish was supposed to send in to the

```
 1    Department of Corrections?
 2          A.    Not as far as I know.
 3          Q.    And for an inmate in this particular
 4    situation, if Orleans Parish did not send in that
 5    paperwork, there was nothing done of the
 6    Department of Corrections to learn of that
 7    inmate's existence in location --
 8          A.    Correct.
 9          Q.    -- at East Carroll Parish?
10          A.    Correct.
11          Q.    So to your knowledge, there could be the
12    situation where this inmate was a DOC-sentenced
13    inmate, was housed at East Carroll Parish, and
14    East Carroll Parish was billing the Department of
15    Corrections for housing that inmate, where no
16    preclassification or time calculation was being
17    completed on that inmate?
18          A.    I don't know, because I don't really
19    have that much -- I mean, I didn't have any access
20    with the billing information.  I guess they could
21    be billing, and we were not aware of it, because
22    it's still not something that -- we weren't
23    connected with the business office.  So if it's
24    something they were doing, we were not aware of
25    it.
```

```
 1          Q.    So at no point would the business office
 2    alert you that East Carroll Parish, say, was
 3    billing the Department of Corrections, the
 4    Department of Corrections was paying for
 5    DOC-sentenced inmates at East Carroll, where you
 6    had received no paperwork?
 7          A.    No, they would not have notified us.
 8          Q.    And so is it my understanding that
 9    preclassification at the Department of Corrections
10    and the billing department at the Department of
11    Corrections had no communication about the
12    location or existence of Department of
13    Corrections-sentenced inmates?
14          A.    Correct.
15          Q.    Just briefly, in terms of time
16    calculation, if an inmate had completed their
17    sentence from credit for time served at their
18    sentencing date, was there any mechanism that the
19    Department of Corrections would allow them to be
20    released immediately without their
21    preclassification paperwork being sent in?
22          A.    No.
23          Q.    And so for those individuals, they would
24    necessarily be overdue for release at the time
25    their calculation was completed?
```

1        A.    It could be, yes.

2        Q.    Does the Department of Corrections have

3    a way to track which facility an inmate is being

4    held at, besides Cajun?

5        A.    Not that I know of.

6        Q.    I think you testified earlier that a

7    local parish can transfer a Department of

8    Corrections-sentenced inmate to another local

9    facility, but only after the preclassification

10   paperwork is sent; is that right?

11       A.    That's the way our -- that had been

12   standard procedure, yes, as far as I knew.

13       Q.    Is that something that was communicated

14   to parishes in the packet of information sent --

15       A.    No.

16       Q.    -- to each of them?

17       A.    I don't think that had anything to do

18   with that, no.

19       Q.    How is that requirement communicated to

20   parishes?

21       A.    It didn't come from the preclass.

22   department.

23       Q.    We mentioned Cajun a couple of times.

24   What sort of Cajun access did you have in your

25   role as manager of preclassification department?

```
 1        A.    I could add, modify time comp, whatever
 2   I needed for my job.
 3        Q.    Who else had access to Cajun in your
 4   department; was it every single staff member?
 5        A.    Every single staff member.
 6        Q.    Did Perry Stagg have Cajun access?
 7        A.    I would assume he did, but I don't know.
 8        Q.    After the time calculation process was
 9   completed, and you had a release date calculated
10   for an inmate, how is that communicated to a local
11   facility?
12        A.    Once we -- once it got to that point, I
13   would send that offender a notification to our
14   release department.  At that time, releases were
15   done by the other manager.  She managed the
16   release department.  I would send her notification
17   on a daily basis of each -- of any releases.  And
18   then once it got to her, then that's -- she would
19   manage it from there.
20        Q.    Was that other manager in charge of
21   communicating to the local facility the release
22   date?
23        A.    Her staff was, yes.
24        Q.    And how was that communication made by
25   her staff to the local facility to alert them of
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1  release dates?

2      A.   Once the release date was found, and it

3  went downstairs, they would process something out

4  of Cajun.  And it would print, what they call, a

5  clearance sheet out of Cajun.  And that clearance

6  sheet would be sent to the housing facility for

7  them to clear that offender for release.

8      Q.   And was it true that in 2016 and 2017,

9  Secretary LeBlanc had ultimate oversight of the

10 process of time calculation and releases being

11 timely issued?

12     A.   As far as him being over us, yes.

13     Q.   At some point, did you become aware that

14 a number of people sentenced to the Department of

15 Corrections were being kept past their release

16 dates in East Carroll Parish?

17     A.    I can't say I knew they were being kept

18 past their release date.  I remember when -- I

19 mean, I was aware that it came up that there were

20 Orleans offenders being housed in East Carroll.

21     Q.   I'm going to look at some documents.

22 I'm going to hand you what's been marked as

23 Exhibit 28.  While I'm marking that document, when

24 did you first learn of Orleans' inmates or inmates

25 out of Orleans sentenced to Department of

1    Corrections time being housed in East Carroll?

2        A.   I don't remember the exact date.  I know

3    it was towards the end of the year; like,

4    November.

5        Q.   Is that November of 2016?

6        A.   2016, yes.

7        Q.   Okay.  And how did you learn about it at

8    that time?

9        A.   I don't remember exactly.  I just

10   remember we were getting several phonecalls.  We

11   were getting messages from other people here at

12   headquarters that they were receiving phonecalls

13   from family members that their family was being

14   housed at East Carroll, and they were wondering

15   why they didn't have release dates.  And at that

16   point, we started -- that was a flag to us that

17   something wasn't right.  So we started researching

18   and then looking to see if the inmates were

19   actually sentenced to the Department of

20   Corrections and then sent to East Carroll.  And

21   that was our flag to start doing what we needed to

22   do, to get the documentation.

23       Q.   And for those inmates that were

24   sentenced to the Department of Corrections out of

25   Orleans, but housed in East Carroll, had you

```
1    received their sentencing information from the
2    Orleans clerk of court?
3         A.   I don't remember.
4         Q.   Let's go to a few examples.  Now I'm
5    going to hand you what's been marked as Exhibit
6    28.  I can represent to you that this is an e-mail
7    correspondence thread that we received in
8    discovery in this case from the Department of
9    Corrections.  And I'm just going to direct you to
10   page 1.  In the bottom right-hand corner of this
11   page, you can see that this is Bates numbered
12   002041.
13        A.   Yes.
14        Q.   Sorry, I just mean the top page.
15        A.   Okay.
16        Q.   You can see at the top of the page that
17   this e-mail thread was sent to you, correct?
18        A.   Correct.
19        Q.   Your e-mail address is in the CC
20   recipient line, correct?
21        A.   Correct.
22        Q.   Glynn Stassi's e-mail address is also
23   there.  Can you tell me what position Glynn Stassi
24   was in?
25        A.   In 2016, I'm not for sure exactly which
```



1    position he was in.

2        Q.    And this e-mail thread that we're

3    looking at, the subject line of this thread is

4    titled "Offender Jessie Crittindon;" is that

5    accurate?

6        A.    Yes.

7        Q.    And this appears to be an e-mail sent

8    from Angela Griffin to Perry Stagg, and you are

9    cc'd; is that accurate?

10        A.    Correct.

11        Q.    Okay.  And this e-mail appears to be

12    forwarding a previous line of communication that

13    we see following the initial e-mail underneath and

14    extending onto pages 2 and 3; is that correct?

15        A.    Yes.

16        Q.    Okay.  If we turn to the second page of

17    the exhibit, and this page in the bottom

18    right-hand corner has the Number 002042.  Do you

19    see that?

20        A.    Yes.

21        Q.    There we see that this thread was

22    forwarded first to Perry Stagg, and then on to you

23    and Angela Griffin; is that correct?

24        A.    Correct.

25        Q.    Okay.  In turning to the third page, we



