# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

JESSIE CRITTINDON, *et al.*                          CIVIL ACTION

VERSUS                                               17-512-SDD-EWD

MARLIN GUSMAN, *et al.*

## RULING

This matter is before the Court on the following *Motions*:

- The *Motion for Partial Summary Judgment*[1] filed by Plaintiffs Jessie Crittindon ("Crittindon"), Leon Burse ("Burse"), Eddie Copelin ("Copelin"), Phillip Dominick III ("Dominick"), and Donald Guidry ("Guidry")(collectively, "Plaintiffs"). There are three *Oppositions* to the *Motion*: one by Defendants Marlin Gusman ("Sheriff Gusman") and Corey Amacker ("Amacker") of the Orleans Parish Sheriff's Office ("OPSO")(collectively, "the OPSO Defendants");[2] one by Defendants Wydette Williams ("Sheriff Williams"), Johnny Hedgemon ("Hedgemon"), and Edward Knight ("Knight") of the East Carroll Parish Sheriff's Office ("ECPSO")(collectively, "the ECPSO Defendants");[3] and another by Defendants James LeBlanc ("Secretary LeBlanc"), Angela Griffin ("Griffin"), and Perry Stagg ("Stagg") of the Louisiana Department of Public Safety and Corrections ("DPS&C" or "DOC")(collectively, "the DPS&C Defendants");[4]

---

[1] Rec. Doc. No. 111.
[2] Rec. Doc. No. 146.
[3] Rec. Doc. No. 131.
[4] Rec. Doc. No. 141.
59792

- The *Motion for Summary Judgment*[5] filed by the DPS&C Defendants. Plaintiffs filed an *Opposition*,[6] to which the DPS&C Defendants filed a *Reply*.[7] Plaintiffs also filed a *Sur-Reply*;[8]

- The *Motion for Summary Judgment*[9] filed by the OPSO Defendants, to which Plaintiffs filed an *Opposition*;[10]

- The *Motion for Summary Judgment*[11] filed by the ECPSO Defendants, to which Plaintiffs filed an *Opposition*.[12]

For the reasons that follow, the Court finds that the motions shall be DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are former prisoners who allege that they were "incarcerated for months beyond the date when each was legally entitled to release."[13] Their individual cases played out in similar fashion: Plaintiffs were all arrested and initially placed in the custody of the Orleans Parish Sheriff's Office (OPSO) before being transferred to the River Bend Detention Center ("River Bend") in Lake Providence, Louisiana, where they were held by the East Carroll Parish Sheriff's Office (ECPSO) as Orleans pretrial detainees.[14] Later, each Plaintiff was transported back to Orleans Parish to enter a plea in Orleans Parish Criminal District Court. Once the plea was entered and a sentence handed down, each Plaintiff was transported back to River Bend, where, they allege, they remained in custody

---

[5] Rec. Doc. No. 110.
[6] Rec. Doc. No. 142.
[7] Rec. Doc. No. 149.
[8] Rec. Doc. No. 155.
[9] Rec. Doc. No. 104.
[10] Rec. Doc. No. 144.
[11] Rec. Doc. No. 102.
[12] Rec. Doc. No. 143.
[13] Rec. Doc. No. 111-1, p. 2.
[14] *Id.* at pp. 3-5.
59792

even though they were entitled to immediate release, having been sentenced to time served (in the case of Plaintiffs Crittindon, Burse, Copelin, and Dominick).[15] Plaintiff Guidry was not entitled to immediate release upon sentencing, but he alleges that he was entitled to release on September 4, 2016, and was not actually released from River Bend until January 24, 2017.[16] All five Plaintiffs were no longer pretrial detainees but DOC-sentenced inmates when, they allege, they were held in custody beyond their lawful sentences.

In their *Complaints*,[17] Plaintiffs bring four claims against Defendants, in both their individual and official capacities: (1) violation of their federal due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (2) violation of their state due process rights under Article 1, Section 2 of the Louisiana Constitution; and (3) and (4), state law claims for false imprisonment and intentional infliction of emotional distress. In their *Motion for Partial Summary Judgment*, however, Plaintiffs seek summary judgment on a narrow subset of the claims at issue:

> Plaintiffs seek partial summary judgment from this Court on three issues of liability: (1) whether, as a matter of law, Defendants violated the due process rights guaranteed to Plaintiffs by the federal and state constitutions; (2) whether, as a matter of law, Defendants falsely imprisoned Plaintiffs; and (3) whether the liability of OPSO, ECPSO, and the DPS&C Defendants is solidary. . .[18]

Notably, Plaintiffs' *Motion* seeks summary judgment against the OPSO Defendants and the ECSPO Defendants *in their official capacities only*; as to the DPS&C

---

[15] Rec. Doc. No. 111-1, pp. 3-5.
[16] *Id.* at p. 5.
[17] Rec. Doc. No. 1; Rec. Doc. No. 4; Case No. 17-cv-602, Rec. Doc. No. 1. This case began as two separate cases -- 17-cv-512 (with Plaintiffs Crittindon and Burse) and 17-cv-602 (with Plaintiffs Copelin, Dominick III, and Guidry) -- which were consolidated on October 18, 2017. *See* Rec. Doc. No. 23.
[18] Rec. Doc. No. 111-1, p. 2.
59792

Defendants,[19] Plaintiffs seek summary judgment against them in their *individual* capacities.[20]

Plaintiffs argue that the OPSO Defendants had "a practice of 'releasing' newly-sentenced DOC prisoners from Orleans Parish" directly to River Bend, "without proper completion and provision of the paperwork and documentation required by state law and necessary to ensure their release from custody."[21] Similarly, they argue that the ECPSO Defendants are liable because, "[d]espite promulgating a written policy that requires documentation of 'the legal basis for commitment' for the intake of prisoners," the ECPSO Defendants allegedly had an "official practice of accepting persons into [River Bend] without obtaining this information."[22] The OPSO and ECPSO Defendants counter that Plaintiffs cannot prevail on their official capacity § 1983 claims because they have "failed to establish that there was a specific policy or a pattern of similar overdetention incidents which arose out of specifically similar circumstances, sufficient to put" them on notice that their practice was constitutionally deficient.[23] Further, both OPSO and ECPSO Defendants contend that Plaintiffs have failed to establish that they "acted with the requisite deliberate indifference necessary to find the parties liable in their official capacity."[24]

As for the individual capacity claims against the DPS&C Defendants, Plaintiffs argue that they are entitled to summary judgment based on these Defendants' "direct

---

[19] The parties and the Court use "DPS&C" and "DOC" interchangeably to refer to the Louisiana Department of Public Safety and Corrections.
[20] Rec. Doc. No. 111-1, p. 2.
[21] *Id.* at p. 22.
[22] *Id.* at p. 33.
[23] Rec. Doc. No. 146, p. 2 (OPSO Defendants); Rec. Doc. No. 131, p. 9 (ECPSO Defendants).
[24] *Id.*
59792

participation in the acts which caused the deprivations of Plaintiffs' due process rights," as well as summary judgment on

> three separate theories of supervisory liability: (1) failure to adopt policies that could have prevented the Plaintiffs' injuries; (2) failure to train and supervise department employees, resulting in the Plaintiffs' injuries; and (3) direct participation in DPS&C intolerably slow response to the discovery of scores of DOC-sentenced prisoners held at River Bend without having been pre-classified, resulting in the Plaintiffs being held even longer than if DPS&C had taken swift action.[25]

The DPS&C Defendants counter that summary judgment is improper because they are entitled to qualified immunity. Specifically, they argue that there is no evidence that they acted with deliberate indifference; instead, they claim, they "promptly processed" Plaintiffs' release paperwork "after receiving the necessary documentation"[26] from the other Defendants. Because DPS&C "is dependent upon the Sheriff to provide necessary paperwork to calculate an offender's time," Defendants argue that they cannot be liable for the overdetention of Plaintiffs based on the Sheriffs' failure to provide that paperwork. Additionally, the DPS&C Defendants argue that Plaintiffs cannot show a failure to adopt effective policies, explaining that "there is no indication of a pattern or practice of DOC staff wholly failing to reach to local official to obtain paperwork. Indeed, DOC staff remained in communication with Orleans Parish throughout December 2016 and into January 2017."[27]

---

[25] Rec. Doc. No. 111-1, p. 42.
[26] Rec. Doc. No. 141, p. 12.
[27] *Id.* at p. 17.
59792

According to Plaintiffs, all Defendants are also liable for false imprisonment under Louisiana law based on their constitutionally deficient practices. Plaintiffs ask this Court to find that all Defendants are solidarily liable for the harm to Plaintiffs, explaining that:

> The OPSO, ECPSO, and DPS&C Defendants each played a role in preventing each Plaintiff from going free on his respective lawful release date. None of the Plaintiffs' releases could be 'partially executed.' The obligation owed to Plaintiffs, therefore, is a joint, indivisible obligation and OPSO, ECPSO, and the DPS&C Defendants are solidarily liable.[28]

The Defendants disagree, noting that in 1996, the Louisiana Civil Code "was amended to eliminate solidary liability of joint tortfeasors, except for intentional or willful acts."[29]

For their part, the ECPSO Defendants move for summary judgment on the claims against them for the following reasons: (1) because "Plaintiffs' claims are barred by *Heck v. Humphrey* and should be dismissed on that basis";[30] (2) because "plaintiffs fail to state a claim against either Sheriff Williams, in his individual capacity, or the East Carroll Defendants collectively in their official capacities";[31] (3) because the ECPSO Defendants "are entitled to qualified immunity in their individual capacities";[32] and (4) because the "plaintiffs fail to state a cause of action for intentional infliction of emotional distress under Louisiana law."[33]

Similarly, the OPSO Defendants' *Motion for Summary Judgment* posits that they are entitled to summary judgment on the claims against them for the following reasons: (1) because "Plaintiffs' claims are barred by *Heck v. Humphrey* and should be dismissed

---

[28] Rec. Doc. No. 111-1, p. 13.
[29] Rec. Doc. No. 146, p. 14.
[30] Rec. Doc. No. 102-1, p. 4.
[31] *Id.* at p. 10.
[32] *Id.* at p. 12.
[33] *Id.* at p. 14.
59792

on that basis";[34] (2) because "Plaintiff [sic] has failed to state facts which support an official capacity claim against the Sheriff";[35] and (3) because the "Sherriff and Amacker are entitled to qualified immunity in their individual capacities."[36]

Lastly, the DPS&C Defendants move for summary judgment, arguing that "(1) the Plaintiffs' claims are barred by the principles set forth in the United States Supreme Court case *Heck v. Humphrey* and its progeny, (2) the defendants are entitled to qualified immunity, (3) the DPS&C Defendants are not the 'jailers' for purposes of the state law false imprisonment analysis, and (4) the DPS&C Defendants did not intentionally inflict emotional distress upon the Plaintiffs."[37]

Having reviewed the parties' memoranda and the applicable law, the Court finds that all of the motions before the Court shall be DENIED. The Court will address the parties' arguments in turn below.