```
 1   see the body of the original e-mail.  That says,
 2   "Tammie Crittindon, the mother of the above
 3   referenced offender, called in regards to her
 4   son's time not being calculated.  Upon further
 5   discussion, I learned that Offender Crittindon has
 6   been in Riverbend since July of 2014.  He was
 7   sentenced in August of 2016.  I know they could be
 8   a little behind in regards to his time
 9   calculation, but I cannot find him in Cajun.  Can
10   you have this looked into and provide me with an
11   update?"  Do you see where I have read that?
12        A.   Yes.
13        Q.   And do you remember receiving this
14   thread of e-mail correspondence?
15        A.   I can remember it, because I'm seeing
16   it.  But as far as me knowing specifics, if you
17   want to know that day -- but I remember when this
18   started.  I mean, this was the beginning.
19        Q.   In terms of your responsibilities and
20   the responsibilities of Angela Griffin, why was it
21   that, after receiving this information, Perry
22   Stagg sent it to the two of you?
23        A.   Because Angela is the director over the
24   preclass. department, and I was the manager over
25   intake and time computation.
```

```
 1        Q.   And then looking at page 1 again, we see
 2   the e-mail from Angela Griffin on November 21st of
 3   2016.  Do you see where I'm indicating?
 4        A.   Yes, I do see that.
 5        Q.   Angela Griffin writes, "this offender is
 6   not in Cajun.  We do not know where he was
 7   convicted.  The paperwork is worked by parish of
 8   conviction.  If he was sentenced in East Carroll,
 9   that would be a DWCC case to work."  Do you see
10   that?
11        A.   Yes.
12        Q.   In a situation such as this, where a
13   person, you're alerted to their existence and the
14   fact that they're a DOC-sentenced inmate, but
15   they're not in Cajun, is there really no way for
16   you to know where that person was convicted?
17        A.   Correct.
18        Q.   In this instance, what follow-up was
19   done by you to address the underlying problem
20   being recorded in the original e-mail in terms of
21   Jessie Crittindon being in Riverbend since July of
22   2014, and sentenced in August of 2016, but with no
23   Cajun entry or time calculation done?
24        A.   At this very point, when I received
25   this, this e-mail was cc'd back to me, I really
```

1    wouldn't have done anything, because we didn't

2    know where this offender was convicted.  And

3    Angela Griffin responded to Perry Stagg with her

4    response.  And it looks like the offender was an

5    East Carroll offender.  That's the way we would

6    have looked at it, because he was in East Carroll.

7    And no one had given us no other information that

8    differed from that.

9         Q.   When you referred to Angela Griffin's

10   response, her response is that "we do not know if

11   Jessie Crittindon is Department of Corrections.

12   The only way we know an offender is Department of

13   Corrections is when we receive the complete

14   preclassification packet."  That's her response,

15   correct?

16        A.   Correct.

17        Q.   And so to your knowledge, after Angela

18   Griffin sent this response, nothing was done by

19   you or anyone else, that you know of, to determine

20   whether Jessie Crittindon was DOC sentenced or why

21   you didn't have his preclassification packet?

22        A.    I would not have done anything further.

23        Q.    And to your knowledge, would anyone else

24   at the Department of Corrections have done

25   anything further to determine why no time

1    calculation had been completed for this

2    DOC-sentenced inmate?

3         A.    The only thing I see that could have

4    been is if Perry Stagg would have notified David

5    Wade that -- and I don't know if that happened or

6    not.  I would just say that he would have possibly

7    notified David Wade that we've received a

8    phonecall from an East Carroll offender, that they

9    need to research it.

10        Q.    And in terms of receiving communications

11   like this from an inmate with no DOC number and no

12   preclassification packet, is it your understanding

13   that, as stated by Angela Griffin in her e-mail at

14   the top of page 28, when hearing about this

15   inmate, you would simply wait to receive the

16   preclassification packet?

17        A.    Correct.

18        Q.    Even if you had been notified that a

19   person had been sentenced in August of 2016, and

20   it was now November of 2016?

21        A.    Yes, because we would have no other way

22   to go about it.  We don't have a date of birth.

23   We have no other identifying information.

24        Q.    In terms of identifying what parish an

25   inmate was sentenced out of, if they were being

1  held at East Carroll Parish, someone could have
2  called East Carroll Parish to ask where that
3  inmate had been sentenced out of; is that correct?
4      A.   Yes, I guess so.
5      Q.   And in terms of determining whether
6  David Wade Correctional had the preclassification
7  paperwork for this inmate, whose time calculation
8  hadn't been done, someone could have called David
9  Wade to follow up --
10     A.   Correct.
11     Q.   -- is that correct?
12     But to your knowledge, that wasn't done in
13 this case?
14     A.   I didn't.  I'm not for sure of anyone
15 else.
16     Q.   And so in the case of Jessie Crittindon,
17 you did not participate in any follow-up in
18 ensuring that his time calculation was completed?
19     A.   Not per this e-mail.  Now, I don't
20 remember if I'm in any other e-mails referring to
21 him specifically.  I don't know.  I don't remember
22 that.
23     Q.   And to your knowledge, was the time
24 calculation of Jessie Crittindon ever completed?
25     A.   I assume it was, but like I said, that's



1    been a long time ago.

2        Q.    And there was no system in cases like

3    these, where there had been correspondence about

4    the time calculation of a DOC-sentenced inmate,

5    there was no system for memorializing whether the

6    issue had been resolved in the end?

7        A.    No, not from me.

8        Q.    So when you were speaking earlier about

9    how you would keep time calculation issues on your

10   desk for those inmates that you had been alerted

11   to that there was a time calculation issue for

12   them, the report from -- the report of Jessie

13   Crittindon and the situation in this case was not

14   something that you would have placed on your desk

15   to follow up on?

16       A.    No, because at this point, it didn't

17   look like it was the responsibility of us.  It

18   looked like he was an East Carroll offender, and

19   that they would have taken care of it.  And I'm

20   assuming that it was not in my position to contact

21   someone that I'm equal to, to tell them that they

22   need to do something.  Once Perry Stagg responded,

23   who do I contact at David Wade, I would assume he

24   contacted David Wade.

25       Q.    And to your knowledge, did anyone ever

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.419.0799

```
 1   reply to Perry Stagg with the contact information
 2   for anyone at David Wade?
 3         A.   I don't know.  Not to my knowledge.  I
 4   don't know.
 5         Q.   And so in general, when you were talking
 6   about receiving communications by letter or phone
 7   from inmates or families of inmates who were
 8   contacting the preclassification department about
 9   time calculation not being completed, was it the
10   case that if, from that communication, you learned
11   that the DOC-sentenced inmate was presently
12   located at Riverbend or East Carroll Parish, in
13   those cases, you would not do any follow-up on
14   that communication?
15         A.   No, because, as far as I would know,
16   that that would be his parish of conviction, would
17   have been Riverbend, East Carroll.
18         Q.   And so upon receiving a call or a letter
19   from an inmate at Riverbend, you would take no
20   further action, correct?
21         A.   I can't say if that was a yes or no
22   question, because I do know, in the past, I mean,
23   we have contacted David Wade, but I can't say for
24   100 percent sure if it was done in this instance
25   or not.
```

1      Q.   It was your practice, if an inmate was

2  located at Riverbend, to not yourself or instruct

3  any of your staff to look into their time

4  calculation concern?

5      A.   No.  It would have been forwarded up

6  north to David Wade.

7      Q.   And how would you have forwarded that

8  communication to David Wade?

9      A.   It could have either been a phonecall or

10  an e-mail, if it would have went that far.

11      Q.   And what do you mean if it had went that

12  far?

13      A.   Well, if I would have done something, it

14  would have been either in an e-mail or a

15  phonecall.  With this particular offender, we had

16  no other information other than he was sentenced.

17  The mother says he was sentenced, and he's in

18  Riverbend.

19      Q.   Okay.

20      A.   I can't say what I did.  I don't

21  remember.

22      Q.   So when receiving a call or a letter or

23  communication about an inmate sentenced to

24  Department of Corrections time who was presently

25  located at Riverbend, you would assume that they