## II.    LAW AND ANALYSIS

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[39] A party moving for summary judgment "must 'demonstrate the absence

---

[34] Rec. Doc. No. 104-1, p. 4.
[35] *Id.* at p. 6.
[36] *Id.* at p. 9.
[37] Rec. Doc. No. 110-1, p. 2.
[38] FED. R. CIV. P. 56(a).
[39] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
59792

of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[40]  If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[41]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[42]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[43]  All reasonable factual inferences are drawn in favor of the nonmoving party.[44]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[45]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint."'"[46]

---

[40] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25)).

[41] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[42] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[43] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[44] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

[45] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

[46] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).

59792

## B. Official Capacity Claims Under 42 U.S.C. § 1983

A suit against a government official in his official capacity is the equivalent of filing suit against the government agency of which the official is an agent.[132] Accordingly, the claims against the defendants in their official capacities are, in effect, claims against the municipal entity they represent. A plaintiff asserting a Section 1983 claim against a municipal official in his official capacity or a Section 1983 claim against a municipality "must show that the municipality has a policy or custom that caused his injury."[134] To establish an "official policy," a plaintiff must allege either of the following:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated the policymaking authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.[47]

For municipal liability, the policymaker must have final policymaking authority.[48] "[W]hether a particular official has final policymaking authority is a question of *state law*."[49] Moreover, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff" for the necessary determination to be made on the policy's relative constitutionality.[50]

---

[47] *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir.1984).
[48] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).
[49] *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotations omitted) (emphasis in original).
[50] *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001).
59792

Although "a single decision may create municipal liability if that decision were made by a final policymaker responsible for that activity,"[51] absent an official policy, actions of officers or employees of a municipality do not render the municipality liable under Section 1983.[52] A municipality cannot be held liable under Section 1983 for the tortious behavior of its employees under a theory of *respondeat superior.*[53] "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."[54] However, a plaintiff may establish a policy or custom based on isolated decisions made in the context of a particular situation if the decision was made by an authorized policymaker in whom final authority rested regarding the action ordered.[55]

### C. Analysis

#### i. OPSO Defendants

The OPSO Defendants contend that the official capacity § 1983 claim against them fails because Plaintiffs have not successfully demonstrated that OPSO's alleged practice of releasing pretrial detainees to the River Bend Detention Center without the proper paperwork was widespread or persistent enough to give rise to municipal liability. The OPSO Defendants argue that their alleged practice or custom cannot give rise to official capacity liability without an "allegation of prior similar constitutional violations which would have put Sheriff Gusman on notice that his policy . . . was inadequate."[56] Indeed, the Fifth

---

[51] *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir.1996) (internal quotations and citations omitted).
[52] *Id.*
[53] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).
[54] *Id.*
[55] *Cozzo v. Tangipahoa Parish Council–President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002)(citing *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 124–25 (1988); *Pippin*, 74 F.3d at 586.
[56] Rec. Doc. No. 146, p. 7.
59792

Circuit has held that "[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability,"[57] and that a "customary municipal policy cannot ordinarily be inferred from single constitutional violations."[58]

To be sure, there is evidence that the practice was relatively widespread; for example, Plaintiffs cite a spreadsheet, generated by DOC in December 2016, listing offenders sentenced in Orleans and housed at River Bend who were in "DOC [custody] without paperwork."[59] There are 57 prisoners on the list. However, a finding of municipal liability based on a pattern or practice requires that "[a]ctual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority."[60] The record evidence suggests that Orleans Parish Sheriff Gusman was aware of issues with inmate transfer paperwork, though the timing and specificity of his knowledge of the specific problems with inmate transfers to River Bend is a question of fact. In his deposition, Sheriff Gusman testified under oath that "the information that I was getting did not indicate that we were having a problem"[61] with providing the requisite paperwork before transferring prisoners. However, the evidence also reflects that OPSO promulgated a new policy in July 2016 (OPSO No. 501.13, "Department of Corrections Pre-Classification") that set forth the process that OPSO deputies were to follow when preparing pre-classification information

---

[57] *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001) (quoting *Bennett,* 728 F.2d at 768 n.3).
[58] *Id.*
[59] Rec. Doc. No. 111-37, p. 3-5.
[60] *Bennett*, 735 F.2d at 862.
[61] Rec. Doc. No. 146-2, p. 59.
59792

for inmates transferred to state prisons.[62] Asked in his deposition if the policy was promulgated due a problem with the collection of pre-classification documents, Sheriff Gusman testified, "I don't think it was a problem that was brought to my attention but just a – I would call it more of a concern that we wanted to make sure we got the fingerprints done, that we had the order from the court, certified order, those kind of things . . ."[63] Gusman stated that "every once in a while someone would tell me as I walked through the jail that 'Hey, I haven't been fingerprinted yet,' and I would get them fingerprinted . . ."[64] Asked whether the new OPSO policy for pre-classification, if followed, would put OPSO in compliance with the Basic Jail Guidelines, Gusman answered, "Yes. And that was certainly our intention."[65] Although Sherriff Gusman denied being aware of an issue with providing paperwork for transfers to River Bend, he admitted that at some point, he "certainly became aware of a problem, and as soon as I became aware of the problem, I said, 'Look, we've got to take care of this immediately'. . . we dispatched one of our staff to go up there and – to East Carroll Parish and to resolve this as quickly as we could."[66]

Ultimately, Gusman's testimony presents a somewhat mixed picture of his awareness of the alleged practice of transferring inmates to River Bend without proper paperwork. The evidence in this case demonstrates that the "arrangement" of OPSO sending pretrial detainees to River Bend began in September 2015 with a verbal agreement between OPSO and ECPSO. The question of whether, by the time the spreadsheet showing 57 OPSO prisoners "without paperwork" at River Bend was

---

[62] Rec. Doc. No. 111-23.
[63] Rec. Doc. No. 146-2, p. 48.
[64] *Id.* at p. 47.
[65] *Id.* at p. 51.
[66] *Id.* at p. 62-63.
59792

generated in December 2016, Gusman, Amacker, and OPSO officials had the requisite knowledge of the alleged practice for the Court to conclude that this practice was a persistent, widespread, well-settled municipal policy is a disputed question of fact to be determined at trial. Therefore, Plaintiffs' *Motion for Partial Summary Judgment* is denied with respect to their official capacity claim against the OPSO Defendants. The OPSO Defendants' *Motion for Summary Judgment*[67] on the official capacity claims against them is likewise denied, for the same reasons, as discussed more fully *infra*.

## ii. ECPSO Defendants

Plaintiffs move for summary judgment against the ECPSO Defendants in their official capacities based on their alleged practice "of imprisoning persons without verifying or establishing the legal authority to detain them."[68] Per Plaintiffs, this practice was the "official policy of the ECPSO,"[69] and ECSPO undertook this practice in violation of their own written Policy No. 17-14, which requires documentation including "the date of arrest and admission, duration of confinement, and a copy of the court order or other legal basis for commitment"[70] for individuals booked into the River Bend Detention Center.

The ECPSO Defendants' *Opposition* is not particularly responsive to the policy and practice claim against them. In fact, they do not deny that they had the above-described practice of accepting transfers from OPSO without the requisite paperwork. Instead, they repeatedly emphasize that their duty was "only to operate as a housing unit"[71] and that they "were not the party responsible for the packets [of paperwork] at issue in this

---

[67] Rec. Doc. No. 104.
[68] Rec. Doc. No. 111-1, p. 33.
[69] *Id.*
[70] *See* Rec. Doc. 105-26.
[71] Rec. Doc. No. 131, p. 7.
59792

matter."[72] Their conceded practice of accepting prisoners without paperwork does not give rise to liability, they argue, because it was "not unreasonable for the ECPSO to have relied upon the substantial codal and statutory authority, common understanding, shared expectations, customary practices, Basic Jail Guidelines, and written agreements in forming their belief that they were not the entity responsible for compiling the packets at issue and sending them to DPS&C."[73]

But Plaintiffs do not argue that ECPSO should have been *compiling* paperwork; rather, they seek summary judgment against ECPSO based on its practice of accepting prisoners without documentation of their legal authority to detain them. As to that claim, ECPSO argues only that "there are no allegations that the sheriff had any notice that any policy (or lack thereof) adopted by his office would or could lead to unlawful detention."[74] Again, as discussed with respect to the OPSO Defendants above, the Fifth Circuit has held that "[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability,"[75] and that a "customary municipal policy cannot ordinarily be inferred from single constitutional violations."[76]

Plaintiffs cite ample testimony establishing that this practice was persistent, repeated, even "constant." For example, they note the testimony of Sheila Bell, an ECPSO employee handling intake, who testified at her deposition as follows:

---

[72] Rec. Doc. No. 131 p. 9.
[73] *Id.* at p. 8.
[74] Rec. Doc. No. 131, p. 9.
[75] *Piotrowski v. City of Houston,* 237 F.3d 567, 581 (5th Cir. 2001) (quoting *Bennett,* 728 F.2d at 768 n.3).
[76] *Id.*
59792

A. Right. And a lot of times we don't get no paperwork from some of these people, for some of these parishes. Sometimes they come here empty handed –

Q. Okay.

A. – so we don't always get this.

Q. Okay.

*A. Lots of times, we don't get this information.*

Q. Okay. So it's the responsibility of the lieutenant to get as much information in booking as he can; is that correct?

A. Yes. But, like I said, again, *a lot of times when these offenders come in, they – the parishes don't give the transportation guys anything.*

Q. Okay.

A. They are just "here, take your man," that's it.[77]

And:

Q. Okay. So it's possible that a prisoner would be booked into Riverbend, go through the bullpen, get their picture taken with you and have their file passed on to records without it having these pieces of information such as are listed in this checklist?