```
 1     were sentenced out of East Carroll Parish?
 2          A.   Yes.
 3          Q.   Okay.  And in the instance of this
 4     e-mail, an e-mail such as this, where there is
 5     contact information for the family of the loved
 6     one who is alerting you to the lack of time
 7     calculation, if you know that the inmate is
 8     presently located at Riverbend, you would not
 9     follow up with the family to obtain any more
10     information?
11          A.   Not at that point, no.
12          Q.   Okay.  So I'll take that exhibit -- or
13     actually, you can keep those there.  I'm going to
14     hand you another document.  This one is marked
15     Exhibit 29.  And again, this is one of the ones
16     you should have in front of you, as well.  And I
17     can make this same representation to you about
18     this document, that we received a copy of this
19     e-mail correspondence from the Department of
20     Corrections as a part of discovery in this case.
21          If you look at the top page of this Exhibit
22     29, you can see in the bottom right-hand corner,
23     that the Bates number here is 002007.  Do you see
24     where I'm indicating?
25          A.   Yes.
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

 1      Q.    And going to the top e-mail on this
 2  page, your e-mail address is in the recipient line
 3  of this e-mail, correct?
 4      A.    Correct.
 5      Q.    This appears to be an e-mail forwarding
 6  a line of communication that's listed underneath
 7  that top e-mail, correct?
 8      A.    Yes.
 9      Q.    The subject line of this e-mail is
10  "Offender Donald Guidry, Number 713219," correct?
11      A.    Correct.
12      Q.    Going back to -- flipping the page so
13  that we see the second and third pages of Exhibit
14  29, we see the e-mail that originated this message
15  thread; is that correct?
16      A.    Yes.
17      Q.    And in this e-mail, Raven Groom wrote,
18  "Ms. Jemica White, (504)205-0083, called in
19  regards to Offender Guidry time calculation.  She
20  mentioned Offender Guidry was sentenced July 15th,
21  2016.  She is concerned that the offender might be
22  due for release if his time is calculated.  Please
23  handle as appropriate."  Is that accurate?
24      A.    Yes.
25      Q.    Okay.  And do you remember receiving

1   this e-mail thread related to the time calculation
2   concern regarding Donald Guidry?
3        A.   I don't remember the specifics.
4        Q.   Why is this e-mail something that again
5   was forwarded from Perry Stagg to you and Angela
6   Griffin?
7        A.   Because Angela Griffin is the director
8   of preclass., and I'm the director -- I mean,
9   manager over the intake and time computation.
10       Q.   So is it correct that the e-mail
11  forwarded by Raven -- or sent by Raven Groom
12  described a problem with time calculation and
13  preclassification?
14       A.   Correct.
15       Q.   And if there was a problem with time
16  calculation and preclassification, you and Angela
17  Griffin would be the appropriate staff members to
18  look into it, correct?
19       A.   Yes.
20       Q.   And at the top of this -- of page 1 of
21  Exhibit 29, Angela Griffin wrote to you saying,
22  "please have someone send Corey an e-mail in
23  reference to this offender.  He may be on the ones
24  he's getting from Riverbend today or tomorrow."
25  Do you see that?

```
 1        A.   Yes, I see it.
 2        Q.   What does that refer to?
 3        A.   That refers to the fact that she sees
 4   that this offender was transferred to Riverbend
 5   Detention Center, because that's his transfer
 6   code, shows transfer.  She looked at his previous
 7   transfers and realized that there's a trend that
 8   had been updated showing that his conviction was
 9   out of Orleans.  So she's telling me that I need
10   to send -- I need to have someone send Corey an
11   e-mail to this offender.
12        Now, this would have been an e-mail for them
13   to send Corey to request, if we did not have the
14   paperwork.  From what it looks like in the system,
15   we didn't have any paperwork on him.  That he
16   needs to send us the documentation for this
17   offender.  Now, the rest of that sentence, I'm not
18   really for sure what she's meaning by that; he's
19   getting from Riverbend today or tomorrow.  I
20   really don't know what that means, unless they
21   were sending him back to them.
22        Q.   When you indicated, looking at this
23   screen shot of a Cajun entry, that it appeared you
24   didn't receive any paperwork on Donald Guidry,
25   what alerted you to that?
```



1    A.   Because there's no information filled
2    in, in this bottom part.  And where it says
3    "preclass. status," there's nothing there.
4         Q.   So upon receipt of the preclassification
5    paperwork, we would expect to see something
6    entered in the preclass. status line?
7         A.   Yes.
8         Q.   How did it happen that Donald Guidry was
9    put into Cajun without having received any
10   preclassification paperwork on him?
11        A.   There's another department here that
12   receives transfers from parish jails when an
13   offender is transferred from facility to facility.
14   That's how our Cajun system is updated.
15        Q.   So a Cajun entry on a Department of
16   Corrections-sentenced inmate is created when the
17   transfer department at the Department of
18   Corrections receives information from a local
19   parish?
20        A.   Correct.
21        Q.   At that point, you can see the
22   Department of Corrections-sentenced inmate in
23   Cajun in the preclass. department if you looked
24   him up, correct?
25        A.   If we looked him up, yes.

Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Angela Smith 7/22/2019

```
 1        Q.   And does the transfer department
 2   communicate with the preclassification department
 3   at all?
 4        A.   No.
 5        Q.   Does the preclassification department
 6   check Cajun for newly entered Department of
 7   Corrections-sentenced inmates?
 8        A.   No.
 9        Q.   So just to make sure I understand,
10   you -- in the preclassification department, you
11   would have access to the location of an inmate,
12   such as Donald Guidry, and access to information
13   about where they were sentenced if you looked in
14   Cajun, correct?
15        A.   Yes.
16        Q.   But for people such as Donald Guidry,
17   there would be no steps taken by the Department of
18   Corrections to reach out to request their
19   paperwork?
20        A.   Not until we received this information
21   that we was aware of him.
22        Q.   And when you say not until we receive
23   the information --
24        A.   Well, until we received some type of
25   e-mail or telephone call telling us that this
```

Angela Smith  7/22/2019

```
 1   offender is there, that there's something wrong,
 2   that we need to check into it.
 3        Q.   And so in this instance and instances
 4   like these, where the transfer department receives
 5   information about a DOC-sentenced inmate and
 6   creates the Cajun entry for them, at that point,
 7   they assign a DOC number; is that correct?
 8        A.   Yes.
 9        Q.   And so at that point, the transfer
10   department would be aware that they were the first
11   department receiving this information on this
12   newly DOC-sentenced inmate, correct?
13        A.   Yes.
14        Q.   But the transfer department does not
15   take any steps to alert the preclassification
16   department that there is a newly sentenced
17   Department of Corrections inmate?
18        A.   Yes.
19        Q.   Are you aware of why Raven Groom first
20   communicated the information about this time
21   calculation complaint to Monisa Lentz, instead of
22   sending it directly to you or to Perry Stagg?
23        A.   I'm not for sure, other than maybe if
24   Monisa supervises her or something.  I'm not for
25   sure.
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

Angela Smith - 7/22/2019

```
 1        Q.   And in this case concerning the lack of
 2   time calculation for Donald Guidry, what action
 3   did you take to follow up?
 4        A.   Referencing Angela's e-mail, I would
 5   have got with either my supervisor or the staff
 6   member that monitored -- or that handled the
 7   Orleans paperwork, and got with them and told them
 8   that they needed to contact Corey regarding this
 9   paperwork being sent to us.
10        Q.   And --
11        A.   I think I would have e-mailed them, but
12   I'm not 100 percent sure.  I could have gotten up
13   and went in there and talked to them about it.
14   Seemed like I would have e-mailed them, but I may
15   not have.  I dealt with my staff closely, as far
16   as communicating with them.
17        Q.   And if your staff had e-mailed or if
18   your staff had contacted Corey Amacker instead of
19   you being the person to contact Corey Amacker,
20   would they have contacted him via e-mail?
21        A.   Yes, I think so.
22        Q.   And are you aware, do you remember if
23   this situation regarding the time calculation not
24   being done for Donald Guidry was ever resolved?
25        A.   I would hope it was, yes.
```