A. Of course.[78]

Other ECPSO staff testified along the same lines. For example, Captain Robert A. Russell, who identified himself at his deposition as the Chief of Security at River Bend, was asked whether every person in ECPSO custody at River Bend should have the documents described in ECPSO's internal policy before booking, he answered:

A. Ideally, yes. But like anything, when you are dealing with people. They omit some things, so you can't – I can't say that all that information is in every file.[79]

Likewise, Warden Hedgemon, the warden at River Bend, was asked in his deposition how he knows "that Orleans has the right to be detaining the person that they're transferring into your custody."[80] He responded:

---

[77] Rec. Doc. No. 111-25, p. 53, lines 2-20 (emphasis added).
[78] *Id.* at p. 54, lines 15-21.
[79] Rec. Doc. No. 111-22, p. 60, lines 14-17.
[80] Rec. Doc. No. 111-26, p. 76.
59792

A. I don't know. The only thing I know is they send them here . . .

Q. And you take Orleans' word for it?

A. I take many parishes' words, yes, ma'am.[81]

Warden Edward Knight, also of River Bend, testified that the prisoner files are "turned over" to an employee named Mary Brown. Asked if it is Brown's responsibility to review those files to see if the required documentation is present, Knight answered, "She should," and, "Apparently, according to this, she doesn't."[82]

The testimony from the ECPSO employees who work at and oversee River Bend Detention Center clearly establishes a widespread practice of accepting prisoners into the facility without documentation. Perhaps most egregiously, Warden Hedgemon stated under oath that he "takes the word" of the parishes transferring the inmates that there is a legal basis for their detention. The ECPSO Defendants argue that despite the evidence of this practice, there is no official capacity liability because Plaintiffs have not shown that they acted with deliberate indifference. But the deliberate indifference standard may also attach to the *failure* to promulgate a policy.[83] Plaintiffs do not argue that ECPSO failed to promulgate a policy; in fact, they show that ECPSO had a policy governing the necessary documentation for incoming pretrial detainees. What Plaintiffs argue is that the ECPSO Defendants are liable under *Monell* for employing a widespread and persistent municipal practice that was the moving force behind the violation of Plaintiffs' rights.

The "moving force" element gives the Court pause. There is no genuine dispute, based on the record evidence, that ECPSO had a practice of accepting prisoners without documentation of their legal right to detain them. What is less clear, based on that same

---

[81] Rec. Doc. No. 111-26, p. 76.

[82] Rec. Doc. No. 111-28, p. 117.

[83] See *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

59792

evidence, is whether ECPSO's failure to collect that paperwork was the moving force behind the overdetention of Plaintiffs. Plaintiffs present evidence that, via the billing process by which ECPSO was paid by DOC for housing DOC inmates, ECPSO was aware of the instances where a prisoner was present at River Bend but not "showing up" in the DOC system. Per Plaintiffs, overdetention was the "predictable result" of ECPSO detaining prisoners even when they knew "that DOC-sentenced prisoners had not been processed by DPS&C such that their time would be calculated and their releases issued."[84] Of course, ECPSO could and arguably should have alerted DOC when they learned a prisoner in their custody had not been processed by DOC. But Plaintiffs also repeatedly argue that the parish of conviction (not the parish of detention) is responsible for providing notice to the DOC. Plaintiffs explain: the DOC "pre-classification department receives notification of a newly-sentenced DOC prisoner by the receipt (by paper copy, e-mail, or fax) of a 'packet' from the Sheriff's Office of the parish of conviction."[85] Elsewhere, Plaintiffs again note that "the parish of conviction is responsible for providing certain paperwork and documentation to the DPS&C so that the person's time calculation can be completed and his release issued. Multiple state statutory provisions govern this obligation of the OPSO Defendants."[86]

So, even if ECPSO had followed its own policy and collected the requisite documentation for prisoners that it accepted into its River Bend facility, it is not clear from the record that their *possession* of those documents would have avoided the overdetention of Plaintiffs. And Plaintiffs' argument for official capacity liability centers

---

[84] Rec. Doc. No. 111-1, p. 41.
[85] *Id.* at p. 47.
[86] *Id.* at p. 24.
59792

around just that – their failure to obtain the documents. It does not elude the Court that the parties in this case at times seek to avoid liability by pointing the finger at one another, arguing that, although their actions may have been flawed, they were not ultimately responsible for the alleged Constitutional violations. Nevertheless, as irresponsible as ECPSO's practices may have been, material fact issues surrounding the communication between DOC, Orleans, and East Carroll Parish prevent the Court from concluding that those practices were the moving force behind Plaintiffs' overdetention. More importantly, the Court finds that the issue of which agency's, or combination of agencies', conduct was the moving force behind the alleged violations calls for significant credibility determinations and weighing of evidence, making this issue inappropriate for resolution on summary judgment. Therefore, Plaintiffs' *Motion for Partial Summary Judgment* is denied with respect to the official capacity claims against ECPSO. Likewise, the ECPSO Defendants' *Motion for Summary Judgment* on the official capacity claims against them is denied, for the same reasons, as discussed more fully below.

### D. Individual Capacity Claims Under 42 U.S.C. § 1983

    *i. Whether Plaintiffs' Claims are Barred by Heck v. Humphrey[87]*

  In their respective *Motions* and *Oppositions*, all Defendants argue that Plaintiffs' claims are barred by the doctrine announced by the Supreme Court in *Heck v. Humphrey*. Under *Heck*, a § 1983 claim for damages cannot directly attack the constitutionality of a conviction, imprisonment, or other harm caused by unlawful actions unless that conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared

---

[87] 512 U.S. 477.
59792

invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus."[88]   Defendants argue that because Plaintiffs have not provided evidence showing that any of the above is the case, *Heck* stands as a bar to their suit.

Plaintiffs, on the other hand, claim, and the Court agrees, that *Heck* does not apply. Plaintiffs emphasize that they "do not dispute how long they should have been imprisoned or challenge that their calculated release dates were invalid."[89] Their claim that "Defendants failed in their duties to effect the Plaintiffs' release when the legally-mandated period of detention had expired"[90] does not, they argue, imply the invalidity of their convictions or sentences. The Court agrees.

There is ample precedent within the Fifth Circuit for a finding that *Heck* does not bar the claims in the instant case. Indeed, this Court rejected the same argument when raised by the defendants in *Thomas v. Gryder*,[91] a 2019 case where the plaintiff claimed that "he was illegally imprisoned for 589 days past the end of his actual sentence."[92] There, the Court explained:

> The "favorable termination" requirement of *Heck* prohibits a criminal defendant's collateral attack on the defendant's conviction or sentence.[93]   Here, however, Plaintiff does not seek to collaterally attack either his conviction or his sentence. Instead, all parties agree that on January 23, 2013, Plaintiff pleaded guilty in Orleans Criminal District Court and was sentenced as follows: (1) Count 1: sexual malfeasance in prison – five years; (2) Count 2: sexual battery – two

---

[88] *See Hudson v. Hughes*, 98 F.3d 868, 872 (5th Cir.1996) (quoting *Heck*, 512 U.S. at 487) (internal quotations omitted).
[89] Rec. Doc. No. 144, p. 5.
[90] *Id.*
[91] 2019 WL 5790351 (M.D. La. Nov. 6, 2019).
[92] *Id.* at *1.
[93] *Id.* at *5 (citing *Heck*, 512 U.S. at 484-485 ("This Court has long expressed similar concerns for finality and consistency and has generally declined to expand opportunities for collateral attack.")).
59792

years; and (3) Count 3: second degree kidnapping – five years.[94] The parties further agree that Plaintiff's correct release date was June 5, 2015.[95] Nothing in the instant action would invalidate either Plaintiff's conviction or sentence[96] . . . Accordingly, the Court finds that Plaintiff's claims are not *Heck* barred.[97]

The district court for the Eastern District of Louisiana reached the same conclusion in *Traweek v. Gusman*,[98] where the plaintiff alleged that he was held in Orleans Parish Prison for twenty days beyond the date he was eligible for release under his time-served sentence. The Eastern District sharply rejected the defendants' argument that Traweek's claims were *Heck*-barred:

> By seeking to impose the *Heck* procedural bar to Mr. Traweek's claims, the defendants emphasize form over substance, begin from a faulty assumption, and ignore a critical component of *Heck* that is absent here. If Mr. Traweek succeeds on the merits, neither his underlying conviction for aggravated battery nor his seven-month sentence will be impliedly invalidated. Here, Mr. Traweek challenges neither his conviction nor his sentence. He accepts both. Therefore, the reasoning underlying Heck's favorable termination prerequisite is simply not implicated: it would be illogical to require Mr. Traweek to first seek to invalidate his conviction or sentence in order to proceed in this lawsuit. The constitutional violation he advances here is that he was imprisoned 20 days past his release date; he does not take issue with his criminal judgment of conviction or the sentence rendered, but, rather, challenges the constitutionality of the administration of his release after he had served his sentence. Mr.

---

[94] 2019 WL 5790351 at *5 (citing R. Doc. 62-1, p. 1).
[95] *Id.* (citing *supra*, n. 22).
[96] *Id.* (citing *e.g., Chappelle v. Varano*, 4:11-cv-00304, 2013 WL 5876173, at * 13 (M.D. Pa. Oct. 30, 2013) (plaintiff's § 1983 action for damages where parole board recalculated plaintiff's maximum sentence to be July 14, 2009 and defendants released plaintiff on either July 30 or 31, 2009 was not barred by *Heck* because "the Plaintiff does not dispute the validity of his conviction or his corresponding sentence at all. The conflict centers on the amount of time he was held in excess of his valid conviction and sentence. The disputed period of confinement is both temporally and legally separate from the Plaintiff's actual conviction and sentence. A finding for Plaintiff under § 1983 based on the period he was held beyond his original sentence would not imply the invalidity of the conviction or sentence, and therefore does not trigger the application of the favorable termination rule.") (internal citation omitted); *Griffin v. Allegheny County Prison*, Civil Action No. 17-1580, 2018 WL 6413156, at *4 (W.D. Pa. Nov. 5, 2018) (same)).
[97] *Gryder*, 2019 WL 5790351 at *3-4.
[98] *Traweek v. Gusman*, No. CV 19-1384, 2019 WL 5430590 (E.D. La. Oct. 23, 2019)(internal citations omitted).
59792

> Traweek alleges that his jailers failed to timely release him once the legal basis to incarcerate him had expired by court order.[99]

In this case, Plaintiffs' *Statement of Uncontested Material Facts* makes clear that they admit to their underlying convictions and do not dispute the sentences they received.[100] At issue is the time they allegedly served *beyond their sentence.* This Court finds, as in the cases cited above, that such claims do not run afoul of *Heck's* prohibition on collateral attacks of a plaintiff's conviction and sentence. Heck is neither a bar to the suit nor a defense to the Plaintiffs' *Motion for Summary Judgment*. Therefore, the *Motions for Summary Judgment* by the OPSO Defendants, ECPSO Defendants, and DPS&C Defendants[101] shall be DENIED as to their arguments that Plaintiffs' claims are barred by *Heck*.