```
 1        Q.   It's my understanding that there was a
 2   flood that impacted Baton Rouge in August of 2016.
 3   Do you recall that?
 4        A.   Yes.
 5        Q.   Was the preclassification department,
 6   while that was going on, still operating?
 7        A.   No.
 8        Q.   How long did the preclassification
 9   department shut down for?
10        A.   For a week.
11        Q.   And during that week, did you still
12   receive preclassification paperwork at the
13   Department of Corrections?
14        A.   It would have came to our mailroom.  And
15   what the mailroom would have done with it, I
16   assume they would have held it until we came in
17   the following Monday morning and would have
18   brought it to us, or we had someone that went
19   twice a day to the mailroom to receive paperwork.
20        Q.   And when we talked, just turning back
21   again to Donald Guidry, I think that you said you
22   assume that the situation with Donald Guidry would
23   have been resolved.  Do you know if you did any
24   follow-up besides asking someone to contact Corey
25   Amacker?
```

```
 1        A.    I would think I did, but I don't
 2   remember.
 3        Q.    And do you remember if Donald Guidry's
 4   time calculation was done ultimately?
 5        A.    I would think it was done, but I don't
 6   remember it being done.
 7        Q.    During the week that preclassification
 8   was shut down in August of 2016, because of flood,
 9   what was -- what happened to hand delivery made by
10   Orleans for the preclassification?
11        A.    I don't know, because they always
12   hand-delivered it.  They never sent it through the
13   mail.  So I'm not for sure what would have
14   happened to anything that would have been
15   hand-delivered here.
16        Q.    Did your department communicate with
17   Orleans at all about the fact that you were
18   shutting down for a week?
19        A.    No, because we left here in, like, an
20   emergency situation.
21        Q.    And after you came back after that week,
22   did your department reach out to Orleans to
23   determine what had happened to the paperwork from
24   that week?
25        A.    I don't recall.
```

Amerson White

COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.870.0799

```
 1          Q.    In your role as manager in the
 2    preclassification department, did you become aware
 3    of other situations such as these that we've
 4    discussed where a DOC-sentenced inmate had no DOC
 5    number or Cajun entry?
 6          A.    Yes.
 7          Q.    And in situations like these, when you
 8    received complaints of over-detention, I'm correct
 9    that there was no system or practice of anyone in
10    your department for memorializing any of those
11    complaints or the follow-up, correct?
12          A.    Not really.
13          Q.    And after -- I think we spoke earlier
14    about some red flags having been raised by the
15    situation at Riverbend.
16          A.    Yes.
17          Q.    After those red flags were raised to you
18    and others in your department about the situation
19    at Riverbend, what was done to address that?
20          A.    You mean the immediate response?  We
21    started working on getting all of the paperwork
22    that we needed on each individual that we were
23    made aware of.  We started working diligently to
24    get the paperwork that we needed to be able to
25    accurately process them and calculate their
```

```
 1   release dates.
 2        Q.   And for the individuals that you were
 3   made aware of, such as Donald Guidry, you were
 4   able to -- you addressed his situation, because
 5   you could see that he was originally sentenced in
 6   Orleans, correct?
 7        A.   Yes.
 8        Q.   After you realized from Donald Guidry's
 9   situation and others that there were Orleans
10   inmates like Donald Guidry, who were housed at
11   East Carroll Parish, would that have flagged you
12   to loop back around and address situations such as
13   those reported to you in the case of Jessie
14   Crittindon, who was housed at Riverbend, that you
15   didn't do any follow-up on?
16        A.   I would say that we should have or did.
17   I don't know.  I can't recall specifics.
18        Q.   And there would be no way to look back
19   at what was done to address that?
20        A.   No.
21        Q.   Because you didn't log that in any way?
22        A.   No.
23        Q.   Besides the immediate action that could
24   have been taken to obtain paperwork from an
25   individual in this situation, what else was done
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233   P.O. Box 1554 Hammond LA 70404   Fax 985.419.0799

```
 1   to address the situation of Orleans-originated
 2   inmates', sentenced to the Department of
 3   Corrections, time held in Riverbend to get their
 4   paperwork, since this had been a situation that
 5   raised a red flag?
 6        A.   I know it was Corey Amacker got with
 7   Riverbend, and they were supposed to make some
 8   determination as to who was going to send us the
 9   preclass. that we needed, the paperwork that we
10   needed on the fingerprints, because I think we
11   were having to request -- even if we got paperwork
12   from Orleans Parish, if the offender wasn't there,
13   and they had not fingerprinted him prior to him
14   being transferred, we had to coordinate with East
15   Carroll or Riverbend to have that offender
16   fingerprinted in AFIS.
17        Q.   Are you aware of what coordination the
18   Department of Corrections did in order to
19   facilitate getting that information?
20        A.   I think someone higher than me got with
21   Corey Amacker in Orleans Parish to resolve the
22   issue, as far as who was going to send us the
23   paper -- you know, whatever the sentencing
24   paperwork that we needed.  Someone above me got
25   with someone regarding that.
```

```
 1        Q.   And so this was not a situation where
 2   you yourself took any action to resolve the
 3   situation?
 4        A.   Not with them -- not with Orleans
 5   specifically.  That wouldn't have been something
 6   that I could have done in my job capacity.
 7             MRS. LOMMERS-JOHNSON:  Let's take
 8             another break.
 9             THE WITNESS:  Okay.
10             (RECESS 12:56-1:08 P.M.)
11   EXAMINATION BY MRS. LOMMERS-JOHNSON:
12        Q.   I'd like you to take a look at what's
13   previously been marked as Exhibit 41.  I can
14   represent to you that this is another document
15   that we received in discovery from the Department
16   of Corrections.  This appears to be another e-mail
17   chain, correct?
18        A.   Correct.
19        Q.   And if we turn back to the last page, do
20   you see the e-mail that originates this chain from
21   Monisa Lentz?  Do you see where I'm indicating?
22        A.   Yes, I do.
23        Q.   This is an e-mail sent on November 22nd,
24   2016, by Monisa Lentz to Perry Stagg, correct?
25        A.   Correct.
```

1      Q.    This e-mail says, "the above-referenced

2  offender was sentenced to one year DOC and 4 years

3  probation upon release, on August 8th, in Orleans

4  Criminal Court, Section C.  He has since been

5  transferred to Riverbend Detention Center.  Please

6  handle as appropriate."  Do you see where it says

7  that?

8      A.    Yes.

9      Q.    And the above-referenced offender, it

10  would appear from the subject line, is Leon Burse,

11  correct?

12      A.    Correct.

13      Q.    It says there in the subject line, "Leon

14  Burse, no DOC number," and it includes a date of

15  birth; is that correct?

16      A.    Correct.

17      Q.    And on the preceding page and again the

18  page preceding that, we can see that this e-mail

19  thread regarding Leon Burse was forwarded to a

20  number of people and, ultimately, on December 7th,

21  2016, was forwarded to you by Angela Griffin,

22  correct?

23      A.    Yes.

24      Q.    Angela Griffin, on December 7th, 2016,

25  writes to you, "see me on this, please," correct?