### ii. Individual Capacity Claims Against DPS&C Defendants

Plaintiffs argue that Defendants LeBlanc and Stagg are liable as supervisors in their individual capacities for their "failure to implement policies to ensure timely release of prisoners committed to DPS&C."[102] Specifically, they seek to hold LeBlanc and Stagg liable for not making changes to the Basic Jail Guidelines, which govern the parish prisons holding inmates on behalf of DOC, to ensure that sheriffs' offices provide documentation to DOC. For example, Plaintiffs argue, LeBlanc and Stagg "could have issued regulations establishing a specific timeline for Defendants Williams and Gusman, and all other Sheriffs holding DOC-sentenced prisoners, to send the pre-classification packets to

---

[99] *Traweek*, 2019 WL 5430590 at *5.
[100] *See* Rec. Doc. No. 111-2.
[101] Rec. Doc. Nos. 104, 102, and 110, respectively.
[102] Rec. Doc. No. 111-1, p. 59.
59792

DPS&C."[103] Plaintiffs maintain that the Defendants' failure to implement a deadline for pre-classification packets amounts to deliberate indifference in light of what Defendants already knew based on a 2012 study which found, among other deficiencies, that "DPS&C was failing to timely release over two thousand DOC-sentenced prisoners per year, by an average of 71 days' overdetention per prisoner."[104] Additionally, Plaintiffs assert that Defendants Stagg and Griffin "could have employed simple measures which would have brought to their attention that a DOC-sentenced prisoner was in a parish jail without having been pre-classified."[105]

The DPS&C Defendants assert that they are entitled to qualified immunity. Specifically, they argue that there has been no showing that they acted with deliberate indifference; in fact, they argue, "the record reflects that throughout the month of December, the DOC remained in communication with Orleans Parish, who represented on separate occasions that paperwork for DOC offenders housed in Riverbend would be forthcoming."[106] Even if they did act with deliberate indifference, they argue, they are entitled to qualified immunity because "it is not clearly established that the reliance on other entities (such as a Sheriff) to provide the necessary paperwork is objectively unreasonable."[107] As will be discussed below, the Court is not persuaded that the right is so narrowly defined.

In *Saucier v. Katz*, the Supreme Court set forth a two-part framework for analyzing

---

[103] Rec. Doc. No. 111-1, p. 57.
[104] *Id.* at p. 59.
[105] *Id.* at p. 60.
[106] Rec. Doc. No. 141, p. 10.
[107] *Id.* at p. 22.

59792

whether a defendant was entitled to qualified immunity.[108] Part one asks the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[109] Part two asks whether the allegedly violated right is "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[92] A court need not address these two questions sequentially; it can proceed with either inquiry first.[110] "If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'"[111] Officials "who reasonably but mistakenly commit a constitutional violation are entitled to immunity."[112]

The Fifth Circuit in *Porter v. Epps* instructs that there is a clearly established right to timely release from prison.[113] There can be no serious dispute on this point. The DPS&C Defendants contend, however, that "*Porter* does not clearly establish that prison employees, ultimately responsible for completing the time computation of parish offenders, act objectively unreasonable by not calculating an offender's release in the absence of the necessary paperwork."[114] DPS&C re-frames the question arguing that although there is a clearly established obligation to release inmates timely, that neglect

---

[108] *Saucier v. Katz*, 533 U.S. 194 (2001).
[109] *Id.* at 201.
[110] *See Pearson*, 555 U.S. at 236 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."); *see also Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014).
[111] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)).
[112] *Williams*, 180 F.3d at 703 .
[113] *Porter v. Epps,* 659 F.3d 440, 445 (5th Cir. 2011).
[114] Rec. Doc. No. 141, p. 23.
59792

by another agency in the completion of paperwork somehow excuses this obligation. The right to timely release is utterly meaningless without an attendant obligation on the jailer to effectuate that timely release.[115] Defendants complain that "DOC cannot process paperwork it does not have."[116] But Plaintiffs do not suggest it was unreasonable, or deliberately indifferent, for Defendants to wait until they had the necessary paperwork to calculate their sentences. What they argue is that Defendants were unreasonable and deliberately indifferent insofar as they failed to put in place policies that would ensure their receipt of the necessary paperwork in a timely fashion which would protect and give meaning to the plaintiff's clearly established right to timely release. The Court agrees.

Liability for failure to promulgate policy requires a showing of deliberate indifference on the part of Defendants.[117] As to Plaintiffs' first policy claim, which argues that Defendants LeBlanc and Stagg are liable for not implementing a timeline or deadline for Sheriffs to provide pre-classification paperwork to DOC, the Court concludes that the DPS&C Defendants are not entitled to qualified immunity because Plaintiffs have demonstrated that Defendants acted with deliberate indifference and that their actions were objectively unreasonable in light of the clearly established right to timely release.

In large part, Plaintiffs center their argument for deliberate indifference around Defendants' awareness of a 2012 study[118] that revealed significant deficiencies in DOC's processes resulting in widespread overdetention. The record evidence establishes that

---

[115] *Porter*, 659 F.3d at 445. ("There is a clearly established right to timely release from prison" and "a jailer has a duty to ensure that inmates are timely released...").
[116] Rec. Doc. 111-1 p. 22.
[117] *Id.* at p. 446 ("Liability for failure to promulgate policy and failure to train or supervise both require that the defendant have acted with deliberate indifference.").
[118] The "Lean Six Sigma 2012 PreClassification" study (hereinafter "LSS" or "LSS study").
59792

the DPS&C Defendants were aware of the LSS study. While the LSS study results did not specifically identify the problem of over detention at River Bend *per se*,[119] there is ample evidence that the DPS&C Defendants knew there were significant issues with respect to over detention. Plaintiffs summarized the results of the LSS Study in their *Motion for Partial Summary Judgment*:

> According to the study, DPS&C encountered 2252 immediate releases annually, with prisoners being held beyond their release date for an average of 71 days. As of January 2012, there was a backlog of 1,446 prisoners who did not have their time computed; it took on average 110 days for DPS&C to conduct time calculation for prisoners after sentencing; and there was an 83.44% occurrence of an "immediate release" upon processing a prisoner's time calculation. Thus, according to the LSS study, "once time was calculated 83 percent of the cases were due for immediate release either because the release date had passed or it was within ten days."[120]

Further, Angela Griffin, the administrative director of pre-classification for DOC, testified at her deposition that DOC was aware of the issue with overdetention and immediate releases, and that the problem continued even after changes were put in place following the LSS Study:

> Q: And so am I correct in understanding that the Department of Corrections knew at the time of this study that one of the consequences of the delays in time computation was that prisoners were at risk for release beyond their due dates?
> A. Correct.
> Q. And am I correct based on the slides that we reviewed in this presentation that even with the various pilot programs and changes in processes that were part of this study, immediate releases continued?
> A. Yes. We still have immediate releases.[121]

---

[119] Rec. Doc. No. 111-1, p. 55.
[120] *Id.* at p. 53 (citing Rec. Doc. No. 111-29).
[121] Rec. Doc. No. 111-8, p. 111-112.
59792

Specifically, Plaintiffs seek to hold Defendants accountable for their failure "to include a deadline for the submission of pre-classification packets in the Basic Jail Guidelines, so that Sheriffs could be penalized with the loss of DPS&C income if pre-classification packets were not consistently sent by a particular deadline."[122] Defendants point out that such a measure would not necessarily have affected any improvement, given that Sheriffs were *already* failing to comply with the provisions of the Basic Jail Guidelines, and there is no reason to believe that a change in the Guidelines would have changed their behavior. But, both Secretary LeBlanc and Defendant Stagg testified in their depositions that they were familiar with a proposal by the legislative auditor that such a deadline be implemented, and both men expressed approval for the idea.[123] In fact, when Secretary LeBlanc was asked at his deposition if it has "ever been considered to include a timeframe for the submission of these materials to DOC," he responded: "Not that I'm aware of, but **there's no reason why we couldn't**. **I mean, I'm not sure why we don't, to be honest with you**."[124] Secretary LeBlanc added: "I'm not sure that we could enforce it to begin with, but we could certainly, at least, make an attempt."[125] The DPS&C's argument is that since there is no assurance that responsive measures would work, hence the failure to adopt responsive measures is not deliberate indifference. By this logic, a plea of perceived futility owing to the apathy of another would defeat a finding of deliberate indifference. This Court is aware of now jurisprudence which supports this

---

[122] Rec. Doc. No. 111-1, p. 59.

[123] *See* Rec. Doc. No. 111-21, p. 54 (Stagg testified that a deadline "was intended to be a procedure that we put in place"); Rec. Doc. No. 111-19, p. 77 (LeBlanc).

[124] Rec. Doc. No. 111-19, p. 70, lines 18-23 (emphasis added).

[125] *Id.* at p. 70-71, lines 25, 1-2.

59792

notion. The term "indifference" refers to a lack of interest, concern, or sympathy.[126] It refers to the state of mind of the actor, not, as the DPS&C suggests, the apathetic the state of mind another.  It is no excuse not to discipline the child because the parent fears the child will not heed.