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

Angela Smith 7/22/2019

```
 1        A.    Correct.
 2        Q.    And at this point that you received this
 3   thread, it was included that Leon Burse, the
 4   inmate without the time calculation, was sentenced
 5   out of Orleans and housed in Riverbend, correct?
 6        A.    That's correct.
 7        Q.    What did you do after receiving this
 8   e-mail from Angela Griffin alerting you to this
 9   issue for Leon Burse?
10        A.    I don't remember specifically, but I can
11   say that, as per past practice, once I would have
12   got this, I would have went to see her, and we
13   would have discussed the fact that we have someone
14   that's been sentenced out of Orleans Parish.  And
15   I have his date of birth.  So at that point,
16   there's a little bit more that I can do as far as
17   trying to track down his paperwork.  What I did
18   from here, I mean, I can't say.  I don't remember.
19   But I'm saying what I would have done is, at that
20   point, I would have started tracking down his
21   documents.
22        Q.    And in the case of Leon Burse, what
23   steps would you have taken to do that?
24        A.    Well, my first step, I probably would
25   have -- there's a system through the Orleans clerk
```

```
1    of court where you can look up, Docket Masters, as
2    long as you have a date of birth, and you can
3    identify that offender.  I would have looked up
4    his name and date of birth to see if he actually
5    had an Orleans conviction and what that Orleans
6    conviction would be.  And then at that point, I
7    would get with my staff and tell them, you need to
8    get with Orleans Parish and get this documentation
9    so that we can get this inmate's case set up.
10        Q.   And how would you have communicated that
11   to your staff; would you have sent them an e-mail?
12        A.   Yes, it should have been sent in e-mail.
13        Q.   And for the follow-up done by you in the
14   case of Leon Burse, should we be able to see that
15   in his inmate file, like we talked about earlier?
16        A.   I would think, because my notes that we
17   had, we've always -- we have always tried to
18   always make sure all of the notes are scanned in
19   with the file.
20        Q.   So at the time of this e-mail in
21   December of 2016, you were making notes in the
22   narrative form for follow-up you did on time
23   calculation issues; is that correct?
24        A.   Yes.
25        Q.   And so any follow-up that you did would
```

Angela Smith 7/22/2019

1    be on that narrative form in the inmate file?

2          A.    Yes.

3          Q.    You said that one thing that you might

4    have done is look up in Orleans clerk of court

5    Docket Master to see if this inmate was sentenced

6    out of Orleans.  Was it the case that you needed

7    the date of birth in order to complete that

8    search?

9          A.    To ensure that I had the correct person,

10   yes.  We never went off just names.

11         Q.    If you had the name Leon Burse, but you

12   didn't have his date of birth, you could have

13   looked up to see if there was a Leon Burse in the

14   Orleans Docket Master that matched the situation

15   described in the e-mail, correct?

16         A.    I could have looked it up.  If I would

17   have looked up and seen that there was one, at

18   that point, we would have contacted Orleans

19   Parish.

20         Q.    And in this instance, where it's

21   described that Leon Burse was sentenced August 8th

22   in Orleans Criminal Court, and you received this

23   e-mail December 7th, 2016, would you have expected

24   the documents sent by the Orleans clerk of court

25   to have arrived at the preclassification

1    department to start the preclassification process?

2         A.   I don't know.  I'm not for sure.  It

3    came at different times.  Sometimes it would be

4    several weeks; sometimes it will be several

5    months.  We never documented when we received it.

6         Q.   You said you never documented when you

7    received the clerk of court paperwork?

8         A.   Clerk of court paperwork, yes.  I mean,

9    it was date stamped, but we never kept up with,

10   okay, we received it in 3 weeks' time, we received

11   the clerk's, because it was always in a huge

12   stack.  So it wasn't like we logged those in or

13   anything as far as the timeframe between when

14   somebody was sentenced up to the time when we got

15   it.

16        Q.   For a person like Leon Burse, who it

17   appears his preclassification paperwork was never

18   sent by the sheriff's office, you would have

19   started his time calculation from the time you

20   received his sentencing paperwork from the clerk

21   of court when you received it; is that right?

22        If you received Leon Burse's sentencing

23   information from the clerk of court in Orleans, is

24   it correct that you would have begun his time

25   calculation then?

```
 1        A.   No, because we didn't have the paperwork
 2   that we needed from the sheriff's department.
 3        Q.   And so if you received his sentencing
 4   information from the clerk of court in Orleans,
 5   did you take any steps after you received that
 6   information besides waiting for the information
 7   sent by the sheriff's office?
 8        A.   No.  If we received the clerk's
 9   paperwork, and then when we look them up in Cajun,
10   if there was no information in Cajun, we would
11   start -- at that point, we would start looking
12   into trying to retrieve the other documentation
13   that we needed.
14        Q.   And so it appears from this case that
15   you had not looked into the case of Leon Burse
16   until about December of 2016.  In this instance,
17   why would you have not started on this process of
18   gathering his paperwork upon receipt of his
19   sentencing minutes from the Orleans clerk of
20   court?
21        A.   Do we know that we got those?
22        Q.   At the time of this e-mail in 2016 and
23   2017, did you have any disruption in paperwork
24   received from the Orleans clerk of court?
25        A.   It was always very sporadic.  Like I
```

```
 1   say, we would get it every 3 to 4 weeks.
 2   Sometimes it would be a month.  But when we
 3   received it, I'm not going to say that we -- the
 4   day we received it is the day we started looking
 5   it up in the system, because we had to look each
 6   individual -- the clerk's papers, we had to look
 7   up each individual one by their name and their
 8   date of birth in the Cajun system, to be able to
 9   identify that offender.  So I'm not saying that we
10   wouldn't have had it in a week, 2 weeks went by
11   before we checked that particular paperwork in our
12   Cajun system.  So there could have been a delay,
13   yes.
14        Q.   At the point that Orleans -- that you
15   did receive the sentencing minutes from Orleans
16   for that person, at that point, you would be aware
17   that there was a newly sentenced --
18        A.   Yes.  Correct.
19        Q.   -- Department of Corrections inmate --
20        A.   Yes.
21        Q.   -- that you needed to do time
22   calculation for?
23        A.   That we needed to start getting
24   paperwork, yes.
25        Q.   And so regarding the follow-up that you
```

1  did in Leon Burse's case, any follow-up, I think

2  you said, we would expect to see in the narrative

3  form in his inmate file, correct?

4       A.    Yes, if it was scanned with his file.

5       Q.    Okay.  And it would be expected, in your

6  understanding, that narrative form would be placed

7  in his file, correct?

8       A.    Yes.

9       Q.    Where would we be able to look to see

10  any other follow-up that you did in resolving the

11  issue with there being no DOC number or time

12  calculation done for him?

13       A.    Other than any type of notes that had

14  been written, we would have to look at his

15  paperwork to see when it was -- I mean, I know

16  that I would have followed up on this, and I know

17  what my procedure would have been.  For me to be

18  able to tell you where there's a piece of paper

19  that says that, other than there's some notes on

20  the narrative, I don't know.

21       Q.    In turning to the top page of Exhibit

22  41, this appears to advance in time 20 days from

23  the e-mail that you had received on December 7th,

24  e-mail that was sent on December 27th, 2016; is

25  that correct?

Amerson White
COURT REPORTING & LITIGATION SUPPORT

866.870.7233     P.O. Box 1554  Hammond LA 70404     Fax 985.419.0799

1      A.    Yes.

2      Q.    In the e-mail listed in the middle of

3  the page, we see that Raven Groom wrote to Perry

4  Stagg on December 27th, 2016, saying, "the family

5  has called back again.  I looked in Cajun, and I

6  cannot find the offender.  Please handle as

7  appropriate."  Do you see where I'm indicating?

8      A.    Yes, I do.

9      Q.    And this is still -- this thread still

10 has the subject line of "Leon Burse, no DOC

11 number," followed by his date of birth, correct?

12     A.    Correct.

13     Q.    And so between you receiving this e-mail

14 communication from Angela Griffin to meet with her

15 and follow up on the issue on the 7th of December

16 and this e-mail, December 27th, 2016, it does not

17 appear that the issue was resolved; is that

18 correct?

19     A.    Not from this e-mail, no.

20     Q.    And this e-mail was then sent back from

21 Perry Stagg to Angela Griffin and Seth Smith; is

22 that correct?