Secretary LeBlanc's somewhat coy statements underplay DOC's role. Louisiana law is clear that, no matter where State inmates are physically housed, they are legally in the custody of the DOC. The plaintiffs in this case were sentenced by State District Judges for violations of State penal codes. The plaintiffs were State prisoners. Louisiana Revised Statute §15:1824(A) states that "any individual subject to confinement in a state adult penal or correctional institution shall be committed to the Department of Public Safety and Corrections and not to any particular institution within the jurisdiction of the department." Under the law, DOC has the authority to "enter into a contract with a law enforcement district, municipal, or parish governing authority to house additional prisoners."[127] The proverbial buck stops with the DOC. While the established process and workflow was such that DOC relied upon the parishes of conviction to send pre-classification packets, DOC cannot simply passively wait around for the packets to be sent. DOC compensates local Sheriffs for holding DOC-sentenced inmates; surely that money could be made to talk, whether in the form of fines for later pre-classification packets, refusal to house inmates in non-compliant parishes, or some other measure. At the end of the day, DOC was the jailer of Plaintiffs, and the Fifth Circuit has found that "'[w]hile not a surety for the legal correctness of a prisoner's commitment, [a jailer] is most certainly under an

---

[126] The "absence of compulsion to or toward one thing or another". "Indifference," *Meriam-Webter.com* (available at https://www.merriam-webster.com/dictionary/indifference).
[127] LA. REV. STAT. § 15:824(D).
59792

obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release.'"[128]

      To be sure, deliberate indifference is a high bar; the Fifth Circuit has held that "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity."[129] But the DPS&C Defendants fail to show that their failure to implement a deadline for the production of pre-classification packets by the Sheriffs was anything but deliberately indifferent. Their own testimony establishes that there is "no reason" why they couldn't implement such a policy, and the Secretary of the Department testified that he is "not sure why [they] don't."[130] In light of the clearly established right to timely release and Defendants' demonstrated awareness of overdetention issues in their system, Defendants' failure to implement a deadline, even after such a policy was suggested to them, clearly demonstrates that they were aware of the consequences of their failure to act and disregarded them.  The measures that DPS&C Defendants state they have taken in response to the LSS Study, including providing "training to the Sheriff's Association relating to pre-classification paperwork, which included training on what paperwork to send to DPS&C,"[131] are woefully inadequate in light of the clearly established right to timely release and the scope of overdetention revealed by the Study. Asked whether Sheriffs generally attempt to comply with changes to the Basic Jail Guidelines, LeBlanc stated, "Some of them do; some of them don't. But usually we work

---

[128] *Porter*, 659 F.3d at 445 (citing *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1969)).
[129] *Whitley v. Hanna*, 726 F.3d 631, 643 (5th Cir. 2013).
[130] Rec. Doc. No. 111-19, p. 70, lines 18-23.
[131] Rec. Doc. No. 141, p. 21.
59792

with them, and we get them in compliance. And that happens on a fairly regular basis. I mean, we do it, I think it's once every 6 months, once a year, depending on what the issues are."[132] One or two meetings per year is not a proportional response to the recurring and widespread Constitutional violations uncovered by the LSS Study.

Stagg testified that the issue with receiving pre-classification paperwork was limited to Orleans Parish and "we didn't really have a problem with collecting this data from 63 other jurisdictions."[133] He emphasized: "we didn't have that problem [failure to prepare and transmit pre-classification paperwork] except with this one jurisdiction. And I don't know we had that problem before with this jurisdiction until this particular case came up, these particular individuals."[134] Stagg frames the issue in an overly narrow fashion. DOC was alerted to systemic overdetention in 2012. The failure of Orleans to prepare and transmit pre-classification packets is merely a subset of the larger problem of unconstitutional overdetention. Given proof of the DOC's actual knowledge of widespread over-detention in 2012, it was deliberately indifferent to the clearly established right of timely release, for the DOC to fail to inquire further, identify this subset cause of the constitutional violations, and failure to take steps to remedy the violations of this clearly established right. The fact that this exact problem with pre-classification packets was allegedly limited to Orleans Parish, as Stagg suggests, does not absolve the DPS&C Defendants of their duty to ensure a timely release for prisoners convicted and sentenced there. A clearly established constitutional right to timely release gives rise to a clearly established duty on the part of the jailer to affect that release. The Fifth Circuit has held

---

[132] Rec. Doc. No. 111-19, p. 71, lines 3-10.
[133] *Id.* at p. 47, lines 10-11.
[134] *Id.* at p. 50, lines 11-15.
59792

that, in cases "where there is no discretion and relatively little time pressure, the jailer will be held to a high level of reasonableness as to his own actions."[135] Moreover, the court explained, "If [the jailer] negligently establishes a record keeping system in which errors of this kind are likely, he will be held liable."[136] It is clear from the evidence adduced by Plaintiffs that "errors of this kind" are inherently likely in the existing DOC system. The Court concludes that Defendants LeBlanc and Stagg are not entitled to qualified immunity on the individual capacity claims against them for failing discern the failures which caused known violations of the clearly established right and for their failure to implement a policy to rectify the failure, such as requiring a specific timeline for the submission of pre-classification documents to DOC.

In their second claim, Plaintiffs argue that DPS&C Defendants Stagg and Griffin are individually liable because they "failed to institute policies which would have given the pre-classification department notice of DOC-sentenced prisoners who had not been pre-classified."[137] Specifically, Plaintiffs argue that Defendants acted with deliberate indifference for not "instructing pre-classification staff and transfer staff to communicate with each other about incomplete CAJUN[138] entries; requiring pre-classification staff and transfer staff to check the CAJUN system for newly-sentenced DOC prisoners without release dates; and closely monitoring parishes which provided untimely pre-classification packets on a regular basis."[139] Based on the evidence in the record and the applicable law, the Court concludes that, for the same reasons described above with respect to the

---

[135] *Bryan v. Jones*, 530 F.2d 1210, 1215 (5th Cir. 1976).
[136] *Id.*
[137] Rec. Doc. No. 111-1, p. 60.
[138] CAJUN (Corrections and Justice Unified Network) is the tracking software used by DOC.
[139] Rec. Doc. No. 111-1, p. 60.
59792

"deadline" claim, Plaintiff's have come forward with evidence that Defendants Stagg and Griffin were deliberately indifferent in failing to implement policies that would increase the likelihood of DOC becoming aware of prisoners who had not been pre-classified, and thereby protecting the right to be timely released.

In his deposition testimony, Stagg distanced himself from the nuts and bolts of the pre-classification process, stating, "I never recognized a place where we could focus any single point of attention to try to improve the process, because the people know what they're doing, the ones that are trained. They know what they're doing. They do a good job at it. It's just a matter of having the information to do the job with."[140] Stagg described Defendant Angela Griffin as the "director of preclass."[141] Griffin was deposed in connection with this case, along with Angela Smith, a former DOC employee in the pre-classification department. Their testimony and the associated evidence in the record reveal severe deficiencies in the pre-classification process.

The testimony that Plaintiffs highlight in an attempt to show deliberate indifference from Griffin and Smith's depositions establishes that there are serious flaws in the internal DOC process. For example, Smith testified that the transfer department was separate from the pre-classification department and that there was no system in place for the transfer department of a newly-sentenced DOC inmate;[142] that the pre-classification department does not regularly check DOC's CAJUN program to identify new DOC inmates;[143] and that the pre-classification department "didn't track" whether it had

---

[140] Rec. Doc. No. 111-21, p. 76.
[141] *Id.* at p. 18, line 10.
[142] Rec. Doc. No. 111-32, p. 121, lines 3-18.
[143] *Id.* at p. 78, lines 2-18.
59792

"become a habit for a local parish to send in their packets a long time after sentencing."[144]

Angela Smith, a former specialist in the pre-classification department at DOC, testified in her deposition that the parish of conviction was responsible for sending pre-classification documents to DOC but that there was no deadline to do so and thus, the pre-classification paperwork could never be "late," *per se*.[145] She testified that if "it became a habit" for a particular parish to be slow in sending pre-classification information

> I guess it would be brought up, but if it was one case -- you know, if we have 15 packets that were going through, and there's one case in there that the offender has been sentenced for 6 months, and we're just now getting his paperwork, I don't think -- I would not have notified anyone unless we received a large, you know, so many packets. If it became an extreme situation, I would think at that point we would bring it to somebody's attention.[146]

In other words, until the obvious possibility of overdetention became an "extreme situation" involving multiple prisoners, DPS&C employees would not raise the issue of late pre-classification packets. Likewise, when asked what DOC's process was for determining whether any newly-sentenced DOC inmates who needed to be processed, Smith answered: "our only process was waiting for that preclass, because we had no way of knowing, without receiving that paperwork, that an offender had been sentenced to the Department of Corrections."[147] Plaintiffs' counsel asked Smith:

> Q. And I guess my question, then, is: If a local parish somehow lost or didn't send in the preclassification paperwork for a newly sentenced DOC inmate, this inmate could sit at that local parish serving their Department of Corrections sentence indefinitely, unless the inmate or their family made a phone call to the Department of Corrections alerting you that there was a delay in time calculation?
> A. Yes.

---

[144] Rec. Doc. No. 111-32, p. 75, lines 7-11.
[145] *Id.* at p. 73.
[146] *Id.* at p. 75.
[147] *Id.* at p. 77, lines 12-16.

59792

Q. And so if preclassification paperwork is not received by the Department of Corrections, there's no check mechanism to make sure that no inmate sentenced to the Department of Corrections are in existence that you are not performing preclassification and time calculation for?

A. Right. If we're not aware of the offender being sentenced to the Department of Corrections, we don't know he's out there until we receive that paperwork.[148]

None of those facts testified to by Griffin and Smith and are disputed. The state of affairs at the DOC, where DOC's staff were passive and essentially flying blind unless contacted by a concerned family member, evinces a reckless disregard for the likelihood of overdetention in the DOC system. "The Fifth Circuit has recognized that a jailer is 'under relatively little time pressure' and 'has the means, freedom, and the duty to make necessary inquiries.'"[149] The DPS&C Defendants' failure to make the inquiries or implement the policies that would reduce overdetention was objectively unreasonable.

For the same reasons discussed above with respect to the failure to implement a deadline for Sheriffs to transmit pre-classification packets, the Court finds that Defendants' failure to put in place simple processes that would have revealed inmates who were serving time without being pre-classified amounted to deliberate indifference. Plaintiffs have demonstrated that Stagg and Griffin were deliberately indifferent to the clearly established right of timely release by their failure to implement reforms to the pre-classification process.

Lastly, Plaintiffs move for summary judgment on their individual liability claim against the DPS&C Defendants for their direct participation in the acts giving rise to the

---

[148] Rec. Doc. No. 111-32, p. 80-81.
[149] *Gryder*, No. 17-1595-EWD, 2019 WL 5790351 at *7 (M.D. La. Nov. 6, 2019)(quoting *Douthit v. Jones*, 619 F.2d 527, 535 (5th Cir. 1980).