23     A.    Correct.

24     Q.    Why was it the case that, despite having

25 20 days having past between you following up on

Angela Smith 7/2/2019

```
 1   the issue after meeting with Angela Griffin and
 2   this e-mail from Raven Groom, that Leon Burse
 3   still had no Cajun entry?
 4        A.   I'm not for sure.  I possibly got with
 5   my staff, and they had not followed up on it, and
 6   then I had not followed up behind them.  I mean, I
 7   don't have any other explanation.
 8        Q.   It would seem to indicate that there was
 9   a failure to follow up on this issue if there
10   still was not a Cajun entry 20 days later; is that
11   correct?
12             MR. EVANS:  Object to the form.
13                  You can answer.
14             THE WITNESS:  Sir?
15             MR. EVANS:  You can answer.
16             THE WITNESS:  Yes, I would say that.
17             Well, by looking at these e-mails.
18   EXAMINATION BY MRS. LOMMERS-JOHNSON:
19        Q.   Do you know when Mr. Burse eventually
20   did have his time calculated?
21        A.   No, I don't remember specifically.
22             MRS. LOMMERS-JOHNSON:  So now I'm going
23             to show you what I am going to mark as
24             Exhibit 47.
25             (EXHIBIT 47 MARKED FOR IDENTIFICATION)
```

Angela Smith  7/22/2019

```
 1    EXAMINATION BY MRS. LOMMERS-JOHNSON:
 2         Q.   I can make the same representation to
 3    you that this e-mail thread is another that we
 4    received in discovery.  If we look at the top page
 5    of Exhibit 47, with the Bates stamp number at the
 6    bottom right-hand corner of 002335, you see an
 7    e-mail from Laura Sevier to you; is that correct?
 8         A.   Correct.
 9         Q.   And that e-mail was sent by Laura Sevier
10    on December 8th, 2016, correct?
11         A.   Yes.
12         Q.   And it's titled, with the subject line,
13    "Orleans offenders."  Is that accurate?
14         A.   Yes.  Yes.
15         Q.   Briefly, who is Laura Sevier?
16         A.   She was our preclass. contact at
17    Riverbend in East Carroll.
18         Q.   And before receiving this e-mail, had
19    you worked with Laura Sevier before in her
20    position as preclass. contact?
21         A.   Probably, yes.
22         Q.   And you would have worked with her
23    before, even though she was at Riverbend, which
24    was, I think you said earlier, handled by David
25    Wade?
```



AmersonWhite®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1       A.   Yes, because a lot of our offenders
2   would be transferred there, the offenders that we
3   would handle.
4       Q.   And so you were aware that you were in
5   charge of handling the time calculations for a
6   large portion of the inmates held at Riverbend?
7       A.   No, not a large portion.
8       Q.   A portion?
9       A.   We had -- the way the state is broke up,
10  most of these southern convictions end up housed
11  north, in a northern parish.  So any of the
12  northern parishes that we would have to deal with,
13  yes.
14      Q.   And so I guess then my question is just:
15  It was your understanding, at the time, that a
16  portion of the inmates housed at Riverbend would
17  be ones that you were in charge of handling the
18  preclassification?
19      A.   Some of it, yes.
20      Q.   And time calculation for?
21      A.   Some of it, yes.
22      Q.   So looking at this e-mail from Laura
23  Sevier to you in Exhibit 47, the body of the
24  e-mail says, in part, "attached is a spreadsheet
25  of offenders that we were unable to bill DOC for



1    during the month of November.  This list contains
2    only the offenders transferred from Orleans
3    Parish."  Is that accurate?
4         A.    Yes.
5         Q.    Do you remember receiving this e-mail
6    from Laura Sevier?
7         A.    Not really.
8         Q.    And do you -- I guess, even if you don't
9    recall seeing this specific e-mail, it's accurate
10   that it's referencing inmates who had received
11   Department of Corrections sentences in Orleans,
12   but who were being held in East Carroll?
13        A.    Yes.
14        Q.    And it's alerting you to the fact that
15   East Carroll had been unable to bill DOC and
16   receive payment for those DOC-sentenced inmates
17   that it was housing, who had been sentenced out of
18   Orleans --
19        A.    Yes.
20        Q.    -- is that accurate?
21        At the point that you received this e-mail,
22   were you already aware that there were
23   DOC-sentenced inmates from Orleans being held in
24   East Carroll?
25        A.    Yes.

Angela Smith 7/2/2019

1    Q.    Did you ever collect rosters from East

2    Carroll of which DOC-sentenced inmates they were

3    housing?

4    A.    Not on a regular basis.  If she sent

5    any, it was for something specific; like, for me

6    requesting this information from her.

7    Q.    So it would be -- you would be able to

8    request a roster of DOC inmates held at East

9    Carroll Parish?

10    A.    Yes, because we -- at this point, we

11    knew there was some Orleans Parish inmates at East

12    Carroll.

13    Q.    So if you had wanted to check to confirm

14    that you had begun the preclassification process

15    for all DOC-sentenced inmates, it would be

16    possible to request a roster and check that you

17    had begun the process for each of --

18    A.    Yes.  I guess it would have been

19    possible, yes.

20    Q.    But that was not something that anyone

21    at the Department of Corrections did?

22    A.    Not on a regular basis, no.

23    Q.    Do you recall whether that was ever

24    done?

25    A.    Not unless it was something specific we

```
 1    knew we had issues.
 2         Q.   And is it your understanding that this
 3    issue with regard to DOC-sentenced Orleans inmates
 4    being held at East Carroll, this was brought to
 5    your attention only because of the billing
 6    problems?
 7         A.   This particular e-mail, yes.
 8         Q.   What led to you making the request to
 9    Laura Sevier that she send you this information?
10         A.   Well, I can see here that my e-mail for
11    her, I requested from her an updated list of
12    offenders that are housed there from Orleans
13    Parish, because at this point, we were aware that
14    there was issues between Orleans and Riverbend.
15    And so she was a contact, and I e-mailed her to
16    send us -- if she could possibly please send me a
17    list.  And she did.  And she added a whole lot of
18    other paragraphs to it with explanations as to the
19    fact that they were not getting -- could not bill
20    for these offenders.  But she would have never
21    sent me this if I wouldn't have requested it
22    regarding billing.  She would have -- I assume she
23    would have sent it to the business office, because
24    all I asked was for a list of Orleans inmates that
25    are DOC.
```

1    Q.    So it appears, from her sending this

2   list, that she -- that Laura Sevier kept track of

3   which Riverbend-held inmates originated out of

4   Orleans, correct?

5    A.    Yes.  I would assume they all did that.

6    Q.    And so if you had received a complaint

7   about the lack of time calculation on an inmate

8   housed at Riverbend, one option for following up

9   on that complaint and determining where they were

10  sentenced out of would have been contacting Laura

11  Sevier, as your preclassification contact at

12  Riverbend; is that correct?

13   A.    Which I did on December 8th, yes.

14   Q.    And so I think you indicated that this

15  type of roster of information was not something

16  that you requested or required of local parishes,

17  other than this type of specific communication?

18   A.    Correct.

19   Q.    And for the DOC-sentenced inmates listed

20  here, the Department of Corrections, prior to

21  receiving this list, was unaware of those inmates'

22  locations; is that your understanding?

23   A.    I mean, that would be hard to say.  I

24  assume, yes.  I mean, we see -- I mean, I see his

25  name's on there.  I would assume this would have

1   been the first time that we would have gotten all
2   of them that we would have known were there.
3        Q.    And after realizing, as I think you
4   said, that there was an issue with the time
5   calculation being done for Orleans-originating
6   inmates at Riverbend, were there any Department of
7   Corrections changes made after that to prevent
8   issues like this from arising in the future?
9        A.    Not anything specific that I can think
10  of right now.
11       Q.    And from the communication in Exhibit 47
12  and also the e-mails that we've discussed
13  regarding Jessie Crittindon, Donald Guidry and
14  Leon Burse, you did become aware that there were
15  Department of Corrections-sentenced inmates that
16  had fallen through the cracks and not been time
17  calculated?
18       A.    Correct.
19       Q.    But despite becoming aware that those
20  people had fallen through the cracks, Department
21  of Corrections didn't make any changes to prevent
22  situations like that from occurring in the future?
23       A.    Well, I'm not for sure exactly what
24  you're referring to as corrections.  I mean, we
25  still would not have any idea that a particular

Angela Smith 7/2/2019

1    offender has been sentenced in a particular parish
2    until we receive that paperwork.  So I'm not quite
3    understanding the response you're looking for.
4         Q.   I guess my question is:  From the e-mail
5    correspondence we just talked about regarding
6    Donald Guidry and Jessie Crittindon and Leon Burse
7    and this e-mail from Laura Sevier, it appears that
8    the system for getting information from parishes
9    and then processing time calculation for certain
10   inmates was not working properly, correct, because
11   these inmates weren't receiving time calculations?
12        A.   No, because we had not received their
13   paperwork.
14        Q.   And so besides waiting for that
15   paperwork to arrive from the local parishes, after
16   January of 2017, the Department of Corrections
17   didn't elect to take any action to gather that
18   information on newly sentenced, Department of
19   Corrections inmates itself?
20        A.   As far as I know, no, because I couldn't
21   see -- I can't see how our staff could sit down
22   and call every parish or e-mail every parish every
23   day, asking them if they have sentenced-DOC
24   offenders that day.  If that's what you're asking,
25   no, that didn't change.  It's still their

Angela Smith - 7/22/2019

1  responsibility to send us the paperwork.