59792

alleged Constitutional violations, namely, the overdetention of Plaintiffs. Plaintiffs fail to establish that the actions of the DPS&C Defendants after the so-called "River Bend fiasco" was discovered were the moving force behind the alleged Constitutional violations. The evidence in the record demonstrates that after they became aware of the issue, Defendants communicated with the relevant parties to obtain the necessary paperwork, calculate a release date, and release the Plaintiffs. The evidence in the record reflects that each of the Plaintiffs was released the day of or the day after the DPS&C Defendants received the pre-classification paperwork necessary to calculate Plaintiffs' release date:

- DPS&C received the letter of credit for Plaintiff Crittindon on January 12, 2017,[150] and it is not disputed that he was released on January 13, 2017.

- DPS&C received paperwork pertaining to Plaintiff Burse on January 9, 2017, after Angela Griffin asked Corey Amacker to send it over email.[151] Burse was released on January 10, 2017.

- DPS&C received Plaintiff Copelin's documentation was received by Angela Griffin on January 13, 2017[152] and he was released the same day.

- DPS&C received Plaintiff Guidry's paperwork on January 24, 2017[153] and he was released the same day.

Plaintiffs have not shown that Defendants' individual actions after the specific overdetentions were brought to their attention was the moving force behind the alleged violations, Plaintiffs' *Motion for Partial Summary Judgment* is denied as to the individual

---

[150] Rec. Doc. No. 110-12, pp. 19-20.
[151] Rec. Doc. No. 110-8, pp. 18-19.
[152] Rec. Doc. No. 110-9, pp. 1-2.
[153] Rec. Doc. No. 110-10, p. 5.
59792

capacity claims against the DPS&C Defendants for their direct participation in the events giving rise to this case.

### iii. Individual Capacity Claims Against ECPSO Defendants

The ECPSO Defendants contend that the individual capacity claims against them should be dismissed because the overdetention of Plaintiffs "was through no fault of these defendants, who only learned of the issue much later."[154] Bafflingly, the ECPSO Defendants note that Sheriff Williams learned of the overdetention "when he was contacted by the news media," while Wardens Hedgemon and Knight "learned of it when [they] saw it on the television,"[155] as if this information constitutes proof that they are not liable. The ostrich defense is no defense.

The  remainder of the ECPSO Defendants' argument consists of pointing the finger at DPS&C, which, they argue, "is the only actor with the ability to calculate release dates for DPS&C sentenced inmates and the authority to grant them release."[156] As persuasive as that argument may be, it is not responsive to the actual claim against the ECPSO Defendants, which is that they are liable for routinely accepting prisoners into the River Bend facility without legal documentation of their right to detain them. The ECPSO Defendants offer that "[t]here was some question as to whether the ECPSO Defendants were entering the plaintiffs' sentencing information incorrectly into the AFIS system and whether this may have contributed to the plaintiffs' over-detention."[157] In advancing this argument ECPSO demonstrates a material issue fact suggestive of ECPSO's liability.

---

[154] Rec. Doc. No. 102-1, p. 7.
[155] *Id.* at p. 7 n.6.
[156] *Id.* at p. 8.
[157] *Id.* at p. 9.
59792

The ECPSO Defendants have not demonstrated that they are entitled to summary dismissal of the individual capacity claims against them.

On cross-motion, the ECPSO Defendants also invoke the doctrine of qualified immunity, arguing that their actions were reasonable because "they had every reason to believe that they had no duty to forward any paperwork to DPS&C."[158] Again, the ECPSO Defendants miss the mark by arguing against a straw man claim; Plaintiffs do not claim that ECPSO is liable for failing to forward paperwork. The claim is that ECPSO jailed people without having proper legal documentation confirmed its legal right to do so.

In any event, the ECPSO Defendants are not entitled to qualified immunity because Plaintiffs evince evidence that they were aware that they were detaining inmates at River Bend who had not been pre-classified by DOC – in fact, they were detaining inmates that DOC did not even know existed. The deposition testimony of Laura Sevier, the ECPSO employee who prepares invoices so that ECPSO can receive payment for housing prisoners at River Bend, established that Sevier, who reported to Defendants Hedgemon and Knight and whose invoices were signed off on by Sheriff Williams, was regularly identifying "discrepancies" in the prisoner list maintained by ECPSO versus the DOC prisoner list. Specifically, Sevier's invoices revealed that inmates who appeared on ECPSO's list of the prisoners physically present at River Bend contained individuals who did not appear on DOC's list. Calling this a "discrepancy" seems an egregious understatement. The clear import of this is that the ECPSO was jailing persons whom were not identified by the DOC as being subject to state custody. Despite that

---

[158] Rec. Doc. No. 102-1, p. 14.

59792

"discrepancy," the record evidence demonstrates that neither Sevier nor anyone at ECPSO flagged these individuals for DOC. ECPSO never inquired or verified whether these individuals were rightly or lawfully subject to incarceration. Sevier testified that she would simply "disallow"[159] the inmates who did not appear on DOC's CAJUN invoice so that ECPSO's invoice, causing them to appear as having spent "zero days"[160] at River Bend during that billing period, and proceed with obtaining reimbursement. Then, "sometime during the next six months," she would "go in to try to determine why he was not on the CAJUN invoice."[161] In other words, ECPSO would routinely hold individuals at River Bend, knowing that they had not been processed by DOC, for up to three months before even beginning the process of investigating why they were not "showing up" in DOC's system. Even if the responsibility of calculating sentences ultimately lies with DOC, as the ECPSO Defendants repeatedly insist, their actions, or failure to act, evidences a reckless disregard for and deliberate indifference toward the constitutional rights of the inmates in their facility. As Plaintiffs note, the Fifth Circuit has looked down upon the type of argument asserted by the ECPSO Defendants. In *Whirl v. Kern*, the Fifth Circuit stated:

> We do not find any cases nor are we referred to any by counsel which provide that 'good faith' is a defense to an imprisonment that is not only without valid process, but contrary to it. Nor do we believe as a matter of federal policy that such a defense should be available to a jailer in circumstances like those before us. The responsibility for a failure of communication between the courts and the jailhouse cannot justifiably be placed on the head of a man immured in a lockup when the action of the court has become a matter of public record. Ignorance and alibis by a jailer should not vitiate the rights of a man entitled to his freedom. A jailer, unlike a policeman, acts at his leisure. He is not subject to the stresses and split second decisions of an arresting officer, and his acts in discharging a prisoner are

---

[159] Rec. Doc. No. 111-29, p. 43.
[160] *Id.*
[161] *Id.* at pp. 45-50.
59792

> purely ministerial. Moreover, unlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries.[162]

The record evidence demonstrates that the ECPSO Defendants were not only accepting prisoners into their facility without documentation but failing to take any action when their own processes revealed that they were detaining individuals of whom DOC was completely unaware. The obvious consequence of such conduct is an increased risk of overdetention. Arguably, detaining an individual not reflected by the DOC as a state inmate is an *ipso facto* overdetention. Furthermore, the deposition testimony of Wardens Hedgemon and Knight, discussed *supra* in the section on official capacity claims, reveals that they were aware of prisoners coming to their facility without being properly documented, and that their response was, in the words of Warden Hedgemon, to "take many parishes' words"[163] that the men in their physical custody were not actually entitled to immediate release.

Additionally, the record evidence demonstrates that the ECPSO Defendants were accepting inmates in violation of their own internal policy, Policy No. 17-14, which was issued by the ECPSO on September 15, 2012.[164] The Policy requires that when a prisoner is booked into River Bend, ECPSO must collection information regarding the inmates "duration of confinement, and a copy of the court order or other legal basis for commitment."[165] Sheriff Williams testified that Warden Hedgemon and his staff were responsible for ensuring that the information required by the Policy was actually collected

---

[162] *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968).
[163] *Id.*
[164] Rec. Doc. No. 111-24.
[165] *Id.*
59792

at intake.[166] Yet, when presented with a copy of the policy to review during his deposition, Warden Hedgemon stated, "I've never seen it before."[167] Overall, the Court finds that the ECPSO Defendants' actions and omissions were objectively unreasonable in light of the clearly established right to a timely release. Accordingly, the ECPSO Defendants' *Motion for Summary Judgment* is denied with respect to the individual capacity claims against them.

### iv.   Individual Capacity Claims Against the OPSO Defendants

The OPSO Defendants also argue that the individual capacity claims against them fail because they are shielded by qualified immunity. The Court disagrees. The OPSO Defendants first contend that they are entitled to qualified immunity in their individual capacities because the constitutional rights in question were not clearly established. Specifically, Defendants complain that Plaintiffs discuss their rights with an unfairly high level of generality to create the impression of a clearly established right where, they argue, none exists. Plaintiffs characterize the relevant right as the right to timely release from prison,[168] which the Fifth Circuit in *Porter v. Epps* unambiguously held to be clearly established.[169] Gusman and Amacker posit that the relevant right is *actually* the right of Plaintiffs "to have their post-sentencing packets completed and transmitted to DPS&C by the Sheriff."[170] Per the OPSO Defendants, that right has not been established under the law. The OPSO's attempt to reframe and narrowly define the issue is disingenuous. The

---

[166] Rec. Doc. No. 111-16, p. 33.
[167] Rec. Doc. No. 111-26, p. 67.
[168] Rec. Doc. No. 144, p. 36.
[169] 659 F.3d at 445.
[170] Rec. Doc. No. 104-1, p. 12.
59792

completion of the sentencing packets *protects* the clearly established constitutional right, it does not *define* the right.

The Court agrees with Plaintiffs. Defendants cite no authority for the proposition that this right is overly general in the context of this case. Moreover, the Court finds their proposed language – the right "to have their post-sentencing packets completed and transmitted to DPS&C by the Sheriff"[171] – odd. Although it is true that the inquiry into whether a right is clearly established is to be undertaken at a specific, not a general level, the OPSO Defendants provide the Court with no authority for the proposition that a constitutional right need be articulated with reference to specific DPS&C documents in order to be sufficiently specific. The right "to have their post-sentencing packets completed and transmitted to DPS&C by the Sheriff"[172] is, practically speaking, synonymous with the "right to timely release from prison."

The Fifth Circuit has spoken to this issue repeatedly. In *Porter v. Epps*, it held that there is a clearly established right to timely release from prison.[173] The *Porter* court reviewed previous Fifth Circuit cases on the issue, including the 1968 case *Whirl v. Kern*, where it held that a jailer "is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also the duty to effect his timely release."[174] Therefore, the Court concludes for purposes of the qualified immunity analysis that the right to timely release from prison

---

[171] Rec. Doc. No. 104-1, p. 12.
[172] *Id.* at p. 12.
[173] 659 F.3d 440.
[174] 407 F.2d 781, 792 (5th Cir. 1969).
59792

is the relevant right and that it was clearly established at the time of the events giving rise to this case.