2      Q.   There was no change of communication

3  given by the Department of Corrections to local

4  parishes regarding the length of time after

5  sentencing after which they had to get in that

6  paperwork?

7      A.   Not at my level.  If something happened

8  above me, possibly.  I can't speak for that.  But

9  I know at my level, no.

10      Q.   And regarding information in Orleans

11  specifically, it appears from this list sent by

12  Laura Sevier that were here of the individuals

13  that she was unable to bill for, that there was a

14  number of Orleans inmates at Riverbend sentenced

15  to DOC time that she was unable to bill for,

16  correct?

17      A.   I guess if these are all Orleans

18  inmates.

19      Q.   And this would have been because she

20  would be unable to bill because they would have no

21  Cajun entries; is that correct?

22      A.   Correct.

23      Q.   Why would there have been no Cajun

24  entries created for all of these individuals if we

25  would expect that the clerk of court paperwork for

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.870.0799

 1    these individuals would have arrived to your

 2    department?

 3         A.   We didn't necessarily set up trans. off

 4    of clerk's papers, the paperwork from the clerk of

 5    court's office.  That would initiate a reaction

 6    that we need to follow up to see what's going on

 7    with this offender, why we don't have his

 8    paperwork from the sheriff's office.  We would not

 9    have necessarily updated all their trans. just

10    from the clerk of court's papers.

11         Q.   When you say updated trans., do you mean

12    that upon receiving the information from the

13    Orleans clerk of court, you would have created a

14    Cajun entry, but not updated a location?

15         A.   No.  The Cajun entry would be the

16    location.

17         Q.   So the Cajun entry would not be created

18    upon receipt of information from the Orleans clerk

19    of court?

20         A.   No, because we had no identifying

21    information.  We have to have fingerprints in

22    AFIS, rap sheet, before we give anyone a DOC

23    number.  So if that offender did not have a DOC

24    number already in the system, he would not have

25    gotten one just because we received paperwork from

1    the clerk of court's office.  You have to have the
2    paperwork from the sheriff's department where an
3    offender was housed -- I mean, conviction, where
4    he was convicted.
5         Q.   And where did you keep the Orleans clerk
6    of court paperwork on inmates such as these, who
7    you hadn't received any information from the
8    sheriffs on?
9         A.   As far as -- I don't know these specific
10   ones, but I know that they were kept with the
11   other Orleans paperwork -- the person that we
12   always had one person that handled Orleans Parish.
13   That person would have had them in their office
14   somewhere.  Whether it be on their desk, in a
15   tray, I mean, I can't say specifically, because I
16   don't know.
17        Q.   Who, in 2016, and 2017, was that
18   Orleans-assigned person in your office?
19        A.   The only one I remember at that time was
20   Joseph Bordelon.
21        Q.   And so Joseph Bordelon would have had,
22   in theory, a stack of paperwork from the clerk's
23   office for all the inmates listed here whose
24   preclassification paperwork from the sheriff's
25   office wasn't sent?

```
 1        A.    If we would have gotten them, yes.

 2        Q.    How did you first hear that the

 3   Plaintiffs in this case had filed a lawsuit?

 4        A.    When I got the subpoena on this

 5   particular case.  Now, I knew before I retired

 6   that they had some offenders filing lawsuits about

 7   over-detention.  I mean, I knew that before I

 8   retired, but nothing specifically about these

 9   until I got the subpoena.

10        Q.    Since this lawsuit, since you've been

11   aware of this lawsuit, have you spoken to anyone?

12   Besides confidential conversations with counsel,

13   have you spoken to anyone about the lawsuit?

14        A.    No, ma'am.

15        Q.    And what steps did you take to prepare

16   for today's deposition?

17        A.    I met with Gary one day last week.

18        Q.    Besides conversations with counsel, did

19   you take any steps to prepare for today's

20   deposition?

21        A.    No, ma'am.

22        Q.    After you found out about the lawsuit,

23   or in preparing for today's deposition, did you

24   look at any documents; and by that I mean, any

25   paper documents or e-mails?
```

```
 1        A.    We looked at one e-mail that Gary had --
 2              MR. EVANS:  Yes, don't talk about any --
 3              THE WITNESS:  Okay.
 4              MR. EVANS:  Don't talk about any
 5              particular --
 6              THE WITNESS:  Yes.
 7              MR. EVANS:  -- dialogue.  But as far as
 8              documents, go ahead.  I'm sorry.
 9              THE WITNESS:  An e-mail.
10        EXAMINATION BY MRS. LOMMERS-JOHNSON:
11        Q.    Was it an e-mail document from 2016,
12        2017?
13        A.    Yes.
14              MRS. WASHINGTON:  Counsel, can I just
15              clarify for the record, do you represent
16              Ms. Smith in this matter?  It's my
17              understanding she's no longer employed
18              by the department.
19              MR. EVANS:  That is correct, yes.
20              MR. CRAIG:  Which part is correct?
21              MR. EVANS:  That she's no longer
22              employed with the department.
23              MR. CRAIG:  You do represent her?
24              MR. EVANS:  To the extent that she was
25              employed by the DOC during the time of
```

```
 1              this, but, no, I don't currently
 2              represent her, no.
 3   EXAMINATION BY MRS. LOMMERS-JOHNSON:
 4        Q.    So in terms of the documents that you
 5   reviewed, you said you reviewed one e-mail
 6   document; is that correct?
 7        A.    Correct.
 8        Q.    What was that?
 9        A.    It was a document from Corey Amacker to
10   myself.
11        Q.    When was that sent?
12        A.    I can't remember.  I think it was
13   December of 2016.
14        Q.    What did that e-mail say?
15        A.    He was responding to my request for
16   paperwork from him.  I needed paperwork for
17   Orleans offenders, and that was his response.
18        Q.    The e-mail was his response to your
19   request for paperwork --
20        A.    Uh-huh (AFFIRMATIVE RESPONSE).
21        Q.    -- on Orleans offenders?
22              When had you requested paperwork from him on
23   Orleans offenders?
24        A.    That particular e-mail was in December.
25        Q.    And so if I'm understanding correctly,
```

AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799

1    you requested information from Corey Amacker

2    December of 2016, on Orleans offenders; is that

3    right?

4         A.    I asked him for information -- I didn't

5    read the complete e-mail, and it's been 3 years.

6    I inquired of him what he was doing to get us the

7    paperwork that we needed.

8         Q.    What did he respond to you?

9         A.    He responded, he was getting with

10   Riverbend, that it was on them as to why we hadn't

11   gotten paperwork.

12        Q.    Why did you review this particular

13   e-mail?

14        A.    Why?  Because I did not know -- have any

15   clue as to what part of any of this I was expected

16   to know today.  I couldn't remember -- I had no

17   idea.

18        Q.    In terms of your discussions in

19   preparing for this deposition, what all did you

20   talk about in preparation for today?