Having found that Plaintiffs enjoyed a clearly established right, the Court turns to the question of whether Sheriff Gusman and Deputy Amacker's conduct was objectively reasonable. "Even if an official's conduct violates a constitutional right, he is entitled to qualified immunity if the conduct was objectively reasonable."[175] Plaintiffs bear the burden of showing that the OPSO Defendants' conduct was not objectively reasonable.[176] Based on the evidence in the record, the Court concludes that the OPSO Defendants are not entitled to qualified immunity because their actions were objectively unreasonable.

Sheriff Gusman argues that his actions could not possibly have been unreasonable, for the simple reason that "[t]here is no evidence that Sheriff Gusman took any action in this matter."[177] The fact that Gusman took no action is exactly what Plaintiffs claim is unreasonable. Specifically, Plaintiffs point to Gusman's "authorization of the OPSO practice of 'releasing'[178] DOC-sentenced prisoners to another local jail facility, without providing pre-classification documents or transfer notification to DPS&C"[179] and "his failure to supervise subordinate OPSO staff, namely those employees of the OPSO intake and processing and DOC pre-classification sections."[180]

Plaintiffs contend that Gusman's authorization of the practice of transferring prisoners to River Bend without providing the proper documentation was unreasonable

---

[175] *Rankin v. Klevenhagen*, 5 F.3d 103, 105 (5th Cir. 1993)(quoting *Spann v. Rainey,* 987 F.2d 1110, 1114 (5th Cir.1993)).
[176] *Burns-Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir. 1994).
[177] Rec. Doc. No. 104-1, p. 12.
[178] OPSO conveniently refers to the process as a "release" but in actuality OPSO is transferring state inmates to ECPSO.
[179] Rec. Doc. No. 144, p. 27.
[180] *Id.* at p. 28.
59792

because in doing so, Gusman "understood that the provisions of the OPSO written policy on pre-classification would be violated, including the performance of those tasks which require the physical presence of the prisoner such as the collection of fingerprints and the completion of the DOC interview form."[181] Moreover, Plaintiffs argue, Gusman undertook this practice despite the "obvious result being the unconstitutional overdetention of prisoners."[182]

The record reflects that Sheriff Gusman made a verbal agreement to house pretrial detainees at River Bend in 2015.[183] Evidently, Gusman delegated the "logistics" of the arrangement to his staff. At his deposition, Gusman reported talking to East Carroll Parish Sheriff Wydette Williams "in very general terms"[184] about the proposed housing agreement and recalled focusing on "trying to come up with a rate"[185] that would include costs of transportation between Orleans and East Carroll Parish. After that, Sheriff Gusman testified, he "basically turned it over to [his] staff to do the logistics."[186] Gusman testified that he had "several discussions"[187] with his staff about the logistics of housing inmates at River Bend. Eventually, in November 2016, the arrangement was memorialized in a written agreement between OPSO and ECPSO.[188]

---

[181] Rec. Doc. No. 144, p. 31.
[182] *Id.* at p. 28.
[183] Rec. Doc. No. 144-3, p. 20.
[184] *Id.* at p. 21.
[185] *Id.*
[186] *Id.*
[187] *Id.* at p. 22.
[188] Rec. Doc. No. 111-17, ("Cooperative Endeavor Agreement").
59792

ECPSO employee Captain Robert Russell testified at his deposition that the procedures surrounding the transfer of Orleans inmates to River Bend was "strictly fly by night"[189]:

> Q. Okay. Was there any standard operating procedure, memo, anything that standardized what Orleans was doing and what the expectation was about what East Carroll was doing?
> A. No.
> Q. Okay.
> A. Only thing -- like I said, the only thing, they would send me names and/or paperwork telling me I needed these people to be pre-classed and they could -- there wasn't no particular amount they might send me at one particular time. There was no when they was going to send it or what date they was going to send it. It was strictly fly by night.[190]

Further, Deputy Amacker testified that OPSO was not sending any notification to DOC when inmates were transferred to River Bend, nor was OPSO verifying whether ECPSO was actually sending pre-classification packets to DOC.[191] Amacker stated, "I wasn't responsible for verifying whether or not they were doing something properly to – with the Department of Corrections. . ."[192]

The "fly by night" operation put in place by OPSO was patently unreasonable, not just in light of Plaintiffs' clearly established right to timely release, but in light of the fact that the Louisiana Code of Criminal Procedure, the Louisiana Revised Statutes, and multiple provisions of the Basic Jail Guidelines place the responsibility for providing DOC with notice of *transfer* and pre-classification packets squarely on the sentencing and/or sending parish. Plaintiffs correctly summarize the relevant provisions of law:

> LA. CODE CRIM. PROC. art. 892(A) requires the Sheriff of the parish of conviction to "prepare a statement indicating the amount of time a

---

[189] Rec. Doc. No. 111-22, p. 127, lines 3-10.
[190] *Id.*
[191] Rec. Doc. No. 111-15, pp. 66-68.
[192] *Id.* at pp. 75-76.
59792

defendant has spent in custody prior to conviction." This letter of credit, as well as a copy of the indictment and a copy of the Uniform Sentencing Commitment Order, is to "accompany any defendant when said defendant is transferred to a penal institution. . ." LA. CODE CRIM. PROC. art. 892(C).

Further, LA.R.S.§15:566(B)provides that the "sheriff of the parish in which the prisoner has been convicted . . . shall deliver with the prisoner all documents and statements required by Article 892 . . . of the Louisiana Code of Criminal Procedure." LA.R.S.§15:566(C). "If said documents are not tendered with the prisoner, the Department of Corrections shall refuse delivery of said prisoner." *Id*. Lastly, LA.R.S.§15:706 allows a sheriff to transfer prisoners to another parish when the jail is unsafe, unfit for detention, or otherwise presents a security risk. As an explicit condition of such transfers, the statute requires the transferring sheriff to notify either the court (for persons not under DPS&C sentence) or DPS&C (for persons under DPS&C sentence) of the transfer.

Two provisions of the [Basic Jail Guidelines] require actions to be taken by local jails relative to the admission, pre-classification, and transfer of DPS&C-sentenced prisoners. First, Section II-A-008 provides a list of the specific documents that local jails must maintain as part of "offender case record management" for the admission, processing, and release of prisoners. "This offender record shall be transferred with the offender at such time the offender is transferred to another local or DPS&C facility." *Id*. at 18. Additionally, this Section details other information that "shall be collected and forwarded to the DPS&C Pre-Class Coordinator," including a jail credit letter, AFIS print card, and court minutes or uniform commitment for each conviction. *Id*. at 19. Second, Section II-A-009 requires that "[a]ll transfers of DPS&C offenders to other than DPS&C facilities shall be reported to the Office of Adult Services . . . Such notification shall be the responsibility of the **sending** facility."[193]

In July 2016, Sheriff Gusman enacted a written OPSO policy governing the process of collecting and transmitting information to DOC for transfers.[194] The policy clearly states that a prisoner is to be transferred *only* "once his/her packet has been

---

[193] Rec. Doc. No. 144, p. 17 (emphasis added)(some internal citations omitted).
[194] Rec. Doc. No. 111-23 ("Department of Corrections Pre-Classification" No. 501.13").
59792

completed and sent to DOC headquarters"[195] and *only* after "a transfer list has been approved by the Department of Corrections."[196] At his deposition, Sheriff Gusman testified that "[i]t was supposed to be done according to the policy. . .we didn't do it according to the policy in each instance, it looks like. That's what it looks like."[197] Asked if OPSO's failure to follow the policy "could result in a DOC-sentenced prisoner not having their time calculated by DOC," Gusman said:

> A. I think the purpose of the policy, Basic Jail Guidelines, is to make sure that DOC has the information so that they can properly compute, and if the information doesn't get there, then it's a problem.
> Q. And one of the problems is that DOC will not have the information needed to calculate the prisoner's time?
> A. I think that's what I said. [198]

The OPSO Defendants repeatedly hang their case for qualified immunity on their argument that the constitutional right in question is not clearly established, which the Court finds to be untrue in the context of this case. Moreover, the deposition testimony of the OPSO officers and the ECPSO officers with whom they coordinated reveals that, despite the clear bulk of law indicating OPSO's responsibilities with respect to pre-classification and transfer notification, OPSO had a barely functional and extremely disorganized system that resulted in prisoners being sent to River Bend and virtually guaranteed that they would not have their sentences calculated. The Court finds that this conduct was objectively unreasonable. Accordingly, the OPSO's *Motion for Summary Judgment* based on qualified immunity for the individual capacity claims against them shall be denied.

---

[195] Rec. Doc. No. 111-23 at p. 6.
[196] *Id.* at p. 7.
[197] Rec. Doc. No. 144-3, p. 64.
[198] *Id.* at pp. 54-55.
59792

### E. State Law Claims

#### i. Solidary Liability

Plaintiffs urge this Court to find that all Defendants are solidarily liable with respect to the claims in this action. The question of whether Defendants are solidarily liable is not a claim, *per se*, but the Court will analyze it here, in part, because the result affects the fate of the false imprisonment claim, discussed below. Under Louisiana law, "an obligation is solidary for the obligors when each obligor is liable for the whole performance."[199] "Such a solidary obligation is not to be presumed but can arise from either 'a clear expression of the parties' intent or from the law.'"[200] The Civil Code also establishes that "[a]n obligation may be solidary though it derives from a different source for each obligor."[201] Here, Plaintiffs argue that

> OPSO, ECPSO, and the DPS&C Defendants each played a role in preventing each Plaintiff from going free on his respective lawful release date. None of the Plaintiffs' release could be 'partially executed.' The obligation owed to Plaintiffs, therefore, is a joint, indivisible obligation and OPSO, ECPSO, and the DPS&C Defendants are solidarily liable.[202]

Plaintiffs note that the Fifth Circuit in the 1986 case *Hinshaw v. Doffer* held that a police officer and his supervisor were jointly and severally liable under § 1983. After the supervisor appealed and was dismissed from the case, the court faced the question of whether to hold the officer liable for the entire judgment despite the fact that the jury had apportioned him only 65% of the fault. The court held that the officer was liable for the entire judgment, explaining, "We believe that our holding comports with the goals of

---

[199] LA. CIV. CODE art. 1794.
[200] *P H I, Inc. v. Apical Indus., Inc.*, 946 F.3d 772, 776 (5th Cir. 2020) (quoting LA. CIV. CODE art. 1796).
[201] LA. CIV. CODE art. 1797.
[202] Rec. Doc. No. 111-1, p. 13.
59792

section 1983, compensating plaintiffs who suffer a violation of constitutional rights and preventing abuses by those acting under color of state law. Were we to hold [the officer] responsible for only 65% of the damages suffered by [the plaintiff], then [the plaintiff] would not receive full compensation for his injuries."[203]

*Hinshaw* is distinguishable for its application of Texas law and, as the OPSO Defendants point out, for the fact that the police officer and the supervisor that the court held jointly and severally liable were "from the same law enforcement agency,"[204] unlike here, where the allegedly severally liable parties are different agencies and departments entirely. In addition to being distinguishable, *Hinshaw* is also out of date. The OPSO Defendants correctly note that in 1996, Louisiana Civil Code article 2324 was amended to eliminate solidary liability for joint tortfeasors, except for intentional acts.[205] Now, as stated above, solidary liability is "not to be presumed but can arise from either 'a clear expression of the parties' intent or from the law.'"[206] Plaintiffs do not offer evidence or argument to demonstrate how the alleged solidarity of the parties in this action arises.