21             MR. EVANS:  Go ahead.

22             THE WITNESS:  I just came in, and I sat

23             down in here, talked to Gary, just to

24             find out what cases it was.  I

25             recognized Jessie Crittindon's name on

```
 1              the subpoena, that it was something to
 2              do with an Orleans case.  But what
 3              specifically it had to do, I didn't
 4              know.  I couldn't remember.  I've worked
 5              for the corrections for 30 years.  And I
 6              knew it had something to do with that
 7              situation that was going on in November
 8              and December of 2016, but I didn't know
 9              what.  I didn't know what was expected
10              of me to know, and I didn't want to come
11              in not knowing any, you know.
12   EXAMINATION BY MRS. LOMMERS-JOHNSON:
13        Q.   Did you review any of the e-mails that
14   we looked at today together?
15        A.   No.
16        Q.   And the e-mail correspondence that you
17   had with Corey Amacker that you reviewed, that was
18   not something that we've looked at today?
19        A.   No.
20              MRS. LOMMERS-JOHNSON:  That's everything
21              that I have.  Other counsel may have
22              questions for you.
23              MR. EVANS:  Tim, you have anything?
24              Pete, you have anything?
25                   I have just a few follow-up
```

Amerson White
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.870.0799

```
 1              questions, just very briefly.
 2   EXAMINATION BY MR. EVANS:
 3        Q.    Mrs. Smith, you were asked a couple of
 4   times about waiting on paperwork.  And you were
 5   also asked a couple of questions about what steps
 6   were taken to obtain paperwork.  How would you go
 7   about receiving paperwork from a parish, from a
 8   sheriff's office?
 9        A.    They would automatically send it to us
10   either through the mail, or we had two parishes
11   that would hand-deliver, deliver packets.
12        Q.    Okay.  And what about in situations
13   where you got a complaint or you got a phonecall
14   where you found out about an offender, and you
15   didn't have the paperwork, how would you go about
16   getting the paperwork from the sheriff's office?
17        A.    My first response would be to get with
18   my supervisor, to get with her staff to follow up
19   with that parish -- if we knew the parish of
20   conviction, to follow up with that parish, to
21   inquire as to why do we not have the paperwork,
22   can you please send us the paperwork.  We would
23   have to request it sometimes.
24        Q.    And what happens if the sheriff's office
25   didn't send you that paperwork?
```

```
 1        A.    Then we would have to request it again.
 2   We would have to request it until we got it.  And
 3   if it went too long, then I would have to take it
 4   up the command to Angela Griffin.
 5        Q.    Did you have any mechanism to force a
 6   sheriff's office to give you paperwork?
 7        A.    No, sir.
 8        Q.    You were asked a couple of questions
 9   about looking up offenders in Cajun.
10        A.    Yes.
11        Q.    You remember generally that.  How
12   many -- well, actually, let me take a step back.
13   You said you received paperwork, you said, every
14   day from various parishes; is that correct?
15        A.    Yes.
16        Q.    Do you have any idea how many packets
17   you might receive on any given day?
18        A.    It could range from 25 to 80, every
19   given day.
20        Q.    Now, if for a particular offender you
21   did not receive a packet, how would you know to
22   look up such an offender in Cajun?
23        A.    We wouldn't have any way to look him up.
24        Q.    Why is that?
25        A.    Because we were never notified.  We are
```

Angela Smith 7/22/2019

```
 1    not notified until we receive preclass. packet.
 2         Q.   So you were also asked a couple of
 3    questions about looking up offenders who may just,
 4    say, from any particular clerk of court, of how
 5    many offenders were sentenced to DOC time.  You
 6    remember being asked about that?
 7         A.   Yes.
 8         Q.   How would the preclassification
 9    department go about figuring that information out?
10         A.   By how many offenders were sentenced to
11    the Department of Corrections?  I'm sorry, maybe
12    I'm missing something.
13         Q.   In order to keep track of every DOC
14    offender who was sentenced to DOC time on a daily
15    basis, how would preclass. have to go about
16    staying on top of that information?
17         A.   There's no way for us to do that.
18         Q.   Why not?
19         A.   Because we don't know every individual
20    offender that's in a parish jail when he goes to
21    court.
22         Q.   Earlier you testified that basically
23    you'd have to call each clerk of court for all 64
24    parishes to figure that information out?
25         A.   Yes.  Correct.
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA 70404    Fax 985.871.0799

```
 1          Q.    Is there any other way for preclass. to
 2     stay on top of that information?
 3          A.    No, sir.
 4               MR. EVANS:  I think that's all I have.
 5     EXAMINATION BY MRS. LOMMERS-JOHNSON:
 6          Q.    I guess just one follow-up question:  In
 7     terms of the type of e-mail that was sent to you
 8     by Laura Sevier, where she gave you a roster of
 9     all the DOC-sentenced individuals from Orleans
10     being held at Riverbend, do you recall what roster
11     I'm referring to --
12          A.    Yes.
13          Q.    -- in Exhibit 47?
14          It would have been possible to request
15     rosters such as these to be electronically sent to
16     you from individual parishes, correct?
17          A.    It was possible, but it wasn't very
18     realistic.
19          Q.    Tell me what you mean by that.  Why was
20     it not realistic?
21          A.    Because we cannot, on a daily basis,
22     contact every detention center, every parish jail,
23     every clerk of court with a list of anyone that
24     was either sentenced to the Department of
25     Corrections that day or that they are holding for
```



AmersonWhite
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554  Hammond LA  70404    Fax 985.419.0799

```
 1    the Department of Corrections for that specific
 2    day or even week.  There is no way that it would
 3    be realistic for us to be able to do that.
 4         Q.   And I think you're talking about
 5    reaching out specifically to each parish yourself.
 6    My question is:  The preclassification department
 7    and the Department of Corrections could require
 8    each parish facility to send you a roster of what
 9    DOC-sentenced inmates they are holding for you?
10         A.   I guess they could, but that would be a
11    decision that would be made above me.
12         Q.   And that's something that was never
13    done, to your knowledge?
14         A.   No.  And may I back up one second?  When
15    I say "me" or "we," I meant the preclass.
16    department as a whole, not me contacting every one
17    of these facilities.
18         Q.   Got you.
19              MRS. LOMMERS-JOHNSON:  I think we're
20              done.
21              MR. EVANS:  Last call, guys.  Anything
22              else?
23              MR. RICHARDSON:  So we're done.  Thank
24              you.
25              (DEPOSITION CONCLUDED AT 2:05 P.M.)
```

```
 1                    WITNESS' CERTIFICATE

 2

 3

 4       I, ANGELA SMITH, read or have had the foregoing

 5   testimony read to me and hereby certify that it is a

 6   true and correct transcription of my testimony, with

 7   the exception of any attached corrections or

 8   changes.

 9

10

11

12

13

14       _____            _____

15   DATE SIGNED                 ANGELA SMITH

16

17

18

19   INITIAL ONE:

20

21       _____ Read with no corrections.

22

23       _____ Read and correction sheet attached.

24

25   DATE TAKEN:  JULY 2, 2019
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT

866.870.7233    P.O. Box 1554  Hammond, LA  70404    Fax 985.419.0799

```
 1              REPORTER'S CERTIFICATE
 2         This certification is valid only for a
 3    transcript accompanied by my original signature
 4    and original seal on this page.
 5         I, ANNA C. COATES, CCR, RPR, do hereby
 6    certify that ANGELA SMITH, to whom the oath was
 7    administered, after having been duly sworn by me
 8    upon authority of R.S. 37:2554, did testify as
 9    herein above set forth in the foregoing 161 pages;
10    that this testimony was reported by me in the
11    stenotype reporting method, was prepared and
12    transcribed by me and is a true and correct
13    transcript to the best of my ability; that the
14    transcript has been prepared in compliance with
15    transcript format guidelines required by rules of
16    the board; that I have acted in compliance with
17    the prohibition on contractual relationships, as
18    defined by Louisiana Code of Civil Procedure
19    Article 1434 and in rules and advisory opinions of
20    the board; that I am not related to counsel or the
21    parties hereto, nor am I otherwise interested in
22    the outcome of this matter.
23    _____         _____
24    DATE                    ANNA C. COATES, RPR, CCR
25                            LOUISIANA CCR NO. 97018
```



Amerson White®
COURT REPORTING & LITIGATION SUPPORT
866.870.7233    P.O. Box 1554 Hammond LA 70404    Fax 985.419.0799