Plaintiffs expound on how "solidary liability ensures deterrence because any single Defendant may be held liable for the whole, therefore incentivizing Sheriffs and DPS&C supervisors to work together to prevent overdetention, rather than hoping they can escape responsibility by pointing fingers at each other in litigation."[207] The Court agrees on both counts; solidary liability would be a useful tool for plaintiffs in cases like these,

---

[203] *Hinshaw v. Doffer*, 785 F.2d 1260, 1269 (5th Cir. 1986)(internal citations omitted).
[204] Rec. Doc. No. 146, p. 15.
[205] *Id.* at p. 14 (citing *Tufaro v. City of New Orleans*, No. CIV. 03-1429, 2004 WL 1920937, at *3 (E.D. La. Aug. 26, 2004)).
[206] *P H I, Inc.*, 946 F.3d at 776.
[207] Rec. Doc. No. 111-1, p. 15.
59792

which often devolve into finger pointing by the parties; however, Plaintiffs have simply not carried their summary judgment burden of demonstrating that a finding of solidary liability is warranted under these facts and the current law.

ii. *False Imprisonment Under Louisiana Law*

False imprisonment is the "unlawful and total restraint of the liberty of the person."[208] The elements of a false imprisonment claim under Louisiana law are (1) the detention of the Plaintiff, and (2) the unlawfulness of the detention.[209] Based on the evidence in the record, it is not disputed that the physical detention of Plaintiffs occurred at River Bend under the supervision of the ECPSO Defendants.

Plaintiffs argue that "OPSO's liability for this false imprisonment has several sources, but the most obvious is vicarious liability for the acts of its employees."[210] Specifically, Plaintiffs contend, OPSO committed false imprisonment of Plaintiffs due to its "failure . . . to send pre-classification and transfer information on newly-sentenced DOC prisoners to DPS&C."[211] As to the ECPSO Defendants, Plaintiffs argue that they falsely imprisoned Plaintiffs by holding "the Plaintiffs at River Bend for months without any legal basis."[212] Likewise, Plaintiffs claim, the DPS&C Defendants are liable for false imprisonment because "[e]ach of the five Plaintiffs became DOC-sentenced prisoners the day after their sentencing" and thus, "[t]here is no genuine issue of material fact that [DPS&C] was a jailer of the five Plaintiffs."[213] The law is clear that "a jailer has a duty to

---

[208] *Rice v. ReliaStar Life Ins. Co.,* 770 F.3d 1122, 1136 (5th Cir. 2014) (quoting *Crossett v. Campbell,* 122 La. 659, 664, 48 So. 141, 143 (La.1908)).
[209] *See Kennedy v. Sheriff of East Baton Rouge,* 2005–1418, p. 32 (La.7/10/06); 935 So.2d 669, 690.
[210] Rec. Doc. No. 111-1, p. 31.
[211] *Id.*
[212] *Id.* at p. 41.
[213] *Id.* at p. 44.
59792

ensure that inmates are timely released from prison."[214]

As to the second element of false imprisonment – the unlawfulness of the detention – the Court concludes that there is no genuine issue of material fact; Plaintiffs were held at River Bend beyond their lawful sentences. In all three sets of Defendants' responses to Plaintiffs' discovery requests, Defendants admitted (with minor quibbles over language) to the following facts:

- Plaintiff Crittindon resolved his criminal charges on August 2, 2016 and was entitled to immediate release. He was released on January 13, 2017.

- Plaintiff Burse resolved his criminal charges on August 8, 2016 and was entitled to immediate release. He was released on January 11, 2017.

- Plaintiff Copelin resolved his criminal charges on October 14, 2016 and was entitled to immediate release. He was released on January 13, 2017.

- Plaintiff Dominick resolved his criminal charges on September 1, 2016 and was entitled to immediate release. He was released on December 7, 2016.

- Plaintiff Guidry resolved his criminal charges on July 12, 2016 and was entitled to release on September 4, 2016. He was released on January 24, 2017.[215]

There is no disputed fact issue regarding the unlawful nature of the detention after the arrival of each Plaintiffs' release date. However, the first element of false imprisonment – the detention itself – is more difficult to parse given the landscape of the parties in this case. Although the Plaintiffs were physically held by ECPSO at River Bend,

---

[214] Rec. Doc. No. 111-1, p. 44 (quoting *Epps*, 659 F.3d at 445).
[215] *See* Defendants' Responses, Rec. Doc. Nos. 111-4, 111-5, and 111-6.
59792

they were serving DOC sentences after being arrested, detained, and convicted by OPSO. Clearly, each set of Defendants played a part in the detention of Plaintiffs, but it is impossible to say whose part definitively resulted in Plaintiffs' overdetention. Plaintiffs do not offer argument on the subject of how, under the law, each party is specifically liable for false imprisonment.  They merely set forth the facts of each Plaintiff's case, repeat the elements of false imprisonment, and make the conclusory argument that the over detention gives rise to liability for false imprisonment, without addressing the ambiguities of physical custody, legal custody, and so on. Nor is it clear from Plaintiffs' *Motion* how the individual Defendants were personally involved, if at all, in the actual detention of Plaintiffs. Therefore, the Court concludes that Plaintiffs have not carried their summary judgment burden of showing that they are entitled to judgment as a matter of law. Accordingly, Plaintiffs' *Motion for Partial Summary Judgment* shall be denied as to their false imprisonment claims under Louisiana law.

The DPS&C Defendants move for summary judgment on the false imprisonment claims, arguing that there is no evidence "that any of DPS&C Defendants personally detained Plaintiffs without lawful authority."[216] Because they did not have "physical custody of an individual housed in Parish Jail,"[217] they argue, the false imprisonment claim against them must be dismissed. The Court is not persuaded that physical custody is dispositive of the issue. Louisiana law is clear that, as DOC-sentenced inmates, Plaintiffs were "committed to the Department of Public Safety and Corrections and not to any particular institution within the jurisdiction of the department."[218] The same law provides

---

[216] Rec. Doc. No. 110-1, p. 28.
[217] *Id.*
[218] LA. REV. STAT. § 15:824(A).
59792

that DPS&C may "enter into a contract with a law enforcement district, municipal, or parish governing authority to house additional prisoners."[219] The DPS&C Defendants fail to articulate why, by virtue of Plaintiffs' physical presence at River Bend, they cannot be liable for the overdetention and false imprisonment. Thus, the DPS&C Defendants' *Motion for Summary Judgment* on this count shall be denied.

### iii. Intentional Infliction of Emotional Distress

The DPS&C Defendants also move for summary judgment on the intentional infliction of emotional distress claim against them. Under Louisiana law, to prevail on a theory of IIED, a plaintiff must show "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."[220] The DPS&C Defendants argue that there is no evidence that they "actually desired to inflict emotional distress upon the Plaintiffs."[221] Plaintiffs counter that even if DPS&C did not desire to inflict the distress, the third prong of the analysis also creates liability for a party who "knew that severe emotional distress would be certain or substantially certain to result from his conduct."[222] This element is satisfied, Plaintiffs contend, because the "DPS&C Defendants have admitted in deposition testimony that failure to timely and correctly calculate release dates could lead to the detention of DOC-sentenced prisoners after they had served their lawful sentences."[223] "It cannot be doubted that incarceration

---

[219] LA. REV. STAT. § 15:824(D).
[220] *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).
[221] Rec. Doc. No. 110-1, p. 29.
[222] *White*, 585 So. 2d at 1209.
[223] Rec. Doc. No. 142, p. 29.
59792

without legal authority is likely to cause severe emotional distress,"[224] Plaintiffs add. Because the DPS&C Defendants have not adequately addressed the "substantially certain to result" element of the IIED analysis, the Court finds that their *Motion for Summary Judgment* on this count shall be DENIED.

The ECPSO Defendants also move for summary judgment on the IIED claim against them. Their two-sentence argument states that "the plaintiffs do not establish that the East Carroll Defendants were aware or should have been aware that the plaintiffs faced a risk of overlong detention."[225] The Court, *supra*, found that there is evidence that the ECPSO Defendants were aware of the risk of overdetention.[226] The ECPSO Defendants cite no evidence in support of their argument and do not address the first two prongs of the IIED analysis at all, thus failing to carry their summary judgment burden of showing that they are entitled to judgment in their favor as a matter of law. Accordingly, their *Motion for Summary Judgment* on the IIED count is denied.

---

[224] Rec. Doc. No. 142, p. 29.
[225] Rec. Doc. No. 102-1, p. 15.
[226] *See supra* at p. 33.
59792

### III. CONCLUSION

For the reasons set forth above, Plaintiffs' *Motion for Partial Summary Judgment*,[227] the ECPSO Defendants' *Motion for Summary Judgment*,[228] the OPSO Defendants' *Motion for Summary Judgment*,[229] and the DPS&C Defendants' *Motion for Summary Judgment*[230] are hereby DENIED. The matter will be set for trial.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>April 13, 2020</u>.

_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[227] Rec. Doc. No. 111.
[228] Rec. Doc. No. 102.
[229] Rec. Doc. No. 104.
[230] Rec. Doc. No. 110.
59